# 23-356

# United States Court of Appeals for the Second Circuit

EUGENE VOLOKH, LOCALS TECHNOLOGY INC., RUMBLE CANADA INC.,

*Plaintiffs-Appellees,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF AND SPECIAL APPENDIX FOR APPELLANT

BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH N. VALE
 *Deputy Solicitor General*
SARAH COCO
 *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellant
28 Liberty Street
New York, New York 10005
(212) 416-6312

Dated: June 20, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT .......................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 3

ISSUES PRESENTED ........................................................................ 4

STATEMENT OF THE CASE ............................................................. 5

    A.    Factual Background ................................................................ 5

        1.    The May 2022 Buffalo shooting ........................................ 5

        2.    General Business Law § 394-ccc ....................................... 7

    B.    Procedural History ............................................................... 11

        1.    The complaint .................................................................. 11

        2.    The district court's preliminary injunction order ........... 13

STANDARD OF REVIEW .................................................................. 16

SUMMARY OF ARGUMENT ............................................................ 17

ARGUMENT ...................................................................................... 21

POINT I

THE DISTRICT COURT ERRED IN FAILING TO ADDRESS THE
REPORT-MECHANISM REQUIREMENT ....................................................... 22

    A.    Plaintiffs Lack Standing to Challenge the
        Report-Mechanism Requirement. ..........................................22

**Page**

B. The Report-Mechanism Requirement Properly
   Regulates Conduct Rather than Speech. ................................ 25

C. The District Court Should Not Have Enjoined
   Enforcement of the Report-Mechanism Requirement ........... 32

POINT II

PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR
AS-APPLIED CHALLENGE TO THE POLICY-DISCLOSURE REQUIREMENT ..... 35

A. The Policy-Disclosure Requirement Is a Regulation of
   Commercial Speech Subject to the *Zauderer* Framework. .... 36

B. The Policy-Disclosure Requirement Satisfies
   *Zauderer*'s Framework and Satisfies Intermediate
   Scrutiny in Any Event. ............................................. 50

POINT III

PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR
FACIAL OVERBREADTH CHALLENGE ........................................ 58

POINT IV

THE DISTRICT COURT ERRED IN FAILING TO APPLY THE REMAINING
PRELIMINARY INJUNCTION FACTORS ..................................... 62

CONCLUSION ......................................................... 67

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*American Booksellers Found. v. Dean,*
   342 F.3d 96 (2d Cir. 2003) ................................................. 59

*American Meat Inst. v. U.S. Dep't of Agric.,*
   760 F.3d 18 (D.C. Cir. 2014) ............................................. 52

*Bennett v. Spear,*
   520 U.S. 154 (1997) .......................................................... 60

*Board of Trs. of State Univ. of N.Y. v. Fox,*
   492 U.S. 469 (1989) ..................................................... 47, 59

*Brockett v. Spokane Arcades, Inc.,*
   472 U.S. 491 (1985) .......................................................... 59

*Bronx Household of Faith v. Board of Educ. of City of N.Y.,*
   331 F.3d 342 (2d Cir. 2003) ............................................. 63

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
   868 F.3d 104 (2d Cir. 2017) ............................................. 34

*Connecticut Bar Ass'n v. United States,*
   620 F.3d 81 (2d Cir. 2010) ............................................... 47

*CTIA - The Wireless Ass'n v. City of Berkeley,*
   928 F.3d 832 (9th Cir. 2019) ............................................ 52

*Discount Tobacco City & Lottery, Inc. v. United States,*
   674 F.3d 509 (6th Cir. 2012) ............................................ 47

*Doninger v. Niehoff,*
   527 F.3d 41 (2d Cir. 2008) ............................................... 63

*Evergreen Ass'n, Inc. v. City of New York,*
   740 F.3d 233 (2d Cir. 2014) ......................................... 33, 46

iii

**Cases**                                                             **Page(s)**

*FCC v. Pacifica Found.*,
438 U.S. 726 (1978) ............................................................................ 59

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ................................................................. 12

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) ............................................................................ 23

*Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock*,
93 F.3d 68 (2d Cir. 1996) ................................................................... 33

*Maryland v. King*,
567 U.S. 1301 (2012) .......................................................................... 66

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010) ...........................................................36-37, 40, 55

*National Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001) ...................................37, 50, 52-53, 66-67

*National Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra*,
138 S. Ct. 2361 (2018) .................................................................. 36, 46

*NetChoice, LLC v. Attorney Gen., Fla.*,
34 F.4th 1196 (11th Cir. 2022) .............................32-33, 42-43, 48, 52

*NetChoice, LLC v. Paxton*,
142 S. Ct. 1715 (2022) ....................................................................... 66

*NetChoice, LLC v. Paxton*,
49 F.4th 439 (5th Cir. 2022) ..............................................32, 42-43, 52

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) .............................................................. 16

*New York State Club Ass'n, Inc. v. City of New York*,
487 U.S. 1 (1988) ......................................................................... 58, 60

**Cases**                                                                   **Page(s)**

*New York State Rest. Ass'n v. New York City Bd. of Health*,
  556 F.3d 114 (2d Cir. 2009) ..................................................... 37, 50, 53

*Nitkewicz as Tr. of Joan C. Lupe Fam. Tr. v. Lincoln Life &*
  *Annuity Co. of N.Y.*,
  49 F.4th 721 (2d Cir. 2022) ................................................................. 45

*Otokoyama Co. v. Wine of Japan Imp., Inc.*,
  175 F.3d 266 (2d Cir. 1999) ............................................................... 16

*Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California*,
  475 U.S. 1 (1986) ............................................................................. 48-49

*People v. On Sight Mobile Opticians*,
  24 N.Y.3d 1107 (2014) ........................................................................ 33

*People v. Page*,
  35 N.Y.3d 199 (2020) ........................................................................... 61

*Picard v. Magliano*,
  42 F.4th 89 (2d Cir. 2022) ............................................................ 23, 58

*Restaurant L. Ctr. v. City of New York*,
  360 F. Supp. 3d 192 (S.D.N.Y. 2019) ................................................ 26

*RiseandShine Corp. v. PepsiCo, Inc.*,
  41 F.4th 112 (2d Cir. 2022) ............................................................... 16

*Rowan v. U.S. Post Off. Dep't*,
  397 U.S. 728 (1970) ............................................................................. 62

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) ...................................................................... 26, 28-30

*Safelite Grp., Inc. v. Jepsen*,
  764 F.3d 258 (2d Cir. 2014) ............................................................... 56

*Skilling v. United States*,
  561 U.S. 358 (2010) ............................................................................. 45

**Cases**                                                        **Page(s)**

*Stagg P.C. v. U.S. Dep't of State,*
673 F. App'x 93 (2d Cir. 2016) ........................................................... 63

*Stagg, P.C. v. U.S. Dep't of State,*
983 F.3d 589 (2d Cir. 2020) ................................................................ 24

*Strubel v. Comenity Bank,*
842 F.3d 181 (2d Cir. 2016) ................................................................ 22

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ............................................................................ 23

*Sussman v. Crawford,*
488 F.3d 136 (2d Cir. 2007) ................................................................ 21

*Twitter, Inc. v. Taamneh,*
143 S. Ct. 1206 (2023) ........................................................................ 40

*United States v. Smith,*
945 F.3d 729 (2d Cir. 2019) ................................................................ 23

*Vugo, Inc. v. City of New York,*
931 F.3d 42 (2d Cir. 2019) .............................................................56-57

*We The Patriots USA, Inc. v. Hochul,*
17 F.4th 266 (2d Cir. 2021) ........................................................21, 62

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.,*
423 F.3d 137 (2d Cir. 2005) ..........................................................63-64

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ................................................................................ 63

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
471 U.S. 626 (1985) ................................................................... passim

## Laws, Regulations & Rules                                 Page(s)

*Federal*

15 U.S.C.
  § 6502 ................................................................................ 28, 39
  § 7704 .................................................................................... 28

28 U.S.C. § 2107 ............................................................................ 3

42 U.S.C. § 4852d ........................................................................ 38

47 U.S.C. § 551 ............................................................................ 39

12 C.F.R. § 229.16 ....................................................................... 39

16 C.F.R.
  § 313.6 .................................................................................... 39
  § 313.7 .................................................................................... 28

27 C.F.R. § 16.21 ......................................................................... 37

40 C.F.R. § 745.107 ..................................................................... 38

Fed. R. App. P. 4 ........................................................................... 3

*New York*

Ch. 204, 2022 N.Y. Laws (N.Y. Legis. Retrieval Sys.) ............................. 5

General Business Law
  § 218-a ................................................................................... 38
  § 394-ccc ......................................................................... passim

Real Property Law § 462 ............................................................... 38

Rules of City of N.Y. Dep't of Health & Mental Hygiene
  (24 R.C.N.Y.) § 1-01 ................................................................ 37

**Laws, Regulations & Rules**                                       **Page(s)**

*States (alphabetical)*

Cal. Civ. Code
§ 1798.100 ................................................................................. 38
§ 1798.135 ................................................................................. 27

4 Colo. Code Regs. § 904-3, R. 4.03 (46 Colo. Reg. (Mar. 25, 2023)) ....... 27

Conn. Gen. Stat. § 42-471 ........................................................... 39

Del. Code Ann. tit. 6, § 1205C ..................................................... 38

Fla. Stat.
§ 501.142 ................................................................................. 38
§ 501.2041 ............................................................................ 42-43

Haw. Rev. Stat. § 481B-5.5 ........................................................ 38

Me. Stat. tit. 35-A § 9301 ........................................................... 38

940 Mass. Code Regs. § 6.12 ...................................................... 38

Nev. Rev. Stat. § 603A.340 ......................................................... 38

N.J. Stat. Ann. § 56:8-2.16 .......................................................... 38

Tex. Bus. & Com. Code Ann. § 120.051 ..................................... 42

Tex. Civ. Prac. & Rem. Code Ann. § 143A.002 ......................... 43

Utah Code Ann. § 13-61-201 ...................................................... 27

Va. Code Ann. § 59.1-578 ........................................................... 27

**Miscellaneous Authority**

Press Release, Carl E. Heastie, Assembly Speaker, New York
State Assembly, *Assembly Passes Package of Legislation to
Strengthen State's Gun Laws and Protect New York
Communities* (June 2, 2022),
https://nyassembly.gov/Press/?sec=story&story=102242 ..................... 5

## PRELIMINARY STATEMENT

In the wake of a racially motivated mass shooting in Buffalo, New York, during which the shooter livestreamed his attack on social media, the Legislature enacted General Business Law (GBL) § 394-ccc. The statute requires for-profit social media networks operating in New York to provide users with a mechanism for reporting incidents of hateful conduct, defined as use of the network to vilify, humiliate, or incite violence against a group of persons on the basis of race or other characteristics. To better inform users who wish to make use of a network's report mechanism, GBL § 394-ccc also requires networks to disclose a policy explaining how the network will respond to user reports.

Six months after GBL § 394-ccc was enacted, plaintiffs—Eugene Volokh, operator of the legal blog The Volokh Conspiracy, and Rumble Canada Inc. and Locals Technology Inc., the operators of social media networks Rumble and Locals—sued to challenge the statute as unconstitutional under the First and Fourteenth Amendments. The U.S. District Court for the Southern District of New York (Carter, J.) preliminary enjoined the New York State Attorney General from enforcing GBL § 394-ccc in all its applications.

This Court should reverse. Reversal is warranted because the district court erred in enjoining enforcement of GBL § 394-ccc based solely on the court's analysis of the requirement that networks disclose a policy explaining how the network will respond to user reports. That requirement is simply intended to enhance and support GBL § 394-ccc's main requirement—that networks establish a mechanism for reporting incidents of hateful conduct—which the district court failed to address.

A proper analysis of GBL § 394-ccc's main report-mechanism requirement shows that plaintiffs lack standing to challenge the report-mechanism requirement because they each already have a mechanism for accepting user complaints. In any event, because the requirement that networks establish a mechanism for reporting hateful conduct regulates conduct, not speech, it does not infringe on plaintiffs' First Amendment rights.

The district court also erred in its analysis of the policy-disclosure requirement. The district court is incorrect that strict scrutiny applies to the policy-disclosure requirement. The policy-disclosure requirement mandates disclosure of factual, uncontroversial information—the network's *own* policy—which is subject to relaxed scrutiny under *Zauderer*

*v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). Applying the proper level of scrutiny, the policy-disclosure requirement comports with the First Amendment because it furthers the State's interests in providing social media users with accurate information about whether a network will act on user reports of hateful conduct, as well as the State's interest in facilitating reports of hateful conduct. Finally, although the policy-disclosure requirement is constitutional, it is also severable from the statute's main report-mechanism function, which should not be enjoined in any case.

## JURISDICTIONAL STATEMENT

The district court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The district court entered an order granting plaintiffs' motion for a preliminary injunction on February 14, 2023. (Joint Appendix (J.A.) 5.) The State of New York filed a timely notice of appeal on March 13, 2023. (J.A. 357.) *See* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED

1.      Whether plaintiffs are unlikely to succeed on the merits of their as-applied First Amendment challenge to GBL § 394-ccc's core requirement that networks establish a mechanism to accept user complaints, which regulates only the network's conduct, and not its speech.

2.      Whether plaintiffs are unlikely to succeed on the merits of their as-applied First Amendment challenge to GBL § 394-ccc's policy-disclosure requirement, when that provision requires disclosure of factual, uncontroversial information about plaintiffs' own policies and does not dictate what those policies should say.

3.      Whether plaintiffs are unlikely to succeed on the merits of their facial overbreadth challenge.

4.      Whether the remaining preliminary injunction factors, which the district court failed to analyze meaningfully, weigh heavily against a preliminary injunction.

4

## STATEMENT OF THE CASE

**A.    Factual Background**

**1.    The May 2022 Buffalo shooting**

New York's Legislature passed GBL § 394-ccc, the statute challenged here, as part of a package of legislation designed to improve public safety and strengthen gun laws in response to a racially motivated mass shooting in Buffalo, New York. *See* Ch. 204, § 1, 2022 N.Y. Laws (N.Y. Legis. Retrieval Sys.) (effective Dec. 3, 2022); Press Release, Carl E. Heastie, Assembly Speaker, New York State Assembly, *Assembly Passes Package of Legislation to Strengthen State's Gun Laws and Protect New York Communities* (June 2, 2022). The Buffalo mass shooting occurred in May 2022. It was carried out by an 18-year-old white male who targeted Black customers at a grocery store. The attack left ten people dead and three others wounded. (J.A. 80-81.)

The Buffalo shooter used social media to plan and publicize his attack. For example, the Buffalo shooter posted live video of his attack on Twitch, a social media network, as he was driving to the grocery store and began shooting his victims. (J.A. 80-81.) Although a consumer who was viewing the shooter's video live reported it to Twitch, and Twitch was

able to stop the live video broadcast less than two minutes after the consumer report (J.A. 104), video and images of the attack that had already been broadcast proliferated and circulated widely online in the weeks after the attack on social media platforms 4chan, Facebook, Instagram, Twitter, Reddit, YouTube, TikTok, and Rumble (J.A. 107-108).

Moreover, prior to the attack, the Buffalo shooter posted a manifesto to another social media network, Discord, explaining his racist motivations for the attack. (J.A. 80, 86.) According to the shooter, he developed the racist views that caused him to carry out the shooting while using social media. (J.A. 95.) As the shooter explained, he was inspired by a prior mass shooting carried out by a white supremacist who posted live video of the shooting on Facebook and the writings of other racist mass shooters posted online. (J.A. 88-90.) The shooter stated that he posted his manifesto and the live video of the attack on social media to encourage future racially motivated mass shooters and "further attacks that will eventually start the war that will save the Western world." (J.A. 87.) The

manifesto also circulated widely on social media in the weeks after the attack.[1] (J.A. 106.)

## 2. General Business Law § 394-ccc

The Legislature enacted GBL § 394-ccc to provide users with a tool to report hateful conduct on social media. (*See* J.A. 169, 172, 268.) The statute applies to "social media networks," defined as for-profit internet service providers doing business in the State that allow users to share content with other users or the public. GBL § 394-ccc(1)(b), (2). The statute requires social media networks to "provide and maintain a clear and easily accessible mechanism for individual users to report incidents of hateful conduct" on the network. *Id.* § 394-ccc(2). "[H]ateful conduct" is defined as the use of a social media network "to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender

---

[1] Four days after the Buffalo shooting, Governor Kathy Hochul asked the Attorney General to investigate the role of social media in the Buffalo shooting. (J.A. 63.) The Attorney General's investigative report, which was published in October 2022, four months after the passage of GBL § 394-ccc, documented the connection between the Buffalo shooting and the shooter's use of social media and recommended additional steps to prevent future violence caused by online radicalization. (*See* J.A. 70-118.)

identity or gender expression." *Id.* § 394-ccc(1)(a). Under this report-mechanism requirement, networks must provide consumers with a user tool—such as a comment submission form or email address—that both allows consumers to report hateful conduct and "allow[s] the social media network to provide a direct response" to the reporting user. *Id.* § 394-ccc(2). However, there is no requirement that networks must provide any response to user reports.

In addition, to inform consumers who wish to use a network's report mechanism about what to expect and increase transparency, networks must have "a clear and concise policy readily available and accessible on their website and application which includes how such social media network will respond and address the reports of incidents of hateful conduct on their platform." *Id.* § 394-ccc(3). This policy-disclosure requirement does not require networks to respond to consumer reports or address hateful conduct in any particular way—or at all. Rather, networks may decide for themselves whether and how they want to respond to consumer reports, so long as they disclose that policy to consumers clearly and concisely. (*See* J.A. 172, 175.)

8

The Legislature expressly stated that the statute is not to be construed to impose liability on social media networks "for anything other than the failure to provide a mechanism for a user to report to the social media network any incidents of hateful conduct on their platform and to receive a response on such report." GBL § 394-ccc(4). The statute provides for enforcement by the Attorney General via a civil penalty for each knowing failure to comply with the requirements of the statute. *Id.* § 394-ccc(5).

The Legislature made clear that GBL § 394-ccc(4) empowers consumers without requiring social media networks to respond to consumer reports of hateful conduct or to address such conduct. For example, the statute states expressly that it is not to be construed to "adversely affect[]" any person's "right of free speech pursuant to the first amendment." *Id.* § 394-ccc(4). The sponsor memorandum in support of the legislation explained that the statute was enacted to "empower users of social media . . . by providing clear and consistent reporting mechanisms" for incidents of hateful conduct on social media networks. (J.A. 268.) And the sponsor of the bill enacting GBL § 394-ccc repeatedly emphasized that the statute does not tell social media networks whether

9

or how to respond to consumer reports or to address hateful conduct on their networks. (*See, e.g.*, J.A. 172 ("[W]e're not telling them what . . . the policy should be nor . . . if it's reported."); 175 ("We're not telling them what the next step is. . . . [W]e're not saying what they have to do with it other than to show us how they would respond and address it.").) Instead, the sponsor and other legislators explained, the statute requires an "easily accessible mechanism for reporting" hateful conduct on the network (J.A. 169) and disclosure to consumers of the network's policy regarding such conduct—whatever that policy may be (J.A. 172). (*See also* J.A. 174 ("This is a bill that basically raises the standard for social media sites to have a[n] . . . *easily accessible mechanism to report hateful material*. That's all the bill really does."); 174 (statute intended to "make it as easy as possible for people that see [content like the Buffalo shooting video] to report it to the site").)

10

**B. Procedural History**

**1. The complaint**

On December 1, 2022, plaintiffs—Eugene Volokh, the operator of the legal blog The Volokh Conspiracy, and Rumble Canada Inc. and Locals Technology Inc., the operators of social media networks Rumble and Locals—filed this lawsuit under 42 U.S.C. § 1983 in the U.S. District Court for the Southern District of New York against New York Attorney General Letitia James. (J.A. 2, 10-11.) The complaint challenged GBL § 394-ccc as unconstitutional under the First and Fourteenth Amendments, both facially and as applied to plaintiffs. (J.A. 38-48.) The complaint also challenged GBL § 394-ccc as preempted by the Communications Decency Act, 47 U.S.C. § 230. (J.A. 48-50.) Plaintiffs sought declaratory and injunctive relief. (J.A. 50-51.)

Plaintiffs alleged that The Volokh Conspiracy, Rumble, and Locals are for-profit social media networks operating in New York and subject to GBL § 394-ccc that do not meet the statute's requirements. Plaintiffs alleged that they do not have a mechanism for users to report hateful conduct as required by GBL § 394-ccc(2). However, Rumble and Locals alleged that they each have email addresses that allow users to submit

complaints (J.A. 31, 34) and that Rumble "attempts to respond to every complaint" (J.A. 31 (alteration marks omitted)). Plaintiffs alleged that they were uncertain whether these email addresses meet GBL § 394-ccc's report-mechanism requirement. (J.A. 31, 34.) Although plaintiffs alleged that The Volokh Conspiracy does not have any mechanism for reporting hateful conduct (J.A. 27), The Volokh Conspiracy website reveals that the comment moderation policy quoted in plaintiffs' complaint (J.A. 26) ends with the words "Report abuses"—which contain a hyperlink to an email address that allows users to submit complaints to Reason.com, The Volokh Conspiracy's host (J.A. 25).[2]

Plaintiffs further alleged that although each of them has an accessible content moderation policy, these policies do not meet GBL § 394-ccc(3)'s policy-disclosure requirement because they do not explicitly address how plaintiffs will respond to reports of hateful conduct as that term is defined by the statute. Plaintiffs further contended that it would cause them harm to disclose their policies about responding to user reports

---

[2] The Court may take judicial notice of the content of a website relied upon in the complaint. *See, e.g.*, *Force v. Facebook, Inc.*, 934 F.3d 53, 59 n.5 (2d Cir. 2019).

12

of hateful conduct because it would injure their commitments to free speech and free expression. (*See* J.A. 27-28, 30-32, 34-35.)

### 2. The district court's preliminary injunction order

After filing their complaint, plaintiffs moved for a preliminary injunction against enforcement of GBL § 394-ccc. (J.A. 55.) In February 2023, the district court granted plaintiffs' motion. The district court fundamentally erred in failing to address GBL § 394-ccc's core requirement that networks establish a mechanism to allow users to report incidents of hateful conduct. Instead, the district court focused solely on the requirement that networks disclose their policy about responding to consumer reports of hateful conduct, which is simply meant to enhance the report-mechanism requirement by informing users who wish to use the network's report mechanism how the network will respond to reports.

Based only on the policy-disclosure requirement, the court found that plaintiffs were likely to succeed on the merits of their as-applied challenge to the entire statute. The court reasoned that the entire statute is subject to strict scrutiny because the policy-disclosure requirement purportedly compels plaintiffs to speak the State's message about hateful conduct (Special Appendix (S.A.) 9-10) and infringes on their editorial

13

discretion regarding the content to keep or remove on their platforms (S.A. 11-12). The court did not address the State's key argument that GBL § 394-ccc's report-mechanism requirement regulates conduct rather than speech and is thus subject to rational basis review—which the provision easily satisfies. (*See* Def.'s Mem. of Law in Opp'n at 9-10 (Dec. 13, 2022), ECF No. 21.)

The court also rejected the State's argument that the policy-disclosure requirement is subject to relaxed scrutiny because it requires only disclosure of factual and uncontroversial commercial speech—namely, the network's own policy about whether and how it will respond to reports of hateful conduct. (*See* S.A. 12-14.) The court reasoned that the policy-disclosure requirement does not regulate speech related to "the economic interests of the speaker" (i.e., the social media networks) (S.A. 13 (quotation marks omitted)) and instead regulates speech that it is "inextricably intertwined" with network users' protected hate speech (S.A. 14 (quotation marks omitted)).

Applying strict scrutiny, the court concluded that GBL § 394-ccc violates the First Amendment. Although the court acknowledged that the law aimed to empower consumers by "providing the public with clear

14

policies and mechanisms to facilitate reporting hate speech on social media," (S.A. 1) it defined the State's interest far more narrowly, as preventing "hate-fueled mass shootings" (S.A. 14-15). The court found that GBL § 394-ccc is not narrowly tailored to that interest because it does not compel networks to respond to user reports of hateful conduct and thus does not "change[] the status quo"—that some networks would respond to such reports and some would not. (S.A. 15.)

After addressing the as-applied challenge, the district court turned to plaintiffs' facial challenge and concluded that plaintiffs were likely to succeed on the merits because GBL § 394-ccc could have a chilling effect on the *users* of social media networks. (S.A. 16-19.)

The district court correctly rejected plaintiffs' claim that GBL § 394-ccc is preempted by Section 230 of the Communications Decency Act, which grants interactive computer services federal immunity from civil liability based on third-party content. The court explained that GBL § 394-ccc does not impose liability on social media networks as publishers of users' content. (S.A. 19-20.) In particular, the court recognized that GBL § 394-ccc "does not impose liability on social media networks for failing to respond to an incident of 'hateful conduct'" and "does not even

15

require that social media networks remove instances of 'hateful conduct' from their websites." (S.A. 20.)

Finally, having concluded that likelihood of success on the merits was dispositive, the court declined to address meaningfully the remaining preliminary injunction factors. (*See* S.A. 6-7, 20.) Instead, the court stated that the equitable factors favored plaintiffs because enforcement of the statute would purportedly violate their constitutional rights. (S.A. 20.)

## STANDARD OF REVIEW

This Court reviews the district court's ultimate grant of a preliminary injunction for abuse of discretion. *E.g.*, *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022). A district court abuses its discretion by failing to apply the correct legal standard or otherwise basing the decision on an error of law. *See id.*; *Otokoyama Co. v. Wine of Japan Imp., Inc.*, 175 F.3d 266, 270 (2d Cir. 1999). Any legal determinations on which the preliminary injunction rests are reviewed de novo. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).

16

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order granting a preliminary injunction.

I. The district court abused its discretion in enjoining enforcement of GBL § 394-ccc's report-mechanism requirement, which requires social media networks to make available to their users a mechanism for reporting hateful conduct to the network. The court failed to analyze the report-mechanism requirement's constitutionality at all, even though enabling user reports is the primary function of GBL § 394-ccc. Instead, the court enjoined enforcement of the entire statute based solely on its analysis of the policy-disclosure requirement, which is intended to enhance the report-mechanism requirement by providing users who wish to use the mechanism with information about how the network will respond to reports. Properly analyzing the report-mechanism requirement on its own demonstrates that it does not infringe on plaintiffs' First Amendment rights and enforcement of the requirement should not be enjoined.

As a preliminary matter, plaintiffs lack standing to challenge the report-mechanism requirement because they each already have an

17

accessible email address that allows users to submit reports. There is no plausible threat that the report-mechanism provision will be enforced against plaintiffs when they are already complying with that provision.

In any event, the report-mechanism requirement regulates conduct, not speech, and thus is not subject to First Amendment scrutiny. The report-mechanism requirement provides that networks must make a user tool available on their websites—it does not require users to report anything and does not require networks to respond to user reports in any way. The requirement thus addresses what networks must do—make a user tool available—not what they must say. As a regulation of conduct, the report-mechanism requirement comports with the First Amendment because it rationally furthers the State's interests in empowering consumers to report hateful conduct to networks, if they chose to do so, and in reducing violence fueled by social media use.

Finally, the text and legislative history of GBL § 394-ccc demonstrate that the report-mechanism requirement, which is the key part of GBL § 394-ccc, functions independently of the policy-disclosure requirement, which is simply meant to enhance and support the report mechanism by providing users who wish to use the mechanism with

18

information about how the network will respond to reports. The district court thus plainly erred in enjoining enforcement of the report-mechanism requirement.

II. The district court also erred in applying strict scrutiny to the policy-disclosure requirement. The policy-disclosure requirement requires social media networks to disclose factual, uncontroversial information about the network's policy for responding to reports generated through the report-mechanism requirement. Networks are not required to adopt a policy dictated by the State or to refer to the State's definition of hateful conduct in their policy. As two recent Circuit decisions have correctly concluded, such commercial disclosure requirements are subject to relaxed scrutiny under *Zauderer*, 471 U.S. 626.

The policy-disclosure requirement satisfies the *Zauderer* standard. It is reasonably related to the government interest in providing social media users with accurate information about whether and how a network acts on user reports of hateful conduct—thereby allowing users to make informed choices about whether they want to participate on a network. And the policy-disclosure requirement helps reduce instances of hate-fueled violence by facilitating user reports that can inform networks'

19

choices about responding to hateful conduct. Moreover, the policy-disclosure requirement does not unduly burden plaintiffs' speech given that it requires them to disclose only their own policies. Finally, even if the Court were to conclude that the policy-disclosure requirement infringes on plaintiffs' First Amendment rights—which it does not—it would be improper to enjoin enforcement of the entire statute on that basis.

III. The district court incorrectly concluded that plaintiffs were likely to succeed on the merits of their facial challenge to GBL § 394-ccc. The district court concluded that the statute was overbroad on the theory that it could chill the speech of social media users. But the statute's plain text regulates only social media networks, not users.

IV. Finally, the district court abused its discretion in failing to meaningfully address the remaining preliminary injunction factors. Among other things, plaintiffs failed to show irreparable harm. Plaintiffs alleged harm based on having to respond to many user reports, but GBL § 394-ccc does not require plaintiffs to respond to any user reports—as the district court correctly determined. And the court failed to consider

the State's interest in enforcing a duly enacted law that enables user reports to further, rather than hinder, the free flow of information.

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (quotation marks omitted). To carry that burden and obtain a preliminary injunction against a statute's enforcement, "the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir.), *clarified by* 17 F.4th 368 (2d Cir. 2021), *and cert. denied*, 142 S. Ct. 2569 (2022).

Here, plaintiffs failed to establish a likelihood of success on the merits or that the equitable factors weigh in their favor. The district court erred in concluding otherwise, and its preliminary injunction order should be reversed.

## POINT I

### THE DISTRICT COURT ERRED IN FAILING TO ADDRESS THE REPORT-MECHANISM REQUIREMENT

The district court fundamentally erred in failing to address GBL § 394-ccc's main requirement—that networks provide users with a tool to report hateful conduct. When the report-mechanism requirement is properly analyzed, it is clear that plaintiffs lack standing to challenge the report-mechanism requirement and that this requirement comports with the First Amendment.

### A. Plaintiffs Lack Standing to Challenge the Report-Mechanism Requirement.

Plaintiffs lack standing to challenge the report-mechanism requirement because they each already have accessible on their websites an email address that users can use to report incidents of hateful conduct. Although the State did not challenge plaintiffs' standing below, standing is a constitutional prerequisite to the Court's subject matter jurisdiction that must be considered on appeal. *See, e.g.*, *Strubel v. Comenity Bank*, 842 F.3d 181, 188 (2d Cir. 2016).

"To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and

22

the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quotation marks omitted). To show an injury sufficient to bring a pre-enforcement First Amendment challenge, a plaintiff must show that it "intends to engage in a course of conduct protected by the First Amendment, but arguably proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Picard v. Magliano*, 42 F.4th 89, 99 (2d Cir. 2022). Plaintiffs must separately establish standing as to each challenged provision of a regulation. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230 (1990); *United States v. Smith*, 945 F.3d 729, 737 (2d Cir. 2019).

Here, plaintiffs lack standing to challenge GBL § 394-ccc's report-mechanism requirement because they have failed to show that they are engaged in a course of conduct that is "arguably proscribed" by that requirement. To the contrary, plaintiffs are already in compliance with the report-mechanism requirement and thus do not face any plausible threat of prosecution for violating the requirement. Specifically, each plaintiff maintains a clear and easily accessible email address with which to accept user complaints. See *supra* at 11-12. *See* GBL § 394-ccc(2).

23

Plaintiffs' email addresses allow "individual users to report incidents of hateful conduct" to the network, as required. GBL § 394-ccc(2). And receiving an email from a user permits plaintiffs "to provide a direct response" to the report, if it chooses to do so. *Id.* Indeed, Rumble alleged that it "attempts to respond to every complaint" that it receives. (J.A. 31 (alteration marks omitted).)

Plaintiffs vaguely alleged that they "cannot be certain" that these email addresses comply with the report-mechanism requirement (J.A. 31; *see also* J.A. 34-35), but there is no plausible basis for that allegation. Plaintiffs' allegation is thus "too vague and imprecise to effectively plead a credible threat" of enforcement regarding their proposed conduct. *See Stagg, P.C. v. U.S. Dep't of State*, 983 F.3d 589, 604 (2d Cir. 2020) (holding that plaintiff lacked standing to assert pre-enforcement First Amendment challenge to regulation). And further undermining plaintiffs' conclusory allegation is a statement by Volokh, in an article published shortly after the statute was enacted, that he believed providing an email address through which consumers could submit reports would satisfy GBL § 394-ccc's report-mechanism requirement. (*See* J.A. 120.)

24

Plaintiffs' lack of standing forecloses their challenge to the report-mechanism requirement and requires reversal of the preliminary injunction order as to that requirement.

## B. The Report-Mechanism Requirement Properly Regulates Conduct Rather than Speech.

In any event, even assuming plaintiffs have standing, the district court erred in preliminarily enjoining enforcement of the report-mechanism requirement. The district court did not conduct *any* analysis of that requirement's constitutionality, erroneously focusing solely on the policy-disclosure requirement, which is simply meant to enhance the report-mechanism requirement by providing users who might want to use the report-mechanism with additional information. (*See* S.A. 9 (concluding that GBL § 394-ccc regulates speech because it "does not *merely* require that a social media network provide its users with a mechanism to complain about instances of 'hateful conduct'") (emphasis added).) Properly analyzed, plaintiffs are not likely to succeed on the merits of their First Amendment challenge to the GBL § 394-ccc's main requirement because the report-mechanism requirement regulates conduct rather than speech.

25

The report-mechanism requirement regulates "conduct, not speech," because it affects what networks "must *do*," not "what they may or may not *say*." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 60 (2006). In particular, the report-mechanism requirement mandates that networks "provide and maintain a clear and easily accessible mechanism" for users to report incidents of hateful conduct. GBL § 394-ccc(2). The requirement thus requires social media networks to make available a user tool—such as an email address or report submission form—that allows the networks' consumers to report incidents of hateful conduct if the consumers want to do so. Providing such a consumer-facing tool on a website is conduct, not speech.

Indeed, the report-mechanism requirement does not require social media networks to speak at all, let alone speak any message about hateful conduct. *Cf., e.g.*, *Restaurant L. Ctr. v. City of New York*, 360 F. Supp. 3d 192, 213 (S.D.N.Y. 2019). The requirement does not, for example, require networks to reference the State's definition of hateful conduct in making a report mechanism available, so long as the mechanism provided

26

permits consumers to report conduct meeting that definition.[3] *See* GBL § 394-ccc(2). The requirement also does not require social media networks to respond to any consumer report. Nor does it force networks to speak about or endorse consumers' reports by requiring, for example, that networks publish any information about the reports they receive or whether the network has acted on those reports.

By requiring social media networks to make a certain tool easily available to their customers, GBL § 394-ccc is similar to other regulations requiring the creation of consumer tools. For example, many States require entities that collect consumers' personal information to establish a mechanism to allow consumers to request that their information be deleted or kept private from third parties. *See, e.g.*, Cal. Civ. Code § 1798.135(a)(1)-(2) (Deering); 4 Colo. Code Regs. § 904-3, R. 4.03(B)(1)(a) (46 Colo. Reg. (Mar. 25, 2023)) (effective July 1, 2023); Va. Code Ann. § 59.1-578(D); Utah Code Ann. § 13-61-201(4), (1) (LexisNexis) (effective

---

[3] Though GBL § 394-ccc's plain text is clear, to the extent there is any ambiguity, the Court should interpret the report-mechanism requirement to avoid any constitutional difficulties or certify the interpretative question to the New York Court of Appeals. See *infra* at 45 n.5.

Dec. 31, 2023). Federal law similarly requires entities that collect consumers' information to provide consumer tools. *See, e.g.*, 16 C.F.R. § 313.7(a)(1)(iii), (a)(2)(ii) (financial institutions that collect personal information must give consumers mechanism to opt out). Federal law also requires entities to create consumer communication tools in other contexts. *See* 15 U.S.C. § 6502(b)(1)(A)(ii), (b)(1)(B) (websites that collect information from children must provide mechanism for parents to request collected information); 15 U.S.C. § 7704(a)(3)(A) (senders of email advertisements must provide mechanism allowing consumers to opt out of receiving future emails).

The conduct that the report-mechanism prohibits—declining to offer a mechanism for users to report incidents of hateful conduct—is not inherently expressive and is thus subject to rational basis review. *See Rumsfeld*, 547 U.S. at 66. As the Supreme Court explained in *Rumsfeld*, the test for whether conduct is inherently expressive is not whether a plaintiff intends to express an idea through its conduct, but rather whether a neutral observer would understand that the plaintiff is expressing an idea through its conduct. *Id.* Here, even if The Volokh Conspiracy lacked a mechanism for users to report comments (but see

*supra* at 12), nothing about that conduct makes it "'overwhelmingly apparent'" that The Volokh Conspiracy objects to users reporting incidents of hateful conduct. *Rumsfeld,* 547 U.S. at 66 (quoting *Texas v. Johnson*, 491 U.S. 397, 406 (1989)).

Rather, the view that The Volokh Conspiracy claims to express— i.e., that a report mechanism is "contrary to the Volokh Conspiracy's ethos, purpose, and mission" (J.A. 27)—becomes clear only when explained through separate speech that is not prohibited or regulated by the report-mechanism requirement. For example, as explained below (at 54-55), it would be permissible for a network to say alongside its report mechanism that its policy is to not respond to any reports made by users because removing any content is contrary to the network's ethos, purpose, and mission. Indeed, it is difficult to see how a neutral observer would understand the lack of a report mechanism as expressing plaintiffs' views about free speech or hateful conduct when plaintiffs already make report mechanisms available on their websites—while expressing whatever views they wish about free speech or hateful conduct. In other words, GBL § 394-ccc's report-mechanism requirement does not require plaintiffs to alter their current conduct and thus does not plausibly affect any

purported message that their conduct is sending to consumers or the public.

Moreover, even if some component of the report-mechanism requirement does involve speech, such as by requiring plaintiffs to disclose the email address or other mechanism by which reports may be made, such speech is incidental to the provision's regulation of conduct, *see Rumsfeld*, 547 U.S. at 62. The report-mechanism requirement does not regulate speech simply because compliance is "initiated, evidenced, or carried out by means of [printed] language." *Id.*

As a regulation of conduct, the report-mechanism requirement is subject to rational basis review, which it easily satisfies. Given the connection between social media use and violent conduct, including racially motivated mass shootings (see *supra* at 5-7), the State has an interest in empowering social media users to report hateful conduct to networks easily and quickly. (*See* J.A. 268; 174 (statute intended to "make it as easy as possible for people that see [content like the video of the Buffalo shooting] to report it to the site").) Such prompt reporting ensures that networks are at least aware of hateful conduct and can then decide for themselves whether to take any action in response. Indeed, a

30

user report allowed the social media network Twitch to stop the Buffalo shooter's live video of his attack less than two minutes after the report. (J.A. 104.) The Legislature rationally concluded that facilitating such reports going forward will provide a small but important step towards addressing violent conduct that is fueled by social media use.

In the alternative, if the Court determines that the report-mechanism requirement does implicate speech directly, the requirement is, at most, a commercial disclosure requirement subject to *Zauderer*'s relaxed scrutiny. As discussed further below (at 36-37), commercial disclosure requirements comport with the First Amendment when they require disclosure of "factual and uncontroversial information" and such disclosure is reasonably related to an appropriate government interest. *Zauderer*, 471 U.S. at 650-51. The report-mechanism requirement satisfies this standard here because it directly advances the State's important interest in facilitating user reports of hateful conduct and thereby alerting networks to such conduct. And the report-mechanism requirement is not unduly burdensome, *see id.* at 651-52, given that it requires only the availability of an email or other report mechanism. That conclusion is consistent with recent decisions in the Fifth and

31

Eleventh Circuits applying *Zauderer* and declining to enjoin enforcement of provisions of Texas and Florida law that required social media platforms to create certain consumer tools. *See NetChoice, LLC v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022) (consumer complaint mechanism); *NetChoice, LLC v. Attorney Gen., Fla.*, 34 F.4th 1196, 1230 (11th Cir. 2022) (mechanism for consumer to determine how many other users viewed the user's content). (For further discussion of these cases, see *infra* at 41-43.)

## C. The District Court Should Not Have Enjoined Enforcement of the Report-Mechanism Requirement.

The district court abused its discretion in enjoining enforcement of GBL § 394-ccc's report-mechanism requirement based on its conclusion that plaintiffs were likely to succeed on the merits of their challenge to the policy-disclosure requirement. That approach improperly thwarted the statute's core purpose—empowering users to report hateful conduct to networks (J.A. 268)—based on a purported constitutional infirmity with a subsidiary requirement that is simply meant to enhance the statute's main reporting function. Although the policy-disclosure requirement is constitutional (see *infra* at 35-57), it is severable in any

32

event and enjoining enforcement of the policy-disclosure requirement does not require enjoining enforcement of the entire statute. (*See* J.A. 332.) *See, e.g.*, *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 243 (2d Cir. 2014); *Attorney Gen., Fla.*, 34 F.4th at 1227 n.22.

"The determination of whether an invalid portion of a state statute can be severed from the valid portions so that the remainder of the statute can be preserved is a question of state law." *Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock*, 93 F.3d 68, 72 (2d Cir. 1996). Under New York law, "a court should refrain from invalidating an entire statute when only portions of it are objectionable." *Id.* (quotation marks omitted). The test for severability is whether "the Legislature would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether." *People v. On Sight Mobile Opticians*, 24 N.Y.3d 1107, 1109 (2014) (quotation marks omitted).

The text of GBL § 394-ccc makes plain the Legislature's preference for GBL § 394-ccc's core report-mechanism requirement to remain in force even if the policy-disclosure requirement, which simply enhances the report-enabling function by providing users with additional information, is invalidated. The statutory text highlights the importance of the report-

33

mechanism requirement by stating expressly that GBL § 394-ccc is not intended to "increase liability of a social media network for anything other than the failure to provide a mechanism for a user to report to the social media network any incidents of hateful conduct . . . and to receive a response." GBL § 394-ccc(4). The report-mechanism requirement is also set forth in its own subsection of the statute, *id.* § 394-ccc(2), separate from the policy-disclosure requirement's subsection, *id.* § 394-ccc(3). *See, e.g.*, *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 124 (2d Cir. 2017) (Jacobs, J., dissenting) (severance appropriate where statute "contains separate commands, separately lettered").

The legislative history of the statute further emphasizes the importance of the report-mechanism requirement. The sponsor memorandum accompanying the bill explains that its purpose is to "require social media networks to provide and maintain mechanisms for reporting hate speech on their platform." (J.A. 268.) One legislator supporting the bill concluded: "This is a bill that basically raises the standard for social media sites to have a[n] . . . *easily accessible mechanism to report hateful material*. That's all the bill really does." (J.A. 174.) And as the sponsor of

34

the bill emphasized, in the context of discussing the difficulty of identifying content like the Buffalo shooter's live video and writings, the report-mechanism requirement makes it easier for users to report hateful conduct to networks. (J.A. 175.)

Accordingly, at minimum, this Court should vacate the portion of the preliminary injunction that enjoins enforcement of GBL § 394-ccc's main report-mechanism requirement.

## POINT II

### PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR AS-APPLIED CHALLENGE TO THE POLICY-DISCLOSURE REQUIREMENT

The district court also erred in concluding that GBL § 394-ccc's policy-disclosure requirement is unconstitutional. The policy-disclosure requirement is a commercial disclosure requirement that is subject to the framework set forth in *Zauderer*, not strict scrutiny, as the district court erroneously concluded. The policy-disclosure requirement comports with the First Amendment under the *Zauderer* framework. And even if the Court did not apply *Zauderer*'s framework, the policy-disclosure requirement also satisfies the intermediate scrutiny standards that would apply instead. Finally, even if enforcement of the policy-disclosure requirement

35

were properly enjoined—which it is not—that conclusion would not justify enjoining enforcement of the entire statute. The Legislature intended the policy-disclosure requirement to enhance the statute's core report-mechanism requirement, by providing users with additional information about how the network will act on user reports. But the policy-disclosure requirement is not necessary for the report-mechanism to function and may be severed.

## A. The Policy-Disclosure Requirement Is a Regulation of Commercial Speech Subject to the *Zauderer* Framework.

As the Supreme Court has made clear in *Zauderer* and its progeny, regulations that require providers of commercial services to disclose "factual, uncontroversial information" about the terms under which their "services will be available" are analyzed under a specific framework when they are challenged under the First Amendment. *Zauderer*, 471 U.S. at 651. Under that framework, commercial disclosure regulations comport with the First Amendment if the required disclosures reasonably relate to an appropriate governmental interest and do not unduly burden speech. *See id.* at 650-51; *National Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra*, 138 S. Ct. 2361, 2372 (2018); *Milavetz, Gallop & Milavetz, P.A.*

36

*v. United States*, 559 U.S. 229, 248-253 (2010). That framework is appropriate because a speaker's "constitutionally protected interest in *not* providing" consumers with "factual information" about its own services "is minimal." *Zauderer*, 471 U.S. at 651.

The district court erred in not applying *Zauderer*'s framework here. Courts have repeatedly applied *Zauderer*'s framework to commercial disclosure requirements that empowered consumers to make informed decisions by providing them with information about the product or service at issue. *See, e.g.*, *National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 107, 113-16 (2d Cir. 2001) (disclosure of mercury content and mercury disposal instructions for lightbulbs); *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 134 (2d Cir. 2009) (disclosure of calorie content of menu items). And commercial disclosure regulations often provide consumers with information related to the State's interest in public safety and health. For example, establishments or companies that sell alcoholic beverages must warn patrons that drinking alcohol may cause health problems and birth defects. *See* 27 C.F.R. § 16.21; Rules of City of N.Y. Dep't of Health & Mental Hygiene (24 R.C.N.Y.) § 1-01. And real-estate sellers must advise home-buyers about the presence and

dangers of lead paint, lead pipes, asbestos, and other toxic substances in a residence. *See* 42 U.S.C. § 4852d (lead paint); 40 C.F.R. § 745.107 (same); N.Y. Real Property Law § 462 (pipes, asbestos, toxic substances).

Moreover, many regulations require commercial entities to provide their consumers with disclosures about the policies that apply to the service or product being offered. For example, New York and many other States require retailers to "conspicuously post" a refund policy. *See* GBL § 218-a(1); Haw. Rev. Stat. § 481B-5.5(b)(1); Fla. Stat. § 501.142(1); N.J. Stat. Ann. § 56:8-2.16; 940 Mass. Code Regs. § 6.12. States also require entities that collect personal information to disclose to consumers their policy for handling such information. For example, Delaware requires the operator of a commercial website to "make its privacy policy conspicuously available on its internet website." Del. Code Ann. tit. 6, § 1205C(a). The policy must identify the categories of information the website collects and whether the website has a process for consumers to request changes to their information. *Id.* § 1205C(b)(1)-(2); *see also, e.g.*, Cal. Civ. Code § 1798.100(a)(1); Nev. Rev. Stat. § 603A.340. Other States require similar policy disclosures in specific industries. *See* Me. Stat. tit. 35-A § 9301(6) (providers of broadband service must give consumers notice of privacy

38

rights on website); Conn. Gen. Stat. § 42-471(b) (any person who collects social security numbers in the course of business must "publicly display[]" on their website a privacy protection policy).

Many federal laws similarly require commercial entities to disclose their policies regarding the services they offer. For example, banks must disclose to consumers a policy as to when funds deposited in an account are available for withdrawal, 12 C.F.R. § 229.16(a), and certain financial institutions are required to disclose their policy for sharing consumers' personal information with third parties, 16 C.F.R. § 313.6(c). Cable television operators are likewise required to disclose to consumers at least once a year a policy describing the personal information collected from the consumer, the length of time the information is stored, and whether the information is disclosed to third parties. 47 U.S.C. § 551(a)(1). And any online service that collects personal information from children must "provide notice on [its] website of what information is collected from children by the operator, how the operator uses such information, and the operator's disclosure practices for such information." 15 U.S.C. § 6502(b)(1)(a)(i).

GBL § 394-ccc(3)'s policy-disclosure requirement is akin to these disclosure requirements, and the district court should have analyzed it under *Zauderer*. As an initial matter, the social media networks regulated by GBL § 394-ccc are engaged in commercial transactions with their users. The statute defines covered "social media network[s]" as "service providers" who operate their services "for profit-making purposes." GBL § 394-ccc(1)(b). Social media networks attract users to produce content and "profit from this content largely by charging third parties to advertise on their platforms." *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1216 (2023). Here, each of the plaintiffs allege that they operate for profit and make money from their users, including from targeted advertising and member fees paid directly by some users. (J.A. 26, 29, 32.)

Like other disclosure requirements about policies that govern commercial transactions, GBL § 394-ccc's policy-disclosure requirement provides users with information about the terms under which the network's "services will be available." *See Zauderer*, 471 U.S. at 650-51; *Milavetz*, 559 U.S. at 248. Social media networks like plaintiffs here profit by attracting more users to make and consume content on their networks, and their policies may strongly influence whether a potential

consumer chooses to use the network. Networks' policies about whether or how they will respond to hateful conduct are thus part of the terms of the commercial exchange between users and social media networks.

Moreover, contrary to the district court's conclusion (S.A. 13), the policy disclosure required by GBL § 394-ccc is "factual and uncontroversial." *Zauderer*, 471 U.S. at 651. GBL § 394-ccc requires social media networks to disclose to their users only the network's *own* policy regarding how the network will respond to reports of hateful conduct. Networks are not required to prohibit hateful conduct, remove such conduct from their websites, or otherwise adopt a policy dictated by the State. Indeed, a network may have a policy to do nothing about user reports of hateful conduct, so long as that policy is disclosed to the network's users. (*See* J.A. 175.)

Accordingly, this Court should apply *Zauderer* to the policy-disclosure requirement—as both the Fifth and Eleventh Circuits recently did in analyzing First Amendment challenges to policy-disclosure requirements that are similar to GBL § 394-ccc(3)'s policy-disclosure requirement. The Eleventh Circuit decision addressed a Florida statute that, as relevant here, required social media networks to "publish the

standards, including detailed definitions, it uses or has used for determining how to" remove and hide users' content and ban users. Fla. Stat. § 501.2041(2)(a). In declining to preliminarily enjoin enforcement of this policy disclosure, the Eleventh Circuit applied *Zauderer*'s framework. *See Attorney Gen., Fla.*, 34 F.4th at 1230. The court explained that *Zauderer* applied because social media users were "engage[d] in commercial transactions with platforms by providing them with a user and data for advertising in exchange for access to a forum." *Id.* The court further explained that by requiring networks to disclose their own policies regarding whether and how they will moderate users' content, platforms were required to disclose only "purely factual and uncontroversial information about their conduct toward their users." *Id.* at 1227 (quotation marks omitted).

Similarly, the Fifth Circuit applied *Zauderer*'s framework in declining to preliminary enjoin enforcement of Texas statutory provisions that, as relevant here, required social media networks to disclose on their websites how they moderate and promote content, and to publish a policy that informs users about the type of content allowed on the platform, Tex. Bus. & Com. Code Ann. § 120.051. *See Paxton*, 49 F.4th at 485. As the

42

Fifth Circuit explained, the required commercial disclosures "consist of 'purely factual and uncontroversial information' about the Platforms' services." *Id.* (quoting *Zauderer*, 471 U.S. at 651). This consistent reasoning of both the Fifth and Eleventh Circuits is correct and should be applied here.[4]

In declining to apply *Zauderer* to the policy-disclosure requirement, the district court made several key errors. First, the district court reasoned that the required disclosures are about controversial information because social media networks must disseminate the State's message about hateful conduct or adopt the Legislature's statutory definition of hateful conduct in the policies they disclose. (J.A. 11-12.) But the policy-disclosure

---

[4] The Texas and Florida laws also contain provisions that do not require disclosures and instead prohibit social media networks from making certain decisions about whether and how to remove user content or ban a user from the network. *See, e.g.*, Fla. Stat. § 501.2041(2)(b) (requiring networks to apply content moderation policies in a "consistent manner"); *id.* § 501.2041(2)(h), (j) (prohibiting networks from removing content of political candidates or journalistic enterprises); Tex. Civ. Prac. & Rem. Code Ann. § 143A.002 (social media platforms may not "censor" a user's expression or ability to use platform based on user's viewpoint or geographic location). Although the Fifth and Eleventh Circuit diverged in their First Amendment analyses regarding these content-moderation restrictions, *compare Attorney Gen., Fla.*, 34 F.4th at 1229, *with Paxton*, 49 F.4th at 448-85, GBL § 394-ccc does not contain any such restriction. (*See also* J.A. 179.)

43

requirement does no such thing. Networks are required to disclose only their *own* policies regarding user reports of hateful conduct, not any message or policy dictated by the State. And networks may adopt any policy they want, including a policy to do nothing about some or all reports of hateful conduct. As one legislator explained during the floor debate of GBL § 394-ccc, "[i]t is not about the government telling social media sites what to keep up or what to take down. . . . The site's going to figure out what material on their own policies they're going to take down or they're going to keep up." (J.A. 174.)

Nor is a network required to adopt or even reference GBL § 394-ccc(1)(a)'s definition of hateful conduct in its policy. A network must disclose a policy that includes whether and how it will respond to reports of hateful conduct as defined by GBL § 394-ccc. But it need not reference the State's definition to do so. For example, as plaintiff Volokh posited in an article published shortly after GBL § 394-ccc's enactment, a network could comply with the policy-disclosure requirement by disclosing that "'you can complain about whatever you please by e-mailing me at this address, but I will respond and address the complaints entirely based on

my own discretion.'"[5] (J.A. 120; *see also* J.A. 119 ("Presumably, 'we will not take down any such material' or 'we might or might not take down any such material, depending on our own editorial judgment' would be a legally permissible response.").) Or, a network could disclose their policy to respond to certain user reports—such as conduct that "supports or incites violence or unlawful acts" (J.A. 30)—and specify that they will not respond to any other reports.

Accordingly, there is no plausible basis for plaintiffs' claim that complying with the policy-disclosure requirement will force them to endorse the State's position about hateful conduct in a way that would injure their reputations as advocates of free speech. (*See* J.A. 36.) In fact,

---

[5] GBL § 394-ccc plainly does not require a network's policy to reference the statute's definition of hateful conduct. But if there is any ambiguity on that point, as plaintiffs suggest (J.A. 36), the Court should interpret the statute in a way that avoids "constitutional difficulties." *See Skilling v. United States*, 561 U.S. 358, 406 (2010) (quotation marks omitted); *see also* GBL § 394-ccc(4) (statute shall not to be construed to "adversely affect[]" any person's "right of free speech pursuant to the first amendment"). Or, the Court should certify a question to the New York Court of Appeals to clarify any such ambiguity. *See, e.g.*, *Nitkewicz as Tr. of Joan C. Lupe Fam. Tr. v. Lincoln Life & Annuity Co. of N.Y.*, 49 F.4th 721, 729 (2d Cir. 2022).

networks may burnish their reputations with users by disclosing a policy of not acting on reports of hateful conduct.

Second, the district court erred in relying on *NIFLA*, 138 S. Ct. 2361. (*See* S.A. 9.) In *NIFLA*, the Court declined to apply *Zauderer*'s framework to a regulation requiring crisis pregnancy centers to disclose information about the *State's* abortion services because the required disclosure did not relate to services that the centers provided. *See* 138 S. Ct. at 2372; *see also Evergreen Ass'n, Inc.*, 740 F.3d at 251 (city could not require crisis pregnancy centers to "espouse the government's position on a contested public issue" (quotation marks omitted)). Here, unlike in *NIFLA*, GBL § 394-ccc's policy-disclosure requirement does not require disclosure of state services or policies. It requires disclosure of only the network's own chosen policy.[6]

---

[6] *NIFLA* also involved a regulation requiring crisis pregnancy centers to disclose information about their own services, i.e., that the center's employees did not have licenses to practice medicine. *See* 138 S. Ct. at 2376-77. But the Court in *NIFLA* declined to decide whether *Zauderer*'s framework applied to that disclosure requirement. *Id.* at 2377. Instead, the Court concluded that the disclosure requirement did not satisfy *Zauderer*'s framework even if that framework did apply. *Id.* Here, by contrast, GBL § 394-ccc's policy-disclosure requirement satisfies *Zauderer*'s framework.

46

Third, the mere fact that the disclosure relates in some way to an issue of public debate does not render it "controversial"—particularly when the disclosure is regarding the networks' own policy. *See Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 94 (2d Cir. 2010); *Board of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 475 (1989) ("[C]ommunications can constitute commercial speech notwithstanding the fact that they contain discussions of important public issues" (quotation marks omitted)). Indeed, most companies could claim that they would rather not make a factual disclosure about their product or service because the information touches on an issue about which people disagree. *See, e.g.*, *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 569 (6th Cir. 2012) (upholding graphic health warnings on cigarette packages). But a disclosure requirement is not controversial simply because it requires networks "to provide somewhat more information than they might otherwise be inclined to present." *Zauderer*, 471 U.S. at 650.

Fourth, the district court incorrectly concluded that the policy-disclosure requirement infringes on the networks' editorial discretion regarding which content to keep or remove on their website. Assuming

47

networks have such discretion, the policy-disclosure requirement does not affect their discretion because it does not require networks to publish or remove any content. The cases relied on by the district court are thus inapposite because they addressed regulations requiring an entity to disseminate speech with which it disagreed. *See Attorney Gen., Fla.*, 34 F.4th at 1210 (addressing content moderation provision prohibiting, inter alia, social media networks from deleting content or banning a user who is a candidate for political office or a journalistic entity); *Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California*, 475 U.S. 1, 7 (1986) (addressing regulation requiring electric company to distribute advocacy group's messages in newsletter accompanying its billing statements to consumers). Here, by contrast, networks are required to disclose their *own* policy about the content they will permit on their platform. *See Attorney Gen., Fla.*, 34 F.4th at 1210 (upholding content moderation policy-disclosure requirement).

Fifth, the district court missed the mark in concluding that even if the social networks' policies are commercial speech, the policy-disclosure requirement regulates other, fully protected speech that is "'inextricably intertwined'" with the policies. (S.A. 14 (quoting *Riley v. National Fed'n*

48

*of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).) The district court reached that conclusion by reasoning that the networks' policies were intertwined with social media *users'* protected speech, i.e., the content that users post on plaintiffs' websites. (S.A. 14.) But the plain text of the statute reveals that it does not regulate social media users' speech at all—particularly when it does not require networks to remove or publish any user content. *See* GBL § 394-ccc(5).

Finally, the policy-disclosure requirement is not an impermissible viewpoint-based regulation (*see* S.A. 7) because it does not "penalize[] the expression of particular points of view," *Pacific Gas & Elec. Co.*, 475 U.S. at 9. GBL § 394-ccc is viewpoint neutral because it regulates only social media networks, not social media users, and does not discriminate between social media networks based on viewpoint. The policy-disclosure requirement applies identically to all networks subject to GBL § 394-ccc, including plaintiffs, regardless of whether networks have a policy of removing hateful conduct or a policy of not removing such conduct.

**B.    The    Policy-Disclosure    Requirement    Satisfies    *Zauderer*'s Framework and Satisfies Intermediate Scrutiny in Any Event.**

The policy-disclosure requirement satisfies the *Zauderer* framework because it is reasonably related to appropriate state interests and does not unduly burden plaintiffs' speech. *See Zauderer*, 471 U.S. at 651. This Court has explained that a commercial disclosure regulation will be reasonably related to an appropriate state interest so long as there is "a rational connection between the purpose of [the] commercial disclosure requirement and the means employed to realize that purpose." *National Elec. Mfrs. Ass'n*, 272 F.3d at 115; *see New York State Rest. Ass'n*, 556 F.3d at 132.

Here, the policy-disclosure requirement is intended to support and enhance GBL § 394-ccc's core report-mechanism requirement by providing users with information about how the network will respond to user reports. Consistent with that purpose, the State has substantial interests both (i) in providing social media users with accurate information about networks' policies regarding users' reports of hateful conduct and (ii) in facilitating such reports to help reduce instances of hate-fueled mass shootings and other violence. The district court erred in focusing solely

50

on the latter interest. (*See* S.A. 15.) While GBL § 394-ccc was enacted in the wake of a hate-fueled mass shooting and the State has a compelling interest in preventing future violence, the State also has a broader interest in informing users about how networks will respond to reports of hateful conduct. (*See* J.A. 268.) And the policy-disclosure requirement reasonably serves each of the State's interests here.

First, as the sponsor of the bill enacting GBL § 394-ccc explained, the policy-disclosure requirement (and the report-mechanism requirement) "empower users of social media . . . by providing clear and consistent reporting mechanisms." (J.A. 268.) In this way, the policy-disclosure requirement provides users with information that will allow them to make an informed decision about whether to start or continue using a particular network. For example, the policy-disclosure requirement assists a user who does not want to participate on a network that has extensive hateful conduct to know which networks to avoid. And the policy-disclosure requirement likewise assists a user who wants to participate on a network that does not remove any user content know which networks to choose. As the Fifth Circuit correctly explained, requiring disclosure of content moderation policies is thus reasonably

related to the State's interest in "enabl[ing] users to make an informed choice regarding whether to use the Platforms." *See Paxton*, 49 F.4th at 485 (quotation marks omitted); *see Attorney Gen., Fla.*, 34 F.4th at 1230 (disclosure "ensur[ed] that users . . . aren't misled about platforms' content-moderation policies"). That interest is also consistent with the State's well-established interest in providing users with accurate information about the terms of a transaction and the hazards it may pose. *See National Elec. Mfrs. Ass'n*, 272 F.3d at 115 (disclosure "increase[d] consumer awareness of the presence of mercury in a variety of products"); *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) (disclosure "allow[ed] [cell phone users] to avoid exceeding" safe radiation limit); *American Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 23 (D.C. Cir. 2014) (disclosure "enable[d] consumers to choose American-made products" and address concerns about "food-borne illness outbreak").

Second, the policy-disclosure requirement also reasonably serves the State's strong interest in reducing hate-fueled mass shootings and other violence. By alerting users that certain networks may act on reports of hateful conduct, the policy-disclosure requirement makes it more likely that users who see hateful conduct on those networks will report it. And

52

networks receiving such reports will be able to make more informed decisions about whether and how they want to respond to such reports—though GBL § 394-ccc allows networks to decide not to respond at all.

The Legislature reasonably concluded that encouraging such user reports will make a meaningful difference in mitigating violence and reducing violent and extremist content on social media networks that choose to remove such content. *See, e.g.*, *National Elec. Mfrs. Ass'n*, 272 F.3d at 115 (disclosure requirement "encouraging . . . changes in consumer behavior" was rationally related to reducing mercury contamination); *New York State Rest. Ass'n*, 556 F.3d at 134 (disclosure of calorie content was rationally related to "promot[ing] informed consumer decision-making so as to reduce obesity"). For example, Twitch was able to shut down the live video of the Buffalo shooter's attack after a user reported it. (J.A. 104.) Moreover, an estimated forty percent of mass shooters reveal their plans to commit violence beforehand via a social media post (J.A. 171), and many perpetrators of violence, including the Buffalo shooter, have said that they were inspired or motivated by previous violent attacks that they learned about via social media (*see* J.A. 88-91, 94-97, 179). And although many platforms seek to remove violent and

53

racist content, they often struggle to do so because of the sheer volume of content. (J.A. 105-108.) For example, links to videos of the Buffalo shooter's video or manifesto continued to be found on major social media networks well after the attack, even though Meta (the parent company of Facebook and Instagram) removed approximately one million pieces of content related to the Buffalo shooting and Twitter identified 5,500 pieces of such content. (J.A. 106-107.)

The policy-disclosure requirement also does not impose any undue burdens on plaintiffs' speech. *See Zauderer*, 471 U.S. at 651-52 & n.14 (commercial disclosure requirement need not be "least restrictive means" available). To comply with the requirement, plaintiffs must simply disclose their own policy for responding to reports of hateful conduct, which may be a policy not to respond to such reports. There is thus no plausible basis for plaintiffs' contention that disclosing their own policies would detract from their "pro-free speech purpose and mission." (*See* J.A. 11-12.) To the extent plaintiffs contend that they will not respond to reports of hateful conduct because they believe doing so would detract from their pro-free speech purpose, disclosing that policy would seem to further rather than detract from their purpose. Moreover, GBL § 394-ccc

54

does not prevent plaintiffs from conveying alongside the disclosure whatever additional information or speech that they want to express about their pro-speech mission. *See Milavetz,* 559 U.S. at 250 ("[N]ot preventing . . . [the] convey[ance] [of] any additional information" is one of the essential features of a *Zauderer* disclosure).

And in any event, plaintiffs have each already disclosed policies about whether and how they will permit certain types of user content on their platforms. (J.A 26, 30, 33-34.) Rumble, for example, prohibits content that is "'grossly offensive to the online community, including but not limited to, racism, anti-semitism, and hatred'" and may remove messages which it determines to be "'undesirable, inciting violence, harmful, [or] offensive.'" (J.A. 30.) Locals likewise seeks to foster a community that is "'safe'" and "'respectful'" and prohibits content that "'threatens violence against an individual or a group of people.'" (J.A. 33-34.) And The Volokh Conspiracy, although it does not disclose the types of content that would violate its policies, requests comments that are "'civil'" and warns that it may "'delete any comment for any reason at any time.'" (J.A. 26.) Given that plaintiffs have already disclosed these policies, it is not unduly burdensome to require plaintiffs to provide

55

greater transparency by clarifying that they will not respond to user reports of content other than the prohibited content listed in their policies.

In the alternative, if this Court were to decline to apply *Zauderer*'s framework, the policy-disclosure requirement is at most commercial speech subject to intermediate scrutiny. *See, e.g.*, *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 264 (2d Cir. 2014) (applying intermediate scrutiny where compelled commercial disclosure went "beyond the speaker's own product or service"). The policy-disclosure requirement satisfies intermediate scrutiny because it "directly advances a substantial governmental interest and is not overly restrictive." *Id.* at 261.

As discussed above, the State has a substantial interest in providing social media users with accurate information about networks' policies regarding users' reports of hateful conduct, which is directly advanced by the policy-disclosure requirement. See *supra* at 51-52. In addition, as the district court recognized, the State also has a substantial interest in facilitating reports of hateful conduct to prevent future violence. (S.A. 15.) There is a "reasonable fit," *Vugo, Inc. v. City of New York*, 931 F.3d 42, 52 (2d Cir. 2019), between that interest and the policy-disclosure

requirement because the requirement makes it more likely that users will report hateful conduct by informing users whether networks will act on those reports. And the State reasonably concluded that facilitating reports of hateful conduct would prevent violence, given that the Buffalo shooter and many other mass shooters have been radicalized by violent content on social media and sought to inspire future shootings by publicizing their crimes on social media. (*See* J.A. 88-91, 94-97, 179.) Nor does the disclosure requirement "burden substantially more speech than is necessary." *Vugo, Inc.*, 931 F.3d at 58. It requires disclosure only of the information necessary to assist consumers in making an informed decision about the services they use and to facilitate user reports of hateful conduct.

Finally, even if the Court were to conclude that plaintiffs are likely to succeed on the merits of their challenge to the policy-disclosure requirement (which they are not), the district court erred in using that conclusion as a justification for enjoining enforcement of the entire statute. As discussed above (at 32-35), GBL § 394-ccc is primarily intended to empower users to report incidents of hateful conduct on the network. (*See* J.A. 268.) While the policy-disclosure requirement serves

57

that purpose by providing users with information about how the network will respond to their reports, it is intended to enhance the statute's report-enabling purpose and is not required for the statute to function.

## POINT III

### PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR FACIAL OVERBREADTH CHALLENGE

In the First Amendment context, to prevail on a facial challenge, a plaintiff must show either that the challenged regulation "could never be applied in a valid manner" or that even though it may be validly applied to the plaintiff and others, it is so broad that it "may inhibit the constitutionally protected speech of third parties." *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988) (quotation marks omitted); *see Picard*, 42 F.4th at 101 & n.2. "Properly understood," the latter of these two options, a facial overbreadth challenge, "is an exception to ordinary standing requirements" that allows a plaintiff to proceed on the basis that a challenged regulation "inhibit[s] the constitutionally protected speech of third parties." *New York State Club Ass'n, Inc.*, 487 U.S. at 11 (quotation marks omitted). The overbreadth doctrine is "strong medicine" to be used

58

"sparingly and only as a last resort."[7] *FCC v. Pacifica Found.*, 438 U.S. 726, 743 (1978) (quotation marks omitted).

Here, the district court erred in sustaining plaintiffs' facial overbreadth challenge to GBL § 394-ccc. (*See* S.A. 16-19.) The district court's overbreadth analysis improperly interpreted GBL § 394-ccc to regulate the speech of social media *users*, concluding that users' speech might be chilled because GBL § 394-ccc "mandat[es] a policy and mechanism by which users can complain about other users' protected speech." (S.A. 17.) But GBL § 394-ccc's plain text applies and can be enforced only against social media networks, GBL § 394-ccc(5), and does not create any liability for users whatsoever. Nor does the statute require

---

[7] The district court should not have analyzed the overbreadth claim given its conclusion that plaintiffs were likely to succeed on their as-applied challenge. As this Court has previously explained, courts should be reluctant to entertain a facial overbreadth challenge where plaintiffs have prevailed in an as-applied challenge. *See American Booksellers Found. v. Dean*, 342 F.3d 96, 105 (2d Cir. 2003); *Board of Trs. of State Univ. of N.Y.*, 492 U.S. at 485; *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985). Proceeding with an overbreadth challenge unnecessarily "convert[s] use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws." *Board of Trs. of State Univ. of N.Y.*, 492 U.S. at 485.

social media networks to remove "hateful conduct" from their networks, as the district court appeared to suggest. Rather, the statute leaves "purposely open" how networks will respond to reports of hateful conduct and "does not empower" the Attorney General to pursue networks for failing to remove hateful conduct. (J.A. 172, 175.)

The relationship between the overbreadth doctrine and third-party standing demonstrates the flaw in the district court's reasoning. *See New York State Club Ass'n, Inc.*, 487 U.S. at 11. "Properly understood," a facial overbreadth challenge allows a plaintiff to assert standing based on injuries suffered by third parties not before the court. *Id.* But here, social media users would not have standing to challenge GBL § 394-ccc because they would be unable to show any injury resulting from the statute. Even if a network removed hateful conduct posted by a user, that removal would be an "independent action" by the network not traceable to the statute, which does not mandate removal. *See Bennett v. Spear*, 520 U.S. 154, 169 (1997) (quotation and alteration marks omitted). Indeed, each of the plaintiffs already have a policy of removing some content posted by users. (*See* J.A. 30 (Rumble's policy of removing "harmful" or "offensive" content); *see also* J.A. 26, 33-34.)

60

The district court's reliance on the title of the statute was likewise misplaced. (*See* S.A. 18.) The title, "Social media networks; hateful conduct prohibited," can be reasonably understood to refer to the requirement that social media networks clarify, through an accessible policy, whether and what "hateful conduct" *they* "prohibit." *See* GBL § 394-ccc(3). In any event, under New York law, "the text of the statute must take precedence over its title." *People v. Page*, 35 N.Y.3d 199, 204 n.3 (2020) (quotation marks omitted). "[W]hile a title or heading may help clarify or point the meaning of an imprecise or dubious provision, it may not alter or limit the effect of unambiguous language in the body of the statute itself." *Id.* (quotation marks omitted). Here, the text of the statute plainly does not regulate the speech of social media users, giving the Attorney General enforcement authority only as to networks. GBL § 394-ccc(5); *see also id.* § 394-ccc(4) ("Nothing [in GBL § 394-ccc] shall be construed . . . as an obligation imposed on a social media network that adversely affects the rights or freedoms of any persons, such as exercising the right of free speech.").

The district court also erred in concluding that the statute is unconstitutionally vague. (*See* S.A. 18-19.) The court reasoned that social

media users' speech might be chilled because users might be unsure whether other users would interpret (and report to the network) their content as using social media to "humiliate" or "vilify." (S.A. 18-19.) But as discussed, the law does not regulate the speech of social media users at all. See *supra* at 61. Instead, it requires networks to disclose how they will respond to reports of hateful conduct as identified and reported by the users themselves. And it gives networks, the only regulated entity, clear notice of the conduct that must be made reportable by networks: conduct that users identify as hateful conduct. *Cf. Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728 (1970) (rejecting vagueness challenge to federal law prohibiting mailing of material that recipient deemed obscene).

## POINT IV

### THE DISTRICT COURT ERRED IN FAILING TO APPLY THE REMAINING PRELIMINARY INJUNCTION FACTORS

A party seeking to enjoin enforcement of a statute must separately show "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *We The Patriots USA, Inc.*, 17 F.4th at 279. In the First Amendment context, when a plaintiff alleges an injury that is not caused

62

by "a rule or regulation that directly limits speech," then "irreparable harm is not presumed and must still be shown." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008); *see Bronx Household of Faith v. Board of Educ. of City of N.Y.*, 331 F.3d 342, 350 (2d Cir. 2003). *Cf. Stagg P.C. v. U.S. Dep't of State*, 673 F. App'x 93, 95 (2d Cir. 2016) (summary order).

Here, the district court failed to meaningfully consider whether plaintiffs had adequately alleged irreparable harm or whether the public interest weighed in favor of granting an injunction. (*See* S.A. 6, 20.) Those gaps in the court's analysis constitute an abuse of discretion. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) (abuse of discretion where lower courts "addressed [the relevant] considerations in only a cursory fashion").

Moreover, plaintiffs failed to allege irreparable harm. First, plaintiffs' delay in filing this action weighs against preliminary injunctive relief. *See Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005). Plaintiffs waited until December 1, 2022, to file this action and seek a preliminary injunction, even though GBL § 394-ccc was enacted nearly six months earlier, on June 6, 2022. (J.A. 2.) And plaintiffs were aware of the statute's potential application to them long before filing

63

their complaint. Indeed, an article written by Volokh at the time the statute was enacted noted that it would apply to The Volokh Conspiracy and that he had "six months to figure out whether to post a policy . . . or perhaps to challenge the law." (J.A. 119-120.) "The failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Weight Watchers Int'l, Inc.*, 423 F.3d at 144 (quotation and alteration marks omitted).

In addition, plaintiffs failed to make the requisite showing of irreparable injury given that they relied primarily on their erroneous interpretation of the statute as requiring social media networks to respond to each user report of hateful conduct. (*See* J.A. 36-37.) For example, Rumble and Locals contended that they would suffer irreparable harm absent an injunction because they would have to "hire additional staff" to respond to user complaints. (J.A. 36.) And Volokh contended that he would "be required to respond to each [user] comment personally." (J.A. 37; *see also* J.A. 28.)

But as the district court correctly concluded (*see* S.A. 4, 15, 20), the statute plainly does not require networks to reply to any user report of

hateful conduct—let alone all such reports. Indeed, Volokh has publicly stated that the statute "seems to just mandate platforms to provide a reporting mechanism, and to indicate how they will respond." (J.A. 119.) For The Volokh Conspiracy to comply with the law, he concluded, he would simply have to "post a policy []which would be 'you can complain about whatever you please by e-mailing me at this address, but I will respond and address the complaints entirely based on my own discretion.'" (J.A. 120.)

As to the report-mechanism and policy-disclosure requirements, plaintiffs alleged that those requirements cause plaintiffs irreparable harm by requiring plaintiffs to endorse the State's message about hate speech. (J.A. 35-37.) But that is incorrect. As explained above (at 26-27, 44-45), neither requirement requires networks to endorse or even reference the State's definition of "hateful conduct." Nor does the statute otherwise infringe on plaintiffs' communication of their pro-free speech ethos and mission.

The public interest also weighs against a preliminary injunction here. Plaintiffs seek to enjoin enforcement of a duly enacted State statute that empowers users of social media by facilitating user reports of hateful

conduct and providing users with accurate information about a social media networks' policies regarding hateful conduct. (*See* J.A. 268.) "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation marks omitted). Moreover, a pre-enforcement injunction is particularly inappropriate where, as here, a federal court facially enjoins enforcement of a state law before the State's courts have had the opportunity to interpret it. *See, e.g.*, *NetChoice, LLC v. Paxton*, 142 S. Ct. 1715, 1718 (2022) (Alito, J., dissenting).

These public interests outweigh the minimal burden on plaintiffs from establishing a mechanism to accept user reports (which plaintiffs already have) and disclosing a policy explaining how they will respond to those reports. As this Court has recognized, "[p]rotection of the robust and free flow of accurate information is the principal First Amendment justification for protecting commercial speech, and requiring disclosure of truthful information promotes that goal." *National Elec. Mfrs. Ass'n*, 272 F.3d at 114. Accordingly, "mandated disclosure of accurate, factual, commercial information . . . furthers, rather than hinders, the First

Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'" *Id.*

## CONCLUSION

This Court should reverse the district court's order granting a preliminary injunction against enforcement of General Business Law § 394-ccc.

Dated:  New York, New York
        June 20, 2023

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellant

By:   */s/ Sarah Coco*
     SARAH COCO
     Assistant Solicitor General

BARBARA D. UNDERWOOD      28 Liberty Street
  *Solicitor General*             New York, NY 10005
JUDITH N. VALE               (212) 416-6312
  *Deputy Solicitor General*
SARAH COCO
  *Assistant Solicitor General*
    *of Counsel*

67

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Alenette B. Jordan, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 12,912 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

  /s/ *Alenette B. Jordan*

# SPECIAL APPENDIX

# TABLE OF CONTENTS

**Page**

Opinion & Order, dated Feb. 14, 2023.................................................................1

New York General Business Law § 394-ccc ..................................................... 22

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**EUGENE VOLOKH, LOCALS TECHNOLOGY INC. and RUMBLE CANADA INC.,**

                              **Plaintiffs,**

        **-against-**                                          **22-CV-10195 (ALC)**

**LETITIA JAMES,** *in her official capacity as*                **OPINION AND ORDER**
*New York Attorney General*,

                              **Defendant.**

---

**ANDREW L. CARTER, JR., United States District Judge:**

     "Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or

any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that

we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744,

1764 (2017) (citations omitted).

     With the well-intentioned goal of providing the public with clear policies and mechanisms

to facilitate reporting hate speech on social media, the New York State legislature enacted N.Y.

Gen. Bus. Law § 394-ccc ("the Hateful Conduct Law" or "the law").   Yet, the First Amendment

protects from state regulation speech that may be deemed "hateful" and generally disfavors

regulation of speech based on its content unless it is narrowly tailored to serve a compelling

governmental interest.   The Hateful Conduct Law both compels social media networks to speak

about the contours of hate speech and chills the constitutionally protected speech of social media

users, without articulating a compelling governmental interest or ensuring that the law is narrowly

tailored to that goal.   In the face of our national commitment to the free expression of speech, even

where that speech is offensive or repugnant, Plaintiffs' motion for preliminary injunction, prohibiting enforcement of the law, is **GRANTED**.

**BACKGROUND**

### I.   Factual Background

The following facts are drawn from the Complaint, Plaintiffs' declaration in support of their motion for preliminary injunction, and Defendant's declaration in opposition to the motion, and the documents relied upon therein.

#### A.   The Plaintiffs

Plaintiffs Eugene Volokh ("Volokh"), Rumble Canada Inc. ("Rumble") and Locals Technology Inc. ("Locals") operate online platforms that they believe are subject to the law as a "social medial network" as defined by the law.  Plaintiff Volokh is a California resident and the co-owner and operator of the Volokh Conspiracy, a legal blog. (Compl., ECF No. 1 ¶ 12.) Plaintiff Rumble, headquartered in Toronto, Canada, operates a website "similar to YouTube" which "allows independent creators to upload and share video content". (*Id.* ¶ 13.)  Rumble has a "pro-free speech purpose" and its "mission [is] 'to protect a free and open internet' and to 'create technologies that are immune to cancel culture.'"  (*Id.*)  Plaintiff Locals is a subsidiary of Rumble Inc. and operates a website that allows "creators to communicate and share content directly with unpaid and paid subscribers." (*Id.* ¶ 14.)  Locals also has a stated "pro-free speech purpose" and a "mission of being 'committed to fostering a community that is safe, respectful, and dedicated to the free exchange of ideas.'"  (*Id.*)

#### B.   The Buffalo Mass Shooting

On May 14, 2022, an avowed white supremacist used Twitch, a social media platform, to livestream himself perpetrating a racially motivated mass shooting on Black shoppers at a grocery

2

**SA2**

store in Buffalo, New York.  (Sawyer Decl., ECF No. 20 ¶ 4; *id.*, Ex. A, ECF No. 20-1 at 34.)  The

attack left ten people dead and three wounded.  (*Id.*)  Shortly thereafter, a recording of the mass

shooting "went viral" and was re-posted on several websites, including 4chan and Reddit.  (*Id.*)  A

manifesto expressing the shooter's racist ideology was also shared on social media.  (*Id.* at 15–16,

34.)

In response to the mass shooting, Governor Kathy Hochul issued a referral letter to the

Office of the Attorney General ("OAG"), directing it to investigate the events surrounding the

shooting, focusing on "the specific online platforms that were used to broadcast and amplify the

acts and intentions of the mass shooting[.]" (*Id.* at 6; Compl., ECF No. 1 ¶ 38.)  Governor Hochul

also directed the OAG to "investigate various online platforms for 'civil or criminal liability for

their role in promoting, facilitating, or providing a platform to plan or promote violence."  (*Id.*)

On October 18, 2022, the OAG released a report detailing its findings.  (Sawyer Decl., ECF

No. 20 ¶ 3.)  In the associated press release, Defendant stated that "[o]nline platforms should be

held accountable for allowing hateful and dangerous content to spread on their platforms" because

an alleged "lack of oversight, transparency, and accountability of these platforms allows hateful

and extremist views to proliferate online."  (Compl., ECF No. 1 ¶ 3.)

C.  The Hateful Conduct Law

The Hateful Conduct Law, entitled "Social media networks; hateful conduct prohibited"

went into effect on December 3, 2022.  The law applies to "Social media network(s)"[1], and defines

"Hateful conduct" as:

---

[1]"Social media network" is defined as "service providers, which, for profit-making purposes,
operate internet platforms that are designed to enable users to share any content with other users
or to make such content available to the public."  N.Y. Gen. Bus. Law § 394-ccc(1)(b).
Defendant does not challenge Plaintiffs' assertion that they have standing to sue, but Defendant
reserves the right to do so in the future.  (Def.'s Opp'n, ECF No. 21 at 6, n.3.)

> "[T]he use of a social media network to vilify, humiliate, or incite
> violence against a group or a class of persons on the basis of race,
> color, religion, ethnicity, national origin, disability, sex, sexual
> orientation, gender identity or gender expression."

N.Y. Gen. Bus. Law § 394-ccc(1)(a).  Thus, the Hateful Conduct Law requires that social media networks create a complaint mechanism for three types of "conduct": (1) conduct that vilifies; (2) conduct that humiliates; and (3) conduct that incites violence.  (*Id.*)  This "conduct" falls within the law's definition if it is aimed at an individual or group based on their "race", "color", "religion", "ethnicity", "national origin", "disability", "sex", "sexual" orientation", "gender identity" or "gender expression".  *Id.*

The Hateful Conduct Law has two main requirements: (1) a mechanism for social media users to file complaints about instances of "hateful conduct" and (2) disclosure of the social media network's policy for how it will respond to any such complaints.  First, the law requires a social media network to "provide and maintain a clear and easily accessible mechanism for individual users to report incidents of hateful conduct."  This mechanism must "be clearly accessible to users of such network and easily accessed from both a social media networks' application and website. . . ." and must "allow the social media network to provide a direct response to any individual reporting hateful conduct informing them of how the matter is being handled."  N.Y. Gen. Bus. Law § 394-ccc(2).

Second, a social media network must "have a clear and concise policy readily available and accessible on their website and application. . . "  N.Y. Gen. Bus. Law § 394-ccc(3).  This policy must "include[] how such social media network will respond and address the reports of incidents of hateful conduct on their platform."  N.Y. Gen. Bus. Law § 394-ccc(3).

**SA4**

The law also empowers the Attorney General to investigate violations of the law and provides for civil penalties for social media networks which "knowingly fail[] to comply" with the requirements.  N.Y. Gen. Bus. Law § 394-ccc(5).

## II.  Procedural History

This action was commenced by Plaintiffs on December 1, 2022.  (Compl., ECF No. 1.) The Complaint alleges both facial and as-applied challenges to the Hateful Conduct Law, arguing that it violates the First Amendment because it: (1) is a content and viewpoint-based regulation of speech; (2) is overbroad; and (3) is void for vagueness.  (*See generally id.*)  Plaintiffs also allege that the law is preempted by the Communications Decency Act, 47 U.S.C. § 230.  (*Id.*)

Plaintiffs filed their motion for preliminary injunction on December 6, 2022, arguing that (1) Plaintiffs have a well-founded fear that the law will be enforced against their online platforms and (2) they are likely to prevail on the merits because the law burdens and compels speech, is overbroad, void for vagueness, and preempted by the Communications Decency Act.  (Mot., ECF No. 8; *see generally* Pl.'s Mem., ECF No. 9.)  Defendant filed a memorandum in opposition on December 13, 2022, arguing that Plaintiffs are unlikely to succeed on the merits of their claims because, *inter alia*, the law does not target protected expression based on content or viewpoint, is not substantially overbroad or vague, and is not preempted.  (*See generally* Def.'s Opp'n, ECF No. 21.)

The Court heard oral argument on the motion on December 19, 2022.  (*See* Dec. 19, 2022 "Tr.", ECF No. 27.)

## LEGAL STANDARD

To obtain a preliminary injunction, the movant must show "a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of

**SA5**

equities tips in the party's favor, and that an injunction is in the public interest." *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). However, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 462, 472 (S.D.N.Y. 2010) ("Temporary restraining orders and preliminary injunctions are among the most drastic tools in the arsenal of judicial remedies, and must be used with great care.") (internal citations omitted).

## **DISCUSSION**

### I.  **Irreparable Harm**

Although a showing of irreparable harm is typically the "single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted), "[c]onsideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress and Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Accordingly, the Court's analysis will focus on the second prong of the preliminary injunction analysis.

### II.  **Likelihood of Success on the Merits**

Where, as is the case here, the injunction being sought will provide the plaintiff with substantially all the relief sought in the complaint, the plaintiff must demonstrate a "clear or substantial likelihood of success on the merits." *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (internal citations and quotations omitted).

For the reasons set out more fully below, the Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their First Amendment claims, but not on their preemption claim.

### A.   Plaintiffs' As-Applied First Amendment Challenge

#### i.   *The Legal Framework for the First Amendment*

"The First Amendment generally prevents government from proscribing speech…or even expressive conduct…because of disapproval of the ideas expressed. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (internal citations and quotations omitted).   "The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).   Thus, as is relevant to the current facts, "[a]s a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* at 461.   This protection extends to speech which the government may seek to limit because it is offensive or insulting. *See R.A.V*, 505 U.S. at 391 ("The First Amendment does not permit [the government] to impose special prohibitions on those speakers who express views on disfavored subjects.")  Even regulations that seek to regulate speech "that insult[s], or provoke[s] violence, on the basis of race, color, creed, religion, or gender" have been found to run afoul of the First Amendment because they constitute content and viewpoint-based regulation of protected speech. *Id.* at 391–92.

In evaluating whether a regulation violates the First Amendment, courts "distinguish between content-based and content-neutral regulations of speech." *Id.*   "Content-based laws— those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

**SA7**

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Additionally, when "a state compels an individual to speak a particular message, the state alters the content of their speech, and engages in content-based regulation." *CompassCare v. Cuomo*, 465 F. Supp. 3d 122, 155 (N.D.N.Y. 2020) (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*") (internal quotations and alterations omitted)).

       *ii.*     *Whether the Hateful Conduct Law Compels Speech*

Plaintiffs argue that the law regulates the content of their speech by compelling them to speak on an issue on which they would otherwise remain silent. (Pl.'s Mem., ECF No. 9 at 12; Tr., ECF No. 27 at 47:5–13.) Defendant argues that the law regulates conduct, as opposed to speech, because there is no requirement for *how* a social media network must respond to any complaints and because the law does not even require the network to specifically respond to a complaint of hateful content. (Def.'s Opp'n, ECF No. 21 at 9.) Instead, the law merely requires that the complaint mechanism *allows* the network to respond, if that is the social media network's policy. (Tr., ECF No. 27 at 11:25–1212:4.)

Defendant likens the Hateful Conduct Law to the regulation upheld in *Restaurant Law Ctr. v. City of New York*, which required fast-food employers to set up a mechanism for their employees to donate a portion of their paychecks to a non-profit of that employee's choosing. 360 F. Supp. 3d 192 (S.D.N.Y. 2019). The court found that this did not constitute "speech"—nor did it constitute "compelled speech"—noting that the "ministerial act" of administering payroll deductions on behalf of their employees did not constitute speech for the employers. *Id.* at 214. As such, the court applied rational basis review and found that the regulation passed muster. *Id.* at 221.

However, those facts are not applicable here.  The Hateful Conduct Law does not merely require that a social media network provide its users with a mechanism to complain about instances of "hateful conduct".  The law also requires that a social media network must make a "policy" available on its website which details how the network will respond to a complaint of hateful content.  In other words, the law requires that social media networks devise and implement a written policy—*i.e.*, speech.

For this reason, the Hateful Conduct Law is analogous to the state mandated notices that were found not to withstand constitutional muster by the Supreme Court and the Second Circuit: *NIFLA* and *Evergreen*.  In *NIFLA*, the Supreme Court found that plaintiffs—crisis pregnancy centers opposing abortion—were likely to succeed on the merits of their First Amendment claim challenging a California law requiring them to disseminate notices stating the existence of family-planning services (including abortions and contraception).  *NIFLA*, 138 S. Ct. at 2371.  The Court emphasized that "[b]y compelling individuals to speak a particular message, such notices 'alte[r] the content of [their] speech.'"  *Id.* (quoting *Riley v. National Federation of Blind of N. C., Inc.*, 487 U.S. 781, 795 (1988)).  Likewise, in *Evergreen*, the Second Circuit held that a state-mandated disclosure requirement for crisis pregnancy centers impermissibly burdened the plaintiffs' First Amendment rights because it required them to "affirmatively espouse the government's position on a contested public issue…."  *Ass'n, Inc. v. City of New York*, 740 F.3d 233, 250 (2d Cir. 2014) (quoting *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 236 (2d Cir. 2011), *aff'd*, 570 U.S. 205 (2013)).

Similarly, the Hateful Conduct Law requires a social media network to endorse the state's message about "hateful conduct".  To be in compliance with the law's requirements, a social media network must make a "concise policy readily available and accessible on their website and

application" detailing how the network will "respond and address the reports of incidents of hateful conduct on their platform." N.Y. Gen. Bus. Law § 394-ccc(3). Implicit in this language is that each social media network's definition of "hateful conduct" must be at least as inclusive as the definition set forth in the law itself. In other words, the social media network's policy must define "hateful conduct" as conduct which tends to "vilify, humiliate, or incite violence" "on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." N.Y. Gen. Bus. Law § 394-ccc(1)(a). A social media network that devises its own definition of "hateful conduct" would risk being in violation of the law and thus subject to its enforcement provision.

The gap between the state's definition of "hateful conduct" and other potential definitions is illustrated by Plaintiffs' own current content moderation policies. For instance, Rumble reserves the right to unilaterally remove any content that it deems is:

> "a) is illegal; b) is pornographic, obscene, or of an adult or sexual nature; c) is grossly offensive to the online community, including but not limited to, racism, anti-semitism and hatred; d) supports or incites violence or unlawful acts; e) supports groups that support or incite violence or unlawful acts; or f) promotes terrorist organizations."

(Compl., ECF No. 1 ¶ 116 (internal quotations omitted).) The policy does not explicitly pertain to content that vilifies or humiliates, as is defined in the law, and does not explicitly apply to content aimed at a person or group's "religion", "disability", "sexual orientation" or "gender expression", as is expressly enumerated in the Hateful Conduct Law. For Rumble to be in compliance with the law, it would need to publish a policy expressly indicating that its users have a mechanism to complain about the "hateful conduct" as defined by the Hateful Conduct Law, not removable content as defined by Rumble.

Likewise, Locals' website identifies a few categories of content that it may remove from its website, including content that "threatens violence against an individual or group of people." (*Id.* ¶ 133.)  However, this policy also does not encapsulate the classes of groups or persons to whom "hateful conduct" may be directed as is defined by the New York legislature, and it would need to be modified to be brought into compliance with the law by including speech that potentially vilifies or humiliates a group or individual.  To be in compliance with the law, Locals would need to publish a policy detailing the types of content its users are entitled to complain about through the new mechanism—*i.e.,* "hateful conduct" as defined by the law—thus compelling Locals to endorse the state's definition of that term.

Clearly, the law, at a minimum, compels Plaintiffs to speak about "hateful conduct".  As Plaintiffs note, this compulsion is particularly onerous for Plaintiffs, whose websites have dedicated "pro-free speech purpose[s]" (Compl., ECF No. 1 ¶¶ 13, 14), which likely attract users who are "opposed to censorship" (Pl.'s Mem., ECF No. 9 at 24).  Requiring Plaintiffs to endorse the state's definition of "hateful conduct", forces them to weigh in on the debate about the contours of hate speech when they may otherwise choose not to speak.  In other words, the law, "deprives Plaintiffs of their right to communicate freely on matters of public concern" without state coercion. *Evergreen,* 740 F.3d at 250.

Additionally, Plaintiffs have an editorial right to keep certain information off their websites and to make decisions as to the sort of community they would like to foster on their platforms.  It is well-established that a private entity has an ability to make "choices about whether, to what extent, and in what manner it will disseminate speech…" *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1210 (11th Cir. 2022).  These choices constitute "editorial judgments" which are protected by the First Amendment. *Id.* (collecting cases). In *Pacific Gas & Electric Co. v. Public*

**SA11**

*Utilities Commission of California*, the Supreme Court struck down a regulation that would have forced a utility company to include information about a third party in its billing envelopes because the regulation "require[d] appellant to use its property as a vehicle for spreading a message with which it disagrees." 475 U.S. 1, 17 (1986).

Here, the Hateful Conduct Law requires social media networks to disseminate a message about the definition of "hateful conduct" or hate speech—a fraught and heavily debated topic today. Even though the Hateful Conduct Law ostensibly does not dictate what a social media website's response to a complaint must be and does not even require that the networks respond to any complaints or take down offensive material, the dissemination of a policy about "hateful conduct" forces Plaintiffs to publish a message with which they disagree. Thus, the Hateful Conduct Law places Plaintiffs in the incongruous position of stating that they promote an explicit "pro-free speech" ethos, but also requires them to enact a policy allowing users to complain about "hateful conduct" as defined by the state.

iii.    *Whether the Hateful Conduct Law Compels Commercial Speech*

In the alternative, Defendant argues that even if the law is found to regulate speech, it only regulates commercial speech and should thus be subject to a lesser standard of review. (Def.'s Opp'n, ECF No. 21 at 9, 12–13.) Defendant characterizes the law's requirement that social media networks publish a policy as "a truthful disclosure of fact" that is only subject to rational basis review. (Tr., ECF No. 27 at 44:7–8.) Defendant likens the Hateful Conduct Law's policy requirement to other regulations upheld by the Second Circuit requiring (1) chain restaurants to post calorie content information for their menu items, *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 137 (2d Cir. 2009), and (2) lightbulb manufacturers to disclose the

12

**SA12**

mercury content in their products, *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001).

In general, laws regulating commercial speech are subject to a lesser standard of scrutiny. *N.Y. State Rest. Ass'n v. New York City Bd. of Health*, No. 08-CV-1000(RJH), 2008 WL 1752455, at *6 (S.D.N.Y. Apr. 16, 2008), *aff'd*, 556 F.3d 114 (2d Cir. 2009) (citing *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001)). The Supreme Court has articulated two definitions of what constitutes commercial speech. First, speech is considered to be commercial when it "'does no more than propose a commercial transaction.'" *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)). Second, "commercial speech [constitutes] 'expression related solely to the economic interests of the speaker and its audience.'" *Conn. Bar Ass'n*, 620 F.3d at 94 (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980)). Commercial speech is generally subject to intermediate scrutiny, *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014); however, where the commercial speech conveys "purely factual and uncontroversial" information, courts apply rational basis review. *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009) (*citing Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 114–15).

The policy disclosure at issue here does not constitute commercial speech and conveys more than a "purely factual and uncontroversial" message. The law's requirement that Plaintiffs publish their policies explaining how they intend to respond to hateful content on their websites does not simply "propose a commercial transaction". Nor is the policy requirement "related solely to the economic interests of the speaker and its audience." Rather, the policy requirement compels a social media network to speak about the range of protected speech it will allow its users to engage (or not engage) in. Plaintiffs operate websites that are directly engaged in the proliferation of

**SA13**

speech—Volokh operates a legal blog, whereas Rumble and Locals operate platforms where users post video content and comment on other users' videos.

The "lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988). Where speech is "inextricably intertwined with otherwise fully protected speech", it does not retain any of its potential commercial character. *Id.* Here, the law clearly implicates protected speech—namely hate speech—by requiring a disclosure of the Plaintiffs' policy for responding to complaints of hateful content. This is different in character and kind from commercial speech and amounts to more than mere disclosure of factual information, such as caloric information or mercury content, as Defendant tries to equate.

### iv. *Whether the Hateful Conduct Law Survives Strict Scrutiny*

Because the Hateful Conduct Law regulates speech based on its content, the appropriate level of review is strict scrutiny. *See Evergreen*, 740 F.3d at 244. To satisfy strict scrutiny, a law must be "narrowly tailored to serve a compelling governmental interest." *Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 96 (2d Cir. 2007). A statute is not narrowly tailored if "a less restrictive alternative would serve the Government's purpose." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813, (2000).

Plaintiffs argue that limiting the free expression of protected speech is not a compelling state interest and that the law is not narrowly tailored. While Defendant concedes that the Hateful Conduct Law may not be able to withstand strict scrutiny, she maintains that the state has a compelling interest in preventing mass shootings, such as the one that took place in Buffalo. (Tr., ECF No. 27 at 45:1–15.)

14

**SA14**

Although preventing and reducing the instances of hate-fueled mass shootings is certainly a compelling governmental interest, the law is not narrowly tailored toward that end.[2]  Banning conduct that incites violence is not protected by the First Amendment[3], but this law goes far beyond that.

While the OAG Investigative Report does make a link between misinformation on the internet and the radicalization of the Buffalo mass shooter (Sawyer, Decl., Ex. A, ECF No. 20-1 at 23–26), even if the law was truly aimed at reducing the instances of hate-fueled mass shootings, the law is not narrowly tailored toward reaching that goal.  It is unclear what, if any, effect a mechanism that allows users to report hateful conduct on social media networks would have on reducing mass shootings, especially when the law does not even require that social media networks affirmatively respond to any complaints of "hateful conduct".  In other words, it is hard to see how the law really changes the status quo—where some social media networks choose to identify and remove hateful content and others do not.

_____

[2] The memorandum in support of the legislation that was presented to the New York State Assembly ahead of the floor debate lists the justification for the law as "concerns about misinformation that is spread on social media networks."  (Sawyer Decl., Ex. C, ECF No. 20-3.) While the law was enacted in the wake of the Buffalo mass shooting, the original iteration of the bill was drafted in the wake of the events of January 6, 2021 (Compl., ECF No. 1 ¶ 30; Sawyer Decl., Ex. D, ECF No. 20-4 at 182–183), further suggesting that the law is really aimed at misinformation on the internet.  However, the First Amendment's shielding of hate speech from regulation means that a state's desire to reduce this type of speech from the public discourse cannot be a compelling governmental interest

[3] The Supreme Court has held that speech that consists of "fighting words" and speech that incites violence or lawlessness are not protected by the First Amendment.  *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).  For speech to incite violence, "there must be 'evidence or rational inference from the import of the language, that [the words in question] were intended to produce, and likely to produce, imminent' lawless action."  *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 70 F. Supp. 3d 572, 581 (S.D.N.Y. 2015), *vacated on other grounds*, 109 F. Supp. 3d 626 (S.D.N.Y. 2015) (citations omitted).  The Hateful Conduct law's ban on speech that incites violence is not limited to speech that is likely to produce *imminent* lawless action.

15

**SA15**

Accordingly, for the reasons stated above, the Court finds that Plaintiffs have demonstrated a substantial likelihood of success on their as applied First Amendment challenges to the Hateful Conduct Law.

B. <u>Plaintiffs' Facial First Amendment Challenges</u>

Plaintiffs argue that the Hateful Conduct Law "is overbroad because it applies to a substantial amount of protected speech, especially compared to its nonexistent or minimal lawful application" and is unconstitutionally vague. (Pls.' Mem., ECF No. 9 at 17–20.)  In response, Defendant argues that Plaintiffs have not demonstrated that the law would chill protected speech and that the operative terms of the law are clear and defined. (Def.'s Opp'n., ECF No. 21 at 18–23.)

Both the Supreme Court and the Second Circuit have recognized that "[a]lthough facial challenges are generally disfavored, they are more readily accepted in the First Amendment context." *Picard v. Magliano*, 42 F.4th 89, 101 (2d Cir. 2022) (quoting *Beal v. Stern*, 184 F.3d 117, 125 (2d Cir. 1999)).  Although facial invalidation of a statute is a "strong medicine" that should be applied "sparingly and only as a last resort", *Hobbs v. Cnty. of Westchester*, 397 F.3d 133, 155 (2d Cir. 2005) (quoting *FCC v. Pacifica Foundation*, 438 U.S. 726, 743 (1978)); *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 105 (2d Cir. 2003), a court may consider a facial overbreadth claim where a plaintiff has established that there are no set of circumstances under which the challenged statute could be valid or that the challenged statute "lacks any plainly legitimate sweep." *Picard*, 42 F.4th at 101 (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).

"It is established that the courts may, as an exception to ordinary standing requirements, entertain a claim that a law, even if constitutional as applied to the claimant, is so broad that it

16

**SA16**

"may inhibit the constitutionally protected speech of third parties[.]"  *Hobbs*, 397 F.3d at 155.

"The purpose of an overbreadth challenge is to prevent the chilling of constitutionally protected

conduct, as prudent citizens will avoid behavior that may fall within the scope of a prohibition,

even if they are not entirely sure whether it does."  *Farrell v. Burke*, 449 F.3d 470, 499 (2d Cir.

2006).  "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in

relation to the statute's plainly legitimate sweep."  *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S.

601, 615 (1973)).  "When a court finds that a statute suffers from such substantial overbreadth, all

enforcement of the statute is generally precluded."  *Am. Booksellers Found.,* 342 F.3d at 104.

As the Court has already discussed, the law is clearly aimed at regulating speech.  Social

media websites are publishers and curators of speech, and their users are engaged in speech by

writing, posting, and creating content.  Although the law ostensibly is aimed at social media

networks, it fundamentally implicates the speech of the networks' users by mandating a policy and

mechanism by which users can complain about other users' protected speech.

Moreover, the Hateful Conduct law is a content based regulation.  The law requires that

social media networks develop policies and procedures with respect to hate speech (or "hateful

conduct" as it is recharacterized by Defendant).  As discussed, the First Amendment protects

individuals' right to engage in hate speech, and the state cannot try to inhibit that right, no matter

how unseemly or offensive that speech may be to the general public or the state.  *See Matal*, 137

S. Ct. at 1764; *see also R.A.V.*, 505 U.S. at 391.  Thus, the Hateful Conduct Law's targeting of

speech that "vilifi[es]" or "humili[ates"] a group or individual based on their "race, color, religion,

ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression"

N.Y. Gen. Bus. Law § 394-ccc(1)(a), clearly implicates the protected speech of social media users.

**SA17**

This could have a profound chilling effect on social media users and their protected freedom of expression.  Even though the law does not require social media networks to remove "hateful conduct" from their websites and does not impose liability on users for engaging in "hateful conduct", the state's targeting and singling out of this type of speech for special measures certainly could make social media users wary about the types of speech they feel free to engage in without facing consequences from the state.  This potential wariness is bolstered by the actual title of the law— "Social media networks; hateful conduct prohibited" —which strongly suggests that the law is really aimed at reducing, or perhaps even penalizing people who engage in, hate speech online.  As Plaintiffs noted during oral argument, one can easily imagine the concern that would arise if the government required social media networks to maintain policies and complaint mechanisms for anti-American or pro-American speech.  (Tr., ECF No. 27 at 29:2.)  Moreover, social media users often gravitate to certain websites based on the kind of community and content that is fostered on that particular website.  Some social media websites—including Plaintiffs'— intentionally foster a "pro-free speech" community and ethos that may become less appealing to users who intentionally seek out spaces where they feel like they can express themselves freely.

The potential chilling effect to social media users is exacerbated by the indefiniteness of some of the Hateful Conduct Law's key terms.  It is not clear what the terms like "vilify" and "humiliate" mean for the purposes of the law.  While it is true that there are readily accessible dictionary definitions of those words, the law does not define what type of "conduct" or "speech" could be encapsulated by them.  For example, could a post using the hashtag "BlackLivesMatter" or "BlueLivesMatter" be considered "hateful conduct" under the law?  Likewise, could social media posts expressing anti-American views be considered conduct that humiliates or vilifies a group based on national origin?  It is not clear from the face of the text, and thus the law does not

put social media users on notice of what kinds of speech or content is now the target of government regulation.

Accordingly, because the Hateful Conduct Law appears to "reach[…] a substantial amount of constitutionally protected conduct", *Farrell*, 449 F.3d at 496 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983)), the Court finds that Plaintiffs have demonstrated a likelihood of success on their facial challenges under the First Amendment.[4]

C.  Preemption Under Section 230 of the Communications Decency Act

Lastly, Plaintiffs allege that the Hateful Conduct Law is preempted by Section 230 of the Communications Decency Act because it imposes liability on websites by treating them as publishers.  (Pl.'s Mem., ECF No. 9 at 20–21.)

The Communications Decency Act provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1); *see also Ricci v. Teamsters Union Loc. 456*, 781 F.3d 25, 27 (2d Cir. 2015).  The Act has an express preemption provision which states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).

---

[4] The Court also finds that severing parts of the law would not serve to save the entire statute. As stated in footnote four, while speech that incites violence is not protected by the First Amendment, whether speech does in fact incite violence is a fact-based inquiry.  *See Am. Freedom Def. Initiative*, 70 F. Supp. 3d at 581 (For speech to incite violence, "there must be 'evidence or rational inference from the import of the language, that [the words in question] were intended to produce, and likely to produce, imminent' lawless action.").  The Supreme Court has rarely applied this standard, "and never explicitly found speech to be on the proscribable side of the standard."  *Id.*  Thus, it is not clear that limiting the Hateful Conduct Law only to speech that incites violence would necessarily pass constitutional muster.  In addition, at oral argument, Plaintiffs argued that the law was not severable.  (Tr., ECF No. 27 at 62:8–63:7.)

A plain reading of the Hateful Conduct Law shows that Plaintiffs' argument is without merit. The law imposes liability on social media networks for failing to provide a mechanism for users to complain of "hateful conduct" and for failure to disclose their policy on how they will respond to complaints. N.Y. Gen. Bus. Law § 394-ccc(5). The law does not impose liability on social media networks for failing to respond to an incident of "hateful conduct", nor does it impose liability on the network for its users own "hateful conduct". The law does not even require that social media networks remove instances of "hateful conduct" from their websites. Therefore, the Hateful Conduct Law does not impose liability on Plaintiffs as publishers in contravention of the Communications Decency Act.

### III. Balance of the Equities

Finally, given that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their First Amendment claims, the Court must consider whether "the balance of the equities tips in [Plaintiffs'] favor, and [whether] an injunction is in the public interest." *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

Given that "enjoining enforcement of a statute that potentially violates citizens' constitutional rights is in the public interest", and that Defendant can show no harm as a result of being prevented from enforcing an unconstitutional statute, the Court finds that the balance of the equities tips in favor of granting the preliminary injunction. *See CompassCare*, 465 F. Supp. 3d at 159.

### <u>CONCLUSION</u>

Accordingly, for the aforementioned reasons, the Court finds that Plaintiffs are entitled to a preliminary injunction prohibiting the enforcement of N.Y. Gen. Bus. Law § 394-ccc. The Clerk of Court is respectfully requested to terminate the pending motion at ECF No. 8.

Dated:  February 14, 2023
        New York, New York

_____
        ANDREW L. CARTER, JR.
        United States District Judge

# NY CLS Gen Bus § 394-ccc

Current through 2022 released Chapters 1-642

*New York Consolidated Laws Service* > *General Business Law (Arts. 1 — 46)* > *Article 26 Miscellaneous (§§ 390 — 399-zzzzz)*

## § 394-ccc. Social media networks; hateful conduct prohibited.

**1.** As used in this section, the following terms shall have the following meanings:

**(a)** "Hateful conduct" means the use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression.

**(b)** "Social media network" means service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public.

**2.** A social media network that conducts business in the state, shall provide and maintain a clear and easily accessible mechanism for individual users to report incidents of hateful conduct. Such mechanism shall be clearly accessible to users of such network and easily accessed from both a social media networks' application and website, and shall allow the social media network to provide a direct response to any individual reporting hateful conduct informing them of how the matter is being handled.

**3.** Each social media network shall have a clear and concise policy readily available and accessible on their website and application which includes how such social media network will respond and address the reports of incidents of hateful conduct on their platform.

**4.** Nothing in this section shall be construed (a) as an obligation imposed on a social media network that adversely affects the rights or freedoms of any persons, such as exercising the right of free speech pursuant to the first amendment to the United States Constitution, or (b) to add to or increase liability of a social media network for anything other than the failure to provide a mechanism for a user to report to the social media network any incidents of hateful conduct on their platform and to receive a response on such report.

**5.** Any social media platform that knowingly fails to comply with the requirements of this section shall be assessed a civil penalty for such violation by the attorney general not to exceed one thousand dollars. Each day such offense shall continue shall constitute a separate additional violation. In determination of any such violation, the attorney general shall be authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules.

## History

L 2022, ch 204, § 1, effective December 3, 2022.

New York Consolidated Laws Service
Copyright © 2022 All rights reserved.

End of Document