# 23-356

## United States Court of Appeals
## for the Second Circuit

EUGENE VOLOKH, LOCALS TECHNOLOGY INC., RUMBLE CANADA INC.,

*Plaintiffs-Appellees*,

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

## JOINT APPENDIX
### Volume 1 – Pages 1-218

LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
(716) 849-1333

FOUNDATION FOR INDIVIDUAL RIGHTS
 AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
(215) 717-3473

LETITIA JAMES
 *Attorney General*
 *State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-8020

*Attorneys for Appellees*

*Attorney for Appellant*

# TABLE OF CONTENTS

**Page**

**Volume 1**

Docket Report Sheet ..........................................................................JA1

Complaint, dated Dec. 1, 2022 ........................................................JA7

Notice of Plaintiffs' Motion for Preliminary Injunction, dated Dec. 6, 2022 .....JA55

Declaration of Darpana Sheth in Support of Plaintiffs' Motion for
Preliminary Injunction, dated Dec. 6, 2022 ................................JA58

    Ex. A  -  New York General Business Law § 394-ccc .......................JA62

    Ex. B  -  Press Release, New York State Office of the Attorney
General (OAG), Attorney General James Launches
Investigations into Social Media Companies for Role in
Buffalo Attack (May 18, 2022) ...........................................JA63

    Ex. C  -  Press Release, New York State Office of the Attorney
General, Attorney General James and Governor Hochul
Release Report on the Role of Online Platforms in the
Buffalo Shooting (Oct. 18, 2022) ........................................JA64

    Ex. D  -  New York State Office of the Attorney General,
*Investigative Report on the Role of Online Platforms in the
Tragic Mass Shooting in Buffalo on May 14, 2022* (2022)....JA70

    Ex. E  -  Eugene Volokh, *New N.Y. Law Aimed at Getting Social
Media Platforms to Restrict "Hateful" Speech*, Reason
(June 7, 2022) ...................................................................JA119

    Ex. F  -  Eugene Volokh, *No, There's No "Hate Speech" Exception
to the First Amendment*, Washington Post (May 7, 2015)...JA121

    Ex. G  -  Transcript of New York Assembly Debate, June 1, 2022.... JA124

# TABLE OF CONTENTS

**Page**

**Volume 2**

Ex. H - Roni Cohen, Comment, *Regulating Hate Speech: Nothing Customary About It*, 15 Chi. J. Int'l L. 229 (2014) .............. JA219

Declaration of Rick Sawyer in Opposition to Plaintiffs' Motion for a Preliminary Injunction, dated Dec. 13, 2022 ...........................................JA238

*Selected Exhibits*

Ex. B - U.S. Department of Homeland Security, *Homeland Threat Assessment* (2020) ...................................................JA242

Ex. C - Sponsor's Memorandum in Support of New York Assembly Bill 7865 (2021) .................................................JA268

Transcript of Dec. 21, 2022, Proceedings, filed Jan. 5, 2023....................JA270

Opinion & Order, dated Feb. 14, 2023........................................................JA336

Notice of Appeal, dated Mar. 13, 2023.......................................................JA357

STAYED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:22−cv−10195−ALC

Volokh et al v. James
Assigned to: Judge Andrew L. Carter, Jr
Cause: 42:1983 Civil Rights Act

Date Filed: 12/01/2022
Jury Demand: None
Nature of Suit: 950 Constitutional − State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Eugene Volokh**                    represented by  **Barry Nelson Covert**
Lipsitz, Green et al
42 Delaware Avenue
Suite 120
Buffalo, NY 14202
716−849−1333
Fax: 716−855−1580
Email: bcovert@lglaw.com
*ATTORNEY TO BE NOTICED*

**Daniel Ortner**
Foundation for Individual Rights and Expression
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
215−717−3473
Email: Daniel.Ortner@thefire.org
*ATTORNEY TO BE NOTICED*

**James Michael Diaz**
Foundation for Individual Rights and Expression
510 Walnut St
Suite 1250
Philadelphia, PA 19106
215−717−3473
Fax: 215−717−3440
Email: jay.diaz@thefire.org
*ATTORNEY TO BE NOTICED*

**Darpana Mukund Sheth**
Foundation for Individual Rights and Expression (FIRE)
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
646−279−4980
Email: darpana.sheth@thefire.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Locals Technology Inc.**          represented by  **Barry Nelson Covert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Ortner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Michael Diaz**
(See above for address)

**JA1**

*ATTORNEY TO BE NOTICED*

**Darpana Mukund Sheth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rumble Canada Inc.**                    represented by    **Barry Nelson Covert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Ortner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Michael Diaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Darpana Mukund Sheth**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Letitia James**                         represented by    **Seth Jonathan Farber**
*in her official capacity as Attorney*                    NYS Office of The Attorney General
*General of New York*                                      28 Liberty Street
Ste 17th Floor
New York, NY 10005
212−416−8029
Fax: 212−416−6009
Email: seth.farber@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine Rhodes Janofsky**
New York State Office of the Attorney
General
28 Liberty Street
New York, NY 10005
212−416−8621
Email: Katherine.Janofsky@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Richard W Sawyer**
Office of the Attorney General
28 Liberty St.
New York, NY 10005
212−416−6182
Email: richard.sawyer@ag.ny.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 12/01/2022 | 1 | COMPLAINT against Letitia James. (Filing Fee $ 402.00, Receipt Number ANYSDC−27027075)Document filed by Eugene Volokh, Rumble Canada Inc., Locals Technology Inc...(Sheth, Darpana) (Entered: 12/01/2022) |
| 12/01/2022 | 2 | CIVIL COVER SHEET filed..(Sheth, Darpana) (Entered: 12/01/2022) |

**JA2**

| | | |
|---|---|---|
| 12/01/2022 | 3 | NOTICE OF APPEARANCE by Darpana Mukund Sheth on behalf of Locals Technology Inc., Rumble Canada Inc., Eugene Volokh..(Sheth, Darpana) (Entered: 12/01/2022) |
| 12/01/2022 | 4 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Rumble Inc. for Locals Technology Inc.; Corporate Parent 100045728 Ontario Inc. for Rumble Canada Inc.. Document filed by Locals Technology Inc., Rumble Canada Inc...(Sheth, Darpana) (Entered: 12/01/2022) |
| 12/01/2022 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to Letitia James, re: 1 Complaint. Document filed by Locals Technology Inc., Rumble Canada Inc., Eugene Volokh..(Sheth, Darpana) (Entered: 12/01/2022) |
| 12/02/2022 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Darpana Mukund Sheth. The party information for the following party/parties has been modified: Letitia James, Eugene Volokh, Rumble Canada Inc., Locals Technology Inc. The information for the party/parties has been modified for the following reason/reasons: party role was entered incorrectly; party text was omitted. (vf) (Entered: 12/02/2022)** |
| 12/02/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge Andrew L. Carter, Jr. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district−judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf−related−instructions..(vf) (Entered: 12/02/2022) |
| 12/02/2022 | | Magistrate Judge Ona T. Wang is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018−06/AO−3.pdf. (vf) (Entered: 12/02/2022) |
| 12/02/2022 | | Case Designated ECF. (vf) (Entered: 12/02/2022) |
| 12/02/2022 | 6 | ELECTRONIC SUMMONS ISSUED as to Letitia James. (vf) (Entered: 12/02/2022) |
| 12/05/2022 | 7 | NOTICE OF APPEARANCE by Seth Jonathan Farber on behalf of Letitia James..(Farber, Seth) (Entered: 12/05/2022) |
| 12/06/2022 | 8 | MOTION for Preliminary Injunction . Document filed by Locals Technology Inc., Rumble Canada Inc., Eugene Volokh..(Sheth, Darpana) (Entered: 12/06/2022) |
| 12/06/2022 | 9 | MEMORANDUM OF LAW in Support re: 8 MOTION for Preliminary Injunction . . Document filed by Locals Technology Inc., Rumble Canada Inc., Eugene Volokh..(Sheth, Darpana) (Entered: 12/06/2022) |
| 12/06/2022 | 10 | DECLARATION of Darpana Sheth in Support re: 8 MOTION for Preliminary Injunction .. Document filed by Locals Technology Inc., Rumble Canada Inc., Eugene Volokh. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H).(Sheth, Darpana) (Entered: 12/06/2022) |
| 12/06/2022 | 11 | PROPOSED ORDER. Document filed by Locals Technology Inc., Rumble Canada Inc., Eugene Volokh. Related Document Number: 8 ..(Sheth, Darpana) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 12/06/2022) |
| 12/06/2022 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 11 Proposed Order was reviewed and approved as to form. (tp) (Entered: 12/06/2022)** |
| 12/07/2022 | 12 | ORDER: The Court is in receipt of Plaintiffs' motion for preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) at ECF No. 8. Defendant is directed to file a written response by December 13, 2022. Any reply must be filed by December 15, 2022. The Court shall hold a telephonic hearing on the motion on Monday, December 19, 2022 at 2:00 p.m. The parties shall contact the Court at 1−888−363−4749 (access code: 3768660). SO ORDERED..( Responses due by 12/13/2022, Replies due by 12/15/2022., Telephone Conference set for 12/19/2022 at |

**JA3**

| | | 02:00 PM before Judge Andrew L. Carter Jr..) (Signed by Judge Andrew L. Carter, Jr on 12/07/2022) (ama) (Entered: 12/07/2022) |
|---|---|---|
| 12/07/2022 | 13 | NOTICE OF APPEARANCE by Barry Nelson Covert on behalf of Locals Technology Inc., Rumble Canada Inc., Eugene Volokh..(Covert, Barry) (Entered: 12/07/2022) |
| 12/08/2022 | 14 | MOTION for Daniel Ortner to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−27060246. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Locals Technology Inc., Rumble Canada Inc., Eugene Volokh. (Attachments: # 1 Supplement Certificate of Good Standing, # 2 Supplement Certificate of Good Standing, # 3 Affidavit Declaration of Daniel Ortner, # 4 Text of Proposed Order Granting Motion for Pro Hac Vice).(Ortner, Daniel) (Entered: 12/08/2022) |
| 12/08/2022 | 15 | AFFIDAVIT OF SERVICE of Summons and Complaint. Letitia James served on 12/2/2022, answer due 12/23/2022. Service was accepted by Jasmine Hughes, Intake Specialist. Document filed by Eugene Volokh; Rumble Canada Inc.; Locals Technology Inc...(Sheth, Darpana) (Entered: 12/08/2022) |
| 12/08/2022 | 16 | MOTION for James Diaz to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−27061404. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Locals Technology Inc., Rumble Canada Inc., Eugene Volokh. (Attachments: # 1 Supplement Certificate of Good Standing, # 2 Affidavit Declaration of James Diaz, # 3 Text of Proposed Order Granting Motion for Pro Hac Vice).(Diaz, James) (Entered: 12/08/2022) |
| 12/08/2022 | 17 | NOTICE OF APPEARANCE by Katherine Rhodes Janofsky on behalf of Letitia James..(Janofsky, Katherine) (Entered: 12/08/2022) |
| 12/09/2022 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE−FILE Document No. 14 MOTION for Daniel Ortner to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−27060246. Motion and supporting papers to be reviewed by Clerk's Office staff. The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of California and the Supreme Court of Virginia. Re−file the motion as a Motion to Appear Pro Hac Vice − attach the correct signed PDF − select the correct named filer/filers − attach valid Certificates of Good Standing issued within the past 30 days − attach Proposed Order. (sac)** (Entered: 12/09/2022) |
| 12/09/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 16 MOTION for James Diaz to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−27061404. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sac)** (Entered: 12/09/2022) |
| 12/09/2022 | 18 | ORDER granting 16 Motion for James M. Diaz to Appear Pro Hac Vice. (Signed by Judge Andrew L. Carter, Jr on 12/9/2022) (ate) (Entered: 12/09/2022) |
| 12/12/2022 | 19 | NOTICE OF APPEARANCE by Richard W Sawyer on behalf of Letitia James..(Sawyer, Richard) (Entered: 12/12/2022) |
| 12/13/2022 | 20 | DECLARATION of Rick Sawyer in Opposition re: 8 MOTION for Preliminary Injunction .. Document filed by Letitia James. (Attachments: # 1 Exhibit Ex A − AG Investigative Report of Buffalo Shooting of May 2022, # 2 Exhibit Ex B − Homeland Security Threat Assessment October 2020, # 3 Exhibit Ex C − Assembly Sponsors Memo re Bill A7865.pdf, # 4 Exhibit Ex D − Assembly Debate − June 1, 2022).(Farber, Seth) (Entered: 12/13/2022) |
| 12/13/2022 | 21 | MEMORANDUM OF LAW in Opposition re: 8 MOTION for Preliminary Injunction . . Document filed by Letitia James..(Farber, Seth) (Entered: 12/13/2022) |
| 12/15/2022 | 22 | MOTION for Daniel Moshe Ortner to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Locals Technology Inc., Rumble Canada Inc., Eugene Volokh. (Attachments: # 1 Supplement Certificate of Good Standing from Supreme Court of California, # 2 Supplement Certificate of Good Standing from Supreme Court of Virginia, # 3 Affidavit Declaration of Daniel Ortner, # 4 Text of Proposed Order Granting Motion for Pro Hac Vice).(Ortner, |

| | | |
|---|---|---|
| | | Daniel) (Entered: 12/15/2022) |
| 12/15/2022 | 23 | REPLY MEMORANDUM OF LAW in Support re: 8 MOTION for Preliminary Injunction . . Document filed by Locals Technology Inc., Rumble Canada Inc., Eugene Volokh..(Diaz, James) (Entered: 12/15/2022) |
| 12/16/2022 | | >>>**NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 22 MOTION for Daniel Moshe Ortner to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sgz)** (Entered: 12/16/2022) |
| 12/16/2022 | 24 | ORDER FOR ADMISSION PRO HAC VICE: granting 22 Motion for Daniel Moshe Ortner to Appear Pro Hac Vice. (Signed by Judge Andrew L. Carter, Jr on 12/16/2022) (ama) (Entered: 12/16/2022) |
| 12/19/2022 | | Minute Entry for proceedings held before Judge Andrew L. Carter, Jr: Telephone Oral Argument on the Motion for Preliminary Injunction held on 12/19/2022. Barry Covert, Michael Ellis, Daniel Ortner, James Diaz and Darpana Sheth for Plaintiffs. Seth Farber, Katherine Janofsky and Richard Sawyer for Defendant. (tdh) (Entered: 12/27/2022) |
| 12/20/2022 | 25 | LETTER MOTION for Extension of Time *for Defendant James to Respond to Complaint* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated December 20, 2022., LETTER MOTION for Extension of Time to File *Defendant James's Response to Complaint* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated December 20, 2022. Document filed by Letitia James..(Farber, Seth) (Entered: 12/20/2022) |
| 12/20/2022 | 26 | ORDER: granting 25 Letter Motion for Extension of Time; granting 25 Letter Motion for Extension of Time to File. SO ORDERED. (Signed by Judge Andrew L. Carter, Jr on 12/20/2022) (ama) (Entered: 12/20/2022) |
| 12/20/2022 | | Set/Reset Deadlines: Letitia James answer due 2/3/2023. (ama) (Entered: 12/20/2022) |
| 01/05/2023 | 27 | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/19/2022 before Judge Andrew L. Carter, Jr.. Court Reporter/Transcriber: Marissa Mignano, (212) 420−0771. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/26/2023. Redacted Transcript Deadline set for 2/6/2023. Release of Transcript Restriction set for 4/5/2023. (js) (Entered: 01/05/2023) |
| 01/05/2023 | 28 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/19/2022 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(js) (Entered: 01/05/2023) |
| 02/14/2023 | 29 | OPINION AND ORDER re: 8 MOTION for Preliminary Injunction . filed by Rumble Canada Inc., Locals Technology Inc., Eugene Volokh. Accordingly, for the aforementioned reasons, the Court finds that Plaintiffs are entitled to a preliminary injunction prohibiting the enforcement of N.Y. Gen. Bus. Law § 394−ccc. The Clerk of Court is respectfully requested to terminate the pending motion at ECF No. 8. (Signed by Judge Andrew L. Carter, Jr on 2/14/2023) (tg) (Entered: 02/14/2023) |
| 03/13/2023 | 30 | NOTICE OF INTERLOCUTORY APPEAL from 29 Memorandum & Opinion,. Document filed by Letitia James. Filing fee $ 505.00, receipt number ANYSDC−27458321. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Farber, Seth) (Entered: 03/13/2023) |
| 03/13/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 30 Notice of Interlocutory Appeal. (tp) (Entered: 03/13/2023) |
| 03/13/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 30 Notice of Interlocutory Appeal, filed by Letitia James were transmitted to the U.S. Court of Appeals. (tp) (Entered: 03/13/2023) |

| 03/14/2023 | 31 | LETTER MOTION for Extension of Time to File Answer re: 1 Complaint addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023., LETTER MOTION to Stay *All Pending Deadlines* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023., LETTER MOTION for Extension of Time to File *Response to Complaint* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. Document filed by Letitia James..(Farber, Seth) (Entered: 03/14/2023) |
|---|---|---|
| 03/14/2023 | 32 | ORDER: The Court is in receipt of Defendant's motion for a stay of these proceedings pending its appeal to the Second Circuit. (ECF No. 31.) Plaintiffs are directed to file a letter by March 15, 2023 indicating whether they consent to or oppose a stay. (Signed by Judge Andrew L. Carter, Jr on 3/14/2023) (ate) (Entered: 03/14/2023) |
| 03/15/2023 | 33 | LETTER RESPONSE in Opposition to Motion addressed to Judge Andrew L. Carter, Jr. from Daniel M. Ortner dated March 15, 2023 re: 31 LETTER MOTION for Extension of Time to File Answer re: 1 Complaint addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. LETTER MOTION to Stay *All Pending Deadlines* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. LETTER MOTION for Extension of Time to File *Response to Complaint* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. . Document filed by Locals Technology Inc., Rumble Canada Inc., Eugene Volokh..(Ortner, Daniel) (Entered: 03/15/2023) |
| 03/16/2023 | 34 | ORDER: Plaintiffs are granted leave to file a letter brief in opposition to Defendant's motion to stay at ECF No. 31 by March 24, 2023. Defendant may file a letter brief in response by March 31, 2023. ( Responses due by 3/31/2023) (Signed by Judge Andrew L. Carter, Jr on 3/16/2023) (ate) (Entered: 03/16/2023) |
| 03/24/2023 | 35 | LETTER RESPONSE in Opposition to Motion addressed to Judge Andrew L. Carter, Jr. from Daniel M. Ortner dated 03/24/2023 re: 31 LETTER MOTION for Extension of Time to File Answer re: 1 Complaint addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. LETTER MOTION to Stay *All Pending Deadlines* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. LETTER MOTION for Extension of Time to File *Response to Complaint* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. . Document filed by Locals Technology Inc., Rumble Canada Inc., Eugene Volokh..(Ortner, Daniel) (Entered: 03/24/2023) |
| 03/31/2023 | 36 | REPLY MEMORANDUM OF LAW in Support re: 31 LETTER MOTION for Extension of Time to File Answer re: 1 Complaint addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. LETTER MOTION to Stay *All Pending Deadlines* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. LETTER MOTION for Extension of Time to File *Response to Complaint* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. . Document filed by Letitia James..(Farber, Seth) (Entered: 03/31/2023) |
| 04/03/2023 | 37 | ORDER granting 31 Letter Motion for Extension of Time to Answer re 31 LETTER MOTION for Extension of Time to File Answer re: 1 Complaint addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. LETTER MOTION to Stay *All Pending Deadlines* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. LETTER MOTION for Extension of Time to File *Response to Complaint* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023.. ; granting 31 Letter Motion to Stay re: 31 LETTER MOTION for Extension of Time to File Answer re: 1 Complaint addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. LETTER MOTION to Stay *All Pending Deadlines* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. LETTER MOTION for Extension of Time to File *Response to Complaint* addressed to Judge Andrew L. Carter, Jr. from Seth Farber dated March 14, 2023. ; terminating 31 Letter Motion for Extension of Time to File. Accordingly, Defendant's deadline to answer or otherwise respond to the Complaint is adjourned until 30 days after the conclusion of all appeals of the Court's February 14, 2023 Opinion and Order. The Clerk of Court is respectfully requested to terminate the pending motion at ECF No. 31 and mark this case as stayed. (Signed by Judge Andrew L. Carter, Jr on 4/3/2023) (ate) (Entered: 04/03/2023) |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EUGENE VOLOKH, RUMBLE CANADA INC., and LOCALS TECHNOLOGY INC. <br><br> *Plaintiffs*, <br><br> v. <br><br> LETITIA JAMES, in her official capacity as Attorney General of New York, <br><br> *Defendant*. | Civil Action No.: 1:22-cv-10195 |

**VERIFIED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

DARPANA M. SHETH
(New York Bar No. 4287918)
DANIEL M. ORTNER*
(California State Bar No. 329866)
JAMES M. DIAZ*
(Vermont Bar No. 5014)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut St., Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
daniel.ortner@thefire.org
jay.diaz@thefire.org
darpana.sheth@thefire.org

BARRY N. COVERT**
(New York Bar No. 27118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave., Suite 120
Buffalo, NY 14202
Tel: (716) 849-1333 x 365
bcovert@lglaw.com

*Attorneys for Plaintiff*
**Pro Hac Vice* Motions Forthcoming
** S.D.N.Y. Admission Pending

1

**INTRODUCTION**

1.      The State of New York has enacted a new law, slated to take effect December 3, 2022, with one goal: to silence disfavored—but constitutionally protected—expression. New York General Business Law Section 394-ccc ostensibly targets "hateful conduct," but in reality, regulates protected online speech that someone, somewhere perceives to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories (the "Online Hate Speech Law").

2.      New York's Online Hate Speech Law, titled "Social media networks; hateful conduct prohibited," hangs like the Sword of Damocles over a broad swath of online services (such as websites and apps), threatening to drop if they do not properly address speech that expresses certain state-disfavored viewpoints, as the state now mandates they must. In something of a First Amendment "double whammy," the Online Hate Speech Law burdens the publication of disfavored but protected speech through unconstitutionally compelled speech—forcing online services to single out "hate speech" with a dedicated policy, a mandatory report & response mechanism, and obligatory direct replies to each report. If a service refuses, the law threatens New York Attorney General investigations, subpoenas, and daily fines of $1,000 per violation.

3.      There can be no reasonable doubt New York will enforce the Online Hate Speech Law to strong-arm online services into censoring protected speech. The Attorney General's intentions, in fact, could not be clearer; as recited, for example, in an October press release, the Attorney General declared that "[o]nline platforms should be held accountable for allowing hateful and dangerous content to spread on their platforms" because an alleged "lack of oversight, transparency, and accountability of these platforms allows hateful and extremist views to proliferate online." Press Release, Office of the New York State Attorney General, *Attorney*

2

**JA8**

*General James and Governor Hochul Release Report on the Role of Online Platforms in the Buffalo Shooting* (Oct. 18, 2022), https://ag.ny.gov/press-release/2022/attorney-general-james-and-governor-hochul-release-report-role-online-platforms [https://perma.cc/L5VP-3EMN].

4.     The threat posed by the new Online Hate Speech Law is of critical concern to online services like those operated by the Plaintiffs here.

5.     Plaintiff Eugene Volokh operates The Volokh Conspiracy, a legal blog subject to the Online Hate Speech Law. The Volokh Conspiracy is dedicated to maintaining a free and open marketplace of ideas, and thus generally avoids regulating or removing visitor comments from his site based on viewpoint. Volokh does not believe that speech targeted by the Online Hate Speech Law warrants the now mandated policy, report & response mechanism, or direct replies to reports.

6.     Plaintiffs Rumble Canada Inc. and Locals Technology Inc. own and operate online services subject to the Online Hate Speech Law. The sites compete with market leaders such as YouTube by touting their acceptance of a robust variety of speech, including viewpoints rejected by other platforms. Both sites generally avoid regulating or removing creator content or visitor comments from their sites so long as the content or comments comply with their content policies. Neither Plaintiff has a business reason to create a dedicated policy and report & response mechanism, or to directly reply to reports for the speech targeted by the Online Hate Speech Law.

7.     New York cannot regulate disfavored online speech by compelling online services to "mouth support for views they find objectionable," *Janus v. Am. Fed'n of State, Cnty. and Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018), in hopes of deterring or eliminating hate speech. Plaintiffs bring this lawsuit to vindicate their constitutional and statutory rights because the First Amendment does not tolerate efforts, like those of the State of New York, to "cleanse public debate." *Cohen v. California*, 403 U.S. 15, 25 (1971).

3

**JA9**

## JURISDICTION

8.      This action arises under the First and Fourteenth Amendments to the United States Constitution and the following federal laws: (a) the Civil Rights Act of 1871, 42 U.S.C. Sections 1983 and 1988; (b) Section 230 of the Communications Decency Act, 47 U.S.C. Section 230; and (c) the Declaratory Judgment Act, 28 U.S.C. Sections 2201–02.

9.      Plaintiffs seek declaratory and injunctive relief declaring that New York General Business Law § 394-ccc is unconstitutional, facially and as-applied, under the First and Fourteenth Amendments, and is also preempted by Section 230 of the Communications Decency Act.

10.      This Court has original jurisdiction over these federal claims under 28 U.S.C. Sections 1331 and 1343.

## VENUE

11.      Venue is proper in this judicial district under 28 U.S.C. Section 1391(b)(1) because Defendant resides in the Southern District of New York. The New York Attorney General maintains an office in this District and conducts a substantial portion of its activity in this District. *Buffalo Tchrs. Fed'n, Inc. v. Helsby*, 426 F. Supp. 828, 830 (S.D.N.Y. 1976).

## THE PARTIES

### *Plaintiffs*

12.      Plaintiff Eugene Volokh, a California resident and constitutional law professor at UCLA School of Law,[*] is co-owner and operator of The Volokh Conspiracy, a legal blog with posts by Volokh, other professors, and various academically minded lawyers from around the country (collectively "Volokh" or "The Volokh Conspiracy"). The site is hosted at reason.com/volokh by Reason magazine, a print and online publication dedicated to "free minds

---

[*] Eugene Volokh is participating in this lawsuit on his own behalf. UCLA has taken no position on the matter.

and free markets." Volokh and his co-bloggers have final editorial authority on The Volokh Conspiracy, including with regard to content selection. Visitors to the site, after registering, may comment on published blog posts and reply to other commenters. The public can view all comments and replies. New York's Online Hate Speech Law regulates The Volokh Conspiracy as a "social media network" because it is an "internet platform[] . . . designed to enable users to share any content with other users or to make such content available to the public." Volokh objects to the Online Hate Speech Law's requirements as contrary to The Volokh Conspiracy's mission.

13.    Plaintiff Rumble Canada Inc., headquartered in Toronto and a wholly owned subsidiary of Rumble Inc. (which is headquartered in Longboat Key, Florida), is the owner and operator of Rumble.com (collectively "Rumble"), an online service similar to YouTube in that it allows independent creators to upload and share video content, and registered users to comment on videos and to reply to other commenters. The public can view all videos, comments, and replies on Rumble. New York's Online Hate Speech Law regulates Rumble as a "social media network" because it is an "internet platform[] . . . designed to enable users to share any content with other users or to make such content available to the public." Rumble objects to the Online Hate Speech Law's requirements as contrary to its pro-free speech purpose and mission "to protect a free and open internet" and to "create technologies that are immune to cancel culture." *About Us*, Rumble Inc., https://corp.rumble.com (last visited Nov. 25, 2022).

14.    Plaintiff Locals Technology Inc., headquartered in Longboat Key, Florida, and a wholly owned subsidiary of Rumble Inc., is the owner and operator of Locals.com (collectively "Locals"), an online service that allows creators to communicate and share content directly with unpaid and paid subscribers. Visitors to Locals, after registering, may comment on creator pages or reply to other commenters. New York's Online Hate Speech Law regulates Locals as a "social

5

**JA11**

media network" because it is an "internet platform[] . . . designed to enable users to share any content with other users or to make such content available to the public." Locals objects to the Online Hate Speech Law's requirements as contrary to its pro-free speech purpose and mission of being "committed to fostering a community that is safe, respectful, and dedicated to the free exchange of ideas." *Community Guidelines*, Locals, https://locals.com/community-guidelines (last visited Nov. 25, 2022).

***Defendant***

15.    Defendant Letitia James, New York's Attorney General, is responsible for enforcing the Online Hate Speech Law, which provides her office investigative authority, subpoena powers, and the ability to assess civil penalties for violations and carry out this obligation. N.Y. Gen. Bus. Law § 394-ccc(5). At all relevant times, Attorney General James was and is acting under the color of state law. Attorney General James is sued in her official capacity only.

## FACTUAL ALLEGATIONS

16.    Hate speech is generally viewed as "[s]peech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground." *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017). But it is nonetheless protected against viewpoint-based suppression. *Id.*

17.    Since the end of World War II, as other nations across the globe passed laws to prohibit or penalize hate speech, our Supreme Court has repeatedly struck down laws purporting to target hate speech. *See* Roni Cohen, *Regulating Hate Speech: Nothing Customary About It*, 15 Chi. J. Int'l L. 229, 238–48 (2014). "As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011). As the Court recently emphasized, limiting speech perceived to be

**JA12**

hateful, insulting, or offensive "strikes at the heart of the First Amendment." *Matal*, 137 S.Ct. at 1764. For the United States, "the interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship." *Reno v. Am. C.L. Union*, 521 U.S. 844, 885 (1997).

18.     Despite its First Amendment protection, after New York's lawmakers spent several years targeting online "hate speech," the State passed a law that singles out and penalizes this speech. Acting in the wake of a racially motivated mass shooting, New York's Legislature fast-tracked the Online Hate Speech Law, passing it with little debate after only nineteen days.  New York Governor Kathy Hochul praised the law, saying it would require "social media networks to monitor and report hateful conduct on their platforms." Governor Kathy Hochul, *Governor Hochul Signs Landmark Legislative Package to Strengthen Gun Laws and Protect New Yorkers* at 12:30–13:07 (June 6, 2022), https://youtu.be/SNrci_ey8L4?t=750. Attorney General James said the law was necessary because "social media platforms provide an unchecked vehicle for [] dangerous and corrosive ideas to spread," and it would allow her office to "expand our work . . . to address this growing threat" from "dangerous and hateful platforms." *Id.* at 35:50–36:35.

19.     Effective December 3, 2022, New York's law requires virtually every online service that is accessed by New Yorkers and allows third parties to share information, to endorse the state's definition of hate speech, mislabeled as "hateful conduct." Specifically, the law compels online services to single out hate speech with a dedicated policy, a report & response mechanism, and mandated direct replies to each report. In doing so, the law targets and burdens protected speech that someone, somewhere believes to "vilify, humiliate, or incite violence against a group or a class of persons" based on race, color, religion, or other protected categories. N.Y. Gen. Bus. Law § 394-ccc(a).

20.    Plaintiffs, owners of online services subject to New York's law, object to the law's impositions. They seek to promote free and open debate on their platforms because they believe in the free marketplace of ideas. They publish all manner of speech and do not believe that the speech targeted by the Online Hate Speech Law should be chilled, prohibited, or removed as a result of a government edict. They do not want to parrot the state's message or be required to reply to every complaint of alleged "hate speech."

21.    Plaintiffs allow a wide range of speech and are concerned that publishing a policy and mechanisms targeting a specific form of speech is likely to chill the protected speech of commenters, and thus implicate their platforms in the chilling of protected speech.

22.    Moreover, as a result of the law's vague terms, Plaintiffs are not even sure how to comply. The law's title "Social media networks; hateful conduct prohibited" suggests Plaintiffs must ban speech that meets state-defined hate speech. The definition's vague terms, "vilify," "humiliate," "incite," and "violence," make it impossible for either Plaintiffs or the public to know exactly what speech constitutes "hateful conduct."

23.    Under New York's expansive hate speech definition, a John Oliver comedy/news segment poking fun at the British monarchy could be categorized as humiliating English people based on their national origin, LastWeekTonight, *The Monarchy: Last Week Tonight with John Oliver (HBO)* (Nov. 14, 2022), https://www.youtube.com/watch?v=KWterDbJKjY; an interview by ReasonTV discussing a satirical tweet by the Babylon Bee calling the Biden Administration's Assistant Secretary for Health Rachel Levine its "man of the year" may be "vilifying" or "humiliating" to transgender people, ReasonTV, *Babylon Bee Won't Back Down Over Trans Joke Twitter Ban* (Aug. 23, 2022), https://rumble.com/v1h339k-babylon-bee-wont-back-down-over-trans-joke-twitter-ban.html [https://perma.cc/3VDG-EDAX]; a video from London's Barbican Art

**JA14**

Gallery showcasing a photography exhibit on masculinity and patriarchy might humiliate or vilifying men, Barbican Centre, *Curator Tour: Masculinities: Liberation through Photography at the Barbican Art Gallery* (Jul. 20, 2022) https://www.youtube.com/watch?v=AivPz4enrmA; a Wall Street Journal book review article with comments quoting Gandhi's use of a racist term for Black South Africans may be vilifying or humiliating Black South Africans, Indians, or both based on their race or ethnicity, Wm. Roger Louis, *Ghandi The Imperialist*, Wall St. J. (Jan. 8, 2016), https://www.wsj.com/articles/Gandhi-the-imperialist-1452290431; and a black and white historical video of Malcom X discussing white people's guilt could be viewed as vilifying or humiliating white people based on their race, MalcolmShabazz, *Malcolm X On White People's Guilt Complex* (Jan. 30, 2018), https://www.youtube.com/watch?v=q0nNSRuSzx4.

24.    New York cannot justify such a sweeping regulation of protected speech. The Online Hate Speech Law violates the First Amendment because it burdens the publication of speech based on its viewpoint, unconstitutionally compels speech, and is overbroad. It is also vague in violation of the Fourteenth Amendment, *see Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018) ("It is self-evident that an indeterminate prohibition carries with it the opportunity for abuse." (quotation marks and alterations omitted)), and preempted by Section 230 of the Communications Decency Act. Given well-settled Supreme Court precedent, the New York's law must be enjoined and struck down.

***New York Aims to Adopt the Online Hate Speech Law to Control Certain Internet Speech.***

**A.  New York officials have been trying to suppress certain online speech for several years.**

25.    For at least the last several years, New York policymakers have tried to compel online services to chill, prohibit, or remove online speech disfavored by the state.

9

**JA15**

26.     For example, in 2019, New York State Senator David Carlucci introduced Senate Bill S.7275, or the "Social Media Hate Speech Accountability Act." S.B. 7275, 2019–20 Leg. Sess. (N.Y. 2019), https://www.nysenate.gov/legislation/bills /2019/s7275.

27.     S.7275 sought to "require social media network platforms to create a process to remove" so-called "hate speech." Sponsor Memo, S.B. 7275, 2019–20 Leg. Sess. (N.Y. 2019), https://www.nysenate.gov/legislation/bills/2019/s7275.

28.     S.7275 would have required social media networks to remove or block "hate speech" within 24 hours of receiving a visitor complaint and "immediately" notify the complainant of a decision along with the network's reasoning for the decision. S.B. 7275 § 3(b)(ii)-(iv). Violations of the statute, "including any offense not committed in this state," would have been punishable by a fine of up to one million dollars per violation. S.B. 7275 § 5(a)(ii).

29.     In announcing S.7275, Senator Carlucci said, "While social media companies do have policies in place against what content is deemed hate speech or which can be removed, no one but the company is enforcing it. This bill will allow the State to take action and hold social media platforms accountable." Press Release, David Carlucci, Senator, New York State Senate, *Senator David Carlucci Introduces Legislation to Combat Hate Speech on Social Media* (Jan. 21, 2020), https://www.nysenate.gov/newsroom/press-releases/david-carlucci/senator-david-carlucci -introduces-legislation-combat-hate.

30.     In May of 2021, New York Assemblywoman Patricia Fahy and State Senator Anna Kaplan announced a package of legislation, including companion bills S.4511 and A7865, aimed at addressing the proliferation of online hate speech (as well as "misinformation"). Press Release, Anna M. Kaplan, Senator, New York State Senate, *Lawmakers Push for Better Enforcement of Social Media Standards Against Hate and Misinformation* (May 5, 2021),

**JA16**

https://www.nysenate.gov/newsroom/press-releases/anna-m-kaplan/lawmakers-push-better-enforcement-social-media-standards.

31.     S.4511 and A7865 drew from Carlucci's S.7275, but included fewer defined terms and removed the enforcement provisions.

32.     In the May 5, 2021, press release, Assemblywoman Fahy decried "[t]he alarming spread of misinformation and hate speech across our online and social media platforms."

33.     Assemblywoman Fahy also expressed concern that online services "self-promulgated guidelines" for online speech were "often ineffective at preventing the spread of hate speech or other misinformation online before its simply too late."

34.     The bills remained in legislative committees for a year.

**B.   In the wake of a racially motivated mass shooting in Buffalo, New York's highest public officials blamed the internet.**

35.     On May 14, 2022, a white supremacist murdered ten Black people and injured three others at a Buffalo supermarket.

36.     The killer livestreamed the mass shooting via online streaming service Twitch for approximately two minutes to 28 viewers before Twitch ended the stream.

37.     New York officials immediately blamed social media for the attack. The following day on national television, Governor Kathy Hochul blamed "evil ideas . . . all induced by the internet" and faulted "platforms . . . willing to share this information, allow it to be posted." *Meet the Press—May 15, 2022*, NBC News (May 15, 2022), https://www.nbcnews.com/news/ncna 1295425.

38.     On May 18, 2022, Governor Hochul directed New York Attorney General Letitia James, pursuant to New York Executive Law Section 63(8), to investigate various online platforms for "civil or criminal liability for their role in promoting, facilitating, or providing a platform to

**JA17**

plan or promote violence." Letter from Kathy Hochul, Governor of New York, to Letitia James, Attorney General of New York, (May 18, 2022), https://www.governor.ny.gov/sites/default /files/2022-05/Executive_Law_63_Referral.pdf.

39.     That same day, Attorney General James launched an investigation into "social media companies and other online resources," alleging that the Buffalo shooting "revealed the depths and danger of the online forums that spread and promote hate." Press Release, Office of the New York State Attorney General, *Attorney General James Launches Investigations Into Social Media Companies for Role in Buffalo Attack* (May 18, 2022), https://ag.ny.gov/press-release/2022/attorney-general-james-launches-investigations-social-media-companies-role.

40.     Contemporaneously, the New York Legislature reacted by hastily amending the Fahy/Kaplan bills to include an enforcement provision, substituting the bills with Assembly Bill A7865A.

41.     A7685A was then passed on June 2, 2022.

42.     In promoting the bill's passage, Assemblywoman Fahy focused her ire on the internet and social media companies, declaring on Facebook: "racist and violent hate speech has been allowed to spread on the internet and social media almost unchecked." Assemblymember Patricia A. Fahy, Facebook (June 1, 2022), https://www.facebook.com/Assemblymember PatriciaFahy/posts/pfbid0svnTeCD5m3zhbGDT6Hzs45mgoMBxCcQfWzfUJqgdtRbKqryve12o b9Rd8BriPvBEl.

43.     And in a press release, Assemblywoman Fahy said "we need social media platforms to put into place clear, concise policies on how to report and address hateful content." Press Release, Carl E. Heastie, Assembly Speaker, New York State Assembly, *Assembly Passes*

**JA18**

*Package of Legislation to Strengthen State's Gun Laws and Protect New York Communities* (June

2, 2022), https://nyassembly.gov/Press/?sec=story&story=102242.

44.     At a June 6, 2022, press conference to sign the bill, among others, Governor Hochul

declared that the Online Hate Speech Law required "social media networks to monitor and report

hateful conduct on their platforms," noting that "[o]ur great leader, our Attorney General, will be

championing this cause with every power her office can bring in at their disposal." Governor Kathy

Hochul, *Governor Hochul Signs Landmark Legislative Package to Strengthen Gun Laws and*

*Protect New Yorkers* at 12:30–13:07 (June 6, 2022), https://youtu.be/SNrci_ey8L4?t=750.

45.     At the same press conference, Attorney General James alleged that mass shooters'

motives are "enabled by the dark corners of the internet" because "social media platforms provide

an unchecked vehicle for [] dangerous and corrosive ideas to spread." The Attorney General noted

the Online Hate Speech Law would allow her office to "expand our work to study and to address

this growing threat" from "dangerous and hateful platforms." Governor Kathy Hochul, *Governor*

*Hochul Signs Landmark Legislative Package to Strengthen Gun Laws and Protect New Yorkers* at

35:50–36:35 (June 6, 2022), https://youtu.be/SNrci_ey8L4?t=2150.

**C.  Attorney General James's report shows her intent to pressure online services
     across the internet to chill, prohibit, and remove protected speech New York
     disfavors.**

46.     On October 18, 2022, Attorney General James released her responsive

investigative report. Office of New York State Attorney General Letita James, *Investigative*

*Report On The Role Of Online Platforms In The Tragic Mass Shooting in Buffalo on May 14,*

*2022* (Oct. 18, 2022), https://ag.ny.gov/sites/default/files/buffaloshooting-onlineplatformsreport

.pdf (the "Report").

**JA19**

47.     For the report, Attorney General James investigated a variety of online services: video sharing services like Rumble; online messaging boards like Reddit, 4Chan, and 8kun, "and their Derivatives;" Quora, a community-based questions and answers online service; Twitch; Discord; and widely known social network sites such as Facebook and Twitter. Report at 6.

48.     The report squarely blames "[a]nonymous, virtually unmoderated websites and platforms," for a purported correlating rise in mass shootings, alleging that "their refusal to moderate content in any meaningful way ensures that these platforms are and remain breeding grounds for racist hate speech and radicalization." Report at 3.

49.     The report's executive summary, signed by Attorney General James, closes with a dubiously premised rallying cry to pass laws "ensuring online platforms no longer enable horrific mass shootings and hate-based violence." Report at 4.

50.     The report shows that Attorney General James expansively interprets the term "online platform" as everything "from fringe websites to mainstream platforms like Facebook, Instagram, Twitter, and others." Report at 3.

51.     The report also calls for federal and state lawmakers to punish online platforms for not censoring "hate speech" by dramatically limiting Section 230—memorably described as the twenty-six words that created the internet—and imposing civil liability on platforms and individuals for the transmission or distribution of such speech and violent videos or images. *See* Rep. at 41–43; Stephen Engelberg, *Twenty-six Words Created the Internet. What Will It Take to Save it?*, ProPublica (Feb. 9, 2021), https://www.propublica.org/article/nsu-section-230.

52.     In an October 18, 2022, press release promoting the report, Governor Hochul and Attorney General James claimed that a "lack of oversight, transparency, and accountability of these platforms allowed hateful and extremist views to proliferate online." Press Release, Office

14

**JA20**

of the New York State Attorney General, *Attorney General James and Governor Hochul Release Report on the Role of Online Platforms in the Buffalo Shooting* (Oct. 18, 2022), https://ag.ny.gov/press-release/2022/attorney-general-james-and-governor-hochul-release-report-role-online-platforms.

53.    In the October 18, 2022, press release, Attorney General James called for "online platforms [to] be held accountable for allowing hateful and dangerous content to spread on their platforms." *Id.*

54.    The Attorney General's report and statements demonstrate her office will expansively interpret and zealously enforce the Online Hate Speech Law.

***The Online Hate Speech Law is Designed to Encourage the Removal of Protected Speech***

### A.  The Online Hate Speech Law Encourages the Removal of protected speech on a vast array of online services.

55.    The Online Hate Speech Law is titled "Social media networks; hateful conduct prohibited."

56.    The Online Hate Speech Law requires "social media networks" to endorse the state's treatment of disfavored speech, mislabeled as "hateful conduct" and defined as "use of a social media network" that is perceived by someone, somewhere, at some point in time, to "vilify, humiliate, or incite violence against a group or class of persons" based on based on race, color, religion, or other protected categories.

57.    While the Online Hate Speech Law purports to regulate "hateful conduct" on "social media network[s]," the definition of "hateful conduct" only includes speech, because the only way to "use" a "social media network" is to create or share expressive content such as videos or comments.

15

**JA21**

58.     Most, if not all, internet speech that someone, somewhere might argue serves to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion or other protected category is protected by the First Amendment because restrictions on such "bias-motivated" speech "silenc[e] speech on the basis of its content." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992). The Online Hate Speech Law thus seeks to regulate constitutionally protected internet speech.

59.     The Online Hate Speech Law does not define "vilify," "humiliate," "incite," or "violence."

60.     The law does not suggest that the speaker must intend to "vilify, humiliate, or incite violence," just that the speech can be perceived, by an unspecified *someone*, as doing one of those three things.

61.     Such speech is included in a wide variety of comedy, art, journalism, historical documentation, and commentary on matters of public concern that enjoy First Amendment protection. *See supra* ¶ 23.

62.     "Social media network" is defined as "service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public." N.Y. Gen. Bus. Law § 394-ccc(1)(a).

63.     The Online Hate Speech Law does not define "service provider," "for profit-making purposes," "user," "internet platform," "share," or "content."

64.     However, New York elsewhere expansively defines "Internet service provider" as "any person, business or organization qualified to do business in this state that provides individuals, corporations, or other entities with the ability to connect to the internet." N.Y. Pub. Serv. Law § 224-c.

16

**JA22**

65.     The New York statute implies that an entity is organized for "profit-making purposes" so long as it has "net earnings . . . which inure to the benefit of any private shareholder or individual." N.Y. Lab. Law § 190.

66.     "User" is not defined in New York statute.

67.     Based on the term's plain meaning in context, however, a "user" is, at a minimum, anyone who comments on content posted on an online service, as well as those that create and share content.

68.     "Internet platform" is not defined in New York statute.

69.     Based on the term's plain meaning in context, however, an "internet platform" is, at a minimum, an online service including a website or a mobile app.

70.     "Share" is not defined in New York statute.

71.     Based on the term's plain meaning in context, however, "share" is, at a minimum, exchanging information of some kind.

72.     "Content" is not defined in New York statute.

73.     Based on the term's plain meaning in context, however, "content" is, at a minimum, information that is displayed on an online service.

74.     During the New York Assembly's debate on A7865A, Assemblywoman Fahy said that the law would apply to any website that has a "footprint" in New York or is "used by residents here." Transcript of Session Proceedings at 189, New York State Assembly, 2021–22 Sess. (June 1, 2022).

75.     "Social media network" is defined so broadly that it includes any for-profit online service with a comment section that has been visited by at least one person in New York.

17

**JA23**

76.     The Online Hate Speech Law applies regardless of whether any state-defined hate speech has ever appeared on the "social media network."

**B.  The Online Hate Speech Law compels "social media networks" to express New York's disdain for particular protected speech.**

77.     The Online Hate Speech Law requires "social media networks" to take three actions regarding "prohibited" hate speech.

78.     First, "social media network[s]" must develop and publish a policy describing how they "will respond [to] and address" visitor complaints of hate speech (the "Hate Speech Policy").

79.     Second, "social media network[s]" must create a "clear and easily accessible mechanism" for visitors to complain about perceived hate speech on the site and receive responses (the "Report & Response Mechanism").

80.     Third, "social media network[s]" must "provide a direct response" to individual complainants, "informing them of how the matter is being handled" (the "Reply Requirement").

81.     The Online Hate Speech Law does not define "respond," "address," or "handled."

82.     The law's statutory title "Social media networks; hateful conduct *prohibited*," suggests that these undefined terms should be understood as meaning "prohibit" when referring to how online services should treat hate speech on their platforms. (emphasis added).

83.     The New York Attorney General has the authority to enforce the Online Hate Speech Law through assessment of a $1,000 daily fine per violation. N.Y. Gen. Bus. Law § 394-ccc(5).

84.     The law also empowers the New York Attorney General to issue subpoenas and investigate compliance. *Id.*

18

**JA24**

85.     Once the Online Hate Speech Law goes into effect on December 3, 2022,

Attorney General James may begin enforcing Section 394-ccc, under her own interpretation of

the statute.

***Eugene Volokh and The Volokh Conspiracy Are Committed to Free Speech and Open Debate.***

86.     Co-founded by Eugene Volokh, The Volokh Conspiracy is a legal blog hosted at

the reason.com/volokh page of a website operated by Reason magazine, a print and online

publication dedicated to the principles of "free minds and free markets."



87.     Volokh and his co-bloggers post regularly about current legal developments,

frequently regarding free expression issues.

88.     While Reason magazine hosts The Volokh Conspiracy website, Eugene Volokh

and his co-bloggers retain full editorial control over the blog's content and policies.

**JA25**

89.     The Volokh Conspiracy's co-bloggers reside in or are employed throughout the United States, including in California, Colorado, Georgia, Illinois, Indiana, New Jersey, New York, Ohio, Texas, Utah, Virginia, and Washington, D.C.

90.     The Volokh Conspiracy is organized "for-profit making purposes." It generates revenue through targeted advertisements, including ads targeted to New York visitors.

91.     In 2021, 10% of The Volokh Conspiracy's viewers were people in New York. And according to user internet protocol (IP) locations, around 3.9% of comments were posted by New Yorkers.

92.     While Volokh appreciates the revenue that comes from The Volokh Conspiracy, he considers blogging to be an act of professional and personal passion by which he shares his and others' views on a variety of legal topics.

93.     The Volokh Conspiracy is a "social media network" because it is a "service provider" operating an "internet platform" that is "designed to enable users to share [] content" with each other and the public.

94.     Each Volokh Conspiracy blog post includes a publicly viewable comment section where registered commenters may comment and reply to other commenters.

95.     The Volokh Conspiracy currently employs a comment policy that does not exclude any viewpoints: "We invite comments and request that they be civil and on-topic. We do not moderate or assume any responsibility for comments, which are owned by the readers who post them. Comments do not represent the views of Reason.com or the Reason Foundation. We reserve the right to delete any comment for any reason at any time. Comments may only be edited within 5 minutes of posting."

**JA26**

96.     Volokh and his co-bloggers are the sole decisionmakers as to whether comments warrant deletion; in particular, he is the sole decisionmaker as to whether comments posted responding to his own posts warrant deletion.

97.     The Volokh Conspiracy does not have a Hate Speech Policy because its policy does not address "how [The Volokh Conspiracy] *will* respond and address reports of" hate speech. N.Y. Gen. Bus. Law § 394-ccc(3) (emphasis added). Nor does its comment policy reference speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories. Regardless, the law's vagueness makes it impossible for Volokh to know whether the comment policy satisfies New York's Hate Speech Policy requirement or how it could do so.

98.     The Volokh Conspiracy does not have a Report & Response Mechanism to allow visitors to submit complaints, nor does Volokh feel obligated to reply to complainants.

99.     Volokh and his co-bloggers regularly post blog posts in favor of broad free expression rights under the First Amendment.

100.    Volokh and his co-bloggers frequently post content arguing against the regulation of speech that some may consider vilifying, insulting, humiliating, offensive, or hateful.

101.    Volokh believes that most, if not all, of the speech included in the state's definition of "hateful conduct" is constitutionally protected.

102.    Volokh believes that developing and publishing a Hate Speech Policy, creating a Report & Response Mechanism, and fulfilling the Reply Requirement to single out state-defined hate speech through a designated policy, Report & Response Mechanism, or Reply Requirement is contrary to The Volokh Conspiracy's ethos, purpose, and mission.

103.    Posts on The Volokh Conspiracy often receive dozens to hundreds of comments.

**JA27**

104.    Weekly, Volokh hosts an open comment section for commenters to post whatever is on their mind. The weekly comment section routinely receives several hundred comments.

105.    Some commenters on The Volokh Conspiracy have accused other commenters of engaging in hate speech because they post controversial views on topics concerning one or more of the protected categories identified in New York's law. Volokh therefore believes that if he created the Report & Response Mechanism, he would receive numerous complaints alleging that some comments qualify as state-defined hate speech, meant to be "prohibited."

106.    Reviewing and responding to each of these comments, as per the Reply Requirement, will be time-consuming and burdensome, especially given the fact that Volokh would be individually responsible for handling this process.

***Rumble is Committed to Free Speech and Open Debate.***

107.    Rumble is an internet video streaming platform that invites independent creators to upload video content and allows registered users to comment on the videos and communicate with each other.

108.    Rumble has a pro-free speech mission and purpose, described on its "about us" page: "We are Rumble[.] We are for people with something to say and something to share, who believe in authentic expression, and want to control the value of their own creations. We create technologies that are immune to cancel culture. Because everyone benefits when we have access to more ideas, diverse opinions, and dialogue. Join us. We are on a mission to protect a free and

**JA28**

open internet."



109.    Rumble Inc. is publicly traded on the NASDAQ, an American Stock Exchange based in New York City.

110.    Rumble Inc. and its subsidiaries are organized "for-profit making purposes," generating revenue through advertisements and other sources, including ads targeted to New York visitors.

111.    Rumble has many content creators based in New York.

112.    In the third quarter of 2022, Rumble had an average of 71 million global monthly active users, 57 million of whom were based in the United States and Canada. Many New Yorkers access Rumble each month and many New Yorkers post comments on Rumble videos.

JA29

113.    Rumble is a "social media network" because it is a "service provider" that operates an "internet platform" and is "designed to enable users to share [] content" with each other and the public.

114.    Content creators share video content with the public on Rumble and registered visitors can comment on videos and reply to other commenters.

115.    Rumble is known as a neutral video platform that does not impose arbitrary censorship on its content creators, including creators of controversial content that some may perceive as "hateful." *See supra* ¶ 23.

116.    Rumble's policies prohibit content that, among other things, a) is illegal; b) is pornographic, obscene, or of an adult or sexual nature; c) "is grossly offensive to the online community, including but not limited to, racism, anti-semitism and hatred;" d) supports or incites violence or unlawful acts; e) supports groups that support or incite violence or unlawful acts; or f) promotes terrorist organizations. *Website Terms and Conditions of Use and Agency Agreement, Rumble Content Policies*, Rumble, https://rumble.com/s/terms.

117.    Rumble reserves "the right to . . . remove messages which Rumble in its sole discretion determines to be undesirable, inciting violence, harmful, offensive or otherwise in violation of [its] Terms of Use." *Id*. In other words, Rumble is the sole determinant of whether its criteria are met.

118.    Rumble does not have a Hate Speech Policy as required by the Online Hate Speech Law because it has no policy addressing "how [Rumble] *will* respond and address reports of" hate speech. N.Y. Gen. Bus. Law § 394-ccc(3) (emphasis added). Rumble has a policy against racist or antisemitic content, but it does not prohibit content because it may "vilify" or "humiliate." New York's law would force Rumble to create a policy based around the state's definition of "hate

speech" rather than the lines that Rumble has chosen for itself. Nor does it reference speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories. Further, the law's vagueness makes it impossible for Rumble to know whether its policy satisfies New York's Hate Speech Policy requirement or how it could do so.

119.    Some of the videos that content creators post on Rumble's online service may be perceived as "hateful" by some visitors. *See supra* ¶ 23.

120.    Rumble does not believe that all Rumble content that may appear to some as "hateful" under the Online Hate Speech Law warrants a designated Hate Speech Policy, Report & Response Mechanism, or Reply Requirement.

121.    Rumble does not have a Report & Response Mechanism within the meaning of the Online Hate Speech Law. While Rumble visitors may email complaints to the email address support@rumble.com, and Rumble "attempt[s] to respond to every complaint," "Rumble will take appropriate actions in its sole discretion and has no responsibility to at any time report" to the complainant "the status or outcome of its investigation or any actions Rumble has taken as a result." *Website Terms and Conditions of Use and Agency Agreement, Complaint Procedure*, Rumble, https://rumble.com/s/terms.

122.    Furthermore, Rumble cannot be certain that its support@rumble.com email address is a sufficient "mechanism" to "allow [Rumble] to provide a direct response to any individual reporting" hate speech to satisfy the law's Report & Response Mechanism requirement. In addition, even if the email address satisfied the requirement, the law's vagueness makes it impossible to know whether its mechanism is sufficiently "clear and easily accessible" or how it could be so to satisfy the law.

**JA31**

123.    Some commenters on Rumble have accused other commenters of engaging in hate speech because they post controversial views on topics concerning one or more of the protected categories identified in New York's law.

124.    If Rumble is required to create a "clear and easily accessible" Report & Response Mechanism and fulfill the Reply Requirement, it believes it will be inundated with many more complaints alleging that content and comments on Rumble qualify as state-defined hate speech, meant to be "prohibited" regardless of whether such content and comments fall within the definitions of the Online Hate Speech Law.

125.    Reviewing and responding to each of these complaints, as per the Reply Requirement, will be a time-consuming and burdensome process. To avoid assuming this burden Rumble may need to devote additional resources, more aggressively remove content, and/or limit the ability for registered users to participate in Rumble's comment sections.

***Locals is Committed to Free Speech and Open Debate.***

126.    Locals is an online community-building site that allows content creators to crowdfund and create engaged communities. Creators can develop exclusive content and ask interested members to pay a monthly fee to join the creator's "community."

127.    Locals is organized "for-profit making purposes," generating revenue through the fees that members pay to join a creator's community.

128.    Locals has content creators and community members in New York City.

129.    Locals has advertised in New York City, including a recent promotion in Times Square:

**JA32**



130.   Locals is a "social media network" because it is a "service provider" which operates an "internet platform" that is "designed to enable users to share [] content" with each other and the public. Locals content creators can share video, audio, and text content with members of their community, and registered members of a creator's community may post comments or respond to other community members' comments.

131.   Locals "is committed to fostering a community that is safe, respectful, and dedicated to the free exchange of ideas."



132.    To further its mission, within its limited guidelines, Locals allows its creators to independently police content in their "communities."

133.    Locals Community Guidelines list just a few categories of content that are wholly prohibited on its platform: a) content that violates the rights of third parties like a copyright violation; b) content that violates a law or regulation; c) content that fits Locals' definition of "sexual activity;" and d) content that threatens violence against an individual or group of people. Locals makes the sole determination of whether speech violates the community guidelines.

134.    Locals does not have a Hate Speech Policy within the meaning of the Online Hate Speech Law because it has no policy addressing "how [Locals] *will* respond and address reports of" hate speech. N.Y. Gen. Bus. Law § 394-ccc(3) (emphasis added). Nor do its community guidelines reference speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories. Regardless, the law's vagueness makes it impossible for Locals to know whether its policy satisfies New York's Hate Speech Policy requirement or how it could do so.

135.    Some of the content on Locals may offend some visitors.

136.    Locals does not believe that all Locals content that may appear to some as "hateful conduct" under the Online Hate Speech Law warrants a designated Hate Speech Policy, Report & Response Mechanism, or Reply Requirement.

137.    Members of Locals communities can email complaints to Locals about content in their communities to support@locals.com, but there is no requirement that complaints will receive a response from Locals.

138.    Furthermore, Locals general email address is not a "mechanism" that will also "allow [Locals] to provide a direct response to any individual reporting" hate speech, and therefore

**JA34**

may not satisfy the law's Report & Response Mechanism requirement. In addition, even if the email address satisfied the requirement, the law's vagueness makes it impossible to know whether the "mechanism" is sufficiently "clear and easily accessible" or how it could be so to satisfy the law.

139.    Some commenters on Locals have accused other commenters of engaging in hate speech because they post controversial views on topics concerning one or more of the protected categories identified in New York's law.

140.    If Locals is required to post a "clear and easily accessible" Report & Response Mechanism and fulfill the Reply Requirement, it believes it will be inundated with many more complaints alleging that content and comments on Locals qualify as state-defined hate speech, meant to be "prohibited."

141.    Reviewing and responding to each of these complaints, as per the Reply Requirement, will be time-consuming and burdensome. To avoid assuming this burden Locals may need to devote additional resources, more aggressively remove content, and/or limit the ability for Locals members to participate in community comment sections.

***The Online Hate Speech Law Deprives Plaintiffs of Their Rights and Their Injury Will Be Ongoing.***

142.    As of December 3, 2022, as a direct and proximate result of New York's Online Hate Speech Law, Plaintiffs will be required to develop and publish a Hate Speech Policy.

143.    The Plaintiffs each disagree with the speech and message that the Online Hate Speech Law will compel them to convey.

144.    As of December 3, 2022, as a direct and proximate result of the Online Hate Speech Law, Plaintiffs will be required to publish a "clear and easily accessible" Report & Response

29

**JA35**

Mechanism on their online services for visitors to submit complaints about state-defined hate speech on their online services.

145.    Plaintiffs do not want to create and publish the Report & Response Mechanism, nor do they want to communicate to visitors that they endorse the state's definition of hate speech—which differs from their own content policies—or agree with the state's mandated response to it.

146.    As of December 3, 2022, as a direct and proximate result of the Online Hate Speech Law, Plaintiffs will be required to respond to visitor complaints about state-defined hate speech on their online services, and to describe "how the matter is being handled."

147.    Plaintiffs each disagree with the state's message implied by fulfilling the Reply Requirement for visitor complaints about state-defined hate speech and being compelled to describe "how the matter is being handled."

148.    Plaintiffs do not want to communicate, in any way, to visitors that they endorse New York's definition of hate speech or agree with the state's mandated response to it. Being required to do so will harm their reputations as serious advocates of free speech and open debate.

149.    Plaintiffs do not want to be compelled to respond to every visitor complaint about state-defined hate speech, which may or may not align with the content policies of their platforms.

150.    As of December 3, 2022, as a direct and proximate cause of New York's Online Hate Speech Law, Plaintiffs Rumble and Locals will likely be inundated with complaints and either need to hire additional staff to process these complaints, more aggressively remove content, or limit users' ability to participate in their comment sections. Doing so is likely to cause Rumble and Locals to suffer additional financial burdens, and may force them to make significant changes to their platforms and visitor experience.

**JA36**

151.    As of December 3, 2022, Plaintiff Eugene Volokh will be required to respond to each comment personally, a significant new burden, as a direct and proximate cause of New York's Online Hate Speech Law.

152.    As of December 3, 2022, as a direct and proximate cause of New York's Online Hate Speech Law, Plaintiffs will be required to either comply with the terms of the law or risk investigations, subpoenas, and daily fines of $1,000 per violation.

153.    As a result of being pressured to respond in the state's prescribed manner to constitutionally protected expression under the Online Hate Speech Law, Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

154.    As a result of being compelled to speak or having to risk civil penalties under the Online Hate Speech Law, Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Id.*

155.    As a result of the Online Hate Speech Law's overbreadth, Plaintiffs will be both (a) required to develop and enforce a policy dealing with constitutionally protected expression and (b) compelled to speak. Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Id.*

156.    As a result of the Online Hate Speech Law's vagueness, Plaintiffs will be both (a) required to develop and enforce a policy regulating constitutionally protected expression and (b) compelled to speak. Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Id.*

157.    As a result of the Online Hate Speech Law's incompatibility with Section 230, Plaintiffs will be required to assume the risk of liability or civil penalty for their role as publisher

**JA37**

of online content. As result, Plaintiffs' right to publish constitutionally protected expression will be burdened and they will suffer ongoing irreparable injury to their constitutional and statutory rights. *See Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 845 (M.D. Tenn. 2013) (granting a preliminary injunction on both First Amendment and Section 230 preemption grounds); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1273 (W.D. Wash. 2012) (same); *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *6 (D.N.J. Aug. 20, 2013) (same).

158.    Without declaratory and injunctive relief from this Court, New York's unconstitutional law will remain enforceable and Plaintiffs will indefinitely suffer irreparable harm.

159.    Plaintiffs have no other adequate legal remedy to prevent their injury other than an injunction from this Court.

### FIRST CAUSE OF ACTION
**Facial and As-Applied First Amendment Challenge to
New York General Business Law § 394-ccc
(Content- and Viewpoint-Based Regulation of Speech)**

160.    Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

161.    The First Amendment generally prohibits laws that target speech because of the content or viewpoint expressed. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995).

162.    New York's Online Hate Speech Law is content- and viewpoint-based. It is content-based because it singles out speech that is directed at or pertains to groups or classes of persons based on specified protected class statuses. *R.A.V.*, 505 U.S. at 392; *see Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.").

32

**JA38**

163.     New York's Online Hate Speech Law is viewpoint-based because it applies only to speech perceived to "vilify, humiliate, or incite violence against a group or class of persons" and not to speech that, for instance, is perceived to affirm or uplift. *See Matal*, 137 S. Ct. at 1763 ("Giving offense is a viewpoint."). Viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829–30.

164.     New York policymakers, including Governor Hochul and Attorney General James, have threatened that online platforms will be held accountable for publishing state-defined hate speech. The threat is reflected in 1) the Online Hate Speech Law's title—"Social media networks; hateful conduct prohibited"; 2) the Governor's signing statement that the Online Hate Speech Law required "social media networks to monitor and report hateful conduct on their platforms"; and 3) the Attorney General's report calling for sweeping restrictions on online services if they did not take further steps to remove hate speech; among other official statements.

165.     The Online Hate Speech Law places unconstitutional content- and viewpoint-based burdens on protected speech through the ever-present threat to "social media network[s]" of Attorney General investigations or civil penalties for failing to respond to complaints about viewpoints New York deems "hateful." It also places content- and viewpoint-based burdens on speech by requiring "social media network[s]" to bear the cost of developing and publishing the Hate Speech Policy, creating the Report & Response Mechanism, and fulfilling the Reply Requirement.

166.     To avoid these costs, Plaintiffs Rumble and Locals and many other online services are likely to be forced to hire additional staff to conduct moderation, aggressively remove content

**JA39**

that receives a complaint, or limit their comments sections—significantly suppressing speech across their platforms.

167.   The First Amendment prohibits New York from burdening protected speech through "thinly veiled threats" that if "social media network[s]" do not treat the speech in the way the government wishes, they will face consequences from state action. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) ("People do not lightly disregard public officers' thinly veiled threats to institute . . . proceedings against them if they do not come around."). "The sword of Damocles causes harm because it hangs, not necessarily because it drops." *PSINet v. Chapman*, 167 F. Supp. 2d 878, 888 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004); *see also Backpage.com, LLC v. Dart*, 807 F.3d 229, 237–38 (7th Cir. 2015) (First Amendment is violated when government officials "coupl[e] threats with denunciations of the activity that the official wants stamped out").

168.   New York lacks a compelling government interest for pressuring "social media network[s]" to remove protected speech. Indeed, the law lacks even a legitimate interest. The law has no legislative findings providing a government interest. In fact, the only purported interest, stated in the New York Governor's Section 394-ccc signing statement and the Attorney General's report—silencing protected speech—is constitutionally illegitimate. *United States v. Eichman*, 496 U.S. 310, 315 (1990) (where "the Government's asserted interest is related to the suppression of free expression" it "cannot justify its infringement on First amendment rights." (quotation marks and citation omitted) (emphasis omitted)).

169.   The Online Hate Speech Law is not a narrowly tailored means of achieving New York's interest. To the contrary, there are many less restrictive alternatives such as enforcing

34

**JA40**

criminal laws and the government engaging in its own anti-hate speech expression rather than restricting or coopting online services.

170.    As a direct and proximate result of the Online Hate Speech Law, New York will burden a vast amount of internet speech and Plaintiffs will suffer ongoing irreparable injuries, including the deprivation of their constitutional right to publish protected speech without the undue burden imposed by an unconstitutional state mandate.

**SECOND CAUSE OF ACTION**
**Facial and As-Applied First Amendment Challenge to**
**New York General Business Law § 394-ccc**
**(Compelled Speech)**

171.    Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

172.    The First Amendment prohibits laws that compel speech. Generally, laws that compel speech are subject to strict scrutiny because they "plainly alter [] the content of . . . speech." *Nat'l Ins. of Family and Life Advocates v. Beccera*, 138 S. Ct. 2361, 2371 (2018); *see also W. Va. St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

173.    The Volokh Conspiracy, Rumble, and Locals all object to conveying the message that hate speech should be singled out for chilling, prohibition, or removal.

174.    The Online Hate Speech Law compels Volokh, Rumble, Locals, and most other "social media network[s]" to espouse the state's message by requiring them to fulfill three requirements.

**JA41**

175.   First, it compels them to develop and publish a policy for addressing speech on their online services that some may perceive to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected category.

176.   Plaintiffs do not have policies that address hate speech in the manner prescribed by the state—speech that some may perceive to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion or other protected category. While Rumble has a policy prohibiting speech that incites violence generally, as well as racist and antisemitic content, it does not extend to speech that may be perceived to vilify or humiliate a wide range of groups. Regardless, the Online Hate Speech Law's vagueness makes it impossible to know whether Rumble's existing policy satisfies New York's law in this regard or how it could do so.

177.   Forcing "social media network[s]" to develop and publish a policy singling out state-defined hate speech compels Plaintiffs to endorse the state's message—in the least, that such speech is particularly worthy of a designated policy.

178.   Plaintiffs disagree with and do not want to convey the state's message as required by the Online Hate Speech Law.

179.   Second, the Online Hate Speech Law requires "social media network[s]" to create a "clear and easily accessible" Report & Response Mechanism for visitors to report state-defined hate speech and receive a direct response "informing them of how the matter is being handled." N.Y. Gen. Bus. Law § 394-ccc(2).

180.   Volokh does not have a Report & Response Mechanism. Rumble and Locals provide an email address for complaints, but not a mechanism specific to reporting and responding to complaints about perceived hate speech (or one that assures a response as to *any* speech). Volokh occasionally gets complaints through his individual e-mail address, but does not have a mechanism

specific to reporting and responding to complaints about perceived hate speech (or one that assures a response as to *any* speech).

181.    Forcing "social media network[s]" to create a "clear and easily accessible" Report & Response Mechanism for state-defined hate speech compels Plaintiffs to speak and to effectively endorse the state's message that, in the least, such speech is particularly worthy of singling out for complaint and direct response.

182.    Plaintiffs disagree with and do not want to create a Report & Response Mechanism because it requires them to constructively endorse the state's message.

183.    Third, the Online Hate Speech Law requires Plaintiffs to "provide a direct response to any individual" complaining about perceived state-defined hate speech, "informing them of how the matter is being handled." *Id*.

184.    Plaintiffs Volokh and Locals do not have a formal practice of providing a direct response to any complaint of state-defined hate speech or otherwise. While Rumble's policy states that it may provide a direct response to complaints, it explicitly states that it has no obligation to do so.

185.    Forcing "social media network[s]" to "provide a direct response" to complaints of state-defined hate speech about "how the matter is being handled" compels them to speak to these complainants. It also requires them to effectively endorse the state's message that complaints about such speech deserve a "direct response" and that state-defined hate speech must be "addressed" and "handled" because it is particularly worthy of direct response.

186.    Plaintiffs do not want to provide a direct response to every individual complaining about state-defined hate speech because it will effectively endorse the state's message with which they disagree.

**JA43**

187.    New York lacks a compelling government interest for compelling "social media network[s]" to speak by posting a Hate Speech Policy, creating a Report & Response Mechanism, or fulfilling the Reply Requirement.

188.    Indeed, the law lacks even a legitimate interest. The law does not include legislative findings, and thus no description of a government interest. In fact, the only purported interest, stated in the New York Governor's section 394-ccc signing statement and the Attorney General's report—silencing protected speech—is constitutionally illegitimate. *Eichman*, 496 U.S. at 315 (where "the Government's asserted interest is related to the suppression of free expression" it "cannot justify its infringement on First amendment rights." (quotation marks omitted)). The Online Hate Speech Law is not a narrowly tailored means of achieving New York's interest. To the contrary, there are many less restrictive alternatives such as enforcing criminal laws and the government engaging in its own anti-hate speech expression rather than restricting or coopting online services.

189.    As a direct and proximate result of the Online Hate Speech Law, Plaintiffs will suffer ongoing irreparable injuries, including being deprived of their constitutional right against being compelled to speak.

**THIRD CAUSE OF ACTION**
**Facial and As-Applied First Amendment Challenge to**
**New York General Business Law § 394-ccc**
**(Overbreadth)**

190.    Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

191.    First Amendment overbreadth doctrine prohibits laws that regulate speech if "a substantial number of [their] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation marks and citations omitted).

**JA44**

192.    The Online Hate Speech Law is facially overbroad because it pressures online services to chill, prohibit, or remove a substantial amount of constitutionally protected online speech and compels them to voice the state's pro-censorship view. Much speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" is constitutionally protected even when it concerns protected class status. *See, e.g., Snyder v. Phelps*, 562 U.S. 443 (2011) ("God hates fags," "Thank God for 9/11," "Priests Rape Boys," among other signs constitutionally protected); *see also Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action . . . . *A statute which fails to draw this distinction* impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments." (emphasis added) (citations omitted)).

193.    The Online Hate Speech Law has no legitimate sweep because it seeks to unlawfully chill protected speech. Assuming *arguendo* that the law has *some* legitimate sweep with regard to speech that incites violence, its unconstitutional applications dwarf that legitimate sweep because the law reaches all manner of comedy, art, journalism, historical documentation, and commentary on important matters of public concern just because someone, somewhere believes it to "vilify" or "humiliate." *See supra* ¶ 23.

194.    Laws or policies attempting to restrict speech using terms similar to "vilify" and "humiliate" have routinely been struck down as either vague or overbroad. *See, e.g., Saxe v. St. Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001) (striking down policy "prohibiting disparaging speech"); *see also Beverly v. Watson*, No. 14 C 4970, 2017 WL 4339795, at \*8 (N.D. Ill. Sept. 29, 2017) (collecting cases).

**JA45**

195.    As a direct and proximate result of the Online Hate Speech Law's overbreadth, Plaintiffs will suffer ongoing irreparable injuries, including being deprived of their constitutional right to publish protected speech and against being pressured to chill protected speech.

**FOURTH CAUSE OF ACTION**
**Facial and As-Applied Fourteenth Amendment Challenge to**
**New York General Business Law § 394-ccc**
**(Vagueness)**

196.    Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

197.    Fourteenth Amendment vagueness doctrine prohibits laws that do not "give the person of ordinary intelligence a reasonable opportunity to know what is" required, or do not "provide explicit standards for those who apply them" to prevent arbitrary and discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). And "[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).

198.    The Online Hate Speech Law uses broad and ambiguous terms.

199.    The Online Hate Speech Law's most important terms, such as "vilify," "humiliate," "incite," "user," "internet platform," "content," "clear and concise," and "clear and easily accessible," among others, do not have an objective plain meaning.

200.    The terms "vilify" and "humiliate" in particular are incapable of reasoned application. *See Mansky*, 138 S. Ct. at 1888 (emphasizing that when regulating speech "the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out"). They are subject to "a virtually open-ended interpretation" since any two people can widely disagree on what vilifies or humiliates. *Id.* at 1891.

201.    The Online Hate Speech Law therefore does not provide a person of ordinary intelligence a reasonable opportunity to know, for example, 1) what online services are regulated

40

**JA46**

given the fact that "social media network" is defined so broadly that it includes any for-profit online service with a comment section that has been visited by at least one person in New York; 2) what speech must be addressed by the compelled Hate Speech Policy; 3) whether an online service's Hate Speech Policy and Report & Response Mechanism are "clear," "concise," or "easily accessible"; or 4) whether a site has sufficiently responded to complaints.

202.    The Online Hate Speech Law's lack of explicit standards also unconstitutionally invites arbitrary and discriminatory enforcement in determining, for example, (1) which "social media network[s]" the law applies to; (2) whether an online service's policy provides a sufficiently "clear and concise" description of how the site "will respond [to] and address" state-defined hate speech; (3) whether an online service's Report & Response Mechanism is "clear and easily accessible;" and (4) whether an online service has sufficiently responded to complaints.

203.    In light of the law's formal title, Governor Hochul and Attorney General James's official statements, and the Attorney General's report, and in combination with its vague terms, Plaintiffs reasonably believe that the Online Hate Speech Law will be expansively interpreted and aggressively enforced. At a minimum, the vagueness of the law's operative terms affords the Attorney General unbound discretion to adopt such expansive interpretation, whether the Attorney General ultimately does or not, and online services like Plaintiffs will have no way of knowing whether the law will be taken to that extreme and must operate with the expectation that it will. Thus, the law's vagueness encourages Plaintiffs and those similarly situated "to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)) (quotation marks and internal citation omitted), and thereby unconstitutionally incentivizing them to chill

**JA47**

speech on their platform and compelling them to parrot the state's message in order to avoid investigation and civil penalties.

204.    The Online Hate Speech Law contains a savings clause stating that it is not to be construed as (a) imposing an "obligation" on the social media network "that adversely affects the rights or freedoms of any person" under the First Amendment; or (b) adding to or increasing "liability for anything other than the failure to provide a mechanism for a user to report . . . and to receive a response on such report." N.Y. Gen. Bus. Law § 394-ccc(4).

205.    But this vague savings clause does not place "adequate publicly disclosed limits on . . . discretion," *Battle v. City of Seattle*, 89 F. Supp. 3d 1092, 1107 (W.D. Wash. 2015), and therefore cannot save the Online Hate Speech Law. *Stevens*, 559 U.S. at 480 ("The First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige.").

206.    As a direct and proximate result of the Online Hate Speech Law's vagueness, Plaintiffs will suffer ongoing irreparable injury, including being deprived of their constitutional right to a reasonable opportunity to know how they can comport with the law's requirements.

## FIFTH CAUSE OF ACTION
### Statutory Preemption Challenge Under 47 U.S.C. § 230 to New York General Business Law § 394-ccc

207.    Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

208.    Congress enacted Section 230 of the Communications Decency Act (47 U.S.C. § 230) to protect providers of "interactive computer services" from liability for decisions to moderate or not moderate user-generated content.

209.    Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to

42

**JA48**

a computer server, including specifically a service or system that provides access to the Internet."
47 U.S.C. § 230(f)(2).

210.    The Plaintiffs each qualify as an "interactive computer service" because they offer
visitors access to content and the ability to post their own content or comments. In fact, every
online service that qualifies as a "social media network" under the Online Hate Speech Law would
necessarily qualify as an "interactive computer service" under Section 230.

211.    Section 230(c)(1) provides, in pertinent part, that a "provider" of an "interactive
computer service" shall "not be treated as the publisher or speaker of any information provided
by" a content creator or commenter for purposes of civil or criminal liability. Section 230(e)(3)
preempts inconsistent state laws and prevents the imposition of liability. 47 U.S.C. § 230(e)(3)
("No cause of action may be brought and no liability may be imposed under any State or local law
that is inconsistent with this section."); *see Cooper*, 939 F. Supp. 2d at 805 (invalidating a
Tennessee law that regulated websites due to Section 230 preemption).

212.    Section 230 protects an online service's "exercise of its editorial and self-
regulatory functions," *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 986
(10th Cir. 2000), including the ability to establish third-party content policies free from a duty to
scrutinize creator or commenter content. The immunity "extends to . . . website policies and
practices," and their "construct and operation." *Jane Doe No. 1 v. Backpage.com*, 817 F.3d 12, 20
(1st Cir. 2016). Decisions not to change online service policies or its "construct and operation" are
as much editorial decisions as not deleting any particular third-party post. *Id.* (citing *Universal
Commc'n Sys., v. Lycos*, 478 F.3d 413, 422 (1st Cir. 2007).

**JA49**

213.     The Online Hate Speech Law treats "social media network[s]," Plaintiffs included, as publishers, unlawfully holding them liable based on third-party content if they do not fulfill any of three obligations New York has imposed.

214.     First, the Online Hate Speech Law requires "social media network[s]" to develop and publish a Hate Speech Policy describing how they "will respond [to] and address" state-defined hate speech on their platforms, including third-party creator or commenter speech, presupposing that such "response," whatever it may be, is required. Second, the law requires a "clear and easily accessible" Report & Response Mechanism, regulating the "construct and operation" of their sites. Third, the Reply Requirement mandates that online services monitor and screen third-party content in order to "provide a direct response" to visitor complaints.

215.     In these ways the Online Hate Speech Law subjects Plaintiffs to potential investigations, subpoenas, and civil penalties for their decisions as online publishers of third-party content, and it is accordingly preempted by Section 230.

216.     As a direct and proximate result of the Online Hate Speech Law's violation of their protection as publishers under Section 230, Plaintiffs will suffer ongoing irreparable injury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc. respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendant and issue the following relief:

A.     A declaration that:

1.     New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the First Amendment to the Constitution of the United States

44

**JA50**

because it is a content-based and viewpoint-based regulation of speech that is not narrowly tailored to achieve a compelling government interest.

      2.    New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the First Amendment to the Constitution of the United States because it compels their speech.

      3.    New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the First Amendment to the Constitution of the United States because it overbroad.

      4.    New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the Fourteenth Amendment to the Constitution of the United States because it impermissibly vague.

      5.    New York General Business Law § 394-ccc is preempted by Section 230 of the Communications Decency Act.

    B.    Preliminary injunctive relief against Defendant, prospectively enjoining enforcement of New York General Business Law § 394-ccc during the pendency of this litigation.

    C.    Permanent injunctive relief against Defendant, prospectively enjoining enforcement of New York General Business Law § 394-ccc.

    D.    An award of attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law; and

    E.    All other further legal and equitable relief as the Court may deem just and proper.

DATED: December 1, 2022

**JA51**

Respectfully submitted,

/s/ Darapana M. Sheth

DARPANA M. SHETH                          BARRY N. COVERT**
(New York Bar No. 4287918)                (New York Bar No. 27118)
DANIEL M. ORTNER*                         LIPSITZ GREEN SCIME CAMBRIA LLP
(California State Bar No. 329866)          42 Delaware Ave., Suite 120
JAMES M. DIAZ*                            Buffalo, NY 14202
(Vermont Bar No. 5014)                    Tel: (716) 849-1333 x 365
FOUNDATION FOR INDIVIDUAL RIGHTS AND      bcovert@lglaw.com
    EXPRESSION
510 Walnut St., Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
daniel.ortner@thefire.org
jay.diaz@thefire.org
darpana.sheth@thefire.org

*Attorneys for Plaintiff*
\**Pro Hac Vice* Motions Forthcoming
** S.D.N.Y. Admission Pending

46

**JA52**

## VERIFICATION OF EUGENE VOLOKH

Pursuant to 28 U.S.C. § 1746, I, EUGENE VOLOKH, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2. I am the co-founder and owner of the blog The Volokh Conspiracy that was originally located at www.volokh.com and is now hosted at www.reason.com/volokh.

3. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

4. I have personal knowledge of the factual allegations in paragraphs 5, 12,  86-106, 142-149, 151, 152-159, 176-189, 195,  203, 206, and 215-216 of the Complaint and know them to be true regarding Eugene Volokh and the Volokh Conspiracy.

5. I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on November 30, 2022.

_____

Eugene Volokh

Plaintiff

**JA53**

## VERIFICATION OF MICHAEL ELLIS

Pursuant to 28 U.S.C. § 1746, I, MICHAEL ELLIS, declare as follows:

1. I am an authorized representative of the Plaintiffs, Rumble Canada Inc. and Locals Technology Inc., in the present case and a citizen of the United States of America.

2. I am the General Counsel and Corporate Secretary of Rumble Inc., the parent company of Rumble Canada Inc. and Locals Technology Inc.

3. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

4. I have personal knowledge of the factual allegations in paragraphs 6, 13, 14, 23 (that the video that is listed as being on Rumble is in fact found on Rumble as of today), 107-125, 126-141, 142-150, 152-159, 176-189, 166, 195, 203, 206, and 215-216 of the Complaint, and know them to be true with regard to Rumble Canada Inc. and Locals Technology Inc.

5. I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on December 1, 2022.

_____

Michael Ellis

Rumble Canada Inc. and Locals Technology Inc.

Plaintiffs

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| EUGENE VOLOKH, RUMBLE CANADA INC., and LOCALS TECHNOLOGY INC., | |
| *Plaintiffs*, | Civil Action No.: 1:22-cv-10195-ALC |
| v. | |
| LETITIA JAMES, in her official capacity as New York Attorney General, | |
| | **NOTICE OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| *Defendant*. | |

PLEASE TAKE NOTICE THAT Plaintiffs Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc. respectfully move, under Federal Rule of Civil Procedure 65(a), for an order preliminarily enjoining Defendant Letitia James from enforcing New York General Business Law § 394-ccc during the pendency of this action, and for such other and further relief as the Court deems just and proper. In support of this motion, Plaintiffs rely on the following documents:

(1) Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction;

(2) Declaration of Darpana Sheth in Support of Plaintiffs' Motion for a Preliminary Injunction, and accompanying exhibits; and

(3) Verified Complaint for Declaratory and Injunctive Relief.

Plaintiffs respectfully request oral argument on this motion before the Honorable Andrew L. Carter, Jr., at the United States Courthouse, 40 Foley Square, New York, New York 10007.

Respectfully Submitted,

Date: December 6, 2022


/s/ Darpana M. Seth

DARPANA M. SHETH
(New York Bar No. 4287918)
DANIEL M. ORTNER*
(California State Bar No. 329866)
JAMES M. DIAZ*
(Vermont Bar No. 5014)
DARPANA M. SHETH
(New York Bar No. 4287918)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut St., Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
daniel.ortner@thefire.org
jay.diaz@thefire.org
darpana.sheth@thefire.org

*Attorneys for Plaintiff*
**Pro Hac Vice* Motions Forthcoming
** S.D.N.Y. Admission Pending

BARRY N. COVERT**
(N.Y. Bar No. 27118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave., Suite 120
Buffalo, NY 14202
Tel: (716) 849-1333 x 365
bcovert@lglaw.com

2

## <u>CERTIFICATE OF SERVICE</u>

Plaintiff's counsel confirms that a true and correct copy of the foregoing was served via the Court's electronic filing system on this day, December 6, 2022. Notice of this filing will be sent by operation of the Court's electronic filing system

DATED: December 6, 2022

Respectfully submitted,

<u>/s/ Darpana Sheth</u>
 Darpana Sheth
 (New York Bar No. 4287918)
 DANIEL M. ORTNER*
 (California State Bar No. 329866)
 JAMES M. DIAZ*
 (Vermont Bar No. 5014)
 FOUNDATION FOR INDIVIDUAL RIGHTS AND
  EXPRESSION
 510 Walnut Street, Suite 1250
 Philadelphia, PA 19106
 Telephone: (215) 717-3473
 darpana.sheth@thefire.org
 daniel.ortner@thefire.org
 jay.diaz@thefire.org

 *Attorneys for Plaintiff*
 **Pro Hac Vice* Motions Forthcoming
 ** S.D.N.Y. Admission Pending

BARRY N. COVERT**
(N.Y. Bar No. 271118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave Suite 120
Buffalo, NY 14202
Tel: 716 849 1333 x 365
bcovert@lglaw.com

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EUGENE VOLOKH, RUMBLE CANADA INC., and LOCALS TECHNOLOGY INC., | Civil Action No.: 1:22-cv-10195 |
| *Plaintiffs,* | |
| v. | **DECLARATION OF DARPANA SHETH IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| LETITIA JAMES, in her official capacity as New York Attorney General, | |
| *Defendant.* | |

In accordance with 28 U.S.C. § 1746, I, Darpana Sheth, declare as follows:

1.      I am over the age of 18 and have personal knowledge of the facts in this declaration.

2.      I am an attorney with the Foundation for Individual Rights and Expression, counsel for Plaintiffs in this action. I am admitted to the bar of the State of New York.

3.      A true and correct copy of New York General Business Law § 394-ccc (the "Online Hate Speech Law"), downloaded from the New York State Senate website, is attached as **Exhibit A**.

4.      A true and correct copy of Governor Hochul's June 6, 2022 press conference may be viewed at https://www.youtube.com/watch?v=SNrci_ey8L4&t=750s.

5.      A true and correct copy of the May 18, 2022 press release issued by Attorney General Letitia James, downloaded from the Attorney General's website, is attached as **Exhibit B**.

6.      A true and correct copy of the October 18, 2022 press release issued by Attorney General James, downloaded from the Attorney General's website, is attached as **Exhibit C**.

7.      A true and correct copy of the Attorney General's investigative report on the role of online platforms in the tragic mass shooting in Buffalo on May 14, 2022, is attached as **Exhibit D**.

8.      A true and correct copy of Plaintiff Eugene Volokh's blog post on The Volokh Conspiracy titled "New N.Y. Law Aimed at Getting Social Media Platforms to Restrict 'Hateful' Speech" is attached as **Exhibit E**.

9.      A true and correct copy of Plaintiff Eugene Volokh's *Washington Post* article titled "No, there's no 'hate speech' exception to the First Amendment" is attached as **Exhibit F**.

10.      A true and correct copy of the transcript of the June 1, 2022 session of the New York State Assembly, downloaded from the Assembly website, is attached as **Exhibit G**.

11.      A true and correct copy of the Chicago Journal of International Law comment titled "Regulating Hate Speech: Nothing Customary About It" is attached as **Exhibit H**.

12.      A true and correct copy of an interview by ReasonTV discussing a satirical tweet by the Babylon Bee calling the Biden Administration's Assistant Secretary for Health Rachel Levine its "man of the year" may be viewed at https://rumble.com/v1h339k-babylon-bee-wont-back-down-over- trans-joke-twitter-ban.html.

13.      A true and correct copy of an historical video of Malcom X discussing white people's guilt may be viewed at https://www.youtube.com/watch?v=q0nNSRuSzx4.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

Executed on December 6, 2022.

/s/ *Darpana Sheth*
Darpana Sheth

### CERTIFICATE OF SERVICE

Plaintiff's counsel confirms that a true and correct copy of the foregoing was served via the Court's electronic filing system on this day, December 6, 2022. Notice of this filing will be sent by operation of the Court's electronic filing system

DATED: December 6, 2022

Respectfully submitted,

/s/ Darpana Sheth
Darpana Sheth
(New York Bar No. 4287918)
DANIEL M. ORTNER*
(California State Bar No. 329866)
JAMES M. DIAZ*
(Vermont Bar No. 5014)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
darpana.sheth@thefire.org
daniel.ortner@thefire.org
jay.diaz@thefire.org

BARRY N. COVERT**
(N.Y. Bar No. 271118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave Suite 120
Buffalo, NY 14202
Tel: 716 849 1333 x 365
bcovert@lglaw.com

*Attorneys for Plaintiff*
**Pro Hac Vice* Motions Forthcoming
** S.D.N.Y. Admission Pending

**JA61**

# NY CLS Gen Bus § 394-ccc

Current through 2022 released Chapters 1-642

*New York Consolidated Laws Service* **>** *General Business Law (Arts. 1 — 46)* **>** *Article 26 Miscellaneous (§§ 390 — 399-zzzzz)*

## § 394-ccc. Social media networks; hateful conduct prohibited.

**1.** As used in this section, the following terms shall have the following meanings:

**(a)** "Hateful conduct" means the use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression.

**(b)** "Social media network" means service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public.

**2.** A social media network that conducts business in the state, shall provide and maintain a clear and easily accessible mechanism for individual users to report incidents of hateful conduct. Such mechanism shall be clearly accessible to users of such network and easily accessed from both a social media networks' application and website, and shall allow the social media network to provide a direct response to any individual reporting hateful conduct informing them of how the matter is being handled.

**3.** Each social media network shall have a clear and concise policy readily available and accessible on their website and application which includes how such social media network will respond and address the reports of incidents of hateful conduct on their platform.

**4.** Nothing in this section shall be construed (a) as an obligation imposed on a social media network that adversely affects the rights or freedoms of any persons, such as exercising the right of free speech pursuant to the first amendment to the United States Constitution, or (b) to add to or increase liability of a social media network for anything other than the failure to provide a mechanism for a user to report to the social media network any incidents of hateful conduct on their platform and to receive a response on such report.

**5.** Any social media platform that knowingly fails to comply with the requirements of this section shall be assessed a civil penalty for such violation by the attorney general not to exceed one thousand dollars. Each day such offense shall continue shall constitute a separate additional violation. In determination of any such violation, the attorney general shall be authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules.

## History

L 2022, ch 204, § 1, effective December 3, 2022.

New York Consolidated Laws Service
Copyright © 2022 All rights reserved.

End of Document

Case 23-356, Document 26, 06/20/2023, 3531517, Page66 of 221

12/5/22, 4:59 PM     Case 1:22-cv-01859-ALC  Document 10-2  Filed 03/06/22  Page 2 of 3
Attorney General James Launches Investigations into Social Media Companies for Role in Buffalo Attack | New York State Attorney General

# Attorney General James Launches Investigations Into Social Media Companies for Role in Buffalo Attack

*Investigations Will Focus on Platforms Shooter Used to Plan, Promote, and Stream the Attack*

NEW YORK – New York Attorney General Letitia James today announced that her office is launching investigations into social media companies in connection with the terror attack in Buffalo that claimed 10 lives and wounded three individuals. The investigations will look into the social media companies and other online resources that the shooter used to discuss and amplify his intentions and acts to carry out this attack. Specifically, the investigations will focus on those platforms that may have been used to stream, promote, or plan the event, including but not limited to Twitch (owned by Amazon), 4chan, 8chan, and Discord.

"The terror attack in Buffalo has once again revealed the depths and danger of the online forums that spread and promote hate," said **Attorney General James**. "The fact that an individual can post detailed plans to commit such an act of hate without consequence, and then stream it for the world to see is bone-chilling and unfathomable. As we continue to mourn and honor the lives that were stolen, we are taking serious action to investigate these companies for their roles in this attack. Time and time again, we have seen the real-world devastation that is borne of these dangerous and hateful platforms, and we are doing everything in our power to shine a spotlight on this alarming behavior and take action to ensure it never happens again."

It has been reported that the shooter posted online for months about his hatred for specific groups, promoted white supremacist theories, and even discussed potential plans to terrorize an elementary school, church, and other locations he believed would have a considerable community of Black people to attack. Those postings included detailed information about plans to carry out an attack in a predominantly Black neighborhood in Buffalo and his visits to the site of the shooting in the weeks prior. The shooter also streamed the attack on another social media platform, which was accessible to the public, and posted a 180-page manifesto online about his bigoted views.

The Office of the Attorney General received a **referral from Governor Hochul** to conduct this investigation pursuant to New York Executive Law Section 63(8), which permits the attorney general to investigate matters concerning public peace, public safety, and public justice and to subpoena witnesses and compel the production of documents.

**JA63**

# Attorney General James and Governor Hochul Release Report on the Role of Online Platforms in the Buffalo Shooting

*Report Details Shooter's Radicalization on Fringe Websites, Use of Mainstream Platforms to Livestream Violence*

*AG James and Governor Hochul Call for Federal and State Legislative Reforms to Combat Online Extremism and Violence*

NEW YORK – New York Attorney General Letitia James and Governor Kathy Hochul today **released a report** on the role of online platforms in the tragic Buffalo mass shooting where 10 Black individuals were killed and three others were injured at the Tops grocery store. The Office of the Attorney General (OAG) reviewed thousands of pages of documents and social media content to examine how the alleged shooter used online platforms to plan, prepare, and publicize his attack. This investigation and subsequent report were completed in accordance with a referral from Governor Hochul. During the course of the investigation, OAG obtained and reviewed external and internal content and policies of several of the online platforms used by the shooter. The report concludes that fringe online platforms, like 4chan, radicalized the shooter; livestreaming platforms, like Twitch, were weaponized to publicize and encourage copycat violent attacks; and a lack of oversight, transparency, and accountability of these platforms allowed hateful and extremist views to proliferate online, leading to radicalization and violence.

In the wake of these findings, Attorney General James and Governor Hochul are calling for federal and state reforms to combat online extremism and violence, including state legislation that would criminalize graphic images or videos created by a perpetrator of a homicide and penalize individuals who reshare or repost those same images or videos. In addition, Attorney General James and Governor Hochul are recommending changes to Section 230 of the federal Communications Decency Act to increase accountability of online platforms and require companies take reasonable steps to prevent unlawful violent criminal content from appearing on their platforms.

"The tragic shooting in Buffalo exposed the real dangers of unmoderated online platforms that have become breeding grounds for white supremacy," said **Attorney General James**. "Today I met with the victims' families to share the findings of this report. This report is further proof that online radicalization and extremism is a serious threat to our communities, especially communities of color. We saw this happen in Christchurch, Charlottesville, El Paso, and Buffalo, and we cannot wait

**JA64**

for another tragedy before we take action. Online platforms should be held accountable for allowing hateful and dangerous content to spread on their platforms. Extremist content is flourishing online, and we must all work together to confront this crisis and protect our children and communities."

"For too long, hate and division have been spreading rampant on online platforms — and as we saw in my hometown of Buffalo, the consequences are devastating," said **Governor Hochul**. "In the wake of the horrific white supremacist shooting this year, I issued a referral asking the Office of the Attorney General to study the role online platforms played in this massacre. This report offers a chilling account of factors that contributed to this incident and, importantly, a road map toward greater accountability."

The OAG report examined several online platforms used by the shooter, including 4chan, 8kun, Reddit, Discord, Twitch, and YouTube, and other online platforms where OAG found graphic content of the shooting or the shooter's manifesto, including Facebook, Instagram, Twitter, TikTok, and Rumble. The OAG subpoenaed these companies and reviewed thousands of pages of documents. Investigators looked at how platforms have been used to distribute and promote racist and antisemitic memes and messages and share graphic media of previous racially motivated violence, both of which contributed to the alleged shooter's radicalization. The report also details how several more mainstream platforms were used to livestream the shooting with the goal of inciting additional violent acts, and how graphic video of the shooting proliferated online.

In sum, the report confirms that several online platforms played an undeniable role in this racist attack, first by radicalizing the shooter as he consumed voluminous amounts of racist and violent content, helping him prepare for the attack, and finally allowing him to broadcast it. The report notes these takeaways:

›  **Fringe Platforms Fuel Radicalization**: By his own account, the Buffalo shooter was radicalized by virulent racist and antisemitic content on anonymous, virtually unmoderated websites and platforms that operate outside of the mainstream internet, most notably 4chan. In the wake of the Buffalo shooting, graphic video of the shooting recorded by a viewer of the shooter's livestream proliferated on fringe sites. The anonymity offered by 4chan and platforms like it, and their refusal to moderate content in any meaningful way, ensures that these platforms continue to be breeding grounds for racist hate speech and radicalization.

›  **Livestreaming Has Become a Tool for Mass Shooters**: Livestreaming has become a tool of

Attorney General James and Governor Hochul Release Report on the Role Platforms in the Buffalo Shooting | New York State Attorney General        12/5/22, 4:07 PM

mass shooters to instantaneously publicize their crime, further terrorizing the community targeted by the shooter and serving as a mechanism to incite and solicit additional violent acts. The Buffalo shooter was galvanized by his belief that others would be watching him commit violence in real-time. Although the platform he used to livestream his atrocities disabled the livestream within two minutes of the onset of violence, two minutes is still too much.

> **Mainstream Platforms' Moderation Policies Are Inconsistent and Opaque**: Many large, established platforms improved on their response time for identifying and removing problematic content related to the Buffalo shooting, including graphic video of the shooting and the shooter's manifesto, as compared to past events. However, the platforms' responses were uneven, with one platform unable to identify posts that linked to off-site copies of the shooting video even after those posts were flagged through user reports. Many platforms also do not fully disclose how they moderate hateful, extremist, or racist content.

> **Online Platforms Lack Accountability**: Online platforms enjoy too much legal immunity. Section 230 of the Communications Decency Act largely insulates platforms from liability for their content moderation decisions, even when a platform allows users to post and share unlawful content.

In response to the findings in the report, Attorney General James recommends a variety of reforms that are supported by Governor Hochul and would tackle online extremism and increase accountability of online platforms. These recommendations include:

> **Create Liability for the Creation and Distribution of Videos of Homicides**: New York and other states should pass legislation imposing criminal liability for the creation, by the perpetrator, of images or videos depicting a homicide. New York should explore establishing civil liability for anyone who transmits or distributes such images or videos beyond the perpetrator. In concert with appropriate revisions to Section 230, this liability would extend to online platforms, including social media and livestreaming platforms, that do not take reasonable steps to prevent such content from appearing.

> **Add Restrictions to Livestreaming:** Livestreaming was used as a tool by the Buffalo shooter, like previous hate-fueled attacks, to instantaneously document and broadcast his violent acts to

Attorney General James and Governor Hochul Release Report on the Role Platforms in the Buffalo Shooting | New York State Attorney General          12/5/22, 4:07 PM

secure a measure of fame and radicalize others. Livestreaming on platforms should be subject to restrictions — including verification requirements and tape delays — tailored to identify first-person violence before it can be widely disseminated.

> **Reform Section 230**: Currently, Section 230 of the federal Communications Decency Act protects online platforms from liability for third-party content that they host, regardless of those platforms' moderation practices. Congress should rethink the ready availability of Section 230 as a complete defense for online platforms' content moderation practices. Instead, the law should be reformed to require an online platform that wishes to retain Section 230's protections to take reasonable steps to prevent unlawful violent criminal content from appearing on the platform. This proposal would change the default. Instead of simply being able to assert protection under Section 230, an online platform has the initial burden of establishing that its policies and practices were reasonably designed to address unlawful content.

> **Increase Transparency and Strengthen Moderation**: Online platforms should provide better transparency into their content moderation policies and how those policies are applied in practice, including those that are aimed at addressing hateful, extremist, and racist content. They should also invest in improving industry-wide processes and procedures for reducing the prevalence of such content, including by expanding the types of content that can be analyzed for violations of their policies, improving detection technology, and providing even more efficient means to share information.

> **Call on Industry Service Providers to Do More**: Online service providers, like domain registrars and hosting companies, stand in between fringe sites and users. These companies should take a closer look at the websites that repeatedly traffic in violent, hateful content, and refuse to service sites that perpetuate the cycle of white supremacist violence.

"On the afternoon of May 14, 2022, a lone shooter traveled 200 miles to inflict a vile, racist act of terrorism on the good, innocent people of Buffalo. This killer and others like him have used virtual chatrooms and various forms of social media to plan, coordinate, and broadcast attacks leading to unthinkable and yet very real pain and suffering," said **U.S. Representative Brian Higgins**. "For too long mega companies have sidestepped their responsibility to content moderation and have not been held accountable for acting as a host for dangerous and criminal activity. May this horrible tragedy be

Attorney General James and Governor Hochul Release Report on the Role Platforms in the Buffalo Shooting | New York State Attorney General          12/5/22, 4:07 PM

a conduit to fight hate and promote understanding, to hold people responsible for their actions, and to build a more just society."

"The sights and sounds of the horrific, racist attack haunted many of those directly and indirectly impacted by that terrible event. Not only had those in the Tops and their loved ones endured this profound loss in real time, but they would later find out that the racist gunman had broadcast his slaughter on social media, where millions around the world could watch as each of these beautiful, full lives were targeted and taken so senselessly," said **State Senator Tim Kennedy**. "While this livestream was later taken down, the video of their murders and attempted murders continued to circulate, shared by millions on social media and broadcasted in news coverage — a visual no family should ever have to witness once, let alone in perpetuity. The report from Attorney General James highlights these issues and offers smart solutions and action plans. Social media companies need to be held accountable. They must better monitor the hate speech that pervades feeds and platforms, and commit to removing threats and dangerous, aggressive propaganda."

"The hate-fueled mass murder on May 14th forever changed our community. While the pain is real, we are strong and resilient and refuse to allow this racist act to define us as a people and as a community," said **State Assembly Majority Leader Crystal D. Peoples-Stokes**. "This attack highlighted how hate grows and is nurtured in the internet's dark corners. I commend Attorney General James for this report and for her proposals to combat this hatred and calls for violence. We need more accountability from the platforms that encourage and celebrate violence."

"The role that social media played in the mass shooting here in Buffalo illustrates the need to address the increase in vicious online content," said **Erie County Executive Mark C. Poloncarz**. "The ability for a white supremacist to post disturbing messages and images prior to and during senseless attacks such as what occurred in our community on May 14th has to be addressed. Social media organizations have a moral responsibility to identify and remove threatening content, especially indirect and more discreet threats that are often more difficult to flag and investigate than clear statements of intended violence. Attorney General James' report highlighted serious issues that must be addressed, and I thank her for her recommendations on how we move forward on the state and national levels. Radicalized violent extremists should not be provided any additional motivation to kill and cause harm to others."

"We need to take online extremism seriously. The shooter found a community online that reinforced his bigotry, radicalized him by indoctrinating him with conspiracy theories, and provided him with

Attorney General James and Governor Hochul Release Report on the Role Platforms in the Buffalo Shooting | New York State Attorney General          12/5/22, 4:07 PM

strategies to carry out his attack on innocent people," said **Erie County Legislature Chair April N.M. Baskin**. "Here in Erie County, we have developed the Office Behavioral Threat Assessment Team, which will follow up on threats made to institutions and community organizations. This is a model that should be considered in other communities. I thank Attorney General James for the report generated by her office and providing local, state, and federal officials with steps that can be taken to help save lives and combat online radicalization."

"A growing number of violent attacks on communities start with hate speech online," said **Buffalo Mayor Byron Brown**. "It's far too easy for individuals to become radicalized and indoctrinated with a hateful ideology through the internet. The 5/14 mass murderer researched his Buffalo target, spread this hateful manifesto, and livestreamed his murders with disturbing ease. Much more must be done to ensure that there is no place on the internet for hate speech, for hate indoctrination, for spreading hate manifestos."

"Social media had many negative effects on the community regarding the mass shooting on May 14th. It not only broadcasted a malicious attack leaving far too many traumatized, but it made us aware of yet another shared hatred space for communities of color," said **Buffalo Common Council President Darius G. Pridgen**. "The shooter took away ten family members from our community and eliminated the feeling of peace and safety in exchange for fear and pain. We need to ensure that individuals and groups are being better monitored online and investigated so we can prevent further terrorism. All threats of harm should be taken seriously and acted on immediately."

In May 2022, Governor Hochul **provided a referral to OAG under New York Executive Law Section 63(8) to investigate the role of online platforms in the Buffalo shooting**.

The investigation and subsequent report were conducted by the Bureau of Internet and Technology and the Hate Crimes Unit of the Civil Rights Bureau, with special assistance from the Research and Analytics Division and the Division for Criminal Justice.

JA69



Office of the New York State
Attorney General Letitia James

# Investigative Report

## on the role of online platforms
## in the tragic mass shooting
## in Buffalo on May 14, 2022

OCTOBER 18, 2022

# *Table of Contents*

*I. Executive Summary* ...................................................................................................................... 1

*II. Background* ............................................................................................................................... 6
    A. The OAG's Investigation into Online Platforms .................................................................... 6
        1. 4chan, 8kun, and their Derivatives ...................................................................... 6
        2. Discord ............................................................................................................ 8
        3. Reddit .............................................................................................................. 8
        4. Twitch .............................................................................................................. 9
    B. The Shooting in Buffalo ........................................................................................................ 9
    C. The Shooting's Impact on the Community .......................................................................... 11
        1. Personal Stories from Victims' Families ............................................................ 11
        2. Effect on the Community ................................................................................. 12
        3. Residents' Views on the Responsibility of Social Media Companies ..................... 14
    D. The Buffalo Shooter's Ideology: "White Genocide," the "Great Replacement" Theory, and Accelerationism.... 15
    E. The Christchurch Shooter and the Model of Virality .......................................................... 17
    F. The Influence of Prior Extremist Writings on the Buffalo Shooter's Writings ........................ 19
    G. The Buffalo Shooter's Content Doubles as an Inspirational Guide
        and Instructional Manual for the Next Mass Shooter ........................................................ 20

*III. The Role of Online Platforms in the Buffalo Shooting* ............................................................ 23
    A. Online Memes Helped the Buffalo Shooter Learn about the Great Replacement Theory
        and Express his Views in his Manifesto. ........................................................................... 23
    B. Online Platforms Cited by Buffalo Shooter as Formative to Ideology of Hate ..................... 24
        1. 4chan "Politically Incorrect" ........................................................................... 24
        2. Reddit .............................................................................................................25
    C. Online Platform Used by the Shooter to Plan the Details of His Attack ................................ 27
    D. Online Platforms Used by the Shooter to Equip His Arsenal ............................................... 28
        1. YouTube .......................................................................................................... 28
        2. 4chan /k/ Board .............................................................................................. 29
        3. Discord ............................................................................................................ 29
        4. Reddit .............................................................................................................. 30
    E. Online Platform Used by the Shooter to Broadcast His Violence ......................................... 31

*IV. Online Platforms' Response to the Buffalo Shooting* ............................................................... 34
    A. The Spread of Graphic Content Related to the Buffalo Shooting ......................................... 34
    B. The Global Internet Forum to Counter Terrorism's Response to the Tragedy in Buffalo ......... 34
    C. Mainstream Platforms' Moderation of Graphic Content Related to the Shooting ................... 35
    D. Improved Moderation Policies Reduced Prevalence of Violent Content, but Additional Improvement is Needed .....37
    E. Online Platforms' Advertisements and Monetization of Graphic Content Related to the Shooting ........................... 39

*V. Recommendations* ..................................................................................................................... 41
    A. Legislative Proposals .......................................................................................................... 41
        1.New Affirmative Liability ................................................................................. 41
        2. Reforming CDA Section 230 ............................................................................ 43
        3. Restrictions on Livestreaming .......................................................................... 45
    B. Recommendations for Industry ........................................................................................... 45
        1. Online Platforms Should Strengthen and Share Their Moderation Technologies ... 45
        2. Online Platforms Should Increase Transparency................................................ 46
        3. Internet Service and Infrastructure Providers Can and Should Do More .............. 47

# I. Executive Summary

The mass shooting in and around the Tops grocery store in Buffalo, New York on May 14, 2022 that claimed the lives of ten individuals and injured three others was all the more horrific because of the white supremacist ideological motivation that fueled it and the shooter's meticulous planning. The disturbing reality is that this attack is part of an epidemic of mass shootings often perpetrated by young men radicalized online by an ideology of hate. This report details what my office has learned about how the Buffalo shooter was first indoctrinated and radicalized through online platforms, and how he used these and other platforms to plan, implement, and promote these acts of terror.[1] The report assesses the strengths and weaknesses of the response of various online platforms in the wake of the Buffalo shooting. Readers should be cautioned that this report contains graphic textual descriptions of bigotry and violence, including quotes from the shooter's own writing that, in our opinion, are necessary to contextualize and explain this story.

No discussion of the Buffalo shooting can ignore the pressing need for stronger gun laws, as I have called for several times. New York has been at the forefront of enacting state-wide laws to protect its residents from gun violence,[2] but the national problem of gun violence demands national solutions and federal partnership. This should include repeal of existing federal laws that protect firearms manufacturers from liability, reduce transparency into gun sales, and inhibit effective law enforcement;[3] implementation of universal federal background checks and state-wide background checks for ammunition purchases; institution of a federal assault weapons ban; the use of federal extreme risk protection orders; closure of the so-called Charleston Loophole allowing guns to be sold if the FBI does not complete a background check within three days; universal law enforcement data-sharing; stronger regulation of imitation guns; the large-scale expansion of public health and violence-interruption funding; and significantly increased funding for both the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the oversight of gun dealers. Each of these actions will help reduce the amount of gun violence and unnecessary gun-related death and injury in New York and around the country.

---

[1] The individual referenced throughout as the Buffalo shooter has pleaded not guilty to criminal charges arising from the attack, and the criminal charges remain allegations as of the date of this report. This report reflects my office's finding of facts in connection with the investigation described in detail below. The defendant is presumed innocent unless and until found guilty at trial or by plea.

[2] Recent measures include prohibiting undetectable firearms and unserialized "ghost guns," N.Y. Pen. L. §§ 265.50, 265.55, 265.60-61, and the "unfinished" frames and receivers that criminals use to build them without any background check. *Id.* §§ 265.63-64. On July 1, 2022, New York passed the Concealed Carry Improvement Act, a package of reforms designed to comply with the Supreme Court's decision in *NYSRPA v. Bruen*, 142 S. Ct. 2111 (2022) by, among other things, revising New York's licensing laws, strengthening background checks, and specifying the list of sensitive locations such as schools, parks, and health care facilities where guns do not belong. See generally N.Y. Pen. L. §§ 400.00, 265.01-d, 265.01-e; N.Y. Exec. Law § 228. The Office of the Attorney General continues to defend New York's gun safety laws against political attacks, and to bring enforcement actions against those who would violate them.

[3] In particular, Congress should begin by repealing the Protection of Lawful Commerce in Arms Act, the Tiahrt Amendments, and the Firearm Owners Protection Act.

In addition, we must make investments in our healthcare infrastructure to address mental health issues, including those that arise out of the isolation of the recent pandemic and from the prevalence of young people spending countless hours online.

In this report, however, consistent with the directive from Governor Hochul that authorized and initiated the underlying investigation, my office's focus is on the role of social media and other online platforms in radicalizing people to commit acts of hate-inspired violence. We know that online platforms and their business models, which are generally supported by advertising, create incentives to keep users glued to their service for as many hours as possible. The psychological consequences of spending more and more time online and away from engaging with physical reality are significant, and it is hard to ignore the correlation between the rise in mass shootings perpetrated by young men and the prevalence of online platforms where racist ideology and hate speech flourish, in some cases by design. However, the focus of our report is not on the overall ecosystem, but the particulars: what precise mechanisms enabled the shooter to see prior mass shootings, plan his own mass shooting, and correctly expect that his manifesto and video would be widely shared.

The Buffalo shooter authored hundreds of written pages in which he draws the connection between those platforms and his own radicalization and decision to commit a mass attack animated by racism, antisemitism, and other execrable bigotry. And he makes clear that he intended to use those platforms to further promote his racist ideology with his writings, and to inspire new acts of violence through the preservation and dissemination of the videos and images of his own.

The report details several key findings:

> ***Violent White Supremacist Radicalization Traumatizes Vulnerable Communities:*** The Buffalo shooter killed ten Black people and wounded several other individuals. The victims leave behind dozens of loved ones whose grief is compounded by the fear that another attack could similarly target them and their community. That fear is grounded, in part, in the ease with which the shooter planned and enacted his attack, and the lack of options to hold accountable any of the individuals or entities who may have been complicit in his radicalization or otherwise enabled it. Community members described the extra layer of shock and hardship caused by the shooter's decision to target a grocery store in an underserviced area that is otherwise a food desert. The Buffalo Black community has consistently demonstrated its strength and resilience in the wake of this horror, but we must acknowledge the role that systemic racism and poverty played in leaving the community vulnerable.

***Fringe Platforms Fuel Radicalization:*** Anonymous, virtually unmoderated websites and platforms radicalized the shooter. By his own account, the Buffalo shooter's path towards becoming a white supremacist terrorist began upon viewing on the 4chan website a brief clip of a mass shooting at a mosque in Christchurch, New Zealand. His radicalization deepened further through engagement with virulent racist and antisemitic content posted by users on 4chan. The anonymity offered by 4chan and platforms like it, and their refusal to moderate content in any meaningful way ensures that these platforms are and remain breeding grounds for racist hate speech and radicalization. In the wake of the Buffalo shooting, graphic video and images of the shooting proliferated through 4chan more than any other site viewed by my office. When discussing its policy on such content, a head moderator said that "it's not even against the rules" because "the footage itself isn't illegal, any more than footage of any act of violence is illegal." In the absence of changes to the law, platforms like 4chan will not take meaningful action to prevent the proliferation of this kind of content on its site.

***Livestreaming Has Become a Tool for Mass Shooters and Requires Regulation:*** The Buffalo shooter was galvanized by his belief that others would be watching him commit violence in real-time. Livestreaming has become a tool of mass shooters to instantaneously publicize their crimes, further terrorizing the public and the communities targeted by the shooter. Livestreaming is also used by shooters as a mechanism to incite and solicit additional violent acts. Twitch, the platform used to livestream this atrocity, disabled the livestream within two minutes of the onset of violence, an improvement over Facebook's response to the livestream of the Christchurch attack, where the video was only removed after the attack ended. But two minutes is still too much. Even this relatively short video is enough for the horrific content to spread widely and to inspire future shooters.

***Online Platforms Currently Lack Accountability:*** By his own account, the shooter's path to radicalization was cemented by explicitly racist, bigoted, and violent content he viewed online on 4chan, Reddit, and elsewhere. He used the platform Discord to keep a private journal for months, where he wrote down his hateful beliefs and developed specific plans for equipping himself and perpetrating his massacre. He livestreamed his attack through both Twitch and Discord. In the wake of the attack, other users disseminated graphic video of his attack throughout the internet, everywhere from fringe websites to mainstream platforms like Facebook, Instagram, Twitter, and others. The First Amendment has no categorical exemption for hate speech; most of the content the shooter viewed is rankly offensive, but its creation and distribution cannot, constitutionally, be unlawful. Moreover, even when a user posts content that is unlawful, Section 230 of the Communications Decency Act of 1996 (CDA), codified at 47 U.S.C. § 230, largely insulates platforms from liability for claims related to their content moderation decisions.

***Voluntary Commitments are Limited:*** In the wake of the Christchurch shooting, many large, established online platforms adopted reforms under a framework that did improve the responsiveness of those platforms and increase their effectiveness in identifying and removing content depicting the Buffalo shooting, including the video of the shooting and the shooter's manifesto. This effort has been led in part by the Global Internet Forum to Counter Terrorism (GIFCT), of which most of these mainstream platforms are members. But GIFCT's current framework is an ineffective deterrent against white supremacist extremists. It is voluntary and lacks an enforcement mechanism. Moreover, the platforms themselves define what content constitutes objectionable content, within the framework of their private financial or ideological interests, which lacks sufficient transparency and public input.

These and other findings detailed in this report demonstrate that more must be done to prevent future violence arising from online radicalization. We must also reduce the ability of perpetrators of these crimes from promoting their criminal acts and from promoting their hateful ideologies in the process, using the attention that accompanies violence as a method of dissemination. My office has several recommendations set forth in this report, both for lawmakers and for industry participants:

***Criminal Liability for Perpetrator Created Homicide Videos:*** We recommend that New York (and other states) impose criminal liability for the creation by the perpetrator of a homicide, or someone acting in concert with the perpetrator, of images or videos depicting the homicide. Such videos are an extension of the original criminal act and serve to incite or solicit additional criminal acts.

***Civil Liability for Platforms and Individuals:*** In addition, we recommend the creation of new civil liability—with significant deterrent penalties—for the transmission or distribution of video or images captured by or created by the perpetrator of a homicide depicting the homicide. Such liability should include sufficient exemptions to avoid overinclusion of content with social, educational, or historical value. In combination with reform of Section 230, this liability would extend to online platforms that do not take reasonable steps to prevent this content from appearing on their platforms.

***Reform Section 230:*** Under Section 230 of the CDA, online platforms are generally spared liability for the content posted by their users, regardless of their moderation practices. We recommend that Congress reform the law to require an online platform to take reasonable steps to prevent unlawful violent criminal content (and solicitation and incitement thereof) from appearing on the platform in order for it to reap the benefits of Section 230.

***Reasonable Steps Must Include Limits on Livestreaming:*** Livestreaming was used as a tool by the Buffalo shooter, like previous white supremacist shooters, to instantaneously document and transmit his violent acts in an effort to secure a measure of fame within that milieu and radicalize others. Livestreaming on platforms should be subject to restrictions—including verification requirements and tape delays—tailored to identify first-person violence before it can be widely disseminated. The protections afforded by Section 230 should not extend to any platforms that do not take reasonable steps to restrict livestreaming in this way.

**Improved Industry Transparency:** Online platforms must be more transparent about their content moderation policies and how those policies are applied in practice, including those that are aimed at addressing hateful, extremist, racist, and violent content. This will aid accountability and give the public more clarity regarding the nature and success of industry moderation efforts.

**Additional Industry Investment:** Online platforms must invest in improving industry-wide content moderation technology and procedures, including by expanding the types of content that can be analyzed for violations of their policies, improving detection technology, and providing even more efficient means to share information about the existence of violative off-platform content to which users of their services attempt to direct people through the use of off-platform links. In addition, domain registrars, web hosting companies, and other internet infrastructure and online service providers stand in between online platforms and users. These companies should take a closer look at the platforms and websites that repeatedly traffic in violent, hateful content, and refuse to service sites that perpetuate the cycle of white supremacist violence.

We can no longer rely entirely on the industry to regulate itself through voluntary commitments. The cost is too high, and we must take every step we can to prevent violence predicated on hatred and bigotry, fueled by the unlimited consumption of vitriolic racist content online. This must, of course, be coupled with commonsense reforms to address gun violence. We must take action now and march towards a future where online platforms no longer enable horrific mass shootings and hate-based violence.

Letitia James

Letitia James

New York State Attorney General

# II. Background

## A. The OAG's Investigation into Online Platforms

This report is drafted in accordance with the May 18, 2022 referral issued by Governor Kathy Hochul pursuant to Executive Law § 63(8). Governor Hochul's referral letter instructed Attorney General Letitia James to focus on "the specific online platforms that were used to broadcast and amplify the acts and intentions of the mass shooting" that occurred that day.

The Buffalo shooter belongs to a new category of extremists who become radicalized online. In his own words, the internet was the source of his radical beliefs: "There was little to no influence on my personal beliefs by people I met in person." On online platforms, the Buffalo shooter found a community of hate that warped his worldview with racist conspiracy theories, pseudoscience, and a cult of worshipping past mass murderers. These communities thrive on all sorts of online platforms. Pursuant to the Governor's instructions, rather than attempt a survey of the state of white supremacy on the internet, this report focuses on the platforms known or believed to have been central to the Buffalo shooter's use of the internet to plan and broadcast his attack, and the platforms that the investigation by the Office of the New York State Attorney General (OAG) found were used in some way to spread graphic content arising from the shooting.

Some of these platforms, like Facebook, YouTube, and Twitter, are so ubiquitous as to be familiar to most readers of this report. Others, like Discord, Reddit, and Twitch, are extremely popular and very well-trafficked, but contain features and use lingo that may not be clearly comprehensible to those unacquainted with the services. Still others, like 4chan and 8kun (and their derivatives), belong to a corner of the internet that may occasionally reach the casual internet user, but likely do not have the reach to make their operation and usage widely familiar. To assist the reader in understanding how these platforms played a role in this incident, the following is a brief description of the platforms that were part of this investigation and that, in the OAG's opinion, fall into the latter two categories.

### 1. 4chan, 8kun, and their Derivatives

4chan is an anonymous imageboard, an online forum similar to a bulletin board system that centers around the posting of images. 4chan is organized by a number of boards, with each board covering a topic area. For instance, the board entitled "Politically Incorrect" is usually referred to as "/pol/". The board dedicated to weapons is referred to as "/k/". Posts on 4chan are collected into "threads," in which users may reply to the original post. Unlike most bulletin board systems, 4chan does not have a registration system. Users are given the option to enter a name when posting a reply, but need not do so; the default username given to any post where the poster has not entered a name is "Anonymous."

Each board contains ten pages of threads. Threads are "bumped" to the top of the board when a reply is made, unless the thread has reached a set "bump limit." When the bump limit is reached, the thread descends through each page as new threads are created. When a new thread is created, the last thread on the last page is "pruned," or removed from the board index. The thread can still be accessed by users who had the thread open on their page, but will be archived and eventually deleted after some time passes; that time is set differently for each board, although in many cases that time is relatively short. In the case of /pol/, as of August 2021, archived threads are deleted after 72 hours. By comparison, archived threads within the /v/ board, for discussion of video games, are deleted after 170 hours. 4chan's nearly complete anonymity and minimal moderation frequently results in the posting of hate speech, conspiracy theories, and obscene and offensive images.

8kun, formerly known as 8chan, is an imageboard similar to 4chan. Some differences include the ability of any 8kun user to create their own board—users on 4chan must post within pre-determined boards—and the inability to enter a username into a reply form when posting. 8kun was created as an alternative to 4chan and is well-known for hosting posts from the individual or group at the center of the QAnon conspiracy theory.[4]  4chan and 8kun have spawned several imitators, at least one of which the shooter references in his writings.

The Buffalo shooter's indoctrination into internet hate culture is most strongly linked to his use of 4chan. That site is also correlated with the initial spread of graphic content related to the shooting. Although initial reports linked the shooter to use of 8kun, references to the site are few and far between in his writings; instead, he seemed to have intended to post a link to his attacks on an 8kun imitator, although because of the anonymous and temporary nature of these boards, the OAG was unable to ascertain whether he ultimately did so.

4chan monetizes its site through two primary methods. First, it collects ad revenue, although reportedly, it has historically faced difficulty in maintaining a steady stream of revenue from advertisers. Most recently, in June 2022 advertising company Bid Glass appears to have discontinued a two-year-long relationship with 4chan. In 2016, the site's operator claimed its ad revenue was too low to sustain operations indefinitely—although, of course, it survived.[5]  When it has been able to lure advertisers, it has mostly relied on advertisements for pornography, cryptocurrency, non-fungible tokens, and online video games.[6] 4chan also sells "4chan Passes" to users, which allow users to make posts without having to complete a CAPTCHA challenge.

---

[4] *See* Brandy Zadrozny & Ben Collins, *How Three Conspiracy Theorists Took 'Q' and Sparked QAnon*, NBC News (Aug. 14, 2018), https://www.nbcnews.com/tech/tech-news/how-three-conspiracy-theorists-took-q-sparked-qanon-n900531.

[5] *See* Jay Hathaway, *Is 4chan about to go totally broke?*, Daily Dot (Oct. 6, 2016), https://www.dailydot.com/unclick/4chan-broke-malicious-ads-deleting-boards.

[6] *See* Justin Ling, *Who owns 4chan?*, Ars Technica (May 29, 2022), https://arstechnica.com/tech-policy/2022/05/who-owns-4chan.

## 2. Discord

Discord is a text and voice chat platform which optionally allows its users to share their screen or livestream video. The company's history lies in connecting video game players; it is still frequently used in the gaming community, but is used now by many kinds of communities, organizations, and individuals to connect with each other, including law firms, university classes, and others. The platform is organized into servers—not actually computer servers, but rather spaces on the platform created by specific communities and groups as hubs for communication. Servers are further organized into text and voice channels, which are often dedicated to specific topics. The majority of servers are small and invitation-only.

The platform is monetized entirely through a subscription model; there is no advertising. Although use of the platform is free, users may pay a subscription fee to access additional on-platform benefits, such as the option to customize their appearance on the platform and the ability to use custom emotes (or emojis) in any server they join. Users may also pay a fee for a "Server Boost" which provides special perks to a server, like upgraded audio and video quality and the ability to access more custom emotes for use within the server.

As described in greater detail below, the shooter kept a diary of sorts on a private Discord server to which he restricted access only to himself, until he used the Discord server on the day of the shooting to rebroadcast the livestream of his attack and invite others to watch the livestream and read his writings.

## 3. Reddit

Reddit is an aggregation and discussion site distinguished by the use of user-created boards referred to as "subreddits," each with its own subject matter. Users, identified by unique pseudonymous usernames, submit posts to a subreddit (usually denominated with a preceding "r/"). Other users can respond to those posts as comments and can choose to promote the content with upvotes or demote it with downvotes. Subreddits may either be public or private. Reddit's popularity translates into a vast amount of user-generated content. According to the company's own metrics, Reddit users created nearly 430 million posts and 2.7 billion comments across the platform in 2021.[7] Reddit monetizes its platform through a combination of contextual advertising and subscription plans that permit ad-free browsing and other perks.

As described in greater detail below, the shooter used certain subreddits to engage in hateful dialogue and educate himself about gear and tactics for use in his attack. After the attack, Reddit was used to facilitate the spread of graphic content related to the shooting.

---

[7] *See* Reddit, 2021 Transparency Report 3 (Feb. 16, 2022), https://www.redditinc.com/assets/images/site/Reddit-Transparency-Report-2021.pdf.

### 4. Twitch

Twitch is an online platform owned by Amazon and built largely for interactive livestreaming. Content creators can stream multiple feeds at once—for example, a typical livestream of a content creator playing a video game might include a stream of a camera pointed at the broadcaster superimposed in a corner over a stream of that person's computer screen. The bottom of each livestream generally includes information about the stream, and a chat box allows viewers and the broadcaster to interact with each other.

Twitch permits some creators to monetize their livestream channels through advertising, sponsorships, subscriptions to that creator's content, and the purchase of digital goods by viewers. Creators are only invited to monetize their channels upon reaching certain threshold streaming and viewership metrics, and must register with Twitch and agree to the platform's monetization rules.[8] The platform collects a portion of these payments.

As described below, the shooter used Twitch to livestream his attack.

## B. The Shooting in Buffalo

On May 14, 2022, an 18-year-old white male drove from his home in Conklin, NY, to a Tops Friendly Market on Buffalo's East Side, with the intention of "killing as many blacks as possible."[9] According to his own writings, he had chosen that supermarket because of its predominantly Black clientele and had staked it out at least three times in the months and days before the shooting.[10] He was armed with a Bushmaster XM-15 assault rifle, a 12-gauge shotgun, a loaded bolt-action rifle, and several magazines of ammunition. He wore body armor, camouflage fatigues, and a tactical-style ballistic helmet. He had illegally modified the Bushmaster to make it more lethal and painted it with racist slogans. He planned to storm the supermarket, kill the security guard, and "never stop firing" at innocent Black customers.[11]

Shortly before 2:00 p.m., the Buffalo shooter invited several users to a chat room on the online platform Discord, where he posted a link to a livestream and the contents of a manifesto and personal diary he had written to justify his violence and inspire future shootings. The shooter began livestreaming using the online platform Twitch at approximately 2:08 p.m., using a GoPro video camera attached to his helmet. The 2019 livestreamed Christchurch, New Zealand mosque shootings served as a model for the Buffalo shooter. He hoped that broadcasting his brutal slayings would radicalize others into copycat acts of violence.[12] His livestream lasted approximately 24 minutes; for most of that time, the livestream consisted of the shooter driving in his car as he prepared to perpetrate the shooting. Approximately 22 minutes into the livestream, he stepped out of his car and began shooting. Twitch stopped the livestream approximately two minutes after the first person was shot.

---

[8] For the sake of clarity, the Buffalo shooter was never eligible to—and did not—monetize any of his streams on Twitch.

[9] Buffalo shooter's manifesto at 58 [hereinafter "Manifesto"].

[10] *See Gunman Kills 10 at Buffalo Supermarket in Racist Attack*, N.Y. Times (May 17, 2022), https://www.nytimes.com/live/2022/05/14/nyregion/buffalo-shooting#the-accused-gunmans-racist-manifesto-outlined-a-plan-to-kill-blacks-and-referred-to-replacement-theory; Manifesto at 57.

[11] *See* Manifesto at 60.

[12] *Id.* at 5.

Video captured from the livestream shows the shooter driving to Tops with his assault rifle intermittently visible in the passenger seat and his tactical helmet intermittently visible in the rearview mirror.[13] As he arrived in the Tops parking lot he said aloud, to himself and his streaming audience, "I just gotta go for it right? It's the end, right here, I'm going in." Between 20 and 28 people watched some part of the livestream.

The shooter stopped his car directly in front of the grocery store and immediately started shooting. He shot four Black people outside of the store, knocking all four to the ground, killing three. As he walked toward the store, he shot one of the fallen victims in the head to ensure they were dead, just as he threatened to do in his manifesto.[14] The fourth victim lay motionless and pretended to be dead, escaping only once the shooter entered Tops.[15]

Once inside the store, he resumed firing and killed two Black customers. He stopped to reload his weapon, using a detachable magazine that he had modified his assault rifle to accept—in violation of New York law. He once again shot a fallen victim in the head. He turned a corner and exchanged fire with the store's Black security guard, a former Buffalo police officer named Aaron Salter. The shooter had prepared for that confrontation. At a previous visit to the store, he had taken note of the security guard and his firearm, and had purchased body armor specifically to protect against it. Salter shot the Buffalo shooter, but the shooter's body armor left him unharmed. He returned fire and killed Salter.[16]

He then pointed his rifle at a white male Tops employee who had been wounded during the shooting, but did not fire. He instead apologized and continued searching for more Black people to kill. The white male employee survived.[17] He moved towards the pharmacy, shooting indiscriminately; during this period, he shot a white Tops employee. She also survived. The shooter went to the store's checkout area where he killed one Black person. He headed to the aisles and killed three more Black people. Before the Buffalo Police Department arrived, reportedly less than two minutes after the shooting began, the shooter fired his weapon approximately 60 times.[18]

During the attack, Tops employees and customers hid wherever they could—in a stock room, conference room, freezer, and dairy cooler. Some were able to flee through the store's rear door.[19] Tops cashier Fragrance Harris Stanfield recalls not knowing where she was running at first while trying to escape. She remembers getting "knocked to the side by a customer."[20] Taisiah Stewart recalls losing his sandal as he ran barefoot out of the back exit and almost three-quarters of a mile to escape the shooting.[21]

---

[13] Surviving video clips show only the final seven minutes of the shooting livestream, and little is known for certain about the first 17 minutes. Contemporaneous posts on 4chan from purported witnesses describe the shooter "hyping" himself up for the violence to come.

[14] See Manifesto at 60 ("I shoot all downed blacks twice in the head").

[15] See Criminal Complaint at 4, United States v. Gendron, No. 22-cr-00109 (W.D.N.Y. June 15, 2022) [hereinafter "Complaint"].

[16] See Caitlin Yilek, Buffalo Shooting Supermarket Survivor Recalls Escape, CBS News (May 16, 2022), https://www.cbsnews.com/news/buffalo-shooting-supermarket-survivor-recalls-escape.

[17] See Complaint at 4-5.

[18] Id. at 5.

[19] Id.

[20] Yilek, supra n. 16.

[21] See Michael Ruiz, Buffalo Shooting Survivor Recounts Harrowing Escape After Witnessing Start of 'Hate'-fueled Attack, Fox News (May 16, 2022), https://www.foxnews.com/us/buffalo-shooting-hate-crime-survivor-escape.

## C. The Shooting's Impact on the Community

The Buffalo shooting wrought inconceivable damage on Buffalo's Black community. In an attempt to convey that experience, the OAG interviewed over a dozen witnesses, including victims' family members, Tops employees, and Buffalo community leaders. The enormity of their pain is not easily put into words. But the witnesses shared how the massacre upended their lives, shattered Black Buffalo's sense of safety, and left an indelible record— the shooter's video—that perpetuates their suffering. These individuals bore witness for their lost loved ones to spur social change. Their perspectives differed, but nearly every witness demanded legislative action to prevent further atrocities. It was their hope that their stories would give policymakers the courage to act decisively against white supremacist violence online and in the real world.

### 1. Personal Stories from Victims' Families

Kimberly Salter lost her husband, Aaron, a retired police officer and Tops security guard who died defending his community from the shooter. In her words:

> My best friend was taken from me. The love of my husband was taken from me.  That person had no right to do that. God gave my husband to me, and [the shooter] took him away from me and my family. I'm hurt, beyond words, and I grieve daily.
>
> The shooter came to harm, kill, and destroy, but God saw differently. Many lives were saved that day because of what God called my husband to do.
>
> The world looks at my husband as a hero, but that's what my husband was every day of his life. He loved God and served his community. He did what comes naturally. You can't put on heroism for today and take it off tomorrow. Aaron had on a polo shirt and shorts, and he went against a man with full armor and an assault rifle. My husband had only a Glock, but my husband engaged that man. He once told me, "I'm not trained to run. I'm trained to engage."
>
> There were times when I selfishly did not want my husband to go to work. We loved our life together. But I could do nothing but raise my hands and let him do what God called him to do. He went to work that day and God used him, and I live with that every day.

James Young lost his mother, Pearl Young, who was one of the first victims of the shooter's rampage. In his words:

> Pearl Young was just love. She loved everybody, accepted everybody. She was that one person. It didn't matter if she knew you or not, she would take you in. If you were hungry, she would feed you. If you needed clothing, she would clothe you.
>
> If I could speak to her today, she would say, "Forgive him." That's the hardest thing for me. I've been trying to go along with what she would want, what she would do. She would not condemn the shooter. She would just say, "Pray for him." She believed in God and would believe God could change even him. It hurts most because of knowing who she was.

Garnell Whitfield Jr. lost his mother, 86-year-old Ruth Whitfield, the oldest victim of the massacre. In his words:

> It's like somebody reached inside of me and pulled the best part of me out. I felt empty. I lost my mother, the person who loved me more than anybody in this world. I lost the person who's been my champion, my caretaker, my advocate, my supporter. She was everything to me. I see my mortality much clearer now than ever before. She would have been married 68 years to her husband, and she religiously visited him every day in the nursing home.
>
> My father has dementia, but he definitely knows that he doesn't see her. I don't know what to do. We can't do for him what she did. We can't make him feel the way she made him feel.

Zeneta Everheart's son Zaire, who worked at Tops, was shot but miraculously survived. In her words:

> I had just left the house that Saturday, and Zaire called me. It wasn't a call I was expecting. I answered the phone, and Zaire was screaming. He doesn't scream. He's a gentle giant. He was screaming, "Mom, Mom, get here now, I've been shot." When I got to the hospital, it was bittersweet seeing him. There were tubes everywhere, blood everywhere. The blood was just incredible. All over the floor. All over Zaire. I could see the blood in his hair. The shooter shot the woman Zaire was helping point blank, and her brains were all over him. He still has a lot of shrapnel inside him, and we don't know what the long-term effects will be.
>
> I know he's different. Zaire has always been a homebody, but it's ten times multiplied now. I'm concerned depression is setting in, that he has survivor's guilt.
>
> I go to therapy, but how do you get past your child almost dying? The doctor said this much in any other direction and he would be dead. He would have bled out right there.

## 2. Effect on the Community

The attack rocked a closely knit community where most people knew somebody who died. Witnesses described East Side Buffalo's community spirit as both a strength and a vulnerability. "Black people—we love everybody, and to an extent we love too much. As a result, our safety was compromised," said Tops employee Naomi JeanPierre. Pastor Tim Brown echoed that sentiment, "African Americans tend to be very accepting of whoever comes in." The result, in their view, was that the shooter could visit Tops several times, and take note of its layout and security, without raising any suspicion. "We talked to that man. We treated him like a human being. He bleeds like we do, and we treated him like a human being," said Tops employee Lorraine Baker. "This young white supremacist . . . went to one of the poorest neighborhoods in Buffalo, and he scouted, like an NFL coach scouting another football team. There's no talk about how easily he was able to go in there and just hunt," said Mark Talley, son of victim Geraldine Talley.

The shooting left the community feeling that further attacks can happen at any time. "You can feel the fear. When people talk, there's a fear in the conversation. It's an undercurrent along with anger. The community doesn't feel safe. How can this guy get away with doing this—make this plan, get everything he needed, and carry it out?" said James Young. Latisha S. Slaughter, daughter of slain former police officer Aaron Salter, told us, "I have anxiety just putting gas in my car. I'm always looking over my shoulder. You don't know people's mindset, what they are thinking." April N.M. Baskin, Chairwoman of the Erie County Legislature, agreed: "The shooter tore through the lives of dozens of families. The senselessness of the attack is something that we are all still coming to grips with. There is still a sense of fear at public gatherings."

By attacking the Tops Market—the lone grocery store in a food desert—the shooter left the community feeling particularly vulnerable. "Grocery stores are something we all have in common. We all need groceries to feed our family," said Latisha Slaughter. Pastor Brown said, "We fought for those stores for years. We fought diligently to feed the community. On any given Saturday, any one of us could have been in this store." Tops employee Lorraine Baker put it more bluntly, "Saturday is the day our babies are here." The attack shuttered the Tops Market for months and left many unwilling to go back even when it reopened. "He left the community starving. It was the only supermarket in the area," said Mark Talley.

Witnesses described the role that systemic racism and poverty played in leaving the community vulnerable. "He traumatized an already traumatized community. East Side Buffalo has been hurting for so many different reasons," said Zeneta Everheart. "This did not begin on May 14," said Garnell Whitfield. "Our community, Black Buffalo, has been struggling for a long time—intentionally under-resourced, criminalized." Whitfield noted that the shooter easily found a concentrated group of Black targets at the Tops Market because decades of underinvestment had left East Buffalo a food desert, with only one grocery store. He said that without confronting such manifestations of racism, "nothing else matters." In his words, "If you don't deal with the root, it's going to keep growing up." According to Majority Leader Crystal Peoples-Stokes, the massacre "highlighted for the outside world the inequities, discrimination, and racist infrastructure baked into our segregated neighborhoods and institutional systems."

One refrain from witnesses was a lack of resources to understand and combat hate. "The community has a better way of dealing with someone if they know how to stop them. There's no way to know who is being indoctrinated now," said James Young. "We're at war with an enemy we can't see," said Dr. Lavonne Ansari of Community Health Center. "We are not trained in domestic terrorism or in the dark websites that radicalize. We need more transparency on what does someone who has been radicalized look like—how do you recognize him?" Buffalo Council President Darius G. Pridgen echoed that concern, "We need to ensure that individuals and groups are being better monitored online and investigated so we can prevent further terrorism."

Without underplaying the lasting harm, some witnesses sounded a hopeful note, describing the community's resilience and strength. "Everybody has a breaking point, and this broke a lot of people. But there's a collective feeling in the whole Buffalo community that we'll rebuild and get better," said Zeneta Everheart. "In times of crisis, our people bind together. There's been no outpouring of hate or reciprocal violence. I'm very proud of my community," said Garnell Whitfield. Mark Talley started a nonprofit, Agents for Advocacy, to fight food scarcity and other manifestations of poverty—and to keep his mother's memory alive. His organization provides school supplies, feeds the hungry, and promotes health initiatives in the Black community. "I'm doing this organization to combat why she died," he said. Majority Leader Peoples-Stokes emphasized the need to continue to fight: "I hope that the outpouring of support will extend to asking why there was only one supermarket, why he targeted us, and how we can stay united against hate."

### *3. Residents' Views on the Responsibility of Social Media Companies*

The online nature of the massacre preoccupied many witnesses, who described the pain of knowing the shooter's video will exist on the internet forever. "That video was everywhere in East Buffalo, and the families have to continue to relive the tragedy. As soon as the video started coming across it should have been shut down immediately," said Pastor Brown. "It hurts that there is a video like that out there of my child," echoed Zeneta Everheart. "He streamed this live, and it looked like a f****** video game," said James Young. "It hurt when my grandson saw it. It hurt me to think about him, 15 years old in high school, and your classmates find out that your great-grandmother was one of the victims," he continued.  Tops employee Melanie Jean-Pierre said, "The video is in the back of my head. This is something I will never forget." Kimberly Salter, whose husband's death can be seen on the video, said, "To know that it was filmed and that people were watching it like a movie is disgusting." She seeks accountability: "I want everybody who was a part of that—who filmed it, who let him film it—I want them all to suffer consequences for the hate display."

Nearly every witness echoed Salter's entreaty to increase accountability for social media companies. "We need to have stronger laws against preaching hate on public platforms. When you preach hate, the next thing that comes is death. Social media sites that are allowed to do that, it's almost like we're enabling them to set up the next tragic death," said James Young. "The Attorney General has the responsibility to hold social media platforms accountable," said Pastor Brown. "People should have their opinions and free speech. But we should draw a line in the sand when somebody says they are going to kill people because of who they are." Zeneta Everheart agreed, "Any platform that allowed the viewing, sharing, tagging of this video, should all be held responsible. This hurts." Dr. Ansari asked, "If Congress does not act, how can we hold the social media industry accountable for the domestic terrorism that's hitting our community every single moment—to the point where somebody is coming in to blow us away?" Tops employee Melanie Jean-Pierre asked succinctly, "What is the federal government going to do to protect Black people?"

Buffalo's elected officials also called for increased accountability for social media companies. Mayor Byron W. Brown said, "The 5/14 mass murderer researched his Buffalo target, spread this hateful manifesto, and livestreamed his murders with disturbing ease. Much more must be done to ensure that there is no place on the internet for hate speech, for hate indoctrination, for spreading hate manifestos." Congressman Brian Higgins agreed: "For too long, mega companies have sidestepped their responsibility to content moderation and have not been held accountable for acting as a host for dangerous and criminal activity." In the words of State Senator Tim Kennedy, "Social media companies need to be held accountable. They must better monitor the hate speech that pervades feeds and platforms and commit to removing threats and dangerous, aggressive propaganda." And Erie County Executive Mark C. Poloncarz concurred: "Social media organizations have a moral responsibility to identify and remove threatening content, especially indirect and more discreet threats that are often more difficult to flag and investigate than direct threats and clear statements of intended violence."

## D. The Buffalo Shooter's Ideology: "White Genocide," the "Great Replacement" Theory, and Accelerationism

Shortly before the attack, the shooter shared a manifesto describing his racist beliefs with the explicit goal of provoking future mass shootings. It offered a pastiche of different racist theories and memes largely copied from extremist message boards and manifestos left by past mass shooters. It also included extensive discussions of firearms, firearm modifications, and body armor as a way of giving practical advice to future killers. His manifesto, like the manifestos of several previous white supremacist mass shooters, calls for future violence against Black people and others perceived as non-white in order to protect an ideological white race.

The manifesto's most prominent theme concerns the supposed decline of the white race and its replacement by other demographic groups—what he calls "WHITE GENOCIDE."[22] The concept that white birth rates are declining and being surpassed by those of other races—white demographic decline—has deep historical roots reaching back to at least the 19th century. It motivated the 20th century eugenics movement in the United States and Europe. And it has become an organizing principle of white supremacist extremists across the globe. In the late 20th century, white supremacist extremists began propagating a theory of "white genocide" as a Jewish-led conspiracy to lower white birthrates in order to replace white majorities in perceived white homelands with other races.[23] A version of this theory is known as the "Great Replacement" after a book by the same name.[24] For a decade, this was a fringe theory touted by extremists. Recently, however, the "great replacement" has entered mainstream political discourse through pundits such as Tucker Carlson of Fox News, who has repeatedly referenced the theory, particularly with respect to Democratic national politics.[25]

---

[22] *See* Manifesto at 2.

[23] *See*, e.g., Sara Kamali, Homegrown Hate: Why White Nationalists and Militant Islamists are Waging War against the United States 113–15 (2021).

[24] Renaud Camus, Le Grand Remplacement (2011).

[25] *See, e.g.,* Graig Graziosi, *Video of Tucker Carlson Promoting 'Great Replacement' Theory Surfaces Again*, Independent (May 16, 2022), https://www.independent.co.uk/news/world/americas/us-politics/tucker-carlson-video-great-replacement-theory-b2080264.html (collating Carlson's references to the theory, including a September 22, 2021 clip from Carlson's television show where he states—above a chyron reading "An Unrelenting Stream of Immigration" and next to a photograph of President Joe Biden captioned with the phrase "Mass Amnesty"—"In political terms this policy is called the Great Replacement, the replacement of legacy Americans with more obedient people from faraway countries").

Some white supremacist extremists believe that the only way to counteract "white genocide" and the "great replacement" is through a violent confrontation between the races. Sometimes referred to as "racial holy war" or "RAHOWA," these extremists believe that white people's future can only be guaranteed by an apocalyptic battle that extirpates those viewed as non-white from perceived white homelands.[26] Those who embrace this idea also embrace the notion of "acceleration": that acts of violence, especially racially motivated murder, will hasten racial war. The goal of such violence is to "create immediate societal panic, inspire copycat actors, and encourage reciprocal or revenge terror acts from affected groups."[27] The goal is to put into effect the "Fourteen Words," coined by white supremacist David Lane: "We must secure the existence of our people and a future for white children."[28]

The Buffalo shooter's manifesto draws from those abhorrent traditions. He explicitly touted his fear of "ethnic replacement," "cultural replacement," and "racial replacement" based on a combination of declining white birth rates and "[m]ass immigration and higher fertility rates of immigrants."[29] Like many "white genocide" conspiracy theorists, he portrayed Jews as ultimately responsible for white decline: "The real war I'm advocating for is the gentiles vs the Jews."[30] Yet, he writes that targeting Black people is more urgent because of their perceived high fertility rates: "[Jews] can be dealt with in time, but the high fertility replacers will destroy us now, it is a matter of survival we destroy them first."[31] His aim was explicitly accelerationist. He wanted to "encourage further attacks that will eventually start the war that will save the Western world."[32] He hoped his attack would inspire others to commit similar acts and that his followers would have an easier time doing so by following his detailed manifesto.[33]

The "Great Replacement" theory has long been a motivator for white nationalists promoting violence both in the United States and globally. At the 2017 Unite the Right rally in Charlottesville, white nationalists chanted "Jews will not replace us," echoing the Great Replacement Theory.[34] The individual responsible for the 2019 Christchurch shooting that left 51 people dead feared that whites were being replaced by Muslim and other non-white immigrants. The shooter in the 2019 Walmart shooting in El Paso, Texas was motivated by fear of a "Hispanic invasion."[35]

---

[26] Kamali, *supra* n. 23, at 113–14.

[27] Cynthia Miller-Idriss, Hate in the Homeland: The New Global Far Right 14 (2020).

[28] Kamali, *supra* n. 23, at 41–42.

[29] Manifesto at 1–2.

[30] *Id*. at 24.

[31] *Id*. at 12.

[32] *Id*. at 4.

[33] *See* Complaint at 7; Marilyn Mayo, Senior Rsch. Fellow, Ctr. on Extremism, Anti-Defamation League, Remarks at the ADL Webinar, *The Great Replacement Theory and How It Motivates Violent Extremists* (June 14, 2022).

[34] Jonathan Sarna, *The Long, Ugly Antisemitic History of "Jews Will Not Replace Us,"* Brandeis Univ. (Nov. 19, 2021), https://www.brandeis.edu/jewish-experience/jewish-america/2021/november/replacement-antisemitism-sarna.html.

[35] *"The Great Replacement:" An Explainer,* Anti-Defamation League (Apr. 19, 2021), https://www.adl.org/resources/backgrounders/the-great-replacement-an-explainer.

## E. The Christchurch Shooter and the Model of Virality

The Buffalo shooter may have acted alone, but he saw himself as following in the footsteps of others. In the past two decades, violent white supremacists worldwide have ritualized a chilling sequence of events: commit a mass shooting or another atrocity, publish a manifesto, and wait for the next mass casualty.[36] The murders these extremists commit and the manifestos they write are honed into a single weapon to radicalize others and bring about future violence against those perceived as undesirable.

In 2011, in Oslo and Utøya, Norway, an attacker killed 77 people, injured hundreds more, and published an online manifesto justifying the violence as a response to Muslim "replacers" and "invaders." The manifesto used a chatty question-and-answer style and shared details about the shooter's life as well as his ideology and calls to future violence. Researchers have dubbed this the "narcissistic format" of right-wing manifestoes and speculated that it draws inspiration from celebrity profiles in magazines.[37] The Norwegian manifesto included explicit guidance to other extremists for how best to commit future mass atrocities. And followers have heeded his advice—in the years since those murders, white supremacists across the globe have followed this playbook.[38] The Buffalo shooter, like others inspired by those killings, explicitly referenced the Norwegian killer's manifesto in his own writings.

In 2019, in Christchurch, New Zealand, a shooter killed 51 people and injured 40 in attacks on two mosques. The influence of the Norway shooter was clear—not only did the Christchurch manifesto explicitly reference that shooter (and others) while adopting the same language drawn from "Great Replacement" theory, but the Christchurch shooter also followed the Norway shooter's advice for committing future atrocities by joining a gym, bulking up with steroids, joining a rifle club, and cleaning up electronic devices to limit government detection.[39] He expressed a continuity of purpose and self-consciously modeled his actions on the Norway shooter and other past perpetrators of mass violence.

But the Christchurch shooter also changed the playbook in new, deadlier ways. He was the first white supremacist to livestream his attack, and the video of the shootings went viral. He deliberately sought to create an online footprint that he hoped would be galvanizing and instructional to fellow right-wing extremists. These digital artifacts have proved to be indelible and have radicalized others, including the Buffalo shooter, who deliberately modeled his attack on the Christchurch shooter's.

---

[36] *See* Kamali, *supra* n. 23, at 235–36, 240–43.

[37] Graham Macklin and Tore Bjørgo, *Breivik's Long Shadow? The Impact of the July 22, 2011 Attacks on the Modus Operandi of Extreme-right Lone Actor Terrorists* 15 Perspectives on Terrorism 14, 20 (2021).

[38] *See* Kamali, *supra* n. 23, at 236, 240–43 (identifying five such examples).

[39] *Ko Tō Tātou Kāinga Tēnei: Report of the Royal Commission of Inquiry Into the Terrorist Attack on Christchurch Masjidain on 15 March 2019* 197 (2020).

On March 15, 2019, the Christchurch shooter posted links to his Facebook livestream and a written manifesto on Twitter and the /pol/ board on 8chan. He then began his livestream using a GoPro attached to his helmet, recording himself putting his car into gear and driving to the Al Noor Mosque. About two hundred people watched the livestream in real time. The video of the shooting then quickly spread on both mainstream and fringe social media sites. According to Facebook, the website removed 1.5 million uploads of the video within the first 24 hours,[40] and the video was altered at least 800 times, likely by users trying to evade detection by moderators.[41]

As his video went viral, the shooter was lauded as a cult hero in online right-wing extremist forums. Users in 8chan's /pol/ board praised and quoted the Christchurch shooter's video and manifesto, and many created memes and images celebrating the shooting. Many also likened the perpetrator to a religious figure, creating memes that transposed his face onto images of medieval saints and referring to him as a saint.[42]

The Christchurch shooter's written manifesto is littered with memes and sarcasm, mirroring the style of the right-wing extremist forums he frequented and ultimately catered to during the attack. "Shit posting" in these forums involves packaging white supremacy, xenophobia, and racism in a medley of crude jokes, coded cultural references, and meaningless content. Through this format, users can disseminate more direct, explicitly bigoted, pseudo-factual appeals to violence while maintaining a veneer that the content is "just a joke" and was never meant to be taken seriously. For example, in a "Q&A" section, the Christchurch shooter wrote that the video game "Fortnite trained me to be a killer and to floss on the corpses of my enemies."[43] This wink to online gaming communities—many of which are hotbeds of right-wing radicalization—gives adherents the sense that they are in on the joke and cultivates solidarity with him.[44]

---

[40] *See* Chris Sonderby, *Update on New Zealand,* Meta (Mar. 18, 2019), https://about.fb.com/news/2019/03/update-on-new-zealand.

[41] *See* Elise Thomas, *Manifestos, Memetic Mobilization and the Chan Boards in the Christchurch Shooting*, Counterterrorism Yearbook 19, 20 (2020).

[42] *See* Graham Macklin, *The Christchurch Attacks: Livestream Terror in the Viral Video Age*, 12 CTC Sentinel 18, 25 (2019).

[43] *Id.* at 19.

[44] *See* See Aja Romano, *How the Christchurch Shooter Used Memes to Spread Hate*, Vox (Mar. 16, 2019), https://www.vox.com/culture/2019/3/16/18266930/christchurch-shooter-manifesto-memes-subscribe-to-pewdiepie; Linda Schlegel, *Extremists' Use of Gaming (Adjacent) Platforms: Insights Regarding Primary and Secondary Prevention Measures* (Sept. 21, 2021), https://home-affairs.ec.europa.eu/whats-new/publications/extremists-use-gaming-adjacent-platforms-insights-regarding-primary-and-secondary-prevention_en.

The Christchurch shooter's calls to violence begat more killings. A month later, on the last day of Passover in 2019, a white supremacist livestreamed his assault on a synagogue in Poway, California. The Poway shooter killed one and injured three, including the rabbi. His online manifesto claimed the Christchurch shooter "was a catalyst for me personally."[45] Fewer than four months later, a racist shooter in El Paso, Texas, began his manifesto with the words, "In general, I support the Christchurch shooter and his manifesto."[46] The El Paso shooter cited the Christchurch manifesto as the turning point at which Hispanic immigrants became his "target."[47] He killed 22 people, injured 24 others, and claimed this was "just the beginning of the fight for America and Europe."[48]

## F. The Influence of Prior Extremist Writings on the Buffalo Shooter's Writings

The Buffalo shooter explicitly claimed the Christchurch shooter as his direct inspiration. He claimed that the Christchurch shooter's livestream "started my real research into the problems with immigration and foreigners in our White lands, without his livestream I would likely have no idea about the real problems the West is facing."[49] According to his manifesto, the Buffalo shooter found a video of the Christchurch livestream and the Christchurch shooter's manifesto on the online image board 4chan in May 2020, a year after the attack. He sought to "follow [the Christchurch shooter's] lead and the attacks of so many others like him."[50]

Like the Christchurch shooter, the Buffalo shooter used niche cultural references in his manifesto as a signal to fellow online right-wing extremists, displaying antisemitic and racist memes that circulate widely on right-wing extremist forums and joking that "covid vaccine juice" could be the reason he planned to commit the shooting.[51]

The Buffalo manifesto plagiarized liberally from the Christchurch manifesto. It overlaps 63 percent with the earlier document, with 23 percent of the texts matching word-for-word. The Buffalo shooter also used the same questions in the same order as the Christchurch shooter in the Q&A portion of his writings.[52] The Buffalo manifesto is significantly longer than the Christchurch manifesto: 47,000 words compared to 17,000 words. Researchers at the Anti-Defamation League believe the Buffalo shooter used the Christchurch manifesto as a starting point and then added to it, notably adding a new section blaming Jews for the demise of the white race.[53]

---

[45] Kamali, *supra* n. 23, at 242.

[46] El Paso shooter's manifesto at 1.

[47] *See id.*

[48] Kamali, *supra* n. 23, at 242–43.

[49] Manifesto at 8.

[50] *Id.* at 13.

[51] *See id.* at 10.

[52] *See Striking Similarities Between Gendron and Tarrant Manifestos,* Anti-Defamation League (May 24, 2022), https://www.adl.org/resources/blog/striking-similarities-between-gendron-and-tarrant-manifestos.

[53] *Id.*

Although the Buffalo manifesto does sometimes deviate from the Christchurch manifesto, these deviations often resemble aspects of other right-wing extremist manifestos that pre-date the Christchurch shooting. For example, his description of firearms and tactical gear mirrors the Norway attacker's lengthy description of weapons and body armor. Both shooters provided detailed information about the various weapons and armor available, and even described the benefits and shortcomings of using different types of gear to carry out an attack.

His manifesto also shares striking similarities with that of the perpetrator of the 2015 Charleston AME Church shooting. The Charleston manifesto argued that the "issues" with Jews are "not their blood," but rooted in Jewish religion and identity.[54] The Buffalo shooter made a similar argument in his own manifesto, explaining his belief that modern Jews are ethnically white, and that Jewish religion is the source of the "problems" with Jews, rather than Jewish genetics.[55] Additionally, both shooters express admiration for East Asians. The Charleston shooter described his "respent (sic) for the East Asian Races," and suggested that, if the white race were to come to an end, East Asian people could "carry something on."[56] Similarly, the Buffalo shooter wrote that East Asians are "quite admirable," citing what he perceives as their "superior traditional values and genetics."[57]

And the Buffalo shooter drew from previous shooters, who, like the Christchurch shooter, captured their violence on video. When planning his Buffalo attack, he learned online that "a previous attack was recorded on Twitch (Halle Synagogue Shooting) that lasted about 35 minutes, which for me shows that there is enough time to capture everything important. This may not work as intended if it's reported and taken down early."[58]

## G. The Buffalo Shooter's Content Doubles as an Inspirational Guide and Instructional Manual for the Next Mass Shooter

The Buffalo shooter's writings show he understood that prior manifestos and graphic content exerted power in recruiting others to commit mass violence. By creating similar content, the shooter sought to situate himself within that tradition, attempting to build his legacy and pave the way for others to follow in his footsteps.

In addition to his manifesto, he also kept a personal diary in the months before the Buffalo attack that purports to provide an intimate window into his ideological beliefs, daily activities, relationships, and psyche. He intended this document to be read and circulated by others alongside his manifesto as a means of perpetuating his legacy and provoking future violence. He kept his diary on Discord, a voice and instant messaging social platform originally designed to facilitate conversation between remote video gamers in real time. He recorded his daily activities on a personal server that he did not invite anyone to join—access to the content was apparently restricted only to him. Just before executing his attack, he invited select individuals to view his Discord logs and published an edited version of these logs—his diary—for an audience that he imagined would want to understand and possibly mimic him.

---

[54] *See* Charleston shooter's manifesto at 4.

[55] *See* Manifesto at 26-30.

[56] Charleston shooter's manifesto at 4.

[57] Manifesto at 53.

[58] *Id.* at 142.

The transcript of the edited Discord logs is approximately 700 pages, containing original posts written by him, links to outside content, and memes and images pasted onto his server. Much of what was written in the Discord logs was incorporated into his manifesto, evidencing his desire to write for posterity's sake, even in his private diary.

Nearly one hundred pages in his manifesto detail his research into which weapons, helmets, body armor, and other tools he planned on buying. He compares prices on different websites and meticulously discusses pros and cons of multiple models of the same material. He shares links to weapon tutorials and websites where he bought equipment for the attack. His hope was that these detailed accounts of the materials he used, considered using, and those which he deemed not good enough for a mass shooting would all collectively help the next shooter gather the best materials in a much shorter amount of time.

He also meticulously recorded his plan for the attack in the Discord diary, leaving behind a manual for those who he hoped would follow in his footsteps. The logs detail the process of funding and purchasing equipment, selecting a target, and configuring technology for broadcasting the shooting. He funded his efforts primarily through the sale of personal items and silver at flea markets and to buyers he met through 4chan and Reddit.[59] Often he could not afford the quality of equipment he would have otherwise selected, and he wrote at length about what he would have purchased with additional time and resources, attempting to establish himself as a source of knowledge for future attackers. According to his own writings, his knowledge of weapons and related equipment came from personal hunting experience, instructional YouTube videos like those of Garand Thumb, and the 4chan weapons board "/k/".[60] He also used the /k/ board as a marketplace to purchase some body armor, in addition to browsing gear exchanges, pawn shops, and eBay.[61] He bought ammunition and the rifle he used to commit his attack from McLain's Sporting Goods and from Vintage Firearms, two gun shops in New York.[62] He also wrote of frequent trips to New York State public lands to practice shooting, detailing his experiences and setbacks with various configurations of his equipment, and advocating to readers the importance of training before an attack.

---

[59] "I took a picture of my coins and I'm going to attempt to sell them all on r/pmsforsale tomorrow; . . . r/GearTrade may also be a good option to sell equipment." Buffalo shooter's Discord diary at 51, Jan. 13, 2022 [hereinafter "Discord Diary"].

[60] "Heres my plateland RMA rant: // Can someone give me the rundown on RMA? Are they still doing sketchy tests on their plates? Are the UHMWPE they claim actually just fiberglass? Why are their 1189 gen 1 series still available? Why do they make steel plates despite knowing that they are dangerous? Or more importantly do I have to stop listening to whatever Anonymous says on /k/ // 'To our knowledge, our very own model 1189 level 4 hard armor plate is the strongest body armor in the world.' And whats up with all this on their blogs and item descriptions? Who makes these? Am I schizophrenic?" Discord Diary at 356, Mar. 16, 2022.

[61] "Just ordered 2 pairs of darn tough T4021 desert tan large socks on eBay, let's see if it was worth the hype, cost me $56 though." Discord Diary at 29, Jan. 4, 2022.

[62] "Then I went back to Binghamton and went to McClain's Sporting Goods, and looked at ammo prices for 5.56, I picked up 2 boxes of BPS 12 gauge 00 Buck for ~18 dollars and change, then I went to Vintage // Firearms and investigated the AR they had very closely." Discord Diary at 64, Jan. 19, 2022.

The Buffalo shooter's manifesto also appropriated, word-for-word, the Christchurch manifesto's calls to future violent or accelerationist action. In his section "Answers to my people/supporters['] questions" he tells them to make plans, form alliances, get equipped and then act.[63] Doing so, he claims, will ensure that "one day our own children can enjoy the rewards of our labor."[64]

The Discord logs also provide some information on how and where he was radicalized (with the caveat that his writings reflect his own agenda). His self identified radicalization coincided with the start of the COVID-19 pandemic. According to his diary, it was then that he began spending time on 4chan. Through posts on 4chan, he wrote, his radical beliefs first formed.[65] His indoctrination into white supremacy and belief in white genocide was furthered by his activity on Reddit by browsing within certain subreddits and fueled by his research on eugenics, the Great Replacement Theory, and other longstanding race theories.[66]

---

[63] *See* Manifesto at 10.

[64] *Id.* at 166.

[65] *See* Discord Diary at 88, Jan. 30, 2022. *See also* "I only really turned racist when 4chan started giving me facts that they were intellectually and emotionally inferior." Discord Diary at 41, May 5, 2022.

[66] "Of course, many of my beliefs come from reddit too. Many subreddits I joined have been banned but they show up on r/AgainstHateSubreddits all the time. One's [sic] that are still around include r/greentext, r/4chan, r/PoliticalCompassMemes, r/SocialJusticeInAction, r/LoveForLandlords, and r/AntiHateCommunites, of which I am actually in their discord :)" Discord Diary at 41, Jan. 30, 2022.

**JA93**

# III. The Role of Online Platforms in the Buffalo Shooting

Despite the growing use of platform-specific content moderation policies to combat hateful content and the coordination that some platforms have undertaken to refine those policies and practices, the Buffalo shooter describes in his own words the racist and xenophobic content available online that radicalized him. He also turned to online platforms to seek advice on assembling his lethal arsenal, and used yet other platforms in an effort to disseminate his violence.

## A. Online Memes Helped the Buffalo Shooter Learn about the Great Replacement Theory and Express his Views in his Manifesto

Globally, internet memes have been an effective means to mainstream white supremacist extremism and introduce it to new audiences. Memes are "typically visual cultural elements that use jokes . . . in ways that are shared and altered repeatedly by other users online, usually in anonymous ways."[67] By using humor, memes can soften extremist ideas and make them more palatable to outsiders, while simultaneously creating an in-group—a community that understands the sometimes deeply encoded in-jokes.[68] It also gives extremists cover while they incite violence because they can always claim that they were just joking around.[69]

Like the Christchurch shooter before him, the Buffalo shooter peppered his manifesto with memes, in-jokes, and slang common on extremist websites and message boards. The manifesto included memes about "black privilege," Jewish leaders in the media, Jewish religious ritual, Jewish involvement in U.S. slavery, the creation of the COVID-19 vaccines, and the NAACP. He emphasized the power of using "infographics, shitposts, and memes that the White race is dying out, that blacks are disproportionately killing Whites."[70] And he directed anticipated future mass shooters to "create memes, post memes, and spread memes. Memes have done more for the ethno-nationalist movement than any manifesto."[71]

---

[67] Miller-Idriss, *supra* n. 27, at 66.

[68] *See id.*

[69] *Id.*

[70] Manifesto at 13.

[71] *Id.* at 169.

## B. Online Platforms Cited by Buffalo Shooter as Formative to Ideology of Hate

In his writings, he identifies the websites that contributed the most to his growing hatred of nonwhites. On January 30, 2022, he wrote in his Discord diary that his "current beliefs started when I first started to use 4chan a few months after covid [sic] started . . . [o]f course, many of my beliefs came from reddit too. Many subreddits I joined have been banned but they show up on r/AgainstHateSubreddits all the time." Similarly, early on in the Manifesto, he again points to 4chan—specifically the site's /pol/ board—as the primary catalyst for his inculcation into Great Replacement Theory. He cites several fringe white supremacist websites that gave him greater "exposure" to these ideas, but notes that he was led to these sites from 4chan. Indeed, he identifies 4chan as the site where he first watched a portion of the Christchurch shooting, via "a short gif of a man walking into a building and shooting a shotgun through a dark hallway."

In his own words, he says that he began using 4chan regularly in May 2020. Because his Discord diary only dates back to November 2021, the full progression of his radicalization is not known to be documented. Throughout his diary he consistently uses hateful and violent language. He credits much of his ideology and knowledge to 4chan, and those boards surely played a role in indoctrinating him into hateful, white supremacist internet subcultures. In his own words just nine days before the attack: "These experiences didn't make me racist against blacks though, maybe uncomfortable around the majority of them, since I only relate them to trouble. I only really turned racist when 4chan started giving me facts that they were intellectually and emotionally inferior."[72]

### 1. 4chan "Politically Incorrect"

The /pol/ ("politically incorrect") board on 4chan is nominally dedicated to political discussion, but frequently includes white supremacist, antisemitic, and other types of hateful speech, as well as far-right extremism and conspiracy theories. In the early stages of planning his attack, the Buffalo shooter wrote, "Every time I think maybe I shouldn't commit to an attack I spend 5 min of [sic] /pol/, then my motivation returns."[73] According to his writings, most of the memes in his Discord diary are from /pol/.[74] His Discord logs make it evident that he treated the racist charts, graphs, and memes he found there as forms of news and proof of white genocide.[75]

To the extent that 4chan content is moderated, it is performed by volunteer moderators who review posts, remove content violative of the website's rules, ban users, and close threads. Additional volunteers referred to as "janitors" are authorized only to delete posts and submit requests to ban users to moderators. Moderators and janitors are selected from a pool of applications that are occasionally solicited by 4chan from regular users. The website has publicly available rules, which include "Global Rules" that apply across all of (or most of) the website's boards, and additional board-specific rules. In general, however, the site largely permits any speech unless it violates United States law or is considered off-topic within the board in which the post is made.

---

[72] Discord Diary at 33, May 5, 2022.

[73] *Id.* at 21, Dec. 27, 2021.

[74] *Id.* at 194, Feb. 23, 2022 ("most of these pictures I get from /pol/ humor threads lel").

[75] *See* Discord Diary at 88, Jan. 30, 2022 ("Although many threads are utter shitposts of trash quality, I feel there are many problems of the world being addressed that are not popular or talked about on regular media. White genocide is real when you look at data, but is not talked about on popular media outlets.").

The /pol/ board on 4chan sees tens of thousands of posts each day. According to one website that tracks usage data on 4chan, the /pol/ board is the most popular board on 4chan and receives over 115 posts every minute. The site's extremely permissive moderation environment, automatic expiration of user-generated content, and default anonymity contribute to an atmosphere that allows—and even encourages—racist, hateful speech. Indeed, although 4chan's publicly posted "Global Rules" dictate that users may not post "Racism" outside of the anything-goes /b/ board (known as the "random" board, where virtually all posting rules are suspended), 4chan conceded in a letter to the OAG that this particular rule "is not applied to /pol/."

4chan also operates outside of the efforts by other online platform to rein in hate speech and graphic content that contributes to the cycle of white supremacist violence. The company told the OAG, for instance, that they "have not communicated with GIFCT," "have not performed any internal investigation of the Buffalo Mass Shooting beyond that required to respond" to the OAG, and indeed in the last six and a half years, despite repeated references in that time to the use of the website by perpetrators of mass violence, have only performed a single internal investigation into the use of their site to advance terrorism, violent extremism, mass shooting events, or hate crimes—begun in response to an inquiry from the Select Committee to Investigate the January 6th Attack on the United States Capitol—and none at all into the use of the website to promote or facilitate the sale of firearms, body armor, or other military weapons or equipment, or to illegally modify weapons.[76] It is perhaps no surprise given this hands-off attitude that threads on the /pol/ board regularly include links to white supremacist, racist, and Nazi literature and ideology.

## 2. Reddit

Reddit is far more popular and mainstream than 4chan; according to online ranking data firm Semrush, it is the 9th most-visited website on the internet. Reddit's extraordinary success fosters innumerable types of communities, some with anodyne or positive aims and vast membership. For instance, one popular subreddit, r/AskReddit, describes itself as "the place to ask and answer thought-provoking questions" and claims 36.5 million members. Yet until 2020, the site had no clear platform-wide guidelines preventing hateful speech. As the Stanford Internet Observatory has put it, the website's permissive atmosphere and the posts on certain visible communities gained the website a reputation as a "cesspool of racism." On the same day that it implemented its current policy prohibiting hateful content, it also removed over 2,000 subreddits for violating that policy.[77]

---

[76] See Justin Ling, 'Cheering Section' for Violence: The Attacks That Show 4chan Is Still a Threat, Guardian (May 1, 2022), https://www. theguardian.com/technology/2022/may/01/4chan-extremist-online-forum-raymond-spencer (discussing references to 4chan made in the writings of a man in Toronto who killed several people in a "vehicle ramming rampage" in 2018, the Christchurch shooter, and a man in Washington, D.C. suspected of shooting four people in the spring of 2022).

[77] See Adriana Stephan, Comparing Platform Hate Speech Policies: Reddit's Inevitable Evolution, Stan. Freeman Spogli Inst. for Int'l Stud.: FSI News (Jul. 8, 2020), https://fsi.stanford.edu/news/reddit-hate-speech.

Content posted on Reddit is subject both to Reddit's global Content Policy and to subreddit-specific rules. Reddit's platform-wide Content Policy now asserts with respect to hateful content that "[c]ommunities and users that incite violence or that promote hate based on identity or vulnerability will be banned." Each subreddit may have its own specific rules, which may be different or stricter than the global Content Policy. Moderation is conducted through several avenues: administrators enforce the Content Policy, and moderators patrol individual subreddits and enforce the rules specific to each of those communities.[78] A mixture of administrator/moderator human review, user reports, and automated tools elevate potentially problematic posts for possible deletion and further action. Most moderation actions, however, are performed by moderators—users drawn from the Reddit community—without involvement from Reddit itself.[79]  The company asserts that this "self-moderation effort at the community level continues to be the most scalable solution we've seen to the challenges of moderating content online."[80]

According to Reddit, 467 subreddits were removed from the site in 2021 for engaging in hateful conduct, representing a 93% decrease from 2020 in subreddit removal for that reason.[81] That apparent success may be at least partially the result of Reddit's mass suspension of thousands of subreddits in 2020 upon the implementation of the website's hate policy guidelines. Yet of the dozens of million pieces of content removed by administrators and moderators in 2021, fewer than 40,000 were removed due to hateful content.[82] Reddit's own internal analysis from the prior year suggested that 40,000 pieces of hateful content were posted to Reddit every day, and estimated that 78% of "severe hate content" went unreported and unreviewed. Indeed, as the shooter's Discord logs indicate, Reddit's own userbase has taken to policing the site in r/AgainstHateSubreddits and elsewhere.

Some of the subreddits specifically cited by the Buffalo shooter in January 2022 as sources of extremist content no longer exist; an attempt to navigate to the subreddit's URL now directs to a page that says, "This community was banned for violating Reddit's rule against promoting hate." Yet the OAG's investigation revealed, as described below, that Reddit was an outlier among large, mainstream online platforms in how long it took the company to remove posts linking to graphic video of the Buffalo shooting, even after the OAG alerted the site by submitting user reports.

---

[78] See Reddit, 2021 Transparency Report 4–8 (Feb. 16, 2022), https://www.redditinc.com/assets/images/site/Reddit-Transparency-Report-2021.pdf (Content Removals).

[79] Id.at 2 (Introduction).

[80] Id.

[81] Id. at 13 (Content Types).

[82] Id. at 10.

## C. Online Platform Used by the Shooter to Plan the Details of His Attack

As described above, the Buffalo shooter maintained his own Discord server which he used to keep a comprehensive diary. On the day of the shooting, he sent out invitations to various individuals to access the Discord server, which he had also set up to rebroadcast his Twitch livestream. By restricting access to the Discord server only to himself until shortly before the attack, he ensured to near certainty that his ability to write would not be impeded by Discord's content moderation.

Discord's content moderation operates dually at the individual user and server level, and generally across the platform. The Buffalo shooter had no incentive to operate any server-level moderation tools to moderate his own writing. But the platform's scalable moderation tools also did not stop him from continuing to plan his mass violence down to every last detail.

Discord does maintain a Community Guidelines policy prohibiting users from making threats of violence or harm, or from organizing, promoting, or supporting violent extremism.[83] But without users or moderators apart from the shooter himself to view his writings, there could be no reports to the platform's Trust and Safety Team. In practice, he mocked the Community Guidelines, writing in January 2022, "Looks like this server may be in violation of some Discord guidelines," quoting the policy prohibiting the use of the platform for the organization, promotion, or support of violent extremism, and commenting with evident sarcasm, "uh oh."[84] He continued to write for more than three and a half more months in the Discord server, filling its virtual pages with specific strategies for carrying out his murderous actions. Discord's automatic tools either did not scan his writing, or else were not calibrated to develop any assessment about the profusion of popular racist memes, inflammatory rhetoric, and precise details about a planned mass shooting.

In addition to maintaining his own private diary to discuss his racial hatred and plan his attack, he also appears to have frequented Discord servers maintained by others. In his writings, he refers to "the people in my discord groups"[85] and to a specific subreddit "of which I am actually in their discord."[86] The OAG has not assessed the full breadth of his Discord usage, in part because the default private, invitation-only nature of most Discord servers potentially implicates the protections of the Stored Communications Act (SCA), 18 U.S.C. §§ 2701 *et seq.*, which prohibits disclosure by technology providers of the contents of their users' electronic communications absent a warrant, the consent of the sender or recipient, or other enumerated exceptions.[87] Some of his Discord usage was undoubtedly unremarkable. At one point in his writings, he mentions "my old discord rust group," apparently referring to the video game Rust, which he describes playing several times throughout the log.[88] Yet there is also evidence that he may have used the platform to develop his knowledge of body armor, the usage

---

[83] *See* Discord Community Guidelines, Discord (Feb. 25, 2022), https://discord.com/guidelines.

[84] Discord Diary at 75, Jan. 21, 2022.

[85] *Id.* at 8, May 2, 2022.

[86] *Id.* at 88, Jan 30, 2022.

[87] For purposes of this report, the OAG is not taking a position on the applicability of the Stored Communications Act as to any online platform.

[88] Discord Diary at 199, Feb. 25, 2022.

of which was a key factor in allowing him to survive the exchange of gunfire with Tops' security guard, Aaron Salter.[89] Perhaps most notably, he sent the invitation to view the livestream through Discord directly to a group of users, suggesting that for some reason he may have perceived at least some of them to be receptive to his extremist message, raising the possibility that he had previously expressed his hateful views to them in some capacity on the platform.

## D. Online Platforms Used by the Shooter to Equip His Arsenal

One of the shooter's primary uses of various online platforms in the preparation of his assault was to educate himself about, and in some cases acquire, the arms and armaments that he would eventually bring to Buffalo in order to maximize the carnage he could inflict in a short timespan and minimize the risk to his own health. His Discord logs reflect months of research he conducted on rifles, body armor, ballistic helmets, and other equipment in order to carry out his explicit goals to "kill as many blacks as possible" and "avoid dying."

Dozens of pages of his manifesto are dedicated to distilling the information he gleaned about rifles, firearms components, and body armor. He asserts that his online research, including browsing instructional firearms videos on YouTube, helped instruct him on how to convert the fixed magazine in the rifle he used in his massacre to a base that could accept a detachable magazine, allowing for swift reloading and a higher ammunition capacity. He used 4chan's /k/ board, which is dedicated to firearms discussions, to seek advice about his gear and to buy firearms components and equipment to facilitate his attack. Through his use of /k/, he also found a Discord channel named Plate Land that he used to collect advice about ballistics and protective gear, the use of which helped him survive an early exchange of gunfire with, and ultimately kill, Tops security guard Aaron Salter.

### I. YouTube

Although the shooter asserts that he received instruction from YouTube videos in how to convert an AR-15-style rifle with a fixed magazine to accept a detachable magazine—in contravention of New York law—the YouTube videos he cites for this knowledge do not clearly provide specific direction on how to do so. One of the videos actually demonstrates the use of an attachment to convert a rifle to use only a fixed magazine in order to comply with New York and other states' assault weapons bans. The presenter just happens to mention that the product box itself notes that the device can be removed with a drill.

Another video cited by the shooter in the context of his illegal assault rifle conversion demonstrates the installation of a different product created for the same purpose of fixing the magazine to the weapon, purportedly in order to comply with New York law. The shooter's notes on the video describing how he might uninstall the product, which mention the possibility that he might need to "heat treat the part until breaks off," do not come from the video itself or the presenter's remarks.

---

[89] *See* Dan Feidt, *Buffalo Mass Shooter Likely Sought Combat Gear Advice on Online Chats*, Unicorn Riot (May 14, 2022), https://unicornriot.ninja/2022/buffalo-mass-shooter-likely-sought-combat-gear-advice-on-online-chats/.

YouTube maintains a policy prohibiting videos that are "intended to sell firearms, instruct viewers on how to make firearms, ammunition, and certain accessories, or instruct viewers on how to install those accessories." The OAG's review of YouTube videos cited by the shooter in his writings did not uncover any videos that appear to facially violate this policy. Rather, most of the firearms-related videos cited by the shooter concerned product reviews, demonstrations, and maintenance, particularly for AR-15-style weapons and tactical protective gear such as body armor, helmets, ear protectors, and tourniquets.

### 2. 4chan /k/ Board

4chan does not have any global policies applicable specifically to firearms. It does not address the use of the board to facilitate illegal weaponry or sales of firearms, weapons, or components. On the contrary, the /k/ board, subtitled "Weapons," has only one board-specific rule that makes it clear that virtually nothing related to weapons is prohibited: "All weaponry is welcome. Military vehicles/knives/other weapons are included, this board isn't just for firearms!"  In the course of the OAG's investigation, 4chan indicated that it has never performed a single investigation into the use of its site to promote or facilitate illegal weapons modifications, or the sale of firearms, body armor, or other military weapons or equipment.

There is no indication that the shooter bought or sold any components through /k/ that are in and of themselves illegal, or that if used would subject an otherwise legal weapon to a prohibition. Nor is there any indication that he purchased any products through the platform in an illegal manner, such as purchasing a firearm from an unlicensed seller or without undergoing a background check. Nevertheless, 4chan has made no public statements of policy to dissuade others from doing exactly that.

### 3. Discord

The only publicly known use that the Buffalo shooter made of Discord in connection with equipment for his attack, apart from using the platform to set out his personal thoughts on a private server, was to discuss the merits of different kinds of protective gear in a server called Plate Land. On that server, reported to feature discussions of guns and armor, he posted at least 83 messages in the channel known as "#bag-general" between August 1, 2020 and January 1, 2021.[90]  In some of those messages, he asked specific questions about types of body armor, for instance asking about a specific manufacturer's steel body armor, "if it had a spall coating doesnt [sic] it stop all fragmentations?"  Other messages seemed calculated to find other sources of knowledge on the platform, for example asking on August 1, 2020 whether there were any other Discord servers that talk about tactical gear. Some indicated a desire to buy or sell body armor. None of the available messages indicated anything about his intentions to cause violence or to incite racial hatred. One message used a derogatory slur towards the LGBTQ+ community to refer to eBay, apparently because he had been reported for attempting to sell body armor on the website and was unable to complete the sale.

---

[90] Id.

Discord's publicly posted Community Guidelines prohibit the sale or facilitation of sale of prohibited or potentially dangerous goods, including firearms and ammunition—although that prohibition did not extend to body armor or tactical gear. It is not clear whether Plate Land itself had any server-level rules about the sale of body armor (although the shooter continued to post in the server apparently uninterrupted for months after first mentioning his desire to sell body armor products). What is known is that the shooter's Discord logs imply that Plate Land was still active as of late April 2022.[91]

It is not against Discord policy to discuss the merits of various tactical products, even including firearms and ammunition. It is also unclear whether the use of the slur would have violated Discord's hate speech policy, which states that it is "unacceptable to attack a person or a community based on [protected] attributes . . . or other protected classifications."[92] The casual use of a slur to protest a company's effective moderation of its platform does not fall neatly into this rubric. In any event, the shooter continued to use Discord up until hours before the shooting, and his account remained undisturbed through that time.

### 4. Reddit

Although the use of Reddit to acquire knowledge about tactical gear is not reflected in any significant way in the Buffalo shooter's writings, the shooter's Reddit posts suggest that he did use the platform for that purpose.[93] These posts indicate that he was active in subreddits dedicated to discussions of tactical gear and ammunition contemporaneously with the planning of his attack.

Like the available Discord comments, the content of most of these Reddit posts is largely exchanging information about the pros and cons of certain brands and types of body armor and ammunition. They generally lack context from which it could have been apparent to a reader that the writer was planning a murderous rampage. One comment, posted about a year ago, is chilling in retrospect; he asks with respect to dark-colored tactical gear, "in low light situations such as before dusk after dawn and at nighttime it would provide good camouflage, also maybe it would be also good for blending in in a city?" It is difficult to say, however, that this comment should have been flagged at the time it was made. Like other platforms, however, although Reddit prohibits the use of the platform to solicit or facilitate any transactions in firearms or ammunition, it does not prohibit the discussion of body armor, tactical gear, or firearms.

---

[91] "I can obviously add more armor and such but I'll just rely on the boys at plateland to continue it." Discord Diary at 511, Apr. 25, 2022.

[92] *Discord Community Guidelines*, Discord (Feb. 25, 2022), https://discord.com/guidelines.

[93] Reddit disabled the account following the shooting and the posts are no longer publicly available.

## E. Online Platform Used by the Shooter to Broadcast His Violence

Steeped in the toxic white supremacist online milieu, the Buffalo shooter intuitively grasped the power that video of his shooting would lend to his call for increased racial violence. He himself had been drawn into this world by watching video of the Christchurch shooting. In his writings, he expressly asserts that part of his plan is that "[v]ideo will be livestreamed and manifesto published online to increase coverage and spread my beliefs."[94] He also believed the real-time nature of his planned broadcast would embolden him before and during the attack, writing, "I think that live streaming this attack gives me some motivation in the way that I know that some people will be cheering for me."[95]

He briefly considered livestreaming on Facebook Live, but ultimately rejected it because it appeared to him as though only Facebook accountholders could watch a livestream on the platform (in fact, Facebook does permit non-accountholders to watch livestreamed video). He settled instead on the livestream platform Twitch, because it had no user login requirement; anyone with an internet connection and the link to the Twitch stream could watch and record it.[96]

Another factor that the shooter considered important in selecting a livestreaming platform to use was the efficacy of the platform's content moderation; he cited to a 2019 shooting in Germany that targeted a synagogue and kebab shop, noting approvingly that the livestream of that attack on Twitch "lasted about 35 minutes, which for me shows that there is enough time to capture everything important."[97] The platform's moderation efforts were of great importance to the perceived success of his plan: "This may not work as intended if it's reported and taken down early," he wrote.[98] He continued to dwell on that concern, writing in his Discord diary, "I hope the jannies [i.e., janitors/moderators] on twitch dont [sic] cancel my stream before I do anything interesting."[99]

---

[94] Manifesto at 59.

[95] *Id*. at 61.

[96] *See id*. at 142.

[97] *Id*. at 142.

[98] *Id*. at 142.

[99] Discord Diary at 318, Mar. 11, 2022.

Like Discord, Twitch conducts moderation of user-generated content both at the platform level and at the individual channel level (for example, broadcasters may set their own channel rules, designate moderators within the chat box, and leverage automated tools). Insofar as Twitch was used to broadcast the livestream, the platform-level moderation is the most relevant aspect of Twitch's content moderation here; the shooter's plans would not have involved strengthening any content moderation efforts on his own stream, as that would have been contrary to his aim of spreading graphic content. Moderation at Twitch's platform level includes the imposition of platform-wide policies, safety review and enforcement, user reporting, and machine detection. The platform has a nearly four-page standalone Hateful Conduct and Harassment policy, which prohibits, among other proscriptions, the promotion, glorification, threat, or advocacy of violence or physical harm; the use of hateful slurs, symbols, and images; speech or content that perpetuates negative stereotypes, expresses inferiority, hate, content, or disgust based on a protected characteristic.[100] Notably, Twitch also expressly warns users that malicious off-platform conduct, including but not limited to instances of violent extremism, terrorist activities or recruiting, membership in a known hate group, and explicit or credible threats of mass violence, can result in the issuance of on-platform enforcements against user accounts.[101] Severe cases may involve the use of third-party legal experts to assist in investigations of off-platform conduct.[102] In furtherance of this goal, Twitch partnered in April 2021 with a private law firm that specializes in investigations and workplace assessments.

Prior to the day of the shooting, the shooter used Twitch to stream three times, for a combined total of approximately 19 minutes. The OAG's investigation has found no evidence that he violated Twitch platform rules during those streams, was known to be a member of any offline hate group, or that any of his plans for the shooting were known by anyone else prior to the date of the shooting.

On the day of the attack, he followed through with this plan, inviting Discord users he may have perceived as potentially receptive to his hateful cause to view the Discord channel he had restricted to himself until then; fifteen users reportedly accepted the invitation.[103] The invitation also included a direct link to the Twitch stream.[104] Between 20 and 28 users viewed the Twitch stream on that platform. Seven of those users were logged into the platform and could thus choose to report the livestream; users in the United States who were not logged in did not have the option of reporting.

---

[100] *See Hateful Conduct & Harassment*, Twitch Safety Center, https://safety.twitch.tv/s/article/Harassment?language=en_US.

[101] *See Off Service Conduct*, Twitch Safety Center, https://safety.twitch.tv/s/article/Off-Service-Conduct?language=en_US.

[102] *Id.*

[103] *See* Jon Swaine & Reed Albergotti, *Just Before Buffalo Shooting, 15 Users Signed into Suspect's Chatroom, Says Person Familiar with Review*, Wash. Post (May 19, 2022), https://www.washingtonpost.com/investigations/2022/05/19/payton-gendron-discord-buffalo-shootings.

[104] *Id.*

He began broadcasting at approximately 2:08 p.m. Eastern time. The OAG's investigation did not uncover video of the first several minutes of the livestream. Based on contemporaneous posts from people viewing it, the first twenty minutes or so consisted largely of the shooter's drive to Tops, although his rifle and parts of his tactical gear were visible at times. Viewers of the early minutes of the livestream were not logged-in to Twitch. At 2:26:59 p.m., the first viewer who was logged into Twitch entered the livestream. At 2:29:49 p.m., that user also issued the first report about the livestream to Twitch Safety Ops, with the description "about to shoot up a store." The shooting began within approximately one minute of that report. Two other users submitted reports by approximately 2:30 p.m. At 2:31:29 p.m., less than two minutes after the first user report concerning the imminence of violence, Twitch caused the livestream to stop and permanently banned the shooter from any future use of their platform.

Prior to the initial user report, Twitch did deploy at least some automated tools on the shooter's stream. As an infrequent streamer who had not met certain qualifying streaming metrics, Twitch automatically used machine learning tools to visually inspect the shooter's broadcast periodically prior to the commencement of violence. These tools did not detect any content violative of the platform's policies.

In addition to broadcasting directly through Twitch, the shooter used his Discord channel to rebroadcast the Twitch livestream. The invitations that he sent to his perceived friends and allies on Discord to view his channel permitted them to watch the livestream and read his writings within the Discord platform.[105] However, because the livestream on Discord was simply rebroadcasting the feed from Twitch, the actions Twitch took to stop the livestream simultaneously ended the stream on Discord.

---

[105] See Manifesto at 142.

# IV. Online Platforms' Response to the Buffalo Shooting

## A. The Spread of Graphic Content Related to the Buffalo Shooting

The first few minutes of the attack unfolded in real time via a livestream on Twitch. Although only a small number of Twitch users witnessed it at the time, copies of the recorded video were subsequently posted online. Notably, the video of the shooting that has taken root online appears to have originated from a single individual using footage recorded from the livestream through Discord. That individual, a resident of Washington State, appears to have uploaded the video to an obscure file-sharing site and posted a link to the uploaded video on 4chan at approximately 10:45 PM. The post was removed by a 4chan moderator approximately 30 minutes later. By that time, however, other 4chan users had reposted the link approximately 75 times. Only a handful of these additional posts were removed by moderators.

The link quickly spread to other websites. Approximately four minutes after the link was first posted on 4chan, a user posted the link on another fringe site, kiwifarms.net.[106] Shortly thereafter, the link began appearing on mainstream websites, including on Twitter within 17 minutes and on Reddit within an hour. In the following days, the link was posted and reposted on these and other sites thousands of times.

Copies of the video itself also spread quickly. Within 30 minutes of when the link to the video was first shared, another 4chan user had downloaded the video from the file sharing site, uploaded it to a video sharing platform, and posted a link to the video sharing platform on 4chan. A condensed version of the video was uploaded to Reddit's own video sharing service less than an hour and a half later. Links to these videos, as well as to other copies of the video, similarly spread.

## B. The Global Internet Forum to Counter Terrorism's Response to the Tragedy in Buffalo

The Global Internet Forum to Counter Terrorism, or GIFCT, was founded in 2017 by Facebook, Microsoft, Twitter, and YouTube. GIFCT describes its aim to "bring[] together the technology industry, government, civil society, and academia to foster collaboration and information-sharing to counter terrorist and violent extremist activity online."[107] Since its inception, GIFCT's membership has expanded beyond these founding companies to include over a dozen platforms.[108] In response to the Christchurch attack, the founding members announced in September 2019 that GIFCT would evolve from a consortium of technology companies to an independent non-profit organization with its own dedicated technology, counterterrorism, and operations teams.

---

[106] *See* On September 3, 2022, Cloudflare—one of the largest providers of internet infrastructure services—blocked kiwifarms.net, essentially taking the website off of the internet temporarily, citing a sudden escalation in the use of the site in a manner that posed imminent threats to human life. See Matthew Prince, *Blocking Kiwifarms*, Cloudfare: The Cloudfare Blog (Sept. 3, 2022), https://blog.cloudflare.com/kiwifarms-blocked.

[107] *About*, Glob. Internet Forum to Counter Terrorism, https://gifct.org/about.

[108] *See Membership*, Glob. Internet Forum to Counter Terrorism, https://gifct.org/membership.

GIFCT's chief role in the event of a violent event such as the Buffalo shooting is to serve an information sharing tool for member platforms. Current technology allows certain digital content to be "hashed" or assigned a digital value that can be used by a computer to immediately identify the content. GIFCT maintains a database of these hashes that can be used by member platforms to identify content that is visually similar to content that has been removed by other member platforms.

On May 14, 2022, at 4:52pm EDT, approximately 2 hours and 22 minutes after the attack, GIFCT activated its Content Incident Protocol (CIP). GIFCT actions included alerting all GIFCT members that the CIP had been activated, enabling members to share hashes of the perpetrator-produced content depicting the attack, and alerting the U.S. government—as the impacted national government in this incident—that the CIP had been activated in response to the shooting. Between when GIFCT activated the CIP and its conclusion, its members added approximately 870 visually distinct items (740 images and 130 videos) to the GIFCT hash-sharing database, to aid in content moderation. All of the mainstream platforms described above designated the shooting video and the manifesto as a violation of their policies and attempted to remove it through content moderation processes. The success of these attempts varied significantly.

## C. Mainstream Platforms' Moderation of Graphic Content Related to the Shooting

For the period May 20, 2022 to June 20, 2022, OAG investigators searched a number of mainstream social networks and related sites for the manifesto and video of the shooting. Despite the efforts these platforms made at moderating this content, we repeatedly found copies of the video and manifesto, and links to both, on some of the platforms even weeks after the shooting. The OAG's findings most likely represent a mere fraction of the graphic content actually posted, or attempted to be posted, to these platforms. For example, during the course of nine weeks immediately following the attacks, Meta automatically detected and removed approximately 1 million pieces of content related to the Buffalo shooting across its Facebook and Instagram platforms.[109] Similarly, Twitter took action on approximately 5,500 Tweets in the two weeks following the attacks that included still images or videos of the Buffalo shooting, links to still images and videos, or the shooter's manifesto. Of those, Twitter took action on more than 4,600 Tweets within the first 48 hours of the attack.[110]

---

[109] This automated detection is inherently both underinclusive and overinclusive (for instance, the tools may take action on content that looks similar to the Buffalo shooting but is not related, and may not take action on new content that has not been determined to be related).

[110] The 5,500 Tweets were comprised of: (i) approximately 2,700 Tweets associated with a user report that were escalated or removed for featuring portions of the video or graphic still images; (ii) approximately 2,000 Tweets that were blocked at either the point of upload or within one or two seconds of posting for containing other video of the shooting or graphic still images; and (iii) approximately 800 Tweets that were escalated or removed for including links to third-party websites that hosted the manifesto or video. Twitter also blocked links to over 75 unique URLs known to host the manifesto or video, preventing users from being redirected off-platform to those websites.

When we found graphic content as part of these efforts, we reported it through user reporting tools as a violation of the platform's policy. Among large, mainstream platforms, we found the most content containing video of the shooting, or links to video of the shooting, on Reddit (17 instances), followed by Instagram (7 instances) and Twitter (2 instances) during our review period. We also found links to the manifesto on Reddit (19 instances), the video sharing site Rumble (14 instances), Facebook (5 instances), YouTube (3 instances), TikTok (1 instance), and Twitter (1 instance). Response time varied from a maximum of eight days for Reddit to take down violative content to a minimum of one day for Facebook and YouTube to do so.

We did not find any of this content on the other popular online platforms we examined for such content, which included Pinterest, Quora, Twitch, Discord, Snapchat, and Telegram, during our review period. That is not to say, however, that it does not exist on those platforms. Some of those platforms offer comprehensive non-public communications channels outside the scope of the OAG's search for purposes of this investigation.

As demonstrated by the persistence of this content, current moderation techniques are far from perfect. User reporting relies on individual users talking action to moderate their peers. Users are not experts in content moderation and have no special training. At times, offending content may be circulated among a cohort of users who share the views of the person publishing such content and who accordingly may not want to enforce the platform's moderation policies. In addition, user reporting is prone to error and manipulation, including the weaponization of violative content reporting to harass protected groups.

Paid human moderation by the platforms also struggles at scale. No human content-moderation team will be able to review and respond to all user generated content in real time. It can also be inconsistent, as moderators are faced with a high volume of content and may struggle to apply guidelines consistently. Human moderation has severe psychological costs as well, sometimes resulting in significant trauma to mental health. In 2020, for example, Facebook agreed to pay $52 million to current and former moderators to compensate them for mental health issues that the moderators alleged were caused by persistent exposure to extreme content as part of their job.[111] TikTok is currently facing a similar lawsuit.[112]

Although automated review holds significant promise, it also has a number of limitations, including:

- Under-inclusivity: Most media is not pre-scanned prior to posting. Thus, even violative content can be posted, and subject to user viewing (and downloading and reposting), before an automated review occurs.

- Difficulty in identifying altered media: Media identification is largely accomplished by assigning hash values to offending content and comparing the hash numbers. Altering the media, such as adding or removing a few frames, can change the hash value and thus delay detection of the media. For example, one video OAG investigators found on Twitter had black bars added to the frame of the video by the poster to avoid automated detection.

---

[111] *See Scola v. Facebook, Inc.,* No. 18-civ-05135 (Cal. Super. Ct. filed Sept. 21, 2018).

[112] *See Young v. Bytedance Inc.,* No. 3:22-cv-01883 (N.D. Cal. filed Mar. 24, 2022).

· Links to third-party sites: A link may redirect a user to content on a third-party site that has different or less restrictive content moderation policies. Thus, the platform must scan content hosted elsewhere, or resort to manually collecting a list of links to the violative content, largely through user reporting, for identification and removal. We attribute the large number of links to videos found on Reddit, and the links on Instagram, to this limitation.

OAG investigators also found graphic video of the shooting on many fringe websites and less-trafficked platforms. Where possible, we reported the content. With one exception, the videos were not taken down and are still live on the websites.

In particular, links to the graphic video of the shooting and the shooter's writings circulated widely on 4chan. Between May 14, 2022, the day of the shooting, and July 8, 2022, links to video of the shooting were posted on 4chan 382 times, links to the manifesto were posted 179 times, and links to the shooter's Discord diary were posted 53 times. In most cases, these posts were not removed because 4chan does not prohibit violent or hateful content. Indeed, when discussing policy on another mass shooting video, a head moderator stated that "if it's on a board like /b/ or /pol/ it's not even against the rules" and "the footage itself isn't illegal, any more than footage of any act of violence is illegal."

## D. Improved Moderation Policies Reduced Prevalence of Violent Content, but Additional Improvement is Needed

Although our findings show a concerning amount of persistence of extremist and violent content, some of the results are better than in prior incidents. The Christchurch shooter livestreamed on Facebook for 17 uninterrupted minutes; Facebook only took action after the livestream had ended and a user eventually reported it to Facebook.[113] Facebook noted the day after the Christchurch shootings that it had removed 1.5 million videos of the attack, 1.2 million of which were blocked upon upload, marking a 20% failure rate.[114] Indeed, 6 months after the attack, investigators found over a dozen copies of the video still on Facebook.[115] A year after the attack, researchers at the Counter Extremism Project identified at least 14 different websites where footage of the Christchurch terror attack could be accessed.[116]

---

[113] See Christchurch Mosque Shootings: Gunman Livestreamed 17 Minutes of Shooting Terror, NZ Herald (Mar. 15, 2019), https://www.nzherald.co.nz/nz/christchurch-mosque-shootings-gunman-livestreamed-17-minutes-of-shooting-terror/BLRK6K4XBTOIS7EQCZW24GFAPM.

[114] See Chris Sonderby, Update on New Zealand, Meta (Mar. 18, 2019), https://about.fb.com/news/2019/03/update-on-new-zealand.

[115] See Olivia Solon, Six Months After Christchurch Shootings, Videos of Attack Are Still on Facebook, NBC News (Sept. 20, 2019), https://www.nbcnews.com/tech/tech-news/six-months-after-christchurch-shootings-videos-attack-are-still-facebook-n1056691.

[116] See Christchurch Terrorist Video Remains Online, Counter Extremism Project (Mar. 13, 2020), https://www.counterextremism.com/press/christchurch-terrorist-video-remains-online.

Here, Twitch shut down the Buffalo shooter livestream within two minutes of the violence and the first user report. It is unclear, however, how long the livestream would have continued had it not been reported until after the shooting ended, as was the case with the Christchurch shooting livestream. Moreover, the challenge is that just a single minute of violence, once broadcast, can live forever in the current online ecosystem, evading even well-intentioned content moderation policies. Even a short video surviving on the internet serves the shooter's criminal purpose and may be used to inspire others to follow in the shooter's footsteps.

Apart from technological advances, the relative improvements in content moderation may be partially attributed to coordinated efforts by technology companies to rein in extremist content, such as those spearheaded by GIFCT. As described above, GIFCT activated the CIP and alerted all GIFCT members that the CIP had been activated. This allowed its member companies to share hashes of the perpetrator-produced content depicting the attack, in video and image form, along with content featuring the manifesto. The CIP was activated from approximately 4:52pm EDT on Saturday, May 14 through 6:31pm EDT on Sunday, May 15. During this time, members added approximately 870 visually distinct items to the GIFCT hash-sharing database. These related to approximately 740 visually distinct images and approximately 130 visually distinct videos.

The GIFCT protocols—like other voluntary coordination efforts—need improvement, particularly in the absence of legislative reform. Although the initial video of the shooting was taken down more quickly than in previous mass shootings, it is not clear that can be attributed to any content moderation improvements by the platforms, and it was not quick enough to prevent proliferation of the content in the days after the shooting. Moreover, written content like the manifesto is not subject to the same information sharing protocols of the GIFCT. This shortcoming is particularly problematic in the context of white supremacist violence, where attackers receive inspiration from the writings of previous mass shooters and seek to inspire others the same way. Allowing terrorist manifestos to proliferate across the internet contributes to violent extremism and heightens the risk of future attacks.

Additionally, there is no systematic sharing of links that can direct a user off-platform to violative content such as the Buffalo shooting video. Websites are largely on their own to identify a link on their site that leads to violative content and remove it.

Importantly, because frameworks like the GIFCT are voluntary, their effectiveness is thwarted by nonparticipating platforms where extremist and violent content continues to proliferate. These voluntary and self-regulatory frameworks also lack enforcement, allowing the companies themselves to determine how to strike the balance between investment in compliance and other business objectives.

## E. Online Platforms' Advertisements and Monetization of Graphic Content Related to the Shooting

Early reports suggested that online platforms were running advertisements next to footage of the shooting. One report noted that on Facebook, "searches for terms associated with footage of the shooting have been accompanied by ads for a horror film, clothing companies and video streaming services."[117] In some cases, Facebook recommended certain search terms about the video, noting that they were "popular now" on the platform. Facebook admitted that in the days immediately after the incident, ads could be on the same page as video of the shooting if the content was not flagged for removal.

Facebook did eventually turn off banner advertising for searches related to the Buffalo shooting, consistent with their public-facing policy.[118] After Facebook did so, search results for Buffalo content on its platforms did not include advertisements, but it is unclear how much advertising revenue Facebook generated from this horrific event before they made this adjustment. They also turned off the "auto-suggest" and "auto-completion" functionality within their search bars, whereby the platform suggest or offer to complete search phrases after a user has only partially filled out a search request.

However, other platforms performed even worse. For example, weeks after the attack, Twitter was "auto-suggesting" to users a search for "buffalo live stream video" after a user entered only the partial query "buffal" [sic], both on a desktop browser and on its mobile app:[119]



*Figure 1: Partial screenshot of Twitter search bar, captured June 22, 2022 (mobile version)*

---

[117] Ryan Mac, *Facebook Has Been Monetizing Searches for the Buffalo Shooting Video*, N.Y. Times (May 19, 2022), https://www.nytimes.com/2022/05/19/technology/buffalo-shooting-facebook-ads.html.

[118] *See Content Monetization Policies*, Meta, https://www.facebook.com/business/help/1348682518563619?id=2520940424820218.

[119] *See* Amanda Silberling, *Facebook and Twitter Still Can't Contain the Buffalo Shooting Video*, TechCrunch (May 17, 2022), https://techcrunch.com/2022/05/17/buffaloshooting-footage-facebook-twitter-moderation.

Twitter was also serving ads (with promoted content) next to search results where the Buffalo shooting video was a result (as indicated below with a red circle):



*Figure 2: Partial screenshot of Twitter search results, captured June 22, 2022 (web version)*

TikTok continued for weeks to auto-suggest the shooting video as well, although without the advertising.

# V. Recommendations

Part of our mandate pursuant to the Governor's referral is to "determine whether specific companies have civil or criminal liability for their role in promoting, facilitating, or providing a platform to plan and promote violence."[120] Our determination is that no such liability likely exists under these facts, given the present state of the law. As this report describes in detail, the shooter made extensive use of online platforms to immerse himself in the rank hatred of the online white supremacist milieu, to plan his attack in great detail, and to livestream his shooting. He documented his actions for posterity, relying on the power of the internet and online platforms to perpetuate his disturbing deeds. Indeed, within hours of the shooting, graphic videos and images of his attack were widely disseminated across all corners of the internet. Platforms had varying degrees of success in removing that objectionable content—where they even tried to do so at all.

Despite the integral nature of online platforms in this and previous mass shootings, however, it is extremely unlikely that any of them—even the worst offenders who enforce virtually no content moderation—can face any sort of legal liability. There are no laws on the books that directly address the conduct at issue here, not even for the distribution of a graphic, uncensored video created by an attacker killing another person in cold blood. Even if such laws existed, platforms would likely claim First Amendment and Section 230 protections to insulate themselves from any liability based on the content posted by their users. That state of affairs, however, need not remain static. Congress, the State Legislature, and platforms themselves can and must take action if anything is to change.

## A. Legislative Proposals

Legislative reform is necessary to make meaningful progress in preventing online platforms from being the vehicle for radicalization and dissemination of violent criminal activity.

### 1. New Affirmative Liability

We recommend that New York (and other states) impose criminal liability for the creation by the perpetrator, or someone acting in concert with the perpetrator, of images or videos of a homicide. Such videos are an extension of the original criminal act and serve to incite or solicit additional criminal acts. In addition, these videos are obscene on their face. Importantly, appropriate legislation should avoid covering videos created by bystanders or passively, such as those captured by police officers' body-worn cameras.

---

[120] Letter from Gov. Kathy Hochul to Att'y Gen. Letitia James 1 (May 18, 2022), https://www.governor.ny.gov/sites/default/files/2022-05/Executive_Law_63_Referral.pdf.

We also recommend imposing civil liability for the distribution and transmission of this content, including making liable online platforms that fail to take reasonable steps to prevent unlawful violent criminal content from appearing on the platform. Significant penalties, sufficient to realize the goal of deterrence, should be levied in cases where an online platform fails both to take such reasonable steps and to prevent the transmission of content that is captured by or created by the perpetrator of a homicide, or one working in concert with the perpetrator of a homicide, and that depicts a homicide.

Some categories of objectionable content are already subject to restrictions even more stringent and wide-ranging. Tech companies have taken extraordinary measures to comply with federal law criminalizing the creation, distribution, and possession of child sexual abuse material (CSAM). They have made great strides in the effort to fully eradicate CSAM on both the mainstream internet and even on fringe sites, such as 4chan, that otherwise do little content moderation. Anti-CSAM laws have survived First Amendment scrutiny because they criminalize a category of speech widely viewed as obscene. The distribution of CSAM material has been upheld as speech integral to illegal conduct—without a market for CSAM material, there would be no motivation to create such material.

A restriction on creating and distributing this material should be drafted in a manner that ensures conformity with the First Amendment. Critically, the rationale of preventing murderers from promoting their crimes—especially racially motivated mass-murderers—is a governmental interest of the highest order, and there is no societal benefit to the dissemination of such videos by their perpetrators. Accordingly, any such law must be tailored specifically to reach only those videos where such serious crime occurs. Any such law should also aim to avoid imposing any penalty for videos that have educational, historical, or social benefits. At a minimum, state attorneys general and other law enforcement agencies should be given explicit authority to enforce these provisions with steep penalties. Further consideration should be given whether the public (or some group of directly affected individuals) should have a private right of action tailored to promote these compelling government interests.

These are critical first steps; indeed, moderators on 4chan have justified allowing video of violent crimes to remain on the platform because the videos themselves are not illegal. However, promulgating new law that establishes these categories of liability does not fully address the policy goal of breaking the cycle of online white supremacist radicalization and violence, because platforms' enablement of the distribution of the depictions of racial violence committed by these attackers is still subject to Section 230 defenses.

## 2. Reforming CDA Section 230

We hold manufacturers responsible for their products and subject entire industries, like telecommunications, to complex regulatory regimes intended to rein in excesses and abuses. Yet tech companies are largely free to create and operate online platforms without legal consequences for the negative outcomes of their products because of Section 230. The drafters of Section 230 wanted to encourage content moderation by providing protections to online platforms acting as "Good Samaritans" in their attempts to monitor and remove offensive content on their platforms.[121] However, the internet has changed dramatically since 1996, and in that time, courts have found that Section 230(c)(1),[122] which protects companies from liability for the under-removal of user content, "should be construed broadly in favor of immunity."[123] Although there are some discrete areas where Section 230 protections do not apply,[124] by and large the Section 230 case law has made it difficult to hold companies responsible for their failure to take even basic steps to monitor and ensure the safety of their platforms.[125] Therefore, we are calling on Congress to reform Section 230.

While broader reform may be necessary, our proposal focuses on the violent and extremist content at issue here. We recommend that Congress rethink the ready availability of Section 230 as a complete defense for online platforms' content moderation practices. Instead, we recommend an approach that requires an online platform that wishes to retain Section 230(c)(1)'s protections to take reasonable steps to prevent unlawful violent criminal content from appearing on the platform.[126] Significantly, this proposal changes the default. Instead of simply being able to assert protection under Section 230, a defendant company has the initial burden of establishing that its policies and practices were reasonably designed to address unlawful content. This reform proposal would incentivize companies to establish robust content moderation programs, but would not penalize those companies if violative content slips through despite such programs. Reasonableness must account for the prevailing technology, including whether companies are making investments in and deploying the same level of sophisticated technology to content moderation as they are for other parts of their business. This would help establish a baseline of content moderation across online platforms, helping to ensure a safer experience for all users.

---

[121] *See* Danielle Keats Citron, *How to Fix Section 230*, B.U. L. Rev. 7–9 (forthcoming) (Mar. 10, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4054906.

[122] "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

[123] *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019) (cert denied); *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006); *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267 (D.C. Cir. 2019); *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 18 (1st Cir. 2016); *Fair Hous. Council v. Roommates.Com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 408 (6th Cir. 2014).

[124] Courts have declined to extend Section 230 protections when a defendant "assist[s] in the development of what ma[kes] the content unlawful." *Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158,174 (2d Cir. 2016). Courts have also declined to grant Section 230 protections where a lawsuit seeks to hold an online platform accountable for activities, such as selling or designing a product, separate from its role as a publisher. *See, e.g., Erie Insurance Co. v. Amazon.com, Inc.*, 925 F.3d 135, 139–40 (4th Cir. 2019) ("[T]he Communications Decency Act . . . does not protect them from liability as the seller of a defective product."); *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1093 (9th Cir. 2021) ("The duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content.").

[125] The Supreme Court recently granted certiorari to review the scope of Section 230 protection when a company makes targeted recommendations of third-party content. *See Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), *cert. granted*, No. 21-1333, 2022 WL 4651229 (U.S. Oct. 3, 2022).

[126] In this regard, our recommendation is similar to a proposal authored by Professor Danielle Citron. *See supra*, n. 121.

As part of this framework, Congress should authorize a federal agency, such as the United States Federal Trade Commission, or create a new agency dedicated to regulating online platforms, to draft regulations providing guidance on the reasonable steps that an online platform must take to obtain Section 230 protection. At a minimum, reasonable steps should include efforts to remove unlawful violent criminal content and content likely to incite or solicit violent crime, measures to prevent the platform from being used to encourage or plan acts of violence, and limits on live-streaming technology designed to prevent its use to further criminal acts and incite or solicit violent crimes.

Many of the mainstream platforms we have reviewed in preparing this report have taken important steps to prevent such misuse of their services; they have promulgated policies prohibiting extremist and violent content, implemented automated tools to review certain types of content, engaged large numbers of people to review potentially violative content, and enabled their users to police their platforms in furtherance of that goal. But our investigation has also revealed various points at which companies could have taken more robust measures to prevent misuse of their online platforms. A key problem with today's legal regime is that the strength of content moderation policies is based entirely on voluntary efforts without accountability or any enforcement mechanism.

The standard for reasonableness should not simply defer to the business decisions of the largest platforms and how they have chosen to balance investment in compliance against investments in other parts of their business. Instead, an appropriate reasonableness standard should be based on the technology available and the risks that were known or should have been known to online platforms. The standard for reasonableness should also take into account lessons from the Buffalo shooting and this report. For example, the livestream of the Buffalo shooting cut off within two minutes of when the violence began. Although that is an improvement over prior livestreams of mass shootings, as discussed in more detail below, two minutes is too much, and more must be done to prevent live streaming from being used to further the goals of mass shooters. Likewise, the shooter documented his plans in detail over the course of several months, but these logs were not flagged. Drafters of reasonableness guidelines should consider whether a platform should implement automated scanning of content to identify violent plans at a moment when long-standing private content is suddenly distributed to a larger group of people. Furthermore, videos of the violence were visible on both fringe platforms and certain mainstream platforms after the shooting. At a minimum, any reasonableness standard should include robust measures to remove content depicting violent crimes and any other content that violates a platform's content moderation policies.

The fringe websites, like 4chan and others, present substantially clearer cases under a reasonableness standard. These platforms have by and large abdicated any responsibility to moderate content. That approach to content moderation has endured even as these sites have become havens for hateful, violent content. Such platforms should not be entitled to claim a defense against the distribution of unlawful violent criminal content that their absenteeism encourages.

### 3. Restrictions on Livestreaming

Livestreaming requires a special mention for its repeated use by hate-fueled mass shooters to broadcast their massacres. Livestreaming undoubtedly has many legitimate use cases. At the same time, the future of livestreaming needs to grapple with how this service has been used to broadcast these acts of terror, becoming an extension of the criminal act, further terrorizing the targeted community and serving to promote the shooter's ideology. As detailed above, the Buffalo shooter considered the instantaneous transmission of video available through livestreaming to be a centrally motivating factor in his shooting, both because of the intangible support he felt he would receive through it and because he hoped it would inspire others, just as he had been inspired by video of the Christchurch shooter. Although Twitch stopped the Buffalo shooter's livestream within two minutes of the first gunshot, an improvement over Facebook's response to the Christchurch shooter's livestream, two minutes is still too much. Even a short video of a mass shooting can be used to incite others to engage in copycat crimes and serve the criminal goals of the perpetrator.

Reasonable measures to prevent criminal violence on a platform must include additional protections to limit the ability of livestreaming to be used to promote and inspire violent crimes. Platforms that permit livestreaming and want the benefit of continued Section 230 protection should be required to adopt reasonable procedures commensurate with identifiable risk factors. Such platforms should delay livestreams for users that are not verified or that fail to meet other trust factors, such as livestreams from users without a documented history of streaming within the platform's policies, or with few friends/followers. Such tape delays, which are standard in live television broadcasts, would permit livestreaming services to apply automated technology to detect violent crimes, including gunshot detection technology. Likewise, these platforms should be required to restrict algorithmic promotion of such livestreams, at least without conducting some affirmative review to ensure the streamer is legitimate.

## B. Recommendations for Industry

### 1. Online Platforms Should Strengthen and Share Their Moderation Technologies

Simply put, online platforms need to invest even more in content moderation. In the years since the Christchurch shooting, content moderation practices and technologies have improved. However, not all platforms have made great strides. For example, as our investigation proceeded, we found that Reddit had difficulty effectively identifying links to videos of the Buffalo shooting carried on other sites, even when reported by users or this office.

Mainstream platforms should devote time, energy, and money to developing alternative technology to image/video hashing. Hashing works by assigning a number to an offending image or video and comparing the number with a recent upload on a website. But this approach is subject to problems both at the outset of the process and as it runs. At the outset, it requires offending content to actually be identified and hashed, which typically requires human review and causes delay. And if the offending image or video is changed after it has been assigned a hash value, the value can change, allowing individuals to subvert the process of hash-based identification.

Platforms with mature content moderation practices and technologies should also share with other platforms what they have learned. Additionally, platforms should not countenance delay in foreclosing monetization opportunities arising from tragic events like the Buffalo shooting. They should immediately turn off advertising displayed in conjunction with violative content or in response to searches that appear to be looking for violative content, and should immediately cease auto-suggesting terms that lead to searches for violative content. These actions should be undertaken as soon as possible after the event.

Online platforms may have realized improvements in content moderation thanks to their ability to coordinate and share information through groups like GIFCT. But as the organization itself has acknowledged, GIFCT's current hash-sharing database is less effective against white supremacist extremists working outside of established terrorist organizations. It is working to close that gap: on September 20, 2022, GIFCT announced that it has begun to add hashes of PDFs of attacker manifestos and terrorist publications to its hash-sharing database.[127] That is a positive step. Online platforms should continue to identify opportunities to improve coordination. This should include adding text and audio to cross-platform databases, like GIFCT's, that are currently limited to images and videos, in order to help platforms identify terrorist manifestos and other problematic content. Additionally, platforms should catalogue and share URLs to offending content so that platforms can receive the benefit of understanding to which sites users across social media are linking people to offending content.  Most of the videos of the Buffalo shooting that the OAG identified on mainstream websites were links to content maintained on fringe websites and obscure cloud storage services. Finally, platforms should open up a "read-only" level of database access to a wider variety of platforms than those consisting of GIFCT's present membership. This could help balance any concerns about non-members who might seek to weaponize the database to censor legitimate speech with the simple fact that a greater reach is likely to lead to more effective removal of terroristic content from the visible internet.

### 2. Online Platforms Should Increase Transparency.

Governments and users need greater transparency into the policies that online platforms have adopted to address hateful, extremist, or racist content, and how those policies are applied in practice. Online platforms should publicly disclose this information, including the amount and type of content, their policies regarding this type of content, user reports and complaints about the content, actions the platform has taken, and any delay in the takedown.[128] This increased transparency will make it easier for interested parties to hold platforms accountable and craft future policy.

---

[127] Expanding our Collective Capacity: GIFCT's Progress Continues, Glob. Internet Forum to Counter Terrorism (Sept. 20, 2022), https://gifct.org/ 2022/09/20/expanding-our-collective-capacity-gifcts-progress-continues.

[128] In September 2022, California enacted a new law requiring certain social media companies to post terms of service and submit a detailed semiannual report to the California Attorney General describing, among other things, the platform's approach to content moderation with respect to categories including hate speech or racism, and extremism or radicalization. *See* Cal. Bus. & Prof. Code § 22675 *et seq.*

### 3. Internet Service and Infrastructure Providers Can and Should Do More

Although all of the mainstream sites visited by the OAG have content moderation policies and devote resources to removal, many of the fringe sites do nothing. Indeed, much of the content that slips through mainstream site moderation are links to the content hosted on these fringe sites. Service providers can and should do more to foster an internet that is inhospitable to violent extremists and does not further their accelerationist aims and recruiting efforts. There are examples of private entities stepping forward to help achieve those goals. For instance, in the aftermath of the Buffalo shooting, Bid Glass, an advertising service provider, terminated service for 4chan.[129] In a series of prior mass shootings, the site 8chan was taken off the visible internet, when network infrastructure provider Cloudflare stopped providing their content delivery network (CDN) service. Voxility, a web services company that had been renting servers to Epik, the site's new domain registrar, as well as Epik's CDN provider subsidiary BitMitigate, also terminated service.[130]

A similar opportunity is presented here. Service providers, not bound by any legal requirement to facilitate the survival of websites that exist largely to promote hate and violence, should take similar actions and help prevent future violent attacks by refusing to service sites that perpetuate the cycle of white supremacist violence.

---

[129] *See Notice*, Bid Glass, https://archive.ph/Ksi9w.

[130] *See* Graham Kates, *U.S. 8chan Sputters Back to Life with New Name*, CBS News (Nov. 4, 2019), https://www.cbsnews.com/news/8chan-new-name-8kun-webforum-hate-speech.

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▾

FREE SPEECH

## New N.Y. Law Aimed at Getting Social Media Platforms to Restrict "Hateful" Speech

Its operative provisions just require social media platforms to create a mechanism for taking complaints about such "hateful" speech; but the title is "hateful conduct prohibited," and it's clear the legislature is trying to get social media platforms to restrict such speech more.

**EUGENE VOLOKH** | 6.7.2022 3:52 PM

N.Y. General Business Law § 394-ccc, just signed by the Governor yesterday (AB A7865A / SB S4511A) and scheduled to go into effect in six months, provides:

> Social media networks; hateful conduct prohibited.
>
> 1. As used in this section, the following terms shall have the following meanings:
>    a. "hateful conduct" means the use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression.
>    b. "social media network" means service providers, which, for profit-making purposes, operate Internet platforms that are designed to enable users to share any content with other users or to make such content available to the public.
> 2. A social media network that conducts business in the state, shall provide and maintain a clear and easily accessible mechanism for individual users to report incidents of hateful conduct. Such mechanism shall be clearly accessible to users of such network and easily accessed from both a social media networks' application and website, and shall allow the social media network to provide a direct response to any individual reporting hateful conduct informing them of how the matter is being handled.
> 3. Each social media network shall have a clear and concise policy readily available and accessible on their website and application which includes how such social media network will respond and address the reports of incidents of hateful conduct on their platform.

> 4. Nothing in this section shall be construed
>    a. as an obligation imposed on a social media network that adversely affects the rights or freedoms of any persons, such as exercising the right of free speech pursuant to the First Amendment to the United States Constitution, or
>    b. to add to or increase liability of a social media network for anything other than the failure to provide a mechanism for a user to report to the social media network any incidents of hateful conduct on their platform and to receive a response on such report.
> 5. Any social media platform that knowingly fails to comply with the requirements of this section shall be assessed a civil penalty for such violation by the Attorney General not to exceed one thousand dollars. Each day such offense shall continue shall constitute a separate additional violation. In determination of any such violation, the Attorney General shall be authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules.

Despite the section heading—"hateful conduct prohibited"—this seems to just mandate platforms to provide a reporting mechanism, and to indicate how they will respond:. Presumably, "we will not take down any such material" or "we might or might not take down any such material, depending on our own editorial judgment" would be a legally permissible response.

Still, both the heading and the body of the law make clear that this regulation is aimed at pushing restrictions on certain viewpoints, and the mandate it imposes is limited to particular viewpoints. Compare a similar law mandating a mechanism to report "anti-American conduct," defined as "the use of a social media network to vilify, humiliate, or incite violence against the United States of America or any state, their governments, or any of their institutions"—both, it seems to me, are based on the viewpoint of the speech they are targeting, and both should therefore be unconstitutional.

By the way, it seems that sites that allow commenting, which enable users to share content with other users and to make it available to the public, would likely be treated as "social media networks" under the definition in the statute. That might be the Conspiracy, for instance, or for that matter Reason.com and many others. We are obviously much smaller than Facebook and Twitter, and only enable commenters to speak to other commenters, but that seems to be a difference of degree and not of kind for purposes of the statute: To be sure, we're not *Internet* service providers of the sort that provide a connection to the Internet, but neither are Facebook and Twitter (at least for most U.S. users).

I therefore have six months to figure out whether to post a policy (which would be "you can complain about whatever you please by e-mailing me at this address, but I will respond and address the complaints entirely based on my own discretion"), or perhaps to challenge the law.

Thanks to <u>Stephen Green (VodkaPundit)</u> for the pointer.

**JA120**

## The Washington Post

*Democracy Dies in Darkness*

**THE VOLOKH CONSPIRACY**

# No, there's no "hate speech" exception to the First Amendment

By Eugene Volokh

May 7, 2015 at 6:02 p.m. EDT

I keep hearing about a supposed "hate speech" exception to the First Amendment, or statements such as, "This isn't free speech, it's hate speech," or "When does free speech stop and hate speech begin?" But there is no hate speech exception to the First Amendment. Hateful ideas (whatever exactly that might mean) are just as protected under the First Amendment as other ideas. One is as free to condemn Islam — or Muslims, or Jews, or blacks, or whites, or illegal aliens, or native-born citizens — as one is to condemn capitalism or Socialism or Democrats or Republicans.

To be sure, there are some kinds of speech that are unprotected by the First Amendment. But those narrow exceptions have nothing to do with "hate speech" in any conventionally used sense of the term. For instance, there is an exception for "fighting words" — face-to-face personal insults addressed to a specific person, of the sort that are likely to start an immediate fight. But this exception isn't limited to racial or religious insults, nor does it cover all racially or religiously offensive statements. Indeed, when the City of St. Paul tried to specifically punish bigoted fighting words, the Supreme Court held that this selective prohibition was unconstitutional (*R.A.V. v. City of St. Paul* (1992)), even though a broad ban on all fighting words would indeed be permissible. (And, notwithstanding CNN anchor Chris Cuomo's Tweet that "hate speech is excluded from protection," and his later claims that by "hate speech" he means "fighting words," the fighting words exception is not generally labeled a "hate speech" exception, and isn't coextensive with any established definition of "hate speech" that I know of.)

The same is true of the other narrow exceptions, such as for true threats of illegal conduct or incitement intended to and likely to produce imminent illegal conduct (i.e., illegal conduct in the next few hours or maybe days, as opposed to some illegal conduct some time in the future). Indeed, threatening to kill someone because he's black (or white), or intentionally inciting someone to a likely and immediate attack on someone because he's Muslim (or Christian or Jewish), can be made a crime. But this isn't because it's "hate speech"; it's because it's illegal to make true threats and incite imminent crimes against anyone and for any reason, for instance because they are police officers or capitalists or just someone who is sleeping with the speaker's ex-girlfriend.

The Supreme Court did, in *Beauharnais v. Illinois* (1952), uphold a "group libel" law that outlawed statements that expose racial or religious groups to contempt or hatred, unless the speaker could show that the statements were true, and were said with "good motives" and for "justifiable ends." But this too was treated by the Court as just a special case of a broader First Amendment exception — the one for libel generally. And *Beauharnais* is widely understood to no longer be good law, given the Court's restrictions on the libel exception. See *New York Times Co. v. Sullivan* (1964) (rejecting the view that libel is categorically unprotected, and holding that the libel exception requires a showing that the libelous accusations be "of and concerning" a particular person); *Garrison v. Louisiana* (1964) (generally rejecting the view that a defense of truth can be limited to speech that is said for "good motives" and for "justifiable ends"); *Philadelphia Newspapers, Inc. v. Hepps* (1986) (generally rejecting the view that the burden of proving truth can be placed on the defendant); *R.A.V. v. City of St. Paul* (1992) (holding that singling bigoted speech is unconstitutional, even when that speech fits within a First Amendment exception); *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 672 (7th Cir. 2008) (concluding that *Beauharnais* is no longer good law); *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1200 (9th Cir. 1989) (likewise); *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 331 n.3 (7th Cir. 1985) (likewise); *Collin v. Smith*, 578 F.2d 1197, 1205 (7th Cir. 1978) (likewise); *Tollett v. United States*, 485 F.2d 1087, 1094 n.14 (8th Cir. 1973) (likewise); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 1043-45 (4th ed. 2011); Laurence Tribe, *Constitutional Law*, §12-17, at 926; Toni M. Massaro, *Equality and Freedom of Expression: The Hate Speech Dilemma*, 32 Wm. & Mary L. Rev. 211, 219 (1991); Robert C. Post, *Cultural Heterogeneity and Law: Pornography, Blasphemy, and the First Amendment*, 76 Calif. L. Rev. 297, 330-31 (1988).

Finally, "hostile environment harassment law" has sometimes been read as applying civil liability — or administrative discipline by universities — to allegedly bigoted speech in workplaces, universities, and places of public accommodation. There is a hot debate on whether those restrictions are indeed constitutional; they have generally been held unconstitutional when applied to universities, but decisions are mixed as to civil liability based on speech that creates hostile environments in workplaces (see the pages linked to at this site for more information on the subject). But even when those restrictions have been upheld, they have been justified precisely on the rationale that they do not criminalize speech (or otherwise punish it) in society at large, but only apply to particular contexts, such as workplaces. None of them represent a "hate speech" exception, nor have they been defined in terms of "hate speech."

For this very reason, "hate speech" also doesn't have any fixed legal meaning under U.S. law. U.S. law has just never had occasion to define "hate speech" — any more than it has had occasion to define rudeness, evil ideas, unpatriotic speech, or any other kind of speech that people might condemn but that does not constitute a legally relevant category.

Of course, one can certainly argue that First Amendment law *should* be changed to allow bans on hate speech (whether bigoted speech, blasphemy, blasphemy to which foreigners may respond with attacks on Americans or blasphemy or flag burning or anything else). Perhaps some statements of the "This isn't free speech, it's hate speech" variety are deliberate attempts to call for such an exception, though my sense is that they are usually (incorrect) claims that the exception already exists.

I think no such exception should be recognized, but of course, like all questions about what the law ought to be, this is a matter that can be debated. Indeed, people have a First Amendment right to call for speech restrictions, just as they have a First Amendment right to call for gun bans or bans on Islam or government-imposed race discrimination or anything else that current constitutional law forbids. Constitutional law is no more set in stone than any other law.

But those who want to make such arguments should acknowledge that they are calling for a change in First Amendment law, and should explain just what that change would be, so people can thoughtfully evaluate it. Calls for a new First Amendment exception for "hate speech" shouldn't just rely on the undefined term "hate speech" — they should explain just what viewpoints the government would be allowed to suppress, what viewpoints would remain protected, and how judges, juries, and prosecutors are supposed to distinguish the two. Saying "this isn't free speech, it's hate speech" doesn't, I think, suffice.

**WEDNESDAY, JUNE 1, 2022**          **11:58 A.M.**

ACTING SPEAKER AUBRY:  The House will come to order.

In the absence of clergy, let us pause for a moment of silence.

(Whereupon, a moment of silence was observed.)

Visitors are invited to join the members in the Pledge of Allegiance.

(Whereupon, Acting Speaker Aubry led visitors and members in the Pledge of Allegiance.)

A quorum being present, the Clerk will read the Journal of Tuesday, May 31st.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, I move to

1

**NYS ASSEMBLY**                              **JUNE 1, 2022**

dispense with the further reading of the Journal of Tuesday, May the 31st and ask that the same stand approved.

ACTING SPEAKER AUBRY:  Without objection, so ordered.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, sir.  I'd like to begin with a quote today.  This one is from Booker T. Washington.  Most of you remember who Booker T. was from our history lessons.  No matter where you went to school or you learned of his work.  But the words that he's sharing with us today, Mr. Speaker, is that, *Education is not a thing apart from life.  It's not a system nor a philosophy, it is the direct teaching of how to live and how to work.*  Again, these words from Booker T. Washington.

Colleagues and guests that are in the Chambers, if you can just give me a few minutes I will explain where we're going today.  Colleagues have on their desk a main Calendar and an A-Calendar as well as a debate list.  I move to advance that A-Calendar, Mr. Speaker.

ACTING SPEAKER AUBRY:  On Mrs. Peoples-Stokes' motion the A-Calendar is advanced.

Mrs. Peoples--

MRS. PEOPLES-STOKES:  Thank you, sir.  We're going to begin our work today by taking up resolutions which are on page 3.  And then we're going to take up on debate with Calendar No. No. 280 by Ms. Rosenthal.  And immediately after the debate with

2

**NYS ASSEMBLY**                              **JUNE 1, 2022**

Ms. Rosenthal we're going to go straight to consent the A-Calendar, beginning with Rules Report No. 15 as well as the resolution that's on the A-Calendar.  Following consent, we will then take up the following bills on debate with Calendar No. 560 by Ms. Rozic, Rules Report No. 270 by Ms. Pheffer Amato, Rules Report No. 313 by Ms. Fahy, Rules Report No. 318 by Mr. Bronson, Rules Report No. 366 by Ms. Cruz, Rules Report No. 369, Mr. Thiele, Rules Report No. 389, Mr. Braunstein, Rules Report No. 390, Mr. Cahill, Rules Report No. 391 by Mr. Anderson.  I'm just going to ask again for colleagues' patience.  Much like we did yesterday we've got a very long day but we got a lot of things done.  We'd like to duplicate that by getting as much or more completed today.  So I want to thank you in advance for your cooperation and your patience and your ability to let colleagues debate without a lot of chatter in the Chambers.  Thank you so much for that in advance.  If there is going to be a need for further announcements, Mr. Speaker, I will announce it at the appropriate time.  Now is a great time for you to do housekeeping and/or introductions if you have any.

ACTING SPEAKER AUBRY:  No housekeeping, Mrs. Peoples-Stokes.  However, we do have introductions.

Ms. Williams for the purpose of an introduction.

MS. WILLIAMS:  Thank you, Mr. Speaker, for allowing me to speak before today's Body to today's colleagues.  Today we have some special guests.  One of them is very special who you guys may know, and those of you who are new members.  So I'd

3

**NYS ASSEMBLY**                              **JUNE 1, 2022**

like to welcome on this day as we celebrate our Caribbean culture former Assemblymember Diana Richardson, who is now the Deputy Borough President for Brooklyn.  We have Consul General from Trinidad and Tobago, Mr. André Laveau.  We have Consul General for Barbados, Mackie Holder.  We have the Consul General for St. Lucia, Jeremiah Hyacinth.  Dominican Republic Vice Consul Ivan Tolentino.  Dr. Judy Newton, retired NYPD officer -- sorry, detective.  Sharon Long.  Brooklyn Chamber President Randy Peers.  And from Brooklyn Chamber as well, Vladimir Sterlin (inaudible), and from Emblem Health we have Ann Marie Adamson.  And we also have some guests from Brooklyn Borough Hall.  You guys can all stand.

Mr. Speaker, I would like you to welcome all the guests today as we celebrate Caribbean History Month.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Ms. Williams, the Speaker and all the members, we welcome you here, this distinguished group, to the New York State Assembly, extend to you the privileges of the floor.  Know that we appreciate the cultures that you represent, the countries that you represent, and that you have chosen to spend this day with us is a honor.  But then particularly for our former member, as we always say, once a member, always a member.  So your privileges have been established for life.  So good to see you.  Hope you're enjoying your new role in the Borough of Brooklyn.  But to all of you, you're welcome here any time.  This is always going to be a place where you will find a welcoming home.  Thank you so very much.  Congratulations to all of

4

**JA124**

NYS ASSEMBLY                                    JUNE 1, 2022

you.

(Applause)

Mr. Lawler for the purposes of a introduction.

MR. LAWLER:  Thank you, Mr. Speaker.  It is my privilege to introduce to this Body Lori Alhadeff, the President of Make Our Schools Safe, and her mother Terry Rabinowitz.  They are here from Parkland, Florida where Lori's daughter Alyssa was shot eight times in her English classroom in the horrific massacre at Marjorie Stoneman Douglas High School on Valentine's Day 2018.  Mr. Speaker, Lori's cousin Jordan Turner and his daughter Jane who live in Rockland County, and they have connected myself and Assemblyman Zebrowski with Lori and Terry.  Since that tragic day, Lori and her family have formed Make Our Schools Safe, a 501(c)(3) national non-profit organized -- organization dedicated to protecting students and teachers at schools.  Their mission is to empower students and staff to help create and maintain a culture of safety and vigilance in a secure school environment.  Mr. Speaker, as we saw just last week, another senseless school shooting that took the life of 19 children and two teachers, destroying families across Uvalde, Texas and forcing families like the Alhadeffs to relive the tragic death of their daughter.  Mr. Speaker, they are here today and will be here through the week to demand action, to protect our schools and to ensure that this never happens again.  That is why they are tireless advocates for Alyssa's Law, named after her daughter, a critical piece of legislation that addresses the issue of law enforcement response

5

NYS ASSEMBLY                                    JUNE 1, 2022

time when a life-threatening emergency occurs because time equals life.  The law, which has passed the State Senate and is carried by Mr. Zebrowski in this Chamber, calls for the installation of silent panic alarms that are directly linked to law enforcement so in case of any emergency they will get on the scene as quickly as possible and end the threat and triage the victims.  Mr. Speaker, I join them in their urgency to see this legislation passed and encourage all of my colleagues here to demand an up or down vote before we leave Albany this week.

Mr. Speaker, I'd ask that you please welcome Ms. Alhadeff and Ms. Rabinowitz and extend all the courtesies and privileges of the floor to them, and may we always remember their beautiful daughter and granddaughter Alyssa and all of the children who have lost their lives due to gun violence in our schools.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Mr. Lawler, Mr. Zebrowski, the Speaker and all the members, we welcome you here to the New York State Assembly.  And we stand in awe of those who have suffered and turned that suffering into the process of trying to ensure no one else follows you in that task.  And we understand and respect the work that you do.  So you have here the privileges of the floor and also the hearts and minds of the people of the State of New York.  Thank you so very much.

(Applause)

We go to resolutions on page 3.  The Clerk will read.

THE CLERK:  Assembly Resolution No. 1040, Rules

6

NYS ASSEMBLY                                    JUNE 1, 2022

at the request of Mr. Cusick.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 1, 2022 as Global Running Day in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1041, Rules at the request of Ms. Davila.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 1-8, 2022 as Fibro -- Fibroadenoma Awareness Week in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1042, Rules at the request of Ms. Solages.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 13-19, 2022 as Infant Mental Health Awareness Week in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1043, Rules at the request of Mr. Zebrowski.

7

NYS ASSEMBLY                                    JUNE 1, 2022

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 2022 as Migraine and Headache Awareness Month in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1044, Rules at the request of Ms. Lupardo.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 2022 as Dairy Month in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1045, Rules at the request of Mrs. Barrett.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 2022 as Farmers Market Appreciation Month in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1046, Rules -- Rules at the request of Ms. Williams.

Legislative Resolution memorializing Governor

8

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Kathy Hochul to proclaim June 2022 as Caribbean Heritage Month in the State of New York.

ACTING SPEAKER AUBRY:  Ms. Williams on the resolution.

MS. WILLIAMS:  Thank you, Mr. Speaker, for allowing me to speak on this resolution.  As a proud Trinidad-American who also has roots from Venezuela, today I'm proud to stand before this Body to pay tribute to the cultural heritage of so many ethnic groups which comprise and contribute to the richness and diversity of the Caribbean culture as we adopt June as Caribbean Heritage Month.  And today we'll be serving lunch in Room 711-A via our local restaurant back in Brooklyn from Trini Jam, and we also have Calvin and Latoya, the sole owners that's here with us.

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Chandler-Waterman on the resolution.

MS. CHANDLER-WATERMAN:  Hello.  Thank you to the Speaker, Majority Leader, my colleagues, the Assemblywoman Jaime Williams.  As many of you know, I'm a proud Caribbean woman from Barbados and Jamaica who represents a district filled with the rich culture of our people.  Many of -- and you know I have -- I must say pardon me, big up to my mentor Nick Perry who's not here with us but always with me.  Many of my constituents are or come from immigrant families that come to the United States in search of the opportunity for a better life or the American Dream, as we call it.

9

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

It is those individuals and opportunities that give me the inspiration to do the work that we do.  Like many of my colleagues, my office serves as a community resource hub that not only connects people to services, but also leverage our platform to assist residents to navigate the immigration process so that we can live, work and prosper without fear of being torn away from our families.  It is our obligation as elected officials to serve our constituents and work to bring communities together.  Unfortunately, many of the issues that plague my community cross district lines, and only through collaboration between elected officials and community stakeholders would these challenges be sufficiently addressed.  I look forward to working with you all to ensure that we create a new normal for our people where resources and opportunities are easily accessible to all of our constituents.

Thank you.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes on the resolution.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker, for the opportunity to speak on the resolution.  I -- I want to congratulate my colleague because I think it's critically important that we do ask the Governor to honor the heritage of the people who have contributed so much to this country.  And, you know, we are in a time and space in -- in the United States where there are many folks who don't think immigrants have a role here, and they -- they don't understand that if it was not for people like Alexander Hamilton we

10

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

would not even have our country founded in the way that it has been.  He was from the Caribbean.  And so to -- to think that people just got here is not accurate.  We've always been here, Caribbeans have always been here, Africans have always been here and we're being joined by other immigrants.  But it's important for people to honor and know their culture.  Because when you know your culture and know your soul, you will succeed no matter how many obstacles are put in front of you.

So, I honor my colleague for doing this resolution.  I honor all her guests that she has brought to celebrate this, and I hope that I have time to run by 711-A for lunch.  Again, Mr. Speaker, I want to congratulate her and thank her for her work in this area.  And it's great to see our colleague Diana Richardson back, too.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1047, Rules at the request of Ms. Glick.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 2022 Gay Pride Month in the State of New York.

ACTING SPEAKER AUBRY:  Ms. Glick on the resolution.

MS. GLICK:  Thank you, Mr. Speaker.  June is Gay Pride Month because in 1969 a group of folks who were at the

11

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Stonewall Inn were tired of the harassment and the police raids and pushed back and fought back.  And the Stonewall uprising was the beginning of the modern gay rights movement.  It is in my district.  It is now a national park, a historic site.  And while New York State has come a long way, in 2002 we guaranteed basic civil rights for lesbians and gay men in this State.  That was 11 years after I became a member of this Body.  And in 2011, this State took a major step forward in legalizing same-sex marriage.  And I have to say that as far as we have come over this period of time, it saddens me to see the rhetoric that harkens back to a disgraceful period when lesbians and gay men and transgender Americans were used as political pawns to inflame the electorate for political purposes.  The gay Americans deserve the same respect that everybody expects for them and their families.  We deserve no less.  And to have people use that notion of grooming, recruiting, to have a bill in some states that say that you can't even discuss it and use children as the vehicle for anxiety for their parents shows that we are not as mature a people as we like to think we are.  What do first- and second-graders talk about or kindergartners?  They talk about their families.  But if you have two moms or two dads, your teacher is in danger if you mention that.  So there are parts of this country that demonize who we are and then pretend to talk about how they're -- everybody's God's children.  Those words should stick in their throats.  So we are here today to call on the Governor to declare June Gay Pride Month because we are proud of who we are, we're proud of our families.  We're proud of the fact that we have overcome

12

**NYS ASSEMBLY**                                       **JUNE 1, 2022**

stigma, discrimination and violence against us. Whether we're lesbian, gay, transgender should make no difference. We are all a part of humanity, and we only ask that people behave in the same way to us as they expect us to behave towards them.

Now, my parents were straight. Many of our parents were straight. So where did we come from? We are just who we are. We don't have to go out and recruit. Now I'll tell you, there are some people we wouldn't want. They show up anyway. Why? Because people are just people. So, we're here to say thank you for the advancements we've made. We're not going back. The closet door is open. It's been taken off the hinges and it doesn't matter the rhetoric that people use, because once people know who their family members are they reject the stereotypes.

So thank you, Mr. Speaker. I appreciate everybody's kind attention, and I hope that everybody has a very happy Gay Pride Month.

ACTING SPEAKER AUBRY: Thank you.

Mr. Bronson.

MR. BRONSON: Thank you, Mr. Speaker. It is with pride that I rise and stand in support of this resolution brought by Assemblymember Deborah Glick, and I thank her for her leadership and thank her and Assemblymember Danny O'Donnell whose shoulders I stand on along with those shoulders of my late friend, Council Member Tim O. Mains. These folks are trailblazers who in difficult times in our history were brave enough to stand up and say

13

**NYS ASSEMBLY**                                       **JUNE 1, 2022**

who they are and to live authentically. As the sponsor mentioned, we are seeing more and more folks in other states in particular who are using our community as a political wedge. That is unacceptable.

Mr. Speaker, I live by and I legislate by a simple proposition: That no matter who you are, what you look like, what your ability, where you come from, who you love or how you identify, we all have dignity. And with that dignity we deserve full equality, justice and an opportunity to succeed. Here in New York State we have a long history of fighting for equality for all. And certainly that history includes my community, the LGBTQ community. But we have work left to do. The fight will continue and we will forever struggle for that full equality here in New York and across this country. But Gay Pride Month gives us an opportunity to look at that history. It gives us an opportunity to celebrate living authentically. It gives us an opportunity to shout out loud, *I am gay, I am proud and I love who I am.* And I only ask our community and our society to see our community with the dignity that each of us have inside and treat us with the justice and the fairness and the humanity that every person, every person deserves.

Thank you, Mr. Speaker, and thank you Assemblymember Glick for bringing this forward.

ACTING SPEAKER AUBRY: On the resolution, all those in favor signify by saying aye; opposed. The resolution is adopted.

THE CLERK: Assembly Resolution No. 1048, Rules

14

**NYS ASSEMBLY**                                       **JUNE 1, 2022**

at the request of Ms. Reyes.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim July 25, 2022 as Afro-Latina -- Afro-American and Afro Diaspora Women's Day [sic] in the State of New York.

ACTING SPEAKER AUBRY: On the resolution, all those in favor signify by saying aye; opposed, no. The resolution is adopted.

THE CLERK: Assembly Resolution No. 1049, Rules at the request of Ms. Rosenthal.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 2022 as Cytomegalovirus Awareness Month in the State of New York.

ACTING SPEAKER AUBRY: On the resolution, all those in favor signify by saying aye; opposed, no. The resolution is adopted.

Ms. Walsh for the purposes of a introduction.

MS. WALSH: Good morning, Mr. Speaker, and thank you so much for allowing me to interrupt the proceedings to introduce a couple of special guests to the Chamber today. I'd like to introduce Carter Cukerstein and his mother and father Alyssa and Josh Cukerstein who are here in the Chamber today. Carter is a member of the Shenendehowa Varsity Track and Field Team that's located in my district in Clifton Park, New York. During this most recent indoor track and field season, Carter was recognized among the top sprinters

15

**NYS ASSEMBLY**                                       **JUNE 1, 2022**

in the United States. During the Millrose Games Trials in January he ran the fastest 55-meter dash in the country at this time, posting a 6.29- second finish. Carter would then go on to be undefeated during the season in the 55-meter, winning the New York State championship in 6.28 seconds. Carter also set the New York State all-time indoor 55- meter and 60-meter records during the Ocean Breeze Elite Invitational on Staten Island. He's now a senior at Shenendehowa. He holds five all-time Shenendehowa records. And just in case you don't know, Shenendehowa is an athletic powerhouse. They -- they hold a lot of records. So, to hold five all-time Shenendehowa records is pretty big, in the 55 meter, 60 meter, 4x200 meter, 100 meter and 200 meter distances, and he's been a part of numerous Suburban Council and Section 2 championship teams for the school. He's graduating this year. He's going to attend the University of Oklahoma, a Division 1 school this fall sprinting for the Sooners on a full athletic scholarship.

And I ask you, Mr. Speaker, to please recognize Carter and his proud parents Alyssa and Josh and welcome them to the Chamber. Thank you so much.

ACTING SPEAKER AUBRY: Certainly. On behalf of Ms. Walsh, the Speaker all the members, we welcome you here to the New York State Assembly. We extend to you the privileges of the floor. We're in awe of the accomplishments as you have made as a runner, obviously with the support of your parents. So important that you have that support as you proceed in life. Looking forward to

16

**NYS ASSEMBLY**                              **JUNE 1, 2022**

probably seeing you in the Olympics if it looks good to me, and I will be watching intensely for you, sir.  Thank you so very much and good luck on your beginning career.

(Applause)

Page 37, Calendar No. 280, the Clerk will read.

THE CLERK:  Assembly No. A07926-A, Rules Report No. 280, L. Rosenthal, Meeks, Simon, Epstein, Zinerman, Galef, Fernandez, Burgos, Gottfried, Steck, Seawright, Niou, Zebrowski, Abinanti, Carroll, Paulin, Gallagher, Dinowitz, Fahy, Quart, Colton, Griffin, Hyndman, Pretlow, Burdick, O'Donnell, Glick.  An act to amend the Penal Law, in relation to requiring semiautomatic pistols sold in this State be verified as a microstamping-enabled pistol; and to amend the Executive Law, in relation to requiring the Division of Criminal Justice Services to certify the viability of microstamping-enabled pistols.

ACTING SPEAKER AUBRY:  An explanation is requested, Ms. Rosenthal.

MS. ROSENTHAL:  This bill would amend the Penal Law to require the Division of Criminal Justice Services to examine the technological viability of microstamping-enabled pistols, and if such investigation deems the technology viable would require all semiautomatic pistols sold in New York State to be microstamping-enabled.

MR. SMULLEN:  Thank you, Mr. Speaker.  Would the sponsor yield for some questions, please?

17

**NYS ASSEMBLY**                              **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  Ms. Rosenthal, will you yield?

MR. ROSENTHAL:  Yes.

MR. SMULLEN:  Well, thank you, Ms. Rosenthal.  So thank you for that explanation.  But what is microstamping really about?  You as the sponsor of the bill, could you tell us what you mean by this bill?

MS. ROSENTHAL:  I can explain what microstamping is.  It's -- it is a forensic technology that imprints a microscopic array of characters on a cartridge casing to identify the make, model and serial number of the pistol.  So, each firearm has a unique code engraved into the gun's firing pin which is then stamped onto each cartridge case when the gun is fired.

MR. SMULLEN:  And what -- what is the purpose, then, of microstamping from a criminal justice perspective?

MS. ROSENTHAL:  The purpose is to track down those who have used that gun in -- in a crime.

MR. SMULLEN:  So the -- the ultimate purpose is to -- is to catch criminals, you would say?

MS. ROSENTHAL:  I would say that is so, and to, you know, help the families put closure on -- on the crime that happened to them.  It can improve law enforcement's ability to address gun violence, provide intelligence about multiple shootings carried out with the same gun, allow for more gun crimes to be easily traced, help -- help identify leads, solve shootings and bring closure to victims and

18

**NYS ASSEMBLY**                              **JUNE 1, 2022**

their families.  So it has a multitude of good purposes.

MR. SMULLEN:  So in this bill itself there's some discussion about the actual feasibility of the technology.  There's a provision in the bill that is going to give some responsibility to the State Police.  Can you tell me what the -- what the State Police's role would be under your bill?

MS. ROSENTHAL:  Well, the State Police would have to certify or decline to certify that microstamping-enabled pistols are technologically viable.

MR. SMULLEN:  So at this point we do not know if this technology is viable, and in doing so in writing the bill the first thing we must do is actually task our preeminent law enforcement organization to actually see if the technology will work?

MS. ROSENTHAL:  Well, there have been studies that show that it actually -- it has proven to be viable, but we just want to make sure DCJS --

MR. SMULLEN:  What -- what studies are you referring to?

MS. ROSENTHAL:  I can -- hold on a second.  The Coalition to Stop Gun Violence has a paper, *Microstamping Technology Precise and Proven*.  I can forward you the article.  Last -- this is last visited on May 10th, 2022.  So that's the most notable and most --

MR. SMULLEN:  So it's a study -- it's a --

MS. ROSENTHAL:  -- and most recent research on

19

**NYS ASSEMBLY**                              **JUNE 1, 2022**

microstamping --

MR. SMULLEN:  The most recent research by mostly an anti-gun organization.  I -- I'll take that for what it is.  What other states have implemented microstamping here in the United States?

MS. ROSENTHAL:  Well, California.

MR. SMULLEN:  So California has an active microstamping program and a law that's on the books?

MS. ROSENTHAL:  Well, that one has a long history including an attempt by manufacturers to get around the law, and they were not -- they did not work together with the state government.  So that -- that law talked about newly -- new models of semiautomatic guns.  And so the manufacturer said, *Well, we're just not going to make new models.*

MR. SMULLEN:  So the --

MS. ROSENTHAL:  They were trying to thwart the intent and the ability for microstamping to play a role in law enforcement.

MR. SMULLEN:  So the -- the 2007 California law has been a failure is what you're saying.

MS. ROSENTHAL:  Well, that's what you would call it.  I would call it a first attempt and they've done subsequent -- subsequent legislation.

MR. SMULLEN:  And what -- you know, for that California law it's been 15 years.  Does California sell pistols now that

20

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

only have microstamps?

MS. ROSENTHAL:  Well, what they're doing in California, in 2020 they passed a new law to address the obstruction created by the manufacturers who refused to participate in law enforcement's efforts to identify criminals.  And they passed a new law to ensure that more handguns certified for sale and manufactured come equipped with basic lifesaving consumer safety features as well as microstamping mechanisms.  So, beginning on July 1st of 2022 the law will direct DOJ to remove three older less safe semiautomatic pistol models from its rosters, roster handguns certified for sale in California for every new certified microstamping model.  And eventually, slowly but surely, it will ensure that more commercially-available handguns become fully compliant with California's modern safety -- gun safety laws over time.

MR. SMULLEN:  So -- so it hasn't been implemented and we're -- we're still struggling with the technology in California.  Tell me a little bit about the actual technology itself.  Who owns it?  How many actual organizations or -- or corporations that work with these gun manufacturers own this technology?

MS. ROSENTHAL:  Well, we know at least two manufacturers that produce microstamping mechanisms for semiautomatic pistols and we also anticipate that other companies will follow.  The technology is not patented, and so the bill allows -- also allows time for this to occur.  But it is something that exists and we predict that more companies will participate in the microstamp

21

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

technology field.

MR. SMULLEN:  But -- but at this point California does not have a -- a valid verifiable viable microstamping technology that's been implemented after 15 years?

MS. ROSENTHAL:  Well, this is New York State so we do things differently.

MR. SMULLEN:  Okay.  Well, thank you.  I need to move on to a different area of this proposed law.  There's an unlawful sale provision that's in the law.  Does this affect -- does this take effect immediately upon passage of this law if the Governor signs it?

MS. ROSENTHAL:  No, it doesn't and let me -- well, ask the next question.

MR. SMULLEN:  Does this unlawful sale provision prohibiting the sale of pistols without microstamping technology take effect immediately upon signature by the Governor?

MS. ROSENTHAL:  No -- no, it does not.

MR. SMULLEN:  So it takes effect after the -- the State Police's evaluation of the technology, their promulgation of regulations, about four years is what -- what I think the law says?

MS. ROSENTHAL:  Up to four years.

MR. SMULLEN:  I'm sorry?

MS. ROSENTHAL:  Up to four years.

MR. SMULLEN:  Up to four years, right.  Fifteen years in California, New York has four years to implement it for this -- this particular technology.  So after that point, then, no pistols in

22

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

New York would be allowed to be sold without microstamping technologies if all goes according to your plan.

MS. ROSENTHAL:  Yes.

MR. SMULLEN:  And -- and what does that mean for the pistols that are all already lawfully licensed by people in New York?  What -- what does that mean for those -- those law-abiding citizens?

MS. ROSENTHAL:  I mean this law applies to pistols manufactured after this law goes into effect.

MR. SMULLEN:  And how many pistols are licensed in New York State?  How many lawful gun owners will this affect?

MS. ROSENTHAL:  I'm not sure.

MR. SMULLEN:  No -- no idea?

MS. ROSENTHAL:  Well, I have some idea but maybe you can tell me.

MR. SMULLEN:  Well, if we're going to pass a law, it would be incumbent to -- to know how many of our citizens that this actual law is going to affect, at least in my --

MS. ROSENTHAL:  Well we can't -- we don't know because it's future purchases.

MR. SMULLEN:  Right.  And -- and this would only affect semiautomatic pistols --

MS. ROSENTHAL:  Yes.

MR. SMULLEN:  -- it wouldn't affect revolvers --

MS. ROSENTHAL:  No.

23

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

MR. SMULLEN:  -- historical or any antique firearms?

MS. ROSENTHAL:  Correct.

MR. SMULLEN:  And so, you know, knowing that and knowing how many pistols are actually licensed in New York State, how will this actually do anything with stolen guns that are used by criminals?  What lawful gun owners who register their pistols with the State to not commit crimes because they're -- they're actually -- their -- their purposes of owning are for the -- the fundamentals of the Second Amendment.  For those criminals who can simply file off the microstamping device on the -- on the breech of the -- of the pistol or change the firing pin, how -- how is that going to stop a criminal from -- from evading this law?

MS. ROSENTHAL:  Well, one might ask the same question about every law we pass that criminals do not adhere to.  The fact about criminals removing the microstamp code, that would be prohibited and it would be a crime.  But criminals don't obey the law.  So they're not going to obey any new laws, either, perhaps, but we hope they will.

MR. SMULLEN:  So --

MS. ROSENTHAL:  That's why we're all here, to pass laws that people will obey.

MR. SMULLEN:  But it -- but it's your estimate as the sponsor of the bill and by your own admission that criminals don't follow the law, that it's -- it's a much less crime to say, *Let's file off*

24

**NYS ASSEMBLY**                                JUNE 1, 2022

*this -- this breech marking and then put a firing pin in -- a different firing pin in,* and then the gun becomes untraceable in the commission of more serious crimes.  So --

MS. ROSENTHAL:  I mean, if you look up in the dictionary "criminal", criminal is someone who does not follow the law.  That applies to every law we pass here.  But there -- there are penalties, and this gives law enforcement another tool, which I think we all want to give them and that they want to have better ways to track down who -- who committed a crime connected with perhaps other crimes that were committed by the same individual.  This is what law enforcement needs to continue in its quest to protect society.

MR. SMULLEN:  But we're going to let the State Police decide whether the technology is viable?

MS. ROSENTHAL:  You don't trust the State Police?

MR. SMULLEN:  I -- I'm just -- I'm asking the question.

MS. ROSENTHAL:  Well --

MR. SMULLEN:  In this -- how this law is written --

MS. ROSENTHAL:  Yes.

MR. SMULLEN:  The State Police will decide.

MS. ROSENTHAL:  We -- DCJS will decide if the technology is viable.

MR. SMULLEN:  Very good.  Well, thank you for that.

So, a few follow-up questions regarding lawful gun

25

**NYS ASSEMBLY**                                JUNE 1, 2022

owners.  What is your estimate of the cost, the additional cost that microstamping will have for lawful gun owners to buy new firearms going forward four years from now if this law is deemed viable by the State Police through DCJS?

MS. ROSENTHAL:  Right.  I mean, I've heard and I've read about it adds about $1.50, it could be $5 in cost per firearm.

MR. SMULLEN:  How much?

MS. ROSENTHAL:  It could be $1.50 to $5 in cost per firearm.

MR. SMULLEN:  Per firearm.  So what about the actual cost for maintaining the database and the actual system itself for -- for these look -- looking after these things?  If we're going to -- we're trying to use this to solve crimes.  We think that criminals don't -- are -- are going to evade it by avoiding the microstamping techniques.  But the actual application of the database itself, who's going to maintain that?

MS. ROSENTHAL:  Well, this bill does not create a new database.  A database already exists into which these -- these alphanumeric codes can be loaded.

MR. SMULLEN:  And about how many --

MS. ROSENTHAL:  No pun intended.

MR. SMULLEN:  And about how many crimes per year involve handguns where this microstamping technique would be useful to people trying to solve crimes?

MS. ROSENTHAL:  I mean, we do know that from

26

**NYS ASSEMBLY**                                JUNE 1, 2022

2019 to 2020, gun homicides increased 76 percent which is the highest rate in 15 years.  And data from 2021 from cities across the State suggest that gun homicides remain persistently high.  In Rochester, for example, from 2019 to 2021, shootings increased by 143 percent.  They doubled in New York City and in Buffalo, and in Albany they increased by 83 percent.

MR. SMULLEN:  Well, thank you very much for admitting that crime is off the charts since we've repealed many of the criminal justice laws.  In -- in my mind it would help --

MS. ROSENTHAL:  But I didn't exactly say that --

MR. SMULLEN:  -- remove those criminals from the street --

MS. ROSENTHAL:  -- you can infer what you want to infer.

MR. SMULLEN:  Thank you.  There was -- I didn't -- I didn't detect a number in there about how many cases this is -- this is actually going to help us solve and whether or not the juice is worth the squeeze here.  But my time is running short.

Mr. Speaker, on -- on the bill, please.

ACTING SPEAKER AUBRY:  On the bill.

MR. SMULLEN:  Unfortunately, this technology as a tool in -- in criminal justice matters is -- is largely unachievable.  For 15 years California has not been able to make a go at it.  It's going to only simply add to the cost for lawful gun owners.  And that's probably the real purpose of this bill, is to increase the cost of gun

27

**NYS ASSEMBLY**                                JUNE 1, 2022

ownership for those who lawfully, properly under the Second Amendment exercising their rights have these particular kind of pistols.  This is completely unfeasible when you think about how many pistols there are that are lawfully owned, and then going forward this will effectively preclude the sale after we go through this charade of four years of evaluating whether or not the technology is usable.  It's going to effectively preclude the sale of pistols in New York State.  And it had a chilling effect in California.  It's certainly going to have that effect here in New York.  And unfortunately, it won't do anything to make our schools safer, which is I think the purpose of this -- this debate that's going to go on this week as far as gun control in New York.

(Buzzer sounds)

And this is really about controlling guns.  It's a bad bill.  It's been here before and we should vote no.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.  Mr. Angelino.

MR. ANGELINO:  Thank you, Mr. Speaker.  Will the sponsor yield for some questions?

ACTING SPEAKER AUBRY:  Ms. Rosenthal, will you yield?

MS. ROSENTHAL:  Surely.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. ANGELINO:  Thank you, sir.  This will -- this

28

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

won't be as long as I expected because my learned colleague to my left answered many -- asked many of my questions and I appreciate your answers. So, I -- I believe it was in 2010 California started their microstamping. Is that what you have in your notes?

(Pause)

It's been some time --

MS. ROSENTHAL: I just want to get the exact --

MR. ANGELINO: Yeah, it's -- it's been some time. So we can say about a decade?

MS. ROSENTHAL: Yeah, definitely.

MR. ANGELINO: Are there any examples from California of where microstamping has been successful in an investigation and led to a prosecution?

MS. ROSENTHAL: It hasn't been implemented yet, so we don't have information on that.

MR. ANGELINO: Okay. The -- the microstamping, just to name itself, micro means tiny. Will the microstamp on the firearm be visible to the naked eye or is this microscope things we're talking about?

MS. ROSENTHAL: I mean, it's microscopic, one would say, to get -- to get it on the, you know, the casing.

MR. ANGELINO: And I -- I did some research on this and I -- there's different portions of the -- the handgun that can be laser engraved.

MS. ROSENTHAL: Right.

29

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. ANGELINO: One is the breech, the other is the firing pin.

MS. ROSENTHAL: It's just the --

MR. ANGELINO: What does your bill propose?

MS. ROSENTHAL: The pin.

MR. ANGELINO: The firing pin.

MS. ROSENTHAL: Yes.

MR. ANGELINO: Okay. The -- the firing pin is a moving part inside the weapon, and I -- I guess when the fire pin strikes the ammunition, microstamped --

MS. ROSENTHAL: Yes.

MR. ANGELINO: -- impression is left.

MS. ROSENTHAL: On the casing.

MR. ANGELINO: -- and the spent shell casing is ejected.

MS. ROSENTHAL: On the casing, yes.

MR. ANGELINO: Right. And law enforcement is going to find the shell casing.

MS. ROSENTHAL: Correct.

MR. ANGELINO: Got it. So there -- they'll be able to tie the casing that they find at the scene, maybe there's a gun left behind, I don't know, but they will know which pistol fired them.

MS. ROSENTHAL: Yes, they should.

MR. ANGELINO: And the -- a handgun -- you know, I don't think criminals go out and buy a brand-new handgun

30

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

specifically looking for microstamping because that's the newest technology. They -- they'll probably be using older firearms. Once microstamping takes place and that metal-on-metal contact happens and it happens during an explosion, how many firings do the experts say before that microstamp wears off?

MS. ROSENTHAL: Well, not for a very long time. They've conducted tests where they fired thousands upon thousands of rounds and the -- technology stood up very well.

MR. ANGELINO: There was no obliteration or degradation?

MS. ROSENTHAL: You know, even if there was a little bit, there was enough there to help identify where it came from.

MR. ANGELINO: Well, that's amazing because I -- I read a study here on my desk that said it's obliterated --

MS. ROSENTHAL: No --

MR. ANGELINO: -- after about a thousand firings.

MS. ROSENTHAL: No, no I -- that's not my information.

MR. ANGELINO: Okay. I'm sure we have biased studies that we're each looking at, without a doubt.

And this is only for semiautomatic handguns.

MS. ROSENTHAL: Yes.

MR. ANGELINO: Criminals generally don't want to caught. We can agree there, correct?

MS. ROSENTHAL: Yes. Unless they do.

31

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. ANGELINO: Well, sometimes they're not the brightest --

MS. ROSENTHAL: But that's a deeper psychological issue. Yes.

MR. ANGELINO: Yes. But the -- generally speaking, criminals want to commit their crime and get away.

MS. ROSENTHAL: Yep.

MR. ANGELINO: Do you think there's going to be an increase in the use of revolvers that do not eject their casings?

MS. ROSENTHAL: I mean, this hasn't happened yet so I can't predict the future. But in any event, there were still be semiautomatic pistols out there that law enforcement can use the microstamping technology to pursue the people who committed crimes.

MR. ANGELINO: So the new technology in the new pistols that will -- can only be purchased lawfully by a permitted gun owner, those are the ones that are going to be holding the microstamping unless they get stolen from the owner.

MS. ROSENTHAL: Mm-hmm.

MR. ANGELINO: So, again, I -- you know, criminals aren't dumb, they don't want to get caught. I think we're going to switch to revolvers.

MS. ROSENTHAL: Right.

MR. ANGELINO: And in my experience there's many more revolvers than handguns because they've been around

32

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

longer.  The -- I heard the -- I heard both.  State Police and DCJS is

going to certify the viability or is it -- or is that wrong?

MS. ROSENTHAL:  DCJS.

MR. ANGELINO:  DCJS.

MS. ROSENTHAL:  Yes.

MR. ANGELINO:  Okay.  I did hear --

MS. ROSENTHAL:  And -- and also I just wanted to

comment what you said earlier is that just because someone buys a

gun lawfully and all that doesn't mean they won't commit a crime.

MR. ANGELINO:  That's correct.

MS. ROSENTHAL:  Yes.  So a microstamped

lawfully-bought semiautomatic can also be used in a crime.

MR. ANGELINO:  And the same goes with anything,

any law that we have, though.  You know, I can buy a new --

MS. ROSENTHAL:  Yeah.

MR. ANGELINO:  -- car and be arrested for drunk

driving.

MS. ROSENTHAL:  Yeah, but you were -- you were

saying only unlawful --

MR. ANGELINO:  Right.

MS. ROSENTHAL:  -- and some will be lawfully

bought.

MR. ANGELINO:  I -- I think I asked about the

California and I read, too, that they've been doing this for quite a

while.

33

---

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

MS. ROSENTHAL:  Mm-hmm.

MR. ANGELINO:  Do you envision that we're going

to be more successful than California at this?

MS. ROSENTHAL:  Well, we always want New

York to be more successful than any other state, but I think that we

have learned from their experience and this bill has been drafted and

-- and thought about and created to not meet some of the pitfalls of the

California law.

MR. ANGELINO:  Well, the -- the firing pin is an

easily removed item on a gun and can -- firing pins break.

MS. ROSENTHAL:  Mm-hmm.

MR. ANGELINO:  So what happens when a gun

owner has a firing pin that does snap under the explosion?  Where do

they get a new firing pin that's been microstamped?  At my home right

now I have more than one firing pin for a couple of weapons just for

that occasion.

MS. ROSENTHAL:  Yeah.  One sec.

(Pause)

So, if a microstamping component of a

microstamping-enabled pistol when it's damaged or in need of

replacement, then that can happen.  Lawfully, the -- the bill provides

for that to be replaced for a legitimate purpose that is only used for

that purpose.  So yes, it could be replaced.

MR. ANGELINO:  Okay.  The -- the firing pin,

again, it's a delicate part, it's one of the smaller parts, and it -- it looks

34

---

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

like a nail.  It's got a very small --

MS. ROSENTHAL:  Yes.

MR. ANGELINO:  So the -- there's other methods of

microstamping.  Did you consider microstamping the breech face?

MS. ROSENTHAL:  I think we decided the -- the --

using the pin would be the best method.

MR. ANGELINO:  Okay.  Again, I disagree because

the firing pin -- if you really want this to be successful, the firing pin is

easily replaced, modified and exchanged, where the breech has a

serial number on it.

MS. ROSENTHAL:  Mm-hmm.

MR. ANGELINO:  And it's basically where the bullet

explodes, and that can't be replaced without having another serialized

part.  And I was just -- is it more difficult to laser engrave the breech?

Because the firing pin is the -- the weak link in this.

MS. ROSENTHAL:  Okay.  The technology that

exists right now has to do with the firing pin.

MR. ANGELINO:  Okay.  Well, laser -- laser

engraving, anywhere you can shine a light a laser beam can get in

there and engrave it.  But the -- I'm just -- I guess I'm just saying that

the breech would be the better place to do this.

MS. ROSENTHAL:  I mean, this bill talks about the

firing pin and perhaps down the line we can add more components,

too, that have to be getting -- you know, have to have the number put

on them.  But right now we're just doing it through the pin.

35

---

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

MR. ANGELINO:  Thank you, Madam sponsor.

You can take a break.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. ANGELINO:  So, I contacted law enforcement

agencies in California and the microstamping of semi --

semiautomatic handguns in their state has been a -- a boondoggle, was

their word, because the technology ten years ago when they started

wasn't what it is today.  But they've had zero cases of anybody in a

decade of being caught from the scene of a crime because of a fired

bullet and the casing left behind.  The -- the deal with microstamping

is it -- their words were this is just to scare gun manufacturers away

from the State of California, and I think we're going to do the same

thing in our state.  And that's a viable manufacturing industry.  You

know, with high technology and also skilled craftsmen taking blocks

of metal and making it into a useful tool for hunting, sport -- sporting

and I believe alls we're going to do here is just create another law that

will make criminals out of who were once law-abiding citizens.

You know, in the 1950s automobiles were a

relatively new device.  They'd only been around 25, 30 years.  And in

the1950s the first generation of cars were becoming old used cars and

young people were buying them.  And they were driving them with

reckless abandon and they were killing themselves in those cars.  So,

we realized that it was a problem with the automobile and we started

teaching children in high school drivers education.  I took it and

36

---

**JA132**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

learned a lot and I still use some of those techniques to this day. In the 60s and 70s we had a lot of unwanted pregnancies. Young teenage girls were finding themselves in a predicament and I think that's where in '73 the monumental decision was made. But we also tried to educate the young people, boys and girls, about sex education in our schools. When I was going to school we had a rifle team. We had a -- a firing range on school property, and we didn't have the mass shootings. The Second Amendment has been around for a couple of hundred years plus. Yet, these mass shootings are something that is a phenomenon that has happened steadily in about the last 20 years. So something changed in those 20 years. There's always been a random shooting here or there, but the epidemic that we're looking at right now is something new. And I think we ought to pick the scab off and realize that this is a mental health issue, not an inanimate object issue. And if we really want to gain some respect and education in this, we ought to start considering teaching firearm safety to those who want to participate in it in a mentored adult setting with young people. I sponsor a skeet team for a high school in my district, and it is Marksmanship, Fun and Safety. And they stress the safety part of it every minute that they're doing it. It's respect for the tool in their hand. And I don't know if this microstamping is actually going to do anything. California has been doing it for a decade now and I will probably be long retired from this Chamber and it will still be being debated.

Thank you, Mr. Speaker.

37

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

ACTING SPEAKER AUBRY: Thank you, Mr. Angelino.

Mr. Lemondes.

MR. LEMONDES: Thank you, Mr. Speaker. Will the sponsor yield for a few questions?

ACTING SPEAKER AUBRY: Ms. Rosenthal, will you yield?

MS. ROSENTHAL: Yes.

ACTING SPEAKER AUBRY: The sponsor yields.

MR. LEMONDES: Thank you very much. I'd like to take the conversation in a little bit different direction based on the technology readiness level of this particular technology that's being proposed that's the basis for this entire bill. Could you state the technology readiness level of this technology?

MS. ROSENTHAL: I believe it's -- it's ready.

MR. LEMONDES: Everything I've done in my research and as we've heard from my colleagues, we believe that it is not ready. There are generally nine technology readiness levels with level nine being proven technology. So I think this lies some -- somewhere between one and eight. Additionally, with respect to cost, could you address again the -- the cost that this would impose per weapon?

MS. ROSENTHAL: As I -- I said earlier, it's commercially available, can be mass produced for a cost of between 50 cents to $5 per firearm, are the estimates I have.

38

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. LEMONDES: That's interesting. I have information stating that it could raise the cost as much as $200 per part --

MS. ROSENTHAL: Oh no, I've never seen that number. I have seen 50 cents to $5.

MR. LEMONDES: Sure. I -- I understand we -- we are working off of different information.

Additionally, do you know how many jobs this could impact?

MS. ROSENTHAL: In terms of adding jobs?

MR. LEMONDES: In -- in terms of job loss.

MS. ROSENTHAL: I don't think it would result in any job loss. I would assume it would -- it could help increase the number of jobs available.

MR. LEMONDES: Again, we disagree. Thank you for your answer.

With respect to crime scenes, could you -- could you tell me the average number of rounds necessary to be recovered from a crime scene in order to piece together the signature of that particular weapon?

MS. ROSENTHAL: I would say you need the casing from the gun that was -- that was used in the commission of the crime.

MR. LEMONDES: That's what I'm asking --

MS. ROSENTHAL: Yes.

MR. LEMONDES: -- how many casings do you

39

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

need?

MS. ROSENTHAL: You can get one casing.

MR. LEMONDES: Again, we have -- we're working off of different information. The -- the information I have says that in order to recover the code you can need up to ten rounds of ammunition.

MS. ROSENTHAL: I have not seen that anywhere.

MR. LEMONDES: That's the -- that's the information that I have.

MS. ROSENTHAL: Okay.

MR. LEMONDES: And the -- do you know how many -- how many rounds of ammunition are used in the commission of a typical crime with a firearm, with a handgun?

MS. ROSENTHAL: It -- that varies.

MR. LEMONDES: I'm sorry, I couldn't hear you.

MS. ROSENTHAL: I said that varies.

MR. LEMONDES: That's okay. The number I have is four. And the point is that if the average number of rounds of ammunition used in the commission of a crime is four, yet you may need as many as ten to piece together the code on the actual microstamp, in most crimes you won't have the information available.

MS. ROSENTHAL: Well, your assumption is ten and my fact is one.

MR. LEMONDES: I -- I would dispute the value of the fact because the firing pins themselves can be easily removed and

40

NYS ASSEMBLY                                      JUNE 1, 2022

changed.  Any criminal that -- that committed a crime with a weapon that's microstamped could easily remove the firing pin, throw it away and -- and you would -- you would have quite a time piecing that weapon to that crime.

 MS. ROSENTHAL:  You know, I think what I have learned throughout this is that law enforcement needs more tools and this a tool that they want and that they can use.

 MR. LEMONDES:  Sure.  I -- I don't agree with you on that.

 All right.  Mr. Speaker, on the bill.

 ACTING SPEAKER AUBRY:  On the bill, sir.

 MR. LEMONDES:  Thank you.  I think the cart may be before the horse.  If we can't even state the technical readiness level of this technology and -- and demonstrate that it is proven when there's so much information that says some sources say it's workable, others say it's unproven, as my colleague just mentioned.  For over ten years in California it hasn't led to the -- to the solving of a single crime.  And so, therefore, due to unproven technical -- unproven technology and its -- and its limitations, this does not impact the -- the source of illegal weapons flow.  It will only impact law-abiding citizens.  If we really want to reduce crime from weapons, let's close the southern border.  Let's stop the elicit flow of weapons that are coming into our country every single day, probably by the thousands, that will be used in the hands of terrorists, that will accompany fentanyl that's killing 285 Americans a day.  Let's go after that.  The

41

NYS ASSEMBLY                                      JUNE 1, 2022

additional considerable cost that this will impose on law-abiding citizens and the cost to State law enforcement agencies that have to buy the technology or learn how to -- learn how to use the technology and maintain the technology to do this, yet the person who commits the crime can simply remove the firing pin, throw it away, replace it with another one.  And by the way, it takes about two to three minutes to remove a firing pin.  That defeats the whole purpose of this.

 So, for those reasons, I have to vote against this.  Thank you, Mr. Speaker.

 ACTING SPEAKER AUBRY:  Thank you, sir.  Mr. Gallahan.

 MR. GALLAHAN:  Thank you, Mr. Speaker.  Will the sponsor yield?

 ACTING SPEAKER AUBRY:  Ms. Rosenthal, will you yield?

 MS. ROSENTHAL:  Yes.

 ACTING SPEAKER AUBRY:  Ms. Rosenthal yields, sir.

 MR. GALLAHAN:  Thank you.  Can you tell me how this bill would differ from what we had several years ago during the Pataki Administration called CoBIS where up in my area, the 131st in Ontario and Seneca Counties, neighbors had to take their -- their firearms to Batavia for a firing and then they would register the cartridge and -- and it was what I see is almost the same identical bill that we're looking at here today.  Now, we -- we enacted that bill

42

NYS ASSEMBLY                                      JUNE 1, 2022

during -- during the Pataki Administration, as did Maryland.  And over 71,000 rounds were registered and not one crime was ever solved.  Can you tell me how this is different from the previous bill that we had, and maybe why former Governor Cuomo disbanded the program and got rid of it?

 MS. ROSENTHAL:  Well that is way beyond the scope of this bill.  I -- I -- I have no clue why the former Governor did much of anything in certain areas.  However, this bill we know will help law enforcement fight crime and identify criminals.

 MR. GALLAHAN:  Can you tell me what the technology is in this bill versus the last law that we had on the books?  How do they differ?

 MS. ROSENTHAL:  I'm familiar with the technology in this bill, so I believe I described it earlier.  I'm not familiar with that one, but I can repeat that a microstamped firearm has a unique code engraved into the gun's firing pin which is then stamped onto each cartridge case when the gun is fired.  So, law enforcement can match spent cartridge casings to a specific firearm in the same way license plates can be used to identify the make, the model and the registered owner of a car.

 MR. GALLAHAN:  Okay.  Thank you.  I -- I understand that.

 Another question that I have is, you know, bullets and cartridge cases are made of different materials.  And I've been in the -- in the cutting tool industry for 35 years and I've been selling to many

43

NYS ASSEMBLY                                      JUNE 1, 2022

firearms manufacturers and machine shops that produce these parts to produce these -- these weapons here in New York.  There's firing impressions.  And what happens is with the -- with the three materials that we're talking about here -- soft material alloys, brass, nickel-plated brass and steel.  Each one of those materials has a different relative flexibility so that when the firing pin hits that material some of it is -- will create a half-way decent image.  When you get into the harder steels, especially ammunition that is bought overseas that's brought to the United States, purchased here, that ammunition, the -- the primer in that ammunition, much of it is made of extremely hard steel and it won't microstamp with any kind of regularity.  And in California, the Department of Justice study, 50 firing -- 50 firing cases from the Federal Cartridge Corporation working for the Department, just in the same gun a microscopic examination by experts in California - this was done by the Department of Justice - 38 percent were missed.  When different cartridge makes were added to the mix, all from the same gun, 62 percent were missed.  Obviously this presents a serious problem with an only once-fired bullet (inaudible) this -- this technology.  And -- and I don't understand how this is going to affect solving cases in our State.  Maybe you have a different opinion.  Maybe you can tell me how these hard steel primers are -- are -- are going to not be affected by this -- by the technology that we have today.  Because I don't understand how it cannot be affected.

 MS. ROSENTHAL:  Well, that is why we leave it to DCJS to certify or to decline to certify that the microstamping-enabled

44

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

pistols are technologically viable.  We -- we leave that in their learned
hands.

 MR. GALLAHAN:  Okay.  Thank you for your

answer.

 MS. ROSENTHAL:  Thank you.

 MR. GALLAHAN:  The last question I have is, firing
pins are made from many different types of steel.  And we discovered
that if you code a firing pin, that coding is anywhere from 89 to 95
percent Rockwell hardened.

 MS. ROSENTHAL:  Mm-hmm.

 MR. GALLAHAN:  So if you get a new firing pin
and you coat it, it will last much longer than a standard firing pin.  So
in competition shooting, which happens all the time, you get a broken
firing pin, which my colleague alluded to earlier in his -- his debate.
So, my question is, how is this technology going to be effective when
you take that firing pin from that weapon and you coat it with tin
coating or chicken coating or titanium carbon nitrate coating?  How is
that going to affect it, which is -- which is a common practice today to
ensure that your firing pins last much longer on the line?

 MS. ROSENTHAL:  Well, thank you for your
expertise in that matter.  I -- I believe that DCJS will take all of those
factors and others into consideration when considering the viability of
the technology.

 MR. GALLAHAN:  Okay.  My final question I guess
would be if I'm at the firing range in a competition and I break my

45

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

firing pin, if I replace that firing pin, which I can do within a matter of
minutes at the firing range with a standard firing pin that doesn't have
the microstamping technology in it to finish -- to finish my -- my
competition, does that make me a criminal?

 MR. GALLAHAN:  No.

 MR. GALLAHAN:  I can do that?  I can change that
firing pin on the line, on the spot, and continue in my competition?

 MS. ROSENTHAL:  For sporting purposes it does
not apply.

 MR. GALLAHAN:  When -- well, if it doesn't apply
for sporting purposes, the firearms that I buy are strictly for sporting
purposes.  So they're -- they're exempt from this bill?

 MS. ROSENTHAL:  Let me get you the exact
language.  This is right near the end of the bill.  It says, *Any person
who modifies a microstamp-enabled pistol or microstamping
component with the intent to prevent production of a microstamp is
for a first offense guilty of a Class B misdemeanor*, et cetera et cetera.
*It shall not be unlawful to replace the microstamping component of a
microstamping-enabled pistol when the component is damaged or in
need of replacement with another valid microstamping component for
the safe use of the firearm or replacing such pin for a legitimate
sporting purpose that is only used for that legitimate purpose.*

 MR. GALLAHAN:  So I'm -- I'm still confused.  It
says that it has to be replaced with a microstamped firing pin.

 MS. ROSENTHAL:  Yes.

46

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

 MR. GALLAHAN:  So when you buy a new -- a new
handgun, are you going to be able to order eight or ten more firing
pins for that particular weapon so that you have them on hand so that
you're not breaking the law?  When you break a firing pin at the range
and you have to replace that firing pin, it's a misdemeanor, which you
just read to me, if I use a standard firing pin, but it's not a
misdemeanor if I use a microstamped firing pin.  How do you acquire
those microstamped firing pins and have those extra in your shooting
bag so that when you break your firing pin you can replace it legally
and not be breaking the law?

 MS. ROSENTHAL:  You know, if it -- if it does
break then you would have to replace it with a microstamped-enabled
firing pin.

 MR. GALLAHAN:  So how do you finish your
competition if you have a broken firing pin?  What happens to the
thousands of -- of incidents that happens across our State every year?

 MS. ROSENTHAL:  It doesn't happen thousands of
times.

 MR. GALLAHAN:  It is quite -- quite frequent in --
in the sporting world to break a firing pin.

 MS. ROSENTHAL:  Well, that -- you know.  That --

 MR. GALLAHAN:  It's very common.  Very
common.

 MS. ROSENTHAL:  Okay.  Well that's the
responsibility under the law.

47

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

 MR. GALLAHAN:  So how would you -- you
wouldn't be able to finish the competition.  Is that what you're telling
me?

 MS. ROSENTHAL:  If you didn't have the proper
firing pin then I guess you wouldn't.

 MR. GALLAHAN:  So, my next question -- I'm
sorry, I thought I had the last question --

 MS. ROSENTHAL:  Yeah, you said one.

 MR. GALLAHAN:  But --

 MS. ROSENTHAL:  Go ahead.

 MR. GALLAHAN:  But apparently I can't count.  My
next question would be, if you do break that firing pin and you have
that useless weapon, how do you go about getting another firing pin
for that weapon?  Do you have to send that weapon back to the
manufacturer?  Will the manufacturer send you a firing pin because
doesn't that have to be fired through the -- through the weapon in
order to register that -- that cartridge?  So that would entail sending
that weapon back to the manufacturer at an incurred cost to the -- to
the shooter, shipping it all back, whatever the manufacturer -- they're
not going to do it for free.  That's -- they're not going to do it for free,
so it seems like a large inconvenience for a law-abiding citizen to
have to go through to keep shooting in the -- in the sport that they --
they so dearly appreciate.

 MS. ROSENTHAL:  Well, I think if you go to the
gun dealer they could provide advice and direction and probably a

48

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

firing pin.

MR. GALLAHAN:  I'm sure the firing -- the -- the dealer is not going to have firing pins at their -- at their disposal at their -- at their shop.

MS. ROSENTHAL:  Okay.  I mean DCJS I'm sure will consider all of these scenarios.

MR. GALLAHAN:  Mr. Speaker, on the bill.

ACTING SPEAKER JONES:  On the bill.

MR. GALLAHAN:  This technology's been around for -- for decades.  New York participated in this technology for five years.  Never solved a crime.  Our former Governor recognized that this was a cost burden to the State, a severe cost burden to the State and disbanded the program.  I can't see where technology has advanced to the point -- the other states that are doing it certainly aren't successful with solving crimes with this technology.  I'm looking through the bill memos.  I don't see the support of any law enforcement agencies.  I see some opinions but I see no support.  So I cannot -- I cannot support this bill.  The technology is not where it needs to be.  It is not successful in any other state.  Any kind of -- I don't even know that a crime has been solved with this technology in other states.

So I will be voting in the negative.  I would encourage my colleagues to do the same.  Thank you, Mr. Speaker.

ACTING SPEAKER JONES:  Thank you, sir.

Mr. Lawler.

49

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

MR. LAWLER:  Thank you, Mr. Speaker.  Will the sponsor yield?

ACTING SPEAKER JONES:  Will the sponsor yield?

MS. ROSENTHAL:  Yes, of course.

ACTING SPEAKER JONES:  The sponsor yields.

MR. LAWLER:  Thank you.  So I -- I want to start where my colleague just left off because I'm -- I'm a little confused by this.  So, the microstamping technology that you assert as available and functioning would be with respect to the firing pin, correct?  That's what this bill does?  It microstamps the firing pin?

MS. ROSENTHAL:  I mean it microstamp -- the casing is what is microstamped.

MR. LAWLER:  But the -- the actual engravement is on the firing pin?

MS. ROSENTHAL:  Yes.

MR. LAWLER:  Okay.  So when the firing pin breaks, as many of my colleagues explained -- and I would take their advice on this, they all seem to have quite a bit of knowledge about it -- when the firing pin breaks and you replace the firing pin, is the microstamp supposed to be the exact same microstamp that was on the broken firing pin, or is it a new microstamp?

(Pause)

MS. ROSENTHAL:  Well, each -- it's a unique code each time.  So I would then say that it is probably specific to -- and I'd

50

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

also question how often the firing pin breaks.  I know you've said it breaks a lot, but it is -- it's extremely hard to remove and I don't believe it breaks that often.

MR. LAWLER:  Well, can I you ask a question?  Do you have firsthand experience with whether or not it breaks or you're just surmising?

MS. ROSENTHAL:  Do you?

MR. LAWLER:  I -- I do, yes.  Do you?  I'm -- I'm just asking.

MS. ROSENTHAL:  I have consulted with many experts in this field and what they tell me is that it doesn't break that often as you allude to --

MR. LAWLER:  Well, I didn't -- just to -- for clarity, I didn't allude to, my colleagues walked -- walked through it and I'm just following up.  So if --

MS. ROSENTHAL:  If the dealer -- the dealer would replace it with a new microstamped pin.

MR. LAWLER:  With a new firing pin.  Would it be the same microstamped engraving or would it be a new microstamped engraving?

MS. ROSENTHAL:  It would be a new microstamped --

MR. LAWLER:  Okay.  So once it's a new microstamped engraving -- so you can only have -- there's only going to be one firing pin with a microstamped engraving.  In other words,

51

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

you can't order ten of them with the same -- same engraving, correct?

MS. ROSENTHAL:  Yeah, because they have to be, you know --

MR. LAWLER:  It's got to be unique.

MS. ROSENTHAL:  -- connected.

MR. LAWLER:  You want it to be unique, like a fingerprint.

MS. ROSENTHAL:  Yes.

MR. LAWLER:  Right?

MS. ROSENTHAL:  And you want it to be connected with the -- the gun --

MR. LAWLER:  You don't want somebody to be able to take a firing pin and --

ACTING SPEAKER JONES:  Mr. Lavine, why do you rise?

MR. LAVINE:  Would the gentleman posing the questions please allow the sponsor to finish her statement before interrupting?

ACTING SPEAKER JONES:  Okay.  Let's one talk, the other talk.  I'm going to try to do my -- my best Mr. Aubry up here.  So --

MR. LAWLER:  Oh.

ACTING SPEAKER JONES:  -- we'll ask questions and allow the sponsor to answer.

MR. LAWLER:  Thank you.  Before I was rudely

52

NYS ASSEMBLY                                              JUNE 1, 2022

interrupted, let me rephrase my question.

MS. ROSENTHAL: I don't think you were rudely interrupted.

MR. LAWLER: I was. I'll rephrase my question. If the microstamp is replaced with a new microstamp on the firing pin --

MS. ROSENTHAL: Yes.

MR. LAWLER: -- does that have to be reregistered somewhere?

MS. ROSENTHAL: I think there -- there would be a new record of purchase. So yes, it would have to -- you know, on -- on this document where -- on this document where all the vital information is recorded, that would have to be added to it. So, yes.

MR. LAWLER: Okay. So it would be registered in a system that would be set up by --

MS. ROSENTHAL: This is -- this is -- sorry. The system is set up, we just have to add this additional information to it.

MR. LAWLER: Okay. So in the system that has already been set up under the SAFE Act? Is that what we're -- what system are we referring to?

MS. ROSENTHAL: There is a system, which I can -- if you hold on I can get it and describe, but it's... okay. Okay, so, if you know anyone who wants to purchase a handgun must obtain a license, State law requires a copy of all the licenses to be filed with the county clerk, a duplicate copy of the license to be filed with the licensing officer of the State Police, and the State is supposed to

53

NYS ASSEMBLY                                              JUNE 1, 2022

maintain a database of all permit records. And so dealers also have to keep records of licenses. So within that.

MR. LAWLER: Okay. So every time the firing pin is replaced it has to be registered. So, in other words, would the gun owner be able to replace the firing pin themselves or would they have to go to a dealer to replace it so that it can be registered?

MS. ROSENTHAL: A person would be able to replace it but they have to purchase it and then they would have to register it.

MR. LAWLER: Okay. So they could purchase -- for instance, let's say they purchased five at a time. When they purchase it all five would be registered with that gun? Is that how that would work if they purchased multiple at a time because they needed to be able to replace it? It would be registered at the time of purchase?

MS. ROSENTHAL: You know, the -- the bill doesn't goes into details on that.

MR. LAWLER: Okay. What happens if DCJS declines to certify? What -- what would happen with this bill?

MS. ROSENTHAL: Well, it would probably be rendered unworkable and we'd have to go back and come up with something else.

MR. LAWLER: And this bill is modeled on California's law or --

MS. ROSENTHAL: No, it's -- it's -- it takes into account what happened in California and avoids some of the pitfalls

54

NYS ASSEMBLY                                              JUNE 1, 2022

that occurred in California because of the lack of cooperation from gun manufacturers. And as someone earlier pointed out, the California law was 2007, so we've gained a lot of knowledge about technology and -- since then.

MR. LAWLER: So in 15 years would you say California's law is working?

MS. ROSENTHAL: I'm not a California resident so I can't properly judge it. However, I think New York's bill/law will work because we've designed it to work.

MR. LAWLER: Okay. So the idea behind microstamping is to say if somebody purchases a gun and they commit a crime, we should be able to trace the shell casing back to the gun and potentially the owner; correct?

MS. ROSENTHAL: Mm-hmm.

MR. LAWLER: Okay. Now, this would apply to all those who legally purchase a gun and commit a crime.

MS. ROSENTHAL: Semi -- semiautomatics.

MR. LAWLER: Right. What happens with 16- and 17-year-olds who use a gun in the commission of a crime?

MS. ROSENTHAL: This bill doesn't address that particular situation.

MR. LAWLER: Well, this bill applies to anybody, correct, who would use a microstamped gun in the commission of a crime, right, or does something to change the microstamping on a gun, correct?

55

NYS ASSEMBLY                                              JUNE 1, 2022

MS. ROSENTHAL: I mean, this bill applies to the sale and defacement. So it doesn't --

MR. LAWLER: I'm sorry, defacement?

MS. ROSENTHAL: Defacement. If somebody --

MR. LAWLER: So if they -- if they alter the microstamping.

MS. ROSENTHAL: Yeah.

MR. LAWLER: Okay. So if the 16- or 17-year-old uses a defaced microstamped gun what would happen to them?

MS. ROSENTHAL: It depends. If they defaced it -- hold on a sec.

MR. LAWLER: Will they be charged criminally?

MS. ROSENTHAL: I have to get back to you on that. I'll get back to you on that.

MR. LAWLER: So -- I mean, I think it's an important question to have an answer on because as we've seen across the State you have a lot of 16- and 17-year-olds that are committing crimes with guns. And if we're trying to close some of the loopholes, if we're trying to address gun violence, shouldn't those who use a gun in the commission of a crime be held accountable in criminal court? So if they alter a microstamped gun and use that in the commission of a crime shouldn't they be charged criminally?

MS. ROSENTHAL: I'm sorry, can you repeat the last question?

MR. LAWLER: Yes, no problem. So if a -- if the

56

**NYS ASSEMBLY**                    **JUNE 1, 2022**

objective here is to ensure that we give law enforcement a tool --

MS. ROSENTHAL: Yes.

MR. LAWLER: -- to go after criminals and that anybody who would alter the microstamping of a gun is held accountable for that, what happens when a 16- or 17-year-old uses a gun -- and this is not like some hypothetical, this is actually happening -- what happens to that 16- or 17-year-old? Should they be held in -- -- in -- charged in criminal court based on this law?

(Pause)

MS. ROSENTHAL: The laws governing 16- and 17-year-olds would -- would apply here and they would be misdemeanor offenses. For the first violation, it would be a Class B, second would be a Class A if -- if they basically deface.

MR. LAWLER: So when you say the laws governing 16- and 17-year-olds would apply, that means they would be charged in family court?

MS. ROSENTHAL: Yes.

MR. LAWLER: Okay, so do you not see a problem with somebody who's 16 and 17 using a defaced gun in the commission of a crime?

MS. ROSENTHAL: What we're talking about here is defacement, not -- not used by a person of -- of a certain age.

MR. LAWLER: Well, in order to determine the defacement obviously it was used somewhere, correct?

MS. ROSENTHAL: Not necessarily.

57

**NYS ASSEMBLY**                    **JUNE 1, 2022**

MR. LAWLER: Okay. So if they just carry a defaced gun how are you going to determine that it was defaced if they're just carrying it?

MS. ROSENTHAL: That would be up to law enforcement.

MR. LAWLER: Okay.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY: On the bill, sir.

MR. LAWLER: It's clear based on this conversation here today that there are a lot of questions unanswered and the technology is not there. The fact that we have to stipulate in the bill that DCJS needs to certify or not certify, decline to certify whether or not this technology is there and viable is disturbing. So many of the questions couldn't even be answered. And when you look at the fact that we're talking about microstamping a specific component that can be easily replaced, obviously those people who would seek to do harm and commit violent acts will do just that. They will deface the gun. Or as my colleague astutely pointed out they will use a revolver in which the casing does not leave the gun. So I think this bill has a lot of work still left to do. I think it continues to be deeply disturbing that when this Body tries to address gun violence they refuse to address 16- and 17-year-olds who use guns in the commission of a crime. If -- if we're trying to end gun violence, if we're trying to end the scourge of people using guns to cause harm then there must be zero tolerance. A16- or 17-year-old should be charged in criminal court if they were

58

**NYS ASSEMBLY**                    **JUNE 1, 2022**

to violate this law or any other provisions with respect to guns. It is illegal for them to posses it and yet we want to charge them in family court. This is happening all across the country where gangs are using 16- and 17-years-olds to commit crimes. And so if we're going to crack down on illegal guns, on ghost guns, if we're going to try to microstamp guns then there has to be zero tolerance. And the fact that my colleague said that --

(Buzzer sounds)

-- the current laws would govern 16- and 17-year-olds is everything you need to know.

ACTING SPEAKER AUBRY: Mr. Lawler, thank you.

Mr. Manktelow.

MR. MANKTELOW: Thank you, Mr. Speaker. Would the sponsor yield for a couple of questions, please?

ACTING SPEAKER AUBRY: Ms. Rosenthal, will you yield?

MS. ROSENTHAL: Yes.

ACTING SPEAKER AUBRY: Ms. Rosenthal yields, sir.

MR. MANKTELOW: Thank you so much, ma'am. Earlier -- earlier on the debate we -- this is a microstamping bill, of course, you talked about gun safety. So -- so what does this bill do for gun safety?

MS. ROSENTHAL: What this bill does is give law

59

**NYS ASSEMBLY**                    **JUNE 1, 2022**

enforcement a tool to -- to track down crimes and the people who commit them.

MR. MANKTELOW: But isn't the goal is to create no crimes, to stop the crimes from happening through different ways of doing gun safety? Isn't that the ultimate goal is to stop the crimes, stop committing the crimes, stop using a gun. Isn't that the ultimate goal?

MS. ROSENTHAL: Well, I mean, obviously we want that to be a goal of all of our -- our gun laws. However, it makes people have to be more accountable to the law because they are required to use microstamped-enabled semiautomatic to buy it.

MR. MANKTELOW: Who does it make more accountable?

MS. ROSENTHAL: I'm sorry?

MR. MANKTELOW: Who does it make more accountable?

MS. ROSENTHAL: Who doesn't...

MR. MANKTELOW: Who -- you said it makes individuals more accountable.

MS. ROSENTHAL: Yes.

MR. MANKTELOW: What individuals are you talking about? Who -- who does it make more accountable?

MS. ROSENTHAL: So if a person buys a microstamped they know that if they use it in committing a crime, for example, that it can be more easily traced.

60

**NYS ASSEMBLY**                    **JUNE 1, 2022**

MR. MANKTELOW:  So you -- you -- so just to -- just to help me understand this.  So if I'm a bad guy or a robber or something, I'm going to know to check that pistol out and make -- to see if it's microstamped before I commit the crime so -- so I know I won't do it then because I know it's microstamped?

MS. ROSENTHAL:  You know, we -- we -- we enact laws and -- and we expect people to be law-abiding and follow the law.  In this case if a microstamped gun is used in the commission of a crime, law enforcement has another tool to help track down who -- who committed that crime.

MR. MANKTELOW:  So -- so if my gun is -- if my pistol is taken from my house and it's microstamped, somebody uses it in a crime will I be held liable?

MS. ROSENTHAL:  Is it what?

MR. MANKTELOW:  Will I be held liable because it was my pistol?

MS. ROSENTHAL:  Well, I -- I would hope if that happened to you that you would report it immediately that your gun was stolen.

MR. MANKTELOW:  Well, of course.  Absolutely the first thing I -- the first thing I would do, ma'am.

MS. ROSENTHAL:  Yes.

MR. MANKTELOW:  But if -- if the bad person gets my pistol and uses it to kill someone because it was my pistol --

MS. ROSENTHAL:  Right.

61

**NYS ASSEMBLY**                    **JUNE 1, 2022**

MR. MANKTELOW:  -- he took it, he or she took it, is there a chance that I would be held liable?

MS. ROSENTHAL:  If someone stole your car and you hit somebody, would you be charged with killing that person?  It's the same system.

MR. MANKTELOW:  Okay.  So I -- so I would not be held liable.  That's what you're saying, right?

MS. ROSENTHAL:  If you did not do it and you reported that your gun is stolen then, you know, you will not be held liable.

MR. MANKTELOW:  So as long as I report it I should be in the clear.

MS. ROSENTHAL:  Well, you know how it is.  If your -- if your car is stolen and -- as I said earlier, your car is stolen, the person who stole it hits someone and kills them, they're not going go to you, they're going to track down -- in their development of the case they're going to track down who -- who actually did it.  And if you have a perfectly good explanation, then why would you be held accountable?

MR. MANKTELOW:  So -- so I still don't understand.  So if you tracked down my pistol that belongs to me in a crime, how does that help solve that crime?

MS. ROSENTHAL:  If you -- you know, it gives them a lead.

MR. MANKTELOW:  A lead to what?

62

**NYS ASSEMBLY**                    **JUNE 1, 2022**

MS. ROSENTHAL:  The more information that law enforcement has the better that they can fit the pieces together.

MR. MANKTELOW:  Well, if they have the cartridge that has already been microstamped, they have all the information they're going to gain from that pistol.  I just -- I just really don't understand what more they're going to gain.

MS. ROSENTHAL:  You know, we -- well, I'm not law enforcement.  I don't develop cases, but --

MR. MANKTELOW:  Sure.

MS. ROSENTHAL:  -- very experienced detectives, et cetera, they know how to handle these kind of issues.

MR. MANKTELOW:  Okay.  Just another question.  You're talking about helping to solve crimes.  What kind of crimes are you talking about?

MS. ROSENTHAL:  Any crimes that are committed with these pistols.

MR. MANKTELOW:  So a robbery, a murder, anything.

MS. ROSENTHAL:  Whatever crimes are committed with the pistols.

MR. MANKTELOW:  Okay.  Are -- are we doing anything to address the individual that's actually pulling the trigger?

MS. ROSENTHAL:  The what?

MR. MANKTELOW:  Are we doing anything that actually addresses the individual that makes the decision to pull that

63

**NYS ASSEMBLY**                    **JUNE 1, 2022**

trigger?

MS. ROSENTHAL:  Well, that's beyond the scope of this bill.  But there -- we have other laws.  There are other bills coming up that perhaps deal with that, but this bill does not.

MR. MANKTELOW:  Okay.  So the way I look at it, gun safety would be used prior to someone using a gun, teaching them the right and wrong ways.  I guess that's where my confusion was.

I was doing a little research while we were debating here with some of the other members, and do you know how many of the -- what the makeup of male versus female shooters?

MS. ROSENTHAL:  I do not have that number here.

MR. MANKTELOW:  It's about 90 to 95 percent male shooters, maybe even a little more in some situations.  I wonder why that is.  I wonder why it's male -- that many male versus female.  Why is it not 50-50, 65 -- 65-35?

MS. ROSENTHAL:  I'm not sure how -- what the relevance of that question is to this bill's content.

MR. MANKTELOW:  Okay.  Well, the bill is ultimately designed for gun safety to stop crimes, correct?

MS. ROSENTHAL:  No matter your -- your gender, how you identify, has nothing to do with that.

MR. MANKTELOW:  That has nothing to do with it?

MS. ROSENTHAL:  No, it has to do with the person who defaces or -- or buys it, sells it, and nothing to do with their

64

NYS ASSEMBLY                                JUNE 1, 2022

gender, if they're gay, if they're transgender, if they're straight, if they're non-binary. None of that has any importance here when it comes to this bill.

MR. MANKTELOW: Okay. So all this bill is going to do is identify the cartridge that was -- that was used coming out of the gun, the automatic pistol because of the microstamping, correct?

MS. ROSENTHAL: Yes.

MR. MANKTELOW: And -- and if we do that, that will help make our streets safer, create less -- less crimes?

MS. ROSENTHAL: You know -- and I'm going to make a pun here -- there's no magic bullet that will solve the problem of gun violence out there. But we take steps. And as I'm sure you've heard, the pleas of the mothers and fathers whose children were massacred in Buffalo or in Texas, they say, *Do something*. We are doing something, and there are more bills in this package that will do something because it is imperative that if the Federal government is not going to take steps, we here in the State will do something to protect our society from gun violence.

MR. MANKTELOW: Okay. I appreciate your time, madam. And yes, you're exactly right. There is no silver bullet that will fix anything of this.

MS. ROSENTHAL: Well, mine was "magic" but you can have a silver one.

MR. MANKTELOW: Well, I'm -- well, I thank you --

65

NYS ASSEMBLY                                JUNE 1, 2022

MS. ROSENTHAL: Thank you.

MR. MANKTELOW: -- for your time.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY: On the bill, sir.

MR. MANKTELOW: Thank you, sir. I just asked a few questions and the sponsor did say something about the mass shootings. Of course we're -- we're devastated for those families that lost those loves ones, and as the sponsor said, it's -- the Federal government is not going to do anything. They're not going to address this. Or at least not the way we think we should here in New York State. But again, we are again looking at the gun. The gun here is not the issue. And I will give this example -- I'll give two examples, actually: If a bad person uses a gun and kills someone, they -- they blame that person -- or they blame that gun, I'm sorry. They blame the gun. When our law enforcement, God forbid they have to use it to save somebody's life, who's on trial? It's our law enforcement officials right off the bat. It's not that gun, it's our law enforcement officials. We have got to come together to come up with a solution.

So I was doing a little research, and as the sponsor had brought up again about the mass shootings not only recently here in New York and in Texas, which are horrific, but around -- around the United States, around -- around everywhere. So when I was young -- my prior member here had talked about 16- and 17-year-olds. What's the common thread? If you do the math, if you look at everything going on, the common thread are -- is most of these

66

NYS ASSEMBLY                                JUNE 1, 2022

shooters are male shooters. No doubt about it. So what's driving those male shooters today? I was a male. I was a male back at 16 and 17. I had lots of guns. I never thought about shooting anybody, I never thought about committing a crime. So I was doing a little research on this, and we have to stop it before it gets to the crime. So what's driving these young men, these young male figures to do these crimes? And looking at what one of the professors looked at, they're -- they're looking at video games. The drastic aggressive solutions. And I'll quote -- I'll -- I would like to read this, what Dr. Anderson said. *Violent video games provide a form for learning and practicing aggressive solutions to conflict -- to conflict situations*, said Dr. Anderson. *In the short-run, playing a video --a violent video game appears to affect aggressive (inaudible) primary and aggressive thoughts*. And if you look -- if you look at the number of male or young men that play violent video games compared to young boys and men that create violent actions by shooting, there's definitely a tie. There's a tie together. So instead of again addressing the gun, let's help these individuals get help so they don't get to the point where they're using a gun. We, as the State, should be looking at some of this instead of again addressing a gun that we all know if we're going to microstamp it's not going to stop a bad person from using it. They're going to find ways around it. We've heard this morning hear on the floor. We know they're going to get it from another state, we know they're going to file something down. Let's really address the issue and get these young individuals help. That is the most

67

NYS ASSEMBLY                                JUNE 1, 2022

proactive thing we can do, because as the sponsor says, it will help solve the crime. Let's do the right thing and not allow it to be a crime. Let's stop it before it becomes a crime. Let's get the help for these individuals. So Mr. Sponsor -- I'm sorry, Mr. Speaker, I apologize -- Mr. Speaker, this doesn't change anything. This isn't going to slow anything down. We have to get it done before they get the urge to want to shoot. So let's work on that, and I'd be more than willing to help anyone do this.

So thank you for the time, Madam Sponsor, thank you for your time and taking the time to answer my questions. I very much appreciate it. Thank you, sir.

ACTING SPEAKER AUBRY: Thank you, sir.

Mr. DiPietro.

MR. DIPIETRO: Thank you, Mr. Speaker.

On the bill, please.

ACTING SPEAKER AUBRY: On the bill, sir.

MR. DIPIETRO: Thank you. First, I'd like to congratulate people on my side of the aisle. They've shown that they're knowledgeable, expertise and they know this bill inside and out and they've done a great job. I would like to start out with we all debate a lot of things up here some of us don't agree. You know, there's a lot of garbage up here, but for me personally this is probably the biggest dump -- dumpster fire of any bill that I've debated. And I enjoy debating this because let's start out with technology. Let's be very clear: There is no technology out there today to microstamp.

68

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Zero.  So you can talk about pie in the sky, we're going to do something, we're going to stop the criminals with microstamping. There's no technology.  Talk to Remington.  I have.  Talk to the leading scientists on microstamping out of California.  I have.  The technology is not there.  It's like saying, *We almost found Bigfoot.  We almost got him.*  It's not there.

Let me tell you a little something about technology. This -- the people here in 1998 I was in dry cleaning that changed the technology for a new dry cleaning machine that had to equal so many billions of parts for emissions.  There was no technology in the world at that time to do this.  Only in New York State.  But they enacted it anyway.  And you know what they said?  They said because the technology will be there in a few years.  So when 20 percent of the dry cleaners went out of business because they couldn't afford these new machines, which weren't -- weren't technically specific, they didn't have it, to this day 24, 25 years later the technology still is not there around the world.  The manufacturers still haven't found out a way to comply with only New York State's technology.  That's the junk we get here.  And we got it with electric.  There's no technology out there to make it worthwhile in 2024 and in 2030 and we're doing it today.

Let's talk about technology.  Let's talk about the firing pin.  Obviously a lot of people in this Chamber have no clue what a firing pin does or what it is.  The firing pin, if I'm a criminal - and some might think I am - but I'm just going to change the firing pin from another state.  How stupid is this?  We're going to pass up in

69

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

New York State whichever criminal is just going to go to another state.  Can you tell me?  I've talked to the sheriff in Buffalo and I talked to one of the troopers -- or sheriffs in Chicago last year.  Every weekend, how many murders do they have in New York City, Chicago?  Do you know how many legal guns are used in those murders?  Less than one percent.  Criminals do not use legal guns that can be traced.  And they're not going to use something as stupid as a microstamp that doesn't even work.  They're going to change the pin out, they're going to file it down.  And if you talk to the people, the scientists like I have, you don't have to file the whole thing down, you file one little part of it and they'll never trace it.  It doesn't work.  Let's talk about what they said, *Well, why don't you do a database?*  I heard this database.  Do you really trust a database?  What does that database do?  Well, if you weren't here ten years ago and debating it like I did and then every year after that, the database was when Governor Cuomo put $80 million in the SAFE Act over five years, $16 million a year for a database.  And an additional $3.2 million every year for five years for 16 -- we found out 16 State Troopers. And you know what was ironic about that as I debated that every year is because the 16 troopers when I asked the Majority every year who they were, what they did, what their title was, where were they stationed, they would not give me an answer because Governor Cuomo told them they couldn't give any answers.  What they were were brown shirt secret police that worked only for the Governor. That database that he put together was only to find law-abiding gun

70

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

owners, $80 million.  Where is that database, folks?  Have you heard it?  That was ten years ago.  Where's the database?  Who are the 16 State Troopers that were working secretly for Governor Cuomo on the SAFE Act?  Where are they?  Give me an answer.  No one has in ten years.  So you expect us to sit here with this garbage legislation and believe it and trust it like some of the other junk that comes up here? Not a chance.  Look, faced with the facts about criminals the other side of the aisle refuses and ignores the facts.  For some reason, criminals are more important than law-abiding citizens and law-abiding citizens who are legal gun owners are now criminals. How upside down and crazy is that?  But that's what we have here. Oh, you want an illegal gun, 16, 17-year-olds?  Oh, forget it, we're not even going to touch that.  Really?  Why do you think Remington left? It was an assault on gun manufacturers.  They said, *See you later, sayonara.  We're gone.*  Three thousand jobs, poof.  But that's okay.

You know, I debated another one of these stupid gun bills in the -- in the -- in the first part of this Session.  I asked a very simple question of the sponsor.  *What does AR mean to you?*  Because that's all we hear, *AR-15, AR, AR.*  And the answer from the Majority was assault rifle.  (Indiscernible sound).  No.  AR stands for ArmaLite Rifle Company.  It's the manufacturer which was broken down to AR. It has nothing to do with assault rifle.  That's not what it means.  But that's the ignorance of people who debate gun bills who don't know anything about what they're talking about.  I can't wait to pass this bill and watch the criminals go, *Boy, I was going to go shoot up somebody*

71

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

*in Chicago or New York City, but you know what?  I got to wait a week because I just don't have the right microstamped firing pin.  Boy, I'm going to have to wait on that.*  Give me a break.  We wasted two hours of our time in this Chamber on this junk.  This is a dumpster fire, it always has been.  I enjoy debating it, though.  And I'd like to take that to heart very seriously about what I said about Governor Cuomo and the $80 million for a database that no one knows what it is, where it is, what it's used for.  And the $16 million or the $2. -- excuse me, $3.2 million for five years, about 16 million that went to a secret police force which you never can find out any data on and have never been able to.  That's very scary stuff, folks, and it happened right here in New York.

So with that, boy, I -- I urge a huge no vote on this on just one basic fact:  There's no technology.  It's not there.  It's not going to be there next year and it's not going to be there the year after. And you can talk to the number-one scientist who is developing this in California and he will tell you that.  And if you don't believe it then go ahead.  Because you know what's going to happen?  Is they're just going to go to Pennsylvania or New Jersey and they're going to buy their firearms because 99 percent of all the murderers are not with legal firearms.  And criminals are very smart.  And they look at what we do up here on this stuff and they laugh.

With that, I appreciate you allowing me to vent my comments, Mr. Speaker.  I urge a no vote on this.  Thank you very much.

72

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  Thank you, sir.
Mr. Reilly.

MR. REILLY:  Thank you, Mr. Speaker.  Will the
sponsor yield for a few questions, please?

ACTING SPEAKER AUBRY:  Ms. Rosenthal, will
you yield?

MS. ROSENTHAL:  Certainly.

ACTING SPEAKER AUBRY:  Ms. Rosenthal yields,
sir.

MR. REILLY:  Thank you, Ms. Rosenthal.  So,
California has had microstamping, as I heard earlier, and they've had it
since 2007, they just redid a bill in 2020.  Do we know how many
cases that involved illegal shootings, aggravated assault by a firearm,
that were solved with the use of microstamping since 2007?

MS. ROSENTHAL:  As we've talked about before,
the bill did not go into effect because the manufacturers refused to --
to issue new models.  So we can't use any data from California on the
issues you're questioning me about.

MR. REILLY:  Is there -- is there any data that's
available?

MS. ROSENTHAL:  Not from California.

MR. REILLY:  Is there any data from anywhere else
besides studies?  I'm talking real-life practice.

MS. ROSENTHAL:  There -- there are plenty of --
there's plenty of evidence on the efficacy of microstamping and the

73

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

ability of law enforcement to use the casings to track the gun.

MR. REILLY:  Can you give me some examples of
that?

MS. ROSENTHAL:  I don't have examples right
here, but there's plenty of evidence I can get for you.

MR. REILLY:  Well, could you just rattle off a little
bit of types of evidence that you may have?  Is there studies, how
many -- how many studies are involved?  Maybe how many rounds
were fired in each study, did they find any deficiencies.

(Pause)

Do we know if there -- as you're looking for that I just
want to add this question to that.  Do we know if there's a number of
rounds that would have to be fired to determine that they are
accurately obtaining the microstamped number?

MS. ROSENTHAL:  Well, there have been many
peer-reviewed studies that have found that microstamped-equipped
firearms accurately marked thousands of rounds fired across a variety
of different firearm models, and that the microstamped codes were
legible on over 90 percent of cartridge cases tested.

MR. REILLY:  Can you tell me who do that study?
Was that the manufacturer of the microstamping?

MS. ROSENTHAL:  No, these are peer review
studies.  I can get you who the author was at a later date.

MR. REILLY:  So peer-reviewed microstamping
analysis.  Do we know how many microstamping experts there may be

74

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

in the world?

MS. ROSENTHAL:  I fail to see the relevance of
that.  We have tasked DCJS with determining the viability of this
technology.

MR. REILLY:  Okay.  So the reason why I asked
that, I'm going to tie this into drug recognition experts that do DWI
and driving under the influence.  I talked about that tremendously
during a debate several years ago, and the reason why I bring that up
is because drug recognition experts have a special talent and training
to testify in court about how they obtain that information.  It costs
roughly $60,000 to train each drug recognition expert.  To put that
into perspective, the NYPD that has 35,000 police officers have 16
DREs.  The reason why I tie that in is if we are going to use experts to
testify in court based on microstamping, how are they going to be
certified as experts in the court of law if we do not have enough
experts across the nation or the world to -- to -- to give that training
and to certify those officers?  That's where we come into a conflict of
if we even have microstamping, how can we prove it?  Because let's
face it, this isn't going to be like CSI where we're going to solve a
crime in 40 minutes.  We need to have the funding.  So is there
funding in this bill for that training?

MS. ROSENTHAL:  This bill does not have funding
attached to it.

MR. REILLY:  I'm sorry, can you repeat that?

MS. ROSENTHAL:  I said this bill does not have

75

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

funding attached to it.

MR. REILLY:  Okay.  So getting back to that
question about how many experts we have in microstamping across
the country, do we know how many and how many actually did the
peer review of that study?

MS. ROSENTHAL:  You know, there -- there is a
company called TACLABS, and in 2018 it began developing a
machine to produce large numbers of firing pins equipped with
microstamping technology and the tool was introduced to the market
for firearm manufacturers.  Firearm manufacturers now have
machines available to do exactly what this bill would require them to
do.

MR. REILLY:  So the company that did the study,
was that someone who invented or maybe sells microstamping
equipment?

MS. ROSENTHAL:  What is your question?

MR. REILLY:  So, the company that did that study in
2018 --

MS. ROSENTHAL:  Well, it's TACLABS which
develops a machine.

MR. REILLY:  So they -- so TACLABS, who -- who
we're basing our study information on and data of 90 percent accuracy
are the ones that make the machines and sell them to the gun
manufacturers?

MS. ROSENTHAL:  You know I think you're trying

76

**NYS ASSEMBLY**                               **JUNE 1, 2022**

to impune the people who are trying to help this country get a handle

on gun violence by questioning how many people there are. There are

people who are expert on this. There are people who have verified.

There are peer studies that all show that microstamping technology

works. You can fire thousands upon thousands of rounds, and you

could still trace -- even with partial of the alphanumeric code on the

casing you can still trace it back. So I think a lot of people take

comfort in that knowledge because we're looking for solutions here.

We're not looking to tear apart tools that law enforcement have asked

for.

    MR. REILLY: So I -- I agree with you 100 percent

that we're not looking to tie and take away tools that law enforcement

have, but unfortunately -- you know, I'm gonna -- Mr. Speaker, on the

bill, please.

    ACTING SPEAKER AUBRY: On the bill, sir.

    MR. REILLY: So it is ironic that we just talked

about taking away tools from law enforcement to combat gun

violence. I stand up here every day talking about the things that we

write in this legislation that does not transition to the street the way it's

supposed to. Sixteen and 17-year-olds, we heard about it earlier, I've

talked about ad nauseam. We talked about it just a few weeks ago

about selling guns. The presumption, three firearms. I gave a nice

little scenario to everybody in this Chamber. Sixteen and 17-year-olds

with three firearms. If he has them in his backpack it should be

automatically a presumption that they're for sale now and he should go

77

**NYS ASSEMBLY**                               **JUNE 1, 2022**

to criminal court. But no, he goes to family court. Because a tool was

taken away from law enforcement, which includes prosecutors and

now it goes to family court. We see 16- and 17-year-olds lighting up

our streets. It's in the news every other day across our State, and we

had the opportunity to fix that. I begged you to fix that. The stuff

we're talking about today, microstamping, the technology's not there.

I said it before. It's not CSI. This isn't a CBS show. We're not going

to solve it in 40 minutes. I asked specifically, do we have case studies

of actual crimes that were committed and solved with microstamping.

We do not. We do not. So what that tells me is we cannot have the

experts to testify in court to actually prove that case. The study you

just heard about in 2018 is done by the manufacturer of the

microstamping machine. A real peer review? Maybe the State should

have bought a microstamping machine and actually did the test

themselves and not rely on someone that might actually get a bid to

implement that. I have been accused of trying to push away the issue

to something else just in this debate. I'm not doing that. I'm trying to

raise the issues that we can do to fix things that we send from this

Legislature. That's all I ever do here is try and improve it, try and

make it work better. Because I can tell you, the years that I spent on

the streets in New York patrolling, I wanted the Legislature to do the

right thing and help me protect our streets. We've gone way past that

now. We don't do that. We actually make it more difficult. But we

decide that we're going to pass legislation to feel good. Let's stop

worrying about feeling good and actually accomplish -- accomplish

78

**NYS ASSEMBLY**                               **JUNE 1, 2022**

something. How are we going to get our police officers trained as

experts for this? How are we going to get the labs, the technicians, to

be certified? It's not even addressed. But you know what? We can

hit our green buttons, we can hit our red buttons, we can all walk out

the door and say why we did that, why we don't want to support it,

why we want to support it. But we actually could maybe get to a

place where what we put on paper really turns out to do the things it's

supposed to on the street, in the courtroom. But until that day I'm

going to stand up here every time we discuss these things, because

there is a time that I hope we will come to where we'll be able to have

these discussions and fix the necessary changes. But until that day,

this is merely fluff. So hopefully you'll all join me one day and say,

*Listen, I think we can fix this.* I think we can actually add some

substance instead of worrying about a press release.

    Thank you, Mr. Speaker.

    ACTING SPEAKER AUBRY: Read the last section.

    THE CLERK: This act shall take effect January 1,

2023.

    ACTING SPEAKER AUBRY: The Clerk will record

the vote on Assembly print 7926-A. This is a Party vote. Any

member who wishes to be recorded as an exception to the Conference

position is reminded to contact the Majority or Minority Leader at the

numbers previously provided.

    Mr. Goodell.

    MR. GOODELL: Thank you, sir. The Republican

79

**NYS ASSEMBLY**                               **JUNE 1, 2022**

Conference is generally opposed to this legislation. Those who

support it can certainly vote yes here on the floor or by contacting the

Minority Leader.

    Thank you, sir.

    ACTING SPEAKER AUBRY: Thank you.

    Mrs. Peoples-Stokes.

    MRS. PEOPLES-STOKES: Thank you, Mr.

Speaker. The Majority Conference will generally be in favor of this

piece of legislation. However, there may be some of our colleagues

who would desire to be an exception. They should feel free to contact

the Majority Leader's Office and their vote will be probably recorded.

    Thank you, sir.

    ACTING SPEAKER AUBRY: Thank you.

    (The Clerk recorded the vote.)

    To explain his vote, Mr. Englebright.

    MR. ENGLEBRIGHT: Thank you, Mr. Speaker. So,

I just want to compliment the sponsor. I think this is an important bill

and we need to, I think, place it in perspective as we prepare to vote.

This is really about trace evidence. A microstamp is simply a mark,

and when metal hits metal, which is what happens when a gun is fired,

there is a mark made. The problem is that we have anonymous marks

being made now because of all of the firing pins make the same mark.

You can go into a forensics storage facility and most police stations

and there are hundreds of shell cases that have been picked up from

crime scenes, and if you look at the mark they're all the same. What

80

NYS ASSEMBLY                                    JUNE 1, 2022

this bill is attempting to do is provide another tool.  We have trace evidence tools that are well-known; fingerprints, shoe prints, blood type, blood spatter.  These are all tools.  Bite mark patterns, fingerprints.  And yes, we should have unique marks being made.  It doesn't cost -- the cost is so trivial that it's ridiculous.  And to say that this is not a technology that is available is ridiculous.  When metal hits metal it makes a mark, and if you file it you make a new unique mark.

I vote yes.

ACTING SPEAKER AUBRY:  Mr. Englebright in the affirmative.

Mr. Lavine.

MR. LAVINE:  Thank you.  I want to dispel some of the odd myths that have been advanced.  I'm going to address just four of them.  It's not Mexican guns coming over the Mexican border that are killing our children, it's American guns smuggled over the Mexican border that are killing Mexicans.  Secondly, the firing pin is not going to last more than 1,000 rounds or so.  I never thought I'd get to rely on this reference point, but consider what Clemenza told Michael in *The Godfather.  Leave the gun, take the cannoli.*  Criminals don't want to get caught with the guns.  Damn, that was good.  Certainly.  Why didn't this happen 20 years ago?  You're telling me Americans we're not as crazy 20 years ago as we are today?  I doubt that very much.  Twenty years ago was the before the proliferation and the marketing of tactical weapons in the United States, romanticizing to people who are young and people who do

81

NYS ASSEMBLY                                    JUNE 1, 2022

have problems how important it is for them to stick up for their rights and get even by having the ability to fire many rounds at the same time.  Cost?  I will guarantee you any cost associated with microstamping is going to cost a whole a lot less than it costs to bury a child.

I'm pleased to report that just moments ago, 1,700 students at Plainview-Old Bethpage High School on Long Island marched out of their school and stood for 21 minutes.  Twenty-one minutes, one minute for each of our Americans dead in Uvalde.  What we are doing with these bills is we are trying our best to change the gun fetish culture in the United States.  And if anyone believes we don't have a gun fetish culture they could have listened to some of the arguments, the passionate, hyper-passionate arguments made.

(Buzzer sounds)

Let's do what we can to protect all of our children.  I vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Lavine in the affirmative.

Mr. Angelino to explain his vote.

MR. ANGELINO:  Mr. Speaker, to explain my vote.  We spent about two hours here debating this technology.  I've offered some tips on how do it better.  This is likely going to cost millions of dollars to manufactures, purchasers.  And all of these law-abiding citizens and gun manufacturers are going to have to adapt to this technology.  Again, millions of dollars, two hours of debate.  And as I

82

NYS ASSEMBLY                                    JUNE 1, 2022

said earlier, criminals don't want to get caught, and all of the effort we've put into this bill can be defeated by a criminal picking up his brass and leaving the scene.  Or if he's a really cunning criminal he'll pick up his brass and he'll throw down somebody else's brass.

So, don't think these things don't happen because they don't want to get caught, and for those reasons and many, many others I will be voting no.

ACTING SPEAKER AUBRY:  Mr. Angelino in the negative.

Mr. Walczyk to explain his vote.

MR. WALCZYK:  Thank you, Mr. Speaker.  My intent is to rise to explain my vote in a way that may assist members of this Body in remembering their constitutional duty as I cast this vote here today and to support and defend the Constitution of the United States that you raised your right hand and swore to do.  This bill requires pistols sold in the State of New York to be microstamping-enabled.  It establishes fines for violations and requires the Department of Criminal Justice Services to certify a technology that doesn't yet exist.  We have a perfect example of this, if you remember back, the Combined Ballistics Identification System ran for a little while.  That was supposed to be the fingerprint on the rounds that went out of every round.  The New York State Police wasted millions of man hours and millions of tax dollars to solve exactly zero crimes with that program and prevented zero crimes with that program, and here we are today on a made-up technology in order

83

NYS ASSEMBLY                                    JUNE 1, 2022

to try to institute the same exact thing.  The Second Amendment of the United States Constitution guarantees the other nine Bill of Rights.

Mr. Speaker, I vote no.

ACTING SPEAKER AUBRY:  Mr. Walczyk in the negative.

Ms. Simon to explain her vote.

MS. SIMON:  Thank you, Mr. Speaker.  I want to commend the sponsor for this bill, and I want to also thank others who have spoken in support.  The reality is that we have learned from California's experience.  That is what smart legislators do, they learn and they craft bills that will address those issues.  Last Sunday, the *New York Times* review had -- the front cover of the review section was 20 or so dates of mass shootings in this country.  And those 20 or so dates, following each one it said, *Police said that the gun or the weapon was legally purchased.*  So the reality is, these are not stolen weapons.  Every single one of these mass shootings, somebody bought that gun legally.  They used it for an illegal purpose, but they bought it legally.  So this nonsense that somehow or other it's just criminals and they don't buy guns legally and it's all law-abiding citizens that have guns and they are the only ones who have guns, that is just not true.  And I point out that one reason we have had a proliferation of mass shootings in the last 18 years, and I say 18 years because the assault weapons ban was not reauthorized in 2004.  And if you're looking for a reason, it's not mental illness, which has been with us since time and memorial, it's the assault weapons ban expiring.  That's what

84

NYS ASSEMBLY                                    JUNE 1, 2022

prompted this.  That and the additional tactical equipment and
fostered and engendered this love of greater and greater fire power.
These guns -- these -- these weapons were made to kill people, and as
many as possible.  That's what has happened.  We need to use every
piece of technology to drive the demand to drive better technology to
ensure that we're able to help law enforcement and help reduce crime
and the number of unnecessary deaths due to firearms in this country.

        I'll be voting in the affirmative.

        ACTING SPEAKER AUBRY:  Ms. Simon in the
affirmative.

        Mr. Lawler to explain his vote.

        MR. LAWLER:  Thank you, Mr. Speaker.  I started
today's Session by introducing the mother of one of the victims in the
Parkland shooting.  She is advocating for a bill to be taken up in this
Body before we leave, whose technology actually works and would
actually help prevent innocent children from being killed in schools by
making sure that the law enforcement response time is as quick as
possible.  For some bizarre reason, the staff in this place has blocked
this bill.  That bill needs to come up for a vote.  That technology
actually works.  As we've seen in this debate, this technology does not
work.  The sponsor could not verify the technology and, in fact, the
bill says we need DCJS to certify or not certify whether this is even
possible.  Numerous examples of how the microstamping could be
eliminated.  Not to mention the fact, obviously, that guns can be
transported across state lines and used in the commission of crimes,

                            85

NYS ASSEMBLY                                    JUNE 1, 2022

and not to mention the fact that 16- and 17-year-olds are using guns to
commit crimes and are being treated in family court.  My colleague
from Nassau talked about 21 minutes and students standing in protest
to remember the 21 lives lost.  Twenty-one minutes?  Let's get the bill
on the floor in 21 minutes and pass Alyssa's Law today.  We don't
need to wait any further.  We can take action to actually help prevent
senseless tragic deaths.

        ACTING SPEAKER AUBRY:  Mr. Lawler -- Mr. --
stay on the bill, please.  No advocating for other bills while you're on
this one.  Thank you.

        MR. LAWLER:  Thank you, Mr. Speaker.  I vote no
on this bill.

        ACTING SPEAKER AUBRY:  Mr. Lawler in the
negative.

        Mr. DiPietro.

        MR. DIPIETRO:  Thank you, Mr. Speaker, to explain
my vote.  Over 30 people killed this past weekend in New York City
and Chicago, do you know how many assault rifles were used in those
deaths?  Zero.  Zero.  I heard someone say that it's the assault rifle
ban, if we had that back all these deaths would go away.  You've got
to be kidding me.  People with mental illness, people with problems, if
they -- if there's an assault rifle ban, number one, they won't buy or
find an illegal one or they won't use a different type of weapon?  That
this is all going to magically disappear?  There will be no more school
shootings?  You've got to be kidding me.  The last thing, what

                            86

NYS ASSEMBLY                                    JUNE 1, 2022

happens every time -- going to the heart of the matter, every time
there's a school shooting, every time there's a mass shooting, every
time there's a murder of some sort, what do we all do?  We all pray.
Ironic that every time something happens we all ask for prayer, yet
we've taken prayer out of school.  Kids can't pray, teachers can't pray,
you can't even mention God in school.

        ACTING SPEAKER AUBRY:  Mr. DiPietro, same
admission to you as to Mr. Lawler.  The bill is in front of us.

        MR. DIPIETRO:  This is part of the bill.  So with that
I'll be voting no and urge my colleagues to also because there's no
easy answers, but this is not the answer.

        ACTING SPEAKER AUBRY:  Mr. DiPietro in the
negative.

        Ms. Rosenthal to explain her vote.

        MS. ROSENTHAL:  Thank you, Mr. Speaker, to
explain my vote.  There have been more school shootings than days in
the year 2022, and that should make every single person in this Body
furious.  And after mass shootings we ring our bells, we send
thoughts and prayers and we wonder what could we have done to
prevent the killing.  Since Sandy Hook when 20 6- and 7-year-olds
and six teachers were murdered and we said, *Never again*, but did
very little on the Federal level to crack down on guns, we have taught
our students, pre-K students as young as four to hide under their desks
and stay quiet if a bad person with a gun comes into their classroom.
To hold -- to hold their cries in in the hopes the gun -- the gunman

                            87

NYS ASSEMBLY                                    JUNE 1, 2022

won't hear them.  School shootings have become a forgone
conclusion.  We can't prevent them, only prepare for them.  And as
policymakers we cannot throw up our hands in the face of so much
senseless violence and blame unlocked doors, video games, educators,
mental illness for the devastation and violence caused by this country's
obsession with guns.  We have a responsibility to take action.  Anyone
who could walk into a school filled with innocent babies and start
shooting indiscriminantly and without provocation is a madman, but
madmen --

        ACTING SPEAKER AUBRY:  Ms. Rosenthal --

        MS. ROSENTHAL:  Yes.

        ACTING SPEAKER AUBRY:  Similarly to the
others, you have a bill in front you.  You need to speak to that bill.

        MS. ROSENTHAL:  Okay, I will do that.  Thank
you.  We need to tighten our laws, ensure that law enforcement has
every single tool available to them to prevent and solve gun crimes to
make our streets safe for our children, and microstamping, despite
what others purport to know, is among one of the most powerful tools
available to law enforcement.  It is available, it's affordable, it's
effective and it will save lives.  We deserve to live without the fear of
preventable gun violence.

        (Buzzer sounds)

        I would like to thank Moms Demand Action, New
Yorkers Against Gun Violence, Brady Campaign Against Gun
Violence, Giffords Law Center, Every Town for Gun Safety, our

                            88

**NYS ASSEMBLY**                    JUNE 1, 2022

former colleague Michelle Schimel for advocacy for this.  And in conclusion, histrionics and angry proclamations citing alternative facts will not work.  Our residents know --

ACTING SPEAKER AUBRY:  Ms. Rosenthal, how do you vote, please?

MS. ROSENTHAL:  Our residents know who is showboating and who wants to do something, and in that vein I vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Rosenthal in the affirmative.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, would you please record our colleagues Mr. Stirpe and Mrs. Gunther in the negative on this piece of legislation?

ACTING SPEAKER AUBRY:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mr. Goodell for the purposes of an introduction.

MR. GOODELL:  Thank you, Mr. Speaker.  After that nice spirited debate it is my pleasure to introduce some distinguished guests, Dana Platin, who is the president of the New York State PTA, and her son Tyler.  They're members of the New York State PTA Leadership Team, and they're in our Assemblymember Doug Smith's Assembly District.  President Platin

89

**NYS ASSEMBLY**                    JUNE 1, 2022

and members from across the State are here in Albany celebrating the 125th anniversary of the New York State PTA which, of course, has a great and proud history supporting New York children.  President Platin is also a kindergarten school-related professional in the Sachem School District, and it is my great honor to introduce the President of the New York State PTA Association here visiting us on this auspicious 125th anniversary.  Please extend the cordialities of the House.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Mr. Goodell, Mr. Smith, the Speaker and all the members, we welcome you all here to the New York State Assembly.  We extend to you the privileges of the floor, hope that you've enjoyed your time with us.  Hope you enjoyed that spirited debate that goes on in the New York State Assembly.  Know that your government will fight for its -- its various concerns and allows an open and free discussion of issues.  You should be proud of that because that's what democracy is about.  And for you, for the -- as all part of the PTAs, I want to thank you for the work that you do to ensure that your schools work and that your schools have parents involved with teachers in order to make that institution work better.  Thank you again very much.

(Applause)

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, colleagues, there will be an immediate meeting of the Ways and Means Committee off the floor.  Those who are in their offices remotely can

90

**NYS ASSEMBLY**                    JUNE 1, 2022

just stay there.  You will be switched to the room.  Those who are in the Chamber with us can go to Room 30.

ACTING SPEAKER AUBRY:  Ways and Means --

MRS. PEOPLES-STOKES:  Those who are in the room with us can go to Room 345 where the Ways and Means meeting will be held.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Room 345 for those of you who are here in the Chamber.

On the A-Calendar, page 3, the Clerk will read the title of the Concurrent Resolution.

THE CLERK:  Rules at the request of Mr. Zebrowski, Assembly Resolution No. 953.

Concurrent Resolution of the Senate and Assembly concerning the rescission of all previous requests by the New York State Legislature or either House thereof for a convention under Article V of the United States Constitution.

ACTING SPEAKER AUBRY:  The resolution is laid aside.

THE CLERK:  Assembly No. A00146-A, Rules Report No. 515, Gottfried, Simon, Morinello, Cahill, J.M. Giglio, Colton, Thiele, Englebright, Cook, Gunther, McDonough, Dinowitz, Peoples-Stokes, Steck, Goodell, L. Rosenthal, Quart, Kim, Palmesano, Abinanti, Ra, DiPietro, Hyndman, Jean-Pierre, Benedetto, Galef, Weprin, Williams, Lavine, Woerner, Dickens, Bronson, Niou, Cusick, Norris, Carroll, Solages, Seawright, Zebrowski, Taylor, Sayegh,

91

**NYS ASSEMBLY**                    JUNE 1, 2022

Salka, McDonald.  An act to amend the Public Health Law, the Tax Law and the Social Services Law, in relation to support of living organ donation.

ACTING SPEAKER AUBRY:  On a motion by Mr. Gottfried, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect April 1st.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 1594.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Palmesano to explain his vote.

MR. PALMESANO:  Thank you, Mr. Speaker.  I just want to take a minute to explain my vote and thank the sponsor for bringing up this legislation.  He's certainly been a leader on the issue of organ donation over the years and during his career and I appreciate his leadership on this issue especially.  And I just want to remind my colleagues, it's legislation like this that helps us improve our numbers regarding organ donation and increase our numbers.  We've made a lot of progress over the past number of years but we still have a long way to go.  And just to remind you how far we have to go, right now still in New York we have 8,500 New Yorkers waiting for an organ transplant.  Thirteen have been waiting for more than five years.  Last year in 2021 we lost 450 men, women and children waiting for a

92

**JA146**

**NYS ASSEMBLY**                                            **JUNE 1, 2022**

lifesaving organ transplant.  Right now in New York our organ donor registration rate is 45 percent, the national average is 62 percent.  There are 52 registries across this country.  New York is number 50 out of 52.  We're only ahead of New Jersey and Puerto Rico.  We have the third-highest need for organ donors, the third-worst registry.  So we have a long way to go.  There's much more we can do.  We should be looking at legislation like this that can increase the opportunity for people to say yes.  We should be putting it on our tax forms, on public assistance forms, college applications, asking people if they want to be an organ donor.  Because I'm convinced that if we give them the chance to say yes they will say yes.  But the most important statistic that we all need to know is that one person donates at the time of their death can save up to eight lives and impact the lives of 75 others.  So I know when we talk about this issue a lot of people don't like to talk about it because you're thinking of one's death.  But think of if your loved one, your mom or dad, brother or sister or, God forbid, your son or daughter were in need of a lifesaving organ transplant and you saw those statistics numbers I just laid out here.  So let's improve -- let's continue to improve the organ donation rate.  This legislation is certainly a great piece of legislation to help encourage living donors -- living donors to do those donations, help our more successful and have better viability.  There's -- and I know there's documentation on that.

So again, I want to thank the sponsor for his leadership on this issue and I encourage enthusiastically you to vote

93

**NYS ASSEMBLY**                                            **JUNE 1, 2022**

yes on this legislation.  Thank you, Mr. -- Madam Speaker.

ACTING SPEAKER WOERNER:  Mr. Palmesano in the affirmative.

Mr. Gottfried to explain his vote.

MR. GOTTFRIED:  Thank you, Mrs. Speaker.  This is presumably not my last bill, I certainly hope not.  I've got a few more.  But I think this is probably a good time to say a few words.  First I want to thank all the amazing staff who have worked with me all these years.  My staff, people on other staffs.  And thank you to the Speaker Heastie and the five Speakers I have served with before him.  And to all of you, my colleagues, and -- and those who have come before you.  We've done some pretty great work together.

You know, from time to time some Assemblymembers think of running for what they consider higher office, and that's understandable.  But I think we already hold a pretty high office.  The public may think mostly about City Hall or Washington, but most of the laws that affect our lives come from Albany.  So it's really important that smart, hardworking people with good hearts be committed to the Assembly.  It does take work and time to learn how to make this place -- this place work to advance your agenda.  And certainly after 52 years I'm still learning.  And our process is certainly often frustrating, but it's worth the time and effort.

And as Robert Kennedy said, *The future is not a gift, it is an achievement*.  Thank you all.  And I vote in the affirmative.

(Applause)

94

**NYS ASSEMBLY**                                            **JUNE 1, 2022**

ACTING SPEAKER WOERNER:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker -- Madam Speaker, to explain my vote.  First of all, I want to honor Dick Gottfried as well.  There's no one here now or probably even in the past that served under five Speakers.  Not one, not two, not three, not four, but five Speakers.  And I really think that what he has to offer in terms of his experience can be helpful to us all.  And so if we have not had a chance to engage with him before he leaves the next couple of days I'm just going to invite you to try and do that because right there is a lot of experience that we all absolutely need.

With that, I am pleased to vote in support of his bill.  As you all know, my daughter was a donor recipient and we were grateful when she was able to receive that donation.  But it is so much better for people to get healthier so much faster if there's more availability of donations.  And so I applaud him for his legislation and I'm personally, personally glad to vote yes.

ACTING SPEAKER WOERNER:  Mrs. Peoples-Stokes in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, Madam Speaker.  I speak on behalf of this bill.  I certainly want to support it.  Being a donor, a living donor, is a unique opportunity to save someone else's life.  My daughter donated a kidney to a person about the same age.  They were acquaintances.  She's done fine, he's done fine, but it's

95

**NYS ASSEMBLY**                                            **JUNE 1, 2022**

really a life-changing opportunity, if you will.  I tried to donate a piece of liver to a neighbor and unfortunately I was rejected.  I recovered from that rejection and he went on to get a much better donation, also from a living donor, and is living a productive life for a young guy that, you know, was in horrific condition could now be healthy and out enjoying life.  So what a tremendous opportunity.

And I also want to extend my great appreciation to the sponsor, Mr. Gottfried.  As you know, from time to time I ask questions of members, and what I particularly appreciate about Mr. Gottfried is I know when I'm asking questions to Mr. Gottfried he knows more about the subject than I do.  And that is a great blessing to everyone in this Chamber when we have someone who takes the time and the effort to know their subject inside out and is compassionate and fully committed to helping New York State become a better state.  So to Mr. Gottfried, my hat's off to you.  Thank you, sir.

ACTING SPEAKER WOERNER:  Mr. Goodell in the affirmative.

And I would add to what Mr. Goodell just said that Mr. Gottfried has indeed set a very high bar for all of us what it means to be an effective member of the New York State Assembly.  Thank you.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

96

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

THE CLERK:  Assembly No. A00911-A, Rules Report No. 516, Jean-Pierre, Englebright, Dickens, Griffin, Stirpe, D. Rosenthal, Smith, DeStefano, McDonough, Thiele, Ra, Stern, Gottfried, Montesano, Woerner, B. Miller.  An act to amend the Navigation Law and the Penal Law, in relation to operating a vessel while intoxicated when a child who is 15 years of age or less is a passenger in such vessel.

ACTING SPEAKER WOERNER:  Read the last section.

THE CLERK:  This act shall take effect on the 180th day.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 516, A.911 -- A.911 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Ms. Walsh to explain her vote.

MS. WALSH:  Thank you, Madam Speaker, to explain my vote.  I just want to commend the sponsor of this piece of legislation and I'm very proud to be a cosponsor of it.  This basically takes Leandra's Law and applies it to the water so people who boat and are under the influence and have a child on board are going to face stiffer penalties, and I think that's only right.  The area that I represent includes areas of the Great Sacandaga Lake, Ballston Lake

97

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

and areas where there -- where there are boating accidents and where not everybody is responsible in the way that they operate their -- their boats and it can cause injuries to other people.  I really think that this is a very important piece of legislation.

I commend the sponsor and I'm thrilled to support it.  And I can see from the board that it has -- it appears to be unanimous support and that's as it should be.  So thank you very much.

ACTING SPEAKER WOERNER:  Ms. Walsh in the affirmative.

MRS. PEOPLES-STOKES:  Madam Speaker, would you please record our colleague Ms. Mitaynes in the negative on this one?

ACTING SPEAKER WOERNER:  Ms. Mitaynes in the negative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A01023-A, Rules Report No. 517 was previously amended on Third Reading and is high.

Assembly No. A01773-C, Rules Report No. 518, Pretlow.  An act to amend the Racing, Pari-Mutuel Wagering and Breeding Law, in relation to State Gaming Commission occupational licenses.

ACTING SPEAKER WOERNER:  The bill is laid

98

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

aside.

THE CLERK:  Assembly No. A02039-B, Rules Report No. 519, Dilan, Hevesi, D. Rosenthal, Cook, Abinanti, Reyes, Hyndman, McDonough, Williams, Glick, Fernandez, Colton, Hunter, Dickens, Taylor, Braunstein, Seawright.  An act to amend the Labor Law, in relation to modular construction work.

ACTING SPEAKER WOERNER:  On a motion by Mr. Dilan, the Senate bill is before the House.  The Senate bill is advanced and the bill is laid aside.

THE CLERK:  Assembly No. A03144-A, Rules Report No. 520, Pretlow, Dickens, Reyes, McMahon, Simon, Mamdani, Salka, Galef, Fahy, González-Rojas.  An act to amend the Public Service Law and the State Finance Law, in relation to enacting the Accessible Electronic Information Act.

ACTING SPEAKER WOERNER:  Read the last section.

THE CLERK:  This act shall take effect on the 90th day.

ACTING SPEAKER WOERNER:  The -- the Clerk will record the vote on Rules Report No. 520, A.3144 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

99

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A03801-A, Rules Report No. 521, Abinanti, Weprin, Williams, Cruz, Smullen, Reilly, McDonough, Epstein.  An act to amend the Public Authorities Law, in relation to enacting the "Toll Payer Protection Act"; and providing for the repeal of certain provisions upon expiration thereof.

ACTING SPEAKER WOERNER:  Read the last section.

THE CLERK:  This act shall take effect on the 120th day.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 521, A.3801 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A04535-A, Rules Report No. 522, Cook, Hyndman, Vanel, Walker, Jackson, Dickens, Anderson.  An act to amend the Insurance Law, in relation to commuter van and ambulette or paratransit vehicles classification review.

100

**JA148**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

ACTING SPEAKER WOERNER:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 522, A.4535 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Read the last section -- oh, sorry, announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A04687-C, Rules Report No. 523, Peoples-Stokes, Meeks.  An act to amend the Executive Law, in relation to the Office of Special Investigation inspecting serious physical injuries that may have resulted in death.

ACTING SPEAKER WOERNER:  Read the -- laid aside.  The bill is laid aside.

THE CLERK:  Assembly No. A05278-B, Rules Report No. 524, Barrett, Burdick, Solages, Griffin, Otis.  An act to amend the Retirement and Social Security Law, in relation to discharged LGBT veterans.

ACTING SPEAKER WOERNER:  Read the last section.

101

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 524, A.5278 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A05304-A, Rules Report No. 525, McDonald.  An act to authorize William Schumaker and Mark Hennessy to receive certain service credit under Section 384-d of the Retirement and Social Security Law.

ACTING SPEAKER WOERNER:  The Home Rule message is at the desk and the bill is laid aside.

THE CLERK:  Assembly No. A05337-A, Rules Report No. 526, McDonald, Jones, Santabarbara, Lupardo, Morinello, J.M. Giglio, Ashby, Darling, Fahy, Jacobson, Otis.  An act to amend the Real Property Actions and Proceedings Law, in relation to authorizing special proceedings to convey title to abandoned commercial and industrial real property to a city, town or village; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER WOERNER:  The bill is laid aside.

102

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

THE CLERK:  Assembly No. A05623-A, Rules Report No. 527, Thiele.  An act to amend the -- to provide procedures relating to the adoption and submission of an annual budget by the Trustees of the Freeholders and Commonalty of the Town of Southampton.

ACTING SPEAKER WOERNER:  On a motion by Mr. Thiele, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 527, Senate Bill 5013 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A05860-B, Rules Report No. 528, Reyes, Williams, Otis.  An act to amend the General Business Law, in relation to the price gouging of medicine.

ACTING SPEAKER WOERNER:  On a motion by Ms. Reyes, the Senate bill is before the House.  The Senate bill is advanced.

103

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 528, Senate Bill 3081 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A05926-B, Rules Report No. 529, Ramos, Thiele, Englebright.  An act to amend Chapter 635 of the Laws of 1987, establishing the Oak Brush Plain State Preserve, located on Long Island, in relation to the acquisition of lands previously comprising Pilgrim State Hospital.

ACTING SPEAKER WOERNER:  On a motion by Mr. Ramos, the bill -- the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 529, Senate Bill 6142 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the

104

NYS ASSEMBLY                                    JUNE 1, 2022

numbers previously provided.

(The Clerk recorded the vote.)

ACTING SPEAKER AUBRY:  Are there any other

votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, thank you

for the opportunity for a brief interruption of our work on the floor to

introduce a guest of our colleague Mr. Gibbs.  She is none other than

the most recently-crowned Ms. New York.  She was crowned on

Sunday, April the 3rd, she's a resident of Harlem, born in Washington,

D.C., a Haitian immigrant.  Marie Charles was educated in both Haiti

and in the United States.  She's a graduate of the esteemed

Massanutten Military Academy where she upholds the values and

principles and resiliency and moral rectitude, leveraging these abilities

to improve both herself and others.  In 2004 she proudly graduated

from Baruch College with a degree in Business Administration.

Mr. Speaker, would you please welcome Ms. New

York to our Chambers?

ACTING SPEAKER AUBRY:  Certainly.  On behalf

of Mrs. Peoples-Stokes and Assemblymember Gibbs, we welcome

you here to the New York State Assembly.  We extend to you the

privileges of the floor.  Delighted that you will represent us as a State.

I can't even imagine how wonderful it must be to be crowned Ms.

105

NYS ASSEMBLY                                    JUNE 1, 2022

New York State.  Thank you so very much for sharing with us.  We

wish you all the luck in your year of reign.  It's a year, right?  You get

a whole year?

MS. MARIE CHARLES:  (Inaudible)

ACTING SPEAKER AUBRY:  Oh, good.  Well, so

we -- we look forward to you doing that and representing us.  Thank

you so very much and you're always welcome and to your crown.

(Applause)

The Clerk will read.

THE CLERK:  Assembly No. A06150-B, Rules

Report No. 530, Septimo, Mamdani, Anderson, Fernandez, Simon,

Sillitti, Epstein, Gottfried, Solages, Forrest, Jackson, González-Rojas,

Darling, L. Rosenthal, Kelles, Seawright, Thiele, Otis, Fahy,

Englebright.  An act to amend the Environmental Conservation Law,

in relation to emissions of toxic air contaminants.

ACTING SPEAKER AUBRY:  On a motion by Ms.

Septimo, the Senate bill is before the House.  The Senate bill is

advanced.  The bill is laid aside.

THE CLERK:  Assembly No. A06365-A, Rules

Report No. 531, Abbate.  An act to amend the Retirement and Social

Security Law, in relation to accidental disability retirement for

uniformed court officers and peace officers employed in the Unified

Court System.

ACTING SPEAKER AUBRY:  On a motion by Mr.

Abbate, the Senate bill is before the House.  The Senate bill is

106

NYS ASSEMBLY                                    JUNE 1, 2022

advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Senate print 8399.  This is a fast roll call.  Any member

who wishes to be recorded in the negative is reminded to contact the

Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Ms. Walsh.

MS. WALSH:  Thank you, Mr. Speaker, to just

briefly explain my vote.  As many of my colleagues know, I've been

an attorney for 30 years and I have practiced a lot in various courts in

mostly Saratoga County.  And I've had a chance over that time to get

to know a lot of the people who are uniformed court officers in the

court system.  And I really do support this bill.  I -- I'm not always

completely on board with everything that the sponsor has in terms of

retirement system changes.  This one I really do support.  I think that

this bill provides a presumption that the uniformed court officers and

peace officers in the Uniform [sic] Court System that are injured as a

result of physical assault by an assailant, suffered in-service will be

entitled to accidental disability retirement in most instances.  And I

will say that particularly in family court that happens.  That -- that

happens.  They -- they have protected me personally on a number of

occasions.  It's getting increasingly more out of hand and -- and

violent and without their assistance we would all be in a lot of trouble.

107

NYS ASSEMBLY                                    JUNE 1, 2022

So they do become injured in the -- in the cause of protecting the rest

of us.

I think that this is a fair and just piece of legislation

and I'm very happy to -- to vote in the affirmative and to just thank

them for their service.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Ms. Walsh in the

affirmative.

Mr. Fitzpatrick.

MR. FITZPATRICK:  Yes, thank you, Mr. Speaker.

Just to explain my vote.  You know, we've seen a lot of these bills at

this time of year, and it is a great benefit to have.  However, it can be

and will more than likely be very expensive and, therefore, it is not

unfair or unreasonable to ask that this be negotiated at the bargaining

table rather than go through the Legislature.  That is what collective

bargaining is for.  It needs to be used in instances like this.  And,

again, this should not go through the Legislature and be mandated on

the taxpayers.  It should be a negotiated item where the other side is

asked to put something on the table to help offset the potentially

tremendous cost of this.

With that said, we admire what they do, we respect

them greatly.  But these types of benefits should be negotiated through

collective bargaining.  Thank you, and I vote no.

ACTING SPEAKER AUBRY:  Mr. Fitzpatrick in the

negative.

Are there any other votes?  Announce the results.

108

NYS ASSEMBLY                                    JUNE 1, 2022

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A06724, Rules Report No. 532, Englebright, Otis, Thiele, L. Rosenthal, Aubry, Cook, Montesano, DeStefano, Jean-Pierre, Niou, Steck, Simon, Gallagher, Dickens, Dinowitz, Abinanti.  An act to amend the Not-for-Profit Corporation Law and the Education Law, in relation to the discovery and disposal of human remains and funerary objects; and to amend the Parks, Recreation and Historic Preservation Law, in relation to requiring certain notice and consultation prior to the undertaking of certain projects.

ACTING SPEAKER AUBRY:  On a motion by Mr. Englebright, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect January 1st.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 5701.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Ms. Walsh.

109

---

NYS ASSEMBLY                                    JUNE 1, 2022

MS. WALSH:  Thank you very much, Mr. Speaker, for allowing me to interrupt these proceedings on behalf of our colleague Assemblywoman Jodi Giglio, who has an introduction that I'm going to make for her.  Joining with us today in the Chamber are two esteemed guests, Manny Vilar, the retiring President of the PBA of New York State, and also Dixon Palmer, the Vice President of Police Conference for New York State.

Would you please, Mr. Speaker, offer the cordialities of the House to these two visitors to our Chamber?

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Ms. Walsh, Ms. Giglio, the Speaker and all the members, sir, we welcome you here to the New York State Assembly, extend to you the privileges of the floor.  Thank you for the work that you do to ensure and keep our public service employees well and taken care of.  Continue that great work.  Know that you will always be welcome here.  Thank you.

(Applause)

The Clerk will read.

THE CLERK:  Assembly No. A07006-B, Rules Report No. 533, Fahy, Lupardo, Magnarelli, Glick, Gottfried, Bronson, L. Rosenthal, Steck, McDonald, Dickens, Reyes, Simon, Gunther, Seawright, Pheffer Amato, Niou, Colton, Griffin, Fall, Galef, Zinerman, Burke, Hunter, Woerner, J. Rivera, Mamdani, Jackson, Forrest, Thiele, B. Miller, Clark, Hevesi, Blankenbush, Jean-Pierre, Kim, Wallace, Carroll, Lunsford, Burdick, Gallagher, Jacobson,

110

---

NYS ASSEMBLY                                    JUNE 1, 2022

Burgos, Gibbs, Kelles, González-Rojas, Zebrowski, Englebright, Stern.  An act to amend the General Business Law, in relation to the sale of digital electronic equipment and providing diagnostic and repair information.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A07079-C, Rules Report No. 534, Burdick, Thiele, Dickens, Gunther, Fernandez, Otis, Clark, Jackson, González-Rojas, Kelles, Epstein, Woerner.  An act to amend the Penal Law, in relation to Sexual Conduct Against a Child in the Third Degree.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 30th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 7079-C.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Burdick to explain his vote.

MR. BURDICK:  Thank you, Mr. Speaker, to explain my vote.  This bill fills a gap in the definition under the Penal Law of the offense of Sexual Conduct Against a Child in the Third Degree.  With this amendment it expands the definition to include use of a finger which, sadly, case law has held does not constitute such an

111

---

NYS ASSEMBLY                                    JUNE 1, 2022

offense.  The bill came about through the sexual assault of a 9-year-old girl, the daughter of a resident of my district, who in tears came to me years after the offense and asked me if something could be done to change the law.  This amendment will not change what occurred, but will provide some closure and peace for the victim and her parents.  While I recognize that clarifying the law does not necessarily deter such action -- assaults, at least it will provide some recourse for future victims.

I am grateful for the bipartisan support for this measure and the tremendous help which staff provided in significantly improving the bill.  I also wish to thank Codes Chair Jeff Dinowitz and the Speaker for finding the path to enactment of this bill.  I vote in the affirmative.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mr. Burdick in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A07436-A, Rules Report No. 535, Abbate.  An act to amend the State Finance Law, in relation to the direct deposit of certain salaries.

ACTING SPEAKER AUBRY:  On a motion by Mr. Abbate, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

112

**JA151**

NYS ASSEMBLY                                    JUNE 1, 2022

THE CLERK:  This act shall take effect January 1, 2023.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 6617-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A07747-B, Rules Report No. 536, Magnarelli, Woerner, Jones, Stirpe, Buttenschon.  An act to amend the Vehicle and Traffic Law and the Parks, Recreation and Historic Preservation Law, in relation to fees for snowmobile trail development and maintenance.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on 7747-B.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

113

NYS ASSEMBLY                                    JUNE 1, 2022

THE CLERK:  Assembly No. A07805-D, Rules Report No. 537, Cymbrowitz, Fall, Benedetto, Burdick, Cook, Tapia, J. Rivera, Seawright, Dinowitz, Eichenstein, Davila, D. Rosenthal, Hyndman, Hevesi, Taylor, Nolan, Bichotte Hermelyn, Williams, Carroll, Rajkumar.  An act to amend the Public Housing Law and the Administrative Code of the City of New York, in relation to establishing the New York City Public Housing Preservation Trust for properties owned or operated by the New York City Housing Authority and providing for the issuance of certain bonds, notes or other obligations of the New York City Housing Development Corporation.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 60th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 7805-D.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Anderson to explain his vote.

MR. ANDERSON:  Thank you, Mr. Speaker, to explain my vote.

ACTING SPEAKER AUBRY:  Sir.

MR. ANDERSON:  Thank you.  So, you know, today

114

NYS ASSEMBLY                                    JUNE 1, 2022

is a very disappointing day with this bill that's in front of us.  We had a real opportunity to make sure that the New York City Housing Authority that has been neglected from having funding for over 40 years a true opportunity for public housing to remain public.  We had an opportunity for 40 years to do the right thing.  This bill represents the wrong thing.  This bill represents us trading pennies for gold.  Section 9 is gold and it provides true and real affordable housing to many working-class families in perpetuity.  This bill harms many aspects of that ability to add and allow for true affordable housing to exist.  We understand the conditions of our residents, of our neighbors, are impacted to them and at this time I feel that we're turning our backs on them by voting on this trust.  It's hard to trust a trust when there's no collective bargaining.  It's hard to trust a trust when there's no voting threshold, rules and regulations to ensure that just five people in a very voter-apathetic public housing development situation and scenario have an opportunity to truly determine their future.

So I strongly encourage all my colleagues across the aisle and here in this Conference to vote no on this particular piece of legislation, and I hope that everybody will do that as well.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mr. Anderson in the negative.

Mr. Epstein to explain his vote.

MR. EPSTEIN:  Thank you, Mr. Speaker.  I rise to

115

NYS ASSEMBLY                                    JUNE 1, 2022

explain my vote.  So, I represent 13 public housing developments in New York City, and I have met with my NYCHA leaders numerous times around this and they are uniformly opposed to this trust bill.  One, they're really deeply concerned around losing their Section 9 protections and moving to Section 8, concerns around the default provisions.  If the trust fails to pay, what's owed when they borrow funds, and through this bonding authority what the risk will be to those residents who through -- through whoever (inaudible) bonded the money.  Their voting rights.  Ensuring that they ensure that the majority of the residents who live in those developments can choose the path that they want.  Time and time again we've said to public housing authorities, like, *Listen to our residents*.  And this is what we're doing.  We're listening to our residents who are telling us to vote no.  We are listening to our residents who care deeply about what they -- where they live and want us to do something responsible for it.  This bill doesn't get there.  This bill doesn't do what we need.  This bill doesn't have the support of our communities.  So time and time again there's our obligation to stand up for our residents.  Standing up for our residents means voting against this bill.  Standing up for our residents means telling NYCHA to do a better job engaging with our communities, engaging with our residents, ensuring that they have a plan that works for them.  This is their home.  They are -- many of them in my community were born and raised in these public housing developments.  They have raised their kids there and their grandkids there.  They believe in this development.  They want to fight for their

116

NYS ASSEMBLY                                    JUNE 1, 2022

public housing and it is our obligation to fight with them.

I'm going to vote against this bill and I encourage my colleagues to do the same.

ACTING SPEAKER AUBRY:  Mr. Epstein in the negative.

Ms. Niou.

MS. NIOU:  Thank you, Mr. Speaker, for allowing me to explain my vote.  I stand here today on behalf of public housing residents in 45 Allen Street, 17 Eldridge Street, the Hernandez, Houses, the LaGuardia Houses, Lower East Side I, Meltzer Tower, the Rutgers Houses, Seward Park Extension, the Smith Houses, the Two Bridges Development and the Vladeck Houses, all 11 NYCHA developments in my district, to firmly oppose this legislation and any other attempt to transform Section 9 public housing into Section 8 units.  I oppose this bill on procedural grounds, that it was crafted without sufficient input from residents and on substantive grounds that it ultimately puts units at an intolerable level at risk.

First and foremost, my opposition is owed to community opposition by NYCHA residents in every development in my district.  Beyond just my district, nine of the ten representatives on the CCOP, a board of tenants elected to represent their neighbors, oppose the trust.  I am disappointed in my colleagues who say this scheme is best for NYCHA residents.  Tenants have boldly and loudly declared that they do not believe that this is best for them.  And they are broadly distrustful of many of this plan's implications and would

117

NYS ASSEMBLY                                    JUNE 1, 2022

rather work to solve the issues with Section 9 rather than turn to Section 8.  We cannot make decisions for public housing residents without public housing residents.  They must have a seat at the table in drafting any proposed NYCHA overhaul, and they have been regularly excluded and ignored in the process of creating this bill.

I will be registering all of my comments officially for the record.  Thank you, and I vote in the negative.

ACTING SPEAKER AUBRY:  Ms. Niou in the negative.

Mr. Lawler to explain his vote.

MR. LAWLER:  Thank you, Mr. Speaker.  Two of the biggest authorities that we have in this State are the MTA and NYCHA, and both are abject failures.  They're horribly run.  The amount of money that goes into them and is wasted, mismanaged, misused.  You have people living in NYCHA who have holes in their ceilings.  Literally water pouring down as they go to the restroom, having to hold an umbrella.  It's shameful, it's disgraceful, it's disgusting.  This bill simply shifts the blame, shifts the problem, moves the costs, allows for more borrowing, and no real plan to fix the problems.  I don't know how in good conscience we could continue down this path and just throw more money at it, allow for more borrowing, more debt and a new name.  This is not a plan.  This is not going to fix a thing.  It is nothing more than window dressing, and I think the residents of NYCHA housing deserve far better than what they've received and what this bill would even do.

118

NYS ASSEMBLY                                    JUNE 1, 2022

This is a money grab and we should not be in favor of it.  We should be voting against it.

ACTING SPEAKER AUBRY:  Mr. Lawler in the negative.

Ms. Weinstein to explain her vote.

MS. WEINSTEIN:  Mr. Speaker, I stand in support of this legislation. I'm just listening and heard a number of colleagues who talked about their NYCHA residents opposing this measure.  In my district in the Sheepshead-Nostrand Houses, the President of the Nostrand Houses is a very strong proponent of this legislation, this -- this concept of trust.  And the residents in my community believe that this will be a tremendous benefit for them over the long-term. So I just wanted to bring that perspective.  There's not uniformity in how residents of NYCHA view this proposal.  And having listened to it and spoken with the NYCHA leadership I believe that it will be a tremendous benefit to many residents of NYCHA and I'm proud to vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Weinstein in the affirmative.

Ms. Septimo to explain her vote.

MS. SEPTIMO:  I represent the South Bronx.  My district is home to more than 15 NYCHA developments.  My district is also home to the poorest congressional district in the nation.  We know that the Federal government has completely abandoned its responsibility to our tenants, to NYCHA tenants across the City, to

119

NYS ASSEMBLY                                    JUNE 1, 2022

public housing tenants across the nation.  Ultimately, these tenants deserve better.  The NYCHA trust blueprint is not the process that is going to get them to better, and we know that because whether you are fighting on the substance of the bill and how these vouchers come to be and how they get funded or the process, at every single point there are too many questions and too many flaws that remain.  This process has been one that has failed to consider tenant voice and tenant rights from start to finish.  Today we know that there are scores -- thousands of tenants across New York City who are feeling vulnerable about their rights going into this piece of legislation.  And right now we are saying that we are not concerned with these genuine moments of pause.

I will be voting in the negative on this piece of legislation because ultimately, any piece of legislation that is aiming to help people has to consider the perspectives of those people and ultimately the blueprint fails to do that.  There are questions as it relates to how developments will opt into the blueprint.  There are questions as to what will make elections that put properties into the blueprint legitimate.  There are questions that remain about how many people will have to participate in decision-making for developments that will affect thousands of people's lives and that we know will affect the housing stock for years to come.  Because of these questions and so many others that have been -- have remained unanswered and because of the wholesale disregard of tenants throughout the City who are in opposition to this project, I will be voting in the negative and I

120

**JA153**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

hope that we can all restore our commitment to these tenants and

respecting their voice moving forward.  Thank you.

ACTING SPEAKER AUBRY:  Ms. Septimo in the

negative.

Mrs. Peoples-Stokes to explain her vote.

MRS. PEOPLES-STOKES:  Thank you, Mr.

Speaker.  I rise to explain my vote.  I understand that public housing

across the nation is a Federal government responsibility, and in many

ways I -- I -- I resent the way that they abdicated their responsibility

consistently over the decades.  And -- and what we have done in New

York and I would suspect in other states as well is to try and take care

of our residents in spite of what the Federal government was or was

not doing.

ACTING SPEAKER AUBRY:  Can we get a little

quiet, please?  Shh.

MRS. PEOPLES-STOKES:  And so I think, Mr.

Speaker, in many ways what the Chair of the Committee and the

sponsor of this legislation is trying to do is to say to New York State

residents who are NYCHA tenants and most likely the responsibility

of Federal government, that we're not just going to keep waiting on

the Federal government to do their responsibility for you.  We're going

to try and help you and help them help you.  So I think this bill is

worth the effort.  I'm glad that the sponsor has introduced it.  And

albeit not everything everybody wants, but when do we ever get

everything that everybody wants?  We're not there yet, but we are in a

121

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

good place where I think this could be beneficial to the tenants both in

the short-term and in the long-term.

So I'm voting yes.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes

in the affirmative.

Ms. Jackson to explain her vote.

MS. JACKSON:  Thank you, Mr. Speaker, for

allowing me to explain my vote.  I have the pleasure of -- I have the

pleasure of speaking up for over 20 NYCHA developments in my

district, and from the beginning of this bill when I learned about it

before I even became an Assemblymember it was problematic

because of how and which NYCHA decided to roll out this piece of

legislation.  The tenant leaders have had issues with the rollout since

the beginning, they have been explaining to leadership for the longest

that there are things in here that they are afraid of for their -- their

living environment.  They want to protect public housing.  My tenant

leaders would love to see that public housing stay public, and what

this bill does for them scares them.  And so it is my responsibility to

speak up and to be the voice since they cannot be here on the floor

and express their vote to say that I will not be voting for this piece of

legislation.  And I respect people that live there.  I don't live there nor

does anyone in this Body that I know of lives in public housing, so it's

hard for us to tell them what -- what is best for them.  We are

supposed to listen to the people and allow the people to have say on

their living environments.  We know how bad it is.  We don't need a

122

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

crash course in that because we know.  But at this point we're asking

that --

ACTING SPEAKER AUBRY:  One minute, Ms.

Jackson.

Ladies and gentlemen under the eave, you're going to

have to tone it down.

MS. JACKSON:  We're asking -- thank you, Mr.

Speaker.  We're asking that their -- that the amendments that they're

asking for, the rules that they're asking for be -- be adopted as such.

So I am a no vote.

ACTING SPEAKER AUBRY:  Ms. Jackson in the

negative.

Ms. Davila to explain her vote.

MS. DAVILA:  Thank you, Mr. Speaker, for

allowing me to explain my vote.  Well, I -- I definitely understand that

there might be some members that are extremely concerned about

NYCHA and the way it has been treated for decades and decades.

There's no doubt that there is -- the trust fund, not too many people are

trustworthy of it, so to speak.  But I -- in my district I have five, six

different developments and I know that they have been suffering for

decades and decades.  This is probably one of the better plans that I

have seen that can give these tenants an opportunity to live in a

habitable environment and to also maintain their housing status as

public housing development.  The thing is that they are going to have

to choose.  This is something that was -- that has never happened

123

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

before.  So we -- we are going to have to take that step one way or

another to ensure that our tenants are treated with dignity and respect

and that they can live in a habitable environment and that they are no

longer targeted as a low-income development or have to feel like they

have to walk around rats and -- and roaches -- because we are not

doing what we need to do on our part.

So with that said, Mr. Speaker, I vote in the

affirmative.

ACTING SPEAKER AUBRY:  Ms. Davila in the

affirmative.

Ms. Frontus on Zoom.

MS. FRONTUS:  Thank you so much, Mr. Speaker,

for allowing me to explain my vote.  I hope that everyone can hear

me.  There is a bit of a delay here.  I represent the 46th District,

Southern Brooklyn, my home neighborhood of Coney Island which

has some nine NYCHA developments.  Some of them are as large as

15 buildings.  Some of my leaders are for the trust, some are against it.

But I can tell you that last night I had a three-hour town hall meeting

and most of the people there told me that they are against this piece of

legislation.  What I find the most troubling, to be honest with you, is

that the average resident in my community was hearing the words

"blueprint for change", was hearing about RAD, was hearing about the

Preservation Trust for the very first time.  If we are going to ask

people to trust us, we are members of government, we have to behave

in a manner where people can take us seriously.  And I, frankly, just

124

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

don't think that this is a way to earn trust with people who have been disappointed for decades and decades.  Some of the families at NYCHA are second-generation, some are third-generation.  They're used to broken promises.  They're used to people not keeping their word.  If we are trying to turn over a new page, if we are trying to turn over a new leaf, then what NYCHA should have done is meet with all of the tenants, as they said they would, because when they first came out with this plan they met with members like myself in the Legislature and the first question we asked them is, *Are you going to have town hall meetings and meet with the residents to make sure they are informed?*  They told us that they would, and much to my chagrin, much to my chagrin, when I started asking around people knew absolutely nothing.

      (Buzzer sounds)

      And so my negative vote today is not really against the trust or the piece of legislation.

      ACTING SPEAKER AUBRY:  Ms. Frontus, how do you vote?

      MS. FRONTUS:  I vote in the negative.  Thank you so much.

      ACTING SPEAKER AUBRY:  Ms. Frontus in the negative.

      Ms. Reyes to explain her vote.

      MS. REYES:  Thank you, Mr. Speaker.  This bill is very troubling for me because like so many of my colleagues have

125

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

mentioned, resident engagement has been very lacking around this issue.  And yes, residents of NYCHA deserve investment.  Nobody should be living in the conditions that NYCHA residents are living in.  But the reality is that NYCHA has also squandered lots and lots of money, lots of resources.  They've had time and time opportunities to do right by tenants and they haven't done that.  So it's ironic that we see a bill that creates a trust in which the residents are supposed to now trust that NYCHA is going to do right by them.  We've seen RAD PACT conversions and other iterations of a NYCHA plan with shotty renovations that are failing currently, and with it we also saw some of the highest eviction rates in our City.  That, to me, is problematic.  The fact that we are passing this without true discussion and true conference and debate on a litany of issues in the language of this trust is also problematic.  One piece is that -- the reality is that Section 9 is the last bastion of affordable housing in our country, and this would be doing away with Section 9 vouchers in the State of New York.  Some of the few that are left.  But also there's a labor component to this, and this language literally gives the option to NYCHA, either participate or not, if they wish, in collective bargaining, possibly doing away with good-paying labor union jobs that the very people who live in NYCHA need to survive and the people who live in our City depend on as well.

      For that and many other reasons I'm going to be voting in the negative.  Thank you.

      ACTING SPEAKER AUBRY:  Ms. Reyes in the

126

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

negative.

      Ms. Walsh for exceptions.

      MS. WALSH:  Thank you, Mr. Speaker.  Would you please record Mr. DeStefano in the negative on this legislation.  Thank you.

      ACTING SPEAKER AUBRY:  So noted.  Thank you.

      Mrs. Peoples-Stokes.

      MRS. PEOPLES-STOKES:  Please record our colleagues Mr. Barnwell, Ms. Mitaynes, Mr. Mamdani and Ms. Gallagher in the negative.

      ACTING SPEAKER AUBRY:  So noted.  Thank you.

      Are there any other votes?  Announce the results.

      (The Clerk announced the results.)

      The bill is passed.

      THE CLERK:  Assembly No. A07837-C, Rules Report No. 538, Norris.  An act in relation to authorizing the County of Niagara to transfer ownership of certain parkland to the Town of Lockport.

      ACTING SPEAKER AUBRY:  On a motion by Mr. Norris, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.

      Read the last section.

      THE CLERK:  This act shall take effect immediately.

127

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

      ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 6313-C.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

      (The Clerk recorded the vote.)

      MRS. PEOPLES-STOKES:  Mr. Speaker, would you please record our colleague Mr. Dinowitz in the negative on this one?

      ACTING SPEAKER AUBRY:  So noted.  Thank you.

      Are there any other votes?  Announce the results.

      (The Clerk announced the results.)

      The bill is passed.

      THE CLERK:  Assembly No. A07876-A, Rules Report No. 539, Carroll, Walker, Gallagher, Barnwell, Jones, Anderson, Stern, Rozic, Quart, Paulin, Cymbrowitz, Gottfried, Dinowitz, Griffin, Nolan, Abinanti, Santabarbara, L. Rosenthal, McDonald, Lavine, Thiele, Otis, Hevesi, Davila, Seawright, D. Rosenthal, Lupardo, Jacobson, Fernandez, O'Donnell, Cusick, Kelles, Burdick, Fahy, Galef, Steck, Magnarelli, Woerner, Barrett, Stirpe, Simon, Hunter, Durso, Gandolfo, Niou, Cruz, Mikulin, Montesano, Englebright, Gibbs, Colton.  An act to amend the Real Property Law, in relation to requiring disclosure of information concerning flood insurance on residential leases.

      ACTING SPEAKER AUBRY:  On a motion by Mr. Carroll, the Senate bill is before the House.  The Senate bill is

128

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

advanced and the bill is laid aside.

        THE CLERK:  Assembly No. A07919-A, Rules
Report No. 540, Bronson, Wallace, Byrnes, Burke, Jensen, Dinowitz,
Barnwell, Lunsford, Rozic, McDonald, Otis, Dickens, Gottfried,
Lupardo, Griffin, Darling, Solages, Joyner, Hawley, Gallahan,
Morinello, Mikulin, Lawler, J.M. Giglio, DeStefano, Gandolfo,
Walczyk, K. Brown, Durso.  An act to amend the State Finance Law,
the General Municipal Law, the Public Authorities Law and the
Highway Law, in relation to enacting the New York State Buy
American Salt Act.

        ACTING SPEAKER AUBRY:  Read the last section.

        THE CLERK:  This act shall take effect immediately.

        ACTING SPEAKER AUBRY:  The Clerk will record
the vote on Assembly print 7919-A.  This is a fast roll call.  Any
member who wishes to be recorded in the negative is reminded to
contact the Majority or Minority Leader at the numbers previously
provided.

        (The Clerk recorded the vote.)

        Ms. Byrnes to explain her vote.

        MS. BYRNES:  Thank you.  Thank you.  Thank you,
Mr. Speaker.  I know this is a fast roll call and I'll be very brief.  I just
wanted to indicate and to thank Mr. Bronson, although he's not here.  I
represent in my district one of the largest salt -- actually, the largest
salt mine in the entire United States of America.  And American Rock
Salt and its predecessor had mined salt under Livingston County for

129

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

over 100 years.  It is the economic driver of Livingston County, which
is my district.  It supports 7- to 800 families.  Not just miners, but also
truck drivers, railroad personnel, and also farmers because in the
wintertime when farmers would normally put their trucks in storage
now they're able to use them in order to transport salt in the
wintertime.  So this is just an economic boom for my area.  The salt
mine plays by old rules, it follows the regulations, it pays the right
wages and benefits.  All the miners wanted was a chance to have a
level playing field.  We have talked a lot in this House about foreign
substandard mining on foreign soil and potential human rights
concerns.  And no, we're not talking about cobalt.  Now we're talking
about salt.  And as a result it's very important that our New York State
local people who are supporting our own families in our own
neighborhoods be able to work and thrive, and that is why I'm
supporting this bill.

        Thank you, sir.

        ACTING SPEAKER AUBRY:  Ms. Byrnes in the
affirmative.

        Mr. Byrne.

        MR. BYRNE:  Thank you, Mr. Speaker.  I vote --
yes, thank you, Mr. Speaker.  With all due respect to my colleague,
and I understand that like many pieces of legislation there are certain
policies that we embrace and support that are very favorable to some
portions of the State and not so favorable to other portions of the
State.  And while I -- I certainly respect her position and understand

130

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

why she's fighting for it, I have gotten phone calls and letters,
communications from a number of my highway superintendents,
raising their concerns about the cap -- the capacity to attain enough
salt, the negative consequences that this could have on them being
able to obtain the salt they need for their operations.  Just as recently
as two days ago I spoke with the highway superintendent of Putnam
Valley who is a registered Democrat and who told me, *Please, Kevin,
do not support this bill.*  And that is why I will be voting in the
negative.

        Thank you, Mr. Speaker.

        ACTING SPEAKER AUBRY:  Mr. Byrne in the
negative.

        Are there any other votes?  Announce the results.

        (The Clerk announced the results.)

        The bill is passed.

        THE CLERK:  Assembly No. A07952, Rules Report
No. 541, Lalor.  An act to amend Chapter 476 of the Laws of 1957
relating to authorizing the board of commissioners of the Land Office
to grant certain easements in lands of the State University Agricultural
and Technical Institute at Farmingdale to Central Hudson Gas and
Electric Corporation in relation to the description of lands for
which the Commissioner of General Services is authorized to grant an
easement to the Central Hudson Gas and Electric Corporation.

        ACTING SPEAKER AUBRY:  On a motion by Mr.
Lalor, the Senate bill is before the House.  The Senate bill is

131

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

advanced.

        Read the last section.

        THE CLERK:  This act shall take effect immediately.

        ACTING SPEAKER AUBRY:  The Clerk will record
the vote on Senate print 9288.  This is a fast roll call.  Any member
who wishes to be recorded in the negative is reminded to contact the
Majority or Minority Leader at the numbers previously provided.

        (The Clerk recorded the vote.)

        Are there any other votes?  Announce the results.

        (The Clerk announced the results.)

        The bill is passed.

        THE CLERK:  Assembly No. A08098, Rules Report
No. 542, Cymbrowitz.  An act to amend the Private Housing Finance
Law, in relation to rental assistance and legal regulated rents in
affordable housing projects.

        ACTING SPEAKER AUBRY:  On a motion by Mr.
Cymbrowitz, the Senate bill is before the House.  The Senate bill is
advanced.

        Read the last section.

        THE CLERK:  This act shall take effect immediately.

        ACTING SPEAKER AUBRY:  The Clerk will record
the vote on Senate print 7235.  This is a fast roll call.  Any member
who wishes to be recorded in the negative is reminded to contact the
Majority or Minority Leader at the numbers previously provided.

        (The Clerk recorded the vote.)

132

**JA156**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08151, Rules Report No. 543, Sillitti.  An act in relation to authorizing St. Francis Hospital, Roslyn, New York, to file an application for exemption from real property taxes.

ACTING SPEAKER AUBRY:  On a motion by Ms. Sillitti, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 7265.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08169-A, Rules Report No. 544, Cruz, Anderson, Solages, Jackson, Simon, Mamdani, Fernandez, Hevesi, Dinowitz, Seawright, Sayegh, J.D. Rivera, Williams, Joyner, Tapia, Burgos, Barnwell, Colton, Glick, González-Rojas, Forrest, Ramos, Aubry, J. Rivera, Carroll, Burdick, Bichotte

133

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Hermelyn, Epstein, Gallagher, Jacobson, Septimo, De Los Santos, Kim, Jean-Pierre, Dickens, Niou.  An act to amend the Insurance Law, in relation to certain prohibited contract provisions.

ACTING SPEAKER AUBRY:  On a motion by Ms. Cruz, the Senate bill is before the House.  The Senate bill is advanced and the bill is laid aside.

THE CLERK:  Assembly No. A08331, Rules Report No. 545, B. Miller.  An act to authorize John Raftery of the Town of Shawangunk to take the competitive Civil Service examination for the position of police officer and be placed on the eligible list for employment as a full-time police officer of the Town of Shawangunk Police Department.

ACTING SPEAKER AUBRY:  On a motion by Mr. Miller, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 7490.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

134

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

THE CLERK:  Assembly No. A08425, Rules Report No. 546, Burke, Taylor, Stirpe, Epstein, Simon, Aubry, Galef, Zebrowski, Magnarelli, Sillitti, Hevesi, Braunstein, Dickens, Gottfried, Glick, McMahon, O'Donnell, McDonough, Jean-Pierre, Otis.  An act to amend the Education Law, in relation to requiring nonpublic schools to follow the same rules and regulations as public schools regarding a pupil who suffers a concussion.

ACTING SPEAKER AUBRY:  On a motion by Mr. Burke, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect July 1st.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 973.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08455-A, Rules Report No. 547, Byrne.  An act to amend the Highway Law, in relation to designating a portion of the State highway system as the "Putnam Valley First Responders Bridge."

ACTING SPEAKER AUBRY:  Read the last section.

135

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 8455-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Ms. Walsh to explain her vote.

MS. WALSH:  Thank you, Mr. Speaker.  Yes, I definitely will support this piece of legislation.  I also just wanted to note for my colleagues that this is our colleague Kevin Byrne's last bill during his time here in the New York State Assembly.  Kevin is a classmate of mine.  We both came to the Assembly in 2017.  He is a friend and he has been an amazing colleague in the Chamber and as our Health Committee Ranker.  He really brought his experience and background in emergency services, his respect for the fire service.  And he really -- I -- I think he just really -- I've really watched him grow as a legislator and I'm -- I'm very sad that he's going to be leaving us.  But I'm sure that his wife, Briana, and son will be very happy to have him a little bit closer to home in the coming years.

So I just wanted to wish him very well, and of course I'll support this bill as well.  Thank you, Mr. Speaker.

(Applause)

ACTING SPEAKER AUBRY:  Mr. Byrne, in my time you've been the first to ever wear kilts on the floor.

136

**JA157**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

(Laughter)

Hopefully you won't be the last.

Mr. Byrne to explain his vote.

MR. BYRNE:  Well, I wasn't sure if I was going to explain my vote, but now I will.  Thank you to our Assistant Minority Leader Pro Tem for those very kind words.  A little bit about this bill, it's fitting that it could be one of my last bills or the last bill.  What we're renaming is an overpass, Pudding Street overpass over the Taconic State Parkway.  And a lot of our colleagues that commute up to Albany or drive up to Albany, this was a very dangerous intersection on the Taconic State Parkway where we actually had a school bus traveling over the Taconic, stopping in the median and then going back over the northbound.  We actually had a town hall forum.  It was before I was elected and I was present with my predecessor Steve Katz in attendance.  Senator Terry Gipson was there, trying to advocate for this capital project to happen.  Former Congressman [sic] Sue Kelly, who I interned for many years ago, brought back Federal dollars for this project.  It never happened.  Finally, about four years ago the project moved.  It was a $28 million project, and it happened.  The -- the overpass opened up about a year or so ago.  I missed the groundbreaking, but here in time to at least rename it after somebody.  We were initially trying to dedicate it after two prominent Putnam Valley people, Jim Gordon and Joe Marra, both first responders, both U.S. service members, both public servants in the Town of Putnam Valley, but we had to shorten the name.  So

137

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

we decided to consolidate it as Putnam Valley First Responders because few people know more about how valued that bridge is than the first responders because it now connects that community (inaudible) with the rest of Putnam Valley and it's going to be a tremendous asset.  And I want to thank all my colleagues for supporting it.  It's been an honor serving in the Assembly and having all the productive debates.

Thank you, Mr. Speaker.  I vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Byrne in the affirmative.

(Applause)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08535-A, Rules Report No. 548, Jensen, Seawright.  An act to amend the Highway Law, in relation to designating a portion of the State highway system as the "Specialist Jason Hasenauer Memorial Highway."

ACTING SPEAKER AUBRY:  On a motion by Mr. Jensen, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8681-A.  This is a fast roll call.  Any member

138

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08549-C, Rules Report No. 549, Burdick, Gallagher, Meeks, Seawright, Santabarbara, Englebright, J.M. Giglio, Hevesi, Sayegh, Lawler, Woerner, González-Rojas, Sillitti, Stern, Ra, DeStefano, J.A. Giglio, Simon, Epstein, McDonald.  An act to amend the State Finance Law, in relation to preferred source status for entities that provide employment to certain persons; and providing for the repeal of certain provisions upon the expiration thereof.

ACTING SPEAKER AUBRY:  On a motion by Mr. Burdick, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 7578-C.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Burdick to explain his vote.

139

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. BURDICK:  Thank you, Mr. Speaker, to explain my vote.  This bill updates a provision in the New York State Finance Law known as the Preferred Source Program which provides that New York State agencies provide a preference in the award of contracts to firms that provide employment for people with disabilities.  The bill updates and modernizes this 45-year-old tradition not just by replacing archaic terms, but by adjusting work ratios and thresholds for review to make it easier both for State agencies and firms doing business with them.  The bill came about from testimony presented at Assembly hearings last fall on barriers to employment for people with disabilities held by the Labor Committee, the Committee on People with Disabilities and the Subcommittee on Employment Opportunities for People with Disabilities, which I have the honor of chairing.  I'm grateful for the bipartisan support for this measure and the help which staff provided in significantly improving the bill.  I also wish to thank Tom Abinanti, Chair of the Committee on People with Disabilities; Ken Zebrowski, Chair of the Government Operations Committee and staff, and each -- each second along the way pitched in.  And of course, Speaker Heastie for allowing this bill to come to the floor.  Finally, I wish to thank Maureen O'Brien, the Executive Director of the non-profit New York State Industry [sic] for the Disabled.

I vote in the affirmative.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

140

**JA158**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

The bill is passed.

THE CLERK:  Assembly No. A08630-A, Rules Report No. 550, Reyes, Thiele, Forrest.  An act to amend the Environmental Conservation Law, in relation to prohibiting cosmetic products and personal care products that contain mercury.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect July 1, 2023.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 8630-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08681, Rules Report No. 551, Cruz, Jackson, Dilan Burgos.  An act to amend the Criminal Procedure Law, in relation to rules of evidence concerning the admissibility of evidence of a defendant's creative expression.

ACTING SPEAKER AUBRY:  On a motion by Ms. Cruz, the Senate bill is before the House.  The Senate bill is advanced and the bill is laid aside.

THE CLERK:  Assembly No. A09046-B, Rules Report No. 552, Gallahan.  An act to amend the Highway Law, in

141

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

relation to designating a portion of the State highway system as the "Ralph Calabrese Memorial Highway."

ACTING SPEAKER AUBRY:  On a motion by Mr. Gallahan, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8085-C.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09068-B, Rules Report No. 553, Angelino.  An act to amend the Highway Law, in relation to designating a portion of the State highway system the "1LT Stephen H. Doane Memorial Bridge."

ACTING SPEAKER AUBRY:  On a motion by Mr. Angelino, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

142

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

the vote on Senate print 7903-B.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09099-A, Rules Report No. 554, Cusick, Simon.  An act to amend the Social Services Law, in relation to providing for the automated identification of affordability program participants.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 9099-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09215, Rules Report No. 555, McDonald, Englebright, Buttenschon, Lupardo, Woerner, Seawright, Thiele, Colton, Gottfried, Aubry, Galef, Simon, Jacobson,

143

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Glick, Brabenec, J.A. Giglio, Angelino, Byrne, Sillitti, O'Donnell, Steck, Fahy, Dickens.  An act to amend the Civil Service Law, in relation to ensuring identical health benefits for skilled nursing care for public retirees.

ACTING SPEAKER AUBRY:  On a motion by Mr. McDonald, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8192.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09255-A, Rules Report No. 556, Lemondes.  An act to amend Chapter 996 of the Laws of 1965 relating to incorporating the Fairmount Volunteer Exempt Firemen's Benevolent Association and providing for its powers and duties, in relation to its purpose and the use of foreign fire insurance premium taxes.

ACTING SPEAKER AUBRY:  On a motion by Mr. Lemondes, the Senate bill is before the House.  The Senate bill is

144

**JA159**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8344-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09325, Rules Report No. 557, Abbate, Jones, Cusick, McDonald, Wallace, Englebright, Burdick, Rozic, Tapia, Griffin, Lavine, Woerner, Zebrowski, Barnwell, Sillitti, Gunther, Stern, Cymbrowitz, Thiele, Solages, Fahy, Lupardo, Clark, Conrad, Aubry, Ramos, Fall, Colton, Barrett, DeStefano, Durso, Pheffer Amato, Abinanti, Darling, Jean-Pierre, J.A. Giglio.  An act to amend the Retirement and Social Security Law, in relation to establishing a 20-year retirement plan for members or officers of law enforcement.

ACTING SPEAKER AUBRY:  On a motion by Mr. Abbate, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

145

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8477.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the votes.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09326-A, Rules Report No. 558, Sillitti.  An act in relation to authorizing the County of Nassau assessor to accept an application for a real property tax exemption from the Nassau Cemetery Association.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 9326-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09334-B, Rules Report No. 559, J.A. Giglio.  An act in relation to authorizing the

146

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

County of Suffolk to transfer ownership of certain parkland to the Town of Southold.

ACTING SPEAKER AUBRY:  On a motion by Ms. Giglio, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 7739-C.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09335-B, Rules Report No. 560, Fitzpatrick.  An act authorizing the County of Suffolk and the Town of Smithtown, located in the County of Suffolk, to exchange certain parklands.

ACTING SPEAKER AUBRY:  Home Rule message is at the desk.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 9335-B.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to

147

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

ACTING SPEAKER PHEFFER AMATO:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09343-B, Rules Report No. 561, Magnarelli.  An act to amend the General Business Law, in relation to vehicle cost recovery fees.

ACTING SPEAKER PHEFFER AMATO:  Read the last section.

THE CLERK:  This act shall take effect on the 60th day.

ACTING SPEAKER PHEFFER AMATO:  The Clerk will record the vote on A9343-B.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Mr. Montesano to explain his vote.

MR. MONTESANO:  Thank you, Madam Speaker, to explain my vote.  It's just, you know, always being pro-business and understanding the overheads and costs that businesses have, sometimes they need to pass things over to the consumer.  And this

148

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

particular bill allows now rental car companies to pass on to the consumer when they calculate additional pricing for the car, what it cost the car rental agency to pay for title, registration, inspection, et cetera, to be additional charges.  And I think what happens in the car rental agencies, they have advertised low prices, you know, to get the consumer to come in and rent the car, and then they lay on top of them all these extra charges that inflates the price of the rental, you know, as separate and apart from the initial rental fee.

I think it's a little bit deceptive and I think also that these rental car companies have to incur the cost of doing business.  They buy a new car, they put it on the road to rent out, they got to pay for the registration and everything else that goes with it.  I don't think it needs to be the renter's expense.  If they want to pass on all these expenses to the renter, then it should be all included into the price that they advertise, you know, for the rental of the car so people know up front what it's costing them, and then they compare between different rental car agencies.  So likewise, I'll be voting in the negative.  Thank you.

ACTING SPEAKER PHEFFER AMATO:  Read the last section -- I'm sorry.  I apologize -- are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09418-A, Rules Report No. 562, Cruz, Fernandez, González-Rojas, Hevesi, Reyes,

149

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Quart, Epstein, Fahy, Taylor, Simon, Solages, Gottfried, McDonald, Glick, L. Rosenthal, De Los Santos, Forrest, Seawright.  An act to amend the Public Health Law and the State Finance Law, in relation to enacting the Lorena Borjas Transgender and Gender Non-Binary (TGNB) Wellness and Equity Fund.

ACTING SPEAKER PHEFFER AMATO:  On a motion by Ms. Cruz, the Senate bill is before the House.  The Senate bill is advanced.  The bill is laid aside.

THE CLERK:  Assembly No. A09435, Rules -- Rules Report No. 563, Solages, Darling, Zinerman, Aubry, Dickens, Pretlow, Williams, Walker, Peoples-Stokes, Cook, Vanel, Hyndman, Cahill, Jean-Pierre, Bichotte Hermelyn, Taylor, Dilan, Joyner, Benedetto, Epstein, Frontus, Reyes, Nolan, O'Donnell, Cruz, Jackson, Burgos, Forrest, Anderson, González-Rojas, J. Rivera, Gibbs, Otis, Gallagher, Ramos, Gottfried.  An act to acknowledge the fundamental injustice, cruelty, brutality and inhumanity of slavery in the City of New York and the State of New York; to establish the New York State Community Commission on Reparations Remedies, to examine the institution of slavery, subsequently de jure and de facto racial and economic discrimination against African-Americans, and the impact of these forces on living African-Americans and to make determinations regarding compensation; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER PHEFFER AMATO:  The bill is laid aside.

150

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

THE CLERK:  Assembly No. A09456, Rules Report No. 564, Magnarelli, Hunter.  An act to amend the Public Authorities Law, in relation to commuter passes on the New York State Thruway in the Syracuse area; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER PHEFFER AMATO:  The bill is laid aside.

THE CLERK:  Assembly No. A09623, Rules Report No. 565, Abbate, Aubry.  An act to amend the Retirement and Social Security Law, in relation to modifying the retirement program for Triborough Bridge and Tunnel members.

ACTING SPEAKER PHEFFER AMATO:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The Clerk will record the vote on 9623.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers provided -- previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09756-A, Rules Report No. 566, Jean-Pierre.  An act in relation to establishing the

151

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

"Wyandanch Health and Wellness Center Design-Build Act"; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER PHEFFER AMATO:  On a motion by Ms. Jean-Pierre, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The Clerk -- the Clerk will record the vote on 9756-A.  This -- and Senate Bill S8531-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09893, Rules Report No. 567, McDonald.  An act in relation to permitting the Oakwood Community Center to file an application for a real property tax exemption.

ACTING SPEAKER PHEFFER AMATO:  On a motion by Mr. McDonald, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The Clerk will record the vote on Senate 8818.  This is a fast roll call.

152

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09907-A, Rules Report No. 568, Kelles, Mitaynes, Fahy, Englebright, Otis.  An act to amend the Local Finance Law, in relation to providing a period of probable usefulness for broadband and related telecommunications infrastructure.

ACTING SPEAKER PHEFFER AMATO:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The Clerk will record the vote on A9907 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09968, Rules Report

153

---

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

No. 569, Paulin, Zinerman, Otis.  An act to amend Chapter 154 of the Laws of 1921, relating to the Port Authority of New York and New Jersey, in relation to the operation of a youth service unit within the Port Authority Police Department.

ACTING SPEAKER PHEFFER AMATO:  On a motion by Ms. Paulin, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The Clerk will record the vote on Senate 8907.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10002-A, Rules Report No. 570, Darling.  An act in relation to authorizing the Village of Freeport, County of Nassau, to alienate and discontinue the use of certain parklands.

ACTING SPEAKER PHEFFER AMATO:  Home Rule message is at the desk.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The

154

---

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Clerk will record the vote on 10002-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

ACTING SPEAKER AUBRY:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10028, Rules Report No. 571, Pretlow.  An act to amend the Racing, Pari-mutuel Wagering and Breeding Law, in relation to allowing New York sire stakes eligibility for foals sired by New York State stallions.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10028.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10041-A, Rules

155

---

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Report No. 572, Sillitti, Ra.  An act to authorize the Village of Mineola, County of Nassau, to alienate certain parklands for use in the Village of Mineola public water supply system and replace such alienated parkland with a new, dedicated parkland.

ACTING SPEAKER AUBRY:  On a motion by Ms. Sillitti, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8895-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Mr. Ra to explain his vote.

MR. RA:  Thank -- thank you, Mr. Speaker.  I just quickly want to thank the sponsor for her partnership in -- in getting this done for the Village of Mineola, as well as our Chair of Local Governments for their assistance.  It's going to help the village move forward with a project, so I'm glad it's getting done.  I cast my vote in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Ra in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

156

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

THE CLERK: Assembly No. A10072, Rules Report No. 573, Dickens, Bichotte Hermelyn. An act to amend the Insurance Law, in relation to establishing a captive insurance program for commuter vans.

ACTING SPEAKER AUBRY: The bill is laid aside.

THE CLERK: Assembly No. A10095, Rules Report No. 574, Otis. An act to amend the Vehicle and Traffic Law, in relation to implementing a residential parking system in the City of Rye.

ACTING SPEAKER AUBRY: On a motion by Mr. Otis, the Senate bill is before the House. The Senate bill is advanced. Home Rule message is at the desk. Read the last section.

THE CLERK: This act shall take effect immediately.

ACTING SPEAKER AUBRY: The Clerk will record the vote on Senate print 8939. This is a fast roll call. Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes? Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK: Assembly No. A10113, Rules Report No. 575, McDonald, Fahy. An act to amend the Real Property Actions and Proceedings Law, in relation to requiring a petition in a summary proceeding to recover possession of real property in the City

157

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

of Albany to allege proof of compliance with local laws requiring rental residential property registration and licensure.

ACTING SPEAKER AUBRY: Read the last section.

THE CLERK: This act shall take effect on the 90th day.

ACTING SPEAKER AUBRY: The Clerk will record the vote on Assembly print A10113. This is a fast roll call. Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes? Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK: Assembly No. A10140, Rules Report No. 576, Lunsford. An act to amend the Mental Hygiene Law, in relation to replacing an instance of the Office of Alcoholism and Substance Abuse Services with the Office of Addiction Services and Supports; and to amend Chapter 378 of the Laws of 2019 relating to creating a public education initiative designed to eliminate stigma and misinformation about mental illness and substance use among military service members, in relation to the effectiveness thereof.

ACTING SPEAKER AUBRY: On a motion by Ms. Lunsford, the Senate bill is before the House. The Senate bill is advanced. Read the last section.

158

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

THE CLERK: This act shall take effect immediately.

ACTING SPEAKER AUBRY: The Clerk will record the vote on Senate print 9408. This is a fast roll call. Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes? Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK: Assembly No. A10168, Rules Report No. 577, Committee on Rules (Pretlow). An act authorizing the alienation of certain parklands required to support the redevelopment of the historic Glenwood Power Plant, uniquely located on the Hudson River in the City of Yonkers, which site lacks any land for parking, and which project was contemplated in the approved May 2009 City of Yonkers Alexander Street Master Plan with a new road network connecting Alexander Street to the south past the Glenwood Power Plant through John F. Kennedy Marina and Trevor Park north to provide increased public access to the Hudson River and enhance said parks through the development of a new sustainable riverfront, transit-oriented project by enhancing the existing parks with new amenities; and to amend Chapter 125 of the Laws of 2013, relating to authorizing the alienation of certain parkland required to support the redevelopment of the historic Glenwood Power Plant, uniquely located on the Hudson River in the City of Yonkers, which site lacks

159

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

any land for parking, and which project was contemplated in the approved May 2009 City of Yonkers Alexander Street Master Plan with a new road network connecting Alexander Street to the south past the Glenwood Power Plant through John F. Kennedy Marina and Trevor Park north to provide increased public access to the Hudson River and enhance said parks through the development of a new sustainable riverfront, transit-oriented project by enhancing the existing parks with new amenities, in relation thereto.

ACTING SPEAKER AUBRY: On a motion by Mr. Pretlow, the Senate bill is before the House. The Senate bill is advanced. Home Rule message is at the desk. Read the last section.

THE CLERK: This act shall take effect immediately.

ACTING SPEAKER AUBRY: The Clerk will record the vote on Senate print 9111. This is a fast roll call. Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes? Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK: Assembly No. A10176, Rules Report No. 578, Committee on Rules (Thiele). An act to amend the Alcoholic Beverage Control Law, in relation to licenses to sell liquor at off-premises catering establishments.

ACTING SPEAKER AUBRY: Read the last section.

160

**NYS ASSEMBLY**                                                    **JUNE 1, 2022**

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10176.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10205, Rules Report No. 579, Committee on Rules (Galef).  An act to amend the Tax Law, in relation to permitting the Village of Cold Spring to impose a hotel and motel tax; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER AUBRY:  Home Rule message is at the desk.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10205.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mrs. Peoples-Stokes.

161

**NYS ASSEMBLY**                                                    **JUNE 1, 2022**

MRS. PEOPLES-STOKES:  Mr. Speaker, we have a few exceptions:  Ms. McMahon, Mr. Barnwell, Mr. Stirpe, Ms. Barnett [sic], and Mr. Ramos.

ACTING SPEAKER AUBRY:  So noted.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please record my colleague Mr. Reilly in the negative.  Thank you.

ACTING SPEAKER AUBRY:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10216-A, Rules Report No. 580, Committee on Rules (Paulin, Dinowitz, Englebright, Burdick, Abinanti, Cusick, Taylor, Fall, Glick, Quart, Fernandez, Niou, Burgos, Reilly, Sayegh, Seawright, Carroll, Jean-Pierre, Dickens, Reyes, Aubry, Epstein, Sillitti, Joyner, L. Rosenthal, J. D. Rivera, Jacobson, Septimo, Thiele, Clark, Buttenschon, McDonald, McMahon, Stern, Pretlow, Ramos, Vanel, J. Rivera, Rozic, Otis, Durso, Morinello, González-Rojas, Tannousis, DeStefano, Griffin, Solages, Woerner, Galef, Mikulin, Burke, Bronson, Gallagher, Cruz, Forrest, Simon, Lupardo, Hyndman, Lavine, Gandolfo, Smith, Cook, McDonough).  An act to amend the Public Service Law, in relation to protecting collective bargaining agreements between public service companies and their employees.

ACTING SPEAKER AUBRY:  On a motion by Ms.

162

**NYS ASSEMBLY**                                                    **JUNE 1, 2022**

Paulin, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8919.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10244, Rules Report No. 581, Committee on Rules (J. D. Rivera).  An act to amend the Alcoholic Beverage Control Law, in relation to a license to sell liquor at retail for consumption on certain premises.

ACTING SPEAKER AUBRY:  On a motion by Mr. Rivera, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9371.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

163

**NYS ASSEMBLY**                                                    **JUNE 1, 2022**

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10271, Rules Report No. 582, Committee on Rules (Woerner).  An act to amend the Private Housing Finance Law, in relation to increasing the timeline for completion and amount spent on emergency home repairs for low-moderate income senior citizens through the RESTORE Program.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10271.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10280, Rules Report No. 583, Committee on Rules (Stern).  An act in relation to establishing a Caumsett State Park fire readiness study.

ACTING SPEAKER AUBRY:  On a motion by Mr. Stern, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

164

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9019.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10393, Rules Report No. 584, Committee on Rules (Cahill).  An act to amend the Navigation Law, in relation to Hudson River pilotage fees.

ACTING SPEAKER AUBRY:  On a motion by Mr. Cahill, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect January 1st, 2023.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9128-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10427, Rules Report

165

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

No. 545, Committee on Rules (Paulin, Galef, Burdick, Sayegh, Abinanti, Otis).  An act to amend the Judiciary Law, in relation to residency requirements for stenographers in the County of Westchester.

ACTING SPEAKER AUBRY:  On a motion by Ms. Paulin, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8985.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Lawler to explain his vote.

MR. LAWLER:  Thank you, Mr. Speaker.  Seeing the word "stenographer" seems like a very appropriate time to thank our two stenographers who do a great job day in, day out, keeping track of all the wonderful things that we say on the floor of the New York State Assembly.  Seems very relevant to the bill, so I just wanted to take the opportunity to thank our stenographers for all of their hard work.

(Applause)

ACTING SPEAKER AUBRY:  And you may delete any of Mr. Lawler's statements at your will.

(Laughter)

166

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

Mr. Goodell.

MR. GOODELL:  Presumably the transcript will say raucous, standing ovation.

ACTING SPEAKER AUBRY:  No doubt.  Deserved ovation, too.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10440, Rules Report No. 586, Committee on Rules (Braunstein, Pheffer Amato).  An act to amend the Real Property Tax Law, in relation to a rebate against real property taxes for certain owners of real property in the City of New York for the fiscal year commencing on the 1st of July, 2021.

ACTING SPEAKER AUBRY:  On a motion by Mr. Braunstein, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9399.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

167

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

THE CLERK:  Assembly No. A10442, Rules Report No. 587, Committee on Rules (Weprin).  An act to amend the Real Property Tax Law, in relation to the determination of adjusted base proportions in special assessing units which are cities.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9372.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10444, Rules Report No. 588, Committee on Rules (Quart).  An act to amend Chapter 538 of the Laws of 2013, amending the Tax Law relating to the estate tax treatment of dispositions to surviving spouses who are not United States citizens, in relation to extending the expiration of the provisions thereof.

ACTING SPEAKER AUBRY:  On a motion by Mr. Quart, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9398.  This is a fast roll call.  Any member

168

**JA165**

**NYS ASSEMBLY**                    **JUNE 1, 2022**

who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10450, Rules Report No. 589, Committee on Rules (Fahy).  An act to amend the Executive Law, in relation to the purchase or lease of zero emission vehicles for State-owned vehicle fleets.

ACTING SPEAKER AUBRY:  On a motion by Ms. Fahy, the Senate bill is before the House.  The Senate bill is advanced and the bill is laid aside.

THE CLERK:  Assembly No. A10455, Rules Report No. 590, Committee on Rules (Barrett).  An act to amend the Alcoholic Beverage Control Law, in relation to authorizing the manufacture of beer, spirits, cider, wine and mead at the Culinary Institute of America; and to repeal certain provisions of such law relating thereto.

ACTING SPEAKER AUBRY:  On a motion by Mrs. Barrett, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8989-A.  This is a fast roll call.  Any member

169

**NYS ASSEMBLY**                    **JUNE 1, 2022**

who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10459, Rules Report No. 591, Committee on Rules (Bichotte-Hermelyn).  An act to amend the New York City Charter, in relation to opportunities for businesses owned by women and minorities.

ACTING SPEAKER AUBRY:  On a motion by Ms. Bichotte-Hermelyn, the Senate bill is before the House.  The Senate bill is advanced and the bill is laid aside.

THE CLERK:  Assembly No. A10461, Rules Report No. 592, Committee on Rules (Dinowitz, Weprin).  An act to amend the New York City Civil Court Act, in relation to monetary jurisdictional limits.

ACTING SPEAKER AUBRY:  On a motion by Mr. Dinowitz, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9377.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

170

**NYS ASSEMBLY**                    **JUNE 1, 2022**

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10470, Rules Report No. 593, Committee on Rules (Dinowitz).  An act to amend the Judiciary Law, in relation to making technical changes to provisions providing for certification for service as a retired judge of the Court of Appeals or a retired justice of the Supreme Court.

ACTING SPEAKER AUBRY:  On a motion by Mr. Dinowitz, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9341.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10476, Rules Report No. 594, Committee on Rules (McMahon).  An act to amend the Social Services Law, in relation to medical assistance to certain disabled individuals.

171

**NYS ASSEMBLY**                    **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10476.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10491, Rules Report No. 595, Committee on Rules (Cook).  An act to amend the Penal Law, in relation to assaults upon certain employees of a transit agency or authority.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 90th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10491.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

172

**NYS ASSEMBLY**                                **JUNE 1, 2022**

(The Clerk announced the results.)

The bill is passed.

The Clerk will read.

THE CLERK:  Assembly No. A09193-B, Calendar No. 560, Rozic.  An act to amend the General Business Law, in relation to fraud in connection with an abnormal disruption of the market.

ACTING SPEAKER AUBRY:  On a motion by Ms. Rozic, the Senate bill is before the House.  The Senate bill is advanced.

An explanation is requested, Ms. Rozic.

MS. ROZIC:  Thank you, Mr. Speaker.  This bill amends the General Business Law, and the General Business Law's 349 New York's Deceptive Acts Law, protect consumers and others from deceptive acts and practices.  It's one of the States's primary and most-often used consumer protection laws.  Unlike the price gouging law, which is General Business Law Section 396R, the Deceptive Acts Law does not treat deceptive conduct differently if it is done during a time of emergency, and we have seen during this pandemic -- or we saw during this pandemic unscrupulous businesses trying to take advantage of consumers or other businesses because of the difficult economic and public health circumstances.  But the State does not have the authority to impose elevated fines associated with the price gouging law, so this bill will change that.  It helps ensure that any business that engages in deceptive conduct during a time of

173

**NYS ASSEMBLY**                                **JUNE 1, 2022**

emergency will be subject to stronger penalties, similar to the State's price gouging law, and the penalty will be up to 15,000 per violation, or three times the actual restitution needed, whichever is greater.  It also gives the Attorney General authority to make regulations reasonably necessary to implement this act.

ACTING SPEAKER AUBRY:  Mr. Mikulin.

MR. MIKULIN:  Thank you.  Will the sponsor yield?

ACTING SPEAKER AUBRY:  Ms. Rozie will yield.

MS. ROZIC:  Yes.

MR. MIKULIN:  Just a few very short questions here.  First, we talk about abnormal changes in -- or disruption of the market.  Can you explain that further?

MS. ROZIC:  Sure.  So for the purpose of this bill, the phrase "abnormal disruption of the market" as defined in the bill shall mean any change in the market, whether actual or imminently threatened resulting from stress of weather, convulsion of nature, failure or shortage of electric power or other source of energy, strike, civil disorder, war, military action, national or local emergency, or other cause of an abnormal disruption of the market which results in the declaration of a state of emergency by the Governor.  It is similarly reflective of the price gouging law.

MR. MIKULIN:  And when we talk about state of emergency, what specifically -- could it be a local emergency as well, or would that just apply to the local locality?

MS. ROZIC:  This bill just says that the declaration

174

**NYS ASSEMBLY**                                **JUNE 1, 2022**

of a state of emergency by the Governor.

MR. MIKULIN:  Okay.  And when we talk about State of emergency, we're talking about the pandemic, correct?

MS. ROZIC:  A pandemic would be included in that.

MR. MIKULIN:  So isn't it true that we're in a state of emergency right now because of the pandemic?

MS. ROZIC:  As long as the Governor has declared it a state of emergency, it would be covered by this.

MR. MIKULIN:  So we could particularly have a continued state of emergency in this State, correct?

MS. ROZIC:  Say that a little louder, I couldn't hear you.

MR. MIKULIN:  We could have a continued state of emergency then?

MS. ROZIC:  We are still currently in a state of emergency according to the Governor.

MR. MIKULIN:  With -- according to -- with almost no means to -- we don't know when this is even going to end, this could go on for years.

MS. ROZIC:  That's not up to me.  That's not spoken for in this bill, but I can tell you without an actively declared state of emergency, there would be no abnormal disruption in the market required to trigger the bill.

MR. MIKULIN:  Thank you so very much.  On the bill.

175

**NYS ASSEMBLY**                                **JUNE 1, 2022**

ACTING SPEAKER GIBBS:  On the bill.

MR. MIKULIN:  I think this bill is very well-intentioned, but unfortunately as we've seen over the past two years, we are in a continued state of emergency, especially when it comes down to COVID.  Now, in the beginning there was more of a disruption of the market as we all saw, but now we have come to a since of normalcy and I do believe that this is giving too much power to the Governor and for that reason, I'm going to be in the negative and I hope my colleagues do the same.  Thank you.

ACTING SPEAKER GIBBS:  Read the last section.

THE CLERK:  This act shall take effect on the 30th day.

ACTING SPEAKER GIBBS:  The Clerk will record the vote on Assembly Bill -- - excuse me, Senate Bill 4954-C.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  The Republican Conference is generally opposed to this legislation.  Those who support it are certainly encouraged to vote yes on the floor or by contacting the Minority Leader's Office.  Thank you.

ACTING SPEAKER GIBBS:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, sir.  The Majority Conference is going to be in favor of this piece of legislation;

176

**JA167**

**NYS ASSEMBLY**        **JUNE 1, 2022**

however, there may be a few that would like to be an exception. They should feel free to contact the Majority Leader's Office, we will make sure their vote is properly recorded. Thank you, sir.

(The Clerk recorded the vote.)

ACTING SPEAKER GIBBS: Are there any other votes? Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 8, Rules Report No. 270, the Clerk will read.

THE CLERK: Assembly No. A10188-A, Rules Report No. 270, Committee on Rules (Pheffer Amato). An act to amend the Environmental Conservation Law, in relation to the filling of borrow pits in Jamaica Bay; to amend Chapter 288 of the Laws of 2014 amending the Environmental Conservation Law relating to the filling of borrow pits in Jamaica Bay, in relation to making the provisions of such chapter permanent; in relation to directing the Department of Environmental Conservation to conduct a study on ecological restoration needs in Jamaica Bay; and providing for the repeal of certain provisions upon expiration thereof.

ACTING SPEAKER GIBBS: On a motion by the Senate bill is before the House -- oh. On behalf of Member Pheffer Amato, the Senate bill is before the House. The Senate bill is advanced. An explanation has been requested.

MS. PHEFFER AMATO: Thank you, Mr. Speaker. This bill will raise the standards of fill that is put into Jamaica Bay, an

177

**NYS ASSEMBLY**        **JUNE 1, 2022**

18,000 square acre of beautiful natural resources located within my community.

ACTING SPEAKER GIBBS: Mr. Goodell.

MR. GOODELL: Thank you, Mr. Speaker. Would the sponsor yield?

ACTING SPEAKER GIBBS: Will the sponsor yield?

MS. PHEFFER AMATO: Absolutely.

ACTING SPEAKER GIBBS: The sponsor yields, sir.

MR. GOODELL: Thank you very much. I see that this bill has been vetoed several times -- passed this Assembly several times and been vetoed by the Governor several times, including in 2014, '16, looks like '18 and '20. Has the language of the bill been amended or have the Governor's concerns been addressed?

MS. PHEFFER AMATO: The bill has been amended from the times it was vetoed. It's actually having a sunset, it would expire at the end of this month, and we have amended the bill to include a study to look at long-term plans for the Jamaica Bay area, in addition to raising the level of checking on the contaminants that would be in the fill that goes into the borrow pits.

MR. GOODELL: And am I correct that under the current version --

MS. PHEFFER AMATO: I'm sorry, can you...

MR. GOODELL: Am I correct that under the current

178

**NYS ASSEMBLY**        **JUNE 1, 2022**

version if the dredged material tests relatively clean that it would qualify for unlimited ocean deposition, doesn't have any high levels of contamination and wouldn't cause any short-term or long-term pollution issues it can be used; is that correct?

MS. PHEFFER-AMATO: Correct. In the last 100 years, the Bay, with its local stewards, have made the waters in the Bay the cleanest it's been in 100 years. We've actually had our first seal this year. So you know, it's a wetland, it's growing, it's vibrant, it's an economical engine for our community, and the goal is to make it as clean as possible. We understand there could be borrow pits and they do put dredge in, but we want the highest level of testing for the least amount of contaminants.

MR. GOODELL: Thank you very much, and I appreciate those clarifications.

On the bill, sir.

ACTING SPEAKER GIBBS: On the bill.

MR. GOODELL: Thank you. As is often the case with legislation that we address here in the House, we're doing a balancing act. The Jamaica Bay area from time to time needs to be dredged for navigational purposes, and there are some deep pits in Jamaica Bay that were created a long time ago when people took fill material out of the Bay and used it on land. It's much less expensive to use the dredged material that's nearby to fill those pits some than it is to take it out into the ocean. And so if you're only looking at the cost of the dredging to maintain navigation, you'd say, *Well, let's fill in*

179

**NYS ASSEMBLY**        **JUNE 1, 2022**

*these pits that are nearby.*

The sponsor correctly, I believe, strikes the right balance by saying, *Yeah, you can do that, but you first have to establish that the dredged materials we're putting in there meet environmental standards, are not highly toxic, won't cause either short-term or long-term environmental issues.* And so I think it's the right balance and for that reason, I would recommend it to my colleagues, and I would also recommend it to the Governor. Thank you.

ACTING SPEAKER GIBBS: Ms. Pheffer Amato.

MS. PHEFFER AMATO: On the bill.

ACTING SPEAKER GIBBS: On the bill.

MS. PHEFFER AMATO: Jamaica Bay is an 18,000 thousand acre wetland estuary surrounded by the Rockaway Peninsula; to the South, Brooklyn -- and South to Brooklyn and Queens to the East. It is a beautiful jewel of New York City. You have to -- you have to come see what it looks like. It has, you know, water sports, families, fish life is going, there's diving in the water, it's just beautiful. Unfortunately, previous administrations have not recognized the fact that we must preserve our natural habitats, that we must preserve areas in our communities that we allow dumping for and to a reason. And thank you to my colleague for pointing out the balance that we need to have.

But after all, in this State we've invested so much money to make our waters clean that in our local communities, we

180

**JA168**

NYS ASSEMBLY                                    JUNE 1, 2022

have to acknowledge that the work that we've done as local environmentalists, stewards of our own backyards, that the State has to recognize that we have to limit the amount of contaminants that are literally in our backyard.  So I want to thank you for the opportunity to speak on this bill and ask everyone for their support.  Thank you.

ACTING SPEAKER GIBBS:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER GIBBS:  The Clerk will record the vote on Senate 886 -- excuse me, 8816-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Englebright to explain her vote.

MR. ENGLEBRIGHT:  Thank you, Mr. Speaker.  I want to commend the sponsor.  Jamaica Bay is the largest of all of the semi-restricted bays around Long Island.  It was the original settlement of Long Island by the Dutch who looked at it and saw the beautiful marshes there and said this is just like where we came from in Holland in the 1600s.  Unfortunately in the early part of the last Century, Jamaica Bay was just spoiled by dredge and fill operations.  We lost 25,000 acres of fringing marsh.  Much of that was due to extraction from the Bay bottom and placed the sediments upon the living marsh.

This measure is very thoughtful.  It will improve the

181

NYS ASSEMBLY                                    JUNE 1, 2022

water chemistry of the harbor.  The main reason for that is that the deep borrow pits will be leveled.  The anoxic conditions at the bottom of the pits will be removed, and the resident's time of pollutants entering the estuary will be reduced.  This is a very wise and thoughtful measure.  It's good for the environment, it's good for the people of the City of New York who are the main constituents who will be benefitting.  I congratulate, again, the sponsor, and I vote aye.

ACTING SPEAKER GIBBS:  Mr. Englebright in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 10, Rules Report No. 313, the Clerk will read.

THE CLERK:  Assembly No. A07865-A, Rules Report No. 313, Fahy, Wallace, Otis, Griffin, Sillitti, Lupardo, McDonald, Paulin, O'Donnell, Jacobson, Woerner, Abinanti, Stirpe, McMahon, Lunsford, Thiele, Zebrowski, Conrad, Burdick, Carroll, Glick, Solages, L. Rosenthal, Stern, Ramos, Cymbrowitz.  An act to amend the General Business Law, in relation to requiring social media networks to provide and maintain mechanisms for reporting hateful conduct on their platform.

ACTING SPEAKER GIBBS:  An explanation has been requested.

MS. FAHY:  On the bill, Mr. Speaker, is in 7865, again, and this is a bill that would -- actually originated a year ago

182

NYS ASSEMBLY                                    JUNE 1, 2022

after the insurrection in the Capitol and given a number of issues with the social media networks and the problems that we have seen with people conduct and violence being portrayed and posted on social media.  It would now -- this bill would require a clear and concise policy regarding how social media platforms or networks would respond to incidences of hateful conduct on their platforms, as well as have them -- require them to maintain an easily accessible mechanism for reporting that conduct on the platforms.  It doesn't tell them how, it just lays out that they -- they must have one.  And let me just add that part of this is we need help.  We have seen the Governor talk about setting up a task force and turning -- a task force and turning to the AG for assistance with better monitoring and warning signs on social media, but we also are reminded that an estimated 4.75 billion, 4.75 billion posts are made every day on social media and that's just an estimate.  So we need help.  We need these -- these networks helping us to monitor and providing individuals a vehicle for recording hateful and violent intended conduct.

Thank you.

ACTING SPEAKER GIBBS:  Mr. Durso.

MR. DURSO:  Thank you, Mr. Speaker.  Thank you, Mr. Speaker.  Would the sponsor yield?

ACTING SPEAKER GIBBS:  Will the sponsor yield?

MS. FAHY:  Sure.

ACTING SPEAKER GIBBS:  Yes.

183

NYS ASSEMBLY                                    JUNE 1, 2022

MR. DURSO:  Thank you, Ms. Fahy.  I just have a couple of questions for you.  So, going towards the bill it says -- really what does the bill define as social media network?  So will it just be something like a Facebook, Instagram or will it also include private messaging apps such as WhatsApp or Signal or any other private messaging applications?

MS. FAHY:  It -- it could include -- it really is the -- the providers.  And we -- we do include a definition, it's very brief.  I'll just -- I'll just read it.  A network is a provider for profit-making purposes that operates internet platforms that are designed to enable users to share content with other users or to make that content available to the public.  So I think one of your examples may not apply here.

MR. DURSO:  Okay.

MS. FAHY:  It would be -- it would be those that are shared with the public.

MR. DURSO:  So -- so not so much a private messaging app between me and someone else, but anything that could be viewed by the public.

MS. FAHY:  Yes.

MR. DURSO:  So would that include our Assembly website, for instance?

MS. FAHY:  If the website, where you can post on it, I don't think --

MR. DURSO:  Well, on our -- I'm sorry, go ahead.  I

184

**JA169**

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

apologize.

    MS. FAHY:  I don't -- I'm not sure the public can access our website.  We make posts on there but I don't know if our actual website would be applicable here since it's -- it's not -- well, it's available to -- well, I guess -- oh, I don't know, I think the -- a website, it's -- it's not an exchange, that's just a website.  But I -- I --

    MR. DURSO:  Well, I think I can ask you a more specific question about it, if that's okay.

    MS. FAHY:  Yeah, sure.

    MR. DURSO:  So, on -- on our Assembly website, so if you look up, say, for instance, my Assembly page there'll be things posted up there from certain events that we do, whether they're here in the Capitol or in the district.  Would then the website from the Assembly, whether my -- you know, my specific page, yours, anybody else in the Chamber, would that constitute a social media website?

    MS. FAHY:  I don't think it meets this type of definition on social media conduct, but a social media network.  However, I will say our website is already closely monitored, just as our newsletters are.  All of those are vetted before any of our video clips are put up.  Everything is vetted.  So we -- we do monitor.  We certainly have a recording mechanism since all of our contact information is available, but -- but I'm not sure we meet the definition of a social media network.

    MR. DURSO:  Okay.  All right.  Well, I'm sure I'll come back to that.

185

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

    MS. FAHY:  Sure.

    MR. DURSO:  So just in regards to in the -- the summary of the bill, there's parts -- the term "hateful conduct" is defined to mean the use of social media network, vilify, humiliate, incite violence against a group or class or persons on the base of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression.  I just wanted to get through all the pieces.  The -- the first two that I want to specifically jump on are "vilify" and "humiliate."  Could you explain to me in regards to the bill what those mean specifically?  Because they may have a different meaning to you or to me than they may have to somebody else.  So, in regards to this bill, what does vilify, humiliate mean?

    MS. FAHY:  Again, we have it in as -- it's -- it's an explanation of what hateful conduct would be.  So I think it would mean vilify or humiliate as a part of a hateful conduct against any of the groups or classes of persons that are listed.  So I think, again, it is -- it is intended with that type of conduct, and as you see in that same phrase it says "or incite violence."  So it's all along that same trajectory, if you will, of hateful conduct which -- which is done by vilifying, humiliating or inciting violence.  So it's -- it's somewhat modifying violence term there as well.

    MR. DURSO:  Got it.  All right.

    MS. FAHY:  Against any of those groups listed.

    MR. DURSO:  And -- and -- and listen, I -- I want to

186

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

say this up front.  I totally agree with you when it comes to social media networks, anybody inciting violence or against a group or class of persons or anybody because of their race or gender, sexual orientation, I 100 percent agree.  So I'm not disagreeing with you on that portion.  My -- my concern is with those two words because again, what might humiliate me or might humiliate somebody else may be different to each person.  So if I have my website up or -- or my social media or my Facebook or my Instagram and I'm wearing a shirt that says "Vote Republican", right, and -- and somebody -- I'm -- I'm just throwing it out there, some might -- might think that that's humiliating or vilifying me.  Somebody else may be vilifying people in general and they could hit a report button, which we'll get into in a moment.  Would that constitute someone hitting a report button and then what would be the answer to that?

    MS. FAHY:  Again, I don't think that would fall under the -- the primary definition which is hateful conduct and, you know, we have an explicit provision in here that this is not intended to hinder or violate any free speech rights that -- that one has.  And again, keep in mind that this is against a group or class of persons.  So I -- I think some of these things will get defined in the regs, but keep in mind it really is hateful toward that violent conduct.  That's what we're after.  With 4.7 billion posts a day, a day, you know, we need help, and certainly it is the most egregious ones that we unfortunately too often find out about after the fact.  So the intent here is to be proactive, not -- not as reactive as -- as has been the case in too many

187

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

horrific incidences of -- of violence.

    MR. DURSO:  And I would -- I would totally agree with you and I understand.  My -- my concern with that is it's very broad language and that -- and again, totally agree with you when it comes to great groups, hate speech, inciting any type of violence.  Just with the words humiliate and vilify, again, everybody could take those, you know, it -- how they define them, how they feel.  What, again, might humiliate you may not humiliate me, so if someone reports it and let's just say Facebook was to take it down because you reported saying that you're humiliated by my actions or something that I'm doing upsets you, that is hindering my free speech even though it is nothing that is attacking a group, a race, anybody upon their sexual orientation or gender or anything like that.

    But let me move on to a couple of more questions.

    MS. FAHY:  Sure.

    MR. DURSO:  As far as the social media outlets that are out there now, most of them do have a report button or -- or some way to report these types of behaviors, correct?

    MS. FAHY:  Most have gotten better.  Some of the more traditional ones that we've known of, certainly, to use Twitter as an example, they have gotten better at least until maybe Elon Musk buys it.  But -- but so far they've -- they've I have noticed a change in the last couple of years.  But as came to light after one of the most recent horrific massacres, there is a whole host of social media platforms, it seems as if there's a new one every day and it's very hard

188

NYS ASSEMBLY                                          JUNE 1, 2022

to keep up with those.  So -- so yes, I think we've seen some efforts,
and certainly Facebook, as you know, has been taken to court a
number of times on this.  So -- so we're seeing progress there.  But this
makes sure it is a clear and concise policy that is noted and a
recording mechanism.  So it's really -- it -- it's laying out something a
-- a little more, again, in a -- in a proactive manner and charging the
AG with this.  The Governor, as you know, has just assigned a task
force on this.  But it's -- it's too monumental.  We need the private
sector working with us on this.

    MR. DURSO:  Okay.  Understood.  So -- so going
back to what you just said, the mechanism and the report button.  So if
there's a report button on every social media website and there's
hateful conduct or something that may incite violence or be
humiliating, they will report it.  Now, New York State, right, we're
here.  If a social media site is ran out of another state, so you say
California or Oklahoma or Florida, how are we going to regulate what
they do with their social media company that's in another state?

    MS. FAHY:  If they're conducting business here, if
they have a footprint here, my sense is they will fall under this.  Some
of that will have to be determined.  But we ran into this with the net
neutrality bill a number of years ago when the FTC was threatening to
eliminate net neutrality and -- and there are ways to make sure that if
they're doing business here that they have to comply by our rules.  So,
again, this is something that will have to be worked out.  But certainly,
most of the major companies have a -- if not a physical footprint, they

189

NYS ASSEMBLY                                          JUNE 1, 2022

certainly are being used by residents here.  So we -- we think it would
be applicable and some of this will have to be hashed out, some of this
may end up in the courts as -- as our gun liability bill did from last
year.

    MR. DURSO:  Okay.  So, as -- as of right now, right,
so -- I'm -- I'm not going to sit here and act like I know about all of
these social media companies, I'm not --

    MS. FAHY:  Right.

    MR. DURSO:  -- as tech savvy as I probably should
be.  But a company that is based out of California right now, we put
these regulations in place, right, saying they have to have a report
button, they have to have a -- a mechanism in place to be able to
report this type of conduct and they don't do it.  How can New York
State find them if they're not here?

    MS. FAHY:  You know, again, that will be up to the
Attorney General.  She's -- she is granted the enforcement authority
here and -- and if need be to issue -- the ability to issue subpoenas.
What she can do across state lines, you used California as an example,
she's -- she's worked very closely with -- with the Attorney General
there, and certainly most of these platforms are available around the
world.  So, you know, those are issues that are going to have to be
worked out.  I would hope in conjunction with other states, but that --
that -- again, they may be challenged and if so, the courts will -- will
settle it.  But we think that if they -- if they have a presence, if it's
being used here and they have paying customers or paying advertisers

190

NYS ASSEMBLY                                          JUNE 1, 2022

on those platforms, they have a -- a base here in this State.  So I'd like
to think, you know, our -- our understanding is it will have a reach.

    MR. DURSO:  Okay.  And then that will just bring
me into one of my final questions because you actually brought it up.
So if there's a company that's based outside of the United States.  Does
the Attorney General really have the authority to go that far with it or
should this be more of a Federal issue?  Maybe we should be lobbying
Congress at this point to maybe take over a bill somewhat like this.  I
mean, it -- it -- do we have that far-reaching effect here in New York
State?

    MS. FAHY:  To be perfectly, you know, realistic
here, obviously that's harder, right?  And again, just trying to keep up
with Facebook, if you just think of Facebook, again, with billions,
billions of posts every day, this is a monumental task.  So I think this
is just the start, and clearly we'll be -- we will be relying on the
cooperation of -- of the social media networks to set up that policy and
to -- to begin to better monitor.  And then we don't have a -- a bashful
Attorney General and we recognize the -- the correlation.  Estimates
are that 80 percent of mass shooters have shown signs of crisis, and
about one-half of that 80 percent have estimated to have revealed their
plans ahead of time by a social media post.  So we know we have an
issue.  We know we need more tools to address it.  Overseas will
clearly be -- harder platforms that are operated overseas will -- will
clearly be a more challenging task.  But certainly -- certainly we know
we have a problem and it's not just -- it -- it's not just confined to New

191

NYS ASSEMBLY                                          JUNE 1, 2022

York.

    MR. DURSO:  Okay.  Thank you, Ms. Fahy.  I
appreciate all your time.

    MS. FAHY:  Thank you.

    MR. DURSO:  Thank you, Mr. Speaker.

    ACTING SPEAKER AUBRY:  Mr. Ra.

    MR. RA:  Thank -- thank you, Mr. Speaker.  Will the
sponsor yield?

    ACTING SPEAKER AUBRY:  Ms. Fahy, will you
yield?

    MS. FAHY:  Sure.  Happy to.

    ACTING SPEAKER AUBRY:  Ms. Fahy yields, sir.

    MR. RA:  Thank you very much.  And certainly I
appreciate your -- your effort with regard to, you know, this issue and
it's something that I think -- it's tricky, right?  It's -- we're trying to
address something that has, you know, some Federal law, obviously,
potentially triggering constitutional provisions, and different states are
different -- doing different things and -- and that's I think one of the,
you know, concerns.  But I was just reading one of the -- the memos
from the NYCLU regarding this, and, you know, I think we all know
that like we have a First Amendment right to speak and all that, but
there's a level at which, you know, you cause danger or -- or
something like that.  So I guess really the -- the question is, you know,
with this -- this language that's in the bill, how do we ensure that we
don't have, you know, the unintended consequence that, you know, a

192

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

social media entity now regulates past what we're trying -- you know,
we're trying to get at that really dangerous, hateful conduct that can
incite violence, all of that.  But how do we make sure that they don't
use this as an opportunity to say certain, you know, speech may be
political in nature on one side or the other and -- and cut down on that
type of speech?

MS. FAHY:  Again, we agree this is tricky.  This is
an area that, you know, we are -- we are venturing into territory that --
that has been tried before, and I think there's been some hesitancy
because all of us value the -- the right of free speech.  We do, again,
add in here that nothing is intended to hinder that.  At the same time,
we know -- and -- and nothing is intended to increase the liability of
these social media platforms.  But we know we have an issue.  We
know violent offenders are too often posting, and again, we are trying
to keep this focused on hateful conduct leading to or is trying to incite
-- we have the word incite violence there -- and it is against a group or
class of persons based on the -- the definition that was read earlier, so
based on a whole host of -- of categories you -- you're quite familiar
with.  And so there is an effort to draw that fine line, yet we've got to
have these social media companies working with us.  You know, the
-- the Attorney General could hire a thousand investigators tomorrow,
and without the cooperation of these platforms and without better
transparency we will not be able to get at this -- these violent
intentions or these violent incidences that are being posted.

MR. RA:  And thank you.  And -- and I know that,

193

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

obviously, you know, we've had social media entities testify before
Congress and, you know, trying to get at the heart of this issue and I
and I -- and I really think that ultimately that's maybe where some
solution lies if, you know, they can get themselves together.  We know
getting anything in agreement in Congress is -- is tough these days.
But, you know, otherwise you end up with kind of like a shish kabob
of all these different state laws.  They're all different.  You know, you
have Texas who did something that is like very much I think can lead
to great unintended consequences of just kind of anything goes.  But
then you have obviously something like this that -- that I think could
also lead to unintended consequences.  But I want to get to maybe the
specifics there.  So, you know, they make a policy accessible to the
user, right, and -- and I would think any major entity is just going to
have to do this because obviously they're reaching New York just like
they're reaching really worldwide, most of these platforms.  So to --
mean, how detailed does this have to be?  Does it have to say
something like, you know, once reported, where you will verify this
within 24 hours, 48 hours and have it removed?  Does it have to go to
the extent of we will follow-up with the person who has reported this?
Can -- can you give me like an idea of how detailed a policy we would
expect under this?

MS. FAHY:  Sure.  Again, here a couple -- in a
couple of places we do note that they -- they are required to have this
policy but it is -- it is to be clear and concise.  And I think it -- the
conciseness is important because we want it -- we don't, you know,

194

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

want ten paragraphs of policy that everybody just checks off and --
and doesn't read again as they're accessing -- as they're purchase -- as
they're purchasing things online.  So this is intended to be clear and
concise and readily available, as well as accessible on the website as
well as the ability to report.  We also include a provision that says that
the -- the social media networks themselves need to show how they
plan to respond.  But we have left this purposely open, if you will,
because we are leaving it up to them.  And as is often the case, the
larger providers, as were talked about earlier, Twitter and Facebook
have spent the last few years trying to navigate this, trying to better
monitor.  And we saw with the massacre in Buffalo -- I -- I don't know
if it was 4chan, I forget what platform that that massacre was being
filmed on -- it was taken down.  One took it down in ten minutes, the
others spent hours before they took down those videos and I'm sure
some are still out in the etherland.  So we know we've had mixed --
mixed success, and that's why we -- we contend we need to be more
assertive here and we've got to get them working with us and working
with the Attorney General.

MR. RA:  Okay.  And then in terms of, you know, the
-- the civil penalty section, so is that civil penalty triggered -- the
violation would be not having a policy.  Could an entity have that, you
know, penalty triggered by their lack of action to something reported
to them or would it just be that they have to the proper mechanisms in
place for these things to be reported?

MS. FAHY:  It -- it also includes a lack of action.  A

195

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

failure to comply could trigger that.

MR. RA:  Okay.  So -- so theoretically, and -- and
this I guess might be or is one of my concerns, is that, you know,
somebody could -- well I guess it would -- the Attorney General
would be the one enforcing this, correct?

MS. FAHY:  I'm sorry?

MR. RA:  The Attorney General would be the one
enforcing it?

MS. FAHY:  Yes.

MR. RA:  So, you know, I -- I -- so, if the Attorney
General say -- say something gets reported, the social media entity
goes through their process, they say, *You know, we don't think this is,
you know, violative of our -- of our policies.  We're -- we're okay with
this.  It maybe pushes -- pushes the line but it doesn't quite cross it,*
and they allow it to stay, potentially the -- the Attorney General could
say, *No, I think this does go past that* and bring an action for violating
this; is that correct?

MS. FAHY:  I think, again, in an effort to be
proactive if that policy is published at the front end, that clear and
concise policy and where it's agreed to, I think it -- it would
presumably prevent one of that, you know, second guessing --
second guessing afterwards.  You know, so there's -- there's no penalty
involved here for not reporting at this point.  It's, you know, we're not
telling them what -- what the policy should be nor if -- if it's reported.
This is -- in so many ways these are just the first steps of really trying

196

NYS ASSEMBLY                              JUNE 1, 2022

to tackle -- tackle a -- a monster item with 4.75 billion posts every

day. So these are -- you know, quite frankly, I think they're -- they're

small steps but we are wading into, as discussed, tricky territory with

trying to be respectful of free speech and trying to -- and trying to get

the assistance of the private sector because there is -- there -- we are

hindered. We know from so many other violent incidences that were

online beforehand, Buffalo was far from the first, we know we need

more cooperation, we need better policies. It's -- it's like the New

York City issue of *See Something, Say Something*. It's -- we're trying

to encapsulate that but with social media.

      MR. RA:  Thank you very much --

      MS. FAHY:  Thank you.

      MR. RA:  -- I appreciate your efforts with regard to --

to this issue.

      Mr. Speaker, on the bill.

      ACTING SPEAKER AUBRY:  On the bill, sir.

      MR. RA:  Just quickly, you know, we -- we do

certainly need to find ways to look at this issue. A lot of, you know,

the Federal laws date back to the earlier days of the internet. I don't

know when, you know, the first time people were using some of those

old search engines or doing whatever they were doing online, going to

these basic websites we ever contemplated the social media world we

live in now. So certainly we're in a different day and -- and our laws

should -- should reflect that. And -- and I think appropriately, you

know, a Federal policy that requires, you know, really neutral policies

197

NYS ASSEMBLY                              JUNE 1, 2022

by -- by social media operators I think would be more effective. But

-- but the whole point of that Federal law way back then was to kind

of just allow the internet to kind of flourish and give kind of safe

harbor so that operators weren't held liable for -- for things people

posted. And I think some way here where we need to get is that if the

entity is making a good faith effort that there's not that potential for

them to be second-guessed. The problem is at the end of the day some

human being, you know, they -- they're going to have their algorithms

and things try to catch things which they all have. And as any of us

should realize when you go on any of these social media platforms

there's -- there's an algorithm trying to make sure you see what they

want -- what they want you to see, and -- and unfortunately in a lot of

ways it ends up creating social media echo chambers because they're

sending content that they think you're going to like and not necessarily

that you think you're not going to like. But my concern is that at some

point there's going to be some person making a -- really a subjective

determination about something, and -- and that's where we get into a

really tricky area.

      So I -- I know this is not an easy area to legislate, so I

certainly appreciate you bringing this bill before us and I'm sure a lot

of work went into getting this language before us. And -- and I hope

that it's a continued conversation because social medial outlets can be

wonderful, but they can be absolutely awful at times, too, in terms of

just people saying things that they would never say to somebody's face

and certainly inciting, you know, hate and violence as well. So, I -- I

198

NYS ASSEMBLY                              JUNE 1, 2022

thank the sponsor for answering my questions. Thank you, Mr.

Speaker.

      ACTING SPEAKER AUBRY:  Thank you.

      Mr. Jensen.

      MR. JENSEN:  Thank you very much, Mr. Speaker.

Will the sponsor yield for a few questions?

      ACTING SPEAKER AUBRY:  Ms. Fahy, will you

yield?

      MS. FAHY:  Sure.

      ACTING SPEAKER AUBRY:  The sponsor yields.

      MR. JENSEN:  Thank you very much.  I just want to

go in a little bit of a different direction than my -- my two colleagues

previously.  End of last week I was in a -- a community meeting trying

to address violence in the Greater Rochester area.  And representatives

from faith-based, community-based organizations who act as violence

interceptors in the community mentioned that they're seeing over the

past few years more and more individuals in the community using

social media, Facebook, as a way to threaten violence against other

people.  And they don't fall into the protected classes that you

mentioned in the bill, but yet they're still trying to incite violence and

incite hate because they're in a rival gang, a rival organization.  And

we've seen that with, you know, waving firearms, threatening people

directly, threatening witnesses.  There was a donnybrook in a Walmart

parking lot where somebody suffered gunshot wounds.  And I guess

my question is, would this cover those types of hateful conduct?

199

NYS ASSEMBLY                              JUNE 1, 2022

Because I think if you're threatening to kill a witness to a crime, that's

pretty hateful.  Would that be covered even -- even though they're not

a protected class?

      MS. FAHY:  My reading of this -- yeah, that's an

excellent question.  Certainly, you know, this is targeted at groups or

classes of persons as were read before and I won't reread them.

      MR. JENSEN:  Yep.

      MS. FAHY:  If it's to purposely target a witness, to

take out a witness, if you will, of another crime, that is -- that is -- my

reading would say it's not covered here.

      MR. JENSEN:  It's not.

      MS. FAHY:  But maybe that's another bill.

      MR. JENSEN:  Yeah.

      MS. FAHY:  But certainly I -- I see your point.

Again, I'm -- I'm trying to be as frank as I can be.  This is -- these are

small steps to get at what is a monumental but difficult problem.  And

but we -- you know, again, this was initiated last year after January

6th.  Certainly we've had incident after incident.  We know we have to

begin somewhere.  But you raise an excellent point.  So -- but -- but if

the policy were there, nothing would preclude the social media

platform or network from adding that in.  You know, again, it's back

to the New York City version of *See Something, Say Something*, but

we're trying to do it online.

      MR. JENSEN:  Right.  And I -- and I think, you

know, one of the questions with that is I know Twitter has a much

200

**JA173**

NYS ASSEMBLY                                        JUNE 1, 2022

more maybe stringent inciting violence and actual threat.  And so I
guess, you know, Mr. Ra talked about this a little bit, that because of
the vagueness of this legislation that we could have a cornucopia of
different social media platforms having different rules for constituting
what they have to have a policy for.  And while they may have to
address taking it down or removing it from their platform, is there
anything that would make them have to report those types of threats to
law enforcement in the relevant jurisdiction rather than just removing
the content from their platform?

      MS. FAHY:  As -- as noted, we're -- we're not even
telling them -- because we are just starting here, we're not even telling
them what to do.  We're just saying that they -- they need to state how
they would respond, we're not saying or address.  But we're not telling
them how they would do that.  And again, I think these are the types
of things, one, that are worked out in regs, but also worked out by the
-- the bigger networks who have already spent the last few years trying
to be more aggressive on this because of previous incidences.  And I
think that will set the tone and lay out -- lay out some paths forward
on this.

      MR. JENSEN:  Okay.

      MS. FAHY:  Is my sense.

      MR. JENSEN:  Well, thank you very much.  I
appreciate you answering my questions.

Thank you, Mr. Speaker.

      ACTING SPEAKER AUBRY:  Thank you, sir.

201

NYS ASSEMBLY                                        JUNE 1, 2022

      Mr. Otis.

      MR. OTIS:  Thank you.  I'm going to speak on the
bill and --

      ACTING SPEAKER AUBRY:  On the bill, sir.

      MR. OTIS:  -- and I'm going to congratulate the
sponsor of the bill for having the foresight to bring a concept that is a
very important issue that we need to address.  But a lot of the
discussion has been about things that are actually not in the bill.  This
is a very simple bill.  This is a bill that basically raises the standard for
social media sites to have a -- and I'll read the language -- *easily --
easily accessible mechanism to report hateful material*.  That's all the
bill really does.  It -- it would have to report on they handle the
complaints.  But what the bill does not do is the bill is not about the
First Amendment, we don't tell the social media sites what they do,
what -- what judgments they make.  It is not about the government
telling social media sites what to keep up or what to take down.  And
it's not very complicated.  What it does do is it sets up -- it doesn't --
doesn't tell them what their role should be.  What the bill does is
basically say we want speed in getting hateful material down.  The
site's going to figure out what material on their own policies they're
going to take down or they're going to keep up.  But as the sponsor
alluded to, in the evil that occurred in Buffalo, it was posted live by
the killer and then reposted on other sites, sometimes for hours and
hours, and the sponsor speculated that maybe it's still up in some
places.  And so what we want to do is we want to make it as easy as

202

NYS ASSEMBLY                                        JUNE 1, 2022

possible for people that see this to report it to the site, and at a certain
point these sites are going to have to look at their own morality and
their own conscience and decide what their policies are going to
be.  And maybe some of these other more complicated judgments and
issues are going to be handled in other legislation or by the Federal
government, but that's not what this bill does.  This bill simply says
we have to have a clear, quick way that the public can report stuff that
they -- they think violates their sense of what hateful speech is.

      So compliments to the sponsor.  She came up with --
with this bill a while ago, but we've seen it in real life in -- in Buffalo
and other places around the country.  This is a bill everybody should
support.  Some of these other issues, they're for arguments about other
bills that aren't before us today.

Thank you.  I'll be voting aye.

      ACTING SPEAKER AUBRY:  Thank you, sir.

      Mr. Lawler.

      MR. LAWLER:  Thank you, Mr. Speaker.  Will the
sponsor yield?

      ACTING SPEAKER AUBRY:  Ms. Fahy, will you
yield?

      MS. FAHY:  Sure.

      ACTING SPEAKER AUBRY:  Ms. Fahy yields, sir.

      MR. LAWLER:  Thank you.  So, former Supreme
Court Justice Antonin Scalia in talking about the First Amendment
basically said that the principal role of the Court in the area of civil

203

NYS ASSEMBLY                                        JUNE 1, 2022

liberties is to prevent the government from backsliding in its
protections of long-recognized personal liberties.  Obviously, this
dynamic is in many respects a very new front in the -- in the First
Amendment fight.  And -- and I think as we've seen, the First
Amendment is not absolute.  There are certain things that you cannot
say or do that -- and especially in threatening violence or -- or harm to
others.  And I think when we look at that I think obviously its
incumbent upon not just social media companies, but across the
spectrum to ensure that those types of hateful rhetoric do not occur.
Where I do get concerned is that we're seeing in other states kind of
the -- the converse here where they're saying that social media
companies cannot try to sensor predominantly political speech and
political thought.  And certainly it appears at times that certain
political parties and/or elected officials are more regulated or looked
at than others.  The Supreme Court has basically upheld -- allowed
Texas' law to go forward.  Isn't this something that maybe needs to be
dealt with Federally as opposed to a state-by-state-by-state basis given
obviously the fact that the internet is global and not just operating in --
in one little area of the world?

      MS. FAHY:  As with so much legislation we do here,
as with so many bills especially this week and talking about a number
of gun measures, we absolutely would like to see more work done at
the Federal level.  I mentioned the net neutrality bill I had a few years
ago.  Certainly -- certainly we would like to see more done there, but
we know no secret of the paralysis as well in Washington and -- and

204

**JA174**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

we can't wait, right?  This was our backyard.  And -- and Buffalo was far from the first where 180 pages were posted on social media with lots of violence posted within those 180 pages, and yet, you know, could a law like this or a bill like this have prevented that?  We don't know.  But we know we need to do more and we need more transparency.  And so it's a matter of do we wait or do we not for the Feds and I say we don't.  We've got to start.  And quite frankly, I think we're going to have more -- more cooperation given the -- the horrors of the last two weeks, let alone of almost daily violence.  And -- and the use, the explosive -- in 2020 the U.S. State Department issued -- issued a -- a study saying racist violence is both on the, quote, "on the rise and spreading geographically", end quote, as White supremacists increasingly target minority groups like immigrants, ethnic minorities, LGBTQ and other, quote, "perceived enemies".  So, you know, we've -- we can't wait is the simple answer.

    MR. LAWLER:  I think all of us probably in this Chamber have some social media accounts, whether we're active or not.  But I'm -- I'm sure everybody here has an account.  And, you know, as -- as Liza Minelli once saying, you know, *If I can make it here I can make it anywhere*.  Obviously, New York is rough and tumble.  It is -- you know, politics can be -- can be rough.  All of us, I'm sure, have gotten notifications of some of the most outrageous things that have been said about each of us.  And I think the -- the question that I have is, you know, look, obviously anyone who is a racist or bigoted or homophobic or attacking somebody else because

205

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

of who they are, that is a -- that is a problem.  It's a societal problem that we have to -- to continue to combat.  But I guess the question is, you know, many of us, I'm sure at times, like I said, have been called some of the worst things.  I've been called a fascist.  I didn't know that -- that my views were so reprehensible, but, you know, does that incite hate?  Does that incite violence?  Like, who is supposed to regulate this?  Who is supposed to make the determination?  And I know as my colleague said that this bill is not saying what they should do, but like where's the line in your mind as to what should be regulated versus what should be not?  Should -- should people on social media be allowed to say things about their elected officials?  You know, we've seen elected officials be compared to -- to Hitler, to, you know, et cetera.  I mean, where -- where is that line that you're looking for to stop that hatred, stop that violence from occurring?

    MS. FAHY:  It -- first of all, you know, we're, again, and being as frank as I can be, we are -- we are taking some very small steps here, right, to try to be proactive.  Once again, government is trying to catch up with technology.  And -- and we're -- what we're asking in this case, we're asking those technology companies, in this case social media networks, to assist us.  We cannot -- we could not with a thousand enforcement officers tomorrow assigned to this, there is no way we could do this through -- through government.  We need that assistance with that reporting and the -- the mechanism -- well, sorry -- the monitoring on the part of the -- the company itself and then the mechanism for making it easily reportable.  We're not telling

206

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

them what the next step is.  We don't say they be fined if -- we're not saying what they have to do with it other than to show us how they would respond and address it.  So these are small steps.  But it is an effort because I -- because of that recognition.  So regulation, it's a -- we're not regulating at this point, we are -- we are empowering, however, the Attorney General to -- to follow through and make sure that companies are complying.  Or -- or enabling her to fine where they are not complying.

    MR. LAWLER:  But if we're saying that they need to come up with some mechanism to report and they need to let us know how they may respond to hateful conduct, what if their response is, you know, that they're not going to remove it?  That's a response.  I mean, so the Attorney General is going to be able to go after them for not removing what she deems hateful?

    MS. FAHY:  This does not empower her in that regard.  Again, that may be other legislation, but -- but this does not -- unfortunately, does not empower her.  But I think some of this is the morality of -- of the situation.  What we are trying to go after here, again, with billions of posts every day, we really are trying to target this on inciting violence.  The -- the hateful conduct moving toward that inciting of violence, right?  So it's a -- it's a -- it's a higher threshold than just calling you a name or calling me a name.  We've all been called names here.  But it's -- it's moving toward that inciting of violence, the hateful conduct --

    MR. LAWLER:  Well --

207

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

    MS. FAHY:  -- moving toward violence toward targeted classes of people.

    MR. LAWLER:  I -- I think where some of the concern is and -- and the New York Civil Liberties Union raised, obviously, the issue of this be -- this bill being preempted by Federal law and potentially presenting a First Amendment problem, but really the definition of hateful conduct being quite vague, and where we say vilify, humiliate or incite violence.  So it's not just the violence part, it's vilifying and humiliating.  So the -- the -- it's not and, it's or.  So I guess the question becomes who's coming up with the definition of vilify or humiliate, which is part of what my colleague was asking at the beginning.  This is, you know, your definition of what it is to vilify somebody, you know, let's say I posted a picture of somebody wearing a fanny pack and -- and, you know, made a joke about it, right?  Like, that may be vilifying somebody or -- or humiliating them.  But what is kind of the -- what's the definition?  Who -- who is going to decide that?

    MS. FAHY:  Again, this would be -- you know, this would be a -- laid with the Attorney General.  And I -- the way this is read it really is, in my view, it's -- it's the -- the whole phrase of -- it's -- it's hateful conduct using social media networks to vilify, humiliate or incite violence.  I still think it's all -- it's all -- you could read it as modifying violence, hateful conduct modifying the violence is one read of it.  Humiliating somebody -- again, with billions of posts every day, I don't think the Attorney General is looking for posts that may

208

NYS ASSEMBLY                          JUNE 1, 2022

hurt your feelings or humiliate -- you know, different people may be humiliated with different things. It really is leaning toward that hateful conduct and leading toward violence. I mean, that's what -- that's what we're trying to get at. That's the pattern that we are seeing all too repeatedly, repeatedly with the -- the profiles that have been done of mass murderers.

MR. LAWLER: So -- so the intent is not so much to go after political speech, but just --

MS. FAHY: No.

MR. LAWLER: -- but to go after those who would use social media platforms to suggest that others, you know, commit violent acts or -- or suggest that they are going to commit violent acts?

MS. FAHY: That's more how I read it. Again, I think that word inciting violence is -- is probably the key word here. And I think we need a high threshold, right? We want -- we want these networks working, cooperating. We want them having that clear and concise policy of -- of what they're monitoring, but we also want that reporting mechanism. Again, we -- what I've read, *See Something, Say Something* in New York City has been somewhat effective, right? The airports use it. It's -- it's -- it's been -- so this is -- in my view, this is similar to that. We are looking for that assistance. In New York City it's from the public, here it is from the social media platforms because there is no way any government entity can monitor billions upon billions of posts every day.

MR. LAWLER: Oh, I -- I agree with that.

209

NYS ASSEMBLY                          JUNE 1, 2022

MS. FAHY: So I see it as a high threshold.

MR. LAWLER: I agree with that. I think some of the concern really as we've seen over the last couple years, I mean, I -- I -- personally, I think social media is generally toxic.

MS. FAHY: Yes.

MR. LAWLER: It -- it is -- there's very few positive things on it. You know, people are just keyboard warriors. You know, they're -- they're happy to attack. Many of the things that people would say on social media they'd never say to your face.

MS. FAHY: Yes.

MR. LAWLER: So it -- it's -- I think generally speaking it -- it -- it's become a very toxic component to our political discourse. I don't think there's many intelligent discussions on social media. It is a lot of echo chambering group thinking and people just wanting to reinforce their own perspectives. And frankly, I think the way the social media companies have operated with their algorithms, they feed into that.

MS. FAHY: Yes.

MR. LAWLER: So that I think is something that does need to be looked at and -- and regulated from a Federal perspective. I do have concern about state-by-state-by-state trying to regulate something that really crosses state boundaries. And I think also there is a problem where some of these social media companies are not consistent in how they apply their own internal rules with respect to vilifying, humiliating or inciting violence. They seem to be

210

NYS ASSEMBLY                          JUNE 1, 2022

okay when things are said about certain people or groups and obviously not when things are said about others. We should be consistent in having zero tolerance for anyone inciting violence in any way, whether it's storming a capitol, whether it is taking control of a Federal courthouse for, you know, nearly 100 days. There should be no tolerance for any of it. And I -- and I think that's where there has been --

(Buzzer sounds)

-- a lack of consistency across the board on this.

ACTING SPEAKER AUBRY: Mr. Lawler, you have expended your time.

MR. LAWLER: Happily.

ACTING SPEAKER AUBRY: Thank you.

MS. FAHY: If -- if I could just add on -- on the bill and in response. We fully agree on everything you mentioned, and yes, social media has become quite toxic. I would make one exception to that, and that is I don't believe we can wait on the Federal government anymore before we can more proactively require the media companies themselves to do this and begin to work to monitor them.

ACTING SPEAKER AUBRY: Mr. Angelino.

MR. ANGELINO: Thank you, Mr. Speaker. Will the Madam sponsor yield for a couple of questions?

ACTING SPEAKER AUBRY: Ms. Fahy, will you yield?

211

NYS ASSEMBLY                          JUNE 1, 2022

MS. FAHY: Sure.

ACTING SPEAKER AUBRY: Ms. Fahy yields.

MR. ANGELINO: Thank you, sir. Thank you very much for indulging me with a couple of quick questions. I have some grave concerns about First Amendment rights with this, and I think many in my Caucus do. Maybe you can help alleviate some of that because I agree this is sometimes, as my colleague in front just said, it can really get inciteful at times. I'm reading paragraph A -- excuse me, -- yes, it's paragraph A, the classes of people based on race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender or gender expression. Would this include -- a buzz thing happening right now is gender pronouns. Would that be something that -- is that inciteful or humiliating (inaudible) this bill?

MS. FAHY: I'm not the Attorney General, but I don't -- I don't read it as -- that as hateful conduct nor as any ability to lead toward inciting violence.

MR. ANGELINO: We -- we've seen recently a lot of that is being used right now for -- against -- the big case was a high school student who refused and said it was his right to use a different pronoun. But another case, and it's not covered on here and it can get quite -- quite heated is debate on sports teams, and that language can sometimes turn into, *We're gonna -- we're gonna murder you* or things like that. These aren't going to trigger some sort of algorithm on a website page and say, *Oh, my gosh, you know, red flag this guy.*

MS. FAHY: Quite frankly, again, since they -- many

212

**JA176**

NYS ASSEMBLY                    JUNE 1, 2022

social media platforms have become quite sophisticated and quite
proficient at creating algorithms. I would think if somebody is talking
about the murder of any group or class of individuals that it would
trigger a minimum reporting mechanism.

MR. ANGELINO: I know I have been on veterans'
chat groups we were talking about the problem of suicide amongst
veterans, and all of a sudden we all have been flagged and we get the
crisis hotline number directed to us through a direct message. So I'm
just concerned that the classes in there, it's not going to be like
employment. Like, we're not going to be protected here. We're
supposed to have thick skin and take this.

MS. FAHY: We're supposed to have what? I'm
sorry.

MR. ANGELINO: Thick -- we're supposed to have
thick skin and take these threats?

MS. FAHY: Well, again, I think depending upon the
group or -- or class of persons, again, if it is to incite violence we
would want something like that reported. But generally -- generally,
again, this is targeted at -- at the groups or classes of persons based on,
again, their race, color, religion, ethnicity, national origin, disability,
sex, sexual orientation, gender identity or gender expression. So it is
-- but -- but -- but that is a next step for -- for individuals. So the case
earlier where it's targeting a gang member for murder, that is not --
that's not something covered under this bill.

MR. ANGELINO: Thank you very much.

213

NYS ASSEMBLY                    JUNE 1, 2022

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY: On the bill, sir.

MR. ANGELINO: Well, earlier this year in my
position as Assemblymember somebody threatened me, and the BCI
downstairs got involved. It didn't really bother me too much, but I
know the -- the HR staff here was concerned about it. But I'm kind of
used to that from my previous life, which brings me to a real group of
people who have been humiliated and vilified, and that's the class of
people who are our law enforcement officers. There's real hatred there
that's being directed at them, particularly a couple years ago in the
heat of the -- the George Floyd murder. And we're not just talking
sour grapes, we're talking real hatred. You know, I -- the NYPD
comes to mind pretty quickly because we saw videos down there that
turned into a cottage industry of people pulling water bottles out of a
fanny pack right up to five-gallon buckets of water being poured on
those NYPD officers. And I -- if you've ever saw the video you
would definitely agree they were humiliated and they really had no
course of action after that. I don't know exactly. I'm listening to the
debate. I hope there's more because I'm undecided in this, but I want
to thank the sponsor for trying to do something in light of what's been
going on.

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY: Thank you, sir.

Ms. Glick.

MS. GLICK: Thank you, Mr. Speaker. Briefly, I

214

NYS ASSEMBLY                    JUNE 1, 2022

would like to make a few comments. First, thank the sponsor for
bringing this forward, but I would like to say that not everything
(inaudible) our world on social media is coarse and maybe a little over
aggressive in -- in some instances. But not all social media is like
that. There are a whole range of folks on, whether it's Facebook or
Twitter, that focus on things like nature. And they're really quite
specific and very soothing. I like to re-tweet some stuff around birds.
Some of the people who follow me because of my political invective
took exception to the fact that there were just too many birds, which I
thought was their problem, not mine. But as you may know, as
elected officials we are not supposed to actually block people on
Twitter. There was a court case, and at the highest level, President
Trump, and so we cannot block people. But what we can do on our
own Twitter feed, and I presume -- I'm not on Facebook, but I
presume there, too -- that you can set up a criteria for blocking. And
if you administer it in an even-handed way you cannot be, I presume,
sued for blocking someone. So I don't think it's rocket science, and I
think we would expect that the geniuses who can program and
develop algorithms could figure out a way, a more efficient way than
they have thus far to do that. So I unpinned that tweet with my
blocking criteria so anybody who goes to my site sees it. Posting of
mistaken of facts, unsavory comments about personal lives, threats of
harm, posts or people engaged in or affiliated with child or revenge
porn -- that was to get at somebody who was actually threatening to
sue me. Posts or people engaged in or affiliated with sexual assault,

215

NYS ASSEMBLY                    JUNE 1, 2022

using abusive, scatological or inappropriate language. It has cleaned
up some of the comments, but I don't think that it is anything that
these tech companies couldn't figure out how to do a better job of.
And they really owe it to society because it has been pernicious and it
has been used to organize violent activities. And so they have a
responsibility because they're making money selling ads, selling
private information as they track us in our searches online. They owe
it to society to be more responsible. And I want to thank the sponsor
for her effort to require them to do a better job of removing the poison
that is undermining our confidence in facts, in reality, creating
division and undermining our ability to get along with each other.

So I want to thank the sponsor. I think it's a
measured approach. As she said, a first step, but it is a signal to
these platforms that they actually have some responsibility. They like
to say, *We're a tech company*, and there's nothing -- you know, they're
not responsible for anything. But they're making money and they're
using your information and selling it to data brokers. So they are, they
are -- part of their work is to be more responsible and to stop creating
a vehicle for division, misinformation, disinformation and violence
and division amongst us.

So I appreciate your time, Mr. Speaker, and I want to
thank the sponsor for bringing this forward.

ACTING SPEAKER AUBRY: Thank you.

Mr. Goodell.

MR. GOODELL: Thank you, sir.

216

NYS ASSEMBLY                                         JUNE 1, 2022

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. GOODELL:  First, I think it should be really
clear that this bill doesn't -- isn't really aimed at conduct at all.  It's
aimed at speech.  Someone says hateful conduct, but what we're really
talking about is hateful speech on social platforms.  And it regulates
three types of speech:  Speech that vilifies, speech that humiliates and
speech that incites violence.  The First Amendment has always been
very clear that speech that involves humiliation or vilification is
generally protected.  And if you want to see an example of that you
can see how MSNBC treats Republicans or Fox News treats
Democrats, and it seems like it's their sport to try to vilify or humiliate
the opposite party.  That speech is protected.  Always has been.  The
third category is speech that incites violence.  That speech has never,
ever been protected.  And we already have actionable causes of action
here in New York State which have been around for decades if you're
a victim of speech that's incited violence.  As my colleagues
mentioned, the problem when we try to pass legislation that regulates
speech, we know that we have to be very careful to be consistent with
the Constitution.  And so what we're really trying to regulate is speech
that's on a platform that in most cases is outside of New York State.
It's maintained by companies that are either national or international.
So if you look at some of the examples -- this, by the way, doesn't
regulate speech that incites violence against anyone, it has to be
violence that's incited against certain people based on religion, race,

217

NYS ASSEMBLY                                         JUNE 1, 2022

color, creed, ethnicity, national origin.  Which is something --
somewhat interesting because I would guess if you got on the internet
right now you'd find a lot of articles that are very incite -- aimed at
inciting violence toward Russians or Ukrainians or whatever group
may be in a violent situation right now.

So I just urge my colleagues, make no mistake about
it, this is a bill that purports to regulate speech and in doing so it needs
to be narrowly tailored to meet a strong legitimate interest of
government or it's invalid.  So nobody here in this room -- I don't
think anyone here in this room supports hateful speech.  I hope
nobody intentionally uses speech that humiliates or embarrasses
anyone else or -- or vilifies anyone else.  I think that's inappropriate.
But I also recognize, as all of us do as politicians, that we're the
subject of that speech on a regular basis, and that's -- that's one of the
natures of our -- of our democracy that we allow uncomfortable
speech and we don't leave it to some foreign corporation to decide
what speech is too uncomfortable or too humiliating or too vilifying.
That's not a role for us to do as a state to appoint private companies to
be automatic censors of language that we ourselves feel
uncomfortable with.

So I very much appreciate the sponsor's desire,
absolutely support you with efforts to curb language that incites
violence.  I would point out it has been on our books for decades and I
continue to support that language and expanding it in different
mediums makes sense to me.  But I think this bill needs to be

218

NYS ASSEMBLY                                         JUNE 1, 2022

narrowed so that we meet constitutional objectives while recognizing
that our country has been built on a foundation that encourages robust
and sometimes uncomfortable speech.

Thank you, sir.  And again, thank you to the sponsor
for her efforts.

I almost forgot.  You know, I've been wrestling with
this.  I think my Caucus is generally going to be in the negative, sir.
Part of the challenge when we deal with subjective words is that it
creates the potential for a donnybrook because there's no general
accepted meaning of what's meant by humiliate or vilify.  And while
we all agree that violence and genocide, those types of activities, are
clearly outside of the appropriate scope, we want to make sure that we
stay away from subjective terms recognizing that some things that
some of us love, whether it's speech or in life, others absolutely hate.
So we try to strike that balance, sir, and again, thank you for allowing
me to comment.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect in 180 days.

ACTING SPEAKER AUBRY:  The Clerk will record
the vote on Assembly print 7865-A.  This is a Party vote.  Any
member who wishes to be recorded as an exception to the Conference
position is reminded to contact the Majority or Minority Leader at the
numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  As you mentioned,

219

NYS ASSEMBLY                                         JUNE 1, 2022

this is a Party vote.  The Republican Conference is generally opposed
over our concerns on freedom of speech and the First Amendment.
But certainly we are opposed to hateful speech that incites violence
and we do support red-flag efforts to identify people and help them
address their issues.  But those who support this can certainly vote yes
on the floor or call the Minority Leader's Office.

Thank you, sir.

ACTING SPEAKER AUBRY:  Ms. Hyndman.

MS. HYNDMAN:  Mr. Speaker, I would like to
remind my colleagues that this is a Party vote.  Any member wishing
to vote in the negative is welcome to call the Majority Leader's Office
at the number previously provided.

Thank you.

(The Clerk recorded the vote.)

ACTING SPEAKER AUBRY:  Ms. Fahy to explain
her vote.

MS. FAHY:  Thank you, Mr. Speaker, to explain my
vote.  Again, this bill would require social media networks to provide
a clear and concise policy regarding how they would respond to
incidences of hateful conduct leading toward this inciting of violence
on their -- their platforms as well as easily accessible mechanisms for
reporting this and responding to it.  It does not tell them how to do
this, it simply says they must have one.  This is cutting edge, as you
heard a lot about tonight.  Cutting edge legislation.  We're chartering
some new territory here in an effort to be proactive given the repeated,

220

**JA178**

NYS ASSEMBLY                                    JUNE 1, 2022

repeated incidences of where, again, the profile of mass shooters that
80 percent are showing a crisis in advance, and of those an estimated
one-half are estimated to have revealed their plans ahead of time on
some type of social media.  We need to be proactive.  There are
roughly five billion posts, social media posts, done daily, daily.  We
need the help.  We need the help of those social media companies.
We know just from the horrors of the Buffalo shooter that -- that
massacre just two weeks ago, there was a 180-page document filed
online before that massacre.  Enough is enough.  In 2020, well before
this the State Department said that racist violence is on the rise and
spreading, increasingly targeting minority groups such as immigrants,
ethnic minorities, LGBTQ and other, quote, unquote, "perceived
enemies."  We need a multi-pronged attack.  That's much about what
New York has been about these last few days.

     And with that, Mr. Speaker, I -- I thank my Senate
sponsor, I thank the Speaker and I thank the Chair of the Senate --
sorry, the Science and Technology for helping to move this bill
forward.  And with that I vote in the affirmative.  Thank you, Mr.
Speaker.

     ACTING SPEAKER AUBRY:  Ms. Fahy in the
affirmative.

     Mr. Lavine to explain his vote.

     MR. LAVINE:  Thank you.  Very, very briefly, I just
want to correct the record.  I think during the colloquy there was --
someone made a reference to the fact that the Supreme Court had

221

NYS ASSEMBLY                                    JUNE 1, 2022

upheld the Texas law.  The Texas law is HB20.  The Texas law
punished platforms for removing offensive speech.  So it seems to me
what this bill does is really just the opposite.  It requires a set of
policies and it provides individuals with the ability to communicate
with the social platform company in order to lodge concerns about
content and conduct.  Yes, it's a dangerous new world we're all
involved in.  Nothing new there, I think that's been the story of our
lives.  But I think that this is a step in the right direction and I'm going
to be very pleased to vote for it.

     Thank you.

     ACTING SPEAKER AUBRY:  Mr. Lavine in the
affirmative.

     Mr. Durso to explain his vote.

     MR. DURSO:  Thank you, Mr. Speaker, to explain
my vote.  I want to agree with the sponsor and thank you because,
again, I applaud your efforts on this and I do agree with you that we
need to do something.  The problem is, this bill in the end is going to
do nothing and that's my concern.  I'm worried that it may lull us into
a false sense of security.  Having a report button on social media
websites is a great thing and I agree with it.  And we can't have hateful
conduct going, inciting violence against protected classes and I
completely agree with you.  The problem is there's no mechanism in
place at the current time for the Attorney General to move forward
and do something about the conduct that goes up on a social media
site that maybe began in a different state.  So until we get that in place

222

NYS ASSEMBLY                                    JUNE 1, 2022

-- again, we're putting a bill in place before we figure out how to
enforce it.  And again, I just -- I'm concerned with the unintended
consequences that could come out of it.  I agree, something needs to
be done.  I appreciate the efforts to do something.  But again, I just -- I
-- I more fear that once again we're going to put together a task force
or a bill or put something forward, no one's going to meet, nothing's
going to get done with it, and I feel that there could be more harm
than good with that.  I would love to help you sponsor something later
that will actually lead to something and that we could do something,
maybe write a letter to the Federal government, have them do it.  They
could do it throughout the States -- the United States.  But New York
State, once again, as one of my colleagues said, we're always rushed
to be the first, but let's be the best.  Let's do it right.  Let's do
something to actually effect change and maybe we could help some of
our kids that do go on social media sites.  And social media, to me, is
disgusting.  I can't stand it.  I never have until I ran for office.  I still
don't want it.  I think it's -- it's just horrible.  But until we can do that
and someone can actually effectuate the change and have that
mechanism in place, I just feel it's going to do nothing.  So I'm going
to vote no on this bill.

     Thank you, sir.

     ACTING SPEAKER AUBRY:  Mr. Durso in the
negative.

     Ms. Wallace to explain her vote.

     MS. WALLACE:  Thank you, Mr. Speaker, for

223

NYS ASSEMBLY                                    JUNE 1, 2022

giving me the opportunity to explain my vote.  I want to commend the
sponsor for putting forth this legislation which, to be clear, just
requires the social media companies to have a policy.  It's not telling
them what that policy should be, it's not forcing them to -- to apply
their own policy.  It is just telling them that they should have a policy.
And because we're not telling social media companies what that
policy should be, it does not, I do not believe, implicate the First
Amendment.  Personally, I wish we would go further.  I wish we
would hold social media companies accountable for their failure to
better police themselves and police their content.  We know for a fact
that the Buffalo terrorist was inspired and radicalized by hateful
conduct that he read on the internet.  And we also know that he
recorded the massacre for all to see.  Doing nothing is no longer an
option.  Social media companies are making billions of dollars off of
their platforms with zero, zero accountability.  Unfortunately, as has
been said, we are limited in what we can do because Congress in its
infinite wisdom, or I would suggest maybe lack thereof, has failed --
has chosen to give social media companies complete immunity.
While that might have made sense when the internet was first starting,
I think given the Goliath position that these companies have in our
society right now and the harm that they are causing, we -- Congress
should revisit that issue.  But in the meantime I applaud the sponsor
for trying to nip the edges and encourage social media companies to
start policing themselves.

     So I proudly vote in the affirmative.  Thank you.

224

**JA179**

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  Ms. Wallace in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please record my colleague Mr. Smith in the affirmative.  Thank you, sir.

ACTING SPEAKER AUBRY:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 10, Rules Report No. 318, the Clerk will read.

THE CLERK:  Senate No. S05356, Rules Report No. 318, Senator Breslin (A08159, Bronson, Fahy, Colton, Reyes, Steck, Lunsford, McDonald).  An act to amend the State Finance Law, in relation to the cost effectiveness of consultant contracts by State agencies and ensuring the efficient and effective use of State tax dollars.

ACTING SPEAKER AUBRY:  An explanation is requested, Mr. Bronson.

MR. BRONSON:  Yes, Mr. Speaker.  This bill would require State agencies to conduct a cost comparison before entering into contracts for consulting services if that contract is anticipated to cost in excess of $1 million within a 12-month period, and the analysis would be for the purposes of determining whether such services can be performed at an equal or lower cost by utilizing State employees.  The objective of the bill is to ensure the efficient and effective use of

225

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

State taxpayer dollars.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  Thank you.  Would the sponsor yield?

ACTING SPEAKER AUBRY:  Mr. Bronson, will you yield, sir?

MR. BRONSON:  Yes, I will, Mr. Speaker.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. GOODELL:  Thank you very much, Mr. Bronson.  As you know, this bill has been vetoed several times by the former Governor who decided that the cost of doing this analysis and the delay would actually overall increase the cost to the taxpayers rather than reduce cost.  And of course you and I both want to keep cost as efficient as possible.  That's the whole purpose of your bill.  Has this bill been changed since then to address those concerns?

MR. BRONSON:  Actually, I think the veto messages indicated that the Governor in his belief indicated that agencies were already doing this analysis, which I disagree with, and also that there may be a delay in going forward with letting out contracts.  I don't believe the Governor indicated in his various veto messages that the cost of performing the analysis would be prohibitive.

MR. GOODELL:  You indicated that the Governor, who is of course the head of the Executive Branch, thought the Executive Branch was already doing it.  You didn't think the Executive Branch was doing it.  How would you know whether or not

226

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

they're doing it?

MR. BRONSON:  Well, because in his veto message the Governor indicated in all of his veto messages that the analysis, one, establishes and documents the need for services; two, ensures that the cost is reasonable; and three, analyze the existence of needed resources available at an agency.  Those three items are included in this analysis, but this analysis requires much more.  So I would argue to the Governor in his veto messages that that is not the same analysis that would be required if this piece of legislation were to become law.

MR. GOODELL:  I guess my question remains, though, how would you know whether this bill is being implemented assuming we passed it and the new Governor signs it?  How would you know that?

MR. BRONSON:  If -- if it's being implemented?  Because we would know if -- there's two criteria.  If it's ten percent or more there's a requirement to do a business plan.  That business plan would be reviewed by the Comptroller.  If it is ten percent or less more, then there is a permissive ability to do a business plan that would also be sent to the Comptroller.  So we would know whether or not it's being done when we're reviewing contracts and whether the Comptroller is issuing reports related to those analysis.

MR. GOODELL:  So you would look at the Comptroller to do audits of the Executive Branch to verify whether or not they were complying with the cost analysis that would be called for under this bill?

227

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

MR. BRONSON:  The -- the Comptroller would be required to issue a report regarding the information received from the Second Floor on their analysis.

MR. GOODELL:  Thank you very much, Mr. Bronson.  I appreciate those comments.

On the bill, sir.

MR. BRONSON:  Thank you.

ACTING SPEAKER AUBRY:  On the bill.

MR. GOODELL:  Certainly I share the sponsor's concern and a desire that we operate safely and as efficiently as possible.  The Governor indicated that at least some level of review is already being performed as a matter of routine amongst the State agencies in evaluating whether they should do work in-house or contract it out.  This bill takes that process and makes it more formal, and provides an independent verification through the Comptroller, as the sponsor yield -- or mentioned.  One of the challenges we always wrestle with when we're dealing with government is whether or not the process that we use to make sure that we're efficient itself creates us an inefficient situation.  And that's exactly the concern that's been expressed by the American Council of Engineering Companies.  They said this bill is unnecessary and burdensome and that it will serve only to increase bureaucracy and inefficiency within the State contracting process.  The Business Council also wrote there's no justification for this legislation, as it would only further burden the State by expending revenues to perform a task that they're already doing.  That was

228

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

echoed by the American Institute of Architects who said the
requirement would add several months to the front end of a project
and divert staff from their core of duties. And so in every situation
where we're all striving - the sponsor, myself, everyone else in this
room - to operate State government as efficiently as possible, we just
want to make sure that the review process itself doesn't cost more than
it saves. And I'll just point out one simple example. When I was
working for the county we had an audit. And when the audit was
done one of our departments discovered a half-a-million-dollar error
that had been missed by the auditing company. And I was very
thankful that our own internal auditors caught it. Our external
auditors said, *You know, based on that error we should audit every
single one of your accounts.* And I said, *That's great. How much
would it charge and how much do you think you're going to save us?*
And the answer is it would cost several hundred thousand and we'd be
lucky to save a few thousand and the study itself exceeded any
savings. And for that reason I think you'll find that the Republican
Caucus is going to be split. Many of us, ironically, may believe the
Governor that this process is already being conducted as a matter of
commonsense and good government on a routine basis and a more
expensive and formalized procedure won't be cost-effective. There's
others of us who might not believe the Governor's protestations in the
past and think a more formal procedure is justified. And so I expect
the Republican Caucus to be somewhat split, reflecting that question
of whether or not the cost of the study will exceed the benefit.

229

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

Thank you, sir, and again, thank you to my colleague.

ACTING SPEAKER AUBRY: Read the last section.

THE CLERK: This act shall take effect in 90 days.

ACTING SPEAKER AUBRY: The Clerk will record
the vote on Senate print 5356. This is a fast roll call. Any member
who wishes to be recorded in the negative is reminded to contact the
Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Bronson to explain his vote.

MR. BRONSON: Yes, Mr. Speaker. I abstain for the
purposes of explaining my vote. This bill is intended to save taxpayer
dollars and finding efficiencies. In New York State we spend over $2
billion a year on consultant contracts, and in many cases these
consultants performed work that could be done easily by the
professional and qualified individuals we have in the State workforce.
By some estimates the State spends 32 percent more on State contracts
and consulting today than it did a decade ago. Over the years various
comptrollers, both Republican comptrollers and Democrat
comptrollers, have indicated we could save hundreds of millions of
dollars if we did an analysis to determine whether or not we could
in-source this work versus out-source this work. Indeed, the folks
who are opposed to this bill are folks who get these contracts, so they
have a self interest, a monetary interest, to suggest that somehow this
is going to cost delays and be more costly when, in fact, analysis by
comptrollers, analysis by an Assembly task force, analysis by the

230

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

Senate have all concluded that if we do this comparison before letting
out contracts we're going to be saving taxpayer dollars, and those
dollars in turn could be used to spend on the important programs that
we provide as a State.

Mr. Speaker, I withdraw my request and I will vote in
the affirmative.

ACTING SPEAKER AUBRY: Mr. Bronson in the
affirmative.

Mr. Goodell.

MR. GOODELL: Thank you, sir. Please record my
colleague Mr. Simpson in the negative.

Thank you, sir.

ACTING SPEAKER AUBRY: So noted.

Are there any other votes? Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 11, Rules Report No. 366, the Clerk will read.

THE CLERK: Senate No. S02903-A, Rules Report
No. 366, Senator Kavanagh (A09877-A, Cruz). An act to amend the
Criminal Procedure Law, in relation to requiring the court, prior to
accepting a plea, to advise the defendant of the risk of deportation if
he or she is not a citizen.

ACTING SPEAKER AUBRY: Mr. Morinello.

(Pause)

Mr. Morinello?

231

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

MR. MORINELLO: An explanation, please?

ACTING SPEAKER AUBRY: Oh. Use the mic,
Mr. Morinello. My ears are getting a little worse.

MR. MORINELLO: I'm sorry. An explanation,
please.

ACTING SPEAKER AUBRY: Ms. Cruz, an
explanation has been requested. Thank you.

MR. MORINELLO: It's getting late, Mr. Speaker.

MS. CRUZ: Thank you. This is a court notification
bill, an act to amend the Criminal Procedure Law in relation to
requiring the court, prior to accepting a plea, to advise a defendant of
their risk of deportation if he or she is not a citizen. This bill would
amend the Criminal Procedure Law to require the court, prior to
accepting a guilty plea, to advise every defendant of the risk of
deportation, denial of naturalization or exclusion from the country if
he or she is not a U.S. citizen and is convicted of any offense. This
change would require judges in all cases, felony as well as
misdemeanors, to give the following notice to defendants orally and
on the record at arraignment and prior to accepting a guilty plea. If
you're not a citizen of the United States you may become deportable,
ineligible for naturalization or inadmissible to the United States based
on a conviction by plea or verdict.

MR. MORINELLO: Thank you. Will the sponsor
yield for a couple of questions?

ACTING SPEAKER AUBRY: Ms. Cruz, will yield?

232

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MS. CRUZ:  (Inaudible)

ACTING SPEAKER AUBRY:  The sponsor yields, sir.

MS. CRUZ:  Certainly.

MR. MORINELLO:  Is there a requirement for a notification of the admonishment currently?

MS. CRUZ:  Yes, there is.

MR. MORINELLO:  All right.  And who has that obligation?

MS. CRUZ:  Can you -- can you say that a little bit louder?  I'm sorry.

MR. MORINELLO:  I'm sorry.  Who has that obligation?

MS. CRUZ:  The judge has an obligation to provide notification on when there is a felony involved and when someone's taking a plea for a felony.

MR. MORINELLO:  No, my question was who currently has that obligation?

MS. CRUZ:  The judge.

MR. MORINELLO:  The judge currently has the obligation?

MS. CRUZ:  Yes.  The judge has that obligation when it's a felony case as well as the attorney.  The defense attorney.

MR. MORINELLO:  All right.  So then what is the change in this one if the judge already has the obligation?

233

---

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MS. CRUZ:  We're expanding it to also include misdemeanors and we're standardizing the language that is used because currently while we are requiring a judge to make a notification, we are not specifically saying what language the judge should use and it has resulted in -- in certain defendants taking pleas that they perhaps would have not taken, as well as defense attorneys not being able to represent their clients to the best of their ability.

MR. MORINELLO:  But currently that admonishment is given to prevent someone from taking a plea so that they wouldn't be deported; am I correct?

MS. CRUZ:  Currently -- I would frame it differently.  It's not to prevent someone, but it's to ensure that someone has enough information when they're making the decision to take the plea.  The problem is that because we don't have standardized language you can have a judge in one county saying it one way and having one outcome, versus a judge saying it in a completely different way in another county and having a different outcome.

MR. MORINELLO:  But the purpose is to prevent or acknowledge -- to have someone acknowledge that they could be subject to deportation?

MS. CRUZ:  Correct.

MR. MORINELLO:  Correct.  So this is to ensure that someone who has broken the law in this country who may not have legal status in this country does not get deported, correct?

MS. CRUZ:  That is incorrect.  This is to ensure that

234

---

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

someone who has been accused of a crime and not yet actually found guilty or taken a plea has enough information to assert their rights that have been recognized by the Constitution in the Supreme Court.

MR. MORINELLO:  Okay.  But that -- that exists only for noncitizens?

MS. CRUZ:  That is correct.

MR. MORINELLO:  Okay.  So this bill now forces a judge or compels a judge to give that admonishment to citizens also who are not subject to deportation?

MS. CRUZ:  That is correct.

MR. MORINELLO:  Okay.  Under the existing law they can inquire as to the status, correct?

MS. CRUZ:  Let me verify that.  Give me one second.

(Pause)

MR. MORINELLO:  Sure.

MS. CRUZ:  My understanding is that that is correct.

MR. MORINELLO:  Okay.

MS. CRUZ:  That is not what is triggered by this particular piece of legislation.  There could be in other circumstances where a judge may be able to ask that question.  But when advising someone of the consequences of the plea, what we are saying is provide the statement and move forward -- and move on with the rest of the trial.

MR. MORINELLO:  All right.  But -- but the issue is,

235

---

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

that statement is only to benefit someone who does not have status in this country, subject to deportation, correct?

MS. CRUZ:  Incorrect.  That statement is to protect the constitutionally-recognized right of someone who has been accused but not found guilty of a crime but happens to not have immigration status in this country.

MR. MORINELLO:  Right, but --

MS. CRUZ:  Or actually, if I may, Mr. Morinello, may actually have immigration status because they may be a permanent resident or may be someone with a different kind of non-permanent status that could face immigration consequences if they take that plea.

MR. MORINELLO:  But that does not apply to a lawful citizen of this country, correct?

MS. CRUZ:  That's correct, yes.

MR. MORINELLO:  Okay.  So what is the purpose of having that admonishment given to a lawful citizen who has no possibility of deportation?

MS. CRUZ:  Well, the current law already recognizes that everyone who's taken a plea needs to be told that statement.  What we are simply doing is expanding that to ensure that it's not just in cases of felonies but it's also in case of misdemeanors.  So the court has already recognized that.  And we are saying here specific language, it's about a 30 second statement, and then the person can move forward with their case.

236

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. MORINELLO: I appreciate that answer, but it did not answer my question. What is the purpose of giving that admonishment to a U.S. citizen who has no ability or is subject to deportation?

MS. CRUZ: Well, I would argue the purpose is to inform every single person, regardless of immigration status, who steps into a court and is accused of their crime of what their rights are under the Constitution and they're recognized by the Supreme Court regardless of immigration status.

MR. MORINELLO: All right. So, we recognize that. But the question is, why do we have to give it to a lawful citizen of the United States rather than just be an inquire of the status of the defendant?

MS. CRUZ: Well, we're not inquiring as to the status of a person, so we wouldn't know if the person -- if the judge -- if I am the judge and I'm required to provide that statement, I'm not inquiring, *Are you a citizen or are you not a citizen* in order for me to know if I should give that statement or not. We are just requiring that every defendant before they take a plea should -- and at arraignment needs to be told that statement.

MR. MORINELLO: But currently they're allowed to inquire as to the status. The question is, why are we eliminating the ability to inquire as to the status and -- and putting it on U.S. citizens, also. That's -- it's a simple question.

MS. CRUZ: Well, I -- I think what we are trying to

237

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

do here is ensure that every single person that walks through the courthouse is treated with the same rights regardless of immigration status or lack thereof.

MR. MORINELLO: Well, you're ensuring that.

MS. CRUZ: Yeah. And I think one of the other things that happens is we don't always know who's a citizen and who isn't. The judge may be able to inquire, but we don't always know who is and who isn't.

MR. MORINELLO: No, but currently you can inquire. So you're changing that ability to inquire.

MS. CRUZ: Only in relation to the specific statement. We're not saying at any other point during the trial that may not come up. We're saying when you are required to give the statement you are at -- you are given the statement and you're not moving beyond that piece.

MR. MORINELLO: If you'll bear with me for one moment.

MS. CRUZ: Take your time.

(Pause)

MR. MORINELLO: Well, I'll move on. It is -- just so you know, it is currently in the statute that you can inquire as to the status. Now, this also says you have to give that admonishment in the language of the individual. But you're not -- can you inquire as to the language necessary so that they can give the admonishment?

MS. CRUZ: Well, yes. And -- and -- in -- in practice

238

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

what generally happens is when -- when a defendant goes to court there's going to be an interpreter provided. So that -- that goes beyond the scope of what this bill -- this particular bill does, but that's something that already happens in practice.

MR. MORINELLO: Well, no, no, no. The bill specifically provides, your bill, that it will be given in the language that the defendant can speak or understands.

MS. CRUZ: Well, the language they speak does not have to do with the immigration status, but the language they speak has to do with their ability to understand the admonishment.

MR. MORINELLO: Correct. Correct.

MS. CRUZ: If I may finish the answer. And so what happens in practice is there's an interpreter in court, and that interpreter is just going to say whatever the judge is saying and, therefore, meeting the requirements of the bill. We're not asking the judge to go and learn a new language and be able to give the admonishment.

MR. MORINELLO: I never said that. There's 62 counties. Not every county has an interpreter in the courtroom. So, I don't know if you are aware of, there is a central repository that you can call and they will attempt to determine if they can find someone with that language. Now, if there's a delay in finding it because it's an obscure language, what happens to that particular defendant? Are you allowed to hold him even though it may be a charge that is non-bailable?

239

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

(Pause)

MS. CRUZ: Yeah. I think that piece goes a little bit beyond the scope of this bill, but I would argue that the judge can, in fact, inquire about the language. Most of those services that you're describing have -- I have used it myself and I've been able to find the kind of language that you couldn't even pronounce or -- or think of. So I would argue that, if in fact, the person is able to -- to actually get that statement in their own language.

MR. MORINELLO: I've been -- I was on the bench 14 years. There were many times because I was in a border town that we had defendants that we could not find through the central repository a ready interpreter to be able to take care of that particular function, and sometimes it would take a day or two because of the languages. So my question is, because the bill says it must be in that language, which means if the judge doesn't speak it you have to have an interpreter, are you allowed to hold that person during that period of time? Mindful of the fact that the issue here is to protect him from deportation so that you really have the potential risk of flight.

MS. CRUZ: So, there are other parts of -- of the Penal Law that make certain requirements about how long you can hold someone or if they are out on -- on -- on bail. I'm sure that's a favorite word around here lately. And so those would be the considerations that actually determine how long you can hold someone. You still have to, as -- as a judge, and -- and as you mentioned, you were in a border town so I'm sure you're very familiar

240

**JA183**

NYS ASSEMBLY                                        JUNE 1, 2022

that often immigrants, because of these same pressures that our system
has put on them - lack of interpretation, lack of available attorney,
lack of a number of things - have been forced into pleas that they
probably shouldn't have taken that then implicate their ability to stay
in the country.  So we are trying to pass a bill that takes that into
account and protects people's constitutional rights.  A completely
separate part of our -- our State's law handles whether they can stay
and -- and how long.

          MR. MORINELLO:  I commend the sponsor on this
bill, but still, I do not feel the answers to the questions, which were
very specific, were satisfied.

          On the bill, Mr. Speaker.

          ACTING SPEAKER AUBRY:  On the bill, sir.

          MR. MORINELLO:  I have no problem with
protecting the constitutional rights of all individuals.  I have no
difficulty in protecting the constitutional rights and advising those that
could be subject to deportation for -- with -- with those rights.  I, in
fact, have had that obligation and had that opportunity.  Currently, it is
not the judge's obligation, it's the obligation of the attorney.  I think
that part of the bill is admirable.  But to have to put the burden on
every single defendant that takes the plea in every single court in the
State of New York where if that admonishment is not given to
someone not even subjected to deportation is subject to vacatur, which
means that that plea is gone.  Again, this Body is looking at not the
victims, but the defendants.  Not the victims and not the citizens.

                              241

NYS ASSEMBLY                                        JUNE 1, 2022

They're looking to protect those that are not here and that are not
watching out for those that have -- that belong here.

          There is also one last point.  People are not being
responsible for the consequences of their actions.  We are forgetting
that little premise that I grew up with and almost everyone in this
Body grew up with.  Our young people think they can get away with
anything and we change the laws.  With that being said I will be in the
negative and I urge my colleagues to vote no on this bill.

          ACTING SPEAKER AUBRY:  Mr. Lawler.

          MR. LAWLER:  Thank you, Mr. Speaker.  Will the
sponsor yield?

          ACTING SPEAKER AUBRY:  Ms. Cruz?

          MS. CRUZ:  I'd like to say no.  Go ahead.

          ACTING SPEAKER AUBRY:  Ms. Cruz yields, sir.

          MR. LAWLER:  You know you enjoy the banter.
That's okay.  So, I want to make sure I understand this correctly.  The
-- and -- and my colleague just I think did a very nice job summing
this up, but the Court of Appeals ruled in November of 2013 that due
process compels a trial court to apprise a defendant that if the
defendant is not an American citizen, he or she may be deported as a
consequence of a guilty plea to a felony.  So this bill would expand it
to all guilty pleas or verdicts?

          MS. CRUZ:  It would -- yes.  It would expand it
beyond felonies to also include misdemeanors.

          MR. LAWLER:  To include misdemeanors.  Would it

                              242

NYS ASSEMBLY                                        JUNE 1, 2022

also include violations?  So, for a traffic violation?

          MS. CRUZ:  Yes.

          MR. LAWLER:  Okay.  So if somebody, for instance,
gets a traffic violation and they get the ticket handed to them, will the
ticket now have this verbiage on it?  Because a lot of times people will
plead guilty or not guilty, but they'll plead guilty potentially on the
ticket or they will go on line and plead guilty.

          MS. CRUZ:  No, it's only upon the court.

          MR. LAWLER:  Okay.  So if somebody chooses to
plead guilty because they fill out the form, the ticket that they were
given, they send it in and the court accepts that as a guilty plea, does
the court have any obligation to tell them about this?

          MS. CRUZ:  Can you hold that thought for a second?

          MR. LAWLER:  Yes.

          (Pause)

          MS. CRUZ:  If it's a Penal Law violation, but if it's a
traffic court violation it does not.  And generally --I -- I know which
tickets you're speaking of, and generally those particular tickets are
traffic court violations and traffic law violations, not Penal Law
violations.

          MR. LAWLER:  Okay.  So -- so then traffic law
violations would not fall under this?

          MS. CRUZ:  That is correct.

          MR. LAWLER:  Okay.  I appreciate that
clarification.  This applies to -- when we say non-U.S. citizens, this

                              243

NYS ASSEMBLY                                        JUNE 1, 2022

applies to Green Card holders, those here on a visa and those who are
undocumented, correct?

          MS. CRUZ:  Yes.  If you have a deferred action for
childhood arrival, if you're an (inaudible), anything that's not -- that
doesn't grant you U.S. citizenship, if you will.

          MR. LAWLER:  Okay.  What are the rules -- what --
what is the law currently with respect to deportation if you violate the
law?  If you plead guilty to a felony or a misdemeanor, are you -- are
you automatically, you know, going to be deported?  What -- what is
the actual current Federal law?

          MS. CRUZ:  Well, you're asking for a very long
explanation.  But the summary is --

          MR. LAWLER:  We -- we have time.

          MS. CRUZ:  Oh, no, we don't.  The -- the gist of it is
that there are certain offenses, both misdemeanor as well as felonies
that make you removable from the country - generally, they're called
crimes of moral turpitude - and they could in turn into an immigration
court case and immigration removal proceeding, et cetera.

          MR. LAWLER:  So what would be an example of a
crime of moral turpitude?

          (Pause)

          MS. CRUZ:  So, I'm not exactly sure what this has to
do with the bill, so if you can elaborate?

          MR. LAWLER:  Well, if somebody is -- if somebody
commits a crime of moral turpitude, let's say they commit a rape.

                              244

NYS ASSEMBLY                                    JUNE 1, 2022

Would that constitute a crime of moral turpitude?

    MS. CRUZ:  Well, I'm -- I'm going to really back up a little bit because I think you're going beyond the scope of what this bill does.  We are not asking the judge that wants -- the person hasn't been found guilty, which is when immigration proceedings and immigration consequences would kick in, to make the admonishment.  We're asking them to do it before, when someone, under the Constitution, is still deemed innocent, to be able to receive that information so that they have all the tools and information to determine if to take the plea, if not to take the plea.  If what their attorney is saying sounds about right or it doesn't.

    MR. LAWLER:  Well, I guess the -- the question becomes if some -- if somebody is guilty of an offense and they would like to plead guilty -- I mean, I think most of our criminal convictions are the result of a guilty plea as opposed to a trial verdict -- most people do end up pleading guilty either for a lesser offense, shorter sentence, et cetera.  I mean, there are reasons why people would do it.  I -- I do -- I do have concern that if we are using this, the -- the threat of deportation, to try and prevent guilty pleas, potentially, that it -- it will open up a -- a serious situation where victims of, say, sexual offenses, are going to be put in harm's way having to testify, you know, before a trial, relive the assault.  And it seems like we're trying to in some way prevent guilty pleas by doing this.

    MS. CRUZ:  As much as I appreciate your examples in this situation, arguably what we're trying to do is to protect

245

NYS ASSEMBLY                                    JUNE 1, 2022

everyone involved in the case, both the defendant and arguably the -- the victim.  What we don't want is someone -- because the Constitution protects everyone until it doesn't except -- you know, I'm not going to get into that part because that's beyond here.  But what we want is every single person in our State - and I wish it was an entire country - before they take a plea, if they happen to have anything other than a citizenship status should have the right to determine if that citizenship or non-citizenship status or their ability to stay in the country is going to be affected by whatever happens in their criminal case.  Because at the point when the admonishment is given they're still presumed innocent.  They haven't gone through trial, we haven't seen all of the evidence.  And what has happened in practice is actually a travesty and the complete opposite of what you're describing.  We have people taking pleas for crimes that they didn't commit because they got erroneous advice, misunderstood the advice, and end up being removed from the only country they know as home when they could have gone through the entire trial and possibly prove that they were innocent.

    MR. LAWLER:  So, if this bill takes effect and the court does not provide this admonishment or does not provide it in full, then the guilty plea would be automatically vacated?

    MS. CRUZ:  They can apply to have it vacated.  It's not automatic.

    MR. LAWLER:  And who would make that determination?

246

NYS ASSEMBLY                                    JUNE 1, 2022

    MS. CRUZ:  Whoever their attorney is at that time, and they would have to go in front of a judge.

    MR. LAWLER:  Sorry, I -- who would they apply to?  They apply to the trial court judge or would they go to another judge?  Who would -- who would they be --

    MS. CRUZ:  The Appellate Court.

    MR. LAWLER:  They -- they -- okay, they would take the conviction to the Appellate Court.

    MS. CRUZ:  Yes.

    MR. LAWLER:  Okay.  And the Appellate Court would be bound to throw it out or they can make a determination based on the individual's circumstances?

    MS. CRUZ:  So, if -- if it's determined that it was not provided on the record and the way that it's required in the language that the person speaks -- and actually, let me read to you.  *Potential actual immigration consequences for the defendant would render the plea unknowing to voluntary intelligence and require vacatur where it's determined that it would -- that the way that they were provided the admonishment or they weren't provided the admonishment did not comply with the requirements we're seeing here today.*  That's one of the reasons why we're literally spelling out the language that we will require the judge to say on the record.

    MR. LAWLER:  Okay.  And right now based on that Court of Appeals ruling this is required in all felony pleas.

    MS. CRUZ:  Yes.

247

NYS ASSEMBLY                                    JUNE 1, 2022

    MR. LAWLER:  Has any -- has any felony plea been thrown out since 2013 based on the failure to do this?

    MS. CRUZ:  I don't know the answer to that question.

    MR. LAWLER:  Okay.  So you're simply -- this -- this bill is --

    MS. CRUZ:  Can you hold on for a second?

    MR. LAWLER:  Yes.

    MS. CRUZ:  I'm sorry, I can't hear.  We're good over there?  All right.  Go ahead.

    MR. LAWLER:  So this bill is simply seeking to codify the 2013 Court of Appeals ruling into law, expand it to misdemeanors, and add a provision that if this admonition is not given in the individual's native language that it can be vacated -- it -- it shall be vacated by the court?

    MS. CRUZ:  I -- I'm going to edit that a little bit.

    MR. LAWLER:  Please.

    MS. CRUZ:  Right now it's in State law as well as in the decision by the Court saying that a defendant has to be told that statement.  But we are not telling a judge exactly what to say, we're just saying in general nature they should be advised of X, Y and Z.  And what we're doing with this bill is saying this is the specific language that we need to give every defendant when they're going through -- through -- before they take a plea and when they're going through -- why is the word escaping me now -- an allocution.  Sorry, I had a brain freeze there for a moment.  An allocution.  And we are

248

**JA185**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

saying if that does not happen, then an individual can apply to have

their -- their plea vacated and it would be vacated if -- if that statement

was found to not meet those certain requirements.

MR. LAWLER:  If it's not part of the record.

MS. CRUZ:  Yes.  If it's not part of the record, it was

not in the language, if it is not the specific language that we're giving

them.

MR. LAWLER:  And even if the -- just a hypothetical

-- if the defense attorney did inform the client or if the prosecutor did

inform the client when negotiating and offering the -- sorry, the

defendant negotiating and offering the plea deal as opposed to the

court, would that constitute sufficient notification to avoid vacating of

the --

MS. CRUZ:  I would cherish the day when a DA

would do something like that.  A defendant -- a defendant's attorney is

already required by -- by the Supreme Court under the case of

(inaudible) to do such a thing, to advise or to get advice from an

immigration attorney and inform their client of the consequences of

taking a plea or whatever is happening in their case.  What we have

here is a requirement on the judges.  One does not do away with the

other.

MR. LAWLER:  Okay.  So as -- as -- regardless of

what the defense attorney may do, regardless of, hypothetically, a

prosecutor doing, the judge must do it and if they do not the court --

the Appellate Division must vacate the decision assuming it is found

249

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

on the record that they did not do it.

MS. CRUZ:  That's correct.

MR. LAWLER:  And that applies to misdemeanors

and felonies, but not to violations.

MS. CRUZ:  That's correct.

MR. LAWLER:  Okay.  Thank you.

MS. CRUZ:  Thank you.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 90th

day.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Senate print 2903-A.  This -- this is a Party vote.  Any

member who wishes to be recorded as an exception to the Conference

position is reminded to contact the Majority or Minority Leader at the

numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican

Conference is generally opposed.  Those who support it can certainly

vote so in the Chambers here or by calling the Minority Leader.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, Majority

colleagues are generally going to be in favor of this piece of

legislation.  However, there may be some who decide to be an

250

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

exception.  They should feel free to contact the Majority Leader's

Office and we'll make sure their vote is properly recorded.

Thank you, sir.

(The Clerk recorded the vote.)

ACTING SPEAKER AUBRY:  Thank you.

Ms. Cruz to explain her vote.

MS. CRUZ:  Thank you, Mr. Speaker.  The Supreme

Court has already determined that under the Constitution immigrants

have the right to receive immigration advice from counsel when

they're facing criminal charges.  This is because of a plea or

conviction either for a misdemeanor or a felony can carry additional

consequences under immigration law which can lead to mandatory

detention or even deportation.  In New York currently the law requires

that all judges notify people of the risk of taking a plea, but only in

felony cases in order to ensure that they're making an informed

decision.  The New York Court of Appeals found that judicial

notification is legally required under the State Constitution in felony

cases, and it's also memorialized in New York State law.  However,

our current law does not apply to misdemeanors, and importantly, the

language or the form used for notification is not standardized in our

statute.  So judges provide notification that can be more harmful than

helpful and can conflict with the defense counsel's duty to provide

accurate legal defense.  Our bill today, which follows actually

(inaudible) 15 other states around the country will provide uniform

(inaudible) consistent script for judges to use during this process and

251

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

will further facilitate meaningful constitutional consultation between

clients and their attorney.  I have several constituents who have taken

pleas for crimes with -- that with proper notification could have

resulted in a different outcome, and years later they're facing

immigration consequences because they were not aware of their

rights.  This bill is an important step to change this for so many others.

I want to thank the advocates and the Speaker for

always prioritizing the rights of immigrant New Yorkers.  I'll be

voting in the affirmative and I urge others to do the same.

ACTING SPEAKER AUBRY:  Ms. Cruz in the

affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 11, Rules Report No. 369, the Clerk will read.

THE CLERK:  Assembly No. A09895, Rules Report

No. 369, Thiele.  An act to amend the Environmental Conservation

Law, in relation to the prohibition of hunting wild deer on State lands

adjacent to a licensed wildlife rehabilitation facility.

ACTING SPEAKER AUBRY:  An explanation is

requested, Mr. Thiele.

MR. THIELE:  Well, thank you, Mr. Speaker.  It is

local bill season, and of all the local bills this may be the most local of

all.  It applies to one piece of property, one piece of State property in

-- in my Assembly District.  To give a little bit of background about

252

**NYS ASSEMBLY**                          **JUNE 1, 2022**

how this bill came about, I have a -- a Suffolk County park in -- in my district. It's called Munn's -- Munn's Pond County Park, and it's on the edge of the Pine Barrens and Hampton Bays. And about 25 years ago the County of Suffolk gave a permit to what is now called the Evelyn Alexander Wildlife Rehabilitation Center. And that rehabilitation center has been there, they're licensed by the State Department of Environmental Conservation. They've been doing their work there for the better part of 25 years. Subsequent to that there's -- there's a piece of State property that is adjacent to this property. And after the Wildlife Rehabilitation Center had been established, the -- the State decided through the DEC to allow hunting on that adjacent property. But there's no direct access to the property, so the -- the parking, there's three parking spaces for hunting. It's a rather modest facility, and they -- they need access to go across the county property to be able to get to the State property. Now, there have been -- because of -- of this configuration and the situation there -- there have been a number of issues with hunting in this particular area. The -- the directors of the Wildlife Rehabilitation Center make complaints periodically through the years about (inaudible), et cetera. You know, seeing hunters in the buffer area where they're not supposed to be on any. Reporting to the DEC, not a lot was done. But what happened in January of this year kind of crossed the line, and that is that a hunter was on the adjacent property, shot a deer on the property of the Rehabilitation Center and apparently wasn't that great a shot because in addition to finally shooting a deer, a couple of stray bullets blew

253

**NYS ASSEMBLY**                          **JUNE 1, 2022**

right through the -- the -- the Rehabilitation Center, missing workers at the Rehabilitation Center by a couple of feet. So this was a big issue in my district. The county legislator who I work with who shares the area because it was county land and State land, we worked together -- in essence, we were at the time trying to seek and get the establishment of a greater buffer to get away from the Wildlife Rehabilitation Center. And we did get a meeting, we did try to work with the DEC. Their response basically was simply to just put up more signage. And that really was the genesis of this bill. You know, we really weren't able to get the attention of the Department of Environmental Conservation. So, this bill in essence would in this one location because of this particular configuration of the property and the adjacent land use which was there before would -- would prohibit hunting on this one parcel adjacent to the Wildlife Rehabilitation Center. And that's what the -- the bill does. We drew it very tightly. It only applies to properties that are in the Town of Southampton and the County of Suffolk where there is a rehabilitation center on a county parcel and there's a State property next door. So, you know, we certainly weren't trying to impact hunting in any -- any way. In fact, you know, I've sponsored measures here that have opened up thousands of acres of areas of hunting in my district on the east end. But this is more of a public safety matter, and that's why we put in the bill in.

          ACTING SPEAKER AUBRY: Mr. Smullen.

          MR. SMULLEN: Thank you very much, Mr.

254

**NYS ASSEMBLY**                          **JUNE 1, 2022**

Speaker.

          On the bill.

          ACTING SPEAKER AUBRY: On the bill, sir.

          MR. SMULLEN: I really appreciate the -- the sponsor's very clear and thoughtful explanation of the nature and -- and genesis of this bill and the safety concerns that are -- that are expressed amongst the local citizenry. However, this seems to be a special case bill that has some worrisome implications. One of the things that's in the Environmental Conservation Law is a 500 foot prohibition. And it sounds to me like there have been lots of signs posted but they've been repeatedly violated. Now when I -- when I look at a situation like this, it's evident to me -- can I get some quiet in the Chamber, please, Mr. Speaker?

          ACTING SPEAKER AUBRY: Gentlemen, a colleague is talking. He doesn't need to compete with you. Thank you.

          MR. SMULLEN: Thank you, Mr. Speaker. And -- and -- when I looked at this situation, it seemed to me that the -- this was a special case, and like -- as I said, I -- I understand the nature of it. But with the -- the 500 foot prohibition that's already in the Environmental Conservation Law, it seemed to me now hearing the sponsor's explanation that there's actually a crime is committed here, that there is an endangering thing, you know, I wonder if we're -- we're headed down the wrong track with what I call micro legislation. And -- and what that is is when there's -- there's something that needs

255

**NYS ASSEMBLY**                          **JUNE 1, 2022**

to be fixed but a department doesn't necessarily react the way they should, in this case the Department of Environmental Conservation. And if -- if it were -- to me, I would -- I would ask the Department much more strongly that they would intervene in this case and -- and provide not only signage but enforcement to be able to make sure that people were not put in danger in their place of work or that the -- the Wildlife Rehabilitation Center was well outside the buffer and that it was -- it was not only clearly marked but -- but also adhered to. Because what this is going to do, it's going to provide a very dangerous precedent when it comes to hunters' rights to recreate on State lands. The land that -- that's out there that's -- that's owned by the people of the State of New York, when it's there for the express purpose in this case of hunting, that has a very high priority in terms of how we should view the usage of that land and whether or not it's up to the Department to properly regulate it.

          For that reason and -- and understanding all the safety concerns, you know, I -- I can't vote for this legislation although I completely understand the nature of the -- of the idea behind it and what we should or shouldn't do. But because of how things are going in this Chamber and how this Body often looks at legislation that affects hunters, that affects the -- the ability of people to use guns that are protected under the Second Amendment, I urge all my colleagues to very carefully consider this and vote no when you think about the what's -- what's good -- the most good for the most people here. There are 800,000 hunters in -- in New York State that don't need to be

256

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

prohibited from hunting in a micro area when that would set a dangerous precedent for other legislators around the State who don't like hunting, who want to go ahead and then foist what is really contrary to New York State's laws on -- on the people through this type of legislation.

So thank you very much, Mr. Speaker.  I urge all of my colleagues that are so inclined to vote no on this bill to send a strong message to the Governor and to the Department of Environmental Conservation to do their job.  Thank you.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 9895.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference will be generally opposed for the reasons mentioned by my colleague, although we are sympathetic to this unique situation.  Those who wish to vote yes should do on the floor or by contacting the Minority Leader's Office.

Thank you, sir.

ACTING SPEAKER AUBRY:  Ms. Hyndman.

MS. HYNDMAN:  Mr. Speaker, the Majority

257

---

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

Conference will be in the affirmative on this piece of legislation.  If there are any members who wish to vote in the negative they can contact the Majority Leader's Office at the number previously provided.

Thank you.

ACTING SPEAKER AUBRY:  Thank you.

(The Clerk recorded the vote.)

Ms. Giglio.

MS. GIGLIO:  Thank you, Mr. Speaker, to explain my vote.  While I respect my colleague and his position on this matter and I'm very familiar with the wildlife facility that he's talking about and they do do great things.  However, we have a very severe deer problem on the North and the South Fork of Long Island.  The deer management permit plan by the New York State DEC for the 2020-2030, what their recommendations are not even being considered.  We are being -- having our constituents hospitalized with tickborne illnesses.  We are really in a bad state.  Car accidents every day from deer running out into the road, farmers putting up deer fences.  I come from a very large agricultural district and I just feel that this is setting a bad precedent.  There's very few properties to hunt and there are many deer.  So as far as I'm concerned that hunter, his license should've been taken away if he was too close where his bullets were coming close to actual -- to people.  So -- and the markers should be out but that it's private property and that they need to stay away from there.  But the deer problem, and I'm sure he could

258

---

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

agree, is rampant.  And we are working together -- the legislator on the North Fork of Long Island has been working closely with me and I do have a bill filed to allow for leniency on hunting because the deer problem is so bad.

So, where I respect my colleague and I understand why he's doing this because he represents his constituents well, I will definitely be a no on this bill.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Ms. Giglio in the negative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please record my colleagues Mr. Durso and Mr. Gandolfo in the affirmative.

Thank you, sir.

ACTING SPEAKER AUBRY:  So noted.

ACTING SPEAKER LUNSFORD:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 11, Rules Report No. 389, the Clerk will read.

THE CLERK:  Senate No. S09184, Rules Report No. 389, Senator Sepulveda (A10215, Committee on Rules, Braunstein, Colton).  An act to amend the Local Finance Law, in relation to the sale of bonds and notes of the City of New York, the issuance of bonds or notes with variable rates of interest, interest rate exchange agreements of the City of New York, the selling of bonds at private

259

---

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

sale, the refunding of bonds, and the down payment for projects financed by bonds; to amend the New York State Financial Emergency Act for the City of New York, in relation to a pledge and agreement of the State; and to amend Chapter 142 of the Laws of 2004, amending the Local Finance Law relating to interest rate exchange agreements of the City of New York and refunding bonds of such city, in relation to the effectiveness thereof.

ACTING SPEAKER LUNSFORD:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER LUNSFORD:  The Clerk will record the vote on Senate bill 9184.  This is a fast roll call.  Any member who wishes to be recorded in the negative -- oh.  I apologize.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank -- thank you, Madam Speaker.

ACTING SPEAKER LUNSFORD:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER LUNSFORD:  The Clerk will now record the vote on Senate bill 9184.  This is a Party vote still.  Any member who wishes to be recorded as an exception to the

260

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Conference position is reminded to contact the Majority or Minority

Leader at the numbers previously provided.

    Mr. Goodell.

    MR. GOODELL:  Thank you, Madam Speaker, for

giving me a second opportunity to announce that the Republican

Conference is generally opposed to this legislation for the reasons I

will explain in a moment.  After the explanation I hope my colleagues

wait at least that long.  Those who wish to vote yes, can do so certainly

here on the floor or by contacting the Minority Leader's Office.

    ACTING SPEAKER LUNSFORD:  Ms. Hyndman.

    MS. HYNDMAN:  Madam Speaker, the Majority

Conference will be in the affirmative on this piece of legislation.

Should any members want to wish to vote in the negative please

contact the Majority Leader's Office at the number previously

provided.

    (The Clerk recorded the vote.)

    ACTING SPEAKER LUNSFORD:  Mr. Goodell to

explain his vote.

    MR. GOODELL:  Thank you, Madam Speaker.  This

bill allows the City of New York to sell its bonds, its debt, at a private

sale rather than through a competitive bid process that applies to

almost all of the other municipalities throughout the State of New

York.  So if you live in Suffolk County or Nassau County or

Westchester or almost any of the other counties with the exception of

Erie, those bonds are put out for a competitive bid.  And are three

261

---

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

important reasons why we use competitive bidding:  First, competitive

bidding has been proven over history to give you the best price.  Or in

the case of a bond the lowest interest rate.  Second, competitive

bidding ensures that everyone has a fair and equal opportunity to bid

on it.  There aren't the insiders or the outsiders, there aren't the

winners or the losers.  Open competitive bidding gives everyone a fair

opportunity.  And third, competitive bidding helps avoid collusion and

favoritism and corruption, whereas if you're negotiating directly with a

person on a multimillion or billion-dollar bond transaction, there are a

dozen ways to Sunday where that person can reward you for your

private negotiations, whether it's campaign contributions or support in

any number of other ways.  So the reason why every -- almost every

other municipality competitively bids its bonds is to get the best price

for the taxpayers, to be fair for everyone and to avoid the potential of

fraud, collusion or corruption.

    Now, the City of New York receives special

authorization to sell their bonds at a private sale.  In 1978 there was a

temporary authorization, temporary, 44 years ago in 1978 because the

City of New York was on the edge of bankruptcy.  Do you remember

that?  And they couldn't sell them.  And every year since then for 44

years we've allowed them to continue.  New York City is no longer in

bankruptcy, there's no longer any justification and, therefore, we

should not extend this to an extension of 46 years.

    Thank you, Madam Speaker.

    ACTING SPEAKER LUNSFORD:  Thank you.

262

---

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

    Are there any other votes?  Announce the results.

    (The Clerk announced the results.)

    The bill is passed.

    Page 11, Rules Report No. 390, the Clerk will read.

    THE CLERK:  Senate No. S08902, Rules Report No.

390, Senator Breslin (A10227, Committee on Rules, Cahill).  An act

to amend the Insurance Law, in relation to extending certain

provisions relating to medical malpractice insurers.

    ACTING SPEAKER LUNSFORD:  An explanation

is requested.

    MR. CAHILL:  Yes, thank you, Madam Speaker.

This bill would merely extend the provisions of the Insurance Law

into 2025 to exempt medical malpractice insurers from certain risk-

based capital requirements.  I think that was a little shorter than Mr.

Thiele's explanation of the bill two -- about two ago.  That's it.  That's

the whole explanation.

    ACTING SPEAKER LUNSFORD:  Mr.

Blankenbush.

    MR. GOODELL:  Madam Speaker, if I may.

    ACTING SPEAKER LUNSFORD:  Mr. Goodell.

    MR. GOODELL:  Thank you.  You know, Madam

Speaker, sometimes we go just like clockwork and sometimes we

throw a few curve balls.  Thank you for recognizing me.  Would the

sponsor yield?

    MR. CAHILL:  No.  Yes, of course.

263

---

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

    MR. GOODELL:  I'm happy either way.

    MR. CAHILL:  I'm so happy, Mr. Goodell.

    MR. GOODELL:  Mr. Cahill, this is really designed

to help physicians deal with some of their malpractice insurance; is

that correct?

    MR. CAHILL:  Yes, that's indeed correct.  These are

two medical malpractice insurance companies that several years ago

were registering in very significant capital deficits.  They were

basically put into rehabilitation and over the past several years have

been able to go from a deficit situation to a minor surplus.  But the

Department of Financial Services believes with another three years to

go, these two companies can be fully rehabilitated and be vital parts of

the medical malpractice insurance product that's available in the State

of New York.

    MR. GOODELL:  But in -- in the process it also

adjusts the capital requirements for an insurance company, correct?

    MR. CAHILL:  It adjusts the capital requirements for

the insurance companies temporarily, yes.

    MR. GOODELL:  And what it does is it eliminate --

or reduces, significantly reduces the normal capital requirements that

an insurance company would have for this type of coverage?

    MR. CAHILL:  Yes, it temporarily reduces the

capital requirements that these companies would be required to

maintain.

    MR. GOODELL:  And what is that reduction?

264

**JA189**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. CAHILL:  Well, it's -- it's -- it's preventing them from having to meet the minimums, which I believe is a determination that is made by the Department of Financial Services.

MR. GOODELL:  Thank you very much.  I appreciate your comments.

On the bill, Madam Speaker.

ACTING SPEAKER LUNSFORD:  On the bill.

MR. GOODELL:  There's no doubt that those who are engaged in delivering babies face extraordinarily high liability costs because a small error can have lifetime consequences.  And so in an effort to help them we implemented this program to provide assistance, if you will, for that particular category of insureds.  Several of my colleagues, though, have considerable concerns on this because it, as the sponsor noted, substantially reduces the capital reserve requirements and that dramatically increases the risk that an insurance company won't have enough cash to actually make the payments that would be required.  And that's why we have those capital reserves.  And so, for example, the New York State Insurance Association wrote, *The measure represents extremely dangerous public policy because it would eviscerate the current strong statutory accounting rules for insurance companies that require adequate reserves and surplus based on actual financial assets and instead would replace it with a cash accounting methodology.*  And so while we are very sympathetic for the objectives of this will -- of this bill, we are very concerned about the reduction in capital requirements and the danger

265

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

it poses for this type of insurance policy which could very have very serious ramifications if the cash accounting method proves to be inadequate.  And for that reason, the last time this came up for a vote there were 38 no votes.

Thank you, Madam Speaker.

ACTING SPEAKER LUNSFORD:  Mr. Goodell.

MR. GOODELL:  Thank you, Madam Speaker.  The Republican Conference will be generally opposed to this legislation.  And so actually call for the vote.  Those who are in the Republican Conference that want to vote for it can certainly do here in the Chamber or by calling the Minority Leader's Office.

Thank you, Madam Speaker.

ACTING SPEAKER LUNSFORD:  We're all eager.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER LUNSFORD:  The Clerk will record the vote on Senate bill 8902.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Madam Speaker, the Majority Conference is going to generally be in favor of this piece of legislation.  However, there may be some of our colleagues who would choose not to do so.  They should feel free to contact the

266

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Majority Leader's Office so that their vote may be properly recorded.

Thank you, ma'am.

ACTING SPEAKER LUNSFORD:  Thank you.

(The Clerk recorded the vote.)

Mr. Blankenbush to explain his vote.

MR. BLANKENBUSH:  Thank you, Madam Speaker.  As my colleague has -- has just spoken, the -- this measure I think is extremely dangerous for public policy.  Right now, the insurance companies currently have strong statutory accounting rules for insurance companies that require adequate reserves and surpluses based on actual financial assets and replace it with cash accounting is a scheme for medical malpractice insurers.  They can count potential but not actually existing surcharges and assessments as admitted assets of the medical malpractice insurer.

For those reasons, I will be -- I will be voting no and hope my colleagues would follow suit.  Thank you.

ACTING SPEAKER LUNSFORD:  Mr. Blankenbush in the negative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Madam Speaker, colleagues, we are actually doing pretty well.  We could go a little faster, but we're doing good.  We're doing good.  So let's just keep

267

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

going here.  Mr. Anderson has not made it back to the building yet, so we are going to go to Rules Report No. 472, Rules Report No. 473, Rules Report No. 477 and Rules Report No. 478.  These are not debatable -- they're -- well, they could be debatable but I don't think they will be, sir -- ma'am.  Thank you.  Then we're going to Rules Report No. 405 by Mr. Gottfried, followed by Rules Report -- actually, Calendar -- was it Rules?  Yes, it is Rules Report -- it's 514, it's by Ms. Fahy.

Thank you.

ACTING SPEAKER LUNSFORD:  Page 16, Rules Report No. 472, the Clerk will read.

THE CLERK:  Senate No. S08129, Rules Report No. 472, Senator Kennedy (A09365, Peoples-Stokes).  An act to amend the Local Finance Law, in relation to the sale of municipal obligations by the County of Erie.

ACTING SPEAKER LUNSFORD:  Read the last section.  Oh, Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER LUNSFORD:  The Clerk will record the vote Senate bill 8129.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

268

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

MR. GOODELL:  Thank you, Madam Speaker.  The Republican Conference will be generally opposed to this for the reasons I will explain shortly.  Those who wish to vote in favor of it can certainly do so here on the floor or by calling the Minority Leader's Office.

Thank you, Madam Speaker.

ACTING SPEAKER LUNSFORD:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Madam Speaker.  The Majority Conference is still going to be in favor of local people making local decisions.  However, should some colleagues desire to be an exception they are certainly welcome to contact the Majority Leader's Office and we'll make sure their vote is properly recorded.

(The Clerk recorded the vote.)

ACTING SPEAKER LUNSFORD:  Mr. Goodell.

MR. GOODELL:  Thank you, Madam Speaker.  As with the bill that we talked about a moment ago dealing with the City of New York, this bill would authorize the County of Erie to sell its debt or its bonds in a private sale.  And I would note that all the other counties outside of the City of New York including Suffolk and Nassau sell their bonds at public auction.  And they do that to get the best price for the taxpayers, to avoid favoritism and give everyone a fair and equal opportunity to bid, and to avoid the potential for any corruption or abuse.  And we initially authorized this for the County of

269

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

Erie at a time when they were facing very severe financial stress.  Thankfully, through the leadership of that county they've made dramatic improvements in their financial strength, and for that reason I think we should revert back to the same process used by all the other counties in the State of New York with the exception of those in New York City and have an open competitive bid that's fair, open, transparent, focused on getting the best price for everyone in the City of -- or the County of Erie.

For that reason, I'll oppose it and recommend against it to my colleagues.  Thank you, Madam Speaker.

ACTING SPEAKER LUNSFORD:  Mr. Goodell in the negative.

ACTING SPEAKER AUBRY:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 16, Rules Report No. 473, the Clerk will read.

THE CLERK:  Senate No. S08253, Rules Report No. 473, Senator Kennedy (A09367, Peoples-Stokes).  An act to amend the Local Finance Law, in relation to facilitating the marketing of any issue of serial bonds or notes of the City of Buffalo issued on or before a certain date.

ACTING SPEAKER AUBRY:  Home Rule message is at the desk.

Read the last section.

270

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8253.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  The Republican Conference is generally opposed to this legislation for the reason that we've discussed in the last two bills.  Again, it's a private sale of bonds using a -- a buyer that's been hand-selected rather than through an open competitive bid process.  And for that reason the Republican Conference will generally oppose this and instead recommend an open competitive bid available to everybody, designed to get the lowest price.

Thank you, sir.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference is generally going to be in favor of this piece of legislation.  However, there may be some who would choose not to.  They can feel free to contact the Majority Leader's Office, we'll be happy to record your vote.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Are there any other votes?  Announce the results.

271

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

(The Clerk announced the results.)

The bill is passed.

Page 17, Rules Report No. 477, the Clerk will read.

THE CLERK:  Senate No. S08497, Rules Report No. 477, Senator Kaminsky (A09465, Lavine).  An act to amend the Real Property Tax Law, in relation to base proportions in assessing units in Nassau County.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8497.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference is generally opposed to this legislation.  There will be members that will be supporting it, for sure.  So those members who are supporting it, make sure you vote yes on the floor or contact the Minority Leader's Office.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  Majority colleagues are -- will generally be in support of this

272

**JA191**

NYS ASSEMBLY                                     JUNE 1, 2022

one.  However, there may be a few that would choose not to.  They should feel free to contact the Minority Leader's Office.  We'll make sure their vote is properly recorded.

    (The Clerk recorded the vote.)

    ACTING SPEAKER AUBRY:  Thank you, ma'am.

    Mr. Goodell to explain his vote.

    MR. GOODELL:  Thank you, sir.  The County of Suffolk has a tax -- taxing system, real property tax system that's a little bit unique in that they put properties in different classifications.  So you can have a residential classification or a commercial classification or other classifications.  And what this bill does, it says basically the residential base will not increase by more than one percent in the -- over the prior year.  Now, not surprisingly this is a very, very popular provision for residents who don't want to pay more in property taxes.  And who does, right?  And it's equally very unpopular with everyone else who has to pay a lot more because they pick up the difference.  So many of us Upstate who are not living in the County of Suffolk think a fair and equitable approach is to tax everyone based on fair market value.  But I certainly recognize that my colleagues from Suffolk County whose residents are affected by this -- by this bill will want to probably vote in favor of keeping the residents who vote -- in Nassau County, my colleagues in Nassau County want to be paying attention to the bill that we're actually on so that they can vote appropriately.

    Thank you, sir.  Same situation in Nassau and Suffolk

273

NYS ASSEMBLY                                     JUNE 1, 2022

County, but thank you, sir, for pointing that out.

    ACTING SPEAKER AUBRY:  Ms. --

    (Pause)

    Mr. Goodell.

    MR. GOODELL:  Please record the following colleagues voting for Nassau County's proportional assessing unit system:  Mr. DeStefano, Mr. Durso, Mr. McDonough and Mr. Mikulin.

    Thank you, sir.

    ACTING SPEAKER AUBRY:  So noted.

    Are there any other votes?  Announce the results.

    (The Clerk announced the results.)

    The bill is passed.

    Page 17, Rules, Report No. 478, the Clerk will read.

    THE CLERK:  Senate No. S08387, Rules Report No. 478, Ms. -- Senator Stewart-Cousins (A09490, Pretlow).  An act to amend the Local Finance Law, in relation to bonds and notes of the City of Yonkers.

    ACTING SPEAKER AUBRY:  Read the last section.

    THE CLERK:  This act --

    ACTING SPEAKER AUBRY:  Home Rule is at the desk.

    Read the last section.

    THE CLERK:  This act shall take effect immediately.

    ACTING SPEAKER AUBRY:  The Clerk will record

274

NYS ASSEMBLY                                     JUNE 1, 2022

the vote on Senate print 8387.  This is a Party vote.  Any member who wishes to be to recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

    Mr. Goodell.

    MR. GOODELL:  Thank you, sir.  The Republican Conference will be generally opposed to this legislation for the reasons I'll mention.  But those who support it can certainly vote yes on the floor or by contacting the Minority Leader's Office.

    Thank you, sir.

    ACTING SPEAKER AUBRY:  Thank you.

    Mrs. Peoples-Stokes.

    MRS. PEOPLES-STOKES:  Thank you.  Again, Mr. Speaker, I want to -- generally, Majority Conference members will be in support of the local decisions so they'll be voting in favor of this one.  However, there may be a few that would like to have an exception.  We will welcome their vote by calling the Majority Leader's Office.

    Thank you, sir.

    ACTING SPEAKER AUBRY:  Thank you, ma'am.

    Mr. Goodell to explain his vote.

    MR. GOODELL:  Thank you, sir.  In 2007 this Assembly authorized the City of Yonkers to sell bonds at a private sale because they were struggling financially.  And thankfully, the City of Yonkers has dramatically improved its financial situation, yet unlike almost every other city in the State of New York it still wants

275

NYS ASSEMBLY                                     JUNE 1, 2022

to sell its bonds at a private negotiated sale, picking a winner and losers on those who can profit from the sale of its bonds.  And the Republican Conference generally supports open, competitive bidding designed to get the best price, to be fair and equal to everybody and to reduce the likelihood of favoritism or any corruption.

    For that reason most of my colleagues, if not all -- most of my colleagues will be voting against this.  Thank you, sir.

    ACTING SPEAKER AUBRY:  Thank you.

    Mrs. Peoples-Stokes.

    MRS. PEOPLES-STOKES:  Mr. Speaker, would you please record our colleague Mr. Englebright in the negative on this one?

    ACTING SPEAKER AUBRY:  So noted.

    Are there any other votes?  Announce the results.

    (The Clerk announced the results.)

    Page 13, Rules Report No. 405, the Clerk will read.

    THE CLERK:  Assembly No. A07230-B, Rules Report No. 405, Gottfried, Hevesi, Dinowitz, Braunstein, McDonald, Thiele, Stirpe, Simon, Steck, Fernandez, Solages, L. Rosenthal, Seawright, Glick, Bronson, Jean-Pierre, Colton, Walker, Pretlow, Woerner, Reyes, Burgos, Aubry, Galef, Zebrowski, Griffin.  An act to amend the Public Health Law, in relation to establishing the Primary Care Reform Commission.

    ACTING SPEAKER AUBRY:  An explanation is requested, Mr. Gottfried.

276

**NYS ASSEMBLY**                                                      **JUNE 1, 2022**

MR. GOTTFRIED: Yes, Mr. Speaker. This bill would create a Commission on Primary Care Spending to develop recommendations on increasing spending on primary care, strengthening primary care infrastructure and avoiding any increase in costs to patients or total healthcare spending.

ACTING SPEAKER AUBRY: Mr. Ra.

MR. RA: Thank you, Mr. Speaker. Will the sponsor yield?

MR. GOTTFRIED: Yes.

ACTING SPEAKER AUBRY: Mr. Gottfried yields, sir.

MR. RA: Thank you, Mr. Gottfried. So just a few questions on this. I think the goal of the bill is a laudable one and one that I think we've talked about often on the Health Committee and this Chamber. But, you know, it does have requirements that some on the insurance side have viewed as being onerous and perhaps duplicative of -- of existing costs. So I -- I want to start with just, you know, my understanding is all the insurers would have to submit information for the prior five years; is that correct?

MR. GOTTFRIED: It requires information for the prior five years and then annually going forward, yes.

MR. RA: Okay. And in terms of the detail of this information and how it differs from the all-payer database that was previously established, what additional information is this bill going to require be disclosed?

277

**NYS ASSEMBLY**                                                      **JUNE 1, 2022**

MR. GOTTFRIED: I don't know that it's additional information. It would -- it would have the information provided in the -- in the aggregate by two major categories. One is primary care spending, the other is everything else. I don't -- so it's, you know, it's not information that every third-party payer doesn't have readily available at the push of a button.

MR. RA: So, I mean, I do think this would be a large amount of data but you're saying it's data that they're largely already disclosing?

MR. GOTTFRIED: Any insurance CEO that doesn't have this information readily available before lunchtime on any given day is an insurance company that is probably already bankrupt.

MR. RA: Okay. Now, what -- what about, you know, proprietary data? Pricing information, proprietary information. Would they be required to disclose that as well?

MR. GOODELL: The bill does not speak to anything resembling that. Although information that comes that is similar to that is arguably already in the all-payer claims database. But actually this bill does not speak in those terms.

MR. RA: Okay. Now, one of the other issues that has been expressed and -- and I think there's concerns about what ultimately would come out of this information and recommendations that may come forward. So, they're -- they're concerned with the plan's ability to minimize consumer cost-sharing and high quality of care --

278

**NYS ASSEMBLY**                                                      **JUNE 1, 2022**

MR. GOTTFRIED: Could you hold or -- hold on for just a second?

MR. RA: -- and its ability to negotiate terms.

MR. GOTTFRIED: Could you folks keep it down? I can't hear him.

I'm sorry. Yes.

MR. RA: So in terms of the plan's ability to negotiate terms, that's one of the objections or concerns that has been raised that this would -- may result in limits to their ability to negotiate terms.

MR. GOTTFRIED: They must be thinking of a different bill. I'm -- you and I have I assume both read the bill. There's nothing resembling that in this bill. Among other things, this bill doesn't -- this commission doesn't have the authority to order anything. All it can do is make recommendations.

MR. RA: Correct. And I -- and I think their -- their concern there is being raised in terms of that that may be a goal or something that comes about after this information is analyzed and recommendations are made. And, you know, you're correct, that would I guess really be up to this Body in the future to decide what to do with that information and perhaps going down that road.

MR. GOTTFRIED: Right. And remember that the bill also talks about calling on the Commission to avoid recommendations that would increase total spending on healthcare. So, for third-party payers the recommendations may call for shifting money towards primary care, which I think any insurance company

279

**NYS ASSEMBLY**                                                      **JUNE 1, 2022**

worth its salt recognizes is the way to go if you're going to be improving the quality of care and ultimately saving money. This should not be an issue for -- for the insurance industry.

MR. RA: All right. Thank -- thank you, Mr. Gottfried.

MR. GOTTFRIED: You're welcome.

MR. RA: Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY: On the bill, sir.

MR. RA: Let me just quickly before I speak about the bill quickly, thank you to the sponsor. This may be the last chance I have the opportunity to ask the sponsor questions on healthcare issues, so I wish him well. I've learned a lot about this topic from -- from serving on the Health Committee for many years. So thank you for, you know, for the opportunity to ask some questions on this bill.

As -- as I said, I think the goal of increasing the use of primary care is one that we've talked about a lot on the Health Committee, in this Body, and obviously in terms of just utilizing the healthcare services that are out there and using them efficiently. The concern that has been raised with regard to this bill is -- is really twofold. It's -- one is that the requirements may be duplicative of other prior pieces of legislation, prior laws that -- that they're complying with. It is a lot of data, but on top of that where this ultimately leads us. And I just want to quickly read the point I was making about the ability to negotiate terms and -- bear with me. So they said, *Implementation of any recommendation resulting from this*

280

**JA193**

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

*bill that struck this critical function would be unprecedented and significantly hamper the insurance efforts to offer affordable premiums with minimal cost-sharing responsibilities.* Now, we're talking obviously about the spending on primary care, total spending by these providers. Like I said, the ultimate goal is a very good one, but getting there in a way that allows the providers to do the things that they do to provide care efficiently is really I think where -- where the crux of the issue is here.

So I just wanted to raise those concerns and I thank the sponsor for answering my questions. Thank you.

ACTING SPEAKER AUBRY: Read the last section.

THE CLERK: This act shall take effect immediately.

ACTING SPEAKER AUBRY: The Clerk will record the vote on Assembly print 7230-B. This is a Party vote. Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL: Thank you, sir. The Republican Conference is generally opposed to this bill, but those who support it can certainly vote yes on the floor or by calling the Minority Leader's Office.

Thank you, sir.

ACTING SPEAKER AUBRY: Thank you.

Mrs. Peoples-Stokes.

281

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

MRS. PEOPLES-STOKES: Thank you, Mr. Speaker. The Majority Conference is generally going to be in favor of this piece of legislation from someone who's probably the best Chair of the Health Committee this House has ever seen, Mr. Gottfried. However, there may be some of our colleagues that would choose to be an exception. They're welcome to call the Majority Leader's Office and we'll be pleased to record their vote.

ACTING SPEAKER AUBRY: Certainly.

(The Clerk recorded the vote.)

Mr. Goodell.

MR. GOODELL: Thank you, sir. I think everyone here in the room agrees that primary care should be considered primary and that there is a great deal of wisdom in making sure that individuals have access to high-quality primary care, and that high-quality primary care can have long-term physical benefits. The concern that many of my colleagues and I have is that this legislation can also be used in an effort to promote other approaches to healthcare that we find difficult to reconcile, including a single-payer system that would eliminate competition throughout the marketplace and result the government takeover of healthcare. So we're very concerned about where this study ultimately go -- goes, but we are certainly supportive of primary care. And I'll -- I'll just mention one quick instance. Back many of you were ever thinking about ever being involved in politics I had the good fortune of working in the County of Chautauqua and we had a brilliant Commissioner of Health.

282

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

And this is in the early '90s. And he realized that our Medicaid patients who were unable to get a doctor for primary care because the Medicaid reimbursement rate was so low and the paperwork was so high that most physicians with a primary care practice simply could not see a lot of Medicaid patients and still pay their own bills. And as a result the Medicaid patients were going to the emergency room, which cost us so much more money and the quality of care was so much lower and there's no continuity of care. And so my Health Commissioner put together a physician case management program and he worked with some of the primary care practitioners and they set up a program where they paid a flat fee for every Medicaid patient that practice accepted, and in return that practice agreed to see the patient for all non-emergent primary care. They completely eliminated all the paperwork. You got a flat rate. How many patients did you have times the fee, flat rate. All that auditing, all that paperwork, all that overhead. The practice made money and my county saved a bundle. We cut our -- our cost by like 60 percent. But it doesn't fit the mindset that seems to have government focused on fee for service or some variation. So if the study goes forward I hope they look at completely different approaches and how we can restructure it to improve care and reduce costs.

Thank you, sir.

ACTING SPEAKER AUBRY: Are there any other votes? Announce the results.

(The Clerk announced the results.)

283

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

The bill is passed.

Page 18, Rules Report No. 514, the Clerk will read.

THE CLERK: Senate No. S09405, Rules Report No. 514, Senator Parker (Committee on Rules, Fahy--A10439). An act to amend the Energy Law, the Executive Law and the State Finance Law, in relation to establishing the "Advanced Building Codes, Appliance and Equipment Efficiency Standards Act of 2022."

ACTING SPEAKER AUBRY: An explanation is requested, Ms. Fahy.

MS. FAHY: Sure. This bill, as it is entitled, is the -- it's a long one - it establishes the Advanced Building Codes, Appliance and Energy Efficiency Standards Act for this year. And essentially, the legislation would align the Energy Code with clean energy and climate policy goals the State adopted a few years ago, as well as increase the State's efficiency standards for appliances.

ACTING SPEAKER AUBRY: Mr. Palmesano.

MR. PALMESANO: Yes, Mr. Speaker. Will the sponsor yield for a few questions?

ACTING SPEAKER AUBRY: Ms. Fahy, will you yield?

MS. FAHY: Sure.

ACTING SPEAKER AUBRY: The sponsor yields.

MR. PALMESANO: Thank you, Ms. Fahy. I know we went through a longer debate last time, I don't think we need to do

284

**JA194**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

that this time. I just kind of want to just ask a couple questions. Can you maybe -- I know this bill is amended, can you run us through some of the amendments that you made from this bill from the last bill that we passed earlier this year?

    MS. FAHY: Yes. A couple of primary ones, were ones that we actually talked about the last time and that was the Building Code Council itself. We had left that alone in the last version, and in this version we have authorized the DEC, Department of Environmental Conservation, as well as NYSERDA, could be appointed -- may be appointed to the Council. The other one authorizes NYSERDA, with the approval of DEC, to establish these energy efficiency standards for water-related appliances and fixtures that use a result and not -- the consumption of energy. One other small one was on historic preservation. It made that language a little clearer and slightly broader.

    MR. PALMESANO: Okay. So as far as some of the changes you made, really, nothing addressed the cost concerns that we brought up in the last budget debate, or the last bill debate relative to retrofit costs and New York construction costs because of the change from a 10-year pay back to a lifecycle cost. None of this -- none of the changes address those issues; those still remain intact, correct?

    MS. FAHY: No. And it doesn't address that directly, but it is intended, the estimates are that it would save billions in efficiency savings over the next -- less than ten years.

    MR. PALMESANO: Those billings that you referred

285

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

to, those take into account societal benefits, not just cost-savings that are through the efficiency process, correct?

    MS. FAHY: You mean the lifecycle cost?

    MR. PALMESANO: Right. Life -- because -- societal benefits are included in those lifecycle cost benefits that you're talking, you're talking --

    MS. FAHY: Yes, yes.

    MR. PALMESANO: Okay. Great. Now, you mentioned about historic preservation. I know during the last debate we mentioned concerns that we had relative to previously historic buildings were exempt from the code, now they have to provide, go through like an application process with -- with the -- was it through the -- they have to go through an application process to get that exemption now; is that correct, under the new -- under this new bill -- new law?

    MS. FAHY: No. It just removes the existing energy code exemption, but it doesn't -- let's see, it -- it just removes the current one and authorizes the Code Council to provide a more generic exemption.

    MR. PALMESANO: So we removed the -- previously they had a flat out exemption. Now with the passage of this bill and the previous bill and these changes, now they don't have the exemption, but they have to basically apply and have to get that from the Codes Council, dealing with that building that they have if they want to try to get some relief from this, or how does that work

286

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

exactly?

    MS. FAHY: They don't have to apply necessarily. The Council can go ahead and just give that exemption.

    MR. PALMESANO: But they do it on a case-by-case basis as far as someone --

    MS. FAHY: No. That's not the intent, to do a case-by-case basis.

    MR. PALMESANO: So how does the Council make the determination if you're talking about, you know, the number of historic preservation buildings we have, how are they going to make that determination throughout this process?

    MS. FAHY: They can make a number of those decisions up front and do that as a part of adopting these new standards.

    MR. PALMESANO: So would it be just a blanket almost, like, exemption, for historics or not? I just -- I'm just kind of confused on it, because if they had a blanket exemption before, now they're saying the Code Council can offer that to them, but I'm really just -- I'm kind of confused on the specifics on how that would work, that's all.

    MS. FAHY: It could be. It does give them that flexibility.

    MR. PALMESANO: Okay. Well, thank you for your time, I appreciate it.

    Mr. Speaker, on the bill.

287

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

    ACTING SPEAKER AUBRY: On the bill, sir.

    MR. PALMESANO: Yeah, this legislation really is -- is really going to eliminate consideration by the Code Council to what are costs of materials and insulation will result in present value energy savings in ten years to a lifecycle cost methodology, and this also expands the mandate of the Energy Code to promote clean energy climate agenda. And from my perspective, this is just another step in the playbook to dismantle our State's economy to ensure that the affordability and reliability of our energy supply system is not -- is not taken into consideration, it will ultimately lead to -- certainly lead to increased costs for families, farmers, seniors, small businesses and manufactures with, in my opinion, very little benefits. I know they talk about societal benefits, I'm concerned about this lifecycle change from the 10-year payback to lifecycle. This legislation, the original had it and now this bill has like some 60 to 70-plus definition changes. Some are very broad, they are listed, and basically gives the authority to NYSERDA to act on that. I think, you know, providing that authority to NYSERDA to basically adopt regulations dealing with establishing energy efficiency, but when you have all these definitions and some not defined, I think that's concerning.

    And changing to the code as it relates to the lifecycle changes are concerning instead of going to a 10-year payback analysis I think is something that needs to be taken into consideration. Code changes that have significant cost impacts on construction, both new and rehabilitation costs, when we talked about in the future, the march

288

**JA195**

NYS ASSEMBLY                                    JUNE 1, 2022

towards electrification with geothermal installations, which would require building shell upgrades -- upgrades to our electric circuits and panels. This all needs to be recognized in the code to be fair and transparent. It doesn't, just like the other policies that come out of this House when it comes to the CLCPA and their implementation that's being talked about by the Climate Action Council.

By eliminating the 10-year payback, you're basically removing affordability and cost as a consideration for new code changes in New York. And even that 10-year payback didn't require it to be acted upon, it just asked for that to be a consideration. But unfortunately, business as usual in New York, cost and affordability are not being taken into consideration as we advance these policies down the pipeline with tremendous upfront costs to consumers, senior citizens, our farmers, our families, small businesses, manufactures and the like.

We talk about affordable housing in this Chamber time and time again. The problem continues to grow and the need continues to grow. We know about the families and individuals who are backdated on rents, landlords who haven't received payments, mortgages that were in distress. This is just going to increase costs and now cost -- these cost increases will not be considered to help create more affordable housing. It's going to be more problematic for our homeowners, for the tenants, for our families. Like I said, the tenants in the buildings and then -- which is going to increase -- you know, require additional costs for landlords which will be passed on

289

NYS ASSEMBLY                                    JUNE 1, 2022

to tenants through rent increases. Is that something you want to see happen? I don't think so.

You have the NYCHA public housing, which I have toured and visited, which is a disaster that needs assistance and needs improvements, and upgrades are going to cost a tremendous amount of money. How is that going to be paid for with the public housing in all those areas? I have very strong concerns about the historic building aspect of this bill. We previously had exemptions in place. Now supposedly the bill -- the building codes are going to be able to put in place some sort of exemption, but just really doesn't seem to be defined here. And I think it's also going to be almost like a new bureaucratic lengthy -- possible lengthy process. And then, you know, there are many older homes that aren't going to be qualified for historic, you know, older farm homes that might not be able to get that eligibility. They're going to be significant cost improvements for them to make that needs to be taken into account in this consideration, as well, which I do not think is being done.

And as we talk about this, you know, this is all part of the march towards electrification, these changes with the building code, cost to fully -- come 2030, your constituents, my constituents, our constituents are faced with a runaway freight train because come 2030 if you heat your home with natural gas and a natural gas boiler or a natural gas furnace, if that natural gas boiler or furnace goes, you will not, based on the policies being adopted by the CAC and the CLCPA to get the zero emission goals, you will not be able to convert

290

NYS ASSEMBLY                                    JUNE 1, 2022

that home to provide -- excuse me, to buy a natural gas boiler or furnace. At that point in time, you will have to fully convert your home to full electric come 2030, which means buying a geothermal heat pump, tens of thousands of dollars, which also means improving the shell of your property, tens of thousands of dollars. Improving your circuits and your electrical equipment, tens of thousands of dollars. The estimates show that it would cost the average family homeowner $35,000 to convert their home over to electrification. Even the Climate Action Council has estimates in their plans being $25- to $50,000. These are significant, upfront costs that the public has no idea that's coming their way, all in the need to say that we're going to meet our climate goals and I think that's just very, very concerning to me from the perspective this is really something that I have been concerned about because your constituents, my constituents, they really don't know what's happening with this area. This is one of the main -- and we're not talking about our electric bill prices, we're talking about these conversion costs.

And listen, when I have talked about this issue, I have never said we shouldn't invest in renewable energy, our side has never said we shouldn't do that. We just said we want it to be balanced and we just don't want to do it alone. The problem is when we try to -- our march to zero net emissions, New York right now only contributes 0.4 percent of the total global emissions in the world -- .4. China is 29 percent, India is 7 percent, Russia is 4 percent. China continues to build coal plants, they have over 1,000 coal plants, they continue to

291

NYS ASSEMBLY                                    JUNE 1, 2022

build more. India doesn't have electricity, they want to use coal to provide electricity. Russia is investing in $110 billion Arctic oil port. All these things are -- these groups, do we expect them going to help us with our march to try to get to zero net emissions? No. We're putting this all on the back of our -- of our taxpayers, our ratepayers because no one is going to participate with us in this goal. So we can get to 0 percent, but at the same time, we're going to jeopardize our reliability in our energy system, which NYSERDA has already said by 2040 we have a huge gap that needs to be met, and met soon. It's not identified -- the Climate Action Council can't identify that. There's going to be carbon leakage when we -- we can be zero here, our New York State doesn't know boundaries when it comes to climate and carbon emissions. Again, if China's emitting at 29 percent, India at 7 percent -- and China in the first quarter of 2021 increased their carbon emissions by 14.5 percent. Even President Biden said if China's not on board, we're wasting our time. I agree with President Biden, we're wasting our time. And that's the problem with the CLCPA. I understand the goals and the initiatives to try to get the clean energy, but we're going at a pace that is not sustainable, that is not affordable and certainly not reliable. How great is it to be at 0 percent if we can't keep the heat and the lights on when we're talking about fully powering your home with heat if you're in the North Country or in Western New York by solar and wind which is not reliable, which we know is intermittent.

I know I'm talking about a lot of things here, but this

292

NYS ASSEMBLY                                JUNE 1, 2022

is all relatable to this bill because it's all part of a package that climate activists continue to push. But my concern, and a number of the concerns on my side of the aisle, the business community and the families is this is not being done in a fair and balanced approach. Affordability and reliability continues not to be taken into account, and that's unfortunate because that's going to be very, very problematic for your constituents, for my constituents, for this entire State. What are we going to send to -- what kind of message are we sending to our business community if they can't -- our manufactures and our small businesses can't operate if they don't have a reliable source of energy and if the energy is too expensive that they're receiving?

One other point, energy security. You know, with the march, when we talk about electric vehicles and, you know, all those supplies that they use, China controls 87 percent of the marketplace when we talk about those rare Earth -- the metals and the elements that go into production of electric vehicles, go into the production of batteries, 87 percent of that is processed by China. They control that market. So we're turning our whole energy security over to China while, at the same time, when they do process that, what are they using? They're using coal power to process. So what kind of impact are we making on our environment as we work towards these goals here in New York State when no one else is joining us, no one else is going to follow us, and I know when we talk about this issue on your side of the aisle you say we're going to lead. We're going to lead, all

293

NYS ASSEMBLY                                JUNE 1, 2022

right, we're going to lead with businesses, families, manufacturers, farmers leaving our State while we bankrupt those who are still here and can't move because they can't afford it. It's challenging and there's a lot more we need to do.

So as we continue this march to zero net emissions and these CLCPA goals that continue to be pushed, I'm just concerned. I wish your side of the aisle would be a little bit more concerned about the financial costs and impact, because we're not going to make the true impact overall when New York only contributes 0.4 percent of the total carbon emissions in the world, and China's running rampant and not helping us and continuing their march to dominate the energy market, whether it's building coal plants and controlling the rare Earth materials that are needed for full electrification along the way. So for that -- these many reasons, Mr. Speaker and my colleagues, I'm going to vote no and I urge my colleagues to continue to do the same. Thank you.

ACTING SPEAKER AUBRY: Read the last section.

THE CLERK: This act shall take effect immediately.

ACTING SPEAKER AUBRY: The Clerk will record the vote on Senate print 9405. This is a Party vote. Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL: Thank you, sir. The Republican

294

NYS ASSEMBLY                                JUNE 1, 2022

Conference is generally opposed to this legislation for the reasons mentioned by my colleague and others. Those who support it can certainly vote yes here on the floor or by contacting the Minority Leader's Office. Thank you.

ACTING SPEAKER AUBRY: Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES: Thank you, Mr. Speaker. The Majority Conference is generally going to be in favor of this piece of legislation; however, there may be some who choose to be an exception. They can either select that option here in the Chambers or they can call the Majority Leader's Office and we will make sure their vote is properly recorded. Thank you, sir.

ACTING SPEAKER AUBRY: Thank you.

(The Clerk recorded the vote.)

Mr. Goodell to explain his vote.

MR. GOODELL: Thank you, sir. Obviously here on the floor of the Legislature, we believe in the importance and value of legislation, and the power and the strength of the State through mandates, backed by law, to accomplish objectives. But there's an even stronger and more effective way to promote efficiency and that's through the marketplace. And so if more efficient appliances cost consumers less money, either in the short-term or long-term, we don't need to pass legislation, do we, because our residents are smart people. And our residents will vote with their pocketbook.

And so rather than passing mandates that some of our

295

NYS ASSEMBLY                                JUNE 1, 2022

residents won't be able to afford, it would be helpful if we focus on how we make energy efficiency more affordable rather than more expensive. And to the extent we're successful in making energy efficiency more affordable, our smart residents won't move in that direction without State legislation. And for that reason, I don't think this legislation is the right approach, and although I certainly support my colleague's desire to improve energy efficiency, the best way to do it is through the marketplace by making it more cost-effective rather than mandating it. Thank you, sir.

ACTING SPEAKER AUBRY: Mr. Goodell in the negative.

Ms. Fahy to explain her vote.

MS. FAHY: Thank you, Mr. Speaker. I just want to briefly note that this bill, again, it establishes Advanced Building Codes, Appliance and Equipment Efficiency. It builds upon the climate goals that we adopted in 2019 and I think it will help us with moving toward more efficient appliances, as well as buildings. Buildings are the single largest user of energy in the State of New York and account for most of the energy consumed by the end use in -- in -- in the State. These new codes would help govern new buildings, as well as existing buildings and build us towards a lesser carbon footprint.

I should add that one analysis shows that energy efficiency in product standards have the potential to reduce 36 million metric tons of carbon dioxide, the equivalent of those emissions over

296

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

lifetime of measures by 2030, or the equivalent of removing the energy of half a million cars from the road each year. This new product and appliance standards also has the ability to deliver a projected $15 billion in utility savings by 2035, which also includes 6 billion of that 15- in utility savings for low- to moderate-income households.

This is overdue, it will help us meet our goals and help increase efficiency. And with that, Mr. Speaker, I vote in the affirmative. Thank you.

ACTING SPEAKER AUBRY: Ms. Fahy in the affirmative.

Mr. Englebright to explain his vote.

MR. ENGLEBRIGHT: Thank you, Mr. Speaker. I just want to compliment the sponsor. Her initiative, I think, is farsighted and necessary. We have just heard during the debate some prerequisites that have been surmised to be appropriate before we take action in New York. I would point out that New York is a leader and that the entire part of the Earth that we call civilization needs to move in the direction that this bill points us toward. We shouldn't impose prerequisites for our own action to wait for China to catch up with the reality that atmosphere changes and -- atmospheric changes and changes in the global ocean are imperiling the global ecosystem. Again, this is a very appropriate, farsighted initiative. Thank you to the sponsor for putting it before us. I vote aye.

ACTING SPEAKER AUBRY: Mr. Englebright in

297

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

the affirmative.

Are there any other votes? Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES: Thank you, Mr. Speaker. We're going to go now back to Mr. Anderson, who is ready.

Mr. Anderson. That's Rules Report No. 391, Anderson.

ACTING SPEAKER AUBRY: Page 12, Rules Report No. 391, the Clerk will read.

THE CLERK: Senate No. S09297, Rules Report No. 391, Senator Kavanagh (Committee on Rules, Anderson--A10228). An act to amend the Private Housing Finance Law, in relation to increasing the bonding authority of the New York City Housing Development Corporation.

ACTING SPEAKER AUBRY: An explanation is requested, Mr. Anderson.

MR. ANDERSON: Thank you, Mr. Speaker. Thank you, Mr. Goodell. This bill would essentially increase the bonding authority of the New York City Housing Development Corporation, also known as HDC, by $1 billion for a total cap of $18 billion. Thank you.

ACTING SPEAKER AUBRY: Mr. Goodell.

MR. GOODELL: Thank you. Would the sponsor

298

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

yield?

ACTING SPEAKER AUBRY: Mr. Anderson, will you yield?

MR. ANDERSON: For Mr. Goodell, I will yield.

ACTING SPEAKER AUBRY: Mr. Goodell, the gentleman yields.

MR. GOODELL: Thank you, Mr. Anderson. And you'll be glad to know there are more Andersons in Jamestown that I represent than any other municipality of its size.

MR. ANDERSON: Wait a minute, is it the cool Anderson with the O, or the E?

MR. GOODELL: S-O-N.

MR. ANDERSON: Ahh, there we go. So they've done it correct.

MR. GOODELL: And so you'll feel right at home in my district.

MR. ANDERSON: I'm excited.

MR. GOODELL: Am I correct that these bonds are backed by the taxpayers of the State of New York if they're not paid for by the proceeds of the bonds?

MR. ANDERSON: I'm sorry, Mr. Goodell, can you repeat?

MR. GOODELL: Am I correct that the -- these bonds are backed by the State of New York?

MR. ANDERSON: No, Mr. Goodell, these bonds are

299

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

not backed by the State of New York. This is a public authority so these bonds are done separately from that process.

MR. GOODELL: I see. And does the State of New York have any, what we call "moral obligation" to pay these bonds based on any appropriation from the State?

MR. ANDERSON: No. No more obligations on these bonds, Mr. Goodell; in fact, and I know you studied Constitutional Law, the Public Authorities and, in this case, corporations, are allowed to issue debt. So that's what this corporation does, HDC, issued debt and that's upheld by the *Schulz v. New York* case in 1994.

MR. GOODELL: And we're -- just a few months ago we passed a budget bill, we include several billions dollars in debt and interest payments. Were any of the funds in the budget bill that we passed just a few months ago used to pay down the debts of this organization?

MR. ANDERSON: No, Mr. Goodell. This is, again, a private sort of entity, public corporation, if you will, rather. So that -- that -- that piece doesn't apply. So I want to just make sure that we're clear. And I also want to -- I know that you referenced earlier in relation to a separate bill, but the legislative history on this bill is very clear. It's passed 2010, 2013, '18, '19, '21, and it's because, again, we're just giving HDC the authority to borrow more.

MR. GOODELL: And looking at the legislative history, and you're correct, it appears as though every year for the last

300

**JA198**

NYS ASSEMBLY                                    JUNE 1, 2022

19 years we have increased their bond limit.  Has their --

MR. ANDERSON:  Bonding authority.

MR. GOODELL:  Bonding authority.  Has their debt ever gone down?

MR. ANDERSON:  But I want to remind you that, Mr. Goodell, these are revenue bonds so they can always borrow and pay down, you know, as -- as time passes.  Again, these are revenue bonds.  I don't want you to think that these are bonds which, you know, in the traditional sense.

MR. GOODELL:  Thank you very much, Mr. Anderson.  I appreciate your comments and clarification.

MR. ANDERSON:  Thank you.

MR. GOODELL:  On the bill, sir.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. GOODELL:  New York has the dubious distinction of having some of the highest debt per capita in the nation, and our public authorities, including this authority, lead the way in terms of adding more and more debt every year.  And indeed, this bill adds $1 billion, $1 billion in additional debt.  Now, no doubt this additional debt will be very helpful for this organization, and no doubt someone, somewhere is going to have to pay it back.  And that's going to be our kids or our grandkids or someone else.

And so just speaking from my perspective, in my private life I do everything I can to reduce my debt and the restructure of my operations saw that my revenues meet or exceed my expenses,

301

NYS ASSEMBLY                                    JUNE 1, 2022

and that's the process that I would recommend for our authorities, as well.  Some practical, common sense economic theory that suggests that we should and can keep our spending in line with our revenues rather than borrowing more and more and more for 19 years in a row.

So for that reason, I and many of my colleagues will be opposing this bill, but I recognize that as with many of my colleagues, they do great work with all the money they borrow.  Thank you, sir, and thank you to my colleague for those comments.

ACTING SPEAKER AUBRY:  Mr. Anderson on the bill.

MR. ANDERSON:  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Sir, you've got to get that mic on.

MR. ANDERSON:  Sorry.  I just didn't know if the mic was working.

Thank you, Mr. Speaker.  So I just want to be clear that most households balance their households on debts and deficits, and I think if we do so responsibly we're able to ensure that there's successful use in that.  And HDC, again, is requiring that cap to be lifted so that it can produce the thousands of affordable homes and apartments across the City of New York to ensure that we address the exacerbated homelessness crisis that's impacting, and housing insecurity crisis that's impacting many, many New Yorkers.

So it's very critical that we pass this piece of legislation, and I encourage my colleagues to vote in favor of it.  I will

302

NYS ASSEMBLY                                    JUNE 1, 2022

be, as well, and I thank my colleague, Mr. Goodell, for his questioning.  It's very important, again, that we look at this from a holistic sense of what we're actually producing with these debts and deficits.  Thank you.

ACTING SPEAKER AUBRY:  Thank you, Mr. Anderson.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9297.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference is generally opposed to the $1 billion increase in debt for the New York City Housing Development Corporation, but certainly we have members that appreciate all the great work they do with all that fund -- all those funds.  And so in general, we'll be voting no, but historically there have been several members that vote yes and I would encourage them to continue to do so here in the Chamber or by calling the Minority Leader's Office.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr.

303

NYS ASSEMBLY                                    JUNE 1, 2022

Speaker.  Majority colleagues are generally going to support our colleague in this legislation to improve housing and affordable housing in the City of New York; however, there may be some who would choose to be an exception.  They should feel comfortable in contacting the Majority Leader's Office and we will be happy to record your vote.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, colleagues, we're going to keep going here because we're doing so well.  So we're going to go to Rules Report No. 139; Rules Report No. 429.  I'm sorry, let me just say Rules Report No. 139 is the sponsor, Lupardo; Rules Report No. 429 is sponsored by Mr. Magnarelli; Calendar No. 44 is sponsored by Ms. Rosenthal; Calendar No. 160 is sponsored by Ms. Buttenschon -- Bichotte Hermelyn, I'm sorry; and Calendar No. 365 is by Mr. Weprin, and 474 is by Mr. Weprin as well.  Those -- 479, Mr. Weprin as well.

Mr. Speaker, those will be straight votes and then we're going to go back to actual debates and that's going to be Calendar No. 24 by Mr. Jacobson; Rules Report No. 513 by Mr. Abbate; Calendar No. 163 by Mr. Abbate; Calendar No. 29 by Ms.

304

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Paulin; and Calendar No. 194 by Ms. Joyner.  In that order, Mr.

Speaker, thank you.

ACTING SPEAKER AUBRY:  Page 6, Rules Report

No. 139, the Clerk will read.

THE CLERK:  Assembly No. A09328-B, Rules

Report No. 139, Lupardo.  An act to amend the Public Authorities

Law and the State Finance Law, in relation to requiring certain funds

received by the New York State Energy Research and Development

Authority that are related to renewables development on viable

agricultural lands to be used for farmland protection programs.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Assembly print 9328-B.  This is a fast roll call.  Any

member who wishes to be recorded in the negative is reminded to

contact the Majority or Minority Leader at the numbers previously

provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 14, Rules Report No. 429, the Clerk will read.

(Pause)

THE CLERK:  Senate No. S08956-C, Senator

Mannion.  An act to amend the Public Authorities Law.

305

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  No, we're going to

have to -- it has --

THE CLERK:  My apologies.

Assembly No. A09966-C, Rules Report No. 429,

Magnarelli.  An act to amend the Public Authorities Law, in relation

to the Syracuse Regional Airport.

ACTING SPEAKER AUBRY:  On a motion by Mr.

Magnarelli, the Senate bill is before the House.  The Senate bill is

advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Senate print 8956-C.  This is a fast roll call.  Any member

who wishes to be recorded in the negative is reminded to contact the

Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 23, Calendar No. 44, the Clerk will read.

THE CLERK:  Assembly No. A00715, Calendar No.

44, L. Rosenthal, Weprin.  An act to amend the Public Health Law

and the Education Law, in relation to authorizing emergency medical

service personnel to provide basic first aid to cats and dogs under

certain circumstances.

ACTING SPEAKER AUBRY:  Read the last section.

306

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

THE CLERK:  This act shall take effect on the 365th

day.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Assembly print 715.  This is a fast roll call.  Any member

who wishes to be recorded in the negative should contact the Majority

or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, sir.  This bill allows

EMTs to provide basic first aid to dog and cats before transporting

them to a licensed vet.  And I love dogs and cats, and I'll be

supporting the bill, but I would point out that this is not quite as

straightforward as you might think, so let me just give you some

things to think about.

So your dog or cat gets hurt, you're going to call the

local EMTs and hope they show up with an ambulance and transport

your dog or cat to the vet.  Well, this bill will allow them to do it

without being sued.  What happens if your dog, in pain, bites the

EMT?  Well, the EMT can sue you, you just can't sue the EMT; that's

what this bill says.  Now, what if he takes your aged dog or cat to the

vet and the vet bill is a couple thousand dollars?  And you said, you

know, *I love Spot, but not that much.*  This bill doesn't address that

issue.

So before people start calling EMTs to rush over and

take care of their dog or cat, you might want to give some thought to

307

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

some of these other issues and make sure, by the way, that they send a

spare ambulance because if your neighbor has a heart attack, you

surely don't want the ambulance that's transporting your dog to the vet

to have to stop and dump your dog on the side of the road so they can

pick up your neighbor and save his life.  I'm just saying, you know, I

support the bill, I love the concept, love dogs and cats, but it's, you

know, it's a little bit more challenging than what it might first appear,

that's all.

So I urge my local volunteer firemen to be

compassionate, but remember their first mission is to rescue humans

in that ambulance and render first aid to dogs and cats as a secondary

obligation.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Are there any other

votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 29, Calendar No. 160, the Clerk will read.

THE CLERK:  Assembly No. A04947-B, Calendar

No. 160, Bichotte Hermelyn, Reyes, Griffin, Meeks, Colton,

Zinerman, Simon, Frontus, J. A. Giglio, González-Rojas.  An act to

amend the Penal Law, in relation to crimes involving the death or

injury of a worker.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 30th

day.

308

**JA200**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 4947-B.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Ms. Bichotte Hermelyn to explain the bill [sic].

MS. BICHOTTE HERMELYN:  Thank you, Mr. Speaker, for allowing me to explain my vote.  This bill seeks to protect workers from corporations and their agents that fail to comply with safety protocols by amending the Penal Code to create new offenses and substantially increasing the fines that can be imposed upon a corporate defendant convicted of certain crimes that lead to an injury or death of a worker.

This bill is not a punitive bill, but a deterrent to have corporations pay attention to safety and stop having workers killed.  Construction is a dangerous business, and there's a difference between a worker dying in an accident and a worker being killed by actions undertaken by their employer.  This bill would issue a fine for convicted misdemeanor, 300,000 to 500,000, and for convicted of felony, 500,000 to 1 million.

Carlos' Law is named for 22-year-old Carlos Moncayo, an Ecuadorian immigrant who was buried alive at a construction site in New York City, Meat Packing District in April 2015 while working in an un-reenforced 14-foot-deep trench that had

309

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

been cited by safety inspectors.  The walls of the trench collapsed on Carlos, who was pronounced dead on the scene.  The safety violations that led to Carlos' death was Harco Construction in conjunction with Sky Materials.  He was working to achieve the American Dream, and all of that has ended.  And I can tell you from firsthand as a Haitian immigrant, as the daughter of a Haitian immigrant, my brother, too, had experienced almost dying, falling off seven stories of a scaffold, and never been able to recover.  He's disabled and unemployed.

The current $10,000 penalty for workers being killed or injured is not sufficient, it's not sufficient for my brother and certainly not sufficient for the death of Carlos Moncayo.  In the last decade, there has been over 500 deaths, construction workers, death-related cases; 263 since the bill was first introduced by Francisco Moya.  Mr. Speaker, again, this is not a punitive bill; instead, it's a bill that would deter corporations, employers for being negligent and reckless, causing workers to be killed at these construction sites.  I will be voting in the affirmative and encourage my colleagues to do so as well.  Thank you.

ACTING SPEAKER AUBRY:  Ms. Bichotte Hermelyn in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Calendar No. 365, page 38, the Clerk will read.

THE CLERK:  Assembly No. A08190-A, Calendar

310

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

No. 365, Weprin, Gibbs.  An act to amend the Correction Law, in relation to allowing a telephone call prior to an incarcerated individual's transfer.

ACTING SPEAKER AUBRY:  On a motion by Mr. Weprin, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect on the 30th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 402-B.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  This will be a Party vote with the Republican Conference generally in the negative.  Obviously those who want to vote in favor can do so on the floor or by calling the Minority Leader's Office.  And I will explain in a moment why many of my colleagues will be opposed to this legislation.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference is going to pretty much be in favor of this legislation; however, there may be a few that would choose to be an exception.  They should feel free to contact the Majority

311

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Leader's Office.  We will make sure their vote is properly recorded.  Thank you, sir.

(The Clerk recorded the vote.)

ACTING SPEAKER AUBRY:  Thank you.

Mr. Weprin to explain his vote.

MR. WEPRIN:  Thank you, Mr. Speaker.  This bill may seem like a simple bill, but as Chair of Correction, I'm often contacted by families of incarcerated individuals who cannot locate their loved one because they were transferred and no one from DOCS had notified them that the individual was being transferred, and there was a certain secrecy with it.  So it seems to be a very reasonable request to allow the incarcerated individual to make a phone call to their loved ones to let them know where they're being transferred to.  It provides, you know, sanity, state of mind to the families and it's a reasonable accommodation.  And I withdraw my request and proudly vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Weprin in the affirmative.

Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, sir.  Under current law, an incarcerated individual who is transferred to a different facility is entitled to a phone call within 24 hours after arriving at the new facility.  This bill would require DOCS to provide the opportunity for a phone call before the transfer except under exceptional circumstances where there's an unacceptable risk to the safety and

312

**JA201**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

security of the staff.  And then when there is such an exceptional

circumstance, it has to be immediately documented.

           Well, our correctional staff have a really difficult and

challenging job and it's absolutely critical to the health and safety of

our correctional staffs that we minimize all their risk.  And the number

of assaults on our correctional staff continue to go up, and it's really,

really troublesome.  And so this bill doesn't say that you don't get a

phone call if there's a risk, it has to be an unacceptable risk and it has

to be exceptional circumstances.  And that's not the correct standard

for us to apply when we're looking at the life and safety of our

correctional officers.  And when a prisoner is transported from one

facility to another, there are inherent risks because you're outside the

confines of that prison, you're in a vehicle.  The likelihood that the

vehicle could be stopped or attacked or ambushed, or an inmate could

escape is dramatically higher.

           And so for most of my colleagues, we want to put the

life and safety of our correctional officers first recognizing, as the

sponsor did, that it's important to notify the families immediately, and

the current law has the correct balance by requiring that that phone

call be made and available within 24 hours after the arrival rather than

before where some inmates will tip off their relatives when they're

moving.  For that reason, I will not be supporting this.  Thank you, sir.

           ACTING SPEAKER AUBRY:  Mr. Goodell in the

negative.

           Mr. Meeks to explain his vote.

313

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

           MR. MEEKS:  Thank you, Mr. Speaker, for an

opportunity to explain my vote.  I think -- I rise in the affirmative.  I

support this bill.  And I think we have to realize that these are

incarcerated individuals.  They are the family members, they are the

loved ones of others.  And in this process, you also have to consider

the fact that the current system is set up in a manner which people

travel across the State in order to visit loved ones who may be

incarcerated.  So you have may have an instance where a family

member has saved resources to visit someone across the State and go

to the facility to find out that they're no longer there.  And it is also a

safety measure for individuals to know where their family members

are and where they're being transferred to.  So I rise in the affirmative.

Thank you.

           ACTING SPEAKER AUBRY:  Mr. Meeks in the

affirmative.

           Mr. Gibbs.

           MR. GIBBS:  Thank you, Mr. Speaker.  I rise in the

affirmative as well, and I want to thank the sponsor for the bill -- and I

want to thank the sponsor for the bill.  It's necessary that we notify the

individual's families for the individual incarcerated, whether it be

prior to being transferred, because like Member Meeks said, there are

family members who are traveling far, and in many cases I went to a

prison and the incarcerated individual was not there.  It's a lot of

resources, it costs a lot of money and since taking this seat, I visited

nine prisons and these are one of the situations where no family

314

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

members are notified about being transferred or other incarcerated

individuals no longer at that facility.  So I rise in the affirmative and I

thank Assemblymember Weprin for the bill.

           ACTING SPEAKER AUBRY:  Mr. Gibbs in the

affirmative.

           Mr. Giglio.

           MR. GIGLIO:  Thank you, Mr. Speaker, to explain

my vote.  The most important thing that's here is safety and security.

And when those phone calls are made after they arrive at their

destination, they're assured they get there safe and secure.  The second

part of this is when we did chapter corrections about why those phone

calls might not have been made, a lot of our incarcerated person's

choice on who they're going to call, and it's not always their family.

So we can't legislate who they're going to call, but we can keep them

safe and that's why I will be voting no.

           ACTING SPEAKER AUBRY:  Thank you, sir.

           Mrs. Galef to explain her vote.

           MRS. GALEF:  Yes, I'd just like to explain my vote.

I had a really interesting experience this weekend.  I spent all Sunday

at Greene County Correctional Facility.  I have a friend who had a

foster child, or adopted a child who ended up there and I, frankly,

because I wanted to take my friend who actually had cancer and was

on a breathing tube and everything else, there so I could allow her to

experience that hug that she had for her foster child.  But it was so

interesting for me to see people that had come from Rochester, they

315

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

had spent three hours to get to the prison.  We had spent two hours to

get there.  There were probably other people that had spent many

more hours to be able to come and take care of their loved ones.  We

sat in the visitor room, you could see people hugging and chatting and

so on.  And it is terrible that people are there, but at the same time we

want to be sure that when you go there as a visitor that you can get in.

Just think of traveling three hours and finding out that your loved one

is somewhere else and you don't know it?

           So I think it's only right that we allow connections

between the correctional facility or the prison as to where that

individual is.  And this is just a good bill, it just makes sense.  And I

think it makes sense for the correction officers that are there, too, that

are trying to do their job and they know that when people are engaged

with individuals that they care about that hopefully they will be better

residents of the facility.  It was a very interesting experience.  I would

suggest -- I have been at Sing Sing, you know that, for many, many

times, but not to visit an individual, and I was very, very -- it was

difficult to do.  Thank you.  I will be voting yes.

           ACTING SPEAKER AUBRY:  Mrs. Galef in the

affirmative.

           Are there any other votes?  Announce the results.

           (The Clerk announced the results.)

           The bill is passed.

           Page 42, Calendar No. 479, the Clerk will read.

           THE CLERK:  Assembly No. A08902, Calendar No.

316

NYS ASSEMBLY                                    JUNE 1, 2022

479, Weprin, O'Donnell, Aubry, Walker, Gibbs.  An act to amend the Correction Law, in relation to certificates of relief from disabilities.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 90th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 8902.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference will be generally opposed to this.  Those who support it can vote here on the floor or by contacting the Minority Leader's Office.  And I will provide a brief explanation why many of my colleagues are opposed to this in a moment, sir.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  This, again, is a vote that generally Democrats are going to be in support of; however, there may be some colleagues who choose to be an exception, and they should feel free to either push their button in the Chambers and/or contact the Majority Leader's Office and I will make sure their vote is properly recorded.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

(The Clerk recorded the vote.)

317

NYS ASSEMBLY                                    JUNE 1, 2022

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  If an individual is convicted of various offenses, there are some positions they cannot then occupy; for example, you can't get a liquor license if you have certain convictions, or certain other licenses or privileges.  And the only way you can get such a license is to get a certificate of relief from disabilities.  That certificate of relief from disabilities can be issued by the Department of Correctional Services or by a court upon a finding that you have completed your sentence and that you are an eligible offender, and that the granting of the certificate is consistent with the rehabilitation and helpful, and consistent with public safety.

Under current law, the issuance of that certificate of relief of disabilities is discretionary.  This bill would make it mandatory.  And I think it's important to recognize that sound discretion can ensure that the certificate of relief from disabilities is only issued to those who qualify and are safe for those occupations that they'll then be applying for and not automatically granted upon completion of their prison sentence.  For that reason, I will be voting against this because I think some discretionary review is appropriate in this situation.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mr. Goodell in the negative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

318

NYS ASSEMBLY                                    JUNE 1, 2022

Page 21, Calendar No. 24, the Clerk will read.

THE CLERK:  Assembly No. A00349-B, Calendar No. 24, Jacobson, Otis, Sayegh.  An act to amend the Municipal Home Rule Law, in relation to the definition of "population" for purposes of providing substantially equal weight for the population of that local government in the allocation of representation in the local legislative Body.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  An explanation, please.

ACTING SPEAKER AUBRY:  An explanation is requested, Mr. Jacobson.

MR. JACOBSON:  Thank you.  This is a very simple, but important bill.  This bill codifies existing case law with respect to redistricting and makes it clear that the definition of "population" for purpose of redistricting for local governments and counties shall mean residents.  This bill modifies Section 10 and Section 34 of the Municipal Home Rule Law.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 349-B.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the number previously provided.

Mr. Goodell.

319

NYS ASSEMBLY                                    JUNE 1, 2022

MR. GOODELL:  Thank you, sir.  The Republican Conference is generally opposed for the reasons I will explain in a moment, but those who support it should vote in favor here on the floor or by contacting the Minority Leader's Office.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference is going to be in favor of this piece of legislation.  There may be some of our colleagues who would choose to be an exception.  They should contact the Majority Leader's Office, I will make sure their vote is properly recorded.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

(The Clerk recorded the vote.)

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  This legislation removes any reference to citizens in terms of determining how election districts on the local level should be reapportioned.  I point out that our New York State Constitution in Article II, so you don't have to read too far into it, the first section refers to, *Every citizen shall be entitled to vote.*  Now, I recognize that in some areas the number of people who are not citizens can be significant; in fact, I saw that the City of New York was trying to pass legislation to enable not only non-citizens, but illegal immigrants, or undocumented immigrants, to vote and they had estimated there were as many as

320

**JA203**

NYS ASSEMBLY                                         JUNE 1, 2022

800,000 who were there. But I think the first and primary function of the New York State Legislature should be to represent New York State residents who are citizens and lawful residents here in our State. And likewise, that if you focus on one person/one vote concept and your mission is to represent citizens who are lawfully in your community, we should not eliminate the reference to citizenship in terms of local redistricting.

And for that reason, I will not be supporting it both because I think it's inconsistent with the letter and spirit of our own State Constitution, but also inconsistent with the concept that representation in local government should be based on equal representation of those who are lawfully here and are citizens. Thank you, sir.

ACTING SPEAKER AUBRY: Mr. Jacobson to explain his vote.

MR. JACOBSON: The current state of the law follows a number of cases that have come from the Supreme Court and in 1964 in the case of *Reynolds v. Sims*, the Court held that the Equal Protection Clause requires that both seats -- that the seats in both Houses of a bicameral State Legislature, such as we have - we have an Assembly and a State Senate - must be apportioned on a total population basis. That's what we do. We, before we redistrict, we use all of the population of the entire State. And that's -- and we do that and that's what the law is now.

And it's important to realize that we represent

321

NYS ASSEMBLY                                         JUNE 1, 2022

everyone who lives in our respective districts. We represent adults and children, those who are voting age and those who are not. We represent those who are eligible to register to vote, but choose not to, and of those who are registered to vote, we represent those who some will vote and some who do not vote. We represent citizens and non-citizens. In short, we represent all the residents in our districts and when it comes to redistricting of the State Legislature, we use the number of residents in the State. This bill makes sure that local governments do the same and use all the residents in their municipality.

So with that, I vote in favor of the bill. Thank you.

ACTING SPEAKER AUBRY: Assemblyman Jacobson in the affirmative.

Are there any other votes? Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 18, Rules Report No. 513, the Clerk will read.

THE CLERK: Assembly No. A10425, Rules Report No. 513, Committee on Rules (Abbate, Sillitti, Englebright, Thiele, Braunstein, Jones, Colton, Gunther, Otis, Burdick, Santabarbara, Abinanti, Dinowitz, Griffin, Lavine, Woerner, Stern, Jean-Pierre, Stirpe). An act to amend the Civil Service Law and the Labor Law, in relation to clarifying the vesting of retiree health insurance within collective bargaining agreements.

ACTING SPEAKER AUBRY: Mr. Goodell.

322

NYS ASSEMBLY                                         JUNE 1, 2022

MR. GOODELL: Thank you, sir.

On the bill.

ACTING SPEAKER AUBRY: On the bill, sir.

MR. GOODELL: The courts have almost universally, for going back decades or centuries, held that when there's a written contract between parties, you have to look at the four corners of the contract to decide what the parties intended to do. And as long as a contract is reasonably clear, the courts would not allow people after they signed a contract to go to court and say, *Hey, that's not really what I meant*, or, *There should be more things covered by this contract.* And that rule which said if you want to be clear, you have a written contract, write it down and we will not consider extrinsic verbal evidence to change what's in the writing. And it's called a parol evidence rule, parol meaning verbal.

So in 2020, the New York State Court of Appeals applied that longstanding rule of contract interpretation to collective bargaining agreements as they related to lifetime health insurance for retirees. And they said you have to read the collective bargaining agreement, it's a written agreement, the words were negotiated, the parties were almost always represented by competent lawyers, and they said -- the Court of Appeals said you don't get lifetime health benefits as a retiree unless the contract says you do. And the only time you can have oral testimony that goes beyond the contract terms is if the contract was, quote, "sufficiently ambiguous as to require additional testimony."

323

NYS ASSEMBLY                                         JUNE 1, 2022

And what this bill says is no, even if it's not ambiguous, even if it's not clearly covered, you can introduce oral testimony. And the problem with it is that it removes the confidence that the parties have that their written agreement actually defines the written terms and conditions, and in this area of lifetime retiree health insurance, it opens a possibility that people can claim that even though the contract didn't cover it, they meant to have lifetime health insurance.

Now, many of my colleagues and I have received lobbying efforts from people that are looking at retirement because having lifetime retiree is a huge benefit, of course. The older I get, the more valuable it looks. But we also have to remember it's a huge cost to our local governments and schools and others, and in my particular district, this lifetime retirement benefit almost drove the City of Jamestown into bankruptcy.

So I think we should stick with standard contract interpretations, require and expect the parties who are represented by attorneys to put what they mean and mean what they say when they write the contract, and to allow parol evidence, or verbal evidence, only when there's an ambiguity that needs that additional evidence. For that reason, I will be voting against it, but I recognize that many of my colleagues will want to support it. Thank you, sir.

ACTING SPEAKER AUBRY: Mr. Goodell.

Read the last section.

THE CLERK: This act shall take effect immediately.

324

**JA204**

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10425.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 30, Calendar No. 163, the Clerk will read.

THE CLERK:  Assembly No. A05108, Calendar No. 163, Abbate, Colton, Barnwell, Lawler, Sillitti, Sayegh, J. A. Giglio, Zebrowski, Tannousis.  An act in relation to affecting the health insurance benefits and contributions of certain retired public employees.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 5108.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference will be generally opposed to this legislation for the

325

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

reasons I'll explain in a moment.  Those who wish to support it can certainly vote yes here on the floor or by contacting our Leader's Office.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, the Democratic Conference is generally going to be in favor of this piece of legislation to assure that people have access to health insurance; however, there may be a few of us who want to be an exception.  They should feel free to either vote in Chambers and/or call the Majority Leader's Office and we will make sure their vote is properly recorded.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you, ma'am.

(The Clerk recorded the vote.)

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  This bill makes it illegal for public employers to diminish the health insurance benefits provided to retirees after the effective date of this law.  And this creates tremendous problems because a lot of municipalities are being -- seeing those costs escalating way beyond what they had ever planned for and, as a result, many municipalities are negotiating with their retirees to have them leave a 100 percent locally-funded retiree plan or health plan -- rather, a health plan and instead go into a Medicaid supplemental plan.  And as I mentioned earlier, these retiree health benefits brought the City of Jamestown right to the edge of

326

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

bankruptcy, and they addressed it by providing their retirees with a supplemental Medicaid plan, or Medicare plan, so they ended up with the equivalent coverage at a fraction of the cost.

This bill would make it illegal for municipalities to implement those types of innovative cost-cutting measures that shift the cost from the local taxpayer on to Medicare and would, therefore, result in much higher taxes for a lot of our municipalities with no corresponding benefit for the retirees.  For that reason, I can't support it and recommend against it to my colleagues.  Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  Mr. Goodell in the negative.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  Please record my colleagues Mr. Durso, Mr. Gandolfo, and Mr. Ra in the affirmative.  Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  So noted.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Also record my colleagues Mr. Smith -- Mr. Schmitt and Mr. Brabenec.

ACTING SPEAKER ZEBROWSKI:  So noted.

MR. GOODELL:  And Jodi Giglio, and let's not forget Mr. Mikulin.

ACTING SPEAKER ZEBROWSKI:  Thank you, Mr. Goodell, so noted.

MR. GOODELL:  Thank you, sir.

327

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

ACTING SPEAKER ZEBROWSKI:  Ms. Walsh to explain her vote.

MS. WALSH:  Actually, Mr. Speaker, I'm not going to explain my vote, but I would like you to please record Mr. Tannousis in the affirmative on this bill.  Thank you.

ACTING SPEAKER ZEBROWSKI:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 22, Calendar No. 29, the Clerk will read.

THE CLERK:  Assembly No. A00382, Calendar No. 29, Paulin, L. Rosenthal, Jacobson, Colton, Quart, Gottfried, Vanel, Hevesi, Fahy, Lupardo, Kelles, Wallace, Lunsford, Forrest, Gallagher, Stirpe, González-Rojas, Cymbrowitz, Reyes, Sayegh, Lavine, Mamdani.  An act to amend the Not-for-Profit Corporation Law, in relation to the creation, operation, and duties of natural organic reduction facilities as cemetery corporations.

ACTING SPEAKER ZEBROWSKI:  Ms. Paulin, an explanation has been requested.

MS. PAULIN:  Of course, I'd love to.  The bill provides for the cremation -- a creation, operation and duties of natural, organic reduction facilities by a cemetery corporation.  Just so you know what natural organic production is, it's the contained accelerated conversion of human remains to soil over roughly a 30-day period.

328

NYS ASSEMBLY                         JUNE 1, 2022

ACTING SPEAKER ZEBROWSKI:  Mr. Lemondes.

MR. LEMONDES:  Thank you, Mr. Speaker.  Will the sponsor yield for a few questions?

ACTING SPEAKER ZEBROWSKI:  Ms. Paulin, will you yield?

MS. PAULIN:  I'd be happy to.

ACTING SPEAKER ZEBROWSKI:  The sponsor yields.

MR. LEMONDES:  Thank you, I appreciate that at this late hour.  Could you describe the process in a little more detail just so -- just so I understand exactly what's happening to the human body in this situation?

MS. PAULIN:  Sure.  So essentially the remains are placed in an above ground capsule containing a mixture of alfalfa leaves, wood chips and brass, and gently and naturally convert to soil over a period of 30 days.  It's similar to burial except once you put formaldehyde on the body, it takes longer to decompose.

MR. LEMONDES:  So what -- what is the purpose of this?  I'm struggling with the -- to me that -- that seems as if it's desecrating the human body --

MS. PAULIN:  Um, in fact --

MR. LEMONDES:  -- depending on what one's -- what one's faith might be.

MS. PAULIN:  Well, let's take the three -- the two options that are allowed by law.  One is putting the body in a coffin

329

NYS ASSEMBLY                         JUNE 1, 2022

with a lot of chemicals and burying it, and then it decomposes over a period of time and the formaldehyde creates a lot of pollution underground.  The requirement of a casket is a lot of man hours and a lot of natural resources, and it's a lot of land.  The second option is cremation.  Cremation you essentially burn the body, which requires a lot of fossil fuels and is very detrimental to the environment.  This third option is similar to burial except without the formaldehyde and it's above ground.  So it's -- it's -- I think if you watch old movies you can think of the tomb that you put the body in and it decomposes, but it's very similar to underground except without the chemicals and without the land space.

MR. LEMONDES:  So -- and thank you for that.  If you don't mind, I'm going to keep going on this.  If I understand you correctly there is no formaldehyde, no embalming fluid used whatsoever in this.

MS. PAULIN:  That's correct.

MR. LEMONDES:  Okay.  Would this be a requirement or an option for those families?

MS. PAULIN:  All -- this would be an option.  It would just be a choice of the family who certainly could use any of the other two methods.  Both are -- we're not making any of them illegal, we're just legalizing this one.

MR. LEMONDES:  So is the -- is the primary driver space, or environmental concerns or both?

MS. PAULIN:  I think it's both.  And to give families

330

NYS ASSEMBLY                         JUNE 1, 2022

another option.  When this bill passes, which we expect it will in the Senate as well and signed into law, we would be the fifth state to allow this, so it's a growing trend in the United States.

MR. LEMONDES:  I disagree on the space component of that.  We lost 319,000 people in New York last year, we lost 1.2 million over the last decade, our population is decreasing, it's not increasing, and the main religions as far as I have information on, the Catholic Conference, the Jewish faith and the Orthodox Christian groups view this as desecration of the body.

MS. PAULIN:  Well, I've only received one negative memo from, you know, a religious organization and that is the Catholic Conference.  And the Catholic Conference says that a process whereby human remains are composed and scattered in a designated scattering garden or area in a cemetery fails to sufficiently respect the dignity due the deceased.  So the question I wondered, because I'm not Catholic, is does the Catholic faith object to cremation?

MR. LEMONDES:  I can't answer that, I'm not -- I'm not Catholic.

MS. PAULIN:  I don't -- I don't think they do.  And the words that are in the law for cremation and for what we're proposing are identical.  So I don't know why one type of burial or, you know, one type of dealing with human remains would be contrary to a religious belief when the law is identical for the other type.  But again, it's a choice.  So if somebody wants to use this as their option

331

NYS ASSEMBLY                         JUNE 1, 2022

they can, and if somebody doesn't they don't have to.  If I want to be able to take some of the remains and plant a tree with my remains so that my family could cherish that tree forever and remember my memory, then that would be some option that I could use.  If someone believes that, you know, this is contrary to their religious beliefs, then they do not have to do this option and they can go with either cremation or -- or burial as we have in the law currently.

MR. LEMONDES:  Thank you for answering that.  Do you think that this would impact jobs at all, perhaps, in the funeral industry across our State?

MS. PAULIN:  The -- you know, there has to be a type of -- we have to deal with the human remains so as long people die, you know, at the same rate as we, you know, we have people -- you know, there's -- you know, we're going to keep those jobs.  So I don't know that it's really a job issue.

MR. LEMONDES:  Thank you for answering those questions.

Mr. Speaker, on the bill.

ACTING SPEAKER ZEBROWSKI:  On the bill.

MR. LEMONDES:  Thank you.  Due to the opposition of the Funeral Directors Association, the Catholic faith, and I will speak only on my own faith as an Orthodox Christian, this is not something that we would do.  I can't support this.  I would also put forward if the -- if the concern is of burial and space, there are -- cremation is still a viable option.  They use wool caskets as is done in

332

NYS ASSEMBLY                                    JUNE 1, 2022

other countries which is completely biodegradable without any chemicals is also an option as well. For those reasons, I would not support this and urge my colleagues not to as well. Thank you.

    ACTING SPEAKER ZEBROWSKI: Read the last section.

    THE CLERK: This act shall take effect on the 90th day.

    ACTING SPEAKER ZEBROWSKI: The Clerk will record the vote on Assembly Bill 382. This is a Party vote. Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

    Mr. Goodell.

    MR. GOODELL: Thank you, sir. Based on our prior Committee votes, the Republican Conference is primarily in the negative on this, but there may be some colleagues that support this option. And they are certainly welcome to use it themselves provided it passes and is signed into law, and they should vote yes here on the floor or by contacting the Minority Leader's Office. Thank you, sir.

    ACTING SPEAKER ZEBROWSKI: Mrs. Peoples-Stokes.

    MRS. PEOPLES-STOKES: Thank you, Mr. Speaker. The Majority Conference is going to be in favor of this piece of legislation; however, there may be some of us who would choose to be an exception. They should feel free to do so by calling the

333

NYS ASSEMBLY                                    JUNE 1, 2022

Majority Leader's Office and/or pressing their button in the Chambers. Thank you, sir.

    ACTING SPEAKER ZEBROWSKI: Thank you.

    (The Clerk recorded the vote.)

    Mrs. Peoples-Stokes.

    MRS. PEOPLES-STOKES: Mr. Speaker, would you please record our colleagues Mr. Eichenstein, Mr. Barnwell and Mr. Colton in the negative on this item. Thank you, sir.

    ACTING SPEAKER ZEBROWSKI: So noted.

    Are there any other votes? Announce the results.

    (The Clerk announced the results.)

    The bill is passed.

    Page 32, Calendar No. 194, the Clerk will read.

    THE CLERK: Assembly No. A05891-C, Calendar No. 194, Joyner, Simon, Dickens, Carroll, Aubry, O'Donnell, Dinowitz, Forrest, Jackson, Hevesi, Mitaynes, González-Rojas, Otis, Epstein, Kelles, Cruz, Reyes, Zinerman, Seawright, Pretlow, Anderson, Burdick, Burgos, Quart, L. Rosenthal. An act to amend the Family Court Act and the Criminal Procedure Law, in relation to the custodial interrogation of juveniles by law enforcement.

    ACTING SPEAKER ZEBROWSKI: Ms. Joyner, an explanation has been requested.

    MS. JOYNER: Sure. This bill -- this bill would provide for additional protections and procedures when a youth is taken into custody by law enforcement during youth interrogations.

334

NYS ASSEMBLY                                    JUNE 1, 2022

    ACTING SPEAKER ZEBROWSKI: Ms. Walsh.

    MS. WALSH: Thank you, Mr. Speaker. Will the sponsor yield, please?

    ACTING SPEAKER ZEBROWSKI: Ms. Joyner, will you yield?

    MS. JOYNER: Yes.

    ACTING SPEAKER ZEBROWSKI: The sponsor yields.

    MS. WALSH: Thank you so much. So I'd like to get -- I have -- I have a number of questions actually, about this, it's very interesting. First of all, I noticed that this bill is in a C print. Can you just talk a little bit about any changes that were made in the bill along the way? Because some of the -- some of the people that -- some of the organizations that have weighed in one way or the other have commented that the bill appears to be improved from earlier versions in their views, so I'd just like to hear that from you.

    MS. JOYNER: I mean, yes. We took in feedback from different groups and we landed on the language that we're discussing today.

    MS. WALSH: Okay. So basically the way I read the bill is that it does, you know, a few different things. The first has to do with notifying a parent or person legally responsible for the juvenile defendant at the moment preceding the arrest or questioning of the juvenile defendant. Can you just talk about what that process is going to be under -- under this legislation?

335

NYS ASSEMBLY                                    JUNE 1, 2022

    MS. JOYNER: Right. It clarifies what immediate notification is. Right now, it's ambiguous. The bill makes it clear that immediate notification is before there's any transport of the child to another location.

    MS. WALSH: Okay. And -- so if the police reasonably believe that there's going to be a parent or person legally responsible at the juvenile defendant's home, they're required to take the juvenile defendant to their home and see if a parent or person legally responsible comes to the door; is that correct?

    MS. JOYNER: Yes. Presumption is to release to the parent.

    MS. WALSH: Okay. So -- and then when they -- say they go there and there's a parent or, and I'll just say PLR, person legally responsible, is available, they come to the door. If it is a felony charge, then what happens in that case?

    MS. JOYNER: If it's a designated felony, you know, they have different options. They can take the child to the police station, family court, or magistrate.

    MS. WALSH: Or, what was the last?

    MS. JOYNER: Magistrate.

    MS. WALSH: Oh, magistrate, okay. Now, if it's something that's not a designated felony, they're directed to issue an appearance ticket and allow the juvenile defendant to remain at their home with their parent or PLR, right?

    MS. JOYNER: Yes.

336

NYS ASSEMBLY                              JUNE 1, 2022

MS. WALSH:  Okay.  So what happens -- okay.  So is there any determination that's being made by law enforcement?  Let's say they get to the juvenile defendant's home and a parent comes to the door who is obviously intoxicated, is obviously impaired in some way or is, you know, for a variety of reasons an unsuitable person to leave the juvenile defendant with.  Under this legislation, must they still do that if it's a -- if it's a non-felony?  Do they still need to release with an appearance ticket in that instance?

MS. JOYNER:  Right.  So if it's an unsafe condition, police will retain discretion as to whether or not it's appropriate to release the youth at their home.

MS. WALSH:  Okay, that's good.  So let's say then that -- let's say it's a felony, a designated felony and instead of -- so in that instance, do they -- does law enforcement have to take the juvenile defendant to the home first or may they take them directly to the police station?

MS. JOYNER:  Right.  So if it's a designated family act -- felony, sorry.  If it's a designated felony, yes, the presumption is to either take to the family court or the magistrate.

MS. WALSH:  But before they do that, must they still make attempts to notify the parent or PLR?

MS. JOYNER:  Yes.

MS. WALSH:  Okay.  And if there is no response or if there is a response, would the parent come to the -- would the understanding be that they would come to the station to join the

337

NYS ASSEMBLY                              JUNE 1, 2022

juvenile defendant at the station during processing?

MS. JOYNER:  Right.  The pres -- you know, we would be presuming that the parent or the PLR would show up but, yes, this bill is just clarifying the timing of notification and giving the parents, you know, awareness that they are -- the child is in custody.

MS. WALSH:  An awareness that this has happened and an opportunity to appear.  Is there any consequence if that parent or PLR says, *You know what, this is the empteenth time that this kid has been in trouble, I'm working, or I'm busy, or I'm not coming down there.*  Does that change anything as we look through the sequence here of what happens?

MS. JOYNER:  No.

MS. WALSH:  Okay.  So they get to the station.  At that point, what happens at that point, what happens next?

MS. JOYNER:  It depends.  If it's just for questioning, it's an invest -- you know, an investigatory process they can, you know, ask questions, but if it's a custodial process, that's where, you know, Miranda Rights are required to be read and the consultation with an attorney must be provided to the -- to the child.

MS. WALSH:  Okay, that's interesting.  So the consultation with the attorney then only takes place if there's going to be a custodial result.

MS. JOYNER:  Yes.

MS. WALSH:  Okay, that's good to know.  I did not get that from the bill, I appreciate that.  So let's talk about that

338

NYS ASSEMBLY                              JUNE 1, 2022

consultation with the attorney.  It can be by video conference, it can be by telephone, it can be in person.

MS. JOYNER:  Correct.

MS. WALSH:  Okay.  Depending upon the time of the night, whether it's a weekend or a weekday, is it envisioned that there would be attorneys for the children that would be available or on-call or on staff to be able to provide these types of services, or...

MS. JOYNER:  After consultation with OCA and Legal Aid, yes, this -- they feel like the need will be met.

MS. WALSH:  Okay.  Because, you know, we have a big state here and some areas are pretty rural and I know speaking as an attorney for the child myself that you, you know, it's -- it's -- the candle is dwindling right now.

MS. JOYNER:  And that's why, you know, we made this expansive list of options.  So again, phone, video, or in person.  So we, you know, made it enough that it's flexible where options are available to, you know, take into consideration the, you know, the issues you're bringing up.

MS. WALSH:  Is there -- is there -- what if there just isn't anybody immediately available, an attorney immediately available to confer with the juvenile defendant; what happens then?

MS. JOYNER:  Then statements cannot be taken at that point.

MS. WALSH:  Okay.  And -- okay.  So let's say that they're able to patch in through video conference, say, an attorney for

339

NYS ASSEMBLY                              JUNE 1, 2022

the child, and that attorney has a consultation.  Is that a private consultation with the juvenile defendant or is it in the presence of law enforcement?

MS. JOYNER:  Private, yes.  Private.

MS. WALSH:  Okay.  So let's say that that occurs and let's say that the attorney advises the juvenile defendant, *Do not make any statements, that is -- I don't want you making any statements at all.*  And they complete the consultation and then the juvenile defendant says, *Yeah, I know that the attorney said that, but I, having been given my Miranda Rights,* and everything that has been met on the Miranda Rights, *I want to make a voluntary statement.*  Can they -- can that defendant do that and still have that admissible later?

MS. JOYNER:  Yes.  If it's a knowing and voluntary waiver, it's admissible, and especially after a consultation with an attorney.

MS. WALSH:  So it's still appropriate -- it could be appropriate for the juvenile defendant to reject any advice through the consultation, the important thing is that the consultation did occur.

MS. JOYNER:  Yes.

MS. WALSH:  All right.  And if -- okay.  So let me just -- I know I'm throwing these at you pretty quickly, let me just get back to my notes here.  All right.  Now, I noticed that in the law itself, and this wasn't a portion that was changed by the -- by the bill, there's a section that deals with kind of factors to be considered.  I'm looking at page 3 starting around line 22, about -- in determining the

340

**NYS ASSEMBLY**                      **JUNE 1, 2022**

suitability of questioning. You're going to consider the presence or absence of parents, the reasonable period of time for questioning, do you see that section?

         MS. JOYNER: Yes.

         MS. WALSH: What -- what is the relevance of those determinations? Because doesn't the bill really have to do with whether a statement is going to be suppressed as a matter of law? I mean, are you really going to be doing like a Huntley Hearing as far as whether a statement is going to be suppressed or not suppressed?

         MS. JOYNER: So Huntley Hearings are still permissible and, you know, we put this language in for the judges to decide, you know, how the interrogation went with the child.

         MS. WALSH: So is it fair to say that a judge at a Huntley Hearing will say, *All right, first of all, has there been -- must I suppress as a matter of law because there was no attorney consultation? If there was attorney consultation and there's still a statement, then I take a look at these other factors to see whether or not it was -- whether or not rules were followed that make it a reasonable -- reasonably obtained statement that I'm going to find does not need to be suppressed.*

         MS. JOYNER: So this doesn't change anything that's, you know, currently happening. It's basically laid out in this way to reassert, you know, factors that the judges can look at in terms of looking at the interrogation process.

         MS. WALSH: Okay. All right. So -- hold on a

341

**NYS ASSEMBLY**                      **JUNE 1, 2022**

second. Okay. So one of the things -- one of the groups that has concerns with the legislation even in its C print where we are here is the New York State Sheriff's Association. So I just want to review what they're saying. They're saying, *This version is better than the original because the original would have prohibited police from even talking to an arrested juvenile unless it was necessary to prevent the immediate death or injury of a third-party.* So that was maybe some of the feedback that you received, you changed the bill, that's great. But they say -- they say, *No defense attorney will ever tell their client to speak with the police so in virtually all cases, the juvenile's culpability for a crime would have to be proven another way.* What -- what is your response to that concern from the Sheriff's Association?

         MS. JOYNER: Right. So you know, basically this bill is just ensuring that Constitutional protections are actually a reality. So you know, I hear the arguments, that's why we need the bill, we made additional changes to the bill in terms of narrowing the scope. But, you know, data is that 90 percent of adolescents are waiving their Miranda Rights, so again, we feel like this is a very important issue and this bill best addresses that goal.

         MS. WALSH: And you just reminded me of a question I forgot to ask you earlier when we were talking about Miranda Rights. Let's say that there is a parent or PLR that comes -- say comes to the station with the juvenile defendant. May the juvenile defendant him or herself waive Miranda Rights?

         MS. JOYNER: It's a non-waiveable right for a child.

342

**NYS ASSEMBLY**                      **JUNE 1, 2022**

The parent cannot waive this right on behalf of the child, no.

         MS. WALSH: So they parent cannot waive it --

         MS. JOYNER: No.

         MS. WALSH: -- only the juvenile defendant him or herself could waive it.

         MS. JOYNER: Correct.

         MS. WALSH: Okay, thank you for that. So one of the other things that the Sheriff's Association points out is they say, *The big question is what about voluntary statements made to officers before the juvenile is brought to a station or to their home.* Would these be admissible?

         MS. JOYNER: Right. So again, if it's during the investigation process, statements are you, know, allowed. It's only after a custodial -- custody arrest where consultation within an attorney is, you know, mandated.

         MS. WALSH: Okay. So for example - and I'm not a criminal lawyer so I don't know the answer to this - when they are transporting the juvenile defendant, say, to the home to see if the parent is there and in the car, in the squad car on the way over to the home the juvenile defendant is making admissions. Is that -- is that considered to be custody where those statements would not be okay, or would we back it up further to, say, at the scene of the crime, or alleged crime if there are statements made there by the juvenile defendant where that defendant is not currently in custody? I mean, where do we draw the line as far as those earlier statements prior to,

343

**NYS ASSEMBLY**                      **JUNE 1, 2022**

say, being at the station?

         MS. JOYNER: Custody is defined as whether the person feels they can leave or not.

         MS. WALSH: Okay. Okay. So I don't know the answer to that. Did you happen to know if that means that if they're in the scenario where they're in the police car on the way to the home? Does it depend on whether the car door is locked?

         MS. JOYNER: You know, this would be up to a judge to look at --

         MS. WALSH: Okay.

         MS. JOYNER: -- whether or not, you know, again, with the factors we laid out in the bill would a child feel like they have the ability to leave or not.

         MS. WALSH: Okay, very good. Now, one of the concerns that was raised by -- a memo of actual support that I thought was interesting was from Safe Horizon and although they were overall supportive of the legislation, they raised what I thought was kind of -- kind of an interesting concern. They say, *First, it's important to acknowledge that we do have concerns about this bill. Treatment and counseling for children exhibiting problematic sexual behaviors is often accessed through a criminal justice process. This must change, of course, but if children who cause harm are likely going to be extracted from police interrogations that currently -- that current existing path to treatment may be closed. Additionally, when law enforcement is unable to obtain statements from those suspected of*

344

**JA209**

NYS ASSEMBLY                                         JUNE 1, 2022

*causing harm, more pressure is placed on the victim of the crime in question whose statement is all law enforcement may have. We do not want to unintentionally harm victims and survivors of violence and abuse, especially children.* And I think that in that instance they were talking specifically about perhaps youth-on-youth sexual crime. I think that they were specifically referring to that. How would you respond to that concern expressed by Safe Horizon?

MS. JOYNER:  There's nothing in this bill that would prohibit any youth that feels unsafe to be, you know, transported to a safe location. But again, if you, know, they are in custody and they are allowed -- this bill is going to allow an attorney to be present.

MS. WALSH:  Very good.  All right.  Thank you very much, Ms. Joyner, I appreciate your answers.

Mr. Speaker, on the bill.

ACTING SPEAKER ZEBROWSKI:  On the bill.

MS. WALSH:  Thank you so much.  I think that my initial 15 minutes is almost expired so I will save my -- I'll speak on the bill -- or I'll explain my vote later is what I'm saying.  I think that there are other people who have questions.  Thank you so much.

ACTING SPEAKER ZEBROWSKI:  Thank you.

Mr. Reilly.

MR. REILLY:  Thank you, Mr. Speaker.  Will the sponsor yield?

MS. JOYNER:  Yes.

ACTING SPEAKER ZEBROWSKI:  The sponsor

345

NYS ASSEMBLY                                         JUNE 1, 2022

yields.

MR. REILLY:  Thank you, Ms. Joyner.  I apologize, I'm behind you, so -- you don't have to turn around, don't worry about it.  I have a question.  During the -- I know in the bill it states that when the police arrive on the scene and there's an incident where the juvenile, whether that's anybody under the age of 18, it says, *They shall immediately, before transporting the child to the police station, have to contact the parent.*  Now, is that accurate?

MS. JOYNER:  Yes.

MR. REILLY:  Is there any exceptions to that?

MS. JOYNER:  Right.  So there's still -- the public safety exception is still applicable.  If there's an emergency situation, that's also still applicable.  So existing exceptions are still permissible.

MR. REILLY:  Is there a reason why we use "shall," then, because shall would mean that they have to do it and there's no exceptions.

MS. JOYNER:  Right.  So shall immediately is current law.  This bill doesn't change current law on that issue --

MR. REILLY:  Okay.

MS. JOYNER:  -- in terms of "shall," "must."  The current law still says shall.

MR. REILLY:  So -- but the current law, because I see the new green highlighted, underlined, it says "before transporting."  The current law doesn't say before transporting, correct?  It was in a reasonable amount of time you contacted

346

NYS ASSEMBLY                                         JUNE 1, 2022

parents; is that accurate?

MS. JOYNER:  So the purpose of that section is basically to clarify and lay out that immediate notification is before a child is transported to any other location.  That's the purpose of the provision.

MR. REILLY:  So if you have a scenario, say at 42nd Street and Broadway in Times Square, there's a big movie theater, right, in Manhattan.  Large fight, 100 juveniles, they get into an argument, they have a fist fight, police arrive, they're making arrests for misdemeanor assaults.  There's a large crowd there.  Can they transport those kids, those offenders, to the precinct without having to contact the parents?

MS. JOYNER:  Current exceptions are still applicable.  So if it's an emergency, an exigent situation, as you, you know, laid out, these exceptions in terms of transporting the child are still permissible.

MR. REILLY:  Okay.  Is there anything in the bill that would clarify that to make sure that those exigent circumstances --

MS. JOYNER:  I mean, case law already lays out, you know, those protections and that ability to transport children in those circumstances.

MR. REILLY:  Okay, thank you.  So during the previous -- my colleague asked some questions and talked about what would equate to a spontaneous utterance.  So if you're doing, in that

347

NYS ASSEMBLY                                         JUNE 1, 2022

scenario, right, that scenario 42nd Street and Broadway, and I'm on patrol with my partner and we arrive and we make the arrest and it's a 14-year-old and we handcuff them and we put them in the backseat of the RMP, the radio motor patrol car, and we're driving back to the precinct because there's exigent circumstances, right, the sheer amount of people, and that 14-year-old says, *I had a gun and I had it on the sidewalk and I placed it there.*  Would that be considered a spontaneous utterance and admissible even though they did not have that consultation with an attorney and their parent wasn't notified?

MS. JOYNER:  So under the facts you presented, I think the court would look at you, know, all of the relevant circumstances that you said.  Was there questioning of the police or was this a voluntary statement, and that would be up for the judge to decide in terms of, you know, was this is a voluntary statement or not.  But again, this law is going to mandate that once the child is in custody, consultation with an attorney is mandated.

MR. REILLY:  Okay.  Is there any, I guess, clearinghouse of juvenile attorneys that will be on-call when police officers in -- throughout the State are going to have to, you know, provide an opportunity for that consultation?  And if there's none available, what happens?

MS. JOYNER:  Again, you know, this bill is mandating that consultation with an attorney must have happen.  OCA believes that they can fulfill this obligation so yes, in all of these circumstances where an attorney must be present and, again, we lay

348

**NYS ASSEMBLY**                    **JUNE 1, 2022**

out, you know, different options for attorneys presence to be allowed. You know, we -- there will be funding to support this initiative.

MR. REILLY:  Okay.  And another -- in line 7 in Sub B in here it says, *When the officer does not reasonably believe the parent or other person legally responsible for the child's care will appear for the child.*  When we say "reasonably believe," are -- what standards are we using?  Does it have to be a certain amount of phone calls?  Is that based on case law?  How many attempts, what would we use for that?

MS. JOYNER:  I guess, you know, it would be based on would a reasonable officer believe that a parent would appear or not.  So that's open.  If the parent doesn't pick up, you know, seeing that they're working, that -- that I believe would be on the discretion of the police officer as to whether or not the parent would appear.

MR. REILLY:  Okay, all right.  So earlier during the debate with our colleague, there was a conversation about can the juvenile waive their right to through Miranda after they've had a consultation with the attorney.  I believe, if I'm not mistaken, you said that they could?

MS. JOYNER:  Yes.

MR. REILLY:  So the reason why I ask that is because I thought once they invoke the right to an attorney, as a law enforcement agent right there questioning had to stop and at that point, if their attorney was not present, they could not withdraw that right.  So is there anything that -- can you recite any, because aren't

349

**NYS ASSEMBLY**                    **JUNE 1, 2022**

they invoking the right to an attorney there with that consultation?

MS. JOYNER:  So yes, the bill doesn't change any current Constitutional protections so yes, you have the right to an attorney.  This is also adding the provision that you have the right to consult an attorney.  After consultation, it's up to the youth whether or not they want to waive their rights and continue speaking or, you know, they want to -- they want to invoke their right to remain silent.

MR. REILLY:  Okay.  And I just want to clarify, before, you said the parents can't waive their right.

MS. JOYNER:  No, they cannot.

MR. REILLY:  All right.  Thank you, Ms. Joyner.

MS. JOYNER:  Thank you.

MR. REILLY:  Thank you, Mr. Speaker.

ACTING SPEAKER ZEBROWSKI:  Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Would the sponsor yield?

ACTING SPEAKER ZEBROWSKI:  Does the sponsor yield?

MS. JOYNER:  Yes.

ACTING SPEAKER ZEBROWSKI:  The sponsor yields.

MR. GOODELL:  Thanks, Ms. Joyner.  I'm looking at the top of page 3.  As I understand this, it says that an officer normally can't question a child about a crime unless they contact the child's parents or go through that process that you described earlier; is

350

**NYS ASSEMBLY**                    **JUNE 1, 2022**

that correct?

MS. JOYNER:  Right.

MR. GOODELL:  And that applies even if the child is not considered a suspect?

MS. JOYNER:  If they're not considered -- what do you mean?

MR. GOODELL:  A suspect, they're just a witness.

MS. JOYNER:  If they're not in custody and they're just a witness, yes, questioning can happen.

MR. GOODELL:  And then at what point does that change?

MS. JOYNER:  When the -- the child feels like they cannot leave.

MR. GOODELL:  I'm sorry?

MS. JOYNER:  When they are in custody and they feel like they cannot leave.

MR. GOODELL:  When they're in custody?

MS. JOYNER:  Yes.

MR. GOODELL:  So let me just give some quick examples, maybe you can help me out.  Police respond to a shooting in New York City, they arrive, there's a dead person on the street and there are a couple of young teenagers, clearly witnesses, could be suspect, but officers obviously arrive and don't know, and the officers question the kids.

MS. JOYNER:  Okay, yeah.  So if they are a witness,

351

**NYS ASSEMBLY**                    **JUNE 1, 2022**

questioning is permissible, which is already allowed under current law.  Once they are a suspect or, you know, transitioned into their -- they cannot leave and they're in custody, that's when all of those other additional safeguards and protections would be implicated.  So this doesn't interfere with any investigatory process that happens in the beginning.  It's only after the child is a suspect or held in custody that then these additional rights are mandated.

MR. GOODELL:  Well, the reason I'm a little confused is if you're looking at page 3, say starting on line 9, it says, *The child shall not be questioned pursuant to this section unless or until A, the child and the person required to be notified, if present, have been advised*, right?  The child's been advised of the right to remain silent, right?  You have basically a Miranda Warning, a statement made by the child may be used by the child, a child's right to have an attorney present, a child has consulted and B, the child has consulted with legal counsel in person, by telephone, by video conference.  This consultation may not be waived, correct?

MS. JOYNER:  That's correct.

MR. GOODELL:  All right, so now with those things in mind, including the absolute right for a child to have legal counsel in person before they can be questioned, if you get a call on a school shooting and you show up and you have a room full of 15-year-old kids who witnessed a school shooting, am I correct that you can't question them until you give all the children a Miranda Right and give them the opportunity to have a lawyer?

352

NYS ASSEMBLY                                           JUNE 1, 2022

MS. JOYNER:  No, that's not correct.

MR. GOODELL:  Well, what do you mean by page 7, line 20?  It says, *A child may not be questioned unless or until*, on paragraph B on line 20, *the child has consulted with legal counsel in person*.

MS. JOYNER:  Right.  So this -- the sections you're reading kick in only after there's been an identifiable child that has been taken into custody.  That's the reading of this piece of legislation.  So it's not taken in isolation, it's after the child is already in custody, then these provisions kick in.

MR. GOODELL:  But isn't it true that the courts consider a child in custody whenever the child cannot freely leave?

MS. JOYNER:  Section 305 of the Family Court Act lays out, you know, when a child is in custody or not.

I'm sorry?

MS. JOYNER:  Section 305 of the Family Court Act, it lays out the factors to determine whether a child is taken into custody.

MR. GOODELL:  But a child is consider in custody if the child is not free to leave.

MS. JOYNER:  Correct.

MR. GOODELL:  And so if an officer shows up at a place and crime scene, you know, like in Texas, and the police officers say, *We want to question you, and no, you can't leave until we've had a chance to talk to you.*  Then the children are considered in

353

NYS ASSEMBLY                                           JUNE 1, 2022

custody, correct?

MR. JOYNER:  So at that point, they're all witnesses so questioning can be permissible, but once there's an identifiable person that is going to be held in custody, that's when all these other provisions kick in.

MR. GOODELL:  And so the police arrive, they have all these kids, it's absolute chaos, they say, *Don't let anyone leave until we have a chance to talk to you*, they talk to one of the kids and the kid said, *Yeah, I shot everyone else.*  Now, that statement under this isn't inadmissible because he wasn't given his Miranda Rights, he wasn't given an opportunity to have a lawyer, right?

MR. JOYNER:  If it's voluntary and before custody, it's permissible.  And the current law of allowing exigent circumstances and emergency circumstances still allow the police officers to ask questions.

MR. GOODELL:  Okay.  So now the officers say, *Well, we'd like you to come to the station and give a statement*, right.  They can't take the child to the station, correct, without -- they have to take instead to the child's home, correct?

MS. JOYNER:  No, that's not correct.  Yes, parental notification, but if it's an exigent circumstance they can transport the child but, you know, hopefully they would notify the parents that are transporting the child from the location.

MR. GOODELL:  But before they take the child to the police station for questioning or for videotaping, right, because we

354

NYS ASSEMBLY                                           JUNE 1, 2022

all want these videotaped, they must immediately and before transporting the child notify the parents, correct?

MS. JOYNER:  Yes.

MR. GOODELL:  Okay.  So you have police -- so we know you have to videotape these, right, that's part of the law now.

MS. JOYNER:  Yes.

MR. GOODELL:  And of course the police don't come with a mobile video van, right, they do that in the police station where they have the proper equipment, correct?

MS. JOYNER:  I'm sorry, can you repeat the question?

MR. GOODELL:  Certainly.  I mean, the police don't drive around with large mobile video conferencing rooms, right, so they would have to, under existing law, take them to the station in order to videotape them in-question, correct?

MS. JOYNER:  That's correct.

MR. GOODELL:  And so you show up to school, there's been a mass shooting, you want to get all the kids' statements down on the record, you want to videotape them.  Number one, you can't take them to the station without notifying their parents, correct?

MS. JOYNER:  Right.  So parental notification is required, but the exceptions of exigent circumstances are also -- I would say trump parental notification.

MR. GOODELL:  Okay.  And then -- but assuming, you know, that the situation -- I mean, there's no active shooter so it's

355

NYS ASSEMBLY                                           JUNE 1, 2022

not exigent circumstances anymore.  Then before you take them down to have them interviewed, you have to notify the parents, you have to give them Miranda Rights, right, you have to provide them with an attorney, right, and anything that they do, videotaping, if it wasn't done with an attorney in advance is inadmissible, correct?

MS. JOYNER:  Correct.

MR. GOODELL:  Okay.  I think I understand it.  Thank you very much for helping explain it to me.

Sir, on the bill.

ACTING SPEAKER ZEBROWSKI:  On the bill.

MR. GOODELL:  We have all been shaken by the amount of violence that we have seen across the nation in the last few weeks and, sadly, if you look at the data, a lot of the FBI data indicates that -- well, the last data I saw were that 33 of the school shootings involved kids that were under the age of 18, 17, 16-year-olds, 15-year-olds.  And it's just horrific when that happens, right?  So if you have a gang shooting at a party or something like that, current law requires the police to videotape the interview of the child.  So they show up and before they can take them to the station to videotape them and get the witness's testimony, they must notify the parents.  And if it was a gang fight, what do you think the parents are going to say to the child?  Are they going to say, *Yeah, identify the gang member who pulled the trigger and shot three of your friends.*  That's not what's going to happen.  The parents are going to say to their kid, *You keep your mouth shut or you might be the next victim.*

356

NYS ASSEMBLY                                    JUNE 1, 2022

And if you don't think that happens, talk to the police in New York City and ask them how much cooperation they have with witnesses after their parents talk to them and after they lawyered up.

Are we serious about stopping violence? Do we want to solve these crimes? Do we want the police to be able to respond to a school shooting and talk to the kids? Or are we more concerned about making sure the parents tell the kids to shut up and don't get involved? Are we more concerned about making sure that these kids have lawyers? Because that's what this bill does.

I'm not going to have that blood on my hand, and I hope you won't have it on your hands either. Our number one mission is not to make sure that child witnesses are lawyered up. That's not our mission. Our mission is to reduce crime, to reduce deaths, to find out who the perpetrators are, to get to the truth, and this makes it harder, not easier. For that reason, I cannot support it.

ACTING SPEAKER ZEBROWSKI: Mr. Tannousis. On the bill.

MR. TANNOUSIS: You know, my time as a prosecutor in both the Bronx and on Staten Island, I have dealt with shooting victims with witnesses, bodies on the street, child witnesses, child victims, and it was a struggle to get them to cooperate in order for us to get the bad guys, the people responsible for these acts off the street. And this Body continues to have the assumption that the police are violating or purposely violate people's rights. They are trying to do the right thing and laws like this will hinder the police officers

357

NYS ASSEMBLY                                    JUNE 1, 2022

from being able to carry out these investigations so they can do their part to keep our streets safe.

We just went through a budget process a few months ago and we sat here and we talked about the fact that 16- and 17-year-olds are being used by gang members to carry out crimes. And instead of passing any type of substantive legislation that would go after the people that are harming our communities, we are now passing bills that will make it more difficult for police officers to do their jobs. We are more concerned with the assumption that the police is out there violating people's rights and not doing the right thing instead of adequately protecting our community. I have dealt with members of the police department. The vast majority of police officers are with us, serving their community to do the right thing. And we need them. We need police to do the right thing and to work with us, not make their jobs more difficult. I vote in the negative. Thank you, Mr. Speaker.

ACTING SPEAKER ZEBROWSKI: Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES: Thank you, Mr. Speaker, for the opportunity to -- I was actually going to ask the sponsor some questions, but I don't think I will after I listened to the last couple of my colleagues' comments because it always appears as if in our efforts of trying to protect people that we're somehow going against other people. That's not the case here. And just to, you know, make people understand how important it is not to protect people just

358

NYS ASSEMBLY                                    JUNE 1, 2022

because they have a title, I'm going to use the example of just what happened in Buffalo. There's a FBI agent who was on a call 30 minutes with this murderous young man who could have alerted people. He swore and protect, and he might be retired, but he took an oath. He said nothing. That's not to say all FBI agents are bad, but it is to say that they're people, they're human and sometimes they do the wrong thing.

And in the same instance, there's a correction officer who went online and almost applauded this young man for his murderous things that he did at that supermarket. We pay him with public tax dollars. So don't try to protect everybody that's supposed to be a public defender, because they're all not. Let's just be analysts, let's just be objective. The sponsor here is trying to protect young people, whether it be from their family, or whether it be from the public servants who are supposed to be working to defend them. Don't try to judge them all as if they're perfect because they are not, some of them are not. And, by the way, just like you can find people who will on the street and be gang bangers, you can find people in the correction institution that promote that, that push it, that agitator.

And so please, let us stop trying to protect people who are not always right. Just because you have the title and perhaps even the skin complexion doesn't make you freaking perfect. Please, let's stop trying to act like it does.

Let me congratulate the sponsor on her piece of legislation and hope that we can move forward in a world that doesn't

359

NYS ASSEMBLY                                    JUNE 1, 2022

always make us right because we've had some previous experience with law enforcement or with our buddies who work in -- who have all taken a public oath. We took a public oath, too, and our public oath didn't say we're going to only protect people who have a badge, or only protect people who are sworn to an oath, or only protect people who wear their uniform on. It says we're going to protect all people, and these children that she's talking about need protection. Let's make that happen. Thank you, Mr. Speaker.

(Applause)

ACTING SPEAKER ZEBROWSKI: Read the last section.

THE CLERK: This act shall take effect April 1st, 2023.

ACTING SPEAKER ZEBROWSKI: The Clerk will record the vote on Assembly Bill 5891-C. This is a Party vote. Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL: Thank you, sir. The Republican Conference is generally not in favor of this legislation. Those who support it are certainly encouraged to vote yes here on the floor or by contacting the Minority Leader's Office. Thank you, sir.

ACTING SPEAKER ZEBROWSKI: Mrs. Peoples-Stokes.

360

**JA213**

**NYS ASSEMBLY**                    **JUNE 1, 2022**

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  Majority colleagues are generally going to be in favor of this; however, there may be some of us who would choose to be an exception.  That's okay, call the Majority Leader's Office, we'll be happy to record your vote, or if you're in the Chambers, press your own vote.  Thank you, Mr. Speaker.

(The Clerk recorded the vote.)

ACTING SPEAKER ZEBROWSKI:  Mr. Angelino to explain his vote.

MR. ANGELINO:  Thank you, Mr. Speaker, to explain my vote.  This -- I listened very intently to all of this and this seems to be a bill that is going to maybe work and maybe work well in a metropolitan area, but there's probably police stations in the Bronx that on any particular shift have more people calling in sick than we have working in the entire county that I live in, and any of the counties I represent.  This isn't going to be workable when you have one officer working and the nearest backup car is another agency 16 miles away.  I have been on the scenes where it's hectic, and one officer, one car, and six people.

And again, it's not specifically this one.  This is looking out for the rights of people, I get that, and -- but it's just not workable.  Even some of the ones that were brought up in the debate, you know, the videotaping, I've had people handcuffed to ball rings in three different locations trying to operate video equipment, and I'll be working this Saturday unless we're still here in Session and I would

361

**NYS ASSEMBLY**                    **JUNE 1, 2022**

ask anybody to come see what it's like to be a one-man department, or a small agency with only two or three officers working.  It's very difficult and this is not going to make it easier.

For those reasons, because it seems like police agencies all over New York State are not New York City police, for those reasons I'll be voting no.  Thank you.

ACTING SPEAKER ZEBROWSKI:  Mr. Angelino in the negative.

Mr. Reilly to explain his vote.

MR. REILLY:  Thank you, Mr. Speaker, to explain my vote.  So we had a lot discussed during the debate, there's a lot of ambiguity here.  I'm a little concerned with the whole consultation with an attorney.  And then during the debate we've talked about the part of being able to -- for the child to waive that right after that consultation.  I think that creates a very gray area here where once they've invoked their right to an attorney by that consultation, because I think that's something that's going to be challenged in court to see if that truly is a, you know, them invoking their right to an attorney.  And then once they hang up after that consultation, can they waive that right to talk to the police during interrogation?  I think that's a slippery slope and I think it's going to be challenged, because anything they would say probably would be dismissed, in my opinion, because during my training it was once they invoke the right to an attorney, all questioning stopped no matter what.  So I think this is something that really needs to be worked out and I'm going to be voting in the

362

**NYS ASSEMBLY**                    **JUNE 1, 2022**

negative.  Thank you.

ACTING SPEAKER ZEBROWSKI:  Mr. Reilly in the negative.

Ms. Walsh to explain her vote.

MS. WALSH:  Thank you, Mr. Speaker.  So I want to thank the sponsor for the debate that we were able to have.  It was -- it was very detailed.  You handled the questions I thought, you know, very well.  I feel that the bill, in my opinion, still needs some more work.  What -- in regard to what the previous speaker and what he said, I'm an attorney for the child.  I have represented juvenile defendants.  I can tell you that in my county, the AFC Panel is dwindling.  You cannot get attorneys who want to be on the AFC Panel anymore and the reason is that the pay stinks, the pay's terrible.  And this Body, there was a big push from the AFC, the Office of Attorneys for Children this year during budget to try to basically double the hourly rate and it didn't make it into the budget.  And attorneys for the child are saying, you know, I can do -- *I can do matrimonial work and make $350-$400 an hour, even Upstate, or I can make $75 an hour as an attorney for the child.*  And they're saying, *I'm not doing it,* they're not on the panel.

So we can't even in my county figure out and handle centralized arraignments yet.  So we're not prepared.  I know -- I respect the fact that the sponsor said that there will be funding to support AFCs.  I'd like to say when?  You know, when is that going to happen because right now, if, you know, requiring a consultation with

363

**NYS ASSEMBLY**                    **JUNE 1, 2022**

an attorney who doesn't exist is not -- is not a solution here.  So I think that that needs to get figured out before we put something this big into place.

I don't want to see anybody's rights getting trampled ever, but I'm not prepared to vote for this bill now.  I just think it needs some more work.  But I do thank the sponsor for her -- for her work on the bill.  I do think it's an improved version, but I'm not ready to vote for it yet.  I vote no.  Thank you.

ACTING SPEAKER ZEBROWSKI:  Ms. Walsh in the negative.

Mr. Meeks to explain his vote.

MR. MEEKS:  Thank you, Mr. Speaker, for the opportunity to explain my vote.  I want to say thank you to the sponsor for this legislation.  I think it is highly relevant.  One of our colleagues stated that everywhere is not New York City; you're absolutely right.  There's Rochester, there's Syracuse, there's Buffalo and a number of other places in between.  I only wish that I had a community in which we had three law enforcement officers because it's likely that those three individuals would know every family and every relative within those families; however, I don't live in that type of community.  We live in a community where we have 7- to 800 police officers and 4 percent live in the city in which they work.  We constantly see the tax base as it relates to the resources that we pay as taxpayers taking flight to the surrounding suburbs.  We also see a practice of an occupying force coming in, treating us as if we're insurgents.  So I

364

**JA214**

NYS ASSEMBLY                                   JUNE 1, 2022

think that our children and members of our community need to know their rights and their rights need to be upheld and we, as legislators, need to do our due diligence in doing so.  Thank you.

    ACTING SPEAKER ZEBROWSKI:  Mr. Meeks in the affirmative.

    Mrs. Peoples-Stokes.

    MRS. PEOPLES-STOKES:  Mr. Speaker, would you please record our colleague Mr. Colton in the negative on this one.  Thank you, sir.

    ACTING SPEAKER ZEBROWSKI:  So noted.

    Are there any other votes?  Announce the results.

    (The Clerk announced the results.)

    The bill is passed.

    Mrs. Peoples-Stokes.

    MRS. PEOPLES-STOKES:  Mr. Speaker and my colleagues, if we could now call our attention to Calendar No. 631 by Ms. Tapia, followed by Rules Report No. 458 by Mr. Jacobson.

    ACTING SPEAKER ZEBROWSKI:  Page 47, Calendar No. 631, the Clerk will read.

    THE CLERK:  Assembly No. A09606, Calendar No. 631, Tapia.  An act to amend the Public Health Law, in relation to requiring third trimester syphilis testing.

    ACTING SPEAKER ZEBROWSKI:  Ms. Tapia, an explanation has been requested.

    MS. TAPIA:  Thank you, Mr. Speaker, for the

365

NYS ASSEMBLY                                   JUNE 1, 2022

opportunity.  This bill would require physicians and authorized practitioners attending to pregnant patients to order a syphilis test for their patients during the third trimester of pregnancy.  Congenital syphilis dramatically increases the risk of miscarriages, fetal growth restriction and neonatal deaths because the number of early syphilis diagnoses in pregnant individuals and congenital syphilis diagnoses have increased dramatically in the last ten years, and syphilis is treatable during any point during the pregnancy.  This bill represents a practical (inaudible) threshold to reduce the likelihood that babies are born with -- with or die from -- from a preventable disease.

    ACTING SPEAKER ZEBROWSKI:  Mr. Byrne.

    MR. BYRNE:  Thank you, Mr. Speaker, and thank you to the sponsor for that explanation.  I'm going to be explaining my vote a little bit to share some of the concerns that have been raised, but I do want to thank the sponsor for the explanation.

    Thank you.

    ACTING SPEAKER ZEBROWSKI:  Read the last section.

    THE CLERK:  This act shall take effect on the 365th day.

    ACTING SPEAKER ZEBROWSKI:  The Clerk will record the vote on Assembly bill 9606.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

366

NYS ASSEMBLY                                   JUNE 1, 2022

    (The Clerk recorded the vote.)

    Mr. Byrne to explain his vote.

    MR. BYRNE:  Thank you, Mr. Speaker.  Again, I want to thank the sponsor for the explanation of the bill.  I think it's very well-intentioned to try to help address syphilis with pregnant women to try to not only help the -- the mother but also the child.  There's some concerns that have been raised because we're talking about adding another mandate.  There's already a required mandatory testing early on in the pregnancy with blood tests, but we're adding another one in the third trimester.  It just doesn't seem to be considering whether or not it's necessary for pregnant women who are not sexually active and it seems to be something that's just not being accounted for in this bill.  And one of the things that some of my colleagues and I discussed was in the Health Committee, it was just a bit odd because this is one bill we're voting on and some of us may oppose this, some may vote -- yes votes.  But there's always some underlying concerns when legislators we're intervening in the doctor-patient relationship.  Also, there's another bill that some of us are expecting to be on the calendar maybe tomorrow that goes in the opposite direction that would actually make it hard or prohibit doctors from requiring certain drug tests and alcohol tests for pregnant women.  So there seems to be this little bit of contradiction in the policymaking in our State's Capitol.  That said, I certainly admire the goals of this bill, and hearing the explanation I'm going to continue to vote yes.

367

NYS ASSEMBLY                                   JUNE 1, 2022

    ACTING SPEAKER ZEBROWSKI:  Mr. Byrne in the affirmative.

    Ms. Tapia to explain her vote.

    MS. TAPIA:  Thank you, Mr. Speaker.  Congenital syphilis had nearly been completely eliminated in New York State in -- in 2000.  Since that time it has come back at an alarming rate.  Last year, DOH, the Department -- Department of Health reported syphilis diagnosis in women have nearly doubled since 2015 to 1,700 diagnoses, with 41 infants born with congenital syphilis.  In 2015 there were only 12 cases.  2015 (inaudible) we had 41 cases.  The screening again in the third trimester presents an instant solution to a preventable disease.

    I vote in the affirmative.

    ACTING SPEAKER ZEBROWSKI:  Ms. Tapia in the affirmative.

    Mr. Goodell to explain his vote.

    MR. GOODELL:  I appreciate my colleague's desire to protect kids from syphilis.  But this is a mandatory medical test that we are requiring every pregnant woman in the State of New York to take in their third trimester, even though the first test was negative.  And in my district, thankfully, most people, as far as I know, are relatively monogamous and we don't care.  We say, *We don't care if you're with the same person, we don't care if your husband's just with you.  We don't care if you have zero risk factors, you've got to take the second test.*  And for -- for those of us who live in those kind of

368

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

communities it's really kind of insult to say you've got to take the test regardless of your risk factor.  I fully support having the physician say to patients, *Look, if you have any risk -- of these risk factors you ought to take the test.*  I don't have any problem saying you ought to take the test if you have a risk factor.  But that isn't what this bill says.  This bill says you must take the test regardless of any risk factors.

Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  Mr. Goodell in the negative.

Ms. Walsh.

MS. WALSH:  Thank you, Mr. Speaker.  I'll be brief, I know it's late.  I -- I just would prefer to leave decisions as far as what kind of testing should occur between a patient and -- and her doctor.  I just -- I just don't think that this is something that should be -- there could be a best practice that's developed within that profession as far as this.  I just don't think as a state we should be legislating this.  So I'm going to vote in the negative on this one.

Thank you.

ACTING SPEAKER ZEBROWSKI:  Ms. Walsh in the negative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 16, Rules Report No. 458, the Clerk will read.

THE CLERK:  Assembly No. A08200-B, Rules

369

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Report No. 458, Jacobson, Gunther, Simon, Buttenschon, Lunsford, Wallace.  An act to amend the General Municipal Law, in relation to prohibiting individuals in certain positions from taking any position with a business or entity dong business with an industrial development authority.

ACTING SPEAKER ZEBROWSKI:  On a motion by Mr. Jacobson, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER ZEBROWSKI:  The Clerk will record the vote on Senate bill 7445-B.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference will be generally opposed to this legislation for the reasons that I hope to explain in a moment.

ACTING SPEAKER ZEBROWSKI:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Democratic Majority is generally going to support our colleague on this legislation.  However, there may be some of us who would choose to be an exception.  They should feel free to do so by

370

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

either pressing their vote in the Chambers or call the Majority Leader's Office and we'll make sure your vote is properly recorded.

Thank you, sir.

(The Clerk recorded the vote.)

ACTING SPEAKER ZEBROWSKI:  Thank you.

Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, sir.  This bill has the laudable and positive intent of trying to prohibit conflicts of interest involving our IDAs, and that's a great thing to -- to see.  Unfortunately, the language is extraordinarily broad and when -- and provides that no independent contractor that's working for an IDA can be an independent contractor or anybody who has received any financial assistance from the IDA.  So let me give you a simple example.  Try calling a plumber to fix the toilet at the IDA.  If the -- if the tradesman comes and the plumber, the electrician, the carpenter, the cleaning service, they're independent contractors.  And under this language if they come and work for the IDA they can't work for anyone else who has received any financial assistance from the IDA.  So presumably, if they come and do the electrical or plumbing or contracting work or cleaning work or any other independent contracting work for the IDA, any subsequent client would have to say, *Are you getting a PILOT agreement from the IDA?  Sorry, I can't do the electrical work for you, can't do plumbing work for you, can't do any trades work for you.*  So, the concept is right.  I agree with my colleague -- my colleague, the sponsor, that we need to tighten these

371

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

conflict of interest rules so that people aren't working both sides of the equation.  And I look forward to working with my colleague to see if we can come up with language that accomplishes that.  Unfortunately, this language which includes independent contractors is way too broad and for that reason I can't support it.  But again, I look forward to working with my colleague to see if we can come up with narrower language that accomplishes our objectives.

ACTING SPEAKER ZEBROWSKI:  Mr. Goodell in the negative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please record my colleagues Mr. Brabenec, Mr. Mikulin, Mr. Schmitt and Mr. Smith in the affirmative.

Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, do you have further housekeeping or resolutions?

ACTING SPEAKER ZEBROWSKI:  We do have both, Mrs. Peoples-Stokes.

On a motion by Mr. Lawler, page 30, Calendar No. 168, Bill No. 5373-A, the amendments are received and adopted.

372

**NYS ASSEMBLY**                    **JUNE 1, 2022**

On a motion by Mr. Schmitt, page 31, Calendar No. 181, Bill No. 5585-B, the bill is amended to its previous number of 5585-A.

We have two privileged resolutions.  Resolution 1057, the Clerk will read.

THE CLERK:  Assembly Resolution No. 1057, Ms. González-Rojas.

Legislative Resolution commemorating the 30th anniversary of the Queens LGBTQ Pride Parade on June 5, 2022.

ACTING SPEAKER ZEBROWSKI:  Ms. González-Rojas.

MS. GONZÁLEZ-ROJAS:  Thank you, Mr. Speaker.  First off, Happy Pride.  I know it's after midnight, but I want to wish everyone Happy Pride.  I want to thank the Speaker and the staff for their assistance with this resolution.  My home Borough of Queens is home to the second-oldest and second-largest parade -- Pride Parade in New York City, which will happen on June 5th this year.  It was cofounded by my friend and the former New York City Council Member Danny Dromm.  The neighborhood of Jackson Heights where it's held and which I live and represent is rich with a history of queer and transgender people who have fought for their right to live and to thrive.  This year we'll marching as our ancestors and our trans-cestors before us, remembering the lives of so many whose shoulders we stand on.  We will remember Julio Rivera and Edgar Garzon and so many lives lost to violence against our LGBTQIA siblings from

373

**NYS ASSEMBLY**                    **JUNE 1, 2022**

Queens.  We will march for resources, for our human rights, and to remind each other that we got us.  But, we will also dance, we will sing and we will celebrate.  So this Sunday we will be queer and proud because we live in the World's Borough and because Queens is the future.

So to conclude, please join us, please march with us, and as Sylvia Rivera said, I am not missing a minute of this.  It is the resolution -- the revolution.  So, thank you so much.

ACTING SPEAKER ZEBROWSKI:  On the resolution, all those in favor signify by saying aye; opposed, nay.  The resolution is adopted.

Resolution 1055, the Clerk will read.

THE CLERK:  Assembly No. 1055, Mr. Manktelow.

Legislative Resolution congratulating Leo Malone upon the occasion of celebrating his 100th birthday.

ACTING SPEAKER ZEBROWSKI:  Colleagues, if we could have a little bit quiet in the Chambers.

Mr. Manktelow.

MR. MANKTELOW:  Thank you, Mr. Speaker.  On behalf of Leader Barclay and myself, it is my pleasure to do this introduction of a gentleman I met about six weeks ago.  His name is Leo -- Leo Malone, and it is on his occasion of his 100th birthday, which is June 27th of this month.  But what's so special about this gentleman is he is one of our few left World War II veterans.  Joining the United States Army Air Corps in 1942, Leo Malone trained to be

374

**NYS ASSEMBLY**                    **JUNE 1, 2022**

an airplane engine mechanic.  He went to Stewart Technical School in New York City to hone his craft and later work on B-17 bomber aircraft.  He was stationed in Honington Air Base in England where he was both a mechanic and part of the Salvage Crew.  He and his team would go out to a crash site and salvage what they could from crashed airplanes.  Leo Malone was honorably discharged on December 23, 1945.  He earned the Marksman Medal, European Theater of Operation Medal, and the "Ruptured Duck" Medal for his honorable discharge.  When I met this gentleman he -- his zest for life was amazing.  He's the type of guy that would be here on this floor with us tonight doing -- arguing for New Yorkers, what he did for us as a country.

So on behalf, again, of Leader Barclay and myself, it's my honor and privilege to introduce him and say thank you, Mr. Speaker, for allowing me to bring this forward.  And thank you so much here on an early Thursday morning.  Happy Birthday, Leo.

ACTING SPEAKER ZEBROWSKI:  On the resolution, all those in favor signify by saying aye; opposed, nay.  The resolution is adopted.

We also have a group of other resolutions we'll take up together.

All those in favor signify by saying aye; opposed, nay.  The resolutions are adopted.

(Whereupon, Assembly Resolution Nos. 1051-1054 and 1056 were unanimously adopted.)

375

**NYS ASSEMBLY**                    **JUNE 1, 2022**

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, I move that the Assembly stand adjourned until 10:00 a.m., Thursday, June the 2nd, tomorrow being a Session day.  I will say this, colleagues.  The sooner you get in and get swiped into the base and get ready for those committee meetings that we probably will have to have - Codes, Ways and Means and Rules - the sooner we can start Session at 10:00.  How about that?  Wouldn't that be great?  Yes, let's do it.

ACTING SPEAKER ZEBROWSKI:  The Assembly stands adjourned.

(Whereupon, at 12:09 a.m., the House stood adjourned until Thursday, June 2nd at 10:00 a.m., that being a Session day.)

376

**JA217**

[*No document reproduced on this page*]