# 23-356

# United States Court of Appeals for the Second Circuit

EUGENE VOLOKH, LOCALS TECHNOLOGY INC., RUMBLE CANADA INC.,

*Plaintiffs-Appellees,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

**JOINT APPENDIX**
Volume 2 – Pages 219-end

| | |
|---|---|
| LIPSITZ GREEN SCIME CAMBRIA LLP<br>42 Delaware Avenue, Suite 120<br>Buffalo, New York 14202<br>(716) 849-1333<br><br>FOUNDATION FOR INDIVIDUAL RIGHTS<br>  AND EXPRESSION<br>510 Walnut Street, Suite 1250<br>Philadelphia, PA 19106<br>(215) 717-3473 | LETITIA JAMES<br>  *Attorney General*<br>  *State of New York*<br>28 Liberty Street<br>New York, New York 10005<br>(212) 416-8020 |
| *Attorneys for Appellees* | *Attorney for Appellant* |


## TABLE OF CONTENTS

**Page**

**Volume 1**

Docket Report Sheet ...................................................................................JA1

Complaint, dated Dec. 1, 2022 ...................................................................JA7

Notice of Plaintiffs' Motion for Preliminary Injunction, dated Dec. 6, 2022 .....JA55

Declaration of Darpana Sheth in Support of Plaintiffs' Motion for Preliminary Injunction, dated Dec. 6, 2022 ................................................JA58

    Ex. A  -  New York General Business Law § 394-ccc ........................JA62

    Ex. B  -  Press Release, New York State Office of the Attorney General (OAG), Attorney General James Launches Investigations into Social Media Companies for Role in Buffalo Attack (May 18, 2022) .............................................JA63

    Ex. C  -  Press Release, New York State Office of the Attorney General, Attorney General James and Governor Hochul Release Report on the Role of Online Platforms in the Buffalo Shooting (Oct. 18, 2022) ..........................................JA64

    Ex. D  -  New York State Office of the Attorney General, *Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022* (2022)....JA70

    Ex. E  -  Eugene Volokh, *New N.Y. Law Aimed at Getting Social Media Platforms to Restrict "Hateful" Speech*, Reason (June 7, 2022) ...................................................................JA119

    Ex. F  -  Eugene Volokh, *No, There's No "Hate Speech" Exception to the First Amendment*, Washington Post (May 7, 2015)... JA121

    Ex. G  -  Transcript of New York Assembly Debate, June 1, 2022.... JA124

## TABLE OF CONTENTS

**Page**

**Volume 2**

    Ex. H  -  Roni Cohen, Comment, *Regulating Hate Speech: Nothing Customary About It*, 15 Chi. J. Int'l L. 229 (2014) ............... JA219

Declaration of Rick Sawyer in Opposition to Plaintiffs' Motion for a Preliminary Injunction, dated Dec. 13, 2022 ............................................. JA238

    *Selected Exhibits*

    Ex. B  -  U.S. Department of Homeland Security, *Homeland Threat Assessment* (2020) .................................................. JA242

    Ex. C  -  Sponsor's Memorandum in Support of New York Assembly Bill 7865 (2021) .................................................. JA268

Transcript of Dec. 21, 2022, Proceedings, filed Jan. 5, 2023 ..................... JA270

Opinion & Order, dated Feb. 14, 2023 ....................................................... JA336

Notice of Appeal, dated Mar. 13, 2023 ...................................................... JA357

# COMMENT: Regulating Hate Speech: Nothing Customary About It

Summer, 2014

**Reporter**
15 Chi. J. Int'l L. 229 *

**Length:** 14302 words

**Author:** Roni Cohen *

* J.D. Candidate, 2015, The University of Chicago Law School. The author would like to thank David Tassa and the Chicago Journal of International Law staff for their guidance and support during the researching and writing process.

## Highlight

**Abstract**

*The proliferation of laws prohibiting and punishing hate speech since World War II has raised serious questions concerning the limits of free speech. While all liberal democracies guarantee the freedom of expression as a fundamental human right, the vast majority also restrict speech deemed hateful or racially discriminatory. Similarly, many major international human rights agreements acknowledge free speech as an essential human right, but also limit that right when hateful. This Comment analyzes the current legal landscape surrounding hate speech laws and evaluates domestic and international practice to determine whether the regulation of hate speech has assumed customary international law status. Due to a lack of uniformity among and within states and the absence of opinio juris, or a sense of legal obligation, this Comment concludes that the international practice of restricting hate speech has not yet assumed customary international law status.*

## Text

 [*231]  I. INTRODUCTION

On December 3, 2003, the trial chamber of the International Criminal Tribunal for Rwanda ("ICTR") convicted three defendants of crimes against humanity based on speech it deemed incitement to racial hatred, but not incitement to racial violence.   [1] In the court's judgment, "hate speech that expresses ethnic and other forms of discrimination violates the norm of customary international law prohibiting discrimination."   [2] The tribunal based its holding on international and domestic law which it believed established a customary international law ("CIL") prohibiting hate speech. This long awaited judgment was notable for--other than being the first time an international court declared hate speech restrictions part of CIL--its divergence from another international tribunal decision. Less than three years earlier, the International Criminal Tribunal for the former Yugoslavia ("TCTY") emphatically declared that incitement to racial hatred did *not* constitute persecution as a crime against

---

[1]  *Prosecutor v. Nabimana*, Case No. ICTR 99-52-T, Trial Judgment and Sentence (Dec. 3, 2003).

[2]  *Id.* P 1076.

humanity, ruling that "the criminal prohibition of [incitement to racial hatred] has not attained the status of customary international law." ³ These conflicting judgments raise the question: have hate speech restrictions really assumed CIL status?

Since World War II, a significant number of European countries have enacted laws restricting hate speech, with the goal of promoting respect and equality. Additionally, several provisions of international law, such as the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the European Convention on Human Rights, likewise mandate limitations on speech deemed hateful. The United States, by contrast, affords substantial protection to hate speech under the First Amendment, protecting even the advocacy of racial violence, ⁴ flag burning, ⁵ and protests at soldiers' funerals against homosexual equality. ⁶

The apparent conflict between European hate speech laws and the general regard for freedom of expression further complicates the issue of whether hate speech regulations have assumed CIL status. CIL is characterized by "general and consistent practice of states followed by them from a sense of legal obligation." ⁷ It is determined by looking to state practice, including domestic  [*232]  laws, international treaties and covenants, and international court decisions. Examples include the Geneva conventions and the practice of granting immunity to visiting foreign heads of state. CIL status may require nations lacking speech regulations to adopt international treaties or domestic statutes restricting hateful speech. Further, CIL status may allow international bodies to enforce hate speech regulations in nations currently lacking them. Conversely, a lack of CIL status will allow nations without discriminatory speech proscriptions to continue to tolerate such speech.

This Comment will argue that hate speech regulations have most likely not assumed CIL status. Section II will explain the legal standard surrounding CIL This section will explain how an international norm becomes customary law. Section III will describe the current state of hate speech laws internationally, focusing on the domestic laws of Germany, France, the United Kingdom, and the United States, along with international agreements. Finally, Section IV will explore whether hate speech regulations have satisfied the legal standard of CIL, evaluating the popularity of hate speech laws throughout the world and in international law and the extent to which nations enact them out of a sense of moral or legal obligation. The analysis will focus on the absence of a consistent definition, the lack of uniform enforcement and the selective prosecution of hate speech laws, concluding that international practice does not meet the requirements for status as CIL.

II. CUSTOMARY INTERNATIONAL LAW

The development of CIL has been described as a "process of continuous interaction, of continuous demand and response" among states that "creates expectations that effective power will be restrained and exercised in certain uniformities of pattern . . . . The reciprocal tolerances . . . create the expectations of patterns and uniformity in decision, of practice in accord with rule, commonly regarded as law." ⁸

Prior to the twentieth century, CIL was the primary source of international law. Since then, especially in the second half of the twentieth century, international treaties, declarations, and covenants have replaced CIL as the primary source of international law. ⁹ Nevertheless, CIL continues to be an [*233] influential source of international norms and customs, filling the gaps

---

³ *Prosecutor v. Kordic*, Case No. IT-95-14/2-T, P 209, Trial Judgment (Feb. 26, 2001).

⁴ Brandenburg v. Ohio, 395 US 444, 448--49 (1969).

⁵ Texas v. Johnson, 491 US 397, 420 (1989).

⁶ Snyder v. Phelps, 131 S. Ct. 1207, 1220 (2011).

⁷ RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 102(2) (1987).

⁸ Myres S. McDougal, Comment, *The Hydrogen Bomb Tests and the International Taw of the Sea*, 49 AM. J. INT'L L. 356, 357--58 (1955).

⁹ *See* United Nations Convention on the Law of the Sea, Dec. 10, 1982, 1833 UNTS 397 (addressing rights on the seas); Geneva Convention relative to the Treatment of Prisoners of War, 75 UNTS 135 (entered into force Oct. 21, 1950( (addressing state conduct during war); Vienna Convention on Diplomatic Relations, art. 31, Apr. 18, 1961, 500 UNTS 95 (addressing diplomatic immunity). Further, various novel areas not previously subject to international regulation, including environmental conservation, human rights, and international crimes, are now covered by international agreements.

within agreements and regulating nonparty state actions. Customary law also addresses longstanding issues that have yet to be settled by agreement [10] and developing areas of international law that may not be covered by treaty. [11]

CIL is international law that arises from the practices of nations followed out of a sense of legal obligation. [12] This translates into a two-part test for determining whether a norm qualifies as CIL: (1) the practice must be widespread and uniform among nations (*usus*), and (2) nations must engage in the practice out of a sense of legal obligation (*opinio juris*). [13] The International Court of Justice ("ICJ") affirmed this understanding: "it is of course axiomatic that the material of customary international law is to be looked for primarily in the actual practice and *opinio juris* of States." [14]

However, despite general agreement concerning the definition of CIL, many questions regarding its scope remain. Ambiguities surround the first element, state practice, also paradoxically referred to as the objective element. It is unclear what state practices contribute to the formation of CIL, and the question of how much state action is required is unsettled. Further, uncertainties surround the amount of time required before state practice establishes CIL. Traditionally, the development of CIL was an inherently slow and lengthy process. [15] However, developments in technology and communication, and the expansion of international bodies have possibly condensed the time required to establish CIL. [16] Questions also surround the second element, *opinio juris*, or the subjective element. The reason states give for engaging in particular conduct--if even supplied--is not necessarily the true reason, making it difficult to confirm [*234] the subjective intent of state practice. There is also a practical problem: how can nations act out of a sense of legal obligation before one exists? There is an inherent dilemma in stating that to establish a legal obligation, states must act as if one already exists. [17] Finally, some scholars argue that states never conduct themselves out of a sense of legal obligation, but rather due to self-interest and coercion. [18] Nevertheless, excluding the subjective element from the equation will complicate distinguishing binding CIL from practices followed merely because of habit, policy, or treaty. [19] This Section will attempt to clarify these issues and exact the meaning and content of the two elements of customary international law. [20]

A. The Objective Element: State Practice

---

[10] Curtis A. Bradley & Mitu Gulati, *Withdrawing from International Custom*, 120 Yale L.J. 202, 209 (2010) (such as, for example, "the immunity of heads of state and limits on the extraterritorial application of national law").

[11] *Id*. ("A possible (although contested) current example is the lack of a treaty addressing the standards for detention and trial of terrorists engaged in an armed conflict with a nation-state.").

[12] *See, for example*, Statute of the International Court of Justice, art. 38(1), June 26, 1945, 59 Stat. 1055, 1060 (stating that one of the sources of international law is "international custom, as evidence of a general practice accepted as law") [hereinafter ICJ Statute]; RESTATEMENT (THIRD) OF FOREIGN RELATIONS, *supra* note 7, § 102(2) (defining CIL as emerging "from a general and consistent practice of states followed by them from a sense of legal obligation").

[13] Jack L. Goldsmith & Eric A. Posner, *A Theory of Customary International Law*, 66 U. CHI. L. REV. 1113, 1116 (1999).

[14] Continental Shelf (Libyan-Arab Jamahiriya/Tunisia), 1985 ICJ 13, P 27 (Judgment of June 3), [hereinafter Continental Shelf].

[15] Bradley & Gulati, *supra* note 10, at 210.

[16] *See id*. at n.28.

[17] *See id*. at 210,

[18] Goldsmith & Posner, *supra* note 13, at 1113 ("States do not comply with norms of CIL because of a sense of moral or legal obligation; rather, their compliance and the norms themselves emerge from the states' pursuit of self-interested policies on the international stage.").

[19] *See, for example*, Mark A. Chinen, *Game Theory and Customary International Law: A Response to Professors Goldsmith and Posner*, 23 MICH. J. INT'L L. 143, 178 (2001).

[20] The framework of the following sections is based on a report concerning customary international humanitarian law produced by the International Committee of the Red Cross. *See* Int'l Comm. of the Red Cross, CUSTOMARY INTERNATIONAL HUMANITARIAN LAW RULES (Jean-Marie Henckaerts & Louise Doswald-Beck, eds., 2005).

15 Chi. J. Int'l L. 229, *234

In assessing state practice, two issues must be evaluated. First, the types of practices that contribute to the development of CIL must be determined. Second, selected practices must be weighed to determine whether they establish a rule of customary international law.

1. Selection of state practices.

First, and most fundamentally, both physical and verbal acts of states are practices that contribute to the development of CIL. [21] While actual physical acts inherently relate to the formation of international norms, official verbal statements are less apparently so. [22] Nevertheless, many international bodies support the notion that verbal commitments contribute to the establishment of international law. The ICJ has considered official government statements on [*235] several occasions, including the *Fisheries Jurisdiction* cases, [23] the *Nicaragua* case, [24] and the *Gabčikovo-Nagymaros Project* case. [25] Likewise, the ICTY affirmed that in determining the existence of CIL, "reliance must be primarily placed on such elements as official pronouncement of States, military manuals and judicial decisions." [26] Accordingly, the International Law Association (ILA) has recognized that verbal acts, as well as physical acts, of states count as state practice, noting that "the practice of the international tribunals is replete with examples of verbal acts being treated as examples of practice. Similarly, States regularly treat this sort of act in the same way." [27] Additionally, the ILA considers practices of the executive, legislative and judicial branches as contributing to the establishment of customary international law. [28] All three branches influence foreign policy and relations, and therefore, commitments by each branch factor into the development of international custom.

Second, the practice of international bodies can affect the establishment of customary international law. For instance, international court decisions, although not state actions, contribute to the formation of CIL. [29] Since international judicial decisions are themselves sources of international law, [30] findings of customary international law carry precedential value to that end. [31] Additionally, the practice of international organizations, such as the United Nations, contribute to an

---

[21] *International Law Association*, Final Report of the Committee on the Formation of Customary (General) International Law, Statement of Principles Applicable to the Formation of General Customary International Law, Report of the Sixty-Ninth Conference, London, 2000, Principle 4 [hereinafter Final ILA Report].

[22] *Id*. *See also* commentary (a) to Principle 4 ("There is no inherent reason why verbal acts should not count as practice, whilst physical acts (such as arresting individuals or ships) should.").

[23] Fisheries Jurisdiction (UK v. Iceland), 1974 ICJ 3, 47 (July 25) (joint separate opinion of Judges Forster, Bengzon, Jiménez de Aréchaga, Nagendra Singh and Ruda) (inferring the existence of customary rules regarding areas of the sea from claims made without considering whether the claims had been enforced) [unless otherwise provided, ICJ cases are available from the court's index at http://www.icj-cij.org/docket/Gles].

[24] Military and Paramilitary Activities (Nicar. v. US), 1986 ICJ 14, 100 (June 27) (finding the existence of customary norms based on the fact that the practice was "frequently referred to in statements by State representatives as being not only a principle of customary international law but also a fundamental or cardinal principle of such law").

[25] Gabčikovo-Nagymaros Project (Hung. v. Slovk.), Judgement, 1997 ICJ 7, 39--46 (Sept 25) (inferring the existence of customary law based on many official statements, among other factors).

[26] Prosecutor v. Dusko Tadić, Case No. IT-94-1-I, Decision on Defence Motion for Interlocutory Appeal on Jurisdiction, P 99 (Oct. 2, 1995), *available at* http://icty.org/x/cases/tadic/acdec/en/51002.htm.

[27] *See* Final ILA Report, *supra* note 21, commentary (a) to Principle 4.

[28] *Id*. Principle 9.

[29] *See* CUSTOMARY INTERNATIONAL HUMANITARIAN LAW RULES, *supra* note 20, xl.

[30] *See* ICJ Statute, *supra* note 12, art. 38(l)(d).

[31] *See* Final ILA Report, *supra* note 21, commentary to Principle 10.

understanding of international norms. [32] These organizations [*236] function on the international stage, independent of their member states, thus allowing their actions to add weight to an international custom. [33]

2. Evaluation of state practices.

In evaluating selected state practices for evidence of CIL, three requirements must be met: the state practice has to be (1) extensive, (2) virtually uniform, and (3) committed due to legal obligation. [34] The ICJ adopted this view, stating:

> an indispensable requirement [in the formation of a rule of customary international law] would be that within the period in question, short though it might be, State practice, including that of States whose interests are specially affected, should have been both extensive and virtually uniform in the sense of the provision invoked; and should moreover have occurred in such a way as to show a general recognition that a rule of law or legal obligation is involved. [35]

The first requirement demands that the state practice selected for evaluation be extensive. According to the ILA, the practice does not have to be universal. Instead, a "general" practice is sufficient. [36] Further, the ILA regards the selection of states as a qualitative rather than quantitative endeavor. As such, there is no threshold amount or percentage of states for a custom to be extensive. While the quantity of states is important, the quality, or which states, is also significant. [37] In other words, the selection must "include that of States whose interests are specially affected." [38]

Second, in order to establish CIL, state practice must be virtually uniform, both internally and collectively. [39] Internal uniformity requires that each state whose practice is being evaluated acted in the same way in virtually all of the instances in which it engaged in that practice. Collective uniformity demands that separate states must conduct themselves in substantially the same fashion. The ICJ has struggled with assessing the uniformity of a state practice. It is clear that when there is

> [*237] so much uncertainty and contradiction, so much fluctuation and discrepancy in the exercise of [state practice] and in the official views expressed on various occasions, . . . [and] so much inconsistency in the rapid succession of conventions [], ratified by some States and rejected by others, . . . it is not possible to discern [] any constant and uniform usage, accepted as law. [40]

However, many cases do not involve such stark contradictions. In these cases, the ICJ has attempted to offer balanced--albeit seemingly contradictory--judgments. In one such case, the court denied the existence of CIL where states adopted a practice in domestic law and in treaties, and arbitral decisions applied the practice to the states, because other states adopted a different practice. [41] In the same opinion, the court equivocated on evaluating the internal consistency of state practice, holding that "too much importance need not be attached to a few uncertainties or contradictions, real or apparent." [42] Instead, substantial

---

[32] *See id*. Principle 11.

[33] *See id*. commentary (b) to Principle 11; *see also* Daphna Shraga, *UN Peacekeeping Operations: Applicability of International Humanitarian Law and Responsibility for Operations-Related Damage*, 94 AM. J. INT'L L. 406, 408 (2000).

[34] *See* Final ILA Report, *supra* note 21, Principle 12.

[35] North Sea Continental Shelf (Fed. Rep. Ger. v. Den.; Fed. Rep. Ger. v. Neth.), 1969 ICJ 3, 43 (Feb. 20) [hereinafter North Sea Continental Shelf cases].

[36] Final ILA Report, *supra* note 21, Principle 14.

[37] *Id*. commentaries (d) and (e) to Principle 14.

[38] North Sea Continental Shelf cases, *supra* note 35, at 43.

[39] Final ILA Report, *supra* note 21, Principle 13.

[40] Asylum (Colom. v. Peru), 1950 ICJ 266, 277 (Nov. 20).

[41] *See* Fisheries (UK v. Nor.), 1951 ICJ 116, 131 (Dec. 18).

[42] *Id*. at 138.

similarity is sufficient. It was under this understanding that the court, in a similar case, recognized a practice as CIL even though various official declarations concerning the practice were not identical. [43]

B. The Subjective Element: *Opinio Juris*

The final requirement in establishing a customary international law, known as the subjective element, refers to "[a] belief, on the part of the generality of States, that a practice satisfying [the requirements of uniformity and extensiveness] corresponds to a legal obligation or a legal right." [44] In other words, the practice must arise from a sense of legal obligation to commit it; a practice that is generally followed but which states assume they are legally free to ignore does not contribute to the formation of customary law. *Opinio juris* is what distinguishes a state practice committed voluntarily from a practice that a state conducts because it is required by law. [45]

There are of course many inherent problems with assessing the subjective element of CIL. Indeed, the ILA has seemingly done away with the requirement. While *opinio juris* is sufficient to prove the existence of CIL, "it is not [] necessary to the formation of such a rule to demonstrate that such a belief exists, either generally or on the part of any particular State." [46] Instead, a belief that a [*238] legal obligation exists is often inferred from the existence of an extensive and uniform practice. [47] However, this makes the subjective element redundant to the objective requirement, which, by definition, is insufficient to establish CIL alone. Therefore, courts and scholars usually require independent confirmation of *opinio juris*. For example, government statements or endorsement of a treaty analogous to the practice can supply such confirmation. [48]

III. CURRENT LEGAL LANDSCAPE

The dichotomy between the United States and Europe over the regulation of speech is based in a disagreement over the most fundamental rights. While the United States, or at least its Supreme Court, views freedom of expression in nearly absolute terms, European nations, and the international community more generally, seek to promote values such as dignity and equality above other rights.

A. European Law

Although laws restricting hate speech predated World War II, [49] they gained a foothold across Europe following that conflict. The expansion of earlier restrictions to cover speech based on anti-Semitism and racism can be traced to the Nazi experience. [50] European lawmakers recognized that the brutality of Nazi Germany began with hate propaganda at targeted groups. [51] Today, Austria, Belgium, Denmark, France, Germany, Italy, Sweden, Switzerland, and the United Kingdom, among others, have hate speech laws in some form or another. [52] Two distinctive features of the European approach emerge from these laws.

---

[43]   *See* Continental Shelf, *supra* note 14, at 74.

[44]   Final ILA Report, *supra* note 21, Principle 16.

[45]   *See* Goldsmith & Posner, *supra* note 13, at 1116.

[46]   Final ILA Report, *supra* note 21, Principle 16.

[47]   *See id*. at 30--31.

[48]   *See* Goldsmith & Posner, *supra* note 13, at 1117--18.

[49]   *See* Robert A. Kahn, *Who's the Fascist? Uses of the Nazi Past at the Geert Wilders Trial*, 14 OR. REV. INT'L L. 279, 281 (2012).

[50]   *See* Robert A. Kahn, *Cross-Bunting, Holocaust Denial, and the Development of Hate Speech Law in the United States and Germany*, 83 U. DET. MERCY L. REV. 163, 184--86 (2006).

[51]   *See* The Hon. Helen Ginger Berrigan, "*Speaking Out*" *About Hate Speech*, 48 LOY. L. REV. 1, 3 (2002);  *see also* Kahn, *supra* note 49, at 280.

First, European regulations and courts take a values-based approach to speech, balancing principles such as dignity and equality with an individual's right of expression. [13] When the two collide, recognized values take precedence over speech. While all of the nations surveyed guarantee freedom of expression, they also acknowledge the supremacy of individual dignity and equality. These [*239] values deserve government protection, and justify limitations on hateful speech. German courts, for example, emphasize the effect discriminatory and derogatory speech can have on the personal identities of members of targeted groups, even if individuals are not specifically targeted. [54] Second, European governments assume the responsibility of realizing these values. Therefore, the state not only has the obligation to avoid violating legal rights, but is also required to protect certain values from infringement. [55] This section will detail the hate speech regimes of three European nations--Germany, the United Kingdom, and France--as a proxy for the continental approach.

1. Germany.

More so than any other European nation, Germany is representative of the values-based approach to regulating speech. While the German constitution guarantees freedom of expression, [56] it also holds "[h]uman dignity [to be] inviolable." [57] Further, the first Article of Germany's Basic Law is not subject to amendment, thereby establishing the preeminence of human dignity in the German constitutional order. [58] In fact, Germany's Constitutional Court recognized that "the Basic Law [] has erected an order bound together by values which places the individual human being and his dignity at the focal point of all of its ordinances. . . . This fundamental constitutional decision determines the structure and the interpretation of the entire legal order." [59] Accordingly, Germany's highest court held that limitations on free speech are constitutional, in order to protect values such as equality and human dignity. [60] Additionally, German jurisprudence recognizes the positive obligation requiring the government to ensure the protection of these values. In upholding the administrative practice of excluding extremists from public office, the Constitutional Court declared: "The Constitution is not morally neutral but grounds itself on certain central values, takes them in its protection and gives the [*240] state the task of protecting and guaranteeing them. It establishes a militant democracy." [61]

German policy toward hate speech stems primarily from experience under Nazi rule, resulting in a heightened sensitivity toward individual dignity and the potential harms of violating these values. [62] As such, Germany's criminal code embraces some of the most extensive provisions, including prohibiting verbally or through published materials "incit[ing] hatred against segments of the population or call[ing] for violent or arbitrary measures against them; or . . . assault[ing] the human dignity of others by insulting, maliciously maligning or defaming segments of the population." [63] While some of the provisions require a

---

[52]  *See* Alexander Tsesis, *Dignity and Speech: The Regulation of Hate Speech in a Democracy*, 44 WAKE FOREST L. REV. 497, 521 (2009).

[54]  *See id*.

[55]  *See id*.

[56]  Grundgesetz für die Bundesrepublik Deutschland [Basic Law], art. 5, May 23, 1949, BGB1. I (Ger.), *available at* https://www.btg-bestellservice.de/pdf/80201000.pdf.

[57]  *Id*. art. 1.

[58]  *See* Michel Rosenfeld, *Hate Speech in Constitutional Jurisprudence: A Comparative Analysis*, 24 CARDOZO L. Rev. 1523, n.100 (2003).

[59]  Bundesverfassungsgericht (BVerfG), 39 BVerfGE 1 (67), *translated in* Robert E. Jonas & John D. Gorby, *West German Abortion Decision: A Contrast to Roe v. Wade*, 9 J. MARSHALL J. OF PRAC. AND PROC. 605 (1976).

[60]  *See* Bundesverfassungsgericht Feb. 24, 1971, 30 Entscheidungen des Bundesverfassungsgerichts 173 (Ger.), *available at* http://www.utexas.edu/law/academics/centers/transnational/work_new/german/case.php?id=1478 (translating the Mephisto decision).

[61]  Douglas-Scott, *supra* note 53 (citing 39 Bundesverfassungsgericht 334).

[62]  *See* Rosenfeld, *supra* note 58, at 1550--51.

threat to public peace, others merely require the public utterance or publishing of discriminatory and derogatory speech. [64] Further, even when proving a threat to the public peace is required, the judicially-endorsed standard for establishing such a threat is easily met. [65]

However, despite the broad aspects of Germany's speech regulations, the most controversial element of the nation's hate speech tenets is the prohibition against historical revisionism. [66] Specifically, Germany's criminal code criminalizes denying the Holocaust, [67] or as German courts refer to it, engaging in the "Auschwitz lie." [68] The prohibition raises serious questions regarding the proper role of government in distinguishing fact from opinion and the proper--if any--limits on academic freedom. [69] Fundamentally, Germany has developed a corpus of law, in line with the European community, which expresses the supremacy of human dignity over other interests.

[*241] 2. The United Kingdom.

The United Kingdom, unlike the other nations surveyed, does not have a written constitution. Nevertheless it has a longstanding rule of law tradition recognizing the right to free speech, recently affirmed by endorsement of and participation in international agreements. [70] However, the United Kingdom has long acknowledged that this right is not absolute. In fact, restrictions on hate speech have existed in the United Kingdom for centuries. [71] Like much of the rest of Europe, however, the United Kingdom adopted further regulations on hate speech in the aftermath of World War II. [72] The Race Relations Act, enacted in 1965, criminalized public speech--including publications--that is "threatening, abusive or insulting" [73] and "intended to incite hatred on the basis of race, color or national origin." [74] Unlike nearly all other European hate speech regulations, the Race Relations Act of 1965 prohibited incitement to hatred rather than incitement to unlawful conduct or violence. [75]

---

[63] Strafgesetzbuch, Nov. 13, 1998, Bundesgesetzblatt, 3322, as amended, § 130 (1), (Ger.), *available at* http://www.gesetze-im-internet.de/englisch_stgb/englisch_stgb.html#pl200.

[64] *See* Rosenfeld, *supra* note 58, at 1551.

[65] *See id*; Friedrich Kübler, *How Much Freedom for Racist Speech?: Transnational Aspects of a Conflict of Human Rights*, 27 HOFSTRA L. REV, 335, 343--44, (1998) (citing cases in which a threat to public peace was established); *see also* id. at 344, n.32 ("[C]ourts tend to give a broad reading to the notion of public peace.'").

[66] *See* Erik Bleich, *The Rise of Hate Speech and Hate Crime Laws in Liberal Democracies*, 37 J. ETHNIC & MIGRATION STUD. 917, 920 (2011) ("Laws forbidding Holocaust denial are perhaps the most controversial limitation on freedom of expression.").

[67] Strafgesetzbuch, *supra* note 63, § 130(3).

[68] Kübler, *supra* note 65, at 344.

[69] *See* Rosenfeld, *supra* note 58, at 1551.

[70] *See id*. at 1544 (internal citations omitted).

[71] *See id*. at 1544--45.

[72] *See id*. at 1546.

[73] Race Relations Act, 1965, c.73, § 6(1) (Eng.).

[74] Rosenfeld, *supra* note 58, at 1546.

[75] *Id*.

The United Kingdom continues to add to its strict hate speech regulations. In 1986, the British Parliament added § 5 of the Public Order Act, which prohibits actions intended to "incite racial hatred," [76] defining "racial hatred" as "hatred against a group of persons defined by reference to color, race, nationality, or ethnic or national origin." [77] And in 1997, the UK enacted the Protection from Harassment Act prohibiting any conduct, including speech, "which amounts to harassment of another." [78] While the Protection from Harassment Act does not specifically relate to hate speech, it is considered yet another tool in combating hate speech. [79] Further, the Act does not define harassment, stating only that an individual should know his conduct constitutes harassment "if a reasonable person in possession of the same information would think the course of conduct amounted to harassment." [80] Additionally, and perhaps most severely, the United Kingdom criminalizes the possession of hate speech materials with intent to incite or the knowledge that incitement to racial [*242] hatred might occur. [81] Finally, in 2006, the UK adopted the Racial and Religious Hatred Act, which further criminalizes speech that might stir up racial or religious hatred. [82] Ultimately, English hate speech law criminalizes the "promotion of *hatred* through persuasion of non-target audiences . . . if it amounted to *harassment* of a target group or individual." [83]

Further, incitement to hatred includes just that and nothing more. The Crown Prosecution Service ("CPS"), which prosecutes crimes in the United Kingdom, issues guidelines for prosecuting "violent extremism." [84] It acknowledges that "[p]rosecutions are not limited to cases [involving incitement to violence, rather] . . . there have been prosecutions for deeply insulting behavior. This is behavior which falls short of a desire to commit violence but is nevertheless threatening, abusive or insulting, and intends to stir up racial hatred." [85] Additionally, the CPS notes that, "[i]f we are not able to prove that the accused intended to stir up racial hatred, we [only] have to show that . . . hatred was likely to be stirred up." [86] Given that in the same breath, CPS recognizes that, "[w]hen deciding whether or not to prosecute such offences, we also have to bear in mind that people have a right to freedom of speech," [87] these guidelines present an extremely easy standard to meet. For example, two individuals were recently convicted for possessing, publishing and distributing racially inflammatory material. [88] Specifically, the individuals published a pamphlet entitled "Tales of the Holohoax" which "suggested that the Jewish people had a history of inventing stories of the commission of atrocities against them and it portrayed the Jewish people in a way that, as was alleged, made it likely that racial hatred would be stirred up against them if the pamphlet was distributed." [89] Since the pamphlet was

---

[76] *See* Public Order Act, 1986, Part III (Eng.).

[77] *Id*. § 17.

[78] Protection From Harassment Act, 1997, c.40, § 1 (Eng.).

[79] Rosenfeld, *supra* note 58, at 1547.

[80] Protection From Harassment Act, 1997, c.40, § 1(2) (Eng.).

[81] Public Order Act, *supra* note 76, c.64, § 23.

[82] Racial and Religious Hatred Act, 2006, c.1, § 29A-G (Eng.).

[83] Rosenfeld, *supra* note 58, at 1547 (emphasis added).

[84] Violent Extremism and Related Offences, Crown Prosecution Serv., *available at* http://www.cps.gov.uk/publications/prosecution/violent_extremism.html (last visited Mar. 23, 2014).

[85] *Id*.

[86] *Id*. at § 3.

[87] *Id*. at § 2.

[88] Regina v. Sheppard [2010] EWCA Crim. 65, [2010] WL 308489 (Eng.).

[89] *Id*. P 8.

published online, the court noted that "the offences of displaying, distributing or publishing racially inflammatory written material do not require proof that anybody actually read or heard the material." [90]

[*243] 3. France.

An artifact of the French Revolution, The Declaration of the Rights of Man declares: "The free communication of ideas and of opinions is one of the most precious rights of man. Any citizen may therefore speak, write and publish freely, except what is tantamount to the abuse of this liberty in the cases determined by Law." [91] So, while guaranteeing the freedom of expression, France's fundamental human rights instrument (on par with the United States' Bill of Rights) recognizes limitations on free speech. The Declaration of the Rights of Man clarifies this position, stating, "[n]o one shall be disquieted on account of his opinions, including his religious views, provided their manifestation *does not disturb the public order* established by law." [92] Yet despite the apparent balancing of these principles, France has some of the strictest and most rigorously enforced restrictions on hate speech in Europe. Indeed, freedom of expression takes a back seat to other fundamental rights in the French constitutional hierarchy. [93] These laws, in harmony with the European approach, are based on the protection of values such as racial equality and dignity, many of which arose, like most European regulations, in response to the racial atrocities of the Holocaust. [94]

France's longstanding Law of the Press is the foundation for much of the country's recent hate speech restriction adoptions. [95] The law criminalizes speech in the public domain that incites unlawful activity. [96] However, the provisions were ineffectual in curbing increasing racist propaganda in response to an influx of immigrants in the second half of the twentieth century. [97] Consequently, the French Parliament unanimously adopted several amendments to the Law of the Press, collectively known as the Pleven Law. [98]

The Pleven Law provides protection against acts of racial discrimination in both public and private spheres. The Pleven Law prohibits speech in both public [*244] and non-public places, whether published or spoken, that "provokes discrimination, hatred or violence against a person or a group of people" on account of ethnicity, nationality, race, or religion. [99]

Nevertheless, hate crimes incited by discriminatory and racist speech continued to increase in France subsequent to the amendments. In one such example, the Jewish cemetery of Carpentras--a town with an established Jewish population, many of whom are North African immigrants--was desecrated in a vile manner. The National Front, a political party opposed to immigration, was linked to the crime. [100] Many believed that nationalist and anti-Semitic rhetoric incited the crime. [101] In

---

[90] *Id.* P 35.

[91] Declaration des droits de l'Homme et du citoyen de 1789, art. 11, *available at* http://www.conseil-consutuuonnel.fr/conseil-constitutionnel/root/bank_mm/angIais/cst2.pdf.

[92] *Id.* art. 10 (emphasis added).

[93] *See* Susannah C. Vance, *The Permissibility of Incitement to Religions Hatred Offenses Under European Convention Principles*, 14 TRANSNAT'L L. & CONTEMP. PROBS. 201, 221 n.134 (2004) (internal citation omitted).

[94] *See* Karen L. Bird, *Racist Speech or Free Speech? A Comparison of the Law in France and the United States*, 32 COMP. POL. 399, 407 (2000).

[95] *See* Law of July 29, 1881 [hereinafter Law on Freedom of the Press], ch. 4, art. 23 (Fr.); Vance, *supra* note 93, at 222.

[96] Law on Freedom of the Press, *supra* note 95, ch. 4, art. 23.

[97] *See* Bird, *supra* note 94, at 408.

[98] *See id*.

[99] *See* Law on Freedom of the Press, *supra* note 95, ch. 4, art. 24; Vance, *supra* note 93, at 223, citing Code Penal [C. Pén.], art. R625-7 (Fr.).

response, France adopted one of the most controversial hate speech regulations in Europe, the Gayssot Act. The Act, also an amendment to the Law of the Press, criminalizes questioning "the existence of one or several crimes against humanity such as are described by Article 6 of the statute of the international military tribunal." [102] In other words, the Act is an attempt to curb anti-Semitic propaganda by criminalizing the denial of the Holocaust. While it accords with France's longstanding appreciation for equality and acknowledgment of the inferiority of speech to other rights, the Act has been criticized by French civil rights associations, French media and press associations, and many French legal and political scholars as being unwise and possibly unconstitutional. [103] Further, these individuals, along with prominent historians, publicly criticized the Act for "establishing an 'official history' that would undermine principles of free academic research and might even give credibility to revisionist theses." [104]

B. American Law

The United States reveres freedom of expression and so extends constitutional protection even to the most vulgar forms of hate speech. [105] As [*245] such, the Supreme Court of the United States repeatedly held that offensiveness alone provides no constitutional basis for suppressing hateful speech. [106] Instead, only speech that creates a "clear and present danger" of producing "substantive evils" that the government has a right to prevent merits criminalization. [107]

Under this test, political speech enjoys constitutional protection "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." [108] The case that enunciated the test, *Brandenburg v. Ohio*, involved a speech at a Ku Klux Klan rally in which the accused made discriminatory and disparaging remarks towards blacks and Jews. [109] The speakers further suggested that they would petition the government to force blacks to return to Africa and Jews to Israel, and that some "revengeance" would be taken if the United States government continued to "suppress the white, Caucasian race." [110] In overturning Brandenburg's conviction, the Court unanimously concluded that the speakers may have advocated violence, but had not incited it, stating:

> "[T]he mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." A statute which fails to draw this

---

[100] Mary Dejevsky Paris, *Jewish Cemetery Attack Linked to Right*, THE INDEPENDENT, Aug. 2, 1996, hup://www.independent.ctxuk/news/world/jewish-cemetery-attack-linked-to-right-l307772.html.

[101] *See* Bird, *supra* note 94, at 412.

[102] Law No. 90-615 of July 13, 1990, JO, July 14, 1990, at 8333; 1990 JCP, No. 64046 (Fr.) (amending the French Law on Freedom of the Press of 1881 to permit the suppression of all racist, anti-Semitic, or xenophobic acts).

[103] *See* Bird, *supra* note 94, at 412.

[104] Bleich, *supra* note 66, at 921 (internal citation omitted).

[105] *See, for example*, Snyder, supra note 6 (overturning a law that illegalized homophobic speech at soldiers' funerals); RAV v. City of St. Paul, 505 US 377 (1992) (overturning a law that criminalized the burning of crosses); Brandenburg, supra note 4 (overturning a law that illegalized advocacy of racial violence).

[106] *See, for example*, Snyder, supra note 6, at 1220 ("As a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate."); Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd., 502 US 105, 118 (1991) (quoting Hustler Magazine, Inc. v. Falwell, 485 US 46, 55 (1988)) ("The fact that society may find speech offensive is not a sufficient reason for suppressing it."); Texas v. Johnson, supra note 5 at 414 ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

[107] Schenck v. United States, 249 US 47, 52 (1919).

[108] Brandenburg, supra note 4, at 447.

[109] Id. at 445--47.

[110] Id. at 446.

distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control. [111]

Since drawing the line between advocacy and incitement in *Brandenburg*, the Supreme Court has never held speech to incite "imminent lawless action." [112] Instead, federal courts have taken a near absolute approach toward the First Amendment's protection of hate speech, evinced by the well-known Skokie [*246] case. [113] In that case, a group of neo-Nazis intended to march in full SS regalia through a Chicago suburb containing a large Jewish population, including many Holocaust survivors. Both state and federal courts invalidated municipal attempts to prohibit the march, including an ordinance that prohibited public displays intended to incite "hatred against persons by reason of their race, national origin, or religion." [114] Even though several of the Holocaust survivors living in Skokie, Illinois testified that the march might provoke them to violence, the courts held that this did not amount to a justifiable reason to prevent the march. [115]

More recently, in *RAV v. City of St. Paul*, the Supreme Court, once again in a unanimous decision, reiterated that attempts intended to specifically regulate hate speech will be invalidated. [116] In this case, white extremists were convicted under a municipal ordinance, which prohibited placing "on public or private property a symbol . . . which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender," for burning a cross on the lawn of a black family. [117] The Court overturned the conviction, finding the ordinance unconstitutional for two recurring reasons. First, the targeted speech only amounted to hateful speech, not to an incitement to violence, and as noted above, "[t]he mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected." [118] Secondly, because the ordinance criminalized some types of speech but not others, it amounted to impermissible viewpoint discrimination: [119]

> Displays containing some words--odious racial epithets, for example-- would be prohibited to proponents of all views. But "fighting words" that do not themselves invoke race, color, creed, religion, or gender--aspersions upon a person's mother, for example--would seemingly be usable ad libitum in the placards of those arguing in favor of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents. One could hold up a sign saying, for example, that all "anti-Catholic bigots" are misbegotten; but not that all "papists" are, for that would insult and provoke violence "on the basis of religion." St. Paul has no such authority [*247] to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules. [120]

Despite seeming to ignore the European values-based approach, the Supreme Court has weighed in on the debate over unfettered free speech and human dignity. For the Court, ultimately, "the interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship." [121] While at least one eminent legal philosopher agrees with the American position, [122] its stark contrast with the laws in Europe has led many legal scholars to

---

[111] Id. at 447--48 (citations omitted) (quoting Noto v. United States, 367 US 290, 297--98 (1961)).

[112] Robin Edger, *Are Hate Speech Provisions Anti-Democratic?: An International Perspective*, 26 AM. U. Int'l. L. REV. 119, 151 (2010) (internal citation omitted).

[113] Collin v. Smith, 578 F.2d 1197 (7th Cir. 1978).

[114] Id. at 1199 (citing Village Ordinance No. 77-5-N-995).

[115] Id. at 1207; *see also* Village of Skokie v. Nat'l Socialist Party of Am., 373 N.E.2d. 21 (Ill. 1978).

[116] RAV, supra note 105, at 393--94.

[117] St. Paul Bias-Motivated Crime Ordinance (1990) (quoted in RAV, supra note 105, at 380).

[118] RAV, supra note 105, at 414 (White, J., concurring).

[119] The same criticism is often made regarding the hate speech regulations that currently exist in democratic nations. *See* Section IV, *infra*, for a more detailed analysis of this criticism.

[120] RAV, supra note 105, at 391--92.

[121] Reno v. ACLU, 521 US 844, 885 (1997).

question the unlimited, absolutist nature of the American approach. [123] One such commentator argues that America's lack of regulations creates a refuge for the promotion of hate speech and terrorist propaganda and is in violation of international law. [124] As such, the United States arguably undermines international efforts to curb the promotion of hurtful speech. [125] Others believe the United States can benefit from incorporating a values-oriented approach without threatening free speech. [126]

C. International Law

International law holds freedom of expression in high regard. [127] Indeed, there are several international covenants and treaties that protect an individual's right to speech.

The Universal Declaration of Human Rights ("UDHR") affords everyone "the right to freedom of opinion and expression . . . [which] includes freedom . . . to seek, receive and impart information and ideas through any media and regardless of frontiers." [128] Additionally, Article 19(2) of the [*248] International Covenant on Civil and Political Rights ("ICCPR") indicates that the "right to freedom of expression" includes the "freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media." [129] Similar provisions can be found in the European Convention on Human Rights ("ECHR"), [130] American Convention on Human Rights ("American Convention"), [131] and African Charter on Human and Peoples' Rights ("African Charter"). [132]

---

[122]  *See* Ronald Dworkin, *Should Wrong Opinions Be Banned?*, THE INDEPENDENT, May 28, 1995.

[123]  *See*, *for example,* Douglas-Scott, *supra* note 53, at 307 n.6 (listing the growing body of critics who challenge the absolute approach of the United States).

[124]  *See* Thomas J. Webb, *Verbal Poison-Criminalizing Hate Speech: A Comparative Analysis and a Proposal for the American System*, 50 WASHBURN L.J. 445, 446--47 (2011) (internal citations omitted).

[125]  *See id*. (internal citation omitted).

[126]  *See*, *generally*, Bradley A. Appleman, *Hate Speech: A Comparison of the Approaches Taken by the United States and Germany*, 14 Wis. Int'l. L. J. 422 (1996); Scott J. Catlin, *A Proposal for Regulating Hate Speech in the United States: Balancing Rights Under the International Covenant on Civil and Political Rights*, 69 NOTRE DAME L. REV. 771 (1994).

[127]  Navanethem Pillay, *Freedom of Speech and Incitement to Criminal Activity: A Delicate Balance*, 14 NEW ENG. J. INT'L & COMP. L. 203, 203 (2008) ("Freedom of speech is a fundamental right recognized in international law and entrenched in most national constitutions.").

[128]  Universal Declaration of Human Rights, GA Res. 217, UN GAOR, 3d Sess., UN Doc. A/810, art. 19 (Dec. 10,1948) [hereinafter "UDHR"].

[129]  International Covenant on Civil and Political Rights, *adopted* Dec. 19, 1966, 999 UNTS 171, art. 19 (entered into force Mar. 23, 1976) [hereinafter "ICCPR"].

[130]  European Convention for the Protection of Human Rights and Fundamental Freedoms, *opened for signature* Nov. 4, 1950, 213 UNTS 221, art. 10, (entered into force Sept. 3, 1953) ("Everyone has the right to freedom of expression. This right shall include freedom to hold opinions and to receive and impart information and ideas without interference by public authority and regardless of frontiers.") [hereinafter "ECHR"].

[131]  American Convention on Human Rights, *opened for signature* Nov. 22, 1969, 1144 UNTS 123, art. 13 (entered into force July 18, 1978) ("Everyone has the right to freedom of thought and expression. This right includes freedom to seek, receive, and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing, in print, in the form of art, or through any other medium of one's choice.") [hereinafter American Convention].

[132]  African Charter on Human and Peoples' Rights, *adopted* June 27, 1981, OAU Doc. CAB/LEG/67/3 rev. 5, 21 ILM 58, art. 9 (entered into force Oct. 21, 1986) ("1. Every individual shall have the right to receive information. 2. Every individual shall have the right to express and disseminate his opinions within the law.") [hereinafter "African Charter"].

Further, the European Court for Human Rights, regarding freedom of expression as a fundamental foundation of democratic society, repeatedly held the freedom "applicable not only to information or ideas that are favourably received or regarded as inoffensive or as a matter of indifference, but also to those that offend, shock or disturb."  [133]

This respect for freedom of expression does not, however, imply that restrictions on hate speech necessarily violate international law. In fact, international agreements prescribe limitations on free speech when that speech is discriminatorily aimed at individuals.  [134]

The International Convention on the Elimination of All Forms of Racial Discrimination ("ICERD") requires state parties to criminalize "all dissemination of ideas based on racial superiority or hatred, incitement to racial discrimination, as well as all . . . incitement to [acts of violence] against any race  [*249]  or group of persons of another colour or ethnic origin."  [135] It also requires states to prohibit "organizations, and also organized and all other propaganda activities, which promote and incite racial discrimination, and shall recognize participation in such organizations or activities as an offence punishable by law."  [136] Further, the protections to individual dignity affirmed in ICERD are not inconsistent with language in the other treaties that affirmatively protect freedom of expression.

The UDHR, for instance, makes the guarantee of freedom of expression subject "to such limitations as are determined by law solely for the purpose of securing due recognition and respect for the rights and freedoms of others."  [137] Similarly, Article 19 of the ICCPR qualifies the right as "carr[ying] with it special duties and responsibilities" subjecting it to certain limitations, such as "respect of the rights or reputations of others."  [138] Interpreting this article, the United Nations Human Rights Committee commented, "[i]t is the interplay between the principle of freedom of expression and such limitations and restrictions which determines the actual scope of the individual's right."  [139] In the manner of ICERD, the ICCPR goes further, requiring states to outlaw "[a]ny advocacy of national, racial or religious hatred that constitutes incitement to discrimination, hostility or violence."  [140] The ECHR,  [141] American Convention,  [142] and African Charter  [143] also place restrictions on the right to freedom of expression.

---

[133] *See*, *for example*, *Handyside v. United Kingdom*, 24 Eur. Ct. HR (ser. A) at 23 (1976) (internal quotation marks omitted).

[134] *See* Webb, *supra* note 124, at 455.

[135] International Convention on the Elimination of All Forms of Racial Discrimination, *opened for signature* Dec. 21, 1965, GA Res. 2106 (XX), UN GAOR, 20th Sess., UN GAOR, 20th Sess., UN Doc. A/6014, art. 4(a) (entered into force Jan. 4, 1969).

[136] *Id.* art. 4(b).

[137] UDHR, *supra* note 128, art 29.

[138] ICCPR, *supra* note 129, art. 19.

[139] UN Human Rights Committee, General Comment 10, P 3, UN Doc. HRI/GEN/1/Rev.1 at 11 (1994).

[140] ICCPR, *supra* note 129, art. 20.

[141] *See* ECHR, *supra* note 130, art. 10(2):

The exercise of these freedoms [of expression], since it carries with it duties and responsibilities, may be subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary . . . in the interests of national security . . . [and] for the protection of the reputation or rights of others.

[142] *See* American Convention, *supra* note 131, art. 13 ("[A]ny advocacy of national, racial, or religious hatred that constitute[e] incitement[] to lawless violence or to any other similar action against any person or group of persons on any grounds including those of race, color, religion, language, or national origin shall be considered [an] offense[] punishable by law.").

[143] *See* African Charter, *supra* note 132, art. 28 ("Every individual shall have the duty to respect and consider his fellow beings without discrimination, and to maintain relations aimed at promoting, safeguarding and reinforcing mutual respect and tolerance.").

[*250] International courts have reinforced the understanding that limitations on speech are affirmatively allowed, if not required, under international agreements. The European Commission on Human Rights has interpreted the ECHR in particular not just to allow restrictions but also, like the ICCPR and ICERD, affirmatively to require them. [144] For example, in *Jersild v. Denmark*, [145] the European Court of Human Rights held that hate speech could be prohibited because it is contrary "to the protection of the reputation or rights of others." [146] The ICTR agreed when, after examining "well-established principles of international and domestic law," it held that "hate speech that expresses . . . discrimination violates the norm of customary international law prohibiting discrimination." [147]

Further, international entities with appellate authority over domestic hate speech cases have affirmed convictions. For example, the UN Human Rights Committee upheld the conviction of a French university professor for advocating revisionist theories of the Holocaust under France's Gayssot Act, which criminalizes questioning the existence of proven crimes against humanity. [148] The Committee determined that the conviction was consistent with the free speech protections of ICCPR. Additionally, The European Court of Human Rights has found restrictions on freedom of expression to be consistent with free speech guarantees of the ECHR. [149]

Finally, scholars generally seem to agree that international law at the very least permits prohibitions on hate speech. [150]

[*251] IV. ASSESSING THE PRACTICE: NOTHING CUSTOMARY ABOUT IT

The absence of a standard definition of "hate speech" challenges the uniformity of hate speech laws. As a current member of the Advisory Panel of the Fundamental Rights Agency of the European Union aptly defined it, hate speech is "whatever people choose it to mean. It lacks any objective criteria whatsoever." [151] In fact, a recent factsheet published by the European Court of Human Rights admits that "[t]here is **no universally accepted definition** of the expression 'hate speech.'" [152] Further a

---

[144] *See* Stephanie Farrior, *Molding the Matrix: The Historical and Theoretical Foundations of International Law Concerning Hate Speech*, 14 BERKELEY J. INT'L L. 1, 62--63 nn.389-91 (1996) (outlining cases where the European Commission on Human Rights approved restrictions on hate speech as valid limitations on freedom of expression).

[145] App. No. 15890/90, 298 Eur. Ct. HR 1 (1994).

[146] Id. PP 1, 28.

[147] *Prosecutor v. Nahimana*, *supra* note 1, P 1076.

[148] *Faurisson v. France*, UN GAOR, Hum. Rts. Coram, 58th Sess., UN Doc. CCPR/C/58/D/550/1993 (1996).

[149] *See, for example, Jersild v. Denmark*, App. No. 15890/89, 19 Eur. Ct. HR Rep. 1 (1995) (Commission report).

[150] *See*, *generally*, Pillay, *supra* note 127 (outlining how various treaties allow for restrictions on hate speech); Mariana Mello, *Hagan v. Australia: A Sign of the Emerging Notion of Hate Speech in Customary International Law*, 28 LOY. LA INT'L & COMP. L. REV. 365, 366 (2006) (arguing that prohibitions or regulations on hate speech have become a part of customary international law); *see also* John C. Knechtle, *When to Regulate Hate Speech*, 110 PENN ST. L. REV. 539, 542 (2006) (noting that "the European Court of Human Rights has consistently decided that hate speech regulations do not violate freedom of expression"); Farrior, *supra* note 144 (explaining how various international treaties have been interpreted to approve or even require restrictions on hate speech); Douglas-Scott, *supra* note 53, at 327--31 (noting the European Commission's acceptance of restrictions on hate speech); Catlin, *supra* note 126, at 793--99 (explaining the ICCPR's requirement that states ban hate speech).

[151] Roger Kiska, *Hate Speech: A Comparison Between the European Court of Human Rights and the United States Supreme Court Jurisprudence*, 25 REGENT U. L. REV. 107, 110 (2013).

[152] European Court of Human Rights, Press Unit, "Factsheet--Hate Speech" (July 2013), *available at* http://www.echr.coe.int/Documents/FS_Hate_speech_ENG.pdf (emphasis in original).