15 Chi. J. Int'l L. 229, *251

"Manual on Hate Speech" commissioned by the Council of Europe acknowledges that "[n]o universally accepted definition of the term 'hate speech' exists, despite its frequent usage." [153]

Nevertheless, despite the lack of a uniform definition, many international entities and governments have attempted to define hate speech authoritatively, often in contradictory and incoherent terms. For example, in one publication, The Fundamental Rights Agency of the European Union defined hate speech as "the incitement and encouragement of hatred, discrimination or hostility towards an individual that is motivated by prejudice against that person because of a particular characteristic." [154] However, in a separate publication, the very same agency, ignoring its previous classification, redefined hate speech as "a broader spectrum of verbal acts . . . [including] disrespectful public discourse." [155] At the same time, the document admits that the data used in the formulation of the definition "may not, strictly speaking, all fall under a legal definition of hate speech." [156] Without a consistent, standard definition of hate speech the practice of proscribing such speech cannot be uniform among any critical mass of states. As the ICJ acknowledged in the Asylum case, it seems  [*252]  clear that here too there is so much "uncertainty and contradiction, so much fluctuation and discrepancy in the [state practice] and in the official [statements], . . . [and] so much inconsistency in the rapid succession of conventions [], . . . it is not possible to discern [] any constant and uniform usage, accepted as law." [157] There simply is no collective consistency or uniformity across the states that regulate hate speech. As the ICTY simply put it, "[t]he sharp split over treaty law in this area is indicative that such speech may not be regarded as a crime under customary international law." [158]

Furthermore, the states that prohibit hate speech do so in an internally inconsistent manner. As noted, the uniformity of a state practice refers to both collective and internal consistency. [159] Thus, the absence of consistent enforcement undermines the claim that the practice is uniform within nations. [160] Although many nations may have enacted these laws, their inconsistent, selective enforcement indicates that the actual "practice" of these laws has not become uniform. While there are no systematic comparative data available on prosecutions of hate-speech crimes, legislation restricting racist or hurtful speech appears to be enforced relatively infrequently in the major European democracies. [161] Between 1994 and 2004, there was a total of only thirty-seven prosecutions for incitement to racial hatred in Britain. [162] Indeed, "the series of attempts in the United Kingdom to create an effective legislative framework in the hope of curtailing the spread of racist propaganda and the activities of racist

---

[153]    Anne Weber, *Manual on Hate Speech*, 3 (Council of Europe 2009), *available at* http://www.coe.int/t/dghl/standardsetting/hrpolicy/Publications/Hate_Speech_EN.pdf.

[154] European Union Agency for Fundamental Rights, "Hate Speech and Hate Crimes against LGBT Persons" (2009), *available at* http://fra.europa.eu/fraWebsite/attachments/Factsheet-homophobia-hate-speech-crime_EN.pdf.

[155] European Union Agency for Fundamental Rights, "Homophobia And Discrimination On Grounds Of Sexual Orientation And Gender Identity in the EU Member States: Part II--The Social Situation," 46 (2009), *available at* http://fra.europa.eu/sites/default/files/fra_uploads/397-FRA_hdgso_report_part2_en.pdf.

[156] *Id.*

[157] Asylum Case, *supra* note 40, at 277.

[158] *Prosecutor v. Kordic*, *supra* note 3, P 209 n.272.

[159] *See* Final ILA Report, *supra* note 21, Principle 13.

[160]    *See* Meera Chandramouli, *Protecting Roth Sides of the Conversation: Towards A Clear International Standard for Hate Speech Regulation*, 34 U. PA. J. INT'L L. 831, 848--52 (2013) (discussing the inconsistent treatment of hate speech in recent judicial decisions of the United Kingdom and Germany, among others); Vance, *supra* note 93, at 205--6 ("On their surface, recent ECHR free speech decisions appear to be inconsistent.") (internal citations omitted).

[161]    *See* Bleich, supra note 66, at 928; *see also* Eric Heinze, *Wild-West Cowboys Versus Cheese-Eating Surrender Monkeys: Some Problems in Comparative Approaches to Hate Speech*, *in* EXTREME SPEECH AND DEMOCRACY 182, 183 (Ivan Hare & James Weinstein eds., 2009) (noting the limited enforcement of hate speech bans across Europe).

[162] Bleich, *supra* note 66, at 928 (internal citations omitted).

15 Chi. J. Int'l L. 229, *252

organizations has achieved little in practice." [163] The provision has not been used widely mainly due to a lack of political will. [164] In other words, officials fear [*253] political consequences and only prosecute in self-advantageous instances. This clearly challenges the notion that hate speech laws are practiced uniformly within relevant states.

Germany also seems to suffer from selective enforcement, only prosecuting about one hundred crimes of hate speech in a given year. For comparison, there were 1,447 prosecutions related to right-wing extremism in Germany in 1987. [165] Further, German courts are inconsistent in their understanding and enforcement of the relevant laws. Trial courts tend to acquit defendants while appellate courts are likely to reverse. [166] While this pattern does not necessarily imply a practice is internally inconsistent, the reason for the dichotomy might. As one commentator explains, younger trial judges, lacking "a sense of personal guilt [] may feel less confident in handing down convictions for a distinctly political crime." [167] Further, trial judges are "more in tune with local attitudes than the higher-level judiciary, and are less responsive to the national policy." [168] Trial judges, who will one day sit on appellate benches, deciding cases of hate speech on different grounds than their appellate counterparts is internally inconsistent. There can be no internal uniformity if different levels of the judiciary decide the same cases based on different attitudes and policies. Ultimately, "[i]t is difficult to discern a consistent pattern in the judgments of the various courts." [169]

Additionally, hate speech regulation suffers from criticism of selective enforcement, [170] further challenging the notion of uniformity and implying that nations are not committed out of a sense of legal obligation. Some commentators argue that "the practice of States in dictating what is and what is not acceptable speech based on content or opinion is blatant viewpoint discrimination and cannot be accepted within a democratic society." [171] The popular argument is that regulation of hate speech can and is being manipulated to impose '"politically correct' attitudes, with a strong tilt toward the left." [172] As [*254] one commentator aptly explains, "it is increasingly clear that whichever 'group' shouts the loudest gets to decide what is and is not criminal speech." [173] How can uniformity within and across states exist if prosecution is left to the biases of current officials and the policies of those presently in power?

For example, the proscription of speech by the German government is one-sided and viewpoint based. Speech hostile to Nazis, Communists, or anti-Semites is not only protected speech, but there are no countervailing dignity interests in favor of these groups. So, while speech hurtful to anti-Semites is protected, anti-Semitic speech is vigorously prosecuted. In other words, "the Federal Constitutional Court appears to be generally more protective of speech that advances the favored government position

---

[163] Geoffrey Bindman, *Incitement to Racial Hatred in the United Kingdom: Have We Cot the Law We Need?*, *in* STRIKING A BALANCE: HATE SPEECH, FREEDOM OF EXPRESSION, AND NON-DISCRIMINATION--ARTICLE 19, INTERNATIONAL HUMAN RIGHTS CENTRE AGAINST CENSORSHIP 258, 262 (Sandra Coliver ed., 1992).

[164] *See id.* at 260--62 (discussing why there have been so few prosecutions); *but consider* Bleich, *supra* note 66, at 928--29 (arguing that, if these "laws were merely symbolic and not backed by any prosecutions or convictions, they would soon lose their effectiveness, as they would be revealed as empty rhetoric").

[165] Bleich, *supra* note 66, at 928 (internal citations omitted).

[166] Eric Stein, *History Against Free Speech: The New German Law Against the 'Auschwitz'--and Other--'Lies'*, 85 MICH. L. REV. 277, 297-99 (1986).

[167] Id. at 299.

[168] *Id*.

[169] Id. at 297.

[170] *See* Rosenfeld, *supra* note 58, at 1559.

[171] Kiska, *supra* note 151, at 151.

[172] Toni M. Massaro, *Equality and Freedom of Expression: The Hate Speech Dilemma*, 32 WM. & MARY L. REV. 211, 216 (1991).

[173] Kiska, *supra* note 151, at 112.

15 Chi. J. Int'l L. 229, *254

on these issues than it is of other kinds of speech." [174] For some, this is unapologetically anti-democratic. While criticizing Germany's approach, Ronald Dworkin embraces the belief that, "[w]e must not endorse the principle that opinion may be banned when those in power are persuaded that it is false and that some group would be deeply and understandably wounded by its publication." [175] As noted above, a practice that is generally followed but which states assume they are legally free to ignore does not satisfy the subjective element of CIL. Even if hate speech regulations were generally and consistently followed, it seems clear to many commentators that states feel free to ignore the laws when the speech advances a favored position. In the United Kingdom, for example the "reluctance of [officials] to launch proceedings for racial incitement has doubtless been influenced by concern about their political or social consequences." [176] A consistent practice may follow from a legal obligation but a selective one, ignored when beneficial, does not.

Finally, the popular argument that these laws serve a symbolic function [177] further questions whether these laws are committed out of a sense of legal obligation. As one commentator explains, "[t]he limited number of prosecutions and penalties is also an indication that laws against racist speech serve both a symbolic and a practical function . . . [with] sympathetic observers [arguing] that hate speech laws' primary function is symbolic." [178] It is hard to imagine how a [*255] practice can be both committed due to a legal obligation and for primarily symbolic reasons. Enacting legislation because of its symbolic effect indicates a voluntary choice, not an obligation. If hate speech regulations primarily serve a symbolic function, they cannot be viewed as a legal obligation, and therefore cannot satisfy *opinio juris*.

V. CONCLUSION

The dangers of racial invective and defamatory hate speech are real. They have been experienced in places ranging from Western Europe to the former Yugoslavia, in Eastern Europe, and down to Rwanda. The efforts to proscribe and punish speech, although taken to promote the dignity and self-worth of every individual and protect against the evils hate speech triggers, ultimately fail to attain the requisite level of legality on an international level. This Comment has taken no position on the wisdom of the European and international approaches to hate speech, as opposed to the American position. Rather, it simply argues that the European and international regulations have most likely not assumed CIL status for three main reasons.

First, the absence of a consistent definition of hate speech expresses a lack of collective and internal uniformity in hate speech regulations. Domestic laws and international agreements vary widely on the standard separating proscribed from protected speech. As the ICTY explained, "[t]he sharp split over treaty law in this area is indicative that such speech may not be regarded as a crime under customary international law." [179] Second, selective enforcement and low levels of prosecution further challenge the existence of internal uniformity. The evidence of inconsistent and selective enforcement by governments and officials demonstrates the lack of uniformity within the practicing states. Finally, the same evidence of discriminatory enforcement and the fact that many believe the regulations serve a primarily symbolic function defies the notion that the practice is taken due to a sense of legal obligation.

Therefore, for hate speech laws to attain the level of legality necessary for CIL status, they must cure the aforementioned defects. There must be a standard definition clearly distinguishing prohibited speech and states must enforce the regulations consistently and uniformly.

---

[174] Ronald J. Krotoszynski Jr., *A Comparative Perspective on the First Amendment: Free Speech, Militant Democracy, and the Primacy of Dignity as a Preferred Constitutional Value in Germany*, 78 TUL. L. REV. 1549, 1584 (2004).

[175] Dworkin, *supra* note 122. Dworkin embraces the opinion, prevalent in Supreme Court jurisprudence, that speech advances valuable notions of individual autonomy and democracy in allowing individuals to independently decide which views will succeed.

[176] Bindman, *supra* note 163, at 260.

[177] *See* David Kretzmer, *Freedom of Speech and Racism*, 8 CARDOZO L. REV. 445, 456 (1987); Kübler, *supra* note 65, at 361--62.

[178] Bleich, *supra* note 66, at 928.

[179] *Prosecutor v. Kordic, supra* note 3, P 209 n.272.

15 Chi. J. Int'l L. 229, *255

Chicago Journal of International Law
Copyright (c) 2014 The University of Chicago
Chicago Journal of International Law

**End of Document**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EUGENE VOLOKH, RUMBLE CANADA INC.,
and LOCALS TECHNOLOGY INC.

No. 22 Civ. 10195 (ALC)

Plaintiffs,

- against -

LETITIA JAMES, in her official capacity as Attorney
General of New York,

Defendant.

### DECLARATION OF RICK SAWYER IN OPPOSITION TO
### PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Under 28 U.S.C. § 1746, I, Rick Sawyer, Special Counsel, Office of the New York State Attorney General, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am Special Counsel for Hate Crimes in the Civil Rights Bureau of the Office of the New York State Attorney General ("OAG"), and attorney for Defendant LETITIA JAMES, in her official capacity as Attorney General of New York, in the above-captioned action.

2. I make this declaration in support of Defendant's Opposition to Plaintiffs' Preliminary Injunction Motion based on personal knowledge for the limited purpose of providing the Court with the attached appendix of exhibits, cited in the Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction, all of which this Court may take judicial notice under Federal Rule of Evidence 201.

3. On October 18, 2022, the OAG published the *Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*. Attached as **Exhibit A** is a true and accurate copy of that report. The report was prepared in response to a request made by Governor Kathy Hochul under Executive Law § 63(8) and was based on an investigation conducted by the OAG. It is judicially noticeable under Rule 201 and can be found at https://ag.ny.gov/sites/default/files/buffaloshooting-onlineplatformsreport.pdf  (retrieved on December 12, 2012).

4. On May 14, 2022, a teenage white supremacist livestreamed himself systematically slaughtering Black people with an assault rifle at a grocery store in East Buffalo, New York. Ex. A at 9–10. The attack left 10 Black people dead and 3 others wounded. *Id.* at 10.

5. Within hours, a recording of the livestream went viral on social media. *Id.* at 34.

**JA238**

6.  Before the shooting began, the shooter published a manifesto touting his racist views and calling for the mass killing of Black people.  *Id.* at 9, 15–16.  That, too, was shared widely on social media.  *Id.* at 34–35.

7.  The shooter's expressed intention in livestreaming his attack and posting his manifesto and livestreaming his mass murder was to inspire others to follow in his footsteps and commit racially motivated murder.  *Id.* at 9, 15–16.

8.  The Buffalo shooter took his inspiration from a similar 2019 massacre in Christchurch, New Zealand, in which the shooter livestreamed an attack on two separate mosques, killing 51 people.  *Id.* at 15, 17–19.

9.  Like the Buffalo shooter, the Christchurch shooter  also created published a manifesto on social media that was widely shared on social media across the internet.  *Id.* at 19.  The Buffalo shooter explicitly credited the Christchurch livestream as the impetus for event as the inspiration that "started my real research into the problems with immigration and foreigners in our White lands."  *Id.*

10.  The U.S. Department of Homeland Security has labeled domestic violent extremists, like the Buffalo shooter, as one of the key threats facing national security today.  Attached as **Exhibit B** is a true and accurate copy of the Department of Homeland Security's October 2020 Homeland Threat Assessment. It is available at: https://www.dhs.gov/sites/default/files/publications/2020_10_06_homeland-threat-assessment.pdf (retrieved on December 12, 2012).

11.  Attached as **Exhibit C** is a true and accurate copy of the Assembly Memorandum in Support of Legislation for A7865A (2022), which was ultimately enacted as New York General Business Law § 394-ccc. It is available at: https://nyassembly.gov/leg/?bn=A07865&term=&Summary=Y&Actions=Y&Votes=Y&Memo=Y&Text=Y (retrieved on December 12, 2012).

12.  Attached as **Exhibit D** is a true and accurate copy of the Assembly Floor Debate for A7865A (June 1, 2022). It is available at: https://nystateassembly.granicus.com/DocumentViewer.php?file=nystateassembly_8ee840ed9d90b1cc1aacbe7e84c00f2b.pdf&view=1 (retrieved on December 12, 2012).

13.  During the floor debate, Assemblymember Patricia Fahy, the sponsor of A7865A,  declared:

> It would now—this bill would require a clear and concise policy regarding how social media platforms or networks would respond to incidences of hateful conduct on their platforms, as well as have them—require them to maintain an easily accessible mechanism for

reporting that conduct on the platforms. It doesn't tell them how, it just lays out that they—they must have one.

Ex. D at 183.

14. During the floor debate, Assemblymember Patricia Fahy, the sponsor of A7865A, declared:

Estimates are that 80 percent of mass shooters have shown signs of crisis, and about one-half of that 80 percent have estimated to have revealed their plans ahead of time by a social media post. So we know we have an issue. We know we need more tools to address it.

Ex. D at 191.

15. During the floor debate, Assemblymember Patricia Fahy, the sponsor of A7865A, declared:

We also include a provision that says that the—the social media networks themselves need to show how they plan to respond. But we have left this purposely open, if you will, because we are leaving it up to them.

Ex. D at 195.

16. During the floor debate, Assemblymember Steven Otis, in support of A7865A, declared:

This is a very simple bill. This is a bill that basically raises the standard for social media sites to have a—and I'll read the language—easily— easily accessible mechanism to report hateful material. That's all the bill really does. It -- it would have to report on they handle the complaints. But what the bill does not do is the bill is not about the First Amendment, we don't tell the social media sites what they do, what—what judgments they make. It is not about the government telling social media sites what to keep up or what to take down. And it's not very complicated. What it does do is it sets up -- it doesn't -- doesn't tell them what their role should be. What the bill does is basically say we want speed in getting hateful material down. The site's going to figure out what material on their own policies they're going to take down or they're going to keep up.

Ex. D at 201–03.

17.  During the floor debate, the following colloquy took place between Assemblymember Mike Lawler and Assemblymember Patricia Fahy, the sponsor of A7865A:

> MR. LAWLER: But if we're saying that they need to come up with some mechanism to report and they need to let us know how they may respond to hateful conduct, what if their response is, you know, that they're not going to remove it? That's a response. I mean, so the Attorney General is going to be able to go after them for not removing what she deems hateful?

> MS. FAHY: This does not empower her in that regard.

Ex. D at 207.

18. During the floor debate, Assemblymember Patricia Fahy, the sponsor of A7865A, declared:

> It is just telling them that they should have a policy. And because we're not telling social media companies what that policy should be, it does not, I do not believe, implicate the First Amendment.

Ex. D at 224.

19. For the reasons set forth in the accompanying Memorandum of Law, it is respectfully requested that Plaintiffs' Preliminary Injunction Motion be denied.

Dated: December 13, 2022

/s/ Rick Sawyer
Rick Sawyer
Special Counsel for Hate Crimes
Office of the New York State Attorney General

# Homeland Threat Assessment
## October 2020



Homeland Security

With honor and integrity, we will safeguard the American people, our homeland, and our values

2

# Contents

**Foreword**                                               3
**Structure of the HTA**                                6
**Threats:**
   **Cyber**                                         8
   **Foreign Influence Activity**                    10
   **Economic Security**                             14
   **Terrorism**                                     17
   **Transnational Criminal Organization**           21
   **Illegal Immigration**                           23
   **Natural Disasters**                             25



| U.S. Department of Homeland Security | 3 |
|---|---|



# Foreword

In my role as Acting Secretary, I receive intelligence, operational, law enforcement, and other information on a daily basis. This Homeland Threat Assessment (HTA), the first of its kind for the U.S. Department of Homeland Security (DHS), draws upon all sources of information and expertise available to the Department, including from intelligence, law enforcement, and our operational Components. The result is a "Whole-of-DHS" report on the threats to the Homeland. This HTA is as close as the American people will get to seeing and understanding the information that I see as Secretary and that our employees see in their national security missions. As you read through the HTA you should have faith in knowing that these threats were identified using the best intelligence, operational information, and employee knowledge available to the Department.



### *Identifying Threats using a Whole-of-DHS Approach*

The men and women serving in our operational Components are the experts in their national security and homeland security missions, making their insights critical in threat identification and prevention. Our operational Components provided information about the threats they see and combat in performance of their mission. DHS is the first and last line of defense against many threats facing our country. Our ability to mitigate these threats is predicated on our ability to understand them and to inform the American people. I hope all Americans take a moment to review this HTA and visit DHS.gov to learn how they can protect themselves from these threats.

### *Today's Threat Environment*

Combatting terrorism will always be a priority to the Department of Homeland Security. Foreign terrorist organizations (FTO) still have the intent to attack the Homeland within and from beyond our borders. In the 19 years since September 11th, 2001, the United States Government (USG), DHS, and our foreign partners have taken the fight directly to those responsible for the attacks on that day, and to other FTOs who seek to destroy our country based on an ill-informed and twisted ideology. We have enhanced our ability to identify and prevent individuals affiliated with these organizations from traveling or immigrating to the United States. We have enhanced security and processes at our airports, ports of entry, and beyond our borders. We have built the world's greatest counterterrorism ecosystem to keep Americans safe. More specifically, DHS has partnered with other USG agencies and foreign governments to raise the baseline for screening and vetting in the United States. In the last few years we have enhanced existing vetting programs, created the National Vetting Center (NVC), expanded biographic

**"DHS has a vital mission: to secure the nation from the many threats we face. This requires the dedication of more than 240,000 employees in positions that range from aviation and border security to emergency response, from cybersecurity analyst to chemical facility inspector. Our duties are wide-ranging, and our goal is clear — keeping America safe."**

**Secretary Chad Wolf, State of the Homeland, September 9, 2020**

**JA244**

| 4 | Homeland Threat Assessment | U.S. Department of Homeland Security |
|---|---|---|



" With honor and integrity, we will safeguard the American people, our Homeland, and our values."

and biometric information sharing programs, and enacted national-level policies requiring foreign governments to share essential information for vetting purposes or face potential travel restrictions.

**Trade and economic security is Homeland Security.** We are increasingly concerned about the threat posed by nation state actors in an emerging era of great power competition. DHS is specifically concerned with the direct and indirect threat posed to the Homeland by the People's Republic of China (PRC). The Chinese Communist Party (CCP)-led PRC is challenging America's place as the world's global and economic leader. Threats emanating from China include damaging the U.S. economy through intellectual property theft, production and distribution of counterfeit goods, and unfair trade practices. DHS has a mandate to mitigate these threats and we will do so with a clear-eyed view that China is a long-term strategic competitor to the U.S.

**Domestic violent extremism is a threat to the Homeland.** As Americans, we all have the right to believe whatever we want, but we don't have a right to carry out acts of violence to further those beliefs. The Department works with other Government, non-Government, and private sector partners to prevent individuals from making this transition from protected speech to domestic terrorism reflected by violence. As Secretary, I am concerned about any form of violent extremism. That is why we design our programs to be threat agnostic – ensuring that we can combat a broad range of domestic threats. However, I am particularly concerned about white supremacist violent extremists who have been exceptionally lethal in their abhorrent, targeted attacks in recent years. I am proud of our work to prevent terrorizing tactics by domestic terrorists and violent extremists who seek to force ideological change in the United States through violence, death, and destruction.

**Exploitation of Lawful and Protected Speech and Protests.** During the course of developing the HTA we began to see a new, alarming trend of exploitation of lawful protests causing violence, death, and destruction in American communities. This anti-government, anti-authority and anarchist violent extremism was identified by DHS in September 2019 when we published our Strategic Framework for Countering Terrorism and Targeted Violence. As the date of publication of this HTA, we have seen over 100 days of violence and destruction in our cities. The co-opting of lawful protests led to destruction of government property and have turned deadly.

Indeed, DHS law enforcement officers suffered over 300 separate injuries and were assaulted with sledgehammers, commercial grade fireworks, rocks, metal pipes, improvised explosive devices, and more. This violence, perpetrated by anarchist extremists and detailed in numerous public statements that remain available on the DHS website, significantly threatens the Homeland by undermining officer and public safety— as well as our values and way of life. While the HTA touches on these issues, we are still in the nascent stages of understanding the threat this situation poses to Americans, the Homeland, and the American way of life.

**Cyber security threats from nation-states and non-state actors present challenging threats to our Homeland and critical infrastructure.** DHS has a critical mission to protect America's infrastructure, which includes our cyber-infrastructure. We are concerned with the intents, capabilities, and actions of nation-states such as China, Russia, Iran, and North Korea. Nation-state targeting of our assets seeks to disrupt the infrastructure that keeps the American economy moving forward and poses a threat to national security. On top of the threats to critical infrastructure, cybercriminals also target our networks to steal information, hold organizations

**JA245**

**U.S. Department of Homeland Security**                    5

hostage, and harm American companies for their own gain.

**Nation-states will continue to try to undermine American elections.** Threats to our election have been another rapidly evolving issue. Nation-states like China, Russia, and Iran will try to use cyber capabilities or foreign influence to compromise or disrupt infrastructure related to the 2020 U.S. Presidential election, aggravate social and racial tensions, undermine trust in U.S. authorities, and criticize our elected officials. Perhaps most alarming is that our adversaries are seeking to sway the preferences and perceptions of U.S. voters using influence operations. Americans need to understand this threat and arm themselves with all information available to avoid falling prey to these tactics.

While Russia has been a persistent threat by attempting to harm our democratic and election systems, it is clear China and Iran also pose threats in this space. The IC's Election Threat Update from August 2020 and Microsoft's announcement of cyber-attacks from China, Russia, and Iran provide further evidence of this threat and underscore the importance in public and private partnerships to secure democratic processes. DHS's #Protect2020 website can help you understand the threat to our elections and increase your preparedness and awareness.

**Transnational Criminal Organizations (TCOs) continue to profit at the expense of American lives.** Mexican cartels and other TCOs will continue to smuggle hard narcotics like fentanyl, heroin, and methamphetamine into our communities, contributing to an alarming level of overdoses in the United States. No American community is immune from the impact of these drugs. Furthermore, cartels will continue to use dangerous human smuggling methods to facilitate migrants to our borders, putting these migrants and our officers and agents at significant risk given the current COVID-19 pandemic.

**The threat of illegal and mass migration to the United States.** Traditional migration push factors like insecurity and economic conditions continue to push individuals north to the United States. While we are addressing illegal migration through a network of initiatives, we are concerned that during a pandemic this poses a more specific threat to the migrants, the communities they

transit, to U.S. border communities, and to our officers and agents who encounter migrants when they enter the United States. To mitigation this threat we instituted enhanced restrictions at our borders, limited travel to only essential travelers and implemented a Center for Disease Control (CDC) order that protects Americans from COVID-19.

**Natural occurrences continue to harm the life and property of Americans.** In 2020 alone we have seen an unprecedented storm season that has taken the livelihoods of many Americans in our Gulf states and a historic wildfire season that has caused devastation on the West Coast. Americans in-between our coasts also face the threat of natural disasters from a variety of causes. On top of the threat to life and safety, these events have devastating impacts on local and national economies. The Department is at the forefront of providing information to help Americans prepare, and we stand ready to respond after these events occur.

Likewise, a foreign-born virus reached our shores in 2020. COVID-19 is the most recent and deadly, in a list of infectious diseases that have threatened the lives of Americans. We have seen unprecedented impact to life, health, and public safety from COVID-19 and taken action to prevent our healthcare system from being overburdened from COVID-19 patients. DHS was at the forefront mitigating threat and we took decisive action to restrict air and sea travel from disease hot-spots, close our land borders to non-essential travel, provide lifesaving PPE to Americans, prevent fraudulent PPE from entering our supply chains, and identify fraudsters who are trying to exploit this situation for their own personal gain.

***Conclusion***

As you read the HTA you will become more acutely aware of the threats facing the American people, the Homeland, and the American way of life. You will also gain a clearer picture of the broad mission of the Department of Homeland Security. It is my privilege and honor to serve as the Acting Secretary of an organization whose employees willingly and bravely put themselves in harm's way every day to protect us all. The men and women of the Department live up to our motto: With honor and integrity, we will safeguard the American people, our Homeland, and our values.

**JA246**

| 6 | Homeland Threat Assessment | U.S. Department of Homeland Security |

# Structure of the Threat Assessment

The Department of Homeland Security (DHS) is the first and last line of defense against the many threats facing our country. Our ability to mitigate these threats is predicated on our ability to understand them and to inform the American people. The DHS Homeland Threat Assessment[1] (HTA) identifies the primary threats facing the United States of America at and inside our borders. This Assessment draws upon all sources of information and expertise available to the Department, including from intelligence, law enforcement, and our operational components.

The purpose of the HTA is to provide the American people with an overview of the information collected and analyzed by DHS employees around the world and provided to the Secretary of Homeland Security.

The HTA is primarily informed by intelligence analysis prepared by the DHS Office of Intelligence and Analysis (I&A) and by the Component intelligence offices, which identified the leading security threats to the Homeland based on a review of all-source intelligence information and analysis. Given the array of potential issues, I&A's scoped its analysis to focus on key threats covered by the intelligence elements of the Department, which expert analysts considered most likely and with the potential to significantly affect U.S. security.

The HTA was also informed by the expertise and insights of the Department's Operational Components, which assess and respond to threats on a daily basis, as well as the informed views of the DHS Office of Strategy, Policy, and Plans (PLCY), which leads threat identification and prevention activities.

This inaugural HTA presents a holistic look from across the Department and provides the American people with the most complete, transparent, and candid look at the threats facing our Homeland. It breaks down the major threats to the Homeland in the following sections:

1. *The Cyber Threat to the Homeland*
2. *Foreign Influence Activity in the Homeland*
3. *Threats to U.S. Economic Security*
4. *The Terrorist Threat to the Homeland*
5. *Transnational Criminal Organization Threats to National Security*
6. *Illegal Immigration to the United States*
7. *Natural Disasters*

---

[1] As used in this document, "Threat Assessment" has the meaning given in the DHS Lexicon: a "product or process of evaluating information based on a set of criteria for entities, actions, or occurrences, whether natural or manmade, that have or indicate the potential to harm life, information, operations and/or property."



WE STAND READY TO RISE
AND FACE THE NEXT
CHALLENGE THAT THREATENS
OUR HOMELAND.

# The Cyber Threat to the Homeland

Cyber threats to the Homeland from both nation-states and non-state actors will remain acute. U.S. critical infrastructure faces advanced threats of disruptive or destructive cyber-attacks. Federal, state, local, tribal and territorial governments, as well as the private sector, will experience an array of cyber-enabled threats designed to access sensitive information, steal money, and force ransom payments.

## Nation State Threats

Russia—which possesses some of the most sophisticated cyber capabilities in the world—can disrupt or damage U.S. critical infrastructure networks via cyber-attacks. Russian state-affiliated actors will continue targeting U.S. industry and all levels of government with intrusive cyber espionage to access economic, policy, and national security information to further the Kremlin's strategic interests.

- Russia probably can conduct cyber-attacks that would result in at least localized effects over hours to days and probably is developing capabilities that would cause more debilitating effects.

- We expect Russian cyber actors to use a range of capabilities including social engineering, publicly known software and hardware vulnerabilities, poorly configured networks, and sophisticated "zero-day" attacks that exploit security weaknesses in software.

- Under Russian law, the Federal Security Service (FSB) can compel Russian firms doing business in the United States—or Russians working with U.S. firms—to comply with FSB information sharing and operational mandates, presenting additional routes for cyber espionage.

China already poses a high cyber espionage threat to the Homeland and Beijing's cyber-attack capabilities will grow. Chinese cyber actors almost certainly will continue to engage in wide-ranging cyber espionage to steal intellectual property[2] and personally identifiable information (PII) from U.S. businesses and government agencies to bolster their civil-military industrial development, gain an economic advantage, and support intelligence operations. China possesses an increasing ability to threaten and potentially disrupt U.S. critical infrastructure.

- We expect China's cyber operations against U.S. companies to focus on the critical manufacturing, defense industrial base, energy, healthcare, and transportation sectors.

- Beijing has targeted information technology and communications firms whose products and services support government and private-sector networks worldwide, while concurrently advocating globally for Chinese information technology companies that could serve as espionage platforms.

- Under China's 2017 National Intelligence Law, Beijing can compel businesses based in China and Chinese citizens living abroad to provide intelligence to the Chinese government.

- We remain concerned about China's intent to compromise U.S. critical infrastructure in order to cause disruption or destruction.

- China's efforts to dominate the 5G world pose new challenges to U.S. efforts to national security, privacy, resistance to malign influence, and human rights. The exponential increases in speed, connectivity, and productivity could render American systems particularly vulnerable to Chinese cyber threats.

While Russia and China are the most capable nation-state cyber adversaries, Iranian and North Korean cyber actors also pose a threat to U.S. systems, networks, and information. Iran continues to present a cyber espionage threat and is developing access in the Homeland that could be repurposed for destructive cyber-attacks.  North Korean cyber capabilities, while sophisticated, probably will remain confined to criminal

| Homeland Threat Assessment | U.S. Department of Homeland Security | 9 |
| --- | --- | --- |

generation of revenue. If Pyongyang's intent changes, however, it probably could quickly build capabilities to conduct broader espionage activity or threaten infrastructure with disruptive cyber-attacks.

### Cybercrime

Cybercriminals increasingly will target U.S. critical infrastructure to generate profit, whether through ransomware, e-mail impersonation fraud, social engineering[3], or malware. Underground marketplaces that trade in stolen information and cyber tools will continue to thrive and serve as a resource, even for sophisticated foreign adversaries.

- Ransomware attacks—which have at least doubled since 2017—often are directed against critical infrastructure entities at the state and local level by exploiting gaps in cybersecurit

- Victims of cybercriminal activity in 2018 reported over $2.7 billion in losses—more than twice the amount lost in 2017. This figure does not represent the full scope of loss because some victims do not report incidents.

### Cyber Threat to the U.S. Democratic Processes

Some state or non-state actors likely will seek to use cyber means to compromise or disrupt infrastructure used to support the 2020 U.S. Presidential election and the 2020 U.S. Census. Given the national importance of these events, any related cyber activities—or mere claims of compromise—might fuel influence operations aimed at depressing voter turnout or census participation, misinforming about democratic processes, or shaping perceptions about the integrity or outcome of the election or census (see subsequent section regarding Foreign Influence in the Homeland).

- Advanced persistent threat or other malicious cyber actors likely will target election-related infrastructure as the 2020 Presidential election approaches, focusing on voter PII, municipal or state networks, or state election officials directly. Operations could occur throughout the 2020 election cycle—through pre-election activities, Election Day, and the post-election period.

- Adversaries' cyber capabilities vary greatly—as does the cyber defensive posture of electoral boards to stymie such actors. Adversaries could attempt a range of election interference activities, including efforts to target voter registration systems; to compromise election system supply chains; to exploit poor cybersecurity practices on protected election systems or networks; or to hack official election websites or social media accounts.

- Unidentified cyber actors have engaged in suspicious communications with the U.S. Census public-facing network over at least the last year, including conducting vulnerability scans and attempting unauthorized access. Cyber activity directed at the U.S. Census could include attempts to gain illicit access to census-gathered bulk data; to alter census registration data; to compromise the census infrastructure supply chain; or conducting denial-of-service attacks.

### OPPORTUNITY FOR CYBER ACTORS TO EXPLOIT COVID-19

Both cybercriminals and nation-state cyber actors—motivated by profit, espionage, or disruption—will exploit the COVID-19 pandemic by targeting the U.S. healthcare and public health sector; government response entities, such as the U.S. Department of Health and Human Services and the Federal Emergency Management Agency; and the broader emergency services sector.

- Cybercriminals most likely will deploy ransomware for financial gain, whereas nation-state cyber actors might seek to capture insights into U.S. response plans and scientific information related to testing, therapeutics, and vaccine development.

- We expect that cybercriminals and nation-state cyber actors will target victims in the United States with COVID-19-themed spear-phishing e-mails, which we already have observed overseas. These e-mails appear to claim to be from official government sources, including the U.S. Centers for Disease Control and Prevention and the U.S. Department of State.

---

[2]On Thursday, September 17, 2020, FBI Director Wray described China's unmatched success in stealing American intellectual property as "the greatest transfer of wealth in the history of the world." U.S. House of Representatives, Committee on Homeland Security, Annual Hearing on Threats to the Homeland.

[3]Social engineering is the act of tricking someone into divulging information or taking action, usually through technology. The idea behind social engineering is to take advantage of a potential victim's natural tendencies and emotional reactions."

**10** Homeland Threat Assessment                                    U.S. Department of Homeland Security

# Foreign Influence Activity in the U.S.

Foreign influence activity will target U.S. foreign and domestic policy, international events such as COVID-19, and democratic processes and institutions, including the 2020 Presidential election. Russia is the likely primary covert influence actor and purveyor of disinformation and misinformation within the Homeland. We assess that Moscow's primary objective is to increase its global standing and influence by weakening America—domestically and abroad—through efforts to sow discord, distract, shape public sentiment, and undermine trust in Western democratic institutions and processes.

### Amplifying U.S. Socio-Political Division

• Russian influence actors will continue using overt and covert methods to aggravate social and racial tensions, undermine trust in U.S. authorities, stoke political resentment, and criticize politicians who Moscow views as anti-Russia. Although some of this activity might



**WHETHER IN CYBERSPACE OR AT THE BORDER, DHS IS UNFLINCHING IN ITS RESOLVE TO SECURE AMERICA'S TERRITORIAL SOVEREIGNTY**

be framed in the context of the U.S. election—seemingly in support of or opposition to political candidates—we assess that Moscow's overarching objective is to weaken the United States through discord, division, and distraction in hopes that America becomes less able to challenge Russia's strategic objectives.

• Russian influence actors will engage in media manipulation—across social media platforms, proxy websites[4], and traditional media, to include state-controlled outlets—to exacerbate U.S. social, political, racial, and cultural fault lines.[5]

• Russian actors will attempt to undermine national unity and sow seeds of discord that exploit perceived grievances within minority communities, especially among African Americans. Russian influence actors often mimic target audiences and amplify both sides of divisive issues to maximize discord, tailoring messaging to specific communities to "push and pull" them in different ways.

• The Russian government promulgates misinformation, threats, and narratives intended to incite panic or animosity among social and political groups. For example, Russian actors amplified narratives such as U.S. law

[4] *Proxy Website: Foreign news outlets, think tanks, and investigative journalist websites on behalf of foreign governments or foreign government-linked businessmen and oligarchs in a non-overt or non-attributed way and that echo foreign government narratives, talking points, and disinformation. State media often cite these proxy websites and portray them as credible and independent sources of information.*

| Homeland Threat Assessment | U.S. Department of Homeland Security | 11 |
|---|---|---|

enforcement ignoring ICE detention requests and releasing an illegal immigrant accused of rape; assaults on supporters and opponents of the President; and portrayals of U.S. law enforcement as racially biased. Russian influence actors also have exploited domestic tragedies, such as the 2017 mass shooting in Las Vegas, and protest movements—sometimes magnifying both a protest and a counter-protest—such as the 2017 protest activity in Charlottesville.

### COVID-19 Influence Narratives

Russian online influence actors are advancing misleading or (what they perceive as) inflammatory narratives about the COVID-19 pandemic probably to stoke fear, undermine the credibility of the U.S. government, and weaken global perceptions of America. Moscow probably will study the American public's reaction to its COVID-19 disinformation to improve future influence campaigns aimed at shaking public confidence in Washington, which it can unleash opportunistically during a crisis, hostilities, or a period of degraded relations.

• Russian online influence actors have claimed that the U.S. President is incapable of managing the COVID-19 crisis and sought to exacerbate public concerns by amplifying content critical of the U.S. response to the public health crisis and the economic downturn. In contrast, the actors highlighted China's and Russia's alleged success against the COVID-19 outbreak and praised

President Putin's COVID-19 plan and Russia's ample supply of tests.

• Russian online influence actors spread misinformation and conspiracy theories about the origin of COVID-19, claiming it is a U.S.-engineered biological weapon that U.S. military officials spread in China.

Chinese operatives probably are waging disinformation campaigns using overt and covert tactics—including social media trolls—to shift responsibility for the pandemic to other countries, including the United States. China might increase its influence activities in response to what it views as anti-China statements from the U.S. Government over China's role in the pandemic.

• Since August 2019, more than 10,000 suspected fake Twitter accounts have been involved in a coordinated influence campaign with suspected ties to the Chinese Government. Among these are hacked accounts from users around the world that post messaging and disinformation about the COVID-19 pandemic and other topics of interest to China.

• China's Foreign Ministry, state media, and official Twitter accounts promote overt narratives claiming the coronavirus may have originated in the United States, criticize the U.S. pandemic response, and publicize

**FOREIGN INFLUENCE DEFINITIONS:**

Foreign Influence. Any covert, fraudulent, deceptive, or unlawful activity of foreign governments—or persons acting on their behalf—undertaken with the purpose or effect of influencing, undermining confidence in, or adversely affecting U.S. democratic processes or institutions or otherwise affecting socio-political sentiment or public discourse to achieve malign objectives.

• Covert Influence: Activities in which a foreign government hides its involvement, including the use of agents of influence, covert media relationships, cyber influence activities, front organizations, organized crime groups, or clandestine funds for political action.

• Overt Influence: Activities that a foreign government conducts openly or has clear ties to, including the use of strategic communications, public diplomacy, financial support, and some forms of propaganda.

• Disinformation: A foreign government's deliberate use of false or misleading information intentionally directed at another government's decisionmakers and decision-making processes to mislead the target, force it to waste resources, or influence a decision in favor of a foreign government's interests.

• Misinformation: Foreign use of false or misleading information. Misinformation is broader than disinformation because it targets a wide audience rather than a specific group.

---

[5] We note that U.S. Persons linking, citing, quoting, or voicing the same themes, narratives, or opinions raised by these influence activities likely are engaging in First Amendment-protected activity, unless they are acting at the direction or under the control of a foreign threat actor. Furthermore, variants of the topics covered in this report, even those that include divisive terms, should not be assumed to reflect foreign influence or malign activity absent information specifically attributing the content to malign foreign actors.

| 12 | Homeland Threat Assessment | U.S. Department of Homeland Security |
|---|---|---|

China's COVID-19-related medical assistance to U.S. cities and states. China has doubled the number of official government posts disseminating false narratives about COVID-19 and has carried out persistent and large-scale disinformation and influence operations that correlate with diplomatic messaging.

- China most likely will continue amplifying narratives supportive of its pandemic response while denigrating U.S. official criticism that Beijing views as tarnishing its global image.

Iranian online influence actors are employing inauthentic social media networks, proxy news websites, and state media outlets to amplify false narratives that seek to shift responsibility for the COVID-19 pandemic to the United States and other Western nations. Tehran probably will continue to malign the United States for enforcing economic sanctions, arguing these sanctions hinder Iran's ability to put forward an appropriate public health response to the pandemic.

- Iranian actors have spread COVID-19 disinformation and false narratives through videos, cartoons, and news stories from state media outlets on popular social media platforms to appeal to U.S. and Western audiences.

- Iranian operatives have covertly used proxy networks and sites to advance narratives suggesting that the United States created the virus as a bioweapon, that Western media is spreading lies about COVID-19 in Iran, and that the Iranian response to the pandemic was better than that of the United States.

### 2020 U.S. Presidential Election

Ahead of the 2020 U.S. elections, adversaries are using covert and overt influence measures to try to sway U.S. voters' preferences and perspectives about candidates, political parties, policies, and the electoral process itself. Influence actors will adjust their goals and tactics as the election nears.

Russia uses online influence operations in its attempt to sway U.S. voter perceptions. As noted earlier, although some Russian influence activity appears to be in support of or in opposition to specific political candidates, Moscow's overarching objective is to undermine the U.S. electoral process and weaken the United States through discord, division, and distraction in hopes America becomes less able to challenge Russia's strategic objectives.

- Russian online influence actors have attacked

or praised multiple 2020 U.S. Presidential candidates—including candidates of both major political parties. Russia uses divisive measures to disrupt the electoral process—including denigrating former Vice President Biden and what it sees as an anti-Russia "establishment"—as part of a broader effort to divide and destabilize America. Russian online influence actors' have opined on a wide swath of socio-political issues relevant to the 2020 elections.

- Russian online influence actors probably will engage in efforts to discourage voter turnout and to suppress votes in the 2020 U.S. election using methods they have deployed since at least 2016. Before the 2016 U.S. Presidential election, Russian trolls directed messages at specific audiences with false information about the time, manner, or place of voting to suppress votes. Russian influence actors also posed as U.S. persons and discouraged African

### EVOLVING INFLUENCE TRADECRAFT AND TARGETING

Russian influence actors are evolving their methods of interacting with target U.S. audiences and obfuscating detection of their online influence activity.

- We expect that influence actors will evolve their ability to create and operate fake social-media accounts, thereby obfuscating their online influence activity.

- Russian influence actors likely will use U.S.-based servers and other computer infrastructure—including virtual private networks—to mask their location, obscure login activity, and prevent account banning.

- Russian influence actors probably will leverage artificial intelligence to automate the creation and distribution of memes with socially divisive messages on social media. Previously, Russian actors mass produced politically themed picture memes called "demotivators," some of which they produced under the guise of U.S. activist groups.

| Homeland Threat Assessment | U.S. Department of Homeland Security | 13 |

Americans, Native Americans, and other minority voters from participating in the 2016 election.

Ahead of the election, China likely will continue using overt and covert influence operations to denigrate the U.S. Presidential Administration and its policies and to shape the U.S. domestic information environment in favor of China. China will further use its traditional "soft power" influence toolkit—overt economic measures and lobbying—to promote U.S. policies more aligned with China's interests.

Iran will continue to promote messages supporting its foreign policy objectives and to use online influence operations to increase societal tensions in the United States. Tehran most likely considers the current U.S. Administration a threat to the regime's stability. Iran's critical messaging of the U.S. President almost certainly will continue throughout 2020.

Russian influence actors see divisive issues regarding the 2020 Census, such as the consideration of adding a citizenship question, as an opportunity to target a fundamental democratic process. In addition to potential cyber operations, Russia might use social media messaging—much like it does in the context of US elections—to attempt to discourage public participation in the census, to promote a loss of confidence in census results, or to undermine trust in public institutions.



**WE WORK AROUND THE CLOCK TO ENSURE THE MOST SECURE ELECTION IN HISTORY**

### *Influencing State and Local Governments*

Foreign governments—principally China—seek to cultivate influence with state and local leaders directly and indirectly, often via economic carrots and sticks such as informal and legal or social agreements that seek to promote cultural and commercial ties. Chinese officials calculate that U.S. state- and local-level officials enjoy a degree of diplomatic independence from Washington and may leverage these relationships to advance policies that are in China's interest during times of strained relations.

- China views a state or locality's economic challenges—including healthcare challenges due to COVID-19—as a key opportunity to create a dependency, thereby gaining influence. Beijing uses Chinese think tanks to research which U.S. states and counties might be most receptive to China's overtures.

- During the beginning of the COVID-19 outbreak, Beijing leveraged sister city relationships with U.S. localities to acquire public health resources. In February, Pittsburgh shipped its

sister city, Wuhan, 450,000 surgical masks and 1,350 coverall protective suits. Pittsburgh also established a GoFundMe account that raised over $58,000 to support Wuhan response efforts by providing medical supplies.

- In Chicago, Chinese officials leveraged local and state official relationships to push pro-Chinese narratives. Also, a Chinese official emailed a Midwestern state legislator to ask that the legislative body of which he was a member pass a resolution recognizing that China has taken heroic steps to fight the virus.

- The Chinese government invites U.S. officials and business leaders on carefully choreographed trips to China, promising them lucrative investment projects and business deals. Although visits this year largely have been postponed due to COVID-19, the Chinese government probably will continue to cultivate state and local relationships virtually and by offering enticements, which might include bailing out U.S. companies, investing in real estate in economically hard-hit areas, and selling medical equipment and supplies at reduced cost.

| 14 | Homeland Threat Assessment | U.S. Department of Homeland Security |

# Threats to U.S. Economic Security

## COVID-19 Effects on Economic Security and Health Security

The COVID-19 pandemic has destabilized U.S. supply chains and introduced opportunities for economic competitors to undermine the United States. This will lead to dramatic and sustained disruptions to the global economy and could challenge U.S. economic and supply chain security.

- In response to measures to control cross-border flows of people and goods, which have significantly disrupted international trade and supply chains, countries will invest in domestic industries and in countries they consider more reliable suppliers, considering the ability to control illicit activity and protect intellectual property rights. Varying social distancing and lockdown policies will continue to strain and disrupt goods supply chains at multiple levels.

- Access to personal protective equipment (PPE) and pharmaceuticals sourced from abroad or that depend on global supply chains will remain especially vulnerable to disruptions due to sustained demand, foreign government actions to secure these supplies for their countries' use, and the length of time required to reconstitute these production capabilities elsewhere.

- Counterfeiters and other malicious actors have exploited the high demand for essential goods during the outbreak by selling substandard or non-approved PPE, vitamins, medicines, and other goods to desperate customers, posing a threat to public health and undermining legitimate businesses. Many manufacturers and distributors have failed to verify that the goods they are selling meet performance specifications. China has been a particularly persistent source of such counterfeit goods.

- Targeting illicit Chinese manufacturers who produced and disseminated fraudulent or prohibited COVID-19 PPE and medical supplies to the United States has resulted in the seizure of over 1,000,000 FDA-prohibited COVID-19 test kits and 750,000 counterfeit masks.

- China is collecting information on U.S. supply chain shortages and is using the COVID-19 crisis to build additional leverage with the United States, given that Beijing controls many critical commodities. China could exploit future shortages of critical supplies by conditioning their provision on U.S. acquiescence in other matters important to Beijing.

The political nature of international critiques regarding COVID-19 responses may depress reporting in future public health crises. This highlights the importance of the Global Health Security Agenda and need for continued effort to drive increased participation.

- Several countries employed denial and deception efforts to conceal COVID-19 statistics and/or limit COVID-19 testing to maintain a low case count. Countries that were transparent in reporting their COVID-19 case count have occasionally been the subject of criticism by adversarial countries. These influence operations may induce countries to limit transparency during future outbreaks, increasing the risk that outbreaks will turn into pandemics as they will not be addressed robustly while still locally or regionally contained.

## Exploiting U.S. Academic Institutions and Research

China will continue seeking U.S. research and expertise vital to its economic and military advancement by using a wide range of government, non-government, and private actors and platforms. China—which has mobilized vast resources to support its industrial development and defense goals—will continue exploiting U.S. academic institutions and the visa system to transfer valuable research and intellectual property (IP) that Beijing calculates will provide a military or economic advantage over the United States and other nations.  Beijing uses some visiting professors, scholars, and students in the United States as non-traditional collectors (NTCs)—individuals who conduct their espionage-like activities by exploiting open systems rather than clandestinely—by virtue of their participation in targeted research and development activities. These NTCs most often include a subset of graduate- and post-graduate-level researchers studying in certain science, technology, engineering, and mathematics (STEM) fields. Although some NTCs are unwitting,

others are cognizant of their role and some have admitted to stealing research from U.S. institutions to advance Chinese research. These non-traditional collectors depart the United States and return to China, taking research and materials without the consent of the academic institutions, often deliberately hiding the material prior to their departure to prevent its detection.

- In January 2020, a Chinese post-graduate researcher in Boston was indicted for allegedly attempting to smuggle stolen vials of biological research; he stated that he planned to bring them to China to conduct research in his own laboratory and publish the results under his own name.

- In June 2020, a Chinese student was arrested at Los Angeles International Airport for visa fraud, having failed to disclose on his visa application that he was an Officer in the People's Liberation Army (PLA). During an outbound interview with U.S. Customs and Border Protection (CBP), he admitted to providing access to research from a California university to the PLA. He said that his supervisor—the director of his military university laboratory in China—instructed him to observe the university's layout and bring the information to replicate it in China.

China's government-run talent recruitment programs facilitate licit and illicit transfer of U.S. technology, IP, and know-how to further China's Science and Technology development and military modernization. The programs recruit overseas academics, scientists, and other experts and reward them for stealing proprietary information and delivering it to the Chinese government to gain an advantage over the United States. Recipient contracts in many cases require them to keep the terms secret and transfer IP rights to the sponsoring Chinese institution. Some program participants are incentivized or obligated to establish "shadow laboratories" in China that mirror their U.S. taxpayer-funded research to provide China with early insights into U.S. research before discoveries are shared globally. Several U.S. professors selected by these programs have been charged with crimes, including fraud and theft of trade secrets.

Now that the U.S. government is aware of these methods of exploiting academic institutions and research, Beijing's strategy will likely change. Considering the issuance of Presidential Proclamation 10043 banning the entry of certain students associated with China's military-civil fusion strategy—as well as increased awareness

by U.S. industry, academia, and local governments of China's tactics for acquiring technology and IP—we expect NTCs to adjust their methods, including by taking different paths to travel to the United States or shifting their studies abroad while still aiming to collect sensitive U.S. information and intellectual property.

### Foreign Investment in the United States

Although Chinese foreign direct investment in the United States over the last two years has decreased from record highs, China will continue to pursue select investment in the United States to gain new technologies that it cannot produce domestically, to develop its own industrial base, and to secure access to critical supply chains.

- Some Chinese firms will adapt to enhanced U.S. national security vetting of foreign direct investment—introduced as part of the Foreign Investment Risk Review Modernization Act (FIRRMA)—by using new types of investment structures and new legal methods. Foreign companies seeking to invest in U.S. businesses might bolster efforts to obfuscate their links to intelligence or security services, such as by using cutout organizations for acquisitions.

### Threats to U.S. Supply Chain Integrity

China and Russia will continue to represent the top threats to U.S. supply chain security, given the sophisticated intelligence and cyber capabilities they can use to infiltrate trusted suppliers and vendors to target equipment and systems. Criminal actors also will engage in efforts to compromise supply chains, with such methods as inserting malicious code in a third party's software to conduct operations against firms that use the software. Criminal and state actors also attempt to compromise supply chains through protectionist measures and by exploiting rapid procurement procedures at the local, state, and federal level during disasters.

- We are especially concerned about adversaries' exploitation of information and communications technology (ICT) supply chains given that the goods that rely on these supply chains play a vital role in most aspects of life. Some actors might exploit ICT through "white labeling"—rebranding equipment or altering equipment's visual appearance to obfuscate the original manufacturer—to get compromised goods into supply chains.

- As Chinese firms become more competitive globally and achieve market dominance in

key sectors, the United States will be less able to source and supply key goods and services that are not dependent on Chinese investment or suppliers.

•   The United States and other nations competing for globally scarce resources during disasters, will struggle to keep up with economies that lower quality standards and requisition U.S. subsidiaries manufacturing facilities to hoard supplies. During the COVID-19 outbreak, Chinese state-owned enterprises were encouraged to convert manufacturing without having the capacity or quality control to produce medical supplies and equipment. In addition to quality control issues, Chinese suppliers export products under one licensed company's name but source their products from second, third or fourth factories with little to no traceability down the chain of supply. In March, a Canadian manufacturer of face masks with factories in China, reported the Chinese government requisitioned all production and nothing was being exported.

•   China began accumulating critical medical supplies rather than ship them to buyers in other countries – indicating apparent knowledge of the outbreak and efforts to hoard critical medical supplies.

### *Violations of U.S. Trade Laws and Policies*

China will remain the leading source of U.S. trade policy violations. Actions by China-based criminal organizations will continue to present the principal challenge to U.S. enforcement of trade laws and policies in the year ahead, despite progress in U.S.-China negotiations aimed at addressing this issue.

•   Chinese entities' infringement on the IP rights of U.S. entities costs the U.S. economy as much as $600 billion annually and adversely impacts U.S. industries and competitiveness.

•   In Fiscal Year 2019, DHS seized more counterfeit goods originating from China than any other country. Counterfeit goods from China and Hong Kong pose the greatest challenge to IP enforcement and present health and safety risks to the public due to the sub-standard quality of most counterfeit products.



ECONOMIC SECURITY IS HOMELAND SECURITY

| Homeland Threat Assessment | U.S. Department of Homeland Security | 17 |

# The Terrorist Threat to the Homeland

Ideologically motivated lone offenders and small groups pose the most likely terrorist threat to the Homeland, with Domestic Violent Extremists presenting the most persistent and lethal threat. Foreign terrorist organizations will continue to call for Homeland attacks but probably will remain constrained in their ability to direct such plots over the next year. Iran will maintain terrorist capabilities, including through proxies such as Lebanese Hizballah, as an option to deter the United States from taking action Tehran considers regime-threatening.

### Violent Extremism in the United States

The primary terrorist threat inside the United States will stem from lone offenders and small cells of individuals, including Domestic Violent Extremists[6] (DVEs) and foreign terrorist-inspired Homegrown Violent Extremists[7] (HVEs). Some U.S.-based violent extremists have capitalized on increased social and political tensions in 2020, which will drive an elevated threat environment at least through early 2021. Violent extremists will continue to target individuals or institutions that represent symbols of their grievances, as well as grievances based on political affiliation or perceived policy positions.

The domestic situation surrounding the COVID-19 pandemic creates an environment that could accelerate some individuals' mobilization to targeted violence or radicalization to terrorism. Social distancing may lead to social isolation, which is associated with depression, increased anxiety, and social alienation. Similarly, work disruptions, including unexpected unemployment and layoffs, can also increase risk factors associated with radicalization to violence and willingness to engage in acts of targeted violence.

- Violent extremist media almost certainly will spread violent extremist ideologies, especially via social media, that encourage violence and influence action within the United States.

- Violent extremists will continue their efforts to exploit public fears associated with COVID-19 and social grievances driving lawful protests to incite violence, intimidate targets, and promote their violent extremist ideologies.

- Simple tactics—such as vehicle ramming, small arms, edged weapons, arson, and rudimentary improvised explosive devices (IEDs)—probably will be most common. However, lone offenders could employ more sophisticated means, to include advanced and/or high-consequence IEDs and using crude chemical, biological, and radiological materials.

- While ISIS and other Foreign Terrorist Organizations (FTOs) have called for attacks in the West using "all available means," biological-focused attempts would likely involve crudely produced toxins and poisons. Similarly, during the COVID-19 outbreak, domestic extremists have called for the spread of the SARS-CoV-2 virus through unsophisticated means. While significant expertise and infrastructure limits the threat by low-level actors, even rudimentary actions can result in economically significant costs and incite fear without a corresponding risk to health.

Some DVEs and other violent actors[8] might target events related to the 2020 Presidential campaigns, the election itself, election results, or the post-election period. Such actors could mobilize quickly to threaten or engage in violence. Violence related to government efforts to mitigate the COVID-19 pandemic and amidst otherwise ongoing lawful protests has exacerbated the typical

---

[6] *Domestic Violent Extremist (DVE): An individual based and operating primarily within the United States or its territories without direction or inspiration from a foreign terrorist group or other foreign power who seeks to further political or social goals wholly or in part through unlawful acts of force or violence. The mere advocacy of political or social positions, political activism, use of strong rhetoric, or generalized philosophic embrace of violent tactics may not constitute extremism, and may be constitutionally protected.*

[7] *Homegrown Violent Extremist (HVE): A person of any citizenship who has lived and/or operated primarily in the United States or its territories who advocates, is engaged in, or is preparing to engage in ideologically-motivated terrorist activities (including providing support to terrorism) in furtherance of political or social objectives promoted by a foreign terrorist organization (FTO), but is acting independently of direction by an FTO. HVEs are distinct from traditional domestic terrorists who engage in unlawful acts of violence to intimidate civilian populations or attempt to influence domestic policy without direction from or influence from a foreign actor.*

| 18 | Homeland Threat Assessment | U.S. Department of Homeland Security |

election-season threat environment.

- Some DVEs have heightened their attention to election- or campaign-related activities, candidates' public statements, and policy issues connected to specific candidates, judging from domestic terrorism plots since 2018 targeting individuals based on their actual or perceived political affiliations.

- Open-air, publicly accessible parts of physical election infrastructure, such as campaign-associated mass gatherings, polling places, and voter registration events, would be the most likely flashpoints for potential violence.

Among DVEs, racially and ethnically motivated violent extremists—specifically white supremacist extremists[9] (WSEs)—will remain the most persistent and lethal threat in the Homeland. Spikes in other DVE threats probably will depend on political or social issues that often mobilize other ideological actors to violence, such as immigration, environmental, and police-related policy issues.

- WSEs have demonstrated longstanding intent to target racial and religious minorities, members of the LGBTQ+ community, politicians, and those they believe promote multi-culturalism and globalization at the expense of the WSE identity. Since 2018, they have conducted more lethal attacks in the United States than any other DVE movement.

- Some WSEs have engaged in outreach and networking opportunities abroad with like-minded individuals to expand their violent extremist networks. Such outreach might lead to a greater risk of mobilization to violence, including traveling to conflict zones.

- Other racially or ethnically motivated violent extremists could seek to exploit concerns about social injustice issues to incite violence and exploit otherwise peaceful protests movements.

Another motivating force behind domestic terrorism that also poses a threat to the Homeland is anti-government/anti-authority violent extremism.

- These violent extremists, sometimes influenced by anarchist ideology, have been associated with multiple plots and attacks, which included a significant uptick in violence against law enforcement and government symbols in 2020. This ideology is also exploited by hostile nation-states, which seek to promote it through disinformation campaigns and sow additional chaos and discord across American society.

- Anti-government and/or anti-authority violent extremists are likely to be emboldened by a perceived success exploiting otherwise peaceful protest movements and concealing violent tactics. These violent extremists are increasingly



**Terrorist Attacks Posing a Threat to Life in the United States: 2018-2019**

This chart depicts DVE and homegrown violent extremists (HVEs) attacks in the US since 2018 that posed a threat to life, based on DHS data. 2019 was the most lethal year for domestic violent extremism in the United States since the Oklahoma City bombing in 1995. We are still evaluating data for incidents occurring in 2020. VEs perpetrated 16 attacks, killing 48, whereas HVEs conducted 5 attacks and killed 1 person. Among DVE actors, WSEs conducted half of all lethal attacks (8 of 16), resulting in the majority of deaths (39 of 48). All the DVE attackers had a dominant violent extremist ideology, with many motivated by multiple violent extremist ideologies or violent extremist ideologies unconnected to global violent extremist groups.

| Homeland Threat Assessment | U.S. Department of Homeland Security | 19 |

taking advantage of large protest crowds to conduct violence against government officials, facilities, and counter-protestors.

• We also remain particularly concerned about the impacts from COVID-19 where anti-government and anti-authority violent extremists could be motivated to conduct attacks in response to perceived infringement of liberties and government overreach as all levels of government seek to limit the spread of the coronavirus that has caused a worldwide pandemic.

• Ideologies driven by such DVE's often are reinforced by a variety of online content, including conspiracy theories and political commentary they view as controversial. Current events that DVEs perceive as infringing on their worldviews often contribute to periods of increased ideologically motivated violence, including recently during the COVID-19 pandemic and nationwide lawful protests.

• The domestic threat environment is rapidly evolving. Operational reporting shows that DHS law enforcement officers suffered over 300 separate injuries while they were present during months of nightly unrest in Portland, Oregon. This is but one example among many across the country, including in Brooklyn, New York, and Kenosha, Wisconsin, where law enforcement officers have been injured or killed.  These increasingly pervasive incidents highlight the threat of anarchist violence that has accelerated in our cities in recent months.

### Foreign Terrorist Threats

Foreign terrorist organizations (FTOs), including al-Qa'ida and the Islamic State of Iraq and ash-Sham (ISIS), will maintain interest in attacking the Homeland but we expect the primary threat from these groups to remain overseas in the coming year due to sustained U.S. counterterrorism pressure. Nevertheless, these groups can adapt quickly and resurge, and terrorists overseas will continue to probe for vulnerabilities in U.S. immigration and border security programs. Collectively, vulnerabilities may create an illegal migration environment that FTOs could exploit to facilitate the movement of affiliated persons towards the United States.

• The primary threat to the Homeland from FTOs probably will manifest as "inspired" attacks. FTOs seek to inspire violent extremism in the United States and continue to use social media and other online platforms to call for attacks against the United States. Despite territorial defeats in Iraq and Syria, ISIS continues to draw support from HVEs in the United States and the group's global calls for attacks have intensified since the death last year of senior leader Abu Bakr al-Baghdadi.

• Transportation infrastructure—especially the aviation sector—almost certainly will remain a primary target for terrorists plotting overseas. While terrorists continue to pursue flight school training and the use of insiders, plotting against domestic aviation targets most likely will remain aspirational among FTOs and their supporters over the next year.

• Terrorists and other criminal actors might look to unmanned aircraft systems (UAS) to threaten critical infrastructure. In 2019, there were nearly 4,000 reports of unique incidents of UAS activity near U.S. critical infrastructure or public gatherings. Although we have no indication that any of these events were terrorism-related, it is possible that malicious or criminal actors will turn to UAS tactics.

### Iran and Lebanese Hizballah

Iran will continue to develop and maintain terrorist capabilities as an option to deter the United States from taking what Tehran considers regime-threatening actions or to retaliate for such activity, real or perceived. The Government of Iran and its proxy, Lebanese Hizballah (LH), have demonstrated the intent to conduct an array of operations in the Homeland.  Iran or LH could advance an attack plot—with little to no warning—in response to heightened tensions. The U.S. Government in recent years has arrested several individuals acting on behalf of the Government of Iran or LH who have conducted surveillance indicative of contingency planning for lethal attacks in the U.S.

### Weapons of Mass Destruction and Other Chemical, Biological, Radiological, and Nuclear Threats

The overall global WMD threat will continue

---

[8] In this instance, and for the purposes of this report, "violent actors" refers to groups or individuals who facilitate or engage in unlawful acts of violence with the intent to cause serious bodily harm and/or damage to critical infrastructure.

[9] Homegrown White Supremist Extremist (WSE): A group or individual who facilitates or engages in acts of unlawful violence directed at the federal government, ethnic minorities, or Jewish persons in support of their belief that Caucasians are intellectually and morally superior to other races and/or their perception that the government is controlled by Jewish persons.

to rise in 2021. Spurred by continued capability expansion, modernization, low yield weapons development, eroding international norms, information proliferation, emerging drone concerns and increasing actor awareness; the risk of intentional chemical, biological, radiological or nuclear incidents in the homeland and abroad has likely increased.



- Biological threats (deliberate, accidental, and naturally occurring) are more diverse and continue to expand with increased global interconnectivity and rapid advances in biotechnology, genomics, and other legitimate-use capabilities that could introduce risks to global health and food security and the potential for adversaries to develop novel biological warfare agents. Notably, the biological agent attribution shortfalls coupled with the now known devastating impacts may lead to a resurgence of state and non-state biological weapon pursuits.

- Chemical threats are particularly notable as we continue in the most significant and sustained period of chemical weapons use in decades. The publicity of emerging chemical weapons compounds and increases in information availability is evolving the chemical threat landscape.  This global trend could manifest as an increased domestic threat.

- Radiological attacks are less likely, guidelines for hazards and safe handling of radiation sources reduce the likelihood of radiological attacks; however, actors driven by extremist ideology could pose a threat if they have knowledge and access of locations to aid radioactive materials acquisition. The major licensed users of radioactive material in the United States are in the energy, healthcare, and construction sectors with larger activity sources protected by physical security measures. The amount of radioactive material in use is not expected to increase in the short term.

- Nuclear threats remain enduring and will remain largely unchanged. The number of nuclear weapons states will probably remain unchanged over the next year. Concerns remain related to lower yield weapons development and regional expansion of nuclear capabilities by several nuclear weapons states and the subsequent increasing risks of weapons loss or nuclear conflict that could have global impacts. Non-state actors continue to face

significant barriers to acquiring special nuclear material for use in an improvised nuclear device, but vulnerabilities remain. Experts do, however, estimate the rate of nuclear security improvement around the globe has decreased since 2018. The COVID-19 pandemic has drawn government resources away from normal functions, similar to resource shifts observed globally in military and other defense sectors; nuclear security may also be vulnerable to resource shifts which could increase risks of theft or sabotage of nuclear facilities. Domestic and foreign-based non-state actors attempting to steal special nuclear material for use in a nuclear weapon will continue to pose a threat to the Homeland.

# TCO Threats to U.S. Security

Transnational Criminal Organizations (TCOs)—especially those based in Mexico—will continue to undermine public health and safety in the Homeland and threaten U.S. national security interests.  They represent an acute and devastating threat to public health and safety in the Homeland and a significant threat to U.S. national security interests. Beyond their complicity in the 71,000 drug overdose deaths in the U.S. last year, TCOs destabilize partner nations, decrease citizen confidence in good governance, foment corruption, and destroy confidence in the international banking system. Countering these organizations' malign activities will remain an enduring challenge to US safety and security. TCOs will continue to take advantage of illegal migration flows to enter the United States and attempt to exploit legal immigration avenues. Criminal elements attempting to provide a level of legitimacy to their illicit immigration claims by intermingling with migrants travelling to the US Southwest border pose an intrinsic risk to the U.S. lawful immigration system.

### Mexico-based Cartels

Among TCOs, Mexico-based cartels pose the greatest threat to the Homeland because of their ability to control territory—including along the U.S. Southwest Border—and co-opt parts of government, particularly at a state and local level. Although COVID-19 has disrupted some cartel operations, their ability to move large quantities of illicit goods into and throughout the Homeland remains largely intact.

- Of the Mexico-based TCOs, the Sinaloa and Jalisco New Generation Cartel (CJNG) networks pose the greatest cross-border drug smuggling threat in the near-term; they dominate the lucrative trafficking of cocaine, heroin, fentanyl, and methamphetamine to the United States.

- Mexican TCO fracturing, disruption of previous drug supply chains, and territorial disputes—especially over important cross-border plazas—almost certainly will lead to increased violence in Mexico, along the U.S. Southwest Border, in the year ahead. Mexican border states experienced nearly 12,000 homicides in 2019, most of which involved TCOs.

- As U.S.-based gangs—some of which provide

retail-level drug distribution and sales for Mexican TCOs—vie for access to new users, the United States may face increased criminal violence in some parts of the country. Social distancing lockdown measures, however, probably will moderate any increase in the near term, as opportunistic crimes become less frequent.

### Illicit Drugs

The COVID-19 pandemic has slowed the pace of drug trafficking into the United States; however, the threat of illicit drugs—including the rates of overdoses—will persist as traffickers adapt and drug compositions become more potent.  TCOs continue to distribute synthetic narcotics such as fentanyl and methamphetamine.

- Potent opioid narcotics like fentanyl and heroin almost certainly will continue to cause alarming levels of overdose in the United States over the next year.  The use of stimulant drugs like methamphetamine and cocaine will continue, and distributors will explore new markets in the United States beyond major transportation hubs and regional cities.

**JA262**

| 22 | Homeland Threat Assessment | U.S. Department of Homeland Security |

- TCOs engaged in the manufacturing of fentanyl and methamphetamine will likely experience mid-term disruption due to COVID-19 response measures that may hinder their receipt of chemicals from international suppliers. Production and transportation of heroin, cocaine, and marijuana also has been affected by travel restrictions and stay-at-home orders within the Western Hemisphere.

### Human Smuggling

Mexico-based cartels play an influential role in human smuggling, often facilitating illicit migration over and near the border. Mexico-based drug cartels control large sections of territory just south of the United States southwest land border and have traditionally taxed human smugglers and traffickers to move migrants through their areas of operation. Since the COVID-19 pandemic began, these criminal groups have continued efforts to facilitate the movement of migrants throughout most of their routes.

### Exploitation of Others for Profit

Criminal elements will continue to exploit others to facilitate their pursuit of illicit profits.

- Human trafficking—both sex trafficking and forced labor—remains a significant issue. Top threats include sex trafficking and juvenile sex

trafficking, domestic labor trafficking and indentured servitude, and goods imported into the United States that were produced by forced labor.  These illicit activities often have a nexus to criminal organizations, such as those operating illicit massage businesses or engaged in exploitation of migrant and undocumented populations.

- Child exploitation is also a significant issue. Top threats in this area include the proliferation of online Child Sexual Abuse Material, live streaming of child sexual exploitation, online enticement and extortion, and child sex trafficking.

- Criminal networks engage in multiple types of illicit financial activities to maintain affirmative control of their proceeds, including bulk cash smuggling, trade-based money laundering (TBML), third party money laundering (3PML), virtual currency-based money laundering and fraud, and transnational financial fraud schemes. The top threats in the illicit finance area are Chinese TCOs, money laundering organizations specializing in supporting drug trafficking organizations, Colombian money brokers, West African TCOs, and cyber hacking groups.



**JA263**

| Homeland Threat Assessment | U.S. Department of Homeland Security | 23 |

# Illegal Immigration to the United States

The duration and severity of the COVID-19 pandemic will shape migration to the U.S. Southwest Border into 2021, along with traditional push and pull factors stemming from weak economic and political conditions in the region. COVID-19's impact on Caribbean nations increases the chance of a mass migration event from Cuba or Haiti. Although the majority of migrants do not pose a national security or public safety threat, pathways used by migrants to travel to the United States have been exploited by threat actors. As a result, surges of migrants could undermine our ability to effectively secure the border without adversely impacting other parts of the immigration system.

## Illegal Immigration via Land

The duration and severity of the COVID-19 pandemic in the United States and within Central and South America and the Caribbean will shape illegal immigration to the U.S. Southwest Border, exacerbating the underlying economic and political conditions in the region. As COVID-19-related restrictions on mobility ease, we are seeing an increase in illegal immigration flows to pre-pandemic levels.

- Illegal immigration flows within the Western Hemisphere have begun to increase after a short-term decline in response to the world-wide COVID-19 pandemic and countries instituting border transit restrictions. Over the medium term, mass migration might occur if the economies of the Caribbean, Central and South American countries continue to decline and if the health and humanitarian response capabilities continue to deteriorate due to COVID-19. Mass migration especially might occur if these negative conditions are coupled with an economic resurgence in the United States.

- COVID-19-related international travel restrictions that many countries have instituted have curtailed some illegal immigration from outside the Western Hemisphere. When these measures are lifted, there will be sporadic illegal immigration into and through the region.

- Weak job markets, high crime rates, and governmental or non-state repression will remain key drivers of U.S.-bound migration from the Caribbean and Central and South America, especially as COVID-19-related citizen mobility restrictions ease in the region. Seasonal weather changes and perceptions of U.S. and Mexican immigration and enforcement policies and measures also will shape migration patterns as inter-governmental division and inconsistent messaging continue to impede Congressionally mandated immigration enforcement policies.

## Human Trafficking

Human traffickers continue to use force, fraud, and coercion against millions of victims worldwide, as many of them attempt to gain entry to the United States via the southwest land border. Many victims never seek assistance from law enforcement because of language barriers, fear of retaliation from their traffickers and/or fear of law enforcement. This allows traffickers to force victims into labor or commercial sexual exploitation. Traffickers continue to target people they believe to be susceptible for a wide variety of reasons including but not limited to psychological or emotional vulnerability, economic hardship, natural disasters, political instability or a lack of a social safety net.

- Increased illegal immigration to the U.S. Southwest Border will require United States Citizenship and Immigration Services (USCIS) to re-examine how resources are properly aligned at the Southwest Border, likely impacting the larger asylum system. Increasing numbers of

**JA264**

| 24 | Homeland Threat Assessment | U.S. Department of Homeland Security |
|---|---|---|

apprehensions will lead to an increased number of fear claims, requiring USCIS to dedicate additional resources to protection screenings and away from addressing case backlogs such as the asylum case backlog.

• Social distancing requirements could continue to affect work taking place in detention facilities along the Southwest border. Budgetary impediments towards immigration enforcement and lack of bipartisan support of detention measures continue to undermine U.S. immigration enforcement policies. Such inconsistent practices continue to lead to the release of dangerous criminal aliens and absconders who may then commit additional crimes when they might otherwise have been expeditiously detained and removed from the United States.

• Since 2014, DHS has experienced repeated illegal immigration surges at the Southwest Border. DHS anticipates that the number of apprehensions at the border will significantly climb post-pandemic, with the potential for another surge as those who were previously prevented from seeking entry into the United States arrive at the border and as poor economic conditions around the world fuel migration. This high volume of illegal immigration, including unprecedented numbers of family units and unaccompanied alien children arrivals, stretch government resources, and create a humanitarian and border security crisis that cripples the immigration system.

• Record migration at the Southwest Border took up limited U.S. Immigration and Customs Enforcement (ICE) detention resources, drove increases in the agency's average daily population (ADP), resulted in decreased interior arrests (including arrests of criminals), and forced ICE to balance its critical public safety mission in the interior with its support for DHS efforts to secure the border. As the pandemic subsides, ICE will conduct additional enforcement operations to uphold its public safety mission and address the growing fugitive backlog.

• DHS projects that until fundamental changes are made to the immigration enforcement process, including legislation that addresses current legal loopholes that incentivize high levels of illegal immigration, the United States will periodically experience additional humanitarian and border security crises.



### *Illegal Immigration at Sea*

The impact of COVID-19 very likely will affect maritime migration from both migrant origin and transit countries in the Caribbean through 2021. Weak socio-economic conditions in Cuba, political instability and food insecurity in Haiti, and the uncertainty of COVID-19 impacts in the region will increase the chances of a maritime mass migration event, although the overall risk remains low.

• Interviews of interdicted migrants reveal that some still desire to come to the United States, regardless of the risk posed by COVID-19, rather than face the deteriorating economic conditions in their home countries.

• Measures such as border closures, quarantines, and a reduction in legitimate vessel traffic can disrupt migrant flows; however, increased food insecurity and unemployment, reduced economic opportunities, a lack of medical infrastructure, and other second- and third-order effects in migrants' home countries serve as likely push factors resulting in increased maritime migration to the United States.

• In the event of increased maritime migration, the U.S. Coast Guard and USCIS will need to increase interdiction and screening resources in the region. This could result in the reallocation of limited resources, impacting the ability to conduct other operations.

Homeland Threat Assessment                    U.S. Department of Homeland Security                    25

# Natural Disasters

Natural disasters—which refer to all types of severe weather, including floods, earthquakes, hurricanes, wildfires, and winter storms—remain an ongoing threat to the nation. These disasters pose a significant threat to human health and safety, property, critical infrastructure, and homeland security while subjecting the nation to frequent periods of insecurity, disruption, and economic loss. Over the last year, the United States has faced the COVID-19 crisis while simultaneously dealing with numerous natural disasters. These natural disasters require the Department to readjust its priority focus, as resources continue to be reallocated to focus on responding to multiple natural disasters, while continuing to handle its traditional roles and responsibilities.

## Hurricanes

Hurricanes pose a persistent hazard to life and property.  DHS assesses that hurricanes will continue to pose a hazard for the United States and its territories in the coming months. While their individual impact varies based on the intensity and duration of the storms, hurricanes are one of nature's most destructive forces, which can cause enormous damage and may precipitate mudslides, flash floods, storm surges, and wind and fire damage.  Severe weather events associated with hurricanes can have widespread impacts across multiple states, take lives, damage or destroy property, and impact the nation's economic capability. They have the potential to overwhelm the emergency response and recovery capabilities of the affected state(s) and may require the sustained deployment of Federal assets.

- The 2020 season has been the second most active Atlantic hurricane season on record, behind only the 2005 season.  This season was the first to see seven named tropical cyclones make landfall in the continental United States before September, which became the most active September on record with 10 tropical or subtropical storms.

- As a result of the COVID-19 pandemic, the Nation continues to face unprecedented challenges as we respond to the compounding issues surrounding the 2020 hurricane season. Although the operating environment has changed the mission of helping people before, during, and after disasters remains the same. Federal, state, local, tribal, and territorial officials, along with the private sector and non-governmental organizations, must continue to partner together to fulfill their respective missions and help disaster survivors.

## Wildfires

Wildland fires pose a major threat to lives, property, and ecosystem integrity. Wildfires increase the likelihood of adverse impacts, including flooding, erosion, reduced water quality, loss of key wildlife habitat, and other ecological and economic impacts.

- Thus far in 2020, there have been 94 large fires, which have burned approximately 5.37 million acres throughout the West.  September alone saw 87 large fires burning simultaneously uncontained from the West Coast to the Rocky Mountains, with over 25 Fire Management Assistance Grants approved. Wildfires not only pose a threat to key infrastructure, housing, and public safety but also contribute to poor air quality.

- Efforts to undertake better and more active land management will be needed at every level of government in order to reduce the annual threat of wildfires.  Such challenges cannot be addressed simply within the federal government, but must also involve state and private actors to better prepare to minimize the impacts of wildfires.



**Homeland Security**

WITH HONOR AND INTEGRITY, WE WILL
SAFEGUARD THE AMERICAN PEOPLE, OUR
HOMELAND, AND OUR VALUES

www.dhs.gov

**NEW YORK STATE ASSEMBLY**
**MEMORANDUM IN SUPPORT OF LEGISLATION**
**submitted in accordance with Assembly Rule III, Sec 1(f)**

**BILL NUMBER:** A7865

**SPONSOR:** Fahy

**TITLE OF BILL**:

An act to amend the general business law, in relation to requiring
social media networks to provide and maintain mechanisms for reporting
hate speech on their platform

**PURPOSE**:

This legislation would require social media networks to provide and
maintain mechanisms for reporting hate speech on their platform

**SUMMARY OF PROVISIONS**:

Section 1 adds a new section to the general business law. Specifically
this legislation defines hate speech as a public expression, either
verbally, in writing or through images, which intentionally makes a
statement about a group of persons because of race, ethnicity, national-
ity, religion or beliefs, sexual orientation, gender identity or phys-
ical, mental or intellectual disability.

This section also defines social media networks, and requires them to
maintain a mechanism for individual users to report and make complaints
of hate speech. These mechanisms shall be clearly accessible to users
and must be easily accessed from both apps and websites Further, Each
social media network will have to create a clear and concise policy
which includes how a social media network will respond and address inci-
dents of hate speech which have been reported. Such policy shall include
a mechanism to provide a direct response to an individual who has
reported possible hate speech and how the matter is being handled.
Section 2 is the effective date.

**JUSTIFICATION**:

This legislation is part of a package aimed at addressing concerns about
misinformation that is spread on social media networks. New Yorkers are
all familiar with the expression "If you see something, say something,"
but unfortunately many virtual social media platforms make the process
of "saying something" confusing at best, and impossible at worst. This
legislation seeks to empower users of social media to keep virtual spac-
es safer for all by providing clear and consistent reporting mechanisms
for instances of hate speech

**LEGISLATIVE HISTORY**:

None.

**FISCAL IMPLICATIONS**:

**JA268**

None

**<u>EFFECTIVE DATE</u>**:
This act shall take effect on the one hundred eightieth day.

**JA269**

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK


EUGENE VOLOKH, RUMBLE CANADA
INC., and LOCALS TECHNOLOGY
INC.,                                : Docket #
                                       1:22-cv-10195-ALC
                      Plaintiff,     :

       -against-                     :

LETITIA JAMES, in her official
capacity as Attorney General of
New York,                            : New York, New York

                      Defendant.

-------------------------------:

                  PROCEEDINGS BEFORE
           THE HONORABLE ANDREW L. CARTER
                UNITED STATES DISTRICT
```

```
APPEARANCES:

For Plaintiff:        FOUNDATION FOR INDIVIDUAL
                      RIGHTS AND EXPRESSION
                      BY:  DANIEL ORTNER, ESQ.
                           DARPANA MUKUND SHETH, ESQ.
                           JAMES MICHAEL DIAZ, ESQ.
                           JARED MIKULSKI
                      510 Walnut Street, Suite 1250
                      Philadelphia, Pennsylvania 19106



                      LIPSITZ GREEN SCIME CAMBRIA LLP
                      BY:  BARRY COVERT, ESQ.
                           42 Delaware Street, Suite 120
                           Buffalo, New York 14202




For Defendant:        NEW YORK STATE OFFICE OF
                      THE ATTORNEY GENERAL
                      BY:  SETH J. FARBER, ESQ.
                           KATHERINE R. JANOFSKY, ESQ.
                           RICHARD W. SAWYER, ESQ.
                      28 Liberty Street
                      New York, New York 10005



Transcription Service: Marissa Mignano Transcription
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

<u>INDEX</u>

E X A M I N A T I O N S

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

E X H I B I T S

| Exhibit<br><u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1              THE DEPUTY CLERK:  Good afternoon.  This is
 2    Tara, Judge Carter's deputy.  Who just joined the
 3    call, please?
 4              MR. FARBER:  Good afternoon.  This is Seth
 5    Farber from the Attorney General's office.  With me
 6    is Kate Janofsky.
 7              MS. JANOFSKY:  Good afternoon.
 8              THE DEPUTY CLERK:  Thank you, Mr. Farber.
 9    Thank you, Ms. Janofsky.
10              And someone else is on the line?
11              MR. SAWYER:  This is Rick Sawyer, also from
12    the Attorney General's Office.
13              THE DEPUTY CLERK:  Thank you, Mr. Sawyer.
14    Is there anyone else?
15              MR. SAWYER:  Thank you.
16              THE DEPUTY CLERK:  Good afternoon.  This is
17    Tara, Judge Carter's deputy.  Who just joined the
18    call, please?
19              MS. GANS:  Hi.  This is Courtney Gans,
20    Judge Carter's law clerk.
21              THE DEPUTY CLERK:  Good afternoon,
22    Courtney.
23              Is there any other counsel on the line
24    whose name I did not take at this time?  Thank you.
25              Good afternoon.  This is Tara, Judge
```

```
1    Carter's deputy.  Who just joined the call, please?
2              MR. ORTNER:  Good afternoon.  This is
3    Daniel Ortner on behalf of the plaintiffs.
4              THE DEPUTY CLERK:  Thank you, Mr. Ortner.
5              Mr. Ortner, how do you pronounce the last
6    name of the first plaintiff listed, please?
7              MR. ORTNER:  Eugene Volokh.
8              THE DEPUTY CLERK:  Volokh.  Thank you, sir.
9    Do you have cocounsel --
10             MR. ORTNER:  I'm sorry, could you repeat
11   your question?  I apologize.
12             THE DEPUTY CLERK:  Will you be having
13   cocounsel joining you, Mr. Ortner?
14             MR. ORTNER:  Yes, several of my colleagues
15   are going to be joining.  I can -- do you want me to
16   give you their names or do you want to wait until
17   they join?
18             THE DEPUTY CLERK:  I'll wait until they
19   join.
20             Good afternoon.  This is Tara, Judge
21   Carter's deputy.  Who just joined the call, please.
22             THE COURT:  Hi, Tara.  It's Judge Carter.
23             THE DEPUTY CLERK:  Hi, Judge.
24             Good afternoon.  This is Tara, Judge
25   Carter's deputy.  Who just joined the call, please?
```

```
 1              MR. ROSS:  Yes, this is Michael Ross.
 2    Member of the public.
 3              THE DEPUTY CLERK:  Thank you, Mr. Ross.
 4    You can just put your phone on mute.
 5              MR. ROSS:  Will do.
 6              THE DEPUTY CLERK:  This is Tara, Judge
 7    Carter's deputy.  Who just joined the call, please?
 8              MR. CASTILLO:  Hi, Tara.  This is Julio
 9    Castillo, Judge Carter's law clerk.
10              THE DEPUTY CLERK:  Hi, Julio.
11              Do we have any additional counsel on the
12    phone as of yet for the plaintiffs?
13              MR. ORTNER:  I don't know who has joined.
14    I know there's a few that -- a few that are planning
15    to join, but I haven't heard them join yet.
16              THE DEPUTY CLERK:  Okay.  Thank you.
17              Hello.  Good afternoon.  This is Tara,
18    Judge Carter's deputy.  Who just joined the call,
19    please?
20              MS. SHETH:  This is Darpana Sheth from
21    FIRE.
22              THE DEPUTY CLERK:  Thank you, Ms. Sheth.
23    Who else just joined?
24              MR. ELLIS:  Michael Ellis from Rumble
25    Canada and Local Technology, Inc.
```

JA275

```
1              THE DEPUTY CLERK:  Thank you, Mr. Ellis.
2              Good afternoon.  This is Tara, Judge
3    Carter's deputy.  Who just joined the call, please?
4              MR. DIAZ:  This is James Diaz on behalf of
5    plaintiffs.
6              THE DEPUTY CLERK:  Thank you, Mr. Diaz.
7              Mr. Ortner, is that everyone, sir?
8              MR. ORTNER:  I believe that Barry Covert,
9    who's the New York based local counsel, should be
10   joining as well.  I'm not sure if he's been on the
11   call yet.
12             THE DEPUTY CLERK:  No, he hasn't joined as
13   of yet.  I'll give him --
14             Good afternoon.  This is Tara, Judge
15   Carter's deputy.  Who just joined the call, please?
16             MR. MIKULSKI:  Hi.  Yes, my name is Jared
17   Mikulski.  I am a litigation fellow at FIRE.
18             THE DEPUTY CLERK:  You just called to
19   listen to the argument today, sir?
20             MR. MIKULSKI:  Correct.
21             THE DEPUTY CLERK:  Okay.  If you can just
22   place the phone on mute.
23             MR. ORTNER:  He's with plaintiffs, although
24   he's not on the briefs but -- not admitted, but he's
25   with us -- with FIRE.
```

```
 1              THE DEPUTY CLERK:  That's fine.  He can
 2    just place his phone on mute.  Thank you.
 3              Good afternoon.  This is Tara, Judge
 4    Carter's deputy.  Who just joined the call, please?
 5              MR. COVERT:  Barry Covert.
 6              THE DEPUTY CLERK:  Thank you, Mr. Covert.
 7              So, counsel, this oral argument -- this
 8    telephone -- telephonic oral argument is being
 9    recorded.  So I ask that each time when you address
10    the Court, please state your name prior to speaking
11    and when you're not addressing the Court, to please
12    place your phone on mute.  Thank you.
13              Civil cause for a telephone oral argument
14    on the motion for preliminary injunction in case
15    number 22-CV-10195, Volokh, et al. vs. James.
16              Counsel, please state your appearances.
17              For the plaintiff.
18              MR. ORTNER:  Thank you.  My name is Daniel
19    Ortner, here on behalf of the plaintiffs, Eugene
20    Volokh, Rumble Canada, Inc., and Locals Technology,
21    Inc.
22              MR. COVERT:  Good afternoon.  This is Barry
23    Covert.  I'm also attorney for the plaintiff.
24              THE DEPUTY CLERK:  Mr. Diaz, if you're
25    speaking, we can't hear you, sir.
```

```
 1              MR. DIAZ:  Yes.  This is James Diaz,
 2    attorney for plaintiffs.
 3              THE DEPUTY CLERK:  And Ms. Sheth?
 4              MS. SHETH:  Yes.  This is Darpana Sheth,
 5    attorney for plaintiff.
 6              THE DEPUTY CLERK:  Thank you.
 7              And for the defendant.
 8              MR. FARBER:  Good afternoon.  This is Seth
 9    Farber, special litigation counsel with the Office
10    of the New York Attorney General appearing for the
11    defendant, Leticia James in her official capacity as
12    Attorney General.
13              With me are --
14              MS. JANOFSKY:  Katherine Rhodes Janofsky,
15    attorney for defendant.
16              MR. SAWYER:  And I'm Rick Sawyer, special
17    counsel with the Office of the Attorney General for
18    defendant.
19              THE DEPUTY CLERK:  Thank you.
20              THE COURT:  Hi.  Good afternoon.  We're
21    here for oral argument related to the preliminary
22    injunction issue.
23              Here's how we'll proceed.  I have some
24    specific questions that I'll pose to the parties.
25    And then at the end of that, I'll give each side an
```

```
1    opportunity to make any brief oral argument they
2    would like to make, touching upon any of those
3    issues that were not addressed in the questions, or
4    if they want to more fully expand on that.  I'll
5    give each side seven minutes at the end of my
6    questions.  Hopefully, the questions are such that
7    it may obviate the need for much oral argument.
8    We'll have the plaintiffs go first for oral
9    argument, followed by the defendants.
10          But first, let me ask my questions.  First
11   question is that there seems to be some disagreement
12   over what the law actually does.  Can both parties
13   just briefly explain their interpretation of the new
14   law?
15          Let me hear from plaintiffs first, and then
16   I'll hear from defendant.
17          MR. ORTNER:  Sure.  Thank you, Your Honor.
18          We read the law as, at a minimum, requiring
19   three things from plaintiffs and other social media
20   networks.  The development of a policy dealing with
21   how they will respond to state-defined hate speech,
22   hateful conduct as the State has defined, and the
23   posting of that policy -- the publishing of that
24   policy on their website in a clear and accessible
25   location.  Second, a mechanism for reporting hateful
```

1    conduct on the website, which would include a way to

2    respond to that.  And third, we read the law as

3    requiring a response based on the plain reading of

4    the text as well, that there is a response

5    requirement that's presumed in the text of the

6    statute.  So we see at least those three

7    requirements.  And then we also point to some of the

8    language, the title of the law, the Attorney

9    General's remarks and reports as suggesting that

10   there's possibly a greater expectation of even

11   removing content with a concomitant threat of action

12   from the Attorney General if content is not removed.

13          But at the very minimum, the three things

14   that we believe are required is the policy, the

15   report mechanism and the response requirements.

16          THE COURT:  Okay.  Let me hear from the

17   defendants what's your view on what the law actually

18   does?

19          MR. FARBER:  Thank, Your Honor.

20          In effect, the law requires two things.

21   The first is that it set up a mechanism for users of

22   a site to report complaints of online hateful

23   conduct to the operator of the website.  And part of

24   that mechanism is a mechanism to respond to reports

25   of those complaints.  We do not believe that the

1    statute actually requires a response to the

2    complaint, although it does require that the

3    mechanism that allows for a report does provide a

4    mechanism for a response.  And second, it does --

5    the statute does require the posting of a policy as

6    to how the site operator intends to respond or if it

7    intends to respond to complaints and reports of

8    online hateful conduct that are brought to its

9    attention.

10          So there's some disagreement -- some

11   disagreement -- some agreement and some disagreement

12   on what the meaning of the statute is.  But our view

13   is the reporting mechanism and the policy are what

14   the statute requires.  Anything beyond that is not

15   required by the statute.

16          THE COURT:  Okay.  So let me ask this

17   question.  It seems that there is still a

18   disagreement as to whether a response is required

19   and what that response must be if it is required.

20          Let me ask plaintiffs this question.  Would

21   it be within the purview of the law for the

22   plaintiffs to state on their website that you have

23   this mechanism to complain?  If you have a

24   complaint, you should email this address, but you

25   should understand that we take the First Amendment

```
1    seriously, and we may or may not respond to your
2    request.  That's one option.  Another option --
3    that's option one.
4         Option two could be an automated response
5    that says, yes, we've received your complaint, and
6    then either we are going to consider it or we won't
7    consider it.  If you don't hear back from us in a
8    certain number of days, understand we're not going
9    to do anything about it.  Or it could simply be an
10   automated response that says, we received your
11   complaint, period.
12        It doesn't seem to me that there is a
13   necessity that any response, if one is required,
14   must be specifically tailored to the user's
15   complaint.  But let me hear from plaintiffs on that
16   in terms of those options.
17        MR. ORTNER:  Sure.  So first of all, the
18   first option that you mentioned, the we may or may
19   not respond, I think that opposing counsel in their
20   opposition brief suggests that all you could say is
21   we don't respond to any complaints.  That's like --
22   a general policy like that.  I don't think that
23   would be enough as far as the hate-speech policy
24   goes because if you look at the language of the
25   statute, it requires a clear -- clear policy that
```

```
 1    states how they will respond and address their
 2    reports of incidents of hateful conduct on their
 3    platform.  So I think at the very least it requires
 4    specific statement from the site of how they will
 5    respond to the speech that the State has identified
 6    in the statute as hateful conduct.  So just like a
 7    very general statement, like we may or may not
 8    respond to any reports, feel free to submit them.
 9    We don't read the stat- -- sufficient because of
10    that language that they have to have a clear policy
11    about how they will respond specifically to
12    incidents of hateful conduct.  And I think because
13    of the we'll respond language in section -- in
14    subsection 3, sites are going to read that --
15    reasonably read that as requiring an affirmative
16    substantive response to posts.  And that's going to
17    put pressure on them to do so.  Put a burden on them
18    that will pressure them to want to take the content
19    down in the first place so they don't have such an
20    obligation.  And I would just point the Court to the
21    fact that we had to bring a lawsuit to have the
22    Attorney General clarify and say no response is
23    required.  That puts -- chills First Amendment
24    activity for websites that are going to read the
25    law.  I think reasonably so, does it require a
```

```
 1    response, as it says.  Will -- you know, the policy
 2    has to say how they will respond and address.  And
 3    then in Subsection 5 -- sorry, Subsection 4, where
 4    it says what they could be held liable for, it
 5    mentions receiving -- receive a response on such
 6    report.  And so I think a reasonable reading for a
 7    website would be we have to respond, we have to have
 8    every individual receive a response on the report
 9    and if we don't, we're going to be investigated and
10    fined by the Attorney General.  That chills First
11    Amendment protected activity on these websites.
12            THE COURT:  Let me ask plaintiff this.
13    Why -- if the policy that the social media platform
14    adopts says that this is how we will respond, we
15    will ignore it.  This is how we will address it, we
16    will ignore it.  Doesn't that comply with the law?
17            MR. ORTNER:  I think that the law is
18    ambiguous and open-ended enough to -- that a
19    plaintiff -- a website would reasonably believe that
20    an obligation, especially if you look at some of the
21    language we cite in our brief from the Attorney
22    General and from the legislative history.  For
23    instance, the governor, you know -- when the press
24    conference signing the law said that the Attorney
25    General will be championing this cause of every
```

1   power her office can bring in at her disposal.  The

2   floor debate emphasized that we have an active

3   Attorney General.  I think -- that the language

4   pointing to that the Attorney General is going to --

5   actively be applying this to the fullest power that

6   she's been given.  And so in light of that, this law

7   has a -- those languages.  If it is an ambiguity, we

8   think it's the best reading.  But even if it's

9   ambiguous, it chills protected activity.  It

10  pressures these sites to take down this content to

11  avoid investigation, to avoid stepping -- writing

12  afoul of what the Attorney General is going to do.

13          THE COURT:  Okay.  Thank you.  Let me ask

14  this question to both parties.  We'll start with

15  defendants first.

16          Can you address the title of the law?

17  Because the title indicates that the law will

18  prohibit hateful conduct, but that doesn't seem to

19  comport with the text of the actual law.  Can you

20  address that, defense counsel?  And then I'll give

21  plaintiffs' counsel an opportunity to address that.

22          MR. FARBER:  Sure.

23          No, Your Honor is absolutely right on that.

24  The title of 394-CCC is Social Media Networks

25  Hateful Conduct Prohibited.  I cannot speak to why

1    it was titled that.  I can tell you that the text of

2    the operative statute itself deals with the two

3    points I made, the reporting mechanism and the

4    policy.

5            So in this case, this is a pretty

6    unambiguous statute as to what it requires as far as

7    a reporting policy and a reporting policy and the

8    reporting mechanism.  So in that sense, we cited

9    some cases for the proposition that under these

10   circumstances, the title just does not preempt or

11   override what the plain text of the statute does.

12   So, as I said, I can't speak to why it's called

13   that, but no hateful conduct as described in this

14   statute is actually prohibited by the statute.

15   Thank you.

16            THE COURT:  Okay.  Let me hear from

17   plaintiffs' counsel.

18            MR. ORTNER:  Sure.  Your Honor, with the

19   First Amendment, there's a real fear of a chilling

20   effect on First Amendment activity.  The First

21   Amendment is there to protect against that chill.

22   And so the title is another piece of that chilling

23   effect that this law has on plaintiffs and other

24   social media networks.  So, you know, the

25   combination, again, of the title, the language in

```
1    the Attorney General's report, the finding
2    statements, the floor debates, all very clearly
3    suggest that there's more being demanded than simply
4    stating a policy of we won't do anything about
5    speech.
6            I really want to point Your Honor to the
7    Bentham Books case that we discuss in our opening
8    brief.  This combination of the kind of carrot and
9    stick, the you do need to do this, and if you don't,
10   we're going to hammer down on you and take action
11   against you and investigate you and pass additional
12   policies that are going to regulate you further.
13   That violates the First Amendment in and of itself.
14   That combination, that's what's really happening in
15   this case with the law and the title.  And all these
16   pieces together are putting pressure on plaintiffs
17   and others and chilling their First Amendment
18   activity.  And so that, at the very least, title
19   plays that role of, again, hitting -- you know,
20   suggesting the plaintiffs that they have to act or
21   there's going to be consequences for the failure to
22   act.
23           THE COURT:  Okay.  Let me ask defense
24   counsel this question.  Can you articulate why, in
25   your view, this law does not regulate speech?  You
```

1    indicate that you think this regulates conduct but

2    not speech.  Can you elucidate that a little bit

3    more?

4         MR. FARBER:  Yes, Your Honor.

5         It does not require the removal, the

6    moderation, indeed the regulation of any speech

7    that's on any of the plaintiffs' websites, or indeed

8    on anyone's website.  What it does is it affords a

9    channel that in some cases may already exist for

10   those entities that already post a means to

11   facilitate complaints being brought to their

12   attention.  It mandates that.  In this case, it

13   mandates a specific category of complaints.  But the

14   statute does not limit what the platform for

15   complaints shall be limited to.

16        Similarly, it does require the posting of a

17   policy which may well constitute speech of a kind,

18   but it's commercial speech.  The policy would

19   presumably be truthful.  It would presumably be the

20   website's factual policy as to how they intend to

21   deal with these responses.  And that's it.  We are

22   not regulating speech.  The definition of hateful

23   conduct is simply a guide to users who may want to

24   bring complaints of what they perceive as hateful

25   conduct to the website operator.  The website

```
1    operator may have a completely different definition
2    of hateful conduct, or the website operator may not
3    believe that there is such a thing as online hateful
4    conduct, and they can either respond or not respond
5    as they see fit, and they are welcome to have that
6    as their policy, or indeed any policy they want.  As
7    we showed in our brief, the legislative history was
8    quite consistent with broad discretion on the part
9    of the website operators as to how or if they want
10   to respond to these complaints.  So Your Honor was
11   absolutely right in suggesting that the possibility
12   of no response complies with this law.
13           Thank you.
14           THE COURT:  But let me ask defense counsel
15   this follow up.
16           MR. FARBER:  Sure.
17           THE COURT:  The law doesn't -- it would be
18   one thing if this was a law that said social media
19   platforms must have a policy for users to complain
20   about content, period.  But this law targets a
21   certain category of speech, hate speech, and it
22   targets a particular category of speech and a
23   particular viewpoint in terms of those people who
24   the speech is pointed at.  How does that change the
25   consideration and how does that not then burden
```

```
 1    speech?
 2            It'd be one thing if this was a very
 3    neutral policy that simply said you must have a
 4    policy -- you must have a methodology for users to
 5    complain about content, but it specifies a certain
 6    type of speech.  Would you agree that the hate
 7    speech is, in fact, speech?  And if so, how should I
 8    analyze that?
 9            MR. FARBER:  Well, first of all, Your
10    Honor, we do take issue with the term hate speech,
11    which is not at all found within the statute,
12    notwithstanding that that's plaintiffs'
13    characterization.  The statute speaks to hateful
14    conduct.  Our reading on this is that the complaint
15    mechanism sets a floor.  At a minimum, the website
16    is obliged to take complaints of hateful conduct.
17    If the website wants to take all manner of
18    complaints through the same facility, as long as
19    hateful conduct is permitted to be conveyed to them,
20    we believe the statute is complied with.
21            So in that sense, Your Honor, it's actually
22    much closer to the hypothetical you suggested than
23    it is to plaintiffs' version on this.  Nonetheless,
24    the legislature believed it was important in this
25    era of increasing violent incidents, some of which
```

```
 1    are linked to the web, to facilitate this kind of
 2    complaint and communication mechanism.
 3              Thank you.
 4              THE COURT:  Okay.  Thank you.
 5              But I guess the concern I have is that in
 6    the statute, the definition of hateful conduct means
 7    the use of a social media network to vilify,
 8    humiliate, or incite violence against a group or
 9    class of persons on the basis of race, color,
10    religion, ethnicity, national origin, disability,
11    sex, sexual orientation, gender identity, or gender
12    expression.  Again, it's only specifying this
13    "conduct" as it relates to certain groups of people.
14    And it's one thing if this is prohibiting the use of
15    a social media network to incite violence.  If we're
16    talking about true threat, those things are not
17    protected by the First Amendment.  But to humiliate
18    or vilify a group of people seems to me to be
19    something that's protected by the First Amendment.
20              Let me hear from defendants on that.
21              MR. FARBER:  Sure.  We are not disagreeing
22    that some humiliating speech, to the extent it
23    doesn't involve inciting a violence or, you know,
24    arguably the fighting words or obscenity the
25    standards that have been deemed not to be protected
```

1   speech, may well constitute protected speech.  The

2   point of this statute is that there's no consequence

3   to the website.  They do not have to take it down.

4   The State is not mandating you must take it down,

5   you must put a warning label on it, you must

6   discipline the poster, or you must do anything.

7   This is a complaint mechanism.  The statute provides

8   conduct that it wants to create a channel for site

9   users to bring it to the attention of the site

10  operator.

11          In that sense, Subsection A of the statute

12  is a guide for users in forming their reports and

13  complaints to the site.  And arguably, it's a guide

14  to those website operators that want to respond to

15  it, if that is their policy.  So, yes, Your Honor,

16  arguably the subject matter might be protected

17  speech, but this statute neither compels nor

18  prohibits protected speech.

19          Thank you.

20          THE COURT:  All right.  And let me ask

21  defense counsel this question, because it seemed to

22  me that you were suggesting that these social media

23  platforms could come up with their own definition of

24  hateful conduct.  It seems to me that the way this

25  statute is written is it's more than just a guide

1     and that the statute sets the floor.  Perhaps a

2     website could go beyond that under this statute.

3     But it says "hateful conduct means," and then it

4     goes through the definition.  And then Section 2

5     says, "A social media network that conducts business

6     in the state shall provide and maintain a clear and

7     easily accessible mechanism for individual users to

8     report incidents of hateful conduct."

9           It seems to me that there's not discretion,

10    the way the law is written for users -- or for the

11    social media platforms to have a definition of

12    hateful conduct that goes below the floor set by the

13    statute.

14          Can defendants weigh in on that?

15          MR. FARBER:  Yes, Your Honor.

16          The hateful conduct refers to the

17    complaints.  There's no question that the website

18    operators are obliged to take complaints from users

19    concerning hateful conduct.  At the end of the day,

20    however, those complaints are in the user's view.

21    The user may well be very adept at identifying

22    things tied to the statute's definition of hateful

23    conduct or not.  The user may have a much broader or

24    a much narrower definition of hateful conduct.  What

25    this statute requires of these websites, however, is

1   that it set up the mechanism.  It's largely a

2   procedural statute, it sets up the mechanism, the

3   complaints and reports are reported to the website,

4   the website responds to them based on its policy,

5   which is entirely within its discretion.  So while

6   hateful conduct may inform the reports, as far as

7   what the website operator may actually be liable for

8   under this statute, it does not impact that.  What

9   they are liable for is if they don't set up the

10  reporting mechanism again.

11         As far as the reporting mechanism, that

12  just sets the minimum of the complaints that they

13  have to receive.  That's all they have to do.  They

14  have to receive them.  As Your Honor indicated,

15  there does not have to be a response.  In fact, it's

16  not -- they don't even have to read them if they

17  don't want to.  But they do have to receive them.

18  That is true.  At a minimum, they have to set up a

19  facility to receive reports of complaints of hateful

20  conduct.

21         Thank you.

22         THE COURT:  Okay.  And again, for

23  defendants, don't the social media platforms have an

24  editorial right to keep information off of their

25  websites, allow certain information, and to make

```
 1    decisions as to what sort of community they want to
 2    create online?
 3            And if so, does this law that requires a
 4    mechanism for only one type of hateful
 5    conduct/speech infringe upon those editorial
 6    decisions because the websites are not required to
 7    set up a reporting mechanism for people who want to
 8    make hateful comments about movie directors or
 9    something like that?
10            Let me hear from defendants on that.
11            MR. FARBER:  Yes, Your Honor.
12            Again, the reporting mechanism is for the
13    minimum.  Again, if the site wants to set up a
14    broader mechanism of complaints, that's within their
15    discretion.  If they would rather not go on record
16    as to how they intend to respond to complaints,
17    reports of online hateful conduct, under the
18    statute -- they can comply with the statute with a
19    policy that says we have no policy.  As long as they
20    post that, they can respond with we will address
21    each report on a case-by-case basis and do not say
22    how we will respond in advance.  They have numerous
23    options to do that.
24            But with respect to receiving the
25    complaints, this does not impact their editorial
```

```
1    freedom.  This sets up a complaint mechanism that
2    does not require them to take a position on hateful
3    conduct.  It doesn't actually require them to take a
4    position on anything other than that they've set up
5    the mechanism.
6              THE COURT:  Okay.  Let me hear from
7    plaintiffs on these issues.
8              MR. ORTNER:  Sure.  I'll start just briefly
9    on the last thing that opposing counsel said that
10   saying you have no policy would suffice.  I would
11   just -- I would say, Your Honor, first of all, I
12   already suggested that we don't read that as
13   compatible with the law's requirement that the
14   policy, has to how they will deal with this type of
15   speech on their platform.  But really, if that's the
16   case, it's hard to see how the law furthers the
17   government's interest at all if the policy can just
18   state, we have no policy.  So I think that really
19   undermines their ability to justify this under any
20   level of scrutiny, ultimately, that the Court
21   applies to this.
22             So going back to the beginning of your
23   questions, Your Honor, the first question is, is
24   this speech versus conduct?  I think in this case,
25   there is no -- they have not -- counsel has not
```

```
1    pointed to any conduct here.  These are websites
2    that are publishing speech.  Everything on there is
3    speech.  The user content is speech.  Everything
4    that -- on The Volokh Conspiracy has news posts
5    about legal current events.  There's nothing there
6    other than pure protected speech on those websites.
7    So it's -- to say it's conduct is, I think,
8    disingenuous.  Opposing counsel also in their brief,
9    uses disinformation to describe this.  They're using
10   other -- trying to find labels to label this other
11   than what it really is, which is fully protected
12   speech.
13           I point, Your Honor, to our briefing, the
14   opening brief, where we have -- and the complaint.
15   We have hypotheticals that this law would apply to a
16   variety of types of speech; John Oliver comedy
17   sketch, news analysis of a tweet by The Onion, an
18   analysis of an art gallery opening which has
19   something to say about patriarchy and sex and gender
20   issues.  All of that is covered by this law.  So it
21   applies very broadly to a wide range of speech.
22           I would say, Your Honor, that this law is
23   clearly focused on speech.  And a hypothetical that
24   might be useful for that is to imagine a law that
25   said a website had to have a policy dealing with
```

1    conservative speech or liberal speech or

2    anti-American speech or pro-American speech.  That

3    would clearly be targeting speech, and it would be

4    unconstitutional.  And that's the same thing that's

5    happening here with hateful conduct, that it's

6    targeting this subset of speech.  And I think Your

7    Honor pointed out the language of vilify and

8    humiliate, that it goes to all the -- it's a very

9    subjective category of expression.  Everything is in

10   the eye of the beholder what vilifies or humiliates.

11   And it goes to core protected speech like parody and

12   satire that's been part of our constitutional

13   tradition from the founding.  So it sweeps up a lot

14   of protected speech there.  The plaintiffs here are

15   publishers of speech of others, similar to what

16   newspapers do when they compile op-eds by outside

17   writers and letters to the editor and publish them

18   in a newspaper.  So the contrast between the case

19   that opposing counsel uses, the Restaurant Law

20   Center case they use in their brief, is really

21   stark.  It's very different than a restaurant

22   serving food.  These are websites functioning as

23   publishers of speech.

24           And then going to the burden on the

25   website, I think opposing counsel suggested that

```
1    this is just a guide and it doesn't do anything
2    really that they don't have to do much of -- that
3    much of anything.  That's not compatible with what
4    the statute actually says.  But also they suggest
5    that you need to be banning speech or outlawing
6    speech to violate the First Amendment.  And that's
7    not the case.  The Supreme Court has repeatedly held
8    that burdens are enough.  I point, Your Honor, to
9    the Riley case that we cite in our reply brief.
10   That case -- all that the solicitors in that case
11   had to do was as part of their phone call,
12   solicitation call, mention the percentage of money
13   that they're generating that they're going to take
14   from the money that they raise in proceeds from the
15   call.  And that was a minor burden of just having to
16   mention, disclose the fact on a phone call.  And the
17   Supreme Court said that that burden, that changed
18   the nature of their conversation.  It undermined and
19   diluted their message ultimately.  And therefore,
20   even though it was a relatively minor burden, still
21   violated the First Amendment.
22           And then we also cite two cases involving
23   the requirement to respond -- to either appear like
24   you're endorsing the message of the government or
25   respond to it.  The Pacific Gas & Electric case and
```

1   the <u>Miami Herald v. Tornillo</u> case that we cite in

2   our reply brief, the Supreme Court said the

3   obligation to either to appear to agree with a

4   viewpoint or to respond, it compels speech because

5   it takes away that -- this is from the Court -- the

6   choice of what not to say.  And that's really what's

7   at stake here is, the choice not to respond, not to

8   have to either endorse -- appear to endorse the

9   State's message that this type of speech is unique,

10  is deserving of being taken down, or to have to

11  respond affirmatively.  And so it takes away their

12  choice not to speak.  It burdens expression.  And I

13  think Your Honor is right.  The other question they

14  have an editorial right to keep information off the

15  website at a minimum, this burdens that by requiring

16  them to say what they're going to say, takes away

17  their ability to just have no policy or have

18  discretion in that regard.  So it at a minimum,

19  imposes a First Amendment burden on plaintiffs.

20          THE COURT:  Okay.  And plaintiffs, let me

21  ask you this question.  Hypothetically if there was

22  a law that said that social media platforms needed

23  to have a mechanism for users to complain about

24  content, period, without specifying any particular

25  type of content, would that violate the First

1    Amendment?

2           MR. ORTNER:  I think it would still impose

3    a burden on the First Amendment.  And then you'd

4    have to analyze that under the standard of view,

5    just to look at the evidence that the opposing

6    counsel would have for a compelling interest.  But

7    the big difference there is it would be content

8    neutral and viewpoint neutral.  It would be you just

9    have to have a policy -- or you just have to have a

10   mechanism, it doesn't matter for what kind of

11   speech.

12          What's really at stake here is that -- Your

13   Honor mentioned this is content based and viewpoint

14   based.  So let's say that a website wanted to have

15   either a policy that just said, we will only accept

16   complaints about conduct that, let's say, incites

17   violence or is a true threat, that would not suffice

18   under New York's law.  You have to include the

19   category, all the category, the whole category of

20   speech that New York is pointing to, including

21   vilifying and humiliating speech.  And so that's

22   what makes this law particularly egregious, is that

23   it requires them to -- it required -- it includes

24   that subset of speech in what they're including in

25   their policy and in what reports they're going to

1    take, what complaints they're going to take.  And

2    then we also believe -- argued that they have an

3    affirmative duty to respond.  Also, again, defined

4    based on viewpoint.  If someone complains about

5    something that's not subject to the law, there's no

6    obligation.  So the obligation is based on, again,

7    the viewpoint and the content of the speech.  And

8    that's what really makes this law particularly

9    egregious.  And clearly, in the realm of strict

10   scrutiny, which defendants do not -- defendant does

11   not argue that the law satisfies strict scrutiny in

12   their briefing and that because it's a viewpoint

13   based, it falls under that category, under that

14   standard.

15        THE COURT:  Plaintiffs, let me ask you this

16   hypothetically.  If New York enacted a law that

17   required social media companies to provide a

18   mechanism for its users to complain about a data

19   privacy breach, would that also run afoul of the

20   First Amendment?

21        MR. ORTNER:  Sorry, Your Honor.  I'm

22   thinking through that.  I think the -- you know,

23   data privacy breach -- complaining about that, a

24   data privacy breach, is not complaining about a

25   particular content or viewpoint of speech.  And so

1     that puts us in a different category than this law,

2     which requires the ability to complain about speech

3     on the website.  The data privacy breach is an

4     action that has happened to a user.  So there's

5     still the element of requiring them to set up a

6     mechanism which has an element of speech to it.  But

7     I think it's substantially different because you're

8     not allowing that -- requiring them to be able to

9     complain about the speech on the website.  It's

10    unrelated to speech, ultimately, the fact that there

11    was a data privacy bridge on the website.  And so

12    that would put it out of the realm of these First

13    Amendment cases that we're talking about, out of the

14    realm of scrutiny, and it would be likely -- much

15    more likely to survive scrutiny under a lesser

16    standard.

17         THE COURT:  Okay.  And let me ask

18    plaintiffs this question.  Defendant hasn't

19    specifically addressed standing, but does this law

20    apply to all of the plaintiffs?  In particular,

21    Plaintiff Eugene Volokh operates a legal blog.  Does

22    that constitute a social media network under this

23    law?

24         MR. ORTNER:  It does, Your Honor, under the

25    definition that the law uses.  New York has used an

1    incredibly broad definition.  It really covers any
2    website that makes a profit in the State of New York
3    and has comments or some ability to share content
4    because it says service providers, which operate
5    platforms designed to enable users to share content
6    with other users or to make such content available
7    to the public.
8            And there were ways that the law could have
9    been drafted more narrowly.  Earlier versions of
10   laws that legislators in New York attempted or
11   considered were drafted to exclude websites like
12   Volokh -- like The Volokh Conspiracy.  We talked
13   about that in our opening brief.  There was language
14   readily available to the State of New York to narrow
15   the law, but they chose very broad language.  And
16   then the floor speech that we point to, also in our
17   opening brief, the lawmakers there were -- one of
18   the chief sponsors of the bill, Congresswoman Fahey,
19   was specifically asked about who would the law apply
20   to and specifically said it would apply to anyone
21   that has a presence in the State of New York that
22   operates a website.  Essentially, very, very broad
23   interpretation.  Finding her exact language -- and I
24   apologize, Your Honor.  But the language there
25   specifically was broad and open-ended in who it

1    applied to.

2          And then I would also then finally point to

3    the fact that opposing counsel does not contest the

4    fact that we assert that it applies to

5    Eugene Volokh, and they don't respond to that.  And

6    then I would say it finally clearly applies to

7    Rumble and to Locals.  And Rumble is even mentioned

8    in the AG's report, which strongly suggests that

9    Rumble is on their radar and the law would be

10   applied to them -- to Rumble.

11          THE COURT:  Defense counsel, can you

12   explain why you believe that rational basis is the

13   appropriate standard of review as opposed to strict

14   scrutiny?

15          MR. FARBER:  Yes, Your Honor.

16          We are not prohibiting speech.  We are not

17   compelling non-commercial speech.  In order for the

18   Court to grant the injunction requested, it would

19   have to find that GBL394-CCC is a content based

20   regulation that compels non-commercial speech.  And

21   it is not.  Speech is not compelled here.  A

22   mechanism for complaints, which, of course, must

23   include what users believe is online hateful conduct

24   is provided for.  There is no requirement that that

25   be responded to.  There is no requirement as to what

1    policy the given websites must have in response to

2    it.  We are not compelling viewpoint.  We are not

3    compelling any message.

4           Frankly, counsel alluded to the contents of

5    his client's websites, which we do not dispute could

6    well be largely, or perhaps even entirely protected

7    speech, certainly to the extent it is the speech of

8    third parties.  And that is why this statute does

9    not regulate it.  We do not require any particular

10   moderation policies.  We do not require any

11   sanctions for any kind of speech, including removal,

12   highlighting, flagging, or anything of the kind.

13   This is a very specific statute.  It requires the

14   reporting mechanism.  As Your Honor noted, it could

15   have required all complaints, in which case counsel

16   for plaintiff responded that he would regard that as

17   unconstitutional.  With regard to Your Honor's

18   question of a data breach, that's a number of

19   possible implications of that.  One possible data

20   breach could be that one user posts data of another

21   user online, in which case how that would be

22   addressed would arguably be part of a complaint

23   mechanism.

24          At this point, we believe that the

25   complaint mechanism, as we set it up, does not

```
 1    regulate protected speech and therefore is not
 2    subject to strict scrutiny.  In fact, it is rational
 3    basis.  The State has a strong interest in that
 4    users of websites are well informed as to what those
 5    websites policies are and that they have an ability
 6    to complain to them.  And similarly with the policy
 7    of the website posting, it is rationally related to
 8    advancing that policy.
 9              Thank you, Your Honor.
10              THE COURT:  Let me just follow up then with
11    defense counsel.
12              MR. FARBER:  Sure.
13              THE COURT:  Tell me more about why you
14    think that there is a rational basis here and what
15    is the -- because the briefing seems to indicate
16    that you take the position that somehow this is
17    related to incidents like the shooting in Buffalo.
18    Is that no longer your position?
19              Can you tell me -- especially since, as you
20    indicated, it seems that many social media users are
21    quite knowledgeable, and it seems that certain
22    social media platforms, I think folks kind of know
23    which ones tolerate all sorts of speech as opposed
24    to others, and maybe that's why they go to certain
25    social media platforms.
```

```
1              But can you just tell me more about that,
2    defense counsel?
3              MR. FARBER:  Certainly, Your Honor.
4              To the extent that we are in an unfortunate
5    era of increasing acts of violence and that
6    oftentimes those acts of violence are, if not
7    foreshadowed, at least indicated online, the ability
8    of users of social media networks to bring such
9    incidents to the attention of the web operator is a
10   reasonable response to the unfortunate increase in
11   those kinds of events.  Second, this statute is
12   advancing the cause of more informed consumers.
13   It's true that certain websites develop certain
14   reputations over time, but not all.  It's not
15   readily apparent to consumers.  This will make it
16   more readily apparent at the outset.  So both of
17   those are important State concerns, and both of them
18   are addressed by the statute.
19              To go back to the case of the Buffalo
20   shooting and to compare and contrast it to another
21   famous shooting in New Zealand.  In the Buffalo
22   situation, the livestream on a platform called
23   Twitch was promptly brought to the operator's
24   attention by various users of social media, and they
25   managed to take that livestream down, I understand,
```

1    in less than three minutes.  By contrast, the

2    horrible mass shooting incident in New Zealand, I

3    believe was on a Facebook platform there, that

4    incident lasted well over nine minutes.  There were

5    no complaints, as we understand it, made to the

6    operator, or at least none were facilitated, and the

7    operator was not aware of those events and did not

8    manage to take it down.

9         So in this case, the difference is Twitch

10   had set up a means of users making complaints and it

11   chose to take action.  For purposes of this

12   argument, I'm not suggesting that it was required to

13   take action, but it did take action and providing it

14   with the information to do so helped it to achieve

15   its goal in that case.  In any event, what we are

16   suggesting by the statute is that creating this

17   facility does not impact anyone's speech.  It does

18   not require that any speech at all, even what some

19   people might regard as hate speech, be taken down or

20   sanctioned in any way.  On the other hand,

21   complaints that might very well be very important to

22   the operator are brought to the operator's

23   attention.

24        So we would respectfully submit that the

25   statute easily meets rational basis.  And I note

1    that in the reply papers, the plaintiff did not

2    challenge that there was no rational basis for the

3    statute.  I should add that in the Restaurant

4    context, similarly, the information we require with

5    regard to policy is factual in nature, analogous to

6    the Restaurant case we cite with calorie count.  It

7    may be information that the user doesn't want its

8    customers to have, but it is factual and does not

9    violate the First Amendment when required to do so.

10   So we believe that the statute amply meets the

11   rational basis standard.

12          Thank you.

13          THE COURT:  And let me just ask a follow-up

14   question.  It seems to me that the livestream that

15   you're referencing regarding the Buffalo shooting,

16   that probably isn't speech in the first place.  And

17   the issue here is if the platforms are not required

18   to do anything, then I'm not sure what -- I

19   understand that in the abstract there's a

20   possibility that something could happen and the

21   website might take something down.  So the harm that

22   is being sought to prevent is the what?  Is the

23   exposure of other people to the livestream?  Because

24   this statute goes further than just the inciting

25   violence.  This talks about, again, the vilification

1    humiliation, these other things.  And certainly that

2    may have been part of the incitement to violence,

3    but it seems to me that there are some important

4    distinctions there.

5              Can I hear from defense counsel on that?

6              MR. FARBER:  Yes, Your Honor.

7              Yeah.  The Buffalo shooting was obviously a

8    unique tragedy and we are not suggesting that this

9    statute will guarantee that events like that never

10   happen again.  But in this case, this was a growing

11   body of what could be perceived as online hateful

12   conduct and basically was not, as far as we know,

13   previously brought to the attention of website

14   operators that might or might not have taken action

15   on it.  But nonetheless, the channel to bring this

16   sort of thing to website operators who might choose

17   to respond, even though the government does not

18   compel them to suspend a user or remove content, the

19   websites may choose to do so.  In any event, to, in

20   this case, compel more information available rather

21   than less is rational.  So in this case, the law

22   doesn't -- there's no way to say that this law would

23   prevent the next Buffalo shooting, but it allows

24   complaints to be brought to the attention of

25   operators, and it allows users to know what's going

1    to happen to those complaints, and those are

2    rational purposes.  And the legislature was careful

3    here.  The legislature was very cognizant of the

4    First Amendment.  That's why we have the savings

5    provision of paragraph four of the statute.  And so

6    the legislature was concerned with the First

7    Amendment and wanted to operate within its bounds.

8    That's why we have the law we have, so it's

9    rationally based.

10           Thank you, Your Honor.

11           THE COURT:  Okay.  And also for defense

12   counsel, you said that this doesn't compel the

13   plaintiffs to speak, but can you tell me why

14   requiring the plaintiff to have a policy regarding a

15   certain type of conduct/speech isn't compelling them

16   to speak?  It may not be compelling them to

17   necessarily take an affirmative up-or-down position

18   on that, but it is compelling them to speak about

19   that and to speak about that conduct and speech as

20   opposed to any other.

21           Can you tell me about that, defense

22   counsel?

23           MR. FARBER:  Certainly, Your Honor.

24           This again comes back to the Restaurant and

25   the calorie case, or a case involving disclosure of

1    mercury hazards out of Vermont that we cited in our

2    brief.  There are situations where truthful

3    commercial speech can be compelled without running

4    afoul of the First Amendment.  We cite them on

5    pages 7 through 11 of our opposition brief.

6         In this case, we would argue that that's

7    what the policy falls into.  It falls into a

8    truthful disclosure of fact.  The substance of

9    what's hateful conduct may be very controversial,

10   but how the website intends to respond to it is not.

11   That's a binary.  That's we will respond, we won't

12   respond.  And then if we will respond, this is what

13   our response is going to be.  So that may well be

14   compelled speech.  But it is -- if it is so, it is

15   compelled commercial speech of a factual nature that

16   the case law has permitted.  The amount of calories

17   in a meal is not a viewpoint.  A complaint policy is

18   not a viewpoint.  Although even if plaintiffs are

19   going to argue that it is, it's their policy.  It's

20   not compelling a position at all.  It's simply

21   disclosing what are they going to do to these

22   reports of hateful conduct brought to their

23   attention.

24        THE COURT:  Okay.  And let me ask defense

25   counsel this question.  What is the defendant's

```
 1    position if this case is analyzed under strict

 2    scrutiny?  Does the sentence concede that this law

 3    doesn't pass strict scrutiny?

 4              MR. FARBER:  We will have a very difficult

 5    time, Your Honor, with that.

 6              First of all, we did not address that in

 7    our brief, just as plaintiffs did not address

 8    rational basis.  I would concede that we would have

 9    a very difficult time with strict scrutiny.  We

10    certainly have a compelling state interest in

11    minimizing and reducing events like the Buffalo

12    event and similar acts of hateful conduct, violence,

13    mass shootings and the like.  It is not clear that

14    this particular statute is narrowly tailored under

15    those circumstances.

16              So I would answer it that way.  I would

17    answer that we would have a difficult time.

18    However, I would argue that we never get there

19    because this is not a content-based statute.  This

20    does not compel speech.  This does not prohibit

21    speech.  This does not -- plain and simple, this

22    does not require these websites to alter their

23    editorial content or their editorial policy.  It

24    does not require the removal or flagging of anything

25    that appears on their website.
```

```
1                Thank you.

2                THE COURT:  Okay.  Thank you.

3                Plaintiffs, let me hear from you as to why

4      you believe that strict scrutiny is appropriate

5      here.

6                MR. ORTNER:  Sure.  Thank you, Your Honor.

7                I think we obviously interpret the statute

8      more broadly than defendants do.  We think our

9      reading is the best reading of the text of the

10     statute, and our reading is true that it requires a

11     direct response to every single complaint that is

12     lodged.  Clearly, that's compelled speech, and under

13     strict scrutiny.  I don't think defendants would

14     necessarily -- they don't try to disagree with that.

15     And so I think under our interpretation of the

16     statute, strict scrutiny applies.

17               But even at, like, the minimum level of the

18     policy, which requires the posting of -- well, first

19     of all, the development of a policy if they don't

20     have one already, which I think is significant, it

21     requires these websites to actually come up with a

22     policy to deal with the specific subset of speech if

23     they don't already have one, and then post it

24     publicly.  That is compelled speech.

25               I would just -- to point out, make the
```

```
 1    analogy, look at the Zauderer standard and the Big
 2    Mac case about calorie counts.  I think two things
 3    to that, Your Honor.  First of all, dealing with
 4    hate speech is not like the number of calories in
 5    the Big Mac.  Everyone disagrees about what is hate
 6    speech.  It's a very case-by-case assessment for a
 7    website operator to decide is this speech acceptable
 8    or not.  That discretion is left to the website now
 9    and -- and New York's law requires them to
10    clearly -- articulate a clear policy about this, so
11    to actually spell it out what they're going to do.
12    And so that requires them to take a stance on that
13    where now they have the ability to be silent.
14            So Zauderer doesn't apply in that regard
15    because it's not -- uncontroversial factual
16    information.  It's much more similar to the
17    Entertainment Software Association.  It's a case
18    about video games -- video game makers having to
19    label -- put a sexually explicit content label on
20    their games, very similarly casting a value judgment
21    of sorts about the nature of the speech or the R.J.
22    Reynolds cases, two of them, involving tobacco
23    labeling and skull and crossbones or other images on
24    tobacco labels.  Again, it's the fact that -- just
25    the nature of the label that they're using of
```

```
 1    hateful conduct is provocative value laden.  It's
 2    crafted to evoke an emotional response.  It's a
 3    subjective and highly controversial message that
 4    they're forcing plaintiffs to either endorse or
 5    refute through stating something to the contrary in
 6    their policy.  So that is very different than
 7    Zauderer.
 8              Also, the defendants never argue why the
 9    speech here is commercial speech.  For Eugene Volokh
10    and The Volokh Conspiracy, that website generates
11    some profit from advertisements.  Publishing speech
12    for profit does not make something automatically
13    commercial speech.  The most obvious case we've
14    talked about already is the Miami Herald v.
15    Tornillo case, that involves a newspaper that makes
16    a profit from the sale of speech and their strict
17    scrutiny applies.  So the fact that someone makes a
18    profit does not sweep it into the category of
19    commercial speech.  And the speech on Volokh's
20    website is not commercial speech.  It is analysis
21    about legal and current events.  The videos on
22    Rumble and Locals also are largely focused on news,
23    entertainment, sports, current events, politics, not
24    selling a product, not an advertisement for a
25    product.  And so the speech on these platforms is
```

1    not commercial speech.  There's no reason to assume

2    that commercial speech is the proper framework to

3    apply here.

4              And finally, even if it is, the Matal v.

5    Tam case, which we cite to, that was a case

6    involving trademark law.  And so that was a

7    trademark over the label of the name of the band,

8    The Slants, which is actually illustrative here

9    because it shows how hate speech is in the eye of

10   the beholder.  This is a group trying to reclaim the

11   label of an anti-agent label and it was labeled

12   hateful by the trademark office, and not -- you

13   know, trademark wasn't granted because of that.  It

14   shows a little bit of the subjectivity of calling

15   something hate speech.  But in that case, it was

16   commercial speech standard, but the Supreme Court

17   still struck that down because it was viewpoint

18   based.  And so the fact that this law is viewpoint

19   based, targeting a specific subset of expression

20   only speech that is vilifies or humiliates based on

21   specific characteristics, that clearly places this

22   in the realm of strict scrutiny, even if commercial

23   speech is still -- at least even if it's under

24   Central Hudson, analyzed very aggressively as the

25   Court did in the Matal v. Tam case.  And so for --

1   all the reasons falls under strict scrutiny.

2          And I would just say one last thing is even

3   if opposing counsel says that we just concede that

4   rational basis that we would lose, I would disagree

5   slightly with that, Your Honor, and to say -- to

6   point out that we cite cases saying that one of the

7   state's primary interest, which is getting the

8   speech off the internet, that's what they turn to

9   again and again and again in the legislative

10  debates, in the AG's report, clearly saying we need

11  the speech removed, protected expression.  We cite

12  to the US v. Eichman case, where it says the

13  suppression of free expression is not even a

14  legitimate government interest.  And in Hurley they

15  say it's a decidedly fatal objective to try to

16  remove protective expression.

17         And so we think that the primary interest

18  the State is pushing for in everything that they're

19  saying in their debates in the report is not even a

20  rational interest.  And the State otherwise is just

21  inconsistent about articulating what their interest

22  is.  And they kind of go back and forth and

23  articulate a lot of different interests without any

24  evidence that this is what the legislature was

25  really thinking about or that there's evidence that

1    the law is needed if a higher standard applies.

2    There's not evidence -- not sufficient evidence at

3    all to satisfy any degree of scrutiny other than

4    rational basis on the level of evidence.  They don't

5    point to evidence that this is necessary, that

6    existing laws are inadequate.  But you need to come

7    into your -- draft websites into posting policies to

8    target protect expression.  And so the law clearly

9    fails strict scrutiny.

10            Last thing I'd say on this, Your Honor, is

11   the requirement to post a policy is a burden on the

12   website's expressive activity.  Eugene Volokh and

13   The Volokh Conspiracy, Rumble and Locals, we cite to

14   many statements on their platform about how they are

15   facilitating free speech.  People you mentioned go

16   to these platforms because they want a place where

17   free speech is widely tolerated.  Volokh is free

18   minds and free markets.  Rumble, their purpose and

19   mission is to protect free and open Internet and to

20   create technologies that are immune to cancel

21   culture.  And Locals have similar statements on

22   their website.  And so being required to have a hate

23   speech or hateful conduct policy on their website

24   and a place for complaints, but they're going to

25   facilitate complaints undermines their core First

```
1    Amendment message of we allow this wide variety of

2    speech.  We don't take speech down based on the

3    viewpoint, in particular.  That's really the key is

4    they don't take speech based on the viewpoint down.

5    And this law requires a policy dealing with just a

6    specific viewpoint of expression.  And so it

7    undermines their First Amendment message just having

8    it -- having to post it, even if they can respond.

9    Again, pointing to Miami Herald and Pacific Gas

10   Companies, that imposes a serious burden on first.

11            THE COURT:  Okay.  Thank you.

12            So I don't have any other questions.  I'm

13   ready for a brief, brief oral argument.  I'll give

14   each side seven minutes.  You don't have to take a

15   full seven, but let's have oral argument quickly by

16   plaintiffs and then followed up by defendants.  Go

17   ahead.

18            MR. ORTNER:  Sure.  I think we've addressed

19   a lot of the issues in the case.  So I'll just turn

20   very briefly, Your Honor, to the couple of things we

21   haven't addressed and mentioned them, which is a

22   couple of other ways that this law could be

23   invalidated.

24            I think overbreadth and vagueness haven't

25   been addressed.  And I think overbreadth has really
```

```
1    been at the heart of the discussion in this oral
2    argument, how this law sweeps a broad swath of
3    potentially offensive but protected speech under its
4    scope.  If the law really was targeting what
5    happened in the Buffalo shooting, which we say is
6    horrific and unacceptable, but if that's what it's
7    trying to do, the law went so far beyond just that
8    kind of expression.  Any speech that vilifies or
9    humiliates, which as you mentioned already, could be
10   anything from a comedy sketch to a news report
11   discussing or to a Tweet that's retweeted to art
12   show, really anything can be seen as offensive -- as
13   vilifying or humiliating based on these kind of
14   characteristics like race and sex that the State has
15   identified.  And so I think that's a real
16   significant issue with overbreadth.  It's requiring
17   policies to deal with clearly protected expression.
18   And I think opposing counsel conceded that
19   effectively that this is vilifying and humiliating.
20   Speech is protected expression.  And so I think that
21   really shows why there's an enormous overbreadth
22   problem.
23           And then with vagueness, I would just point
24   out that these laws like this, they chill not only
25   the policies of websites, they are going to feel
```

```
 1    obligated to take speech down, especially if they
 2    have to respond to complaints.  They're going to
 3    think, well, I might as well take down speech so I
 4    don't have to respond to all the complaints that are
 5    going to come if I allow controversial speech to
 6    remain on my platform.  But it also chills user
 7    speech, because if someone goes to website and
 8    they've thought in the past it's a place for free
 9    expression, and now they see a link in the bottom
10    saying, see our hateful conduct policy, that creates
11    a very different environment on the website for
12    freedom of speech.  It shows user expression.
13    They're going to be more cautious in posting speech
14    that they presume now the website doesn't want and
15    the State of New York is targeting and opposing.
16    And then there is I think it has already come up in
17    this argument.  There are a lot of vague terms that
18    leave discretion to the Attorney General.  The
19    debate over whether there is a reporting
20    mechanism -- or sorry, a response requirement at all
21    is illustrative of that, Your Honor.  That it's not
22    clear whether one is required, the Attorney General
23    now says it's not required.  But if the Attorney
24    General enacted or someone enacted regulations or
25    said we are now interpreting this to require it,
```

1    they certainly could do that under the discretion --

2    the discretion to read the statute more broadly.

3    And that creates serious problems, enforcement

4    problems, especially with the aggressive rhetoric

5    that we point to in the report.  It really creates a

6    sword of Damocles, hanging over the head of

7    websites, where they know -- if you turn to the

8    saying, if you don't take action, there is going to

9    be consequences.  They list several in the report

10   legislative proposals, but with this law on the

11   books also, it's another aspect of that where

12   websites are afraid of investigations, of fines, of

13   public shaming from the Attorney General.  And so I

14   think it creates an environment of chill when the

15   law is so -- drafted with so many vague and

16   arbitrary and unclear terms, and it really fails to

17   define many of the key terms of the statute, as we,

18   I think, point out in our briefing.  So I think that

19   creates a serious problem.

20          And then finally, Section 230 also applies

21   and provides an alternative basis for striking down

22   the law.  It implies anytime a provider exercises a

23   publisher's editorial function -- we cite a case in

24   our reply, Jones v. Dirty World Entertainment

25   Recordings from the Sixth Circuit, which talks about

1   that, and that includes whether to publish,

2   withdraw, or postpone or alter content.  The Second

3   Circuit has interpreted Section 230 very broadly to

4   protect editorial discretion of publishers.  And

5   that's what's at stake here.  Our websites that are

6   publishing third party content, having the

7   discretion to set their own policies, to not have to

8   articulate them in the way that New York wants them

9   to do, to not have to take feedback about it the way

10  the New York -- the State of New York wants them to

11  take feedback, and to not have to respond to

12  complaints the way the State of New York demands

13  that they respond to complaints.  All of that

14  trumps -- supersedes their traditional editorial

15  functions and compels them to have certain positions

16  or to have positions and publicly state them and

17  respond in certain ways to complaints.  All of that

18  violates Section 230.  And so that's another

19  independent reason that New York's law should be

20  invalidated.

21          And then just finally, I think whatever

22  strict scrutiny applies, defendants have essentially

23  conceded the law fails.  Even if we think -- even if

24  Central Hudson or a lower standard applies, New

25  York's law fails.  Again, they have still have the

```
 1    burden under even those lesser standards to prove
 2    the need for the law to show how this law furthers
 3    their interest.  And they've really failed to do
 4    that.  They undermine their own interests --
 5    asserted interests.  You know, if they're right that
 6    the law requires almost nothing from plaintiffs at
 7    all, they can't meet that.  And if it requires what
 8    we say it does, then obviously strict scrutiny
 9    applies to it and it fails.  And so under either
10    conception, New York's law cannot survive scrutiny
11    and has to be invalidated, and we're entitled to
12    (inaudible).
13              THE COURT:  Okay.  Thank you.
14              Let me hear from defense counsel.
15              MR. FARBER:  Thank you, Honor.  This is
16    Seth Farber again.
17              Your Honor, this is a preliminary
18    injunction motion, and plaintiffs bears the burden
19    on each of the elements.  And in this case, they are
20    asking the Court to strike down, find
21    unconstitutionally duly enacted statute.  So we
22    would argue that they bear an even higher burden
23    than they would in an ordinary PI.  But under any
24    burden, they have failed to meet their burden
25    because Section 394-CCC simply does not target
```

```
1    protected expression based on content or viewpoint.
2    In this case, the Court should apply a rational
3    basis test.  And contrary to counsel's argument,
4    rational basis does not require a finding that a
5    legislature had a specific rational basis in mind
6    and that this statute brings it forth.  Is there a
7    rational basis for this?  Yes.  We provide consumer
8    knowledge as to how websites operate and the State
9    has a strong interest in taking steps to hopefully
10   alleviate violence.  That's it.  We've met rational
11   basis.
12           In this case, for the Court to grant the
13   injunction sought, it would have to find that the
14   statute is a content-based regulation that compels
15   noncommercial speech.  And it clearly is not.  As we
16   indicated in our brief, the statute does not
17   regulate protected speech law.  It applies to
18   commercial conduct.  It facilitates a reporting
19   mechanism for individual social media users to
20   report to the website operator.  The ability of a
21   user to report speech is not regulating speech.
22   This contention of a chilling effect is entirely
23   speculative.  Plaintiffs fail to meet their burden
24   on that element of the motion.  The disclosure of
25   their policy as to how to respond to reports and
```

1    nothing else is itself factual and uncontroversial.
2    They do not have to get into the definition provided
3    by the State or provided by anybody else on what
4    constitutes hateful conduct.  We are regulating a
5    commercial business.  In this case, they may well be
6    in the business of putting out protected content of
7    other people.  We are not regulating that protected
8    content.  We are not regulating anything they do
9    that is an editorial function.  We are simply
10   compelling them to have a reporting mechanism.
11        And I should add that the definition of
12   hateful conduct found in the statute does not itself
13   regulate hateful conduct.  It is simply a guide to
14   users to make complaints and to platforms as to how
15   they respond in their discretion.  The statute does
16   not compel plaintiffs to endorse any State message
17   or to respond to reports of any kind, including
18   involving protected speech.  The State is not
19   requiring plaintiffs to state or endorse any
20   particular message of conduct.  The required
21   disclosure is the constitutional disclosure of
22   accurate commercial information only.  The statute
23   does not require any particular response or a
24   response at all, just that the channel for reporting
25   and responses be facilitated.  There is no speech

1    compulsion.

2            With regard to the overbreadth contention.

3    Because plaintiffs argue that the statute is

4    unconstitutional as applied to them, we respectfully

5    submit that the Court should not consider their

6    facial overbreadth claim, because clearly narrowing

7    constructions are possible even if plaintiffs want

8    to rule them out.  The statute does not prohibit or

9    regulate speech.  No restriction or removal of any

10   content is required.  To the extent speech is

11   compelled, it is commercial speech, and overbreadth

12   fails on this basis because the statute cannot be

13   found overbroad if the subject is commercial speech

14   only.  Even if the statute reaches some protected

15   speech or conduct, it is still not overbroad in

16   relation to its legitimate scope.

17           With respect to vagueness, this statute

18   clearly affords plaintiffs of notice of conduct they

19   would be liable for.  They have to have a complaint

20   mechanism, and they have to have a response policy.

21   That's it.  The definitions of hateful conduct

22   themselves are readily understood and have plain

23   objective meanings, but those terms are only

24   provided to define the scope of reports from users.

25   Adequate notice to plaintiffs is more than

1    adequately spelled out here.  The title of the

2    statute does not override the clear statutory text.

3    The statute provides sufficiently clear enforcement

4    standards to eliminate the risk of arbitrary

5    enforcement or to prohibit conduct that falls within

6    the core of the statute's prohibition.  Enforcement

7    is not the result of unfettered latitude here.

8            To the extent that plaintiffs argue that

9    the statute has a chilling effect on the exercise of

10   First Amendment freedoms, that is nothing more than

11   speculative in this case.  The saving clause is not

12   vague in its own right.  And in any event,

13   plaintiffs can't use the legislature's efforts to

14   protect First Amendment freedoms to claim that the

15   statute violates the First Amendment.

16           Regarding Section 230 preemption.  Section

17   230 immunity applies only when content is created

18   entirely by third parties.  It does not apply to

19   content the website creates itself, which in this

20   case would be the complaint mechanism, and their

21   policy.  The statute avoids liability on these users

22   for content published by third parties.  They would

23   be liable only for their own failure to create a

24   reporting mechanism.

25           Finally, with regard to Section 4, we

1    respectfully submit that plaintiffs misread

2    Section 4.  What it requires is a mechanism to

3    report and a mechanism to respond.  As Your Honor

4    indicated, it does not require a specific response

5    on their part if they choose not to make one.

6          Thank you, Your Honor.

7          THE COURT:  Okay.  Thank you.

8          I do have one other question.  I know that

9    plaintiffs request is that I strike down the entire

10   statute.

11         Let me just ask counsel this

12   hypothetically.  Would it be permissible for me to

13   strike sections of the statute, or is this an all or

14   nothing proposition?

15         Let me hear from plaintiffs counsel, then

16   I'll hear from defense Counsel.

17         MR. ORTNER:  I think, Your Honor, the law

18   is integrated ultimately.  All these sections work

19   together.  Going, for instance, the saving statute

20   that defendant points to, that saving statute can't

21   save the law, the plain meaning of which is

22   regulating and compelling speech.  I'm not sure

23   exactly what Your Honor has in mind of what to

24   strike down or not to strike down, but the law

25   ultimately works together and has an effect together

1    on all unburdening protected First Amendment

2    activity.  And so don't believe that just striking

3    down certain provisions is possible in this case,

4    given the First Amendment impact of the whole law

5    that the legislature has enacted altogether in one

6    package.  So we would not support that outcome as

7    the law justifies it.

8            THE COURT:  Okay.  Defense counsel?

9            MR. FARBER:  Well, I'm not sure which

10   provisions Your Honor would consider.

11           THE COURT:  This is just a hypothetical.

12   This is just a hypothetical.

13           MR. FARBER:  Hypothetically.  I mean,

14   hypothetically, you know, I'm not sure.  I will

15   candidly say I was not expecting that question.

16           I note that plaintiffs, of course, are

17   asking to strike the entire statute.  And I think

18   I'll go back to where I came in on this, is that the

19   statute requires a couple of different things.  The

20   statute requires a, you know, reporting mechanism,

21   that that reporting mechanism contain a response

22   mechanism, and the statute requires the posting of

23   the policy.  I would argue that those are separate

24   things.  And that, hypothetically, if the Court were

25   so inclined, it could treat them separately.  I note

```
 1    that the statute does not contain a non-severability

 2    proceeding -- I'm sorry -- a provision that says

 3    it's non-severable.  That's not necessarily binding

 4    in any event.

 5            But in this case, the plaintiffs say that

 6    the statute is content based.  It is not.  We

 7    don't -- that said, Your Honor, under these

 8    circumstances, we respectfully submit that what you

 9    should do is deny the entire preliminary injunction

10    motion.

11            Thank you.

12            THE COURT:  Okay.  Thank you.  We are

13    adjourned.

14            Anything else from plaintiffs' counsel?

15            MR. ORTNER:  No, Your Honor.  Thank you

16    very much.

17            THE COURT:  Anything else from defense

18    counsel?

19            MR. FARBER:  Thank you, Your Honor.  Just a

20    housekeeping matter.  Our response to the complaint

21    is due in about four days.  We will be contacting

22    plaintiff concerning extending that time.

23            THE COURT:  Okay.

24            MR. FARBER:  Thank you.

25            THE COURT:  Thank you.  We are adjourned.
```

```
 1    Thank you.
 2              MR. FARBER:   Thanks so much.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    C E R T I F I C A T E

2

3        I, Marissa Mignano, certify that the foregoing

4   transcript of proceedings in the case of

5   VOLOKH, et al. v. JAMES, Docket #1:22-cv-10195-ALC,

6   was prepared using digital transcription software and

7   is a true and accurate record of the proceedings.

8

9

10  Signature    _____
                    Marissa Mignano
11                  Marissa Mignano

12

13  Date:        December 21, 2022

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **EUGENE VOLOKH, LOCALS TECHNOLOGY INC. and RUMBLE CANADA INC.,** | |
| **Plaintiffs,** | **22-CV-10195 (ALC)** |
| **-against-** | |
| **LETITIA JAMES,** *in her official capacity as New York Attorney General*, | <u>**OPINION AND ORDER**</u> |
| **Defendant.** | |

**ANDREW L. CARTER, JR., United States District Judge:**

"Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (citations omitted).

With the well-intentioned goal of providing the public with clear policies and mechanisms to facilitate reporting hate speech on social media, the New York State legislature enacted N.Y. Gen. Bus. Law § 394-ccc ("the Hateful Conduct Law" or "the law").   Yet, the First Amendment protects from state regulation speech that may be deemed "hateful" and generally disfavors regulation of speech based on its content unless it is narrowly tailored to serve a compelling governmental interest.   The Hateful Conduct Law both compels social media networks to speak about the contours of hate speech and chills the constitutionally protected speech of social media users, without articulating a compelling governmental interest or ensuring that the law is narrowly tailored to that goal.   In the face of our national commitment to the free expression of speech, even

where that speech is offensive or repugnant, Plaintiffs' motion for preliminary injunction, prohibiting enforcement of the law, is **GRANTED**.

## BACKGROUND

### I. Factual Background

The following facts are drawn from the Complaint, Plaintiffs' declaration in support of their motion for preliminary injunction, and Defendant's declaration in opposition to the motion, and the documents relied upon therein.

#### A. The Plaintiffs

Plaintiffs Eugene Volokh ("Volokh"), Rumble Canada Inc. ("Rumble") and Locals Technology Inc. ("Locals") operate online platforms that they believe are subject to the law as a "social medial network" as defined by the law.  Plaintiff Volokh is a California resident and the co-owner and operator of the Volokh Conspiracy, a legal blog. (Compl., ECF No. 1 ¶ 12.) Plaintiff Rumble, headquartered in Toronto, Canada, operates a website "similar to YouTube" which "allows independent creators to upload and share video content".  (*Id.* ¶ 13.)  Rumble has a "pro-free speech purpose" and its "mission [is] 'to protect a free and open internet' and to 'create technologies that are immune to cancel culture.''  (*Id.*)  Plaintiff Locals is a subsidiary of Rumble Inc. and operates a website that allows "creators to communicate and share content directly with unpaid and paid subscribers." (*Id.* ¶ 14.)  Locals also has a stated "pro-free speech purpose" and a "mission of being 'committed to fostering a community that is safe, respectful, and dedicated to the free exchange of ideas.'" (*Id.*)

#### B. The Buffalo Mass Shooting

On May 14, 2022, an avowed white supremacist used Twitch, a social media platform, to livestream himself perpetrating a racially motivated mass shooting on Black shoppers at a grocery

store in Buffalo, New York. (Sawyer Decl., ECF No. 20 ¶ 4; *id.*, Ex. A, ECF No. 20-1 at 34.) The attack left ten people dead and three wounded. (*Id.*) Shortly thereafter, a recording of the mass shooting "went viral" and was re-posted on several websites, including 4chan and Reddit. (*Id.*) A manifesto expressing the shooter's racist ideology was also shared on social media. (*Id.* at 15–16, 34.)

In response to the mass shooting, Governor Kathy Hochul issued a referral letter to the Office of the Attorney General ("OAG"), directing it to investigate the events surrounding the shooting, focusing on "the specific online platforms that were used to broadcast and amplify the acts and intentions of the mass shooting[.]" (*Id.* at 6; Compl., ECF No. 1 ¶ 38.) Governor Hochul also directed the OAG to "investigate various online platforms for 'civil or criminal liability for their role in promoting, facilitating, or providing a platform to plan or promote violence." (*Id.*)

On October 18, 2022, the OAG released a report detailing its findings. (Sawyer Decl., ECF No. 20 ¶ 3.) In the associated press release, Defendant stated that "[o]nline platforms should be held accountable for allowing hateful and dangerous content to spread on their platforms" because an alleged "lack of oversight, transparency, and accountability of these platforms allows hateful and extremist views to proliferate online." (Compl., ECF No. 1 ¶ 3.)

C.   The Hateful Conduct Law

The Hateful Conduct Law, entitled "Social media networks; hateful conduct prohibited" went into effect on December 3, 2022. The law applies to "Social media network(s)"[1], and defines "Hateful conduct" as:

---

[1]"Social media network" is defined as "service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public." N.Y. Gen. Bus. Law § 394-ccc(1)(b). Defendant does not challenge Plaintiffs' assertion that they have standing to sue, but Defendant reserves the right to do so in the future. (Def.'s Opp'n, ECF No. 21 at 6, n.3.)

> "[T]he use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression."

N.Y. Gen. Bus. Law § 394-ccc(1)(a).  Thus, the Hateful Conduct Law requires that social media networks create a complaint mechanism for three types of "conduct": (1) conduct that vilifies; (2) conduct that humiliates; and (3) conduct that incites violence.  (*Id.*)  This "conduct" falls within the law's definition if it is aimed at an individual or group based on their "race", "color", "religion", "ethnicity", "national origin", "disability", "sex", "sexual" orientation", "gender identity" or "gender expression".  *Id.*

The Hateful Conduct Law has two main requirements: (1) a mechanism for social media users to file complaints about instances of "hateful conduct" and (2) disclosure of the social media network's policy for how it will respond to any such complaints.  First, the law requires a social media network to "provide and maintain a clear and easily accessible mechanism for individual users to report incidents of hateful conduct."  This mechanism must "be clearly accessible to users of such network and easily accessed from both a social media networks' application and website. . . ." and must "allow the social media network to provide a direct response to any individual reporting hateful conduct informing them of how the matter is being handled."  N.Y. Gen. Bus. Law § 394-ccc(2).

Second, a social media network must "have a clear and concise policy readily available and accessible on their website and application. . . "  N.Y. Gen. Bus. Law § 394-ccc(3).  This policy must "include[] how such social media network will respond and address the reports of incidents of hateful conduct on their platform."  N.Y. Gen. Bus. Law § 394-ccc(3).

The law also empowers the Attorney General to investigate violations of the law and provides for civil penalties for social media networks which "knowingly fail[] to comply" with the requirements.  N.Y. Gen. Bus. Law § 394-ccc(5).

## II.  Procedural History

This action was commenced by Plaintiffs on December 1, 2022.  (Compl., ECF No. 1.) The Complaint alleges both facial and as-applied challenges to the Hateful Conduct Law, arguing that it violates the First Amendment because it: (1) is a content and viewpoint-based regulation of speech; (2) is overbroad; and (3) is void for vagueness.  (*See generally id.*)  Plaintiffs also allege that the law is preempted by the Communications Decency Act, 47 U.S.C. § 230.  (*Id.*)

Plaintiffs filed their motion for preliminary injunction on December 6, 2022, arguing that (1) Plaintiffs have a well-founded fear that the law will be enforced against their online platforms and (2) they are likely to prevail on the merits because the law burdens and compels speech, is overbroad, void for vagueness, and preempted by the Communications Decency Act.  (Mot., ECF No. 8; *see generally* Pl.'s Mem., ECF No. 9.)  Defendant filed a memorandum in opposition on December 13, 2022, arguing that Plaintiffs are unlikely to succeed on the merits of their claims because, *inter alia*, the law does not target protected expression based on content or viewpoint, is not substantially overbroad or vague, and is not preempted.  (*See generally* Def.'s Opp'n, ECF No. 21.)

The Court heard oral argument on the motion on December 19, 2022.  (*See* Dec. 19, 2022 "Tr.", ECF No. 27.)

## LEGAL STANDARD

To obtain a preliminary injunction, the movant must show "a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of

equities tips in the party's favor, and that an injunction is in the public interest." *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).  However, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 462, 472 (S.D.N.Y. 2010) ("Temporary restraining orders and preliminary injunctions are among the most drastic tools in the arsenal of judicial remedies, and must be used with great care.") (internal citations omitted).

## DISCUSSION

### I.  Irreparable Harm

Although a showing of irreparable harm is typically the "single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted), "[c]onsideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress and Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).  Accordingly, the Court's analysis will focus on the second prong of the preliminary injunction analysis.

### II.  Likelihood of Success on the Merits

Where, as is the case here, the injunction being sought will provide the plaintiff with substantially all the relief sought in the complaint, the plaintiff must demonstrate a "clear or substantial likelihood of success on the merits." *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (internal citations and quotations omitted).

For the reasons set out more fully below, the Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their First Amendment claims, but not on their preemption claim.

> A.  <u>Plaintiffs' As-Applied First Amendment Challenge</u>
>
>> i.   *The Legal Framework for the First Amendment*

"The First Amendment generally prevents government from proscribing speech…or even expressive conduct…because of disapproval of the ideas expressed. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (internal citations and quotations omitted).  "The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).  Thus, as is relevant to the current facts, "[a]s a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* at 461.  This protection extends to speech which the government may seek to limit because it is offensive or insulting.  *See R.A.V*, 505 U.S. at 391 ("The First Amendment does not permit [the government] to impose special prohibitions on those speakers who express views on disfavored subjects.")  Even regulations that seek to regulate speech "that insult[s], or provoke[s] violence, on the basis of race, color, creed, religion, or gender" have been found to run afoul of the First Amendment because they constitute content and viewpoint-based regulation of protected speech.  *Id.* at 391–92.

In evaluating whether a regulation violates the First Amendment, courts "distinguish between content-based and content-neutral regulations of speech." *Id.*  "Content-based laws— those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz*., 576 U.S. 155, 163 (2015).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Additionally, when "a state compels an individual to speak a particular message, the state alters the content of their speech, and engages in content-based regulation." *CompassCare v. Cuomo*, 465 F. Supp. 3d 122, 155 (N.D.N.Y. 2020) (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*") (internal quotations and alterations omitted)).

<p style="text-align:center;">ii.   <em>Whether the Hateful Conduct Law Compels Speech</em></p>

Plaintiffs argue that the law regulates the content of their speech by compelling them to speak on an issue on which they would otherwise remain silent. (Pl.'s Mem., ECF No. 9 at 12; Tr., ECF No. 27 at 47:5–13.) Defendant argues that the law regulates conduct, as opposed to speech, because there is no requirement for *how* a social media network must respond to any complaints and because the law does not even require the network to specifically respond to a complaint of hateful content. (Def.'s Opp'n, ECF No. 21 at 9.) Instead, the law merely requires that the complaint mechanism *allows* the network to respond, if that is the social media network's policy. (Tr., ECF No. 27 at 11:25–1212:4.)

Defendant likens the Hateful Conduct Law to the regulation upheld in *Restaurant Law Ctr. v. City of New York*, which required fast-food employers to set up a mechanism for their employees to donate a portion of their paychecks to a non-profit of that employee's choosing. 360 F. Supp. 3d 192 (S.D.N.Y. 2019). The court found that this did not constitute "speech"—nor did it constitute "compelled speech"—noting that the "ministerial act" of administering payroll deductions on behalf of their employees did not constitute speech for the employers. *Id.* at 214. As such, the court applied rational basis review and found that the regulation passed muster. *Id.* at 221.

However, those facts are not applicable here.  The Hateful Conduct Law does not merely require that a social media network provide its users with a mechanism to complain about instances of "hateful conduct".  The law also requires that a social media network must make a "policy" available on its website which details how the network will respond to a complaint of hateful content.  In other words, the law requires that social media networks devise and implement a written policy—*i.e.*, speech.

For this reason, the Hateful Conduct Law is analogous to the state mandated notices that were found not to withstand constitutional muster by the Supreme Court and the Second Circuit: *NIFLA* and *Evergreen*.  In *NIFLA*, the Supreme Court found that plaintiffs—crisis pregnancy centers opposing abortion—were likely to succeed on the merits of their First Amendment claim challenging a California law requiring them to disseminate notices stating the existence of family-planning services (including abortions and contraception).  *NIFLA*, 138 S. Ct. at 2371.  The Court emphasized that "[b]y compelling individuals to speak a particular message, such notices 'alte[r] the content of [their] speech.'"  *Id.* (quoting *Riley v. National Federation of Blind of N. C., Inc.*, 487 U.S. 781, 795 (1988)).  Likewise, in *Evergreen*, the Second Circuit held that a state-mandated disclosure requirement for crisis pregnancy centers impermissibly burdened the plaintiffs' First Amendment rights because it required them to "affirmatively espouse the government's position on a contested public issue…."  *Ass'n, Inc. v. City of New York*, 740 F.3d 233, 250 (2d Cir. 2014) (quoting *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 236 (2d Cir. 2011), *aff'd*, 570 U.S. 205 (2013)).

Similarly, the Hateful Conduct Law requires a social media network to endorse the state's message about "hateful conduct".  To be in compliance with the law's requirements, a social media network must make a "concise policy readily available and accessible on their website and

application" detailing how the network will "respond and address the reports of incidents of hateful conduct on their platform."  N.Y. Gen. Bus. Law § 394-ccc(3).  Implicit in this language is that each social media network's definition of "hateful conduct" must be at least as inclusive as the definition set forth in the law itself.  In other words, the social media network's policy must define "hateful conduct" as conduct which tends to "vilify, humiliate, or incite violence" "on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." N.Y. Gen. Bus. Law § 394-ccc(1)(a).  A social media network that devises its own definition of "hateful conduct" would risk being in violation of the law and thus subject to its enforcement provision.

The gap between the state's definition of "hateful conduct" and other potential definitions is illustrated by Plaintiffs' own current content moderation policies.  For instance, Rumble reserves the right to unilaterally remove any content that it deems is:

> "a) is illegal; b) is pornographic, obscene, or of an adult or sexual nature; c) is grossly offensive to the online community, including but not limited to, racism, anti-semitism and hatred; d) supports or incites violence or unlawful acts; e) supports groups that support or incite violence or unlawful acts; or f) promotes terrorist organizations."

(Compl., ECF No. 1 ¶ 116 (internal quotations omitted).)  The policy does not explicitly pertain to content that vilifies or humiliates, as is defined in the law, and does not explicitly apply to content aimed at a person or group's "religion", "disability", "sexual orientation" or "gender expression", as is expressly enumerated in the Hateful Conduct Law.  For Rumble to be in compliance with the law, it would need to publish a policy expressly indicating that its users have a mechanism to complain about the "hateful conduct" as defined by the Hateful Conduct Law, not removable content as defined by Rumble.

Likewise, Locals' website identifies a few categories of content that it may remove from its website, including content that "threatens violence against an individual or group of people." (*Id.* ¶ 133.)  However, this policy also does not encapsulate the classes of groups or persons to whom "hateful conduct" may be directed as is defined by the New York legislature, and it would need to be modified to be brought into compliance with the law by including speech that potentially vilifies or humiliates a group or individual.  To be in compliance with the law, Locals would need to publish a policy detailing the types of content its users are entitled to complain about through the new mechanism—*i.e.,* "hateful conduct" as defined by the law—thus compelling Locals to endorse the state's definition of that term.

Clearly, the law, at a minimum, compels Plaintiffs to speak about "hateful conduct".  As Plaintiffs note, this compulsion is particularly onerous for Plaintiffs, whose websites have dedicated "pro-free speech purpose[s]" (Compl., ECF No. 1 ¶¶ 13, 14), which likely attract users who are "opposed to censorship" (Pl.'s Mem., ECF No. 9 at 24).  Requiring Plaintiffs to endorse the state's definition of "hateful conduct", forces them to weigh in on the debate about the contours of hate speech when they may otherwise choose not to speak.  In other words, the law, "deprives Plaintiffs of their right to communicate freely on matters of public concern" without state coercion. *Evergreen,* 740 F.3d at 250.

Additionally, Plaintiffs have an editorial right to keep certain information off their websites and to make decisions as to the sort of community they would like to foster on their platforms.  It is well-established that a private entity has an ability to make "choices about whether, to what extent, and in what manner it will disseminate speech…" *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1210 (11th Cir. 2022).  These choices constitute "editorial judgments" which are protected by the First Amendment. *Id.* (collecting cases).  In *Pacific Gas & Electric Co. v. Public*

*Utilities Commission of California*, the Supreme Court struck down a regulation that would have forced a utility company to include information about a third party in its billing envelopes because the regulation "require[d] appellant to use its property as a vehicle for spreading a message with which it disagrees." 475 U.S. 1, 17 (1986).

Here, the Hateful Conduct Law requires social media networks to disseminate a message about the definition of "hateful conduct" or hate speech—a fraught and heavily debated topic today. Even though the Hateful Conduct Law ostensibly does not dictate what a social media website's response to a complaint must be and does not even require that the networks respond to any complaints or take down offensive material, the dissemination of a policy about "hateful conduct" forces Plaintiffs to publish a message with which they disagree. Thus, the Hateful Conduct Law places Plaintiffs in the incongruous position of stating that they promote an explicit "pro-free speech" ethos, but also requires them to enact a policy allowing users to complain about "hateful conduct" as defined by the state.

iii.    *Whether the Hateful Conduct Law Compels Commercial Speech*

In the alternative, Defendant argues that even if the law is found to regulate speech, it only regulates commercial speech and should thus be subject to a lesser standard of review. (Def.'s Opp'n, ECF No. 21 at 9, 12–13.) Defendant characterizes the law's requirement that social media networks publish a policy as "a truthful disclosure of fact" that is only subject to rational basis review. (Tr., ECF No. 27 at 44:7–8.) Defendant likens the Hateful Conduct Law's policy requirement to other regulations upheld by the Second Circuit requiring (1) chain restaurants to post calorie content information for their menu items, *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 137 (2d Cir. 2009), and (2) lightbulb manufacturers to disclose the

mercury content in their products, *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001).

 In general, laws regulating commercial speech are subject to a lesser standard of scrutiny. *N.Y. State Rest. Ass'n v. New York City Bd. of Health*, No. 08-CV-1000(RJH), 2008 WL 1752455, at *6 (S.D.N.Y. Apr. 16, 2008), *aff'd*, 556 F.3d 114 (2d Cir. 2009) (citing *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001)).  The Supreme Court has articulated two definitions of what constitutes commercial speech.  First, speech is considered to be commercial when it "'does no more than propose a commercial transaction.'"  *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)). Second, "commercial speech [constitutes] 'expression related solely to the economic interests of the speaker and its audience.'"  *Conn. Bar Ass'n*, 620 F.3d at 94 (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980)).  Commercial speech is generally subject to intermediate scrutiny, *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014); however, where the commercial speech conveys "purely factual and uncontroversial" information, courts apply rational basis review.  *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009) (*citing Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 114–15).

 The policy disclosure at issue here does not constitute commercial speech and conveys more than a "purely factual and uncontroversial" message.  The law's requirement that Plaintiffs publish their policies explaining how they intend to respond to hateful content on their websites does not simply "propose a commercial transaction".  Nor is the policy requirement "related solely to the economic interests of the speaker and its audience."  Rather, the policy requirement compels a social media network to speak about the range of protected speech it will allow its users to engage (or not engage) in.  Plaintiffs operate websites that are directly engaged in the proliferation of

speech—Volokh operates a legal blog, whereas Rumble and Locals operate platforms where users post video content and comment on other users' videos.

The "lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988). Where speech is "inextricably intertwined with otherwise fully protected speech", it does not retain any of its potential commercial character. *Id.* Here, the law clearly implicates protected speech—namely hate speech—by requiring a disclosure of the Plaintiffs' policy for responding to complaints of hateful content. This is different in character and kind from commercial speech and amounts to more than mere disclosure of factual information, such as caloric information or mercury content, as Defendant tries to equate.

iv.     *Whether the Hateful Conduct Law Survives Strict Scrutiny*

Because the Hateful Conduct Law regulates speech based on its content, the appropriate level of review is strict scrutiny. *See Evergreen*, 740 F.3d at 244. To satisfy strict scrutiny, a law must be "narrowly tailored to serve a compelling governmental interest." *Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 96 (2d Cir. 2007). A statute is not narrowly tailored if "a less restrictive alternative would serve the Government's purpose." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813, (2000).

Plaintiffs argue that limiting the free expression of protected speech is not a compelling state interest and that the law is not narrowly tailored. While Defendant concedes that the Hateful Conduct Law may not be able to withstand strict scrutiny, she maintains that the state has a compelling interest in preventing mass shootings, such as the one that took place in Buffalo. (Tr., ECF No. 27 at 45:1–15.)

Although preventing and reducing the instances of hate-fueled mass shootings is certainly a compelling governmental interest, the law is not narrowly tailored toward that end.[2]  Banning conduct that incites violence is not protected by the First Amendment[3], but this law goes far beyond that.

While the OAG Investigative Report does make a link between misinformation on the internet and the radicalization of the Buffalo mass shooter (Sawyer, Decl., Ex. A, ECF No. 20-1 at 23–26), even if the law was truly aimed at reducing the instances of hate-fueled mass shootings, the law is not narrowly tailored toward reaching that goal.  It is unclear what, if any, effect a mechanism that allows users to report hateful conduct on social media networks would have on reducing mass shootings, especially when the law does not even require that social media networks affirmatively respond to any complaints of "hateful conduct".  In other words, it is hard to see how the law really changes the status quo—where some social media networks choose to identify and remove hateful content and others do not.

---

[2] The memorandum in support of the legislation that was presented to the New York State Assembly ahead of the floor debate lists the justification for the law as "concerns about misinformation that is spread on social media networks."  (Sawyer Decl., Ex. C, ECF No. 20-3.)  While the law was enacted in the wake of the Buffalo mass shooting, the original iteration of the bill was drafted in the wake of the events of January 6, 2021 (Compl., ECF No. 1 ¶ 30; Sawyer Decl., Ex. D, ECF No. 20-4 at 182–183), further suggesting that the law is really aimed at misinformation on the internet.  However, the First Amendment's shielding of hate speech from regulation means that a state's desire to reduce this type of speech from the public discourse cannot be a compelling governmental interest

[3] The Supreme Court has held that speech that consists of "fighting words" and speech that incites violence or lawlessness are not protected by the First Amendment.  *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).  For speech to incite violence, "there must be 'evidence or rational inference from the import of the language, that [the words in question] were intended to produce, and likely to produce, imminent' lawless action."  *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 70 F. Supp. 3d 572, 581 (S.D.N.Y. 2015), *vacated on other grounds*, 109 F. Supp. 3d 626 (S.D.N.Y. 2015) (citations omitted).  The Hateful Conduct law's ban on speech that incites violence is not limited to speech that is likely to produce *imminent* lawless action.

Accordingly, for the reasons stated above, the Court finds that Plaintiffs have demonstrated a substantial likelihood of success on their as applied First Amendment challenges to the Hateful Conduct Law.

> B. Plaintiffs' Facial First Amendment Challenges

Plaintiffs argue that the Hateful Conduct Law "is overbroad because it applies to a substantial amount of protected speech, especially compared to its nonexistent or minimal lawful application" and is unconstitutionally vague. (Pls.' Mem., ECF No. 9 at 17–20.) In response, Defendant argues that Plaintiffs have not demonstrated that the law would chill protected speech and that the operative terms of the law are clear and defined. (Def.'s Opp'n., ECF No. 21 at 18–23.)

Both the Supreme Court and the Second Circuit have recognized that "[a]lthough facial challenges are generally disfavored, they are more readily accepted in the First Amendment context." *Picard v. Magliano*, 42 F.4th 89, 101 (2d Cir. 2022) (quoting *Beal v. Stern*, 184 F.3d 117, 125 (2d Cir. 1999)). Although facial invalidation of a statute is a "strong medicine" that should be applied "sparingly and only as a last resort", *Hobbs v. Cnty. of Westchester*, 397 F.3d 133, 155 (2d Cir. 2005) (quoting *FCC v. Pacifica Foundation*, 438 U.S. 726, 743 (1978)); *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 105 (2d Cir. 2003), a court may consider a facial overbreadth claim where a plaintiff has established that there are no set of circumstances under which the challenged statute could be valid or that the challenged statute "lacks any plainly legitimate sweep." *Picard*, 42 F.4th at 101 (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).

"It is established that the courts may, as an exception to ordinary standing requirements, entertain a claim that a law, even if constitutional as applied to the claimant, is so broad that it

"may inhibit the constitutionally protected speech of third parties[.]" *Hobbs*, 397 F.3d at 155. "The purpose of an overbreadth challenge is to prevent the chilling of constitutionally protected conduct, as prudent citizens will avoid behavior that may fall within the scope of a prohibition, even if they are not entirely sure whether it does." *Farrell v. Burke*, 449 F.3d 470, 499 (2d Cir. 2006). "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). "When a court finds that a statute suffers from such substantial overbreadth, all enforcement of the statute is generally precluded." *Am. Booksellers Found.*, 342 F.3d at 104.

As the Court has already discussed, the law is clearly aimed at regulating speech. Social media websites are publishers and curators of speech, and their users are engaged in speech by writing, posting, and creating content. Although the law ostensibly is aimed at social media networks, it fundamentally implicates the speech of the networks' users by mandating a policy and mechanism by which users can complain about other users' protected speech.

Moreover, the Hateful Conduct law is a content based regulation. The law requires that social media networks develop policies and procedures with respect to hate speech (or "hateful conduct" as it is recharacterized by Defendant). As discussed, the First Amendment protects individuals' right to engage in hate speech, and the state cannot try to inhibit that right, no matter how unseemly or offensive that speech may be to the general public or the state. *See Matal*, 137 S. Ct. at 1764; *see also R.A.V.*, 505 U.S. at 391. Thus, the Hateful Conduct Law's targeting of speech that "vilifi[es]" or "humili[ates"] a group or individual based on their "race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression" N.Y. Gen. Bus. Law § 394-ccc(1)(a), clearly implicates the protected speech of social media users.

This could have a profound chilling effect on social media users and their protected freedom of expression.  Even though the law does not require social media networks to remove "hateful conduct" from their websites and does not impose liability on users for engaging in "hateful conduct", the state's targeting and singling out of this type of speech for special measures certainly could make social media users wary about the types of speech they feel free to engage in without facing consequences from the state.  This potential wariness is bolstered by the actual title of the law— "Social media networks; hateful conduct prohibited" —which strongly suggests that the law is really aimed at reducing, or perhaps even penalizing people who engage in, hate speech online.  As Plaintiffs noted during oral argument, one can easily imagine the concern that would arise if the government required social media networks to maintain policies and complaint mechanisms for anti-American or pro-American speech.  (Tr., ECF No. 27 at 29:2.)  Moreover, social media users often gravitate to certain websites based on the kind of community and content that is fostered on that particular website.  Some social media websites—including Plaintiffs'— intentionally foster a "pro-free speech" community and ethos that may become less appealing to users who intentionally seek out spaces where they feel like they can express themselves freely.

The potential chilling effect to social media users is exacerbated by the indefiniteness of some of the Hateful Conduct Law's key terms.  It is not clear what the terms like "vilify" and "humiliate" mean for the purposes of the law.  While it is true that there are readily accessible dictionary definitions of those words, the law does not define what type of "conduct" or "speech" could be encapsulated by them.  For example, could a post using the hashtag "BlackLivesMatter" or "BlueLivesMatter" be considered "hateful conduct" under the law?  Likewise, could social media posts expressing anti-American views be considered conduct that humiliates or vilifies a group based on national origin?  It is not clear from the face of the text, and thus the law does not

put social media users on notice of what kinds of speech or content is now the target of government regulation.

Accordingly, because the Hateful Conduct Law appears to "reach[…] a substantial amount of constitutionally protected conduct", *Farrell*, 449 F.3d at 496 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983)), the Court finds that Plaintiffs have demonstrated a likelihood of success on their facial challenges under the First Amendment.[4]

C.  Preemption Under Section 230 of the Communications Decency Act

Lastly, Plaintiffs allege that the Hateful Conduct Law is preempted by Section 230 of the Communications Decency Act because it imposes liability on websites by treating them as publishers.  (Pl.'s Mem., ECF No. 9 at 20–21.)

The Communications Decency Act provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1); *see also Ricci v. Teamsters Union Loc. 456*, 781 F.3d 25, 27 (2d Cir. 2015).  The Act has an express preemption provision which states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).

---

[4] The Court also finds that severing parts of the law would not serve to save the entire statute. As stated in footnote four, while speech that incites violence is not protected by the First Amendment, whether speech does in fact incite violence is a fact-based inquiry.  *See Am. Freedom Def. Initiative*, 70 F. Supp. 3d at 581 (For speech to incite violence, "there must be 'evidence or rational inference from the import of the language, that [the words in question] were intended to produce, and likely to produce, imminent' lawless action.").  The Supreme Court has rarely applied this standard, "and never explicitly found speech to be on the proscribable side of the standard."  *Id.*  Thus, it is not clear that limiting the Hateful Conduct Law only to speech that incites violence would necessarily pass constitutional muster.  In addition, at oral argument, Plaintiffs argued that the law was not severable.  (Tr., ECF No. 27 at 62:8–63:7.)

A plain reading of the Hateful Conduct Law shows that Plaintiffs' argument is without merit. The law imposes liability on social media networks for failing to provide a mechanism for users to complain of "hateful conduct" and for failure to disclose their policy on how they will respond to complaints. N.Y. Gen. Bus. Law § 394-ccc(5). The law does not impose liability on social media networks for failing to respond to an incident of "hateful conduct", nor does it impose liability on the network for its users own "hateful conduct". The law does not even require that social media networks remove instances of "hateful conduct" from their websites. Therefore, the Hateful Conduct Law does not impose liability on Plaintiffs as publishers in contravention of the Communications Decency Act.

### III.  Balance of the Equities

Finally, given that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their First Amendment claims, the Court must consider whether "the balance of the equities tips in [Plaintiffs'] favor, and [whether] an injunction is in the public interest." *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

Given that "enjoining enforcement of a statute that potentially violates citizens' constitutional rights is in the public interest", and that Defendant can show no harm as a result of being prevented from enforcing an unconstitutional statute, the Court finds that the balance of the equities tips in favor of granting the preliminary injunction. *See CompassCare*, 465 F. Supp. 3d at 159.

### CONCLUSION

Accordingly, for the aforementioned reasons, the Court finds that Plaintiffs are entitled to a preliminary injunction prohibiting the enforcement of N.Y. Gen. Bus. Law § 394-ccc. The Clerk of Court is respectfully requested to terminate the pending motion at ECF No. 8.

Dated:  February 14, 2023
       New York, New York

_____

**ANDREW L. CARTER, JR.**
**United States District Judge**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EUGENE VOLOKH, RUMBLE CANADA INC., and LOCALS TECHNOLOGY INC. | No. 22 Civ. 10195 (ALC) |
| Plaintiffs, | |
| - against - | **NOTICE OF APPEAL** |
| LETITIA JAMES, in her official capacity as Attorney General of New York, | |
| Defendant. | |

PLEASE TAKE NOTICE that Defendant Letitia James, Attorney General of the State of New York, hereby appeals to the United States Court of Appeals for the Second Circuit from this Court's Opinion and Order dated February 14, 2023 (ECF No. 29), granting Plaintiffs' motion for a preliminary injunction.

Dated: New York, New York
        March 13, 2023

<div style="margin-left:40%">

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendant-Appellant*
28 Liberty Street
New York, New York 10005

By:  /s/ Seth J. Farber
Seth J. Farber
Special Litigation Counsel
(212) 416-8029
Seth.Farber@ag.ny.gov
Katherine Rhodes Janofsky
Assistant Attorney General
(212) 416-8621
Katherine.Janofsky@ag.ny.gov
Rick Sawyer
Special Counsel for Hate Crimes
(212) 416-6182
Richard.Sawyer@ag.ny.gov

</div>

TO:     All Counsel of Record (Via ECF)

[*No document reproduced on this page*]