# 23-0356

# United States Court of Appeals

*for the*

# Second Circuit

———◆———

EUGENE VOLOKH, LOCALS TECHNOLOGY INC.,
RUMBLE CANADA INC.,

*Plaintiffs-Appellees,*

— v. —

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLEES

JAMES MICHAEL DIAZ
DANIEL ORTNER
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, Pennsylvania 19106
(215) 717-3473

BARRY NELSON COVERT
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
(716) 849-1333

*Attorneys for Plaintiffs-Appellees*

# CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 of the Federal Rules of Appellate Procedure, Appellees certify that Locals Technology Inc. is a private corporation that operates the Locals platform and is a wholly owned subsidiary of Rumble Inc., a publicly held corporation. Rumble Inc. is also the owner of 100045707 Ontario Inc., a private corporation, which owns 100045728 Ontario Inc., a private corporation. 100045728 Ontario Inc. owns Rumble Canada Inc., a private corporation that operates the Rumble Platform. As of the date of this filing, no public corporation or publicly held corporation owns ten percent or more of Rumble Inc.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................VI

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF THE ISSUES.................................................................4

STATEMENT OF THE CASE ...................................................................5

    A.    Factual and Legal Background .................................................5

        1.    New York's Online Hate Speech Law simultaneously regulates, compels, and burdens protected speech based on viewpoint. .........................................................5

        2.    The Online Hate Speech Law was enacted to regulate protected internet speech. ..............................7

        3.    Volokh, Rumble, and Locals are committed to free speech and object to being forced to single out state-defined hate speech. ...........................11

    B.    Procedural History .................................................................12

SUMMARY OF ARGUMENT ..................................................................15

ARGUMENT ...........................................................................................19

    I.    The Online Hate Speech Law Violates the First Amendment Facially and As-Applied. ...................................19

        A.    New York's statute impermissibly singles out a particular viewpoint for stigmatizing regulation. ....................................................................20

            1.    The Online Hate Speech Law is a content-based and viewpoint-discriminatory speech regulation. .......................21

2.    The plain language of the law's provisions and its legislative history demonstrate the State's intent to stigmatize and suppress protected viewpoints. ...........................................23

3.    The Online Hate Speech Law interferes with Plaintiffs' First Amendment rights as speakers and publishers. ....................29

B.    The district court correctly held the Online Hate Speech Law unconstitutionally compels speech on a "contested public issue." ...........................32

C.    New York's Online Hate Speech Law is not narrowly tailored to serve a compelling government interest, if one even exists, and cannot survive even intermediate scrutiny. ...............47

II.    New York's Online Hate Speech Law Burdens the First Amendment Activities of Websites and Users. ...................................................................55

A.    The ultimate goal of New York's Online Hate Speech Law is to suppress speech the government dislikes. ...................................................55

B.    The Online Hate Speech Law will chill covered websites' users' protected speech. ...................58

III.    New York's Online Hate Speech Law Is Unconstitutionally Overbroad. ................................60

IV.    New York's Online Hate Speech Law Is Unconstitutionally Vague. ....................................63

V.    Plaintiffs Have an "Actual and Well-founded Fear" That New York Will Enforce Its Online Hate Speech Law in Violation of the First Amendment. .............66

iv

VI.   The District Court Properly Held Appellees Satisfied the Remaining Preliminary Injunction Factors. ...................................................................... 69

CONCLUSION ......................................................................... 73

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                              **Page(s)**

*All. for Open Soc'y Int'l, Inc. v. USAID,*
  651 F.3d 218 (2d Cir. 2011) ................................................................ 38

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.,*
  70 F. Supp. 3d 572 (S.D.N.Y. 2015) ...................................... 62

*Am. Meat Inst. v. USDA,*
  760 F.3d 18 (D.C. Cir. 2014) .............................................. 52

*American Booksellers Found. v. Dean,*
  342 F.3d 96 (2d Cir. 2003) ................................................... 63

*Anderson v. Treadwell,*
  294 F.3d 453 (2d Cir. 2002) ................................................ 39

*APWU v. Potter,*
  343 F.3d 619 (2d Cir. 2003) ................................................ 25

*Ark. Educ. Television Comm'n v. Forbes,*
  523 U.S. 666 (1998) ............................................................. 30

*Ashcroft v. Free Speech Coal.,*
  535 U.S. 234 (2002) ............................................................. 51

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58, 68 (1963). ................................................. 4, 55

*Bd. of Trustees of State Univ. of New York v. Fox,*
  492 U.S. 469 (1989) ......................................... 39, 40, 54, 63

*Bery v. City of New York,*
  97 F.3d 689 (2d Cir. 1996) .................................................. 69

vi

*Bolger v. Youngs Drug Products Corp.*,
    463 U.S. 60 (1983) ................................................................. 39

*Brockett v. Spokane Arcades, Inc.*,
    472 U.S. 491 (1985) ............................................................... 63

*Bronx Household of Faith v. Bd. of Educ.*,
    331 F.3d 342 (2d Cir. 2003)................................................... 69

*Brown v. Ent. Merchants Ass'n*,
    564 U.S. 786 (2011) ......................................................... 53, 59

*Cf. Doninger v. Niehoff*,
    527 F.3d 41 (2d Cir. 2008)..................................................... 70

*Cf. Palmieri v. Lynch*,
    392 F.3d 73 (2d Cir. 2004)..................................................... 47

*Cipolla-Dennis v. Cnty. of Tompkins*,
    No. 21-712, 2022 WL 1237960 (2d Cir. 2022) ...................... 23

*CISPES v. F.B.I.*,
    770 F.2d 468, 474 (5th Cir. 1985 ......................................... 28

*DeJohn v. Temple Univ.*,
    537 F.3d 301 (3d Cir. 2008)................................................... 62

*Denver Area Educ. Telecomm. Consortium, Inc., v. FCC*,
    518 U.S. 727 (1996) ............................................................... 53

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ............................................................... 42

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................... 69

*Ent. Software Ass'n v. Blagojevich*,
    469 F.3d 641 (7th Cir. 2006) .......................................... 44, 46

*Evergreen Ass'n, Inc. v. City of New York*,
740 F.3d 233 (2d Cir. 2014) .............................................................. 3, 16

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) ............................................................................... 30

*Free Speech Coal., Inc., v. Colmenero*,
No. 1:23-CV-917-DAE (W.D. Tex. Aug. 31, 2023) ................................ 43

*Grocery Mfrs. Ass'n v. Sorrell*,
102 F. Supp. 3d 583 (D. Vt. 2015) ......................................................... 64

*Guterman v. Costco Wholesale Corp.*,
927 F.3d 67 (2d Cir. 2019) ..................................................................... 28

*Healy v. James*,
408 U.S. 169 (1972) ............................................................................... 20

*Hedges v. Obama*,
724 F.3d 170 (2d Cir. 2013) ................................................................... 66

*Hernandez v. Barrios-Paoli*,
93 N.Y.2d 781 (1999) ............................................................................. 24

*Hess v. Indiana*,
414 U.S. 105 (1973) ............................................................................... 51

*Houston v. Hill*,
482 U.S. 451 (1987) .................................................................... 27, 63, 64

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Group of Boston*,
515 U.S. 557 (1995) ...................................................................... *passim*

*IMS Health Inc. v. Sorrell*,
630 F.3d 263 (2d Cir. 2010) ................................................................... 30

*Int'l Dairy Foods Ass'n v. Amestoy,*
  92 F.3d 67 (2d Cir. 1996) ................................................................... 52

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps. Council 31,*
  138 S. Ct. 2448 (2018) ......................................................................... 33

*Jennings v. Rodriguez,*
  138 S. Ct. 830 (2018) ........................................................................... 27

*Knox v. Serv. Emps. Int'l Union, Loc. 1000,*
  567 U.S. 298 (2012) ............................................................................. 33

*La Comunidad Hispana De Locust Valley v. Town of Oyster Bay,*
  868 F.3d 104 (2d Cir. 2017) ................................................................ 26

*Lamont v. Postmaster Gen.,*
  391 U.S. 301 (1965) ............................................................................. 51

*Leathers v. Medlock,*
  499 U.S. 439 (1991) ............................................................................. 49

*Legal Servs. Corp. v. Velazquez,*
  531 U.S. 533 (2001) ............................................................................. 23

*Marks Org., Inc. v. Joles,*
  784 F. Supp. 2d 322 (S.D.N.Y. 2011) ................................................. 71

*Matal v. Tam,*
  137 S. Ct. 1744 (2017) ................................................................. *passim*

*Miami Herald Publ'g. Co. v. Tornillo,*
  418 U.S. 241 (1974) ..................................................................... *passim*

*Missouri v. Biden,*
  No. 23-30445, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) .................. 58

*Nat'l Inst. of Family & Life Advocs. v. Becerra,*
  138 S. Ct. 2361 (2018) .................................................................. 34, 35

*Netchoice, LLC. v. Bonta*,
No. 5:22-cv-08861-BLF (E.D. Cal. Sept. 18, 2023) ............................... 52

*N.Y. State Superfund Coal., Inc. v. N.Y. State Dep't of Env't.*
*Conservation*,
75 N.Y.2d 88 (1989) ................................................................. 26

*NAACP v. Button*,
371 U.S. 415 (1963) ................................................................. 64

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015)..................................................... 41

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001)................................................. 39, 42, 44

*Nat'l Org. for Marriage, Inc. v. Walsh*,
714 F.3d 682 (2d Cir. 2013)................................................... 66, 72

*NetChoice, LLC v. Att'y Gen. Fla.*,
34 F.4th 1196 (11th Cir. 2022).............................................. *passim*

*NetChoice, LLC v. Paxton*,
49 F. 4th 439 (5th Cir. 2022)............................................... 45, 66

*NetChoice, LLC, v. Griffin*,
No. 5:23-CV-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ..... 65

*New York State Club Ass'n, Inc. v. City of New York*,
487 U.S. 1 (1988) ................................................................... 58

*New York State Rest. Ass'n v. New York City Bd. of Health*,
556 F.3d 114 (2d Cir. 2009).............................................. 25, 42, 44

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003)...................................................... 55

*Open Soc'y Just. Initiative v. Trump*,
510 F. Supp. 3d 198 (S.D.N.Y. 2021) ................................................... 72

*Pac. Cap. Bank, N.A. v. Connecticut*,
542 F.3d 341 (2d Cir. 2008) ................................................... 67

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S. 1 (1986) ................................................... 33, 46

*People v. Marquan M.*,
24 N.Y.3d (2014) ................................................... 26

*People v. Page*,
35 N.Y.3d 199 (2020) ................................................... 57

*Pham v. Ragbir*,
141 S. Ct. 227 (2020) ................................................... 22

*PSINet v. Chapman*,
167 F. Supp. 2d 878 (W.D. Va. 2001) ................................................... 58

*Ragbir v. Homan*,
923 F.3d 53(2d Cir. 2019) ................................................... 22

*R.A.V. v. City of St. Paul, Minn.*,
505 U.S. 377 (1992) ................................................... 15, 20, 61, 62

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ................................................... 21, 47

*Reno v. ACLU*,
521 U.S. 844 (1997) ................................................... 55

*Restaurant Law Center v. City of New York*,
360 F. Supp. 3d 192 (S.D.N.Y. 2019) ................................................... 37

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ................................................... 39, 40

xi

*Roberts v. Haragan,*
  346 F. Supp. 2d 853 (N.D. Tex. 2004) .................................................. 62

*Romer v. Evans,*
  517 U.S. 620 (1996) ............................................................................ 51

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
  515 U.S. 819 (1995) ...................................................................... 22, 47

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
  547 U.S. 47 (2006). ............................................................................ 37

*Sable Commc'ns of Cal., Inc. v. FCC,*
  492 U.S. 115 (1989) ...................................................................... 53, 54

*Saxe v. St. Coll. Area Sch. Dist.,*
  240 F.3d 200 (3d Cir. 2001) ............................................................... 61

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ............................................................................ 30

*Stanley v. Georgia,*
  394 U.S. 557 (1969) ............................................................................ 51

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.,*
  60 F.3d 27 (2d Cir. 1995) ................................................................... 71

*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.,*
  17 F.3d 38 (2d Cir. 1994) ................................................................... 71

*Tunick v. Safir,*
  228 F.3d 135 (2d Cir. 2000) ............................................................... 24

*Turner Broad. Sys. v. F.C.C.,*
  512 U.S. 622 (1994) ...................................................................... 21, 33

*Twitter, Inc. v. Taamneh,*
  143 S. Ct. 1206 (2023) ........................................................ 39

*United States v. Keppler,*
  2 F.3d 21 (2d Cir. 1993) ..................................................... 71

*United States v. Playboy Ent. Grp., Inc.,*
  529 U.S. 803 (2000) ........................................................... 48

*United States v. Schwimmer,*
  279 U.S. 655 (1929) ............................................................. 1

*United States v. Wunsch,*
  84 F.3d 1110 (9th Cir. 1996) .............................................. 64

*Virginia v. Am. Booksellers Ass'n, Inc.,*
  484 U.S. 383 (1988). .......................................................... 59

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976) ................................................. 16, 39, 41

*Vt. Right to Life Comm. v. Sorrell,*
  221 F.3d 376 (2d Cir. 2000)............................................... 66

*Wandering Dago, Inc. v. Destito,*
  879 F.3d 20 (2d Cir. 2018)...................................... 22, 32, 48

*Wash. State Grange v. Wash. State Republican Party,*
  552 U.S. 442 (2008) ........................................................... 61

*Washington Post v. McManus,*
  944 F.3d 506 (4th Cir. 2019) ........................... 21, 33, 48, 56

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.,*
  423 F.3d 137 (2d Cir. 2005)............................................... 70

*West Virginia State Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ........................................................... 33

*We the Patriots United States v. Conn. Office of Early Childhood Dev.*,
76 F.4th 130 (2d Cir. 2023) ...................................................................2

*Wooley v. Maynard*,
430 U.S. 705 (1977) ............................................................................33

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
471 U.S. 626 (1985) .................................................................*passim*

## Statutes

Communications Decency Act. 47 U.S.C. § 230 ......................................12

N.Y. Gen. Bus. Law § 394-ccc ..............................................................6

Senate Bill S4511, 2021-2022 Legislative Session (N.Y. 2022)...............8

## Other Authorities

Editorial Board*, Burning the Quran is offensive. Banning it rewards
violent threats.*, THE WASHINGTON POST, Sept. 3, 2023.........................3

Richard Allan, *Hard Questions: Who Should Decide What Is Hate
Speech in an Online Global Community?*, META NEWSROOM, June 27,
2017 .....................................................................................................31

*Transcript of Regular Session of New York State Senate*,
June 2, 2022 .........................................................................................2

# PRELIMINARY STATEMENT

The State of New York enacted General Business Law (GBL) § 394-ccc to stigmatize and suppress "hateful" speech on the internet—disregarding that the "proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 655, 655 (1929) (Holmes, J., dissenting)). Recognizing this fundamental principle, the district court preliminarily enjoined the statute. This Court should affirm.

By its plain language, New York's statute (the "Online Hate Speech Law") is a content-based and viewpoint-discriminatory regulation of speech. It defines hate speech, mislabeled as "hateful conduct," as speech that may "vilify, humiliate, or incite violence against a group" based on ten protected-class statuses. Incorporating this definition, innumerable websites must then develop and publish on their websites a policy and reporting mechanism for hate speech and send responses to individual users who report hate speech. According to the New York Senate's President, these requirements are designed to "allow law enforcement to break the echo chamber where malice

1

festers," and to "confront[] the spread of misinformation and hateful ideology" on the internet.[1] But, as the district court correctly noted, "one can easily imagine the concern that would arise if the government required [websites] to maintain policies and complaint mechanisms for anti-American or pro-American speech." Joint App'x (J.A.) 353. And under the First Amendment, this concern applies equally to all viewpoints.

New York's law explicitly targets one type of speech—hate speech—for regulation. Its three requirements force Plaintiffs Volokh, Rumble, and Locals, among all other covered websites, to promote the State's views—that "hate speech" is disfavored, definable as the State prescribes, and should be reported to authorities—when they otherwise would not. And the definition's overbreadth and vagueness mean that the law encompasses a substantial amount of protected online speech including, for example, footage of Malcolm X speaking about white people, J.A. 15 ¶ 23, a video segment poking fun at the British for

---

[1] *Transcript of Regular Session of New York State Senate* at 5367, June 2, 2022, 1:18 PM. This Court should take judicial notice of the Senate hearing transcript as an official government record. *See, e.g.*, *We the Patriots United States v. Conn. Office of Early Childhood Dev.*, 76 F.4th 130, 136 (2d Cir. 2023) ("[A]s a fundamental matter, courts may take judicial notice of legislative history.").

having a monarchy, J.A. 14 ¶ 23, a recent editorial in *The Washington Post* opposing bans of Quran burning,[2] and content on Plaintiffs' websites. These kinds of speech regulations, by their nature, cannot pass constitutional muster.

The State nevertheless swings wildly from arguing that its law regulates conduct, not speech—even though the law regulates only website content—to claiming that forced promotion of the State's views on hate speech requires only a "factual and uncontroversial" disclosure akin to mercury warning labels on lightbulbs. But, the First Amendment prohibits banning, compelling, chilling or otherwise regulating speech in a manner that "deprives . . . [people of] their right to communicate freely on matters of public concern." J.A. 346 (quoting *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 250 (2d Cir. 2014)). To stop New York's viewpoint-discriminatory regulation of speech and protect the free exchange of ideas on the internet, this Court must affirm.

---

[2] *See* Editorial Board, *Burning the Quran is offensive. Banning it rewards violent threats.*, THE WASHINGTON POST, Sept. 3, 2023, https://www.washingtonpost.com/opinions/2023/09/03/quran-burning-sweden-denmark/ [https://perma.cc/VC2G-EJNR].

## STATEMENT OF THE ISSUES

(1) Does New York's Online Hate Speech Law violate the First Amendment by forcing innumerable websites to target disfavored online "hate speech," as it is defined by the State?

(2) By requiring websites to develop and publish a "hate speech" policy and reporting mechanism, as well as send responses to individual users, does the Online Hate Speech Law unconstitutionally compel speech?

(3) Under *Bantam Books, Inc. v. Sullivan* and its progeny, does the Online Hate Speech Law, in light of numerous veiled threats of enforcement from New York's highest elected officials against websites that publish "hateful" ideas, unconstitutionally burden protected speech in violation of the First Amendment?

(4) Is the Online Hate Speech Law unconstitutionally overbroad or vague because it chills website and user speech related to what someone, somewhere may view as "vilify[ing], humiliat[ing], or incit[ing] violence against" groups in ten protected-class statuses?

## STATEMENT OF THE CASE

### A.    Factual and Legal Background

New York's viewpoint-discriminatory Online Hate Speech Law

furthers its policymakers' stated goals of stigmatizing and suppressing

"hateful" speech on the internet, impinging on the First Amendment

rights of Plaintiffs and countless other websites.

### 1.    New York's Online Hate Speech Law simultaneously regulates, compels, and burdens protected speech based on viewpoint.

New York's Online Hate Speech Law presents a First Amendment

"triple whammy." It unconstitutionally regulates protected speech,

compels covered websites to endorse and promote the State's

unconstitutional perspective on "hate speech" (mislabeled in the statute

as "hateful conduct"), and pressures them to target this disfavored—but

protected—speech because of its viewpoint, under pain of investigation

and fines. J.A. 8 ¶ 2.

The statute is vast in its reach. First, it applies to any "social

media network," which is broadly defined to cover virtually every for-

profit website with user-generated content or a comment section that is

accessed by New Yorkers.[3] GBL § 394-ccc(1)(b), J.A. 62. This could include globally popular sites like Facebook, a niche bonsai cultivation forum,[4] the website of *The Washington Post*, religious blogs,[5] video-sharing platforms like Rumble, subscription-based communities like Locals, and legal news and commentary blogs like *The Volokh Conspiracy*.

Second, the statute expansively targets "use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons" based on ten protected classes, including race, religion, gender, or disability—in other words, "hate speech." GBL § 394-ccc(1)(a); J.A. 62. Although New York mischaracterizes this law as targeting *conduct*, it is aimed at pure expression.

New York requires websites to address "hate speech" in three ways. First, websites must develop and publish a policy describing how they "will respond [to] and address" complaints of "hateful" speech. GBL

---

[3] "Social media network" is defined as "service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public." GBL § 394-ccc(1)(b); J.A. 62.

[4] WEE TREES BONSAI FORUM, http://weetrees.co.uk/phpBB3/ [https://perma.cc/3HYN-2TZ8].

[5] AMT Blog, AMERICAN MUSLIM TODAY, https://americanmuslimtoday.net/blog [https://perma.cc/3HYN-2TZ8].

§ 394-ccc(3); J.A.62. This policy must be "clear and concise" and "readily available and accessible." *Id.* Second, websites must develop and publish a "clear and easily accessible mechanism" for visitors to report "hateful conduct" to the site. GBL § 394-ccc(2); J.A. 62. The mechanism must also allow the website to respond to complaints. *Id.* Third, websites must "provide a direct response" to individual complainants, "informing them of how the matter is being handled." *Id.*; *see also* GLB § 394-ccc(3) (The policy must include "*how* [websites] *will* respond and address the reports." (emphasis added)). These requirements are enforceable through State Attorney General investigations, subpoenas, and daily fines of $1,000 per violation. GBL § 394-ccc(5); J.A. 62.

**2. The Online Hate Speech Law was enacted to regulate protected internet speech.**

New York enacted the Online Hate Speech Law to ensure the State could enforce its policymakers' desire to reduce "hate speech" on the internet, as illustrated by (1) the original bills it was based on; (2) its legislative history and signing statements; and (3) the Attorney General's investigation and report on social media companies in the wake of the tragic Buffalo shooting.

7

However, New York did not enact its Online Hate Speech Law in a vacuum. For at least several years, legislators have sought to chill, prohibit, and remove online hate speech. In 2019, Senate Bill S.7275, the "Social Media Hate Speech Accountability Act," was introduced to "require social media network platforms to create a process to remove" so-called "hate speech." J.A. 16 ¶¶ 26–28. In May of 2021, New York Assemblywoman Patricia Fahy and State Senator Anna Kaplan announced companion bills, initially titled "Social media networks; hate speech prohibited,"[6] to "keep virtual spaces safer" by regulating online hate speech and "misinformation" as well as "conduct and violence being portrayed and posted on social media," J.A. 169, 350 n. 2, through requirements nearly identical to that of the Online Hate Speech Law. J.A. 268. In fact, the Online Hate Speech Law does no more than swap out "hate speech" for "hateful conduct" and slightly amend the relevant definition.

Four days after the May 2022 racist shooting at a Buffalo supermarket, Governor Hochul directed New York Attorney General

---

[6] *See* S.B. S4511, 2021-S4511, 2021–2022 Legis. Sess. (N.Y. 2022) https://www.nysenate.gov/legislation/bills/2021/S4511/amendment/original [https://perma.cc/4BRH-WMB2] .This court can take judicial notice of the introduced bill because it is an official government record. *See, supra*, n.1.

8

Letitia James to investigate online platforms for "civil or criminal liability for their role in promoting, facilitating, or providing a platform to plan or promote violence." J.A. 17–18 ¶¶ 35–38. That same day, James launched the investigation, alleging that the Buffalo shooting "revealed the depths and danger of the online forums that spread and promote hate." J.A. 18 ¶ 39. The investigation's targets included Rumble and other websites like Facebook and Twitter. J.A. 65.

The New York Legislature also fast-tracked the online hate speech bills. Assemblywoman Fahy emphasized that the law would "more proactively require the media companies themselves" to act to remove hate speech and allow the State to "begin to work to monitor them." J.A. 176.

New York's Senate President explained her "aye" vote on the legislation, saying the law "allow[ed] law enforcement to break the echo chamber where malice festers," and "confront[] the spread of misinformation and hateful ideology by finally demanding social media platforms do more." *Supra*, n.1. The New York Legislature enacted the bill on June 2, 2022.

Governor Hochul signed the bill on June 6, 2022, emphasizing its reach: "[W]e're now requiring social media networks to monitor and report hateful conduct on their platforms." J.A. 19 ¶ 44. Attorney General James said the new law was necessary because "social media platforms provide an unchecked vehicle for [] dangerous and corrosive ideas to spread," claiming the law would allow her office to "expand our work . . . to address this growing threat" from "dangerous and hateful platforms." J.A. 19 ¶ 45. The Online Hate Speech Law became effective on December 3, 2022.

On October 18, 2022, Attorney General James released findings from her Buffalo shooting investigation. J.A. 19 ¶ 46. Her report squarely blamed "[a]nonymous, virtually unmoderated websites and platforms" for a purported rise in mass shootings, alleging that "their refusal to moderate content in any meaningful way ensures that these platforms are and remain breeding grounds for racist hate speech and radicalization." J.A. 20 ¶ 48; J.A. 65.

Governor Hochul's and Attorney General James's joint press release claimed that the "lack of oversight, transparency, and accountability of these platforms allowed hateful and extremist views to

10

proliferate online." J.A. 20 ¶ 52. James called for "online platforms [to] be held accountable for allowing hateful and dangerous content to spread," J.A. 21 ¶ 53; J.A. 65, and threatened to push for a suite of measures to ensure "companies take reasonable steps to prevent unlawful violent criminal content from appearing on their platforms." J.A. 64.

### 3. Volokh, Rumble, and Locals are committed to free speech and object to being forced to single out state-defined hate speech.

Plaintiffs Eugene Volokh, Rumble, and Locals each operate interactive websites that promote free speech. J.A. 25–33 ¶¶ 86–131. Volokh's blog, *The Volokh Conspiracy*, frequently publishes posts regarding free expression. J.A. 25, 27 ¶¶ 87, 99. Rumble has a pro-free speech mission and believes in "authentic expression" and striving "to protect a free and open internet." J.A. 28–29 ¶¶ 107–08. Like *The Volokh Conspiracy* and Rumble, Locals is "dedicated to the free exchange of ideas." J.A. 33 ¶ 131. The Plaintiffs do not have, nor do they wish to have, policies or reporting mechanisms addressing the particular kinds of speech that New York mislabels as "hateful conduct"; to the extent they occasionally block or remove certain

11

material, they want to do so by exercising their editorial discretion, rather than by targeting New York-defined hate speech. J.A. 27–28, 30–32, 34–35 ¶¶ 97–106, 118–25, 133–41. They all disagree with and do not want to promote the State's messages that the Online Hate Speech Law requires them to convey.

## B.  Procedural History

Plaintiffs filed their Verified Complaint for declaratory and injunctive relief on December 1, 2022 in the Federal District Court for the Southern District of New York. Plaintiffs filed a motion for preliminary injunction a few days later arguing that the Online Hate Speech Law facially and as-applied: (1) was a content- and viewpoint-based restriction on speech; (2) improperly compelled speech; (3) was overbroad; and (4) was vague.[7] After full briefing and oral argument, the district court correctly recognized the threat § 394-ccc posed, and preliminarily enjoined its enforcement on February 14, 2023. J.A. 336. The district court concluded that Volokh, Rumble, and Locals were likely to succeed on the merits of their First Amendment claims because:

---

[7] Plaintiffs also argued that the Online Hate Speech Law was preempted by Section 230 of the Communications Decency Act. 47 U.S.C. § 230, not at issue here.

> The Hateful Conduct Law both compels social media networks to speak about the contours of hate speech and chills the constitutionally protected speech of social media users, without articulating a compelling governmental interest or ensuring that the law is narrowly tailored to that goal.

J.A. 336. The court found the Online Hate Speech Law fundamentally implicates the speech of websites and their users by mandating that covered websites (1) "devise and implement a written policy—i.e., speech," and (2) provide a mechanism to complain about other users' speech. Both requirements compel the websites to endorse and adopt the State's definition of "hateful conduct." J.A. 344–45. This burden, the district court noted, is "particularly onerous" for Plaintiffs since their "websites have dedicated 'pro-free speech purposes'" and likely attract users who oppose censorship. J.A. 346.

The district court rejected New York's argument that the law regulated only commercial speech or should receive more lenient review as a "purely factual and uncontroversial" disclosure. J.A. 348.

The district court also agreed that Plaintiffs' overbreadth and vagueness claims were likely to succeed because § 394-ccc also "fundamentally implicates the speech of the network's users." J.A. 351–

13

54. And the indefiniteness of terms like "vilify" and "humiliate" resulted in further chill on both websites and users.

Finding Plaintiffs were likely to succeed, the district court determined Plaintiffs would suffer irreparable harm and that the balance of equities favored granting a preliminary injunction. J.A. 341, 355.

## SUMMARY OF ARGUMENT

The district court correctly ruled that the Online Hate Speech Law is a content-based and viewpoint-discriminatory regulation of protected speech on the internet. New York enacted the law, as shown by its plain language and legislative history, to define, stigmatize, and suppress online hate speech. The State's definition of hate speech, mislabeled as "hateful conduct," focuses on internet speech that someone, somewhere may believe "vilif[ies], humiliate[s], or incite[s] violence against" groups of ten protected-class statuses. As the district court recognized, New York has, with this statute, ignored longstanding Supreme Court precedent that regulating speech because the State declares it "hateful," "strikes at the heart of the First Amendment." *Matal*, 137 S. Ct. at 1764; *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 396 (1992) (Government's "special hostility towards the particular biases thus singled out . . . is precisely what the First Amendment forbids.").

Covered websites must apply the State's stigmatizing definition of hate speech to create and then publish a special policy and hate speech reporting mechanism, as well as to respond to individual users reporting hate speech. But, the district court noted, the First

15

Amendment prevents mandating that websites—deserving of protection equal to newspapers, books, and television programming—speak about a "contested public issue." *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 250 (2d Cir. 2014); J.A. 344. Strict scrutiny therefore applies, and New York's law fails because it is not narrowly tailored to serve a compelling government interest, if one even exists.

As it did below, the State defends the law by arguing that its mandates are uncontroversial commercial disclosures under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). This is not the case. Plaintiffs are speakers and publishers of pure speech, not speech that "propose[s] a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976). And "hate speech"—a nuanced and inherently subjective term—is anything but "factual and uncontroversial." *Zauderer*, 471 U.S. at 651.

In any event, the law cannot even survive intermediate scrutiny because the State's goal of suppressing protected speech is illegitimate—the State cannot have an interest in hindering protected speech or distorting the marketplace of ideas. Regardless, the State

16

offers no evidence to demonstrate that it must conscript websites into being its mouthpieces to further its purported goals, and the law nonetheless fails to be narrowly tailored to the claimed interests.

New York's law, especially considering the legislative history and implicit enforcement threats from New York's top elected officials, also unconstitutionally burdens covered websites' protected speech and their publication of others' protected speech. In the first instance, the law's third requirement, requiring responses to reports of hate speech, puts pressure on websites to ban all hate speech rather than undertake the burdensome task of responding to every report. Pressure also manifests in the thinly veiled threats from New York's Governor, Attorney General, and other elected leaders, repeatedly declaring that websites "should be held accountable for allowing hateful and dangerous content to spread." *See, e.g.*, J.A. 21 ¶ 53; J.A. 65.

Further, the district court correctly enjoined New York's law as unconstitutionally overbroad because it is likely to chill core protected speech without a legitimate sweep. *See* J.A. 353. The district court also properly held the law void-for-vagueness because subjective terms like

17

"vilify" or "humiliate" fail to define "what kind of speech or content is now the target of government regulation." J.A. 353–54.

These many constitutional injuries provide Volokh, Rumble, and Locals standing to challenge each part of the Online Hate Speech Law. The district court, therefore, correctly granted a preliminary injunction because Plaintiffs will suffer irreparable harm if the law goes into effect and the balance of the equities is sharply in their favor. This Court should affirm.

# ARGUMENT

## I. The Online Hate Speech Law Violates the First Amendment Facially and As-Applied.

The Online Hate Speech Law is a viewpoint-discriminatory regulation targeting "hateful" speech—protected opinion—on innumerable websites because New York seeks to chill its presence on the internet. As evidenced by its plain language and legislative history, the law stigmatizes speech the State disfavors. It also compels websites to adopt and endorse the State's definition of hate speech, an inherently subjective and controversial topic, and incorporate it when they develop and publish a hate-speech policy and reporting mechanism on their sites, while requiring websites to communicate the State's message that "hateful" speech is disfavored, definable as New York prescribes, and must be reported to authorities—a far cry from "purely factual and uncontroversial disclosures."

The law is thus subject to strict scrutiny. But it cannot survive *any* level of constitutional scrutiny because the State's real interest— chilling and suppressing "hateful" speech—is impermissible; regardless, the State provides no evidence tying its purported interests to the law's terms; and the law is not narrowly tailored to those interests.

19

**A.    New York's statute impermissibly singles out a particular viewpoint for stigmatizing regulation.**

The Online Hate Speech Law accomplishes its unconstitutional goal by forcing innumerable websites to: (1) affirmatively single out certain viewpoints, that the State labels as "hateful," on their sites for special procedures; (2) adopt and promote the State's particular definition of hate speech through a dedicated hate-speech policy and reporting mechanism; and (3) respond to individual reports of hate speech. The district court appropriately recognized that "[e]ven regulations that seek to regulate speech 'that insult[s], or provoke[s] violence, on the basis of race, color, creed, religion, or gender' . . . run afoul of the First Amendment because they constitute content and viewpoint-based regulation of protected speech." J.A. 342 (quoting *R.A.V.*, 505 U.S. 391–92). Regulating speech because the State declares it "hateful" "strikes at the heart of the First Amendment." *Matal*, 137 S. Ct. at 1764; *see also Healy v. James*, 408 U.S. 169, 188 (1972) ("[T]he First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish."). New York's statute strikes deep—Explicitly singling out disfavored "hateful" speech for stigmatization, with the intent to reduce or eliminate it online.

20

1.      **The Online Hate Speech Law is a content-based and viewpoint-discriminatory speech regulation.**

"Hateful conduct" is a misnomer. On its face, the law exclusively regulates *speech*: It targets "use of" websites that allow "shar[ing] any content . . . or mak[ing] such content available to the public"—pure speech—that would "vilify, humiliate, or incite violence against a group or class of persons" based on ten protected-class statuses. This includes a vast range of constitutionally protected speech. In fact, the bill that became the Online Hate Speech Law was initially titled "Social media networks; hate *speech* prohibited." *See supra*, n.6. (emphasis added).

The law requires covered websites to develop and publish a policy for responding to reports of and addressing hate speech, a mechanism for reporting hate speech, and to respond to users reporting hate speech, a "presumptively unconstitutional" content-based speech regulation. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also Washington Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019) (law singling out online political advertisements for disclosure was content-based regulation). A law is content-based if it "suppress[es], disadvantage[s], or impose[s] differential burdens upon speech because of its content." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994).

21

Even where a law is facially neutral, it is content-based if it "cannot be justified without reference to the content of the regulated speech." *Reed*, 576 U.S. at 164. Here, the Online Hate Speech Law, on its face, regulates covered websites' speech and editorial judgment, expressly seeking to control their public position as to what is "hateful."

"Hateful" is viewpoint discriminatory because it inherently relates only speech that denigrates, as opposed to speech that affirms. The same is true for the law's singling out of speech that may "vilify" or "humiliate." "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 828 (1995); *Matal*, 137 S. Ct. at 1765. "Such discriminat[ion] based on viewpoint is an 'egregious form of content discrimination.'" *Ragbir v. Homan*, 923 F.3d 53, 70 (2d Cir. 2019), *cert. granted, judgment vacated on other grounds*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020) (quoting *Matal,* 137 S. Ct. at 1766). The government is, as a result, not permitted to "'single out a particular idea for suppression because it is dangerous or disfavored.'" *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 37 (2d Cir. 2018) (quoting *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541

(2001)) (alterations omitted)); *see also Cipolla-Dennis v. Cnty. of Tompkins*, No. 21-712, 2022 WL 1237960, at *2 (2d Cir. 2022) (quoting *Matal,* 137 S. Ct. at 1766 (Kennedy, J.*,* concurring in part and concurring in the judgment) ("To determine if a restriction rises to the level of viewpoint discrimination, we consider 'whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed.'")).

> **2. The plain language of the law's provisions and its legislative history demonstrate the State's intent to stigmatize and suppress protected viewpoints.**

Each of the law's three components incorporates the State's viewpoint-based definition of hate speech and therefore violates the First Amendment.

*Policy Requirement*

The law demands "a clear and concise policy readily available and accessible on their website and application which includes how such [websites] will respond [to] and address the *reports of incidents of hateful conduct*." GBL § 394-ccc(3) (emphasis added). The plain

23

meaning could not be more apparent:[8] Covered websites *must* publish a policy—whether they already have one or not—related to reports of "hateful conduct." Again, and as the district court correctly held, the explicit reference to "hateful conduct" indicates that a website policy's "definition of 'hateful conduct' must be at least as inclusive as the definition set forth in the law itself." J.A. 345. Using a different definition "would risk being in violation of the law." *Id.*

<u>Reporting Mechanism</u>

The reporting mechanism provision's plain language demonstrates that it solely targets "hateful" speech. The reporting mechanism provision requires covered websites to "provide and maintain a clear and easily accessible mechanism for individual users to report incidents of hateful conduct." GBL § 394-ccc(2). The mechanism must be created specifically "for" reporting "hateful conduct,"[9] staying silent on any

---

[8] In the absence of previous decisions interpreting a New York statute, this Court applies New York's canons of statutory construction, beginning with "'the plain meaning of the words of a statute.'" *Tunick v. Safir*, 228 F.3d 135, 140 (2d Cir. 2000) (Calabresi, J., concurring) (quoting *Hernandez v. Barrios-Paoli*, 93 N.Y.2d 781, 786, 720 N.E.2d 866, 868 (1999)).

[9] The remainder of this provision requires that the mechanism enable covered websites to "provide a direct response" to "any individual reporting hateful conduct." Here, New York's Legislature again chose not to mandate a mechanism that "allow[ed]" (or required) "a direct response" to anything other than reports of "hateful conduct."

other forms of conduct or complaints. And, including "hateful conduct" here imports that term's statutory definition, which is plainly a definition of "hate speech" as discussed above.

The State's reading of this provision, that it demands no more than a general email address, ignores the mechanism's expressed purpose of being "for" reporting hate speech. It thus flouts the longstanding canon of statutory construction against surplusage—that each word or phrase must be given meaning. *See New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 130 n.17 (2d Cir. 2009) (quoting *APWU v. Potter,* 343 F.3d 619, 626 (2d Cir. 2003)) (It is "[a] basic tenet of statutory construction . . . that a text should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."). Had New York's Legislature intended only that websites publish a general-purpose email address, it might have required a mechanism for reporting "complaints," "concerns," or "issues." Logic also demands a more particular mechanism, as a generalized email address would undoubtedly result in any reports of hate speech being buried amidst an indefinite number of other types of complaints—reducing the likelihood

25

that "encouraging such user reports would make a meaningful difference in mitigating violence." Appellant's Br. 53.

For these reasons, the State's argument that the policy requirement is "severable" fails. *See* Appellant's Br. 32–35. The definition of "hateful conduct" is "interwoven inextricably" throughout the statute and included explicitly in both the mechanism and policy provisions—meaning they both fail for the same reason. Thus, "judicial excision of [the policy] provision to let the rest survive is inappropriate." *N.Y. State Superfund Coal., Inc. v. N.Y. State Dep't of Env't. Conservation,* 75 N.Y.2d 88, 94 (1989); *see People v. Marquan M.*, 24 N.Y.3d 1, 10 (2014) (Employing severance doctrine to invalidate statute's unconstitutional portions while leaving the rest of it intact "is not a permissible use of judicial authority."). Regardless, the State did not raise any severability argument in the district court, and it is therefore waived. *See Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 118 (2d Cir. 2017) ("[T]he law is well settled that arguments as to severability are waived where, as here, a party fails to raise the issue."). The State's arguments for constitutional avoidance and certification similarly fail because the

26

Online Hate Speech Law is not ambiguous and neither this Court nor a New York court can "rewrite a statute" to avoid plain constitutional defects, *see Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018); *Houston v. Hill*, 482 U.S. 451, 471 (1987), and regardless, they are waived.

## Response Requirement

The law also requires that websites explain "*how* [they] will respond [to] and address the reports of incidents of hateful conduct." Again, websites are required to respond exclusively to complaints regarding "hateful" speech, a significant viewpoint-based burden. The State's incorrect interpretation that no response is required is based on its repeatedly mistaking the word "how" for "whether." *See, e.g.*, Appellant's Br. 8 (policy only requires covered websites to state "whether and how they want to respond."). But the conjunction "how" means "the way or manner in which."[10] "Whether" means something entirely different.[11] Thus, a plain reading of subsection (3) is that

---

[10] *How*, Merriam-Webster, https://www.merriam-webster.com/dictionary/how?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited Sep. 11, 2023).

[11] *See Whether*, Merriam-Webster, https://www.merriam-webster.com/dictionary/whether#dictionary-entry-1 (last visited Sep. 11, 2023) (describing "whether" as involving stated or implied alternatives).

27

website policies must "include *the manner in which*" they "will respond and address the reports," not "whether" they will do so.

The law's savings clause reinforces the statute's focus on "hateful conduct." *See* GBL § 394-ccc(4).[12] It provides that "failure to provide a mechanism for a user to report . . . *hateful conduct* . . . and to receive a response to such report" is *not* exempt from potential "increase[d] liability"—again permitting liability for a failure to stigmatize state-defined hate speech. *Id.* (emphasis added).

<u>*Legislative History*</u>

The Online Hate Speech Law's legislative history also shows that it is intended to target and burden a particular viewpoint. While the statute's words are the best evidence, legislative history may be relevant. *Guterman v. Costco Wholesale Corp.*, 927 F.3d 67, 70 (2d Cir. 2019). The original bill, entitled "Social media networks; hate speech prohibited," explicitly referenced "hate speech" throughout its text and

---

[12] Regardless, savings clauses generally do not ameliorate a law's unconstitutional burden. *See CISPES (Comm. in Solidarity with People of El Salvador) v. F.B.I.*, 770 F.2d 468, 474 (5th Cir. 1985) (explaining that a savings clause "cannot substantively operate to save an otherwise invalid statute"); *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1276 n. 55 (N.D. Fla. 2022) ("including a 'savings clause'" does not "immunize[] that statute from a constitutional challenge").

included the same mandated policy, reporting mechanism, and response requirements as the Online Hate Speech Law. After the Buffalo shooting, the "hateful conduct" version of the legislation was fast-tracked and passed in less than three weeks. Several members of the New York Assembly spoke about the potential for the law to violate free speech, as well as its vagueness, *see, e.g.*, J.A. 174–178, but the law's sponsors pushed it through, arguing it was needed to combat "hateful material" that users could "read on the internet," J.A. 174, 179, and that it would "confront[] the spread of misinformation and hateful ideology." *Supra*, n.1.

### 3. The Online Hate Speech Law interferes with Plaintiffs' First Amendment rights as speakers and publishers.

The Online Hate Speech Law's viewpoint-discriminatory regulation unconstitutionally interferes with Plaintiffs' and other websites' distinct rights as speakers and publishers of protected speech. As the district court rightly held, the First Amendment protects websites' right to speak and to maintain editorial control over the information they present, J.A. 346–47, because "[i]t is well-established that a private entity has an ability to make 'choices about whether, to

29

what extent, and in what manner it will disseminate speech . . . .'" J.A.

346 (quoting *NetChoice, LLC v. Att'y Gen. Fla.*, 34 F.4th 1196, 1210

(11th Cir. 2022) ("*NetChoice (Florida)*"); *see also First Nat'l Bank of Bos.*

*v. Bellotti*, 435 U.S. 765, 781–84 (1978) (private entities also have free

speech rights). "When [social media companies] (like other entities)

disclose, publish, or disseminate information, they engage in speech

within the meaning of the First Amendment." *NetChoice (Florida)*, 34

F.4th at 1213 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570

(2011)) (internal quotation marks and alterations omitted). Plaintiffs

and other websites, therefore, "engage in speech activity" when they

speak for themselves or exercise editorial judgement "in the selection

and presentation of" content on their sites. *Id.* at 1216–17 (quoting *Ark.*

*Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)). This

Court seemed to agree in *IMS Health Inc. v. Sorrell*—describing the

Supreme Court's instruction "that courts must be very skeptical of

government efforts to prevent the dissemination of information."

630 F.3d 263, 278 (2d Cir. 2010), *aff'd*, 564 U.S. 552 (2011).

30

Volokh, Rumble, and Locals disagree with New York's definition of "hateful."[13] J.A. 26–27, 30, 34, 36, 42–43 ¶¶ 95–102, 118, 133–34, 145, 148, 177, 181. They certainly do not agree that anything which "vilifies" or "humiliates" based on protected-class status is hate speech—and for good reason. Using this definition would likely mean that an editorial in *The Washington Post* opposing bans on burning the Quran,[14] a historical video of Malcolm X discussing white people's guilt, a John Oliver comedy segment poking fun at the British for having a monarchy, a video showcasing a photography exhibit on patriarchy, and many other forms of protected speech are "hate speech." *See* J.A. 14–15 ¶ 23.

The district court correctly recognized the dangers of this law. The law "deprives [websites] of their right to communicate freely on matters of public concern without state coercion." J.A. 346 (quotation marks and

---

[13] New York's definition will also likely interfere with the free speech of other websites including large social media platforms, which maintain their own ever-evolving definitions of "hate speech." For instance, Meta (Facebook's parent-company) has a detailed webpage describing its definition and the global recognition that "[t]here is no universally accepted answer for when something crosses the line" from protected speech into "hate speech." *See* Richard Allan, *Hard Questions: Who Should Decide What Is Hate Speech in an Online Global Community?*, Meta Newsroom, June 27, 2017, https://about.fb.com/news/2017/06/hard-questions-hate-speech/ [https://perma.cc/7NHH-VD5V]

[14] *Supra*, n.2.

citation omitted). It interferes with websites' editorial discretion. *Id*. For Plaintiffs, in particular, it puts them "in the incongruous position of stating that they promote an explicit 'pro-free speech' ethos, but also requires them to enact a policy allowing users to complain about" state-defined hate speech. J.A. 347. The regulation inhibits platforms that may wish to adopt a different definition of hate speech, as well as weakens and muddles Plaintiffs' stated missions of maintaining a free exchange of ideas on their websites. *Id*. New York's attempt to discourage websites from speaking and publishing speech that fits within the "subset of messages" that the State "finds offensive" is "the essence of viewpoint discrimination." *Wandering Dago*, 879 F.3d at 32 (quoting *Matal*, 137 S. Ct. at 1766 (Kennedy, J., concurring)).

**B.** **The district court correctly held the Online Hate Speech Law unconstitutionally compels speech on a "contested public issue."**

The Online Hate Speech Law compels covered websites to speak about hate speech, forcing them to endorse and promote the State's views. The First Amendment proscribes laws that dictate "what shall be orthodox in policies, nationalism, religion, or other matters of opinion." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943);

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012)

("The government may not . . . compel the endorsement of ideas that it

approves."). Neither individuals nor for-profit entities can be forced to

be "an instrument for fostering public adherence to an ideological point

of view [they] find[] unacceptable." *Wooley v. Maynard*, 430 U.S. 705,

715 (1977). This includes protection for "the choice of what not to say,"

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16

(1986), or even for "refrain[ing] from speaking at all." *McManus*, 944

F.3d at 515 (quoting *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps.*

*Council 31*, 138 S. Ct. 2448, 2463 (2018)); *accord Evergreen*, 740 F.3d at

244 ("Mandating speech that a speaker would not otherwise make

necessarily alters the content of the speech.").

In *Miami Herald Publ'g. Co. v. Tornillo*, the Supreme Court held

the First Amendment barred compelling newspapers to run candidate

replies.[15] 418 U.S. 241, 258 (1974) (compelled speech law

---

[15] The Supreme Court has repeatedly extended *Tornillo's* protection of editorial judgment beyond newspapers. *See e.g., Pac. Gas & Elec. Co. v. Pub. Utils. Com.,* 475 U.S. 1 (1986); *Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994); *Ark. Educ. Tv Comm'n v. Forbes,* 523 U.S. 666 (1998); *Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557 (1995); *see also NetChoice (Florida),* 34 F.4th at 1210–1213 (discussing the expansion of editorial-judgment protections across mediums and finding social-media platforms "closely analogous").

unconstitutional "even if a newspaper would face no additional

costs . . . because of its intrusion into the function of editors."). Relying

on *Tornillo* twenty years later, *Hurley* explained that parade organizers

could not be compelled to include a particular contingent because "the

presentation of an edited compilation of speech generated by other

persons . . . fall[s] squarely within the core of First amendment

security." 515 U.S. at 570. The Supreme Court recently reemphasized

these principles in *Nat'l Inst. of Family & Life Advocs. v. Becerra*,

holding that compelling particular healthcare clinics to provide

information about abortion services—"the very practice that petitioners

[were] devoted to opposing"—"plainly alter[ed] the content" of their

speech. 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*").

As a consequence, laws requiring private entities to "affirmatively

espouse the government's position on a contested public issue," or even

to address the government's position, impermissibly burden First

Amendment rights. *Evergreen*, 740 F.3d at 250. In *Evergreen*, a law

compelled "pregnancy services centers" to address abortion and promote

a government message. Considering the regulation's context—a public

debate about abortion—this Court determined that the mandatory

34

statements burdened the centers' "right to communicate freely on matters of public concern." *Id.* at 250.

As in *NIFLA* and *Evergreen*, New York's law forces Plaintiffs, among innumerable other websites, to address and "affirmatively espouse the government's position on a contested public issue"—hate speech. *Id.* (quotation marks omitted). The statute requires Plaintiffs to publish special procedures that apply only to state-defined hate speech and no other. The State thereby demands websites endorse or promote its multiple particular hate speech-related views, including that: (1) hate speech is defined as or must be at least as inclusive as the statute's definition; (2) state-defined hate speech is properly singled out for special procedures; (3) hate speech must be reported to the website's operators, or even law enforcement,[16] because it is dangerous; and (4) because of that danger, platforms must respond to complaints regarding state-defined hate speech. *See* J.A. 344–45 (district court holding that "to be in compliance with the law," Plaintiffs and covered websites "would need to publish a policy expressly indicating that

---

[16] *See* Def.'s Opp. Mot. Prelim. Inj. 25 ("The transparency provisions—the published policy and requirement of a response—will allow consumers to know whether reporting to the company was enough or whether to take further action— for example, by calling local or federal law enforcement.").

[their] users have a mechanism to complain about the 'hateful conduct' as defined by the Hateful Conduct Law, not removable content as defined by [them]"). The law's requirements also compel websites to address "hateful" speech when they would otherwise say nothing. *See Hurley*, 515 U.S. at 573 ("[O]ne who chooses to speak may also decide what not to say." (quotation marks and citation omitted)).

The State argues, reprising an argument the district court properly rejected, that the mechanism requirement is a regulation of conduct, not a compelled-speech regulation. Appellant's Br. 25–32. But the State fails to place the mechanism requirement's impact in its proper context. "Context . . . differentiates activity that is sufficiently expressive from similar activity that is not." *NetChoice (Florida)*, 34 F.4th at 1217. The required mechanism must be developed and published on the website and is defined by its reference to hate speech—indeed, its purpose is to *tell* users where and how they can report hate speech. Its conspicuous presence on the site also implies the importance of singling out state-defined hate speech. The "ministerial act" of allowing payroll deductions in *Restaurant Law Center v. City of New York*, 360 F. Supp. 3d 192 (S.D.N.Y. 2019), is different because it

required only the creation of a *process*, not communication. J.A. 343–44. The State also cites *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, but the Solomon Amendment "neither limit[ed] what law schools may say nor require[d] them to say anything" because hosting military recruiters was not "inherently expressive." 547 U.S. 47, 60 (2006). Here, New York demands that websites—cyberspaces of expression—publish a mechanism particularly related to reporting "hateful" speech. This impermissibly regulates an "inherently expressive" medium and affects covered entities' "own message." *Id.* at 63. The mechanism provision, like the policy and response requirements, compels speech on a contested public issue.

For nearly a century, the parameters, propriety, and legality of "hate speech" have been topics of public debate. J.A. 219–37. They remain so today, particularly regarding "hate speech" on the internet, as demonstrated by Defendant's October 2022 report, Volokh's writings, Rumble's and Locals's missions, and this litigation. *See* J.A. 70–123. But New York's law forces websites to speak about hate speech and espouse the State's views. It requires that websites *publish* a policy related to state-defined "hateful" speech and a mechanism for users to

37

report it. Inserting speech about what content is "hateful"—and by
implication, what content is not—"will change the way in which a
[covered website], if it so chooses, discusses the issues" of "hateful"
speech.[17] *Evergreen*, 740 F.3d at 249–50. New York's compelled speech
is even more "constitutionally troublesome" because it requires websites
"to take the government's side on a particular issue," of significant
public debate. *All. for Open Soc'y Int'l, Inc. v. USAID*, 651 F.3d 218, 235
(2d Cir. 2011), *aff'd*, 570 U.S. 205 (2013); *Evergreen*, 740 F.3d at 249.

The Plaintiffs, among others, prefer not to have state-defined
policies about "hateful" speech or otherwise espouse the State's related
messages. The First Amendment guarantees they will not have to.

The State also argues that *Zauderer* controls here. But *Zauderer*
applies only (1) in the commercial speech context (2) to laws demanding
"purely factual and uncontroversial" disclosures. *See* 471 U.S. at 651;

---

[17] *Evergreen* noted this Court's particular animating concern—analogizing to
the Supreme Court's expressed concern in *Riley*—that compelling speech related to
controversial topics would likely result in the disclosure being "the last words
spoken" before the client walks out. 740 F.3d at 249–50. Here, the reporting
mechanism must be "clear and easily accessible" and the policy must be both "clear
and concise" and "readily available and accessible on" the website. These may
similarly be the last things a visitor sees before clicking away, without giving the
website a chance to explain their position related to a controversial, subjective, and
nuanced public issue.

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113–14 ("*NEMA*") (2d Cir. 2001) (describing *Zauderer* disclosures as "within the class of regulations affecting commercial speech").

First, this case does not involve commercial speech, which is speech that "does no more than 'propose a commercial transaction,'" *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 473 (1989) ("*SUNY*") (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). While the State argues that this is a commercial speech case because it covers for-profit entities, *see* Appellant's Br. 40 (citing *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 1216 (2023)), economic motivation for speaking does not convert noncommercial speech into commercial speech. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988); *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 67 (1983) ("[E]conomic motivation would clearly be insufficient by itself to turn the materials into commercial speech."); *Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002) (citing *Bolger*, 463 U.S. at 66–67). Moreover, the Supreme Court examines compelled statements by "the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Riley*,

39

487 U.S. at 796 (refusing to apply the different levels of protection to different parts of a single speech that included the compelled statement).

In *Riley*, even forcing for-profit fundraising services to, during their pitch, tell potential donors the percentage of donations that went to charity was not a commercial speech regulation because the compelled statement was "inextricably intertwined" with protected fundraising speech, "alter[ing] the content of the speech." *Riley*, 489 U.S. at 795–96; *see also SUNY*, 492 U.S. at 474 ("[In *Riley*], of course, the commercial speech (if it was that) *was* 'inextricably intertwined' because the state law *required* it to be included."). By contrast, the Court applied commercial speech doctrine to a college's ban on in-dorm houseware sales presentations, even though they included protected noncommercial speech about home economics, because the ban applied only to those statements that "propose a commercial transaction." *SUNY*, 492 U.S. at 473–75 (noting "nothing in the nature of things require[d]" mixing the commercial speech with the noncommercial speech, and nothing in the regulation prevented conveying the noncommercial messages).

40

As in *Tornillo* and its progeny, the Online Hate Speech Law hinders core protected speech and editorial discretion. *See supra*, n.15; *Hurley*, 515 U.S. at 570 ("[T]he presentation of an edited compilation of speech generated by other persons . . . fall[s] squarely within the core of First Amendment security."). While websites may have some "economic motivation" for their speech—like books, magazines, newspapers, and television programming—profiting from and spending money to project their speech and edited presentations of others' speech does not render their speech, or any regulation of them, commercial. *See Va. Pharmacy*, 425 U.S. at 761; *see also Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 521 n.8 (D.C. Cir. 2015). *The Volokh Conspiracy* is essentially an online newsletter and message board of editorials, articles, and legal commentary—pure noncommercial speech. Rumble and Locals publish their own speech on their platforms, but they are also largely platforms for speech generated by independent creators and users addressing a wide variety of noncommercial topics, including news, sports, art, and entertainment. And, regardless, New York's law regulates these "for-profit" websites by unconstitutionally compelling particular messages to

41

be "inextricably intertwined" with their traditionally protected expression.

New York's citations prove the point that proper commercial speech regulations address speech that proposes commercial transactions. *See* Appellant's Br. 37 (citing *New York State Rest. Ass'n*, 556 F. 3d at 134 (disclosure of calorie information connected to sale of a restaurant meal) and *NEMA*, 272 F.3d at 107 (requiring mercury labeling on in-store lightbulb packaging)). The State also cites similar existing laws mandating point-of-sale disclosures, Appellant's Br. 37–38 (describing disclosure requirements related to "establishments or companies that *sell* alcohol," "real-estate *seller*" disclosures to home-buyers, and *retail* establishment refund policies (emphasis added)), and disclosure laws related to protecting privacy from sale or potential sale to third parties, Appellant's Br. 38–39—a "substantial state interest" not at issue here. *Edenfield v. Fane*, 507 U.S. 761, 769 (1993).

The State's citation to *NetChoice (Florida)* is also inapposite. There, without discussion, the Eleventh Circuit declared Florida's content-moderation terms of service disclosure law to be a commercial speech regulation subject to *Zauderer* review, *see NetChoice (Florida)*,

42

34 F.4th at 1230, because the law, according to the court, only "*indirectly* burden[ed] platforms' editorial judgment." *Id*. at 1223. But that puts the cart before the horse. *Zauderer's* burden analysis applies only where the required disclosure is first determined to regulate commercial speech. Moreover, the Eleventh Circuit's determination is difficult, if not impossible, to square with the court's detailed holding *in the same case* that the regulated social media platforms had First Amendment-protected editorial discretion under *Tornillo* and its progeny. *See NetChoice (Florida)*, 34 F.4th at 1210–22.

Here, as explained above, a correct analysis of the Online Hate Speech Law's compelled hate-speech policy and mechanism demonstrates that it "regulates First Amendment-protected activity beyond 'proposing a commercial transaction,'" thus "target[ing] protected speech based on its content outside of commercial applications." *Free Speech Coal., Inc., v. Colmenero*, No. 1:23-CV-917-DAE at *56–57 (W.D. Tex. Aug. 31, 2023). New York's law requires a clear and conspicuous policy and mechanism related to hate speech, neither of which present commercial messages about a "transaction," even assuming one exists. The Online Hate Speech Law therefore lacks

43

a sufficient relationship to a commercial transaction, and instead focuses on the covered websites' protected speech. The regulation and compelled speech here must, therefore, be judged under the strict scrutiny test.

Regardless, even if New York's law regulated commercial speech, compelled statements about "hateful" speech are anything but "purely factual and uncontroversial" disclosures. *Evergreen*, 740 F.3d at 245 (quoting *Zauderer*, 471 U.S. at 651 and describing it as applying to "brief, bland, and non-pejorative disclosures" (quotation marks omitted)). There is an important distinction between a disclosure that is "more opinion-based [and] the question of whether a particular chemical is within any given product." *New York State Rest. Ass'n*, 556 F.3d at 134 (contrasting the unconstitutional compelled "18" label on video games meeting Illinois' "opinion-based" definition of "sexually explicit" in *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006), with factual disclosure of lightbulb mercury content in *NEMA*, 272 F.3d 104). Permissible required disclosure laws are those which do not "forc[e] speakers to adopt state-sanctioned positions, suppress[] dissent, confound[] the speaker's attempts to participate in self-governance, or

44

interfer[e] with an individual's right to define and express his or her own personality." *NEMA*, 272 F.3d at 114.

To this point, the State argues that the law requires the equivalent to the "consumer tools" and policy disclosures not enjoined in the Fifth and Eleventh Circuits' recent *NetChoice* decisions. Appellant's Br. 32 (citing *NetChoice, LLC v. Paxton*, 49 F. 4th 439, 485 ("*NetChoice (Texas)*) (5th Cir. 2022) and *NetChoice (Florida)*, 34 F.4th at 1230). But those decisions involved very different disclosure requirements of purely factual and uncontroversial information such as the *number* of users who viewed a post, or existing policies that the social media networks already employed. *NetChoice (Florida)*, 34 F.4th at 1205, 1229. By contrast, New York requires that websites create and publish a viewpoint-based and state-defined hate speech policy—whether they agree with it or not, and whether they have ever had such a policy or not. Even if the Online Hate Speech Law did not force websites to endorse and promote the State's messages about hate speech, it certainly requires them to say *something* about this viewpoint-based

45

category, violating the First Amendment's protection of "the choice of what not to say." *Pac. Gas & Elec. Co.*, 475 U.S. at 16.[18]

Like in *Entertainment Software Ass'n v. Blagojevich*, covered websites must adopt, for each requirement, the State's definition of a "far more opinion-based" term—"hateful conduct"—even though the websites "may have an entirely different definition of this term." 469 F.3d at 652. And like the "services disclosures" in *Evergreen*, the Online Hate Speech Law requires covered websites to "mention controversial services," 740 F.3d at 245 n.6—in the present case, how they respond to and address "hateful" speech online—in addition to "mandat[ing] discussion of controversial political topics." *Id.* at 250. As described above, the State's claim that the law requires only a factual consumer tool and publication of a site's own policy is beside the point. The law singles out a disfavored viewpoint for stigmatizing special procedures, while requiring websites to recognize state-defined "hateful" speech as

---

[18] The Texas law's "complaint mechanism" provision also contrasts with New York's Online Hate Speech law because it requires only that the largest social media platforms "provide an easily accessible complaint system," Tex. Bus. & Com. Code § 120.101, not one specifically designed for complaints about a certain kind of state-defined speech.

an objectionable type of content. That violates the First Amendment.

This is not commercial speech, and *Zauderer* has no relevance here.

### C. New York's Online Hate Speech Law is not narrowly tailored to serve a compelling government interest, if one even exists, and cannot survive even intermediate scrutiny.

New York's law is thus subject to—and cannot survive—strict

scrutiny because it singles out "hateful" speech for special procedures,

explicitly stigmatizes a particular, state-defined, viewpoint and compels

speech on a controversial topic. Indeed, the State does not even argue

that its law survives if strict scrutiny applies, dooming its opposition

here. *Cf. Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) (As plaintiff

"failed to . . . raise this argument" it "has been waived.").

Viewpoint-discriminatory laws are subject to the highest level of

constitutional scrutiny. *Rosenberger*, 515 U.S. at 829–30; *Reed*, 576 U.S.

at 163. In fact, the Supreme Court has stated that viewpoint-

discriminatory laws cannot pass *any* level of constitutional scrutiny. *See*

*Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018)

("[R]estrictions based on content must satisfy strict scrutiny," but "those

based on viewpoint are prohibited."); *Matal*, 137 S. Ct. at 1764

(rejecting any government "interest in preventing speech expressing

47

ideas that offend"); *Hurley*, 515 U.S. at 579 (a viewpoint-based government interest in eliminating "biases," is "a decidedly fatal objective"). Strict scrutiny is a "heavy burden," *Evergreen*, 740 F.3d at 246, requiring the State to demonstrate its law is "narrowly tailored to promote a compelling Government interest." *Id.* (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000)). And there is no distinction between viewpoint-based bans and viewpoint-based burdens for the purposes of determining the appropriate level of scrutiny. *See Playboy Ent. Grp.*, 529 U.S. at 812 ("The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans."); *Evergreen*, 740 F.3d at 249 (applying strict scrutiny to compelled speech on issue of public concern).

As the legislative history makes clear, the State's professed interest is to reduce disfavored speech on the internet. But speech regulations cannot survive constitutional scrutiny when they intend to "distort the marketplace of ideas," *Wandering Dago*, 879 F.3d at 32 (quoting *Matal*, at 1766 (Kennedy, J.,)), because "[t]he lodestar for the First Amendment is the *preservation* of the marketplace of ideas." *McManus*, 944 F.3d at 513 (citing *Leathers v. Medlock*, 499 U.S. 439,

48

448–49 (1991)) (emphasis added). Nevertheless, that distortion of the marketplace of ideas is precisely what the State intended, and it has bragged about it every step of the way, as the statute's legislative history, Attorney General's threats of enforcement, and even the State's brief make plain.

As already discussed, the Online Hate Speech Law started its legislative journey as a bill explicitly defining and targeting "hate speech" and its sponsors and enforcers repeatedly emphasized that the law was intended to combat "hateful material," a "hateful ideology," and the spread of "dangerous and corrosive ideas." J.A. 75, 174, 179.

The State's brief describes its constitutional interest in similar terms. It admits that the New York Legislature's reasoning for the law was to reduce "hateful" speech on the internet. Appellant's Br. 53 ("The Legislature reasonably concluded that encouraging such user reports will make a meaningful difference in . . . reducing violent and extremist content on social media networks that choose to remove such content."). It further justifies the law as a measure to put its thumb on the scale against a particular type of speech, skewing the marketplace of ideas, by noting its interest in helping consumers "know which networks to

avoid." *Id.* 51. The State also claims an interest in providing consumers information to avoid "hazards," *id.*, analogizing (by citation) the State's interest in protecting the public from "hateful" ideas on the internet to the interest of protecting the public from the hazard of mercury poisoning. *Id.* 52. But it is the "proudest boast of our free speech jurisprudence . . . that we protect the freedom to express 'the thought that we hate.'" *Matal*, 137 S. Ct. at 1764. The State's interest in eliminating or preventing exposure to certain kinds of "hateful" speech, as if it were a poison, is a "decidedly fatal objective" under the First Amendment. *Hurley*, 515 U.S. at 579. Indeed, a state interest in suppressing protected speech dooms the law under any standard of constitutional scrutiny.

Even accepting the State's purported interests, the law still fails. The State claims two interests: "facilitating [] reports to help reduce instances of hate-fueled mass shootings and other violence" and "allowing users to make informed choices." Appellant's Br. 19, 50. But these interests do not, indeed cannot, justify impinging the freedom of speech here, and the State has failed to show that the Online Hate Speech Law is narrowly tailored to its purported interests.

First, in regulating speech to "help reduce . . . violence," the government violates a well-established axiom: "The government may not [regulate] speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.'" *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (quoting *Hess v. Indiana*, 414 U.S. 105, 108, (1973) (per curiam)). The State's alternative interest of "allowing consumers to make informed choices" is similarly designed to achieve the unconstitutional purpose of suppressing individuals' ability to receive protected speech. *See, e.g.*, *Lamont v. Postmaster Gen.*, 391 U.S. 301 (1965); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]his right to receive information and ideas, regardless of their social worth, is fundamental to our free society."). As noted above, the State cannot have an interest in helping consumers "know which networks to avoid" or in reducing the chance they will see protected speech because the State views it as presenting "hazards." Appellant's Br. 51–52.

In fact, speech regulations supporting consumers' "informed choices" are only permissible if they are a *means* to satisfy a weighty government interest, not just to encourage censorship or skew the marketplace of ideas. *See Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67,

51

74 (2d Cir. 1996) (noting that under intermediate scrutiny, "[a]bsent . . . some indication that this information bears on a reasonable concern for human health or safety or some other sufficiently substantial governmental concern, the manufacturers cannot be compelled to disclose it"); *Am. Meat Inst. v. USDA*, 760 F.3d 18, 26 (D.C. Cir. 2014) (en banc) (noting that, under *Zauderer* review, compelled disclosures must do no more than "inform consumers about a particular product trait, *assuming of course that the reason for informing consumers qualifies as an adequate interest*" (emphasis added)); *see also Netchoice, LLC. v. Bonta*, No. 5:22-cv-08861-BLF (E.D. Cal. Sept. 18, 2023) (granting preliminary injunction against social media regulations intended to protect children because there was no "causal link" between challenged provisions and "the government's purpose"). The State's citations to myriad disclosure regulations underscore this principle: Each one is directly related to state interests in health, safety, privacy, or preventing consumer deception and confusion. *See* Appellant's Br. 36–39. The State's brief suggests no such interests here.

52

Second, New York is not allowed to "sacrific[e] important First Amendment interests for too speculative a gain." *Denver Area Educ. Telecomm. Consortium, Inc., v. FCC*, 518 U.S. 727, 760 (1996) (quotation marks omitted). The State's support for its interests rests on little more than "conclusory statements during the debates by proponents of the bill," with "no evidence as to how effective or ineffective" the law will be, making it impossible for this Court to evaluate the existence of a "constitutionally acceptable less restrictive means to achieve the Government's interest." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129–30 (1989). For instance, the State provides no evidence to support its claim that "facilitating reports" will prevent even a single act of violence, falling far short of "the degree of certitude that strict scrutiny requires." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 801 n.8 (2011); *see* Appellant's Br. 53 (claiming justification based on copycat violence but showing no evidence of a connection to how New York's law could have prevented that violence). The State also blindly uses an unsupported statistic from Assemblywoman Fahy that "an estimated forty percent of mass shooters reveal their plans . . . beforehand via a social media post."

53

Appellant's Br. 53 (citing J.A. 171). This Court therefore must find New York's Law unconstitutional and cannot "defer" to the New York Legislature's "conclusion about an issue of constitutional law." *Sable*, 492 U.S. at 129.

Even if the State had constitutionally permissible interests that were rationally related to the Online Hate Speech Law, and the Court had sufficient evidence to assess whether the law is narrowly tailored to preventing violence—which it does not—New York's law could not survive strict or intermediate scrutiny. *SUNY*, 492 U.S. at 480 (commercial speech regulations assessed under intermediate scrutiny must still be "narrowly tailored to achieve the desired objective"). Numerous other measures would be more narrowly targeted to prevent violence without compelling or burdening First Amendment-protected speech, including, for instance, legislation prohibiting the violence the State wants to prevent, criminal sentencing enhancements, increased law enforcement, violence prevention programs, and public information or advertising campaigns. The State "has not proved otherwise," as it must, to survive strict or intermediate scrutiny. *Reno v. ACLU*, 521 U.S. 844, 846 (1997).

54

II.    **New York's Online Hate Speech Law Burdens the First Amendment Activities of Websites and Users.**

The Attorney General argues that the Online Hate Speech Law does not require covered websites to *remove* "hateful" speech. Appellant's Br. 54. But the law's text, title, and legislative history, as well as the rhetoric surrounding its enactment, all support a far different conclusion: that websites risk civil penalties and Attorney General investigation if they do not remove speech that the State deems "hateful," consequently chilling the speech of covered websites and their users.

A.    **The ultimate goal of New York's Online Hate Speech Law is to suppress speech the government dislikes.**

The Online Hate Speech Law, combined with the repeated, thinly veiled threats of New York's elected leaders, will chill websites' protected speech. State-imposed burdens on the publication of protected speech violate the First Amendment even when they come in the indirect form of threats or intimations of punishment for failure to act. *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003). "People do not lightly disregard public officers' thinly veiled threats to institute . . . proceedings against them if they do not come around." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963).

55

As discussed, *supra* Part I.A., the text and structure of the law show it is intended to pressure covered websites to remove hate speech. The law burdens websites with "a direct response" to individual reports of "hateful" speech. This imposes a significant cost that naturally incentivizes the proactive banning or removal of hate speech, allowing New York to "accomplish indirectly via market manipulation what it cannot do through direct regulation—control the available channels for political discussion." *McManus*, 944 F.3d at 517.

The law also forces covered websites to either indicate they will not "address" or "handle[]" state-defined "hateful" speech and risk alienating visitors who share the State's animating concern or reinforce the State's message and risk alienating visitors opposed to censorship. The First Amendment does not allow the State to "'burden the speech of others in order to tilt public debate in a preferred direction.'" *NetChoice (Florida)*, 34 F.4th at 1228 (quoting *Sorrell*, 564 U.S at 578–79)*; see also McManus*, 944 F.3d at 516 (striking law requiring websites to public information about political advertisements because "it makes certain political speech more expensive to host than other speech because compliance costs attach to the former and not to the latter").

56

The law is also called "Social media networks; hateful conduct *prohibited*," § 394-ccc (emphasis added), which the district court correctly noted "strongly suggests that the law is really aimed at reducing, or perhaps even penalizing people who engage in, hate speech online." J.A. 353; *see* Appellant's Br. 61 (conceding that a law's title "'may help clarify or point the meaning of an imprecise or dubious provision.'" (quoting *People v. Page*, 35 N.Y.3d 199, 204 n.3 (2020)).

The rhetoric surrounding the law's enactment exacerbates the pressure on websites to remove state-defined "hateful" speech. *See supra* Statement of the Case A.2. According to the law's chief legislative sponsors, as well as New York's Governor and Attorney General, the Online Hate Speech Law would "proactively require" platforms to "remove," "monitor," "prevent," and "report," hateful conduct or risk being labelled "dangerous and hateful platforms" and have their legal protections stripped. The law also allows the state to "monitor" platforms, ensure their "accountability," and "finally deman[d] [they] do more."

The State's message to covered websites is clear: ban and remove speech the State deems to be "hateful" or face Attorney General

57

investigation, subpoenas, and fines, as well as further adverse legal changes. Covered websites "will likely react in a predictable way—i.e., censoring speech—in response to the government's actions." *Missouri v. Biden*, No. 23-30445, 2023 WL 5821788, at *10 (5th Cir. Sept. 8, 2023). Protected internet speech will "be inhibited almost as easily by the potential or threatened use of power as by the actual exercise of that power," *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988), because "[t]he sword of Damocles causes harm because it hangs, not necessarily because it drops." *PSINet v. Chapman*, 167 F. Supp. 2d 878, 888 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004); *see Missouri*, 2023 WL 5821788, at *20 (finding that a combination of "promises of legal regime changes, enforcement actions, and other unspoken threats" violated the First Amendment).

**B.    The Online Hate Speech Law will chill covered websites' users' protected speech.**

The district court correctly observed that New York's statute will have a "profound chilling effect on social media users." JA 353. New York argues that the court improperly considered the law's impact on user speech, but this argument misses the point. If users self-censor or

stop posting as a result of the Online Hate Speech Law, then that will directly impact covered websites' ability to publish some user speech.

Courts regularly examine the impact that a speech regulation has on users. For instance, in *Brown*, when video-game creators and retailers challenged a law about minors' access to the games, the Supreme Court considered the impact on video-game *players*' First Amendment rights. 564 U.S. at 786. Similarly, in *Virginia v. Am. Booksellers Ass'n, Inc.*, the Supreme Court ruled that a bookstore could raise "an infringement of the First Amendment rights of bookbuyers." 484 U.S. 383, 393 (1988). The district court properly considered the Online Hate Speech Law's chilling effect on the users of online platforms.

In light of the law's aggressive title and the sharp rhetoric from the Attorney General and other New York elected leaders, covered websites' users will be "wary about the types of speech they feel free to engage in without facing consequences from the state," J.A. 353, including legal recriminations for their favored sites, losing access to those sites, or even facing personal consequences for their speech. Users will also self-censor given the mere presence of a state-mandated hate

speech policy and reporting mechanism. This is particularly true on platforms like Rumble, which was one of the websites that the Attorney General investigated and criticized in her report, J.A. 65, because content creators earn revenue from views of videos they post on the website. They will, therefore, skew towards developing content that is less likely to be reported as state-defined "hateful" content due to the potential for removal, de-monetization, or other consequences to their revenue—exactly the chilling impact New York hopes its law will achieve.

Chilling user speech therefore directly chills covered websites' speech. The law does not need to "create liability for users." Nor does it need to actually compel the removal of user speech. The chilling effect that will result is directly traceable to the unlawful burdens that the Online Hate Speech Law imposes—not some "independent action" by third parties as the Attorney General suggests. *See* Appellant's Br. 60.

## III. New York's Online Hate Speech Law Is Unconstitutionally Overbroad.

The district court correctly found that the Online Hate Speech Law is overbroad because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449

n.6 (2008)). The Supreme Court has repeatedly held that speech that

may be perceived as "hateful" is constitutionally protected even when it

concerns protected characteristics like race and sexual orientation. *See,*

*e.g.*, *R.A.V.,* 505 U.S. 377 (cross burning); *Snyder v. Phelps*, 562 U.S.

443 (2011) (holding anti-gay signs outside of a military funeral). As

discussed above, New York's statute implicates a staggering range of

protected expression including all manner of comedy, art, journalism,

historical documentation, and commentary on important matters of

public concern—restricting and compelling covered websites' related

speech and pressuring them to remove related user speech. *See supra,*

Sections I–II.

　　As a consequence, the law has no legitimate sweep. The online

speech found on websites like *The Volokh Conspiracy*, Rumble, or Locals

does not fall under categories of traditionally unprotected speech.

Indeed, laws or policies attempting to restrict speech using terms like

"vilify" and "humiliate" have routinely been struck down as overbroad

or vague. *See, e.g.*, *Saxe v. St. Coll. Area Sch. Dist.*, 240 F.3d 200, 210

(3d Cir. 2001) (Alito, J.) (striking down policy "prohibiting disparaging

61

speech"); *DeJohn v. Temple Univ.*, 537 F.3d 301, 320

(3d Cir. 2008) (striking down policy prohibiting speech that created "an

intimidating, hostile, or offensive environment"); *Roberts v. Haragan*,

346 F. Supp. 2d 853, 870 (N.D. Tex. 2004) (striking down speech code

banning "insults, epithets, ridicule, or personal attacks").

Even the law's regulation of speech that someone, somewhere

believes may "incite violence" fails to show a legitimate sweep because

it is not limited to speech that is "intended to produce, and likely to

produce, imminent lawless action." *See* J.A. 354 (quoting *Am. Freedom

Def. Initiative v. Metro. Transp. Auth.*, 70 F. Supp. 3d 572, 581

(S.D.N.Y. 2015)).[19] Regardless, assuming *arguendo* that the law has

some legitimate sweep with regard to speech that incites violence, its

unconstitutional applications dwarf any legitimate sweep.

The statute is also overbroad in the scope of its application. It

applies to any website that has a New York presence and generates any

revenue no matter how insignificant the presence or the income. There

is no justification for burdening such a broad swath of websites with

---

[19] Even so, laws regulating First Amendment-exempted speech cannot be
limited to specified protected groups or classes, as New York's law is, because
content-based laws are presumptively unconstitutional. *See R.A.V.*, 505 U.S. at 402
n.4.

responding to every complaint or alternatively banning all "hateful" speech. Users seeing mechanisms and policies for "hateful" speech across the internet will also feel even more pressured to self-censor. The scope of the law therefore dwarfs any legitimate sweep and violates the First Amendment.

The State also argues that the district court should not have analyzed Plaintiffs' overbreadth facial claim because it could have found they prevailed as-applied. Appellant's Br. 59 n.7. But this is a case where "the range of . . . expressive activities, and the vagueness of the statute" make it "impractical" and not "feasible to consider only" Plaintiffs' "speech." *American Booksellers Found. v. Dean*, 342 F.3d 96, 105 (2d Cir. 2003). Where "the identified overbreadth is incurable and would taint all possible applications of the statute," *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985), there is nothing "gratuitous" about adjudicating the facial claim. *SUNY*, 492 U.S. at 485.

## IV. New York's Online Hate Speech Law Is Unconstitutionally Vague.

As the district court noted, "[t]he potential chilling effect to social media users is exacerbated by the indefiniteness of some of the Hateful Conduct Law's key terms." JA 353. New York's law is unconstitutionally

vague because it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," and "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). There are also "no apparent circumstances" where the Online Hate Speech Law can be validly applied. *Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 643 (D. Vt. 2015).

Terms like "vilify" and "humiliate" are open-ended and highly subjective and do not carry an objective plain meaning. *See, e.g.*, *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996) (invalidating as unconstitutionally vague statute that required attorneys to abstain from "offensive personality"). The district court's rhetorical questions crystalize the unconstitutional vagueness of the statute's terms:

> For example, could a post using the hashtag 'BlackLivesMatter' or 'BlueLivesMatter' be considered 'hateful conduct' under the law? Likewise, could social media posts expressing anti-American views be considered conduct that humiliates or vilifies a group based on national origin?

J.A. 353. The law does not give covered websites or their users "a reasonable opportunity to understand" what is required. *Hill,* 530 U.S.

64

at 732. Websites similarly cannot know what will qualify as a "clear and easily accessible" reporting mechanism or "clear and concise" and "readily available and accessible" policy. The law falls far short of the "narrow specificity" required of laws that infringe on First Amendment freedoms. *NAACP v. Button,* 371 U.S. 415, 433 (1963). For the same reasons, New York's law also "encourages arbitrary and discriminatory enforcement," with the Legislature's awareness. *See* J.A. 170 (Assemblywoman Fahy responding to a question about how to define "humiliate" and "vilify," with "I think some of these things will get defined in the regs.").

The State's only response on vagueness is to argue that the law provides "clear notice of the conduct that must be made reportable by networks: conduct that users identify as hateful conduct." Appellant's Br. 62. This interpretation ignores that covered websites, at each step, must correctly interpret the law's vague terms or risk investigations and liability, and oddly nullifies the statute's definition of "hateful conduct" by turning it into whatever a user believes it means, fundamentally compromising whatever interest the State intended the law to serve. As a result, "companies will err on the side of caution,"

65

which will "burden . . . access to constitutionally protected speech."
*NetChoice, LLC, v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155,
at *15 (W.D. Ark. Aug. 31, 2023) (preliminarily enjoining law requiring
social media users to verify their age before accessing certain
platforms).

## V.    Plaintiffs Have an "Actual and Well-founded Fear" That New York Will Enforce Its Online Hate Speech Law in Violation of the First Amendment.

In light of all of the constitutional harms described above, Volokh,
Rumble, and Locals clearly have standing to challenge the Online Hate
Speech Law, especially "under [the] somewhat relaxed standing and
ripeness rules" that apply in First Amendment challenges. *Nat'l Org.
for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013). Plaintiffs
in First Amendment pre-enforcement challenges "need not demonstrate
to a certainty that they will be prosecuted under the statute to show
injury." *Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376, 382 (2d Cir.
2000). They need only allege "an actual and well-founded fear" that the
law will be enforced against" them.[20] Furthermore, appellees have

---

[20] Failure to follow the Online Hate Speech Law's dictates includes possible of fines of $1,000 per violation per day, as well as New York Attorney General investigations and subpoenas—increasing the statute's chilling effect. *See*

standing when their statutory interpretation is "reasonable enough that [they] may legitimately fear . . . enforcement." *Hedges v. Obama*, 724 F.3d 170, 198 (2d Cir. 2013); *see also Vt. Right to Life Comm.,* 221 F.3d at 383 (standing for plaintiff who demonstrated "an actual and well-founded fear" despite "other, perhaps even better" statutory interpretations); *Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) (standing for plaintiff who "reasonably interpreted" the law even though it was "unknown how the State will apply [the challenged] section").

Myopically viewing the Online Hate Speech Law's "clear and easily accessible" response mechanism provision in a vacuum, the State argues that Plaintiffs do not have standing to challenge it. But, as has already been shown above, the State's definition of "hateful" speech is woven into each requirement of the Online Hate Speech Law, with the greater whole working together to compel websites to communicate the State's messages and to pressure websites to remove or block

---

*NetChoice (Texas)*, 49 F.4th at 489 (possibility of civil penalties is significant when determining "whether a pre-enforcement facial challenge is appropriate").

67

constitutionally protected expression. *See supra*, Part I. The mechanism requirement cannot be viewed in isolation.

The verified complaint alleges numerous other constitutional injuries caused by the mechanism requirement, particularly in concert with the law's other requirements. Volokh, Rumble, and Locals would be compelled to create a policy and mechanism to "single out hate speech," *See* J.A. 8, 13, 27, 3138, 41–43 ¶¶ 2, 18–19, 102, 162, 173, 181, which "places content- and viewpoint-based burdens on speech." J.A. 39 ¶ 165. This will likely result in a deluge of complaints—requiring them to engage in a time-consuming and burdensome review and response process. J.A. 32 ¶ 124. To avoid these burdens, Rumble and Locals would likely "devote additional resources, more aggressively remove content, and/or limit the ability for registered users to" communicate. J.A. 32, 35 ¶¶ 125, 141. Volokh "would be individually responsible for handling" the burdensome process. J.A. 28 ¶ 106. Publishing a "clear and easily accessible" "hateful" speech reporting mechanism will harm their stated missions and public identities—synonymous with their desires to "allow a wide range of speech" and support the "free exchange of ideas." J.A. 14 ¶ 21; J.A. 11–12 ¶ 14. The Online Hate Speech Law

requires them to promote the opposite message on their websites. J.A. 24 ¶ 79. These harms are more than sufficient to show Plaintiffs' "actual and well-founded fear" of enforcement for the purpose of First Amendment pre-enforcement standing.

## VI. The District Court Properly Held Appellees Satisfied the Remaining Preliminary Injunction Factors.

Plaintiffs also satisfy the other preliminary injunction factors. When "a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349–50 (2d Cir. 2003); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

The State argues that because the Online Hate Speech law does not directly affect speech, irreparable harm cannot be presumed, that Plaintiffs failed to allege irreparable harm, and that the district court failed to consider whether there was irreparable harm. All of these arguments fail because "the very nature of [Plaintiffs'] allegations," *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996), establishes a "specific present objective harm" *and* "a threat of specific future harm."

69

*Bronx Household of Faith*, 331 F.3d at 349. Appellees allege and reasonably argue that New York's law, through regulating, restricting, compelling, and interfering with their protected speech, presents "direct limitation[s] on speech that create[] a presumption of irreparable harm." *Evergreen*, 740 F.3d at 246. The law's enforcement also presents "a threat of specific future harm[s]," because it exerts significant pressure on covered websites—particularly in combination with New York officials' barely veiled threats—to comply and remove protected speech. *Cf. Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008) (holding the plaintiff had adequately demonstrated irreparable harm by identifying actions that "had or were likely to have a chilling effect on speech"). Furthermore, the district court correctly held that the law's overbreadth and the vagueness of its key terms "have a profound chilling effect on social media users and their protected freedom of expression," J.A. 353, equally harming the would-be publishers of their speech.

New York's spurious claim that Plaintiffs' "delay" in filing this lawsuit obviates their irreparable harm is unfounded. Appellees filed their lawsuit less than six months from the date of enactment (before

the law was ever in effect) and filed the preliminary injunction motion
only three business days later. Six months from the date of enactment
to obtain counsel, investigate and research the legal and factual issues,
and prepare to file suit, including preparing a motion for preliminary
injunction, is eminently reasonable. *See Weight Watchers Int'l, Inc. v.
Luigino's, Inc.*, 423 F.3d 137, 144–45 (2d Cir. 2005) (collecting cases in
which a delay of four to seven months was held not unreasonable);
*Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333–34 (S.D.N.Y. 2011)
("good faith efforts to investigate the facts and law" justify delay); *Tom
Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 39–40 (2d Cir.
1995) (same). This is particularly the case here since Plaintiffs' waiting
also provided the Attorney General six months to publish draft
guidance or regulations to clarify the law's vague terms—which still has
not happened—and the Attorney General's report, demonstrating her
aggressive approach towards online hate speech, was released less than
a month and a half before Plaintiffs filed suit. J.A. 64. The State also
presents no evidence that granting a preliminary injunction shortly
after the law went into effect caused them any hardship, let alone a

71

"severe prejudice and unconscionable delay." *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.,* 17 F.3d 38, 44 (2d Cir. 1994).

In any event, this argument is also waived. The Attorney General did not raise this argument in the district court, and so it should not be considered. *United States v. Keppler*, 2 F.3d 21, 23 (2d Cir. 1993) ("Generally, issues not raised in the trial court . . . will be deemed waived on appeal.").

Because Volokh, Rumble, and Locals have established their likelihood of success on the merits, the balance of equities and public interest also cut decidedly in their favor. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[I]n the First Amendment context, [] the likelihood of success on the merits is the dominant, if not dispositive, factor."). The State "does not have an interest in the enforcement of an unconstitutional law," and "securing First Amendment rights is in the public interest." *Id.* (quotation marks omitted). The State's purported interest in effectuating its statute "is inadequate to overcome [Plaintiffs'] and the public's interest in the protection of First Amendment rights." *Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 217 (S.D.N.Y. 2021) (holding that the

public's interest in protecting free speech rights outweighs the government's national security and foreign policy interests). The district court therefore correctly issued a preliminary injunction.

## CONCLUSION

This Court should affirm the district court's decision issuing a preliminary injunction.

Dated: September 19, 2023            /s/ James M. Diaz
                                     _____

                                     JAMES M. DIAZ
                                       *Counsel of Record*
                                     DANIEL M. ORTNER
                                     FOUNDATION FOR INDIVIDUAL
                                       RIGHTS AND EXPRESSION
                                     510 Walnut Street, Suite 1250
                                     Philadelphia, Pennsylvania 19106
                                     (215) 717-3473
                                     jay.diaz@thefire.org
                                     daniel.ortner@thefire.org

                                     *Counsel for Eugene Volokh,*
                                     *Rumble, and Locals*

73

**Certificate of Compliance With Type-Volume Limit**

1. This document complies with the word limit of Local Rule 32.1(a)(4) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f): this document contains 13,949 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Date: September 19, 2023        /s/ James M. Diaz
                                _____
                                James M. Diaz
                                FOUNDATION FOR INDIVIDUAL
                                  RIGHTS AND EXPRESSION

# CERTIFICATE OF SERVICE

The undersigned certifies that on September 19, 2023, an electronic copy of the Brief of Plaintiffs-Appellees was filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: September 19, 2023          /s/ James M. Diaz
                                   _____

                                   JAMES M. DIAZ
                                     *Counsel of Record*
                                   DANIEL M. ORTNER
                                   FOUNDATION FOR INDIVIDUAL
                                     RIGHTS AND EXPRESSION
                                   510 Walnut Street, Suite 1250
                                   Philadelphia, Pennsylvania 19106
                                   (215) 717-3473
                                   jay.diaz@thefire.org
                                   daniel.ortner@thefire.org