# 23-356

# In the United States Court of Appeals for the Second Circuit

EUGENE VOLOKH, LOCALS TECHNOLOGY INC., RUMBLE CANADA INC.,

*Plaintiffs-Appellees*,

vs.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

## BRIEF OF *AMICI CURIAE* PROF. ERIC GOLDMAN AND TECHFREEDOM IN SUPPORT OF APPELLEES AND AFFIRMANCE

On Appeal from the United States District Court
for the Southern District of New York

Corbin K. Barthold
Andy Jung
TECHFREEDOM
1500 K Street NW
Washington, DC 20005
(771) 200-4997
cbarthold@techfreedom.org
*Attorneys for Amici Curiae*

- ii -

## CORPORATE DISCLOSURE STATEMENT

TechFreedom has no parent corporation, it issues no stock, and no publicly held corporation owns a ten-percent or greater interest in it.

/s/ Corbin K. Barthold

## TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ........................................................................1

SUMMARY OF ARGUMENT .........................................................................2

ARGUMENT .....................................................................................................4

I.     Section 394-ccc Is an Unprecedented Attack on Publishers' Constitutionally Protected Editorial Freedom ........................................................................................4

II.    Section 394-ccc Lacks Historical Antecedents ...........................7

      A.    We Found No Law Like Section 394-ccc Outside of Broadcasting ..........................................................................7

      B.    Because It Governs Online Publishing, Section 394-ccc Is Not Analogous to a Broadcasting Regulation ............................................................................9

III.  The Recent Precedent on Mandatory Editorial Transparency Dooms Section 394-ccc .......................................11

CONCLUSION ................................................................................................13

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative v. Elenis*,
  143 S. Ct. 2298 (2023) ............................................................... 2, 7

*Herbert v. Lando*,
  441 U.S. 153 (1979) ....................................................................... 6

*Manhattan Cmty. Access Corp. v. Halleck*,
  139 S. Ct. 1921 (2019) .................................................................. 5

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974) ....................................................................... 5

*NetChoice v. Moody*,
  34 F.4th 1196 (11th Cir. 2022) ................................................. 2, 5

*Reno v. ACLU*,
  521 U.S. 844 (1997) ........................................................... 3, 10, 11

*Wash. Post v. McManus*,
  944 F.3d 506 (4th Cir. 2019) .................................... 4, 5, 11, 12, 13

**Regulations**

47 C.F.R. § 73.1212(e) ..................................................................... 10

47 C.F.R. § 73.3526(e)(5-6) ............................................................. 10

47 C.F.R. § 73.3526(e)(11)(i) ........................................................... 10

**Other Authorities**

Corbin K. Barthold, *In Internet Speech Cases, SCOTUS Should Stick Up for Reno v. ACLU*, Techdirt,
  https://tinyurl.com/mprkf2vy (Mar. 28, 2023) ............................ 1, 2

# TABLE OF AUTHORITIES
## (Cont.)

Page(s)

Federal Communications Commission, *Public Inspection Files*, https://publicfiles.fcc.gov/ ......................................................9

Eric Goldman, *The Constitutionality of Mandating Editorial Transparency*, 73 Hastings L.J. 1203 (2022) ....................1

Eric Goldman, *Zauderer and Compelled Editorial Transparency*, 108 Iowa L. Rev. Online 80 (2023) ..........................1

Pet. for Cert., *NetChoice v. Paxton*, No. 22-555 (U.S., Dec. 15, 2022) ...................................................................9

## INTEREST OF *AMICI CURIAE*\*

Prof. Eric Goldman is a law professor and Associate Dean for Research at Santa Clara University School of Law. (He appears here on his own behalf, not on behalf of his employer or anyone else.) Prof. Goldman has been researching and writing about Internet law for thirty years, and his recent research focuses on the censorial consequences when government regulators impose and enforce transparency obligations on content publishers. See, e.g., Eric Goldman, *The Constitutionality of Mandating Editorial Transparency*, 73 Hastings L.J. 1203 (2022); Eric Goldman, *Zauderer and Compelled Editorial Transparency*, 108 Iowa L. Rev. Online 80 (2023).

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. It seeks to advance public policy that makes experimentation, entrepreneurship, and investment possible. TechFreedom opposes government attempts to control online speech. See, e.g., Corbin K. Barthold, *In Internet Speech Cases, SCOTUS Should Stick*

---

\* No party's counsel authored any part of this brief. No one, apart from *amici* and their counsel, contributed money intended to fund the brief's preparation or submission. All parties have consented to the brief's being filed.

*Up for Reno v. ACLU*, Techdirt, https://tinyurl.com/mprkf2vy (Mar. 28, 2023). It appears often as *amicus curiae* in cases where the government attempts to dictate what views are acceptable online. See, e.g., *NetChoice v. Moody*, 34 F.4th 1196, 1219 n.17 (11th Cir. 2022) (quoting TechFreedom's *amicus* brief).

## SUMMARY OF ARGUMENT

New York has enacted a so-called hateful conduct law—*conduct*, here, being the state's misleading euphemism for *speech*—that intrudes on websites' First Amendment rights in a pernicious way. Among other provisions, General Business Law Section 394-ccc uses vague terms (e.g., "vilify" and "humiliate") to define hate speech, and forces covered websites to publish a policy explaining how they will "respond [to] and address" complaints regarding such speech. JA338-39.

The First Amendment bars the government from "interfer[ing] with an uninhibited marketplace of ideas." *303 Creative v. Elenis*, 143 S. Ct. 2298, 2310 (2023) (cleaned up). "From time to time, governments in this country have sought to test th[is] foundational principle[]." *Id*. This is one of those times.

**I.** New York's law flouts the well-established First Amendment protection for publishers' editorial judgment. Section 394-ccc is an effort,

by the government, to distort private entities' editorial decisions by forcibly exposing, scrutinizing, pressuring, and punishing decisions the government doesn't like. On its face, the statute is a compelled-speech provision (bad); but by targeting and changing editorial decisions, the statute also functions as a content-based speech regulation (even worse).

**II.** The censorship-through-disclosure approach encoded in Section 394-ccc has no historical antecedent. Prior to the Internet, legislatures apparently never attempted to impose mandatory disclosure requirements like Section 394-ccc on publishers of newspapers, magazines, books, music, and other printed materials. Section 394-ccc's novelty as a policy approach highlights the exceptional and extreme nature of the legislature's intervention into editorial processes.

To confirm that Section 394-ccc is unprecedented, we researched the matter exhaustively and canvassed 59 media and Internet law experts. None of this research uncovered a pre-Internet law like Section 394-ccc.

In contrast, there have been longstanding disclosure requirements for radio and television broadcasters. However, the survival of these laws says nothing about the constitutionality of Section 394-ccc. *Reno v. ACLU*, 521 U.S. 844 (1997), holds that websites *cannot* be regulated like broadcasters. Courts have allowed the government some discretion to

intrude into broadcasters' editorial judgment. The Internet cannot be subjected to analogous intrusions.

**III.** A recent decision reinforces that legislatures cannot impose editorial disclosure obligations (broadcast-like or not) on Internet publishers. Maryland recently tried to require certain websites to publish, and keep for state inspection, information about the political advertisements they run. *Washington Post v. McManus*, 944 F.3d 506 (4th Cir. 2019), holds that that law violated the First Amendment several times over. Like Section 394-ccc, that law singled out specific categories of content for disclosure. Like Section 394-ccc, it compelled websites to publish content dictated by the government. And like Section 394-ccc, it was not saved by invoking broadcast disclosure precedent. This Court should follow *McManus* and strike down Section 394-ccc.

## ARGUMENT

### I. Section 394-ccc Is an Unprecedented Attack on Publishers' Constitutionally Protected Editorial Freedom

Section 394-ccc is an attack on websites' First Amendment-protected right to editorial judgment.

"The Supreme Court has repeatedly held that a private entity's choices about whether, to what extent, and in what manner it will

- 4 -

disseminate speech … constitute 'editorial judgments' protected by the First Amendment." *NetChoice, LLC v. Moody*, 4 F.4th 1196, 1210 (11th Cir. 2022).

Private publishers that "provide[] a forum for [third-party] speech" have this protected right to "editorial discretion." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). The state generally cannot compel private actors "to publish that which reason tells them should not be published." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Simply put, the state cannot "force elements of civil society to speak when they otherwise would have refrained." *Wash. Post v. McManus*, 944 F.3d 506, 514 (4th Cir. 2019).

Here, the district court correctly concluded that Section 394-ccc "compels Plaintiffs to speak about 'hateful conduct'"—and, more, to "disseminate a message" about it "with which they" might "disagree"—in violation of the First Amendment. JA346-47.

But Section 394-ccc is more than just a compelled-speech provision. It entangles the state in websites' editorial processes and usurps their First Amendment right to editorial control. The required disclosures provide state officials (and others) with extra leverage to pressure websites to alter their editorial decisions. The websites must report their editorial practices with respect to a specific area of controversial and

politically charged speech that's of high interest to the government. The government can then review that information, and, if it decides that it doesn't like the website's editorial policies or how they have been enforced, punish that website for making the "wrong" expressive choices (on the pretext that the editorial disclosures weren't properly made). Even the threat of potential enforcement in this area distorts the publisher's editorial decision-making, as the publisher will reprioritize its choices, optimizing them to placate the regulators, rather than to serve the best interests of its audience.

If New York had aimed its "hateful conduct" law at traditional print publishers—if it had tried to force book publishers or newspapers to publish policies for addressing complaints about state-defined categories of hate speech—the constitutional violation would (one hopes) be plain for all to see. As the Supreme Court has said:

> There is no law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest; and if there were, it would not survive constitutional scrutiny as the First Amendment is presently construed.

*Herbert v. Lando*, 441 U.S. 153, 174 (1979).

Although "the printed word" of course "qualif[ies] for the First Amendment's protections," "no less can hold true when it comes to speech

- 6 -

… conveyed over the Internet." *303 Creative*, 143 S. Ct. at 2312. Online publishers have a First Amendment right to editorial control, and Section 394-ccc invades that right.

## II. Section 394-ccc Lacks Historical Antecedents

Building on our expertise in media regulation, we conducted a multi-pronged search for examples of editorial disclosure laws like Section 394-ccc—and came up empty-handed. There is just one area, the broadcasting industry, where legislatures have attempted to mandate editorial disclosures. But broadcasting is a special case, subject to special restrictions, based on several unique features of the broadcasting medium.

### A. We Found No Law Like Section 394-ccc Outside of Broadcasting

In our effort to confirm Section 394-ccc's novelty, we canvassed 59 law professors, journalism professors, media experts, and First Amendment lawyers, and asked them whether they knew of any pre-Internet regulations similar to Section 394-ccc. Specifically, could the recipients think of historical examples where a legislature has successfully "force[d] publishers to provide greater transparency about their editorial operations or decisions, such as requiring the disclosure of

the publisher's editorial policies"? This survey wasn't meant to be scientific; instead, it was our way of surveying the experts who were likely to have the relevant knowledge so that we could be more confident about proving the absence of precedent.

Twenty-seven of the recipients responded to our inquiry. Of those 27, five (each answering independently) pointed only to the example of disclosure obligations in radio and television broadcasting. No one had any examples of pre-Internet obligations forcing print publishers to disclose information about their editorial practices.

The fact that Section 394-ccc has no analogous precedent tells us at least two important things. First, there is no historical "law of editorial transparency" that serves as binding or potentially persuasive precedent here. In this constitutional challenge, therefore, the court must apply first principles. Fortunately, the applicable principles are familiar—the generally applicable First Amendment right of editorial judgment.

Second, the absence of prior attempts to mandate editorial disclosures may support the inference that legislators have long anticipated that such a law would be unconstitutional.

What explains legislators' attempts to take a different regulatory approach now? The New York legislators who passed Section 394-ccc— like other state legislators who have recently attacked Internet freedom,

see, e.g., Pet. for Cert., *NetChoice v. Paxton*, No. 22-555 (U.S., Dec. 15, 2022)—have embraced Internet exceptionalism, i.e., they want to regulate the Internet more harshly than other comparable media. They are seeking to flout the First Amendment protections for online publishers, as a way to "do something!"—in this case, respond to the horrific mass-shooting in Buffalo.

Section 394-ccc isn't some well-reasoned and carefully crafted law developed to balance the many conflicting policy interests. It is an emotional, censorial reaction to show constituents that lawmakers are punishing *someone*—in this case, social media services and other websites—as retribution for a horrific crime. But the legislators are instead punishing their constituents, by attacking their constitutional rights.

### B. Because It Governs Online Publishing, Section 394-ccc Is Not Analogous to a Broadcasting Regulation

The Federal Communications Commission requires radio and television stations to maintain a variety of editorial-related disclosures in a "public inspection" file. FCC, *Public Inspection Files*, https://publicfiles.fcc.gov/ (accessed Sept. 20, 2023). The files must include, among other things, messages created by the government and certain disclosures that relate, directly or indirectly, to a station's editorial

choices. See, e.g., 47 C.F.R. § 73.3526(e)(5-6) (requiring stations to include a "political file," disclosing information about the political advertising the stations air); *id*. § (e)(11)(i) (requiring stations to list programs they air that address "community issues"); 47 C.F.R. § 73.1212(e) (requiring stations to list the officers of any entity that sponsors broadcast material involving a "political matter" or a "controversial issue of public importance").

What goes for broadcasters, however, does not go for websites. We know this because the Supreme Court has explicitly said so. In *Reno v. ACLU*, 521 U.S. 844 (1997), the Court was asked to treat websites like broadcasters—like highly regulated entities that enjoy less than full First Amendment protection. The Court declined.

There are "special justifications," *Reno* recognizes, "for regulation of the broadcast media"—justifications that "are not applicable to other speakers." *Id*. at 868. For one thing, there is a "history of extensive Government regulation of the broadcast medium." *Id*. For another, broadcasting has an "invasive nature" (when "turning on a radio," one can be "taken by surprise by an indecent message"). *Id*. at 868, 870. Above all, broadcasting is potentially limited by a "scarcity of available frequencies"—such that the government has an interest in equitably parceling out broadcast licenses. *Id*. at 868. None of these considerations

- 10 -

applies to the "vast democratic forums of the Internet." *Id*. The Court could find "no basis," therefore, "for qualifying the level of First Amendment scrutiny that should be applied" to websites. *Id*. at 870.

The justification for affording broadcasting less than full First Amendment protection is "inapposite for the virtually limitless canvas of the internet." *McManus*, 944 F.3d at 519.

This analysis reinforces our earlier conclusion that Section 394-ccc is unprecedented. The statute seeks to impose broadcaster-style disclosure obligations on Internet publishers, even though the First Amendment imposes a much higher bar for any incursions into Internet publishers' editorial processes. Accordingly, Section 394-ccc represents a new type of media regulation, one that has no analogy—and that deserves the highest level of constitutional scrutiny.

### III. The Recent Precedent on Mandatory Editorial Transparency Dooms Section 394-ccc

While Section 394-ccc has no precedent in the pre-Internet era, legislators have recently begun adopting editorial disclosure obligations for Internet publishers. The judicial review of one such law illustrates the constitutional infirmity of such actions.

In 2018, Maryland passed a law requiring large websites to publish, and retain for state inspection, information about the political advertisements they carry. Several news outlets sued, arguing that the law violated the First Amendment. In *Washington Post v. McManus*, the Fourth Circuit struck the law down, concluding that it contained "a compendium of traditional First Amendment infirmities." 944 F.3d 506, 513 (4th Cir. 2019).

Much of the language in *McManus* applies directly to this appeal. Two points, in particular, stand out. First, the Maryland law was "a content-based regulation on speech," in that it "single[d] out one particular topic of speech—campaign-related speech—for regulatory attention." 944 F.3d at 513. Replace "campaign-related speech" with "hate speech" (as defined by the government), and the same goes for Section 394-ccc. Second, the Maryland law "compel[ed] speech," forcing websites "to carry certain messages." *Id*. at 513-14. That, even more clearly, is this case.

In defense of its law, Maryland invoked "the third-party disclosure obligations"—discussed above—"that have been upheld in the broadcasting context." 944 F.3d at 519. The Fourth Circuit was not persuaded. The "comparison," it said, is "inapt." *Id*. The court summarized the "scarcity" rationale, and then explained why that

rationale is limited to the (theoretically) "limited channels" available for "broadcast licenses." *Id*. As we have explained, and as *McManus* confirms, the rules for broadcasters cannot be applied to "the virtually limitless canvas of the internet." *Id*.

Like the invalid Maryland law, Section 394-ccc contains "a compendium of traditional First Amendment infirmities," 944 F.3d at 513, and must be struck down.

## CONCLUSION

The district court's order granting a preliminary injunction should be affirmed.

September 25, 2023    Respectfully submitted,

/s/ Corbin K. Barthold
Corbin K. Barthold
Andy Jung
TECHFREEDOM
1500 K Street NW
Washington, DC 20005
(771) 200-4997
cbarthold@techfreedom.org
*Attorneys for Amici Curiae*

- 14 -

## CERTIFICATE OF COMPLIANCE

I hereby certify:

This brief complies with the type-volume limits of Fed R. App. P. 29(a)(5) because it contains 2,383 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, in 14-point font, using Microsoft Office 365.

/s/ Corbin K. Barthold

- 15 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of September, 2023, a true and correct copy of the foregoing brief was filed and served on all registered counsel through the Court's CM/ECF system.

/s/ Corbin K. Barthold