# 23-356

---

## United States Court of Appeals
## for the Second Circuit

---

Eugene Volokh, Locals Technology Inc., Rumble Canada Inc.,

*Plaintiffs-Appellees*

*v.*

Letitia James, *in her official capacity as Attorney General of New York,*

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRIEF OF LIFE LEGAL DEFENSE FOUNDATION AND YOUNG
AMERICANS FOR FREEDOM AS *AMICI CURIAE* IN SUPPORT
OF PLAINTIFFS-APPELLEES**

---

CATHERINE W. SHORT
    Counsel of Record
SHEILA A. GREEN
Life Legal Defense Foundation
P.O. Box 1313
Ojai, CA 93024-1313
(707) 337-6880
kshort@lldf.org
Counsel to *Amici Curiae*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...........................................................i

TABLE OF AUTHORITIES ................................................... ii

STATEMENT OF *AMICI CURIAE*............................................1

CORPORATE DISCLOSURE STATEMENT ...........................................3

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ...........................................................5

    I.    Laws Mandating the Creation of Reporting Policies Are a Form of Compelled Speech. ...............................................5

    II.    For Purposes of First Amendment Protection, "Speech" and "Conduct" Must Be Distinguished. ..................................9

    III.    "Hateful Conduct" Cannot Exist on Social Media Networks.............11

    IV.    The Notion That Speech is Conduct, Even Violence, Has Become Popular in Certain Cultural Schools of Thought and Must Be Rejected in Law as Posing a Grave Danger to First Amendment Activities........14

CONCLUSION ...........................................................22

RULE 32 (g) CERTIFICATE OF COMPLIANCE.................................24

# TABLE OF AUTHORITIES

**Cases**

*Buckley v. Valeo,* 424 U.S. 1 (1976) ...................................................................9

*Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) ..............1

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................................21

*Lovell v. City of Griffin*, 303 U.S. 444 (1938) ............................................................9

*Matal v. Tam*, 137 S. Ct. 1744 (2017) .......................................................................20

*National Socialist Party of America v. Village of Skokie*, 432 U.S. 43 (1977)..........9

*NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022).........................15

*Snyder v. Phelps,* 131 S. Ct. 1207 (2011) ..................................................................9

*Spence v. Washington*, 418 U.S. 405 (1974)..............................................................10

*Terminiello v. Chicago,* 337 U.S. 1 (1949)................................................................22

*Texas v. Johnson*, 491 U.S. 397 (1989) ....................................................................10

*United States v. O'Brien*, 391 U.S. 367 (1968) .........................................................10

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ..................................................9

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S.

   626 (1985) ...........................................................................................................6, 7

**Statutes**

N.Y. Gen. Bus. Law §394-ccc ........................................................................4, 12, 13

## Other Authorities

"Milo Yiannopoulos Event Canceled After Violence Erupts," *Berkeley News*

    (February 1, 2017) ............................................................................18, 19

Allie Griffin, "NYC College Professor Shellyne Rodriguez Cursed Out Anti-

    Abortion Students Tabling at School," *New York Post* (May 24, 2023, 9:31 AM)

    ............................................................................................................17

Greg Lukianoff, "Free Speech Does Not Equal Violence:  Part 1 of Answers to Bad

    Arguments Against Free Speech from Nadine Strossen and Greg Lukianoff",

    Foundation for Individual Rights and Expression (September 1, 2021) .................22

https://dictionary.findlaw.com/definition/conduct.html#:~:text=conduct%20n,crimi

    nal%20%22Louisiana%20Revised%20Statutes%22%5D.................................11

https://help.twitter.com/en/rules-and-policies/x-rules ...........................................14

https://safety.twitch.tv/s/article/CommunityGuidelines?language=en_US#11

    HatefulConduct....................................................................................15

https://www.merriam-webster.com/dictionary/conduct .........................................12

https://www.merriam-webster.com/dictionary/expression......................................11

https://yaf.org/news/state-senator-wants-to-ban-conservative-speakers-after-

    successful-matt-walsh-yaf-lecture/ ....................................................................18

https://yaf.org/news/university-at-buffalo-leftists-try-to-derail-plans-for-michael-

knowles-lecture-administrators-denounce-his-opinions-contrary-to-university-

values/ ...................................................................................................17

Kevin Litman-Navarro, "Wittgenstein on Whether Speech is Violence," *JSTOR*

*Daily* (August 30, 2017)...........................................................................20

Lisa Feldman Barrett, "When Is Speech Violence?", *The New York Times* (July 14,

2017) ......................................................................................................19

Nisa Dang, "Check Your Privilege When Speaking of Protests," *The Daily*

*Californian* (February 7, 2017) .............................................................18

Reuven Fenton and Emily Crane, "Shellyne Rodriguez, Unhinged NYC College

Professor Who Cursed Out Anti-Abortion Students, Holds Machete to Post

Reporter's Neck," *New York Post* (May 24, 2023, 9:38 AM) .............................17

Vaclav Havel, *The Power of the Powerless*

https://web.archive.org/web/20120107141633/http://www.vaclavhavel.cz/showtr

ans.php?cat=clanky&val=72_aj_clanky.html&typ=HTML ................................16

**Rules**

Federal Rule of Appellate Procedure, Rule 29(a)(4)(E)...........................................1

Federal Rules of Appellate Procedure, Rule 26.1 ....................................................3

Federal Rules of Civil Procedure, Rule 29(a)(2)......................................................3

**Constitutional Provisions**

U.S. Constitution, Amend. I ........................................................................4

## STATEMENT OF *AMICI CURIAE*[1]

Amicus Life Legal Defense Foundation (LLDF) is a California non-profit corporation that provides legal assistance to pro-life advocates. LLDF was started in 1989, when massive arrests of pro-life advocates engaging in non-violent civil disobedience created the need for attorneys and attorney services to assist those facing criminal prosecution. Most of these prosecutions resulted in convictions for trespass and blocking, sentences consisting of fines, jail time, or community service, and stern lectures from judges about the necessity of protesting within the boundaries of the law.

LLDF is concerned about the modern trend toward equating "speech" with "conduct" as a thinly veiled attempt to thwart the expression of viewpoints with which certain lawmakers disagree. Of even greater concern to LLDF is the equating of pro-life speech in particular with harmful conduct or violence, a spurious assertion based on the prior false premise that speech can be conduct at all. With the overturning of *Roe v. Wade* and the return of the issue of abortion "to the people and their elected representative in the democratic process" (*Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2310 (2022)), the need to protect the ability

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for amici represent that no counsel for a party authored this brief in whole or in part and that no person or entity, other than amici or their counsel, made a monetary contribution to the preparation or submission of this brief.

of pro-life citizens to exercise their First Amendment rights to persuade their fellow citizens has taken on new urgency. Courts cannot waver on this fundamental right of citizens to freely express their opinions in order to effect public discourse on this hot button issue and must resist all attempts of lawmakers to twist words to suit their own ends.

Young America's Foundation (YAF) is a 501(c)(3) nonprofit organization whose mission is to educate and inspire young Americans from middle school through college with the ideas of individual freedom, a strong national defense, free enterprise, and traditional values. One way YAF fulfills its mission is through student-led Young Americans for Freedom chapters on campuses across the nation. Freedom chapters are consistently berated, penalized, and banned by school administrators and student governments who label their speech as harmful, hateful, or otherwise problematic.

This case is important to YAF because it presents the court an opportunity to curb unconstitutional government overreach and strengthen fundamental freedom of speech, without which the American experiment would not exist. YAF believes that speech is speech – is does not become conduct merely because the government wishes to regulate it – and that if the government is permitted to regulate speech, the country will lose out on important debates and ideas, and individual autonomy will be stripped away as people are forced to speak in contravention to their own beliefs.

Pursuant to Federal Rule of Civil Procedure 29(a)(2), *Amici* have obtained consent from the parties to file this *amici curiae* brief.

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 of the Federal Rules of Appellate Procedure, *amici* Life Legal Defense Foundation and Young Americans for Freedom certify that they are non-profit corporations with no stock or parent corporations.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case concerns speech about speech about speech. Specifically, the case is about mandating the creation of a policy (speech) concerning reporting (speech) of social media posts (speech) that the state of New York insists on labeling as "conduct."[2]

---

[2] In their Opening Brief, the Attorney General divides the law into the "report-mechanism requirement" and the "policy disclosure requirement." The Attorney General states that the report-mechanism requirement means as little as having "a mechanism for accepting user complaints." Opening Brief for Appellant Attorney General ("AOB") at 2. Accepting that representation as true, Amici here focus on the policy disclosure requirement. Amici note, however, that the Attorney General repeatedly contends that the policy disclosure requirement is only "a subsidiary requirement that is simply meant to enhance the statute's main reporting function." *Id*. at 2, 13, 17, 18, 25, 32, 33, 36, 50, 58. In light of the Attorney General's representation of the negligible nature of the requirement of a report-mechanism, the policy-disclosure "subsidiary" requirement is unlikely to serve any significant, much less compelling, governmental interest.

3

The District Court for the Southern District of New York correctly issued a preliminary injunction prohibiting the enforcement of N.Y. Gen. Bus. Law §394-ccc ("Hateful Conduct Law") based on its facial invalidity under the First Amendment to the U.S. Constitution. Special Appendix to Brief of Attorney General ("S.A.") at 19.

While coming to the same conclusion, Amici approach the "Hateful Conduct Law" from a different angle than the District Court. First, amici show that a statute analogous to New York's law would be a compulsion of speech even if its object were to generate policies and reports about something other than speech.

Second, regardless of the test employed, a law mandating the expression of a falsehood is unconstitutional. Supreme Court precedents allowing mandated disclosure of truthful, factual, and/or uncontroversial information are not relevant where the mandated disclosure is none of those.

The "Hateful Conduct Law" mandates "disclosures" premised on a falsehood, namely, that speech is conduct. Moreover, that falsehood represents the position of one side of a contentious contemporary public debate about the role of free speech in our society. For that reason, the law is facially unconstitutional.

## ARGUMENT

**I.      Laws Mandating the Creation of Reporting Policies Are a Form of Compelled Speech.**

The policy disclosure requirement mandates speech (promulgating a policy) about speech (reporting) about speech (initial posting). But even if the statute only required that social media companies promulgate a policy about conduct rather than speech, this mandate would still represent an unconstitutional compulsion of speech.

Some analogies may be helpful.

Suppose the state of "Columbia" passed a law identical to the New York law, except that everywhere the New York law says, "hateful conduct," the Columbia law said "blasphemous conduct." The law defines "blasphemous conduct" as "the use of a social media network to vilify any being or entity regarded as divine or the equivalent of divine." Noting an increase in acts of violence directed at places of worship, the law purports to serve Columbia's interest in deterring similar acts of violence in the future. As here, Columbia defends the law as viewpoint-neutral because "it does not "penalize[] the expression of particular points of view," and "regulates only social media networks, not social media users, and does not discriminate between social media networks based on viewpoint." AOB at 49. Like the Attorney General, Columbia does not attempt to defend the law as *content*-neutral. Rather, it ignores the issue of content-neutrality entirely and instead argues that the law is consistent with the "*Zauderer* framework," for commercial speech.

*Id*. at 35 (citing *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985)). And under that framework, virtually every argument the Attorney General makes in support of the "Hateful Conduct" law applies just as well to the "Blasphemous Conduct" law. "Networks are not required to prohibit [blasphemous] conduct, remove such conduct from their websites, or otherwise adopt a policy dictated by the State. Indeed, a network may have a policy to do nothing about user reports of [blasphemous] conduct, so long as that policy is disclosed to the network's users." *Id*. at 41, *see also* at 44, ("Nor is a network required to adopt or even reference [Columbia's] definition of [blasphemous] conduct in its policy. A network must disclose a policy that includes whether and how it will respond to reports of [blasphemous] conduct as defined by [Columbia's law]. But it need not reference the State's definition to do so.")

Meanwhile, the state of "Adams" passes a law identical to New York's law, except that "hateful conduct" is replaced with "anti-two-sexes conduct," and "anti-two-sexes conduct" is defined as "the use of a social media network to deny or question the biological sex of any human being." The legislative history of the law notes studies showing the impact of "anti-two-sexes conduct" on social media in causing gender dysphoria contagion, and the consequent increase in unnecessary and harmful medical treatments and surgeries related to gender dysphoria. The state has an interest in deterring and discouraging such harmful behavior. Like Columbia,

6

Adams defends the law relying on the exact same arguments employed by the Attorney General. The law simply requires social media networks to disclose "factual and uncontroversial information" about "its own policy" for dealing with anti-biology conduct: "[T]he mere fact that the disclosure relates in some way to an issue of public debate does not render it 'controversial'—particularly when the disclosure is regarding the networks' own policy." *Id*. at 47.

But by forcing social media networks to *create* and *publish* policies regarding how they will deal with reports of "blasphemous conduct" and "anti-two-sexes conduct," the state is compelling these networks to speak a message effectively admitting the existence of things they may not believe exist – things, moreover, the existence or non-existence of which is a highly-debated topic: divine beings and immutable biological sexes.

Even where a mandated policy does not concern reporting a third party's speech, it can still be an unconstitutional compulsion to speak. For example, suppose the state of "Madison" passed a "Crystals Heal" law mandating that all health care providers provide a mechanism for reporting healings with crystals of patients under their care, and, further, that they post signs and a notice on their website advising their patients of how to report healing using crystals and their policies concerning responding to such reports. The state defends the law as the Attorney General does here: that the policy disclosure requirement simply mandates disclosure of factual

information to consumers relating to their services, i.e., their policies when faced with a patient reporting to have been helped or healed by crystals. The contents of the policies themselves are completely up to the health care providers.

Again, mandating that health care providers inform their patients of how to make reports about crystal healings forces those providers to appear to acknowledge the existence of something they may believe is entirely fictional, and a harmful fiction at that.

A final example, one that involves neither third-party speech nor reporting. Suppose the state of "Jefferson" required all universities, public and private, to require that student-directed organizations must publish a policy concerning their efforts to eradicate "cultural appropriation," defined as "the use of characteristics or customs of a minority group which is not indigenous to the appropriator for the purpose of stereotyping, oversimplifying, mockery, or exploitation." The state does not dictate what that policy must be; indeed, the policy could be that the organization does nothing to eradicate cultural appropriation. But compulsion to enunciate such a policy is itself compulsion to acknowledge the existence of "cultural appropriation" as defined and publicize an officially perceived need to eradicate it.

All of these examples simply take the Attorney General's argument to its natural conclusion. In her view, as long as money is changing hands, then the state may force private entities to adopt policies which, by their very existence,

promulgate and/or affirm the state's views on controversial issues.  Here, by forcing Plaintiffs and other social media networks to create and promulgate policies about "Hateful Conduct" as defined, the law forces them to express New York's *erroneous* stance that the speech appearing on their networks is "conduct."

## II.  For Purposes of First Amendment Protection, "Speech" and "Conduct" Must Be Distinguished.

The Supreme Court has long recognized that virtually all speech is to some extent intertwined with some form of conduct, and that this expressive conduct deserves robust First Amendment protection. *See e.g., Snyder v. Phelps,* 131 S. Ct. 1207 (2011) (picketing); *Lovell v. City of Griffin*, 303 U.S. 444 (1938) (leafletting); *National Socialist Party of America v. Village of Skokie*, 432 U.S. 43 (1977) (demonstrations);  and *Buckley v. Valeo,* 424 U.S. 1 (1976) (monetary contributions to political campaigns).  The Court allow regulations of the time, place, and manner of expressive activity, but only when such regulations are content- and viewpoint-neutral, i.e., when the regulation is unrelated to the content of the speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 803 (1989) (upholding New York City's sound-amplification ordinance as a reasonable and content-neutral regulation of the place and manner of protected speech.)

It is also well-established that symbolic speech, i.e. conduct that expresses an idea without words, is protected under the First Amendment. The Court recognized that the burning of a draft card could be a form of speech demonstrating

opposition to war but upheld the defendant's conviction under a federal law, stating that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). That governmental interest must be "unrelated to the suppression of free expression" and "no greater than is essential to the furtherance of that interest." *Id*. at 377. In *Texas v. Johnson*, 491 U.S. 397 (1989) the Court overturned Mr. Johnson's conviction for flag burning because his actions were expressive conduct that required First Amendment scrutiny, and Texas did not assert an interest unrelated to the suppression of expression. "The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its protection does not end at the spoken or written word." *Id*. at 404. To warrant First Amendment scrutiny, the context of an activity must be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Spence v. Washington*, 418 U.S. 405, 409 (1974).

These cases clearly illustrate the Court's recognition that, even when *conduct* is communicative, it is distinct from the message conveyed. But while conduct may be expressive, the Court has never held that expression itself is conduct. Even those categories of expression that are not protected under the First

Amendment (e.g., true threats, obscenity, defamation, incitement) are still considered speech, not conduct.

### III.      "Hateful Conduct" Cannot Exist on Social Media Networks.

The foregoing precedents do not cite technical legal definitions for "speech," "expression" or "conduct." Rather, they reflect the everyday understanding of the terms as referring to two different things. "Speech" is commonly defined as "the faculty or power of speaking; oral communication; ability to express one's thoughts and emotions by speech sounds and gesture" *Speech*, Dictionary.com, https://www.dictionary.com/browse/speech (last visited September 7, 2023).

More broadly, "expression" means "a. an act, process, or instance of representing in a medium (such as words); b. something that manifests, embodies, or symbolizes something else." *Expression*, Merriam-Webster.com.[3] (last visited September 7, 2023). This latter definition encapsulates the wide range of forms of expression using a variety of mediums, including expressive conduct, that the Court has deemed protected by the First Amendment.

In contrast, "conduct" means "an act or omission to act" (*Conduct,* FindLaw Legal Dictionary[4]) or, sometimes more specifically, "a mode or standard of

---

[3] https://www.merriam-webster.com/dictionary/expression

[4] https://dictionary.findlaw.com/definition/conduct.html#:~:text=conduct%20n,crim inal%20%22Louisiana%20Revised%20Statutes%22%5D

personal behavior especially as based on moral principles." *Conduct,* Merriam-Webster.com.[5]

Common colloquialisms such as "Do as I say, not as I do" or "Practice what you preach" illustrate this latter, commonly understood distinction between speech and conduct. The Supreme Court has never indicated that it was employing anything other than the common understanding of the words in cases involving speech mixed with conduct. Needless to say, the First Amendment does not protect free "conduct," only free "speech," so this simple distinction must be honored and, so far, it has been by courts.

The linchpin of the New York law is its definition of "Hateful Conduct" which "means the use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." Social Media Networks; Hateful Conduct Prohibited, N.Y. Gen. Bus. Law § 394-ccc (2023). This definition simply ignores the fact that online "conduct" described as "hateful" is in fact speech. In its reasoning, the District Court did not accept this recharacterization, but instead correctly relied on the common understanding of the distinction between "speech" and "conduct."

---

[5] https://www.merriam-webster.com/dictionary/conduct

In similar fashion before this Court, the Attorney General attempts to argue that the Hateful Conduct Law regulates conduct, and not speech, because "the report-mechanism requirement does not require social media networks to speak at all, let alone speak any message about hateful conduct." AOB at 26. This explanation disregards the fact that requiring social media companies to provide a mechanism that "permits consumers to report conduct meeting [the State's] definition" of "hateful conduct" (*id.* at 26-27) compels social media companies to implicitly endorse the idea that speech expressed on social media can be "hateful conduct," or conduct at all. This is an assertion that the social media company may or may not embrace as true.[6]

The State of New York may believe that the words "the use of a social media network," in its definition of "hateful conduct" sufficiently distinguish conduct from speech, by focusing on the act of posting as distinct from the content of the post. However, this is specious since all forms of expression use some medium, as the

---

[6] Furthermore, the Attorney General's assertion that social media companies do not have to adopt or reference the State's definition of "hateful conduct" in their policies (AOB at 44) cannot be reconciled with the statutory language. "Each social media network shall have a clear and concise policy readily available and accessible on their website and application which includes how such social media network will respond and address the reports of incidents of hateful conduct on their platform." §394-ccc(3). This strategic retreat from the clear language of the law is of a piece with the Attorney General's dilution of the "hateful conduct" reporting mechanism requirement to where it is satisfied by a "a mechanism for accepting user complaints." AOB at 2.

Merriam-Webster definition states clearly, and involve some type of action, *supra* at 11-12. One might as well claim that regulations on "the use of vocal cords" or "the use of pens" to vilify or humiliate were regulations of conduct. This conflation of speech with conduct simply because it is transmitted through social media is a blatant attempt to chisel away at the First Amendment protections of the targeted speech. In short, defining speech as conduct does not make it so, as the District Court implicitly held. S.A. at 17.

IV. **The Notion That Speech is Conduct, Even Violence, Has Become Popular in Certain Cultural Schools of Thought and Must Be Rejected in Law as Posing a Grave Danger to First Amendment Activities.**

The Hateful Conduct Law is especially concerning because it is not an anomaly, and, as always, the law is simply trying to catch up with cultural trends on a hotly debated issue. The social media giant X (formerly known as Twitter) has a "Hateful Conduct" policy which states, "You may not attack other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease." "The X Rules," *Twitter*.[7] The livestreaming service Twitch also has a "Hateful Conduct" policy which states "Twitch does not permit behavior that is motivated by hatred, prejudice or intolerance, including behavior that promotes or encourages discrimination,

_____

[7] https://help.twitter.com/en/rules-and-policies/x-rules (last visited September 7, 2023)

denigration, harassment, or violence based on the following protected characteristics: *race, ethnicity, color, caste, national origin, immigration status, religion, sex, gender, gender identity, sexual orientation, disability, serious medical condition,* and *veteran status*." "Hateful Conduct," *Twitch*.[8] As it is impossible by the very nature of the service to engage in conduct or behavior in the common understanding of those words while on these social media sites, these policies clearly are referring to speech, not conduct, that the sites wish to detect and eradicate. As privately-owned companies, they are not subject to the same First Amendment strictures. *NetChoice, LLC v. Att'y Gen., Fla*., 34 F.4th 1196, 1210 (11th Cir. 2022). They may, like Vaclav Havel's famous greengrocer, voluntarily post a sign containing one message, intending to signify something quite different.[9] What is relevant is that

---

[8]https://safety.twitch.tv/s/article/CommunityGuidelines?language=en_US#11Hateful Conduct (last visited September 19, 2023)

[9] Obviously the greengrocer is indifferent to the semantic content of the slogan ["Workers of the world, unite!"] on exhibit; he does not put the slogan in his window from any personal desire to acquaint the public with the ideal it expresses. This, of course, does not mean that his action has no motive or significance at all, or that the slogan communicates nothing to anyone. The slogan is really a sign, and as such it contains a subliminal but very definite message. Verbally, it might be expressed this way: "I, the greengrocer XY, live here and I know what I must do. I behave in the manner expected of me. I can be depended upon and am beyond reproach. I am obedient and therefore I have the right to be left in peace." Vaclav Havel, *The Power of the Powerless*, https://web.archive.org/web/20120107141633/http://www.vaclavhavel.cz/showtrans.php?cat=clanky&val=72_aj_clanky.html&typ=HTML

they feel the need to employ the term "conduct" to obfuscate the fact that they are in fact restricting speech. Perhaps they feel the need to obfuscate because they internally acknowledge that regulation of speech is foreign to American ideals, even where not strictly illegal. Of even greater concern is the difficulty in enforcing these policies objectively. How does one decide when a simple statement becomes an "attack?" How does one determine the motivation of a speaker? When does mere speech cross the line and promote or encourage the stated harms? Where does one find a truly unbiased adjudicator for whether something is "hateful"? These policies are fraught with the danger of censoring certain disfavored opinions under the guise of protecting the on-line community.

Pushing this trend even further are those who equate speech not just with hateful conduct, but with violence, even to the point of justifying violent reactions from those who disagree with the speech. Recently, a professor at New York's Hunter College confronted completely non-violent pro-life students hosting an information table on campus, telling them that their information was "f*ing propaganda," "violent" and "bullsh*t." At the end of the exchange, she pushed some of their pamphlets off the table. Allie Griffin, "NYC College Professor Shellyne Rodriguez Cursed Out Anti-Abortion Students Tabling at School," *New York Post* (May 24, 2023, 9:31 AM)[10].

---

[10] https://nypost.com/2023/05/22/nyc-hunter-college-professor-cursed-out-anti-abortion-students-tabling-at-school/

In a classic case of the pot calling the kettle black, the same professor was later shown in a video holding a machete or kitchen knife to the neck of a reporter who knocked on her apartment door to ask her about the incident. Reuven Fenton and Emily Crane, "Shellyne Rodriguez, Unhinged NYC College Professor Who Cursed Out Anti-Abortion Students, Holds Machete to Post Reporter's Neck," *New York Post* (May 24, 2023, 9:38 AM)[11].

In March of 2023, Young Americans for Freedom at the University at Buffalo (UBYAF) announced their intent to bring commentator Michael Knowles to speak on the topic "How Radical Feminism Destroys Women (And Everything Else)." A group of professors claimed that Knowles' speech would "effectively [be] a call for genocidal violence against members of the transgender community."[12]

Just last month, after author Matt Walsh spoke at New Mexico State University at the invitation of Young Americans for Freedom, a state senator, joined by other public officials, wrote to the university, questioning "the rationale for allowing this type of event that would knowingly frighten and harm part of the

---

[11] https://nypost.com/2023/05/23/nyc-college-professor-shellyne-rodriguez-holds-machete-to-post-reporters-neck/

[12] https://yaf.org/news/university-at-buffalo-leftists-try-to-derail-plans-for-michael-knowles-lecture-administrators-denounce-his-opinions-contrary-to-university-values/ (last visited September 20, 2023)/

student population . . .” The writers claimed that students also had expressed “fears because of the Walsh event.”[13]

In 2017, right wing commentator Milo Yiannopoulos was invited to speak on campus by the Berkeley College Republicans. His speech was canceled, and he was evacuated by the UC Police Department due to an “organized violent attack and destruction of property at UC Berkeley’s Martin Luther King Jr. Student Union.” “Milo Yiannopoulos Event Canceled After Violence Erupts,” *Berkeley News* (February 1, 2017).[14] In an expletive-laden opinion piece, one student justified the violence by equating the predicted contents of his speech with “violence.” The writer stated, “If I know that you are planning to attack me, I’ll do all I can to throw the first punch,” and “asking people to maintain peaceful dialogue with those who legitimately do not think their lives matter is a violent act.” She ended her piece with the thrust “[T]here are those of us who know that our grandparents and parents survived hate only through the grace of violent action.” Nisa Dang, “Check Your Privilege When Speaking of Protests,” *The Daily Californian* (February 7, 2017).[15] This student-writer unilaterally declared that Yiannopoulos was no better than a Nazi

---

[13] https://yaf.org/news/state-senator-wants-to-ban-conservative-speakers-after-successful-matt-walsh-yaf-lecture/ (last visited September 22, 2023)

[14] https://news.berkeley.edu/2017/02/01/yiannopoulos-event-canceled (last visited September 19, 2023)

[15] https://www.dailycal.org/2017/02/07/check-privilege-speaking-protests (last visited September 19, 2023)

intent on violence simply because he had opinions differing from her own. Since in her mind, his speech *was* violence, students were justified in resorting to pre-emptive violence.  Even the exercise of First Amendment rights by engaging with a person having a different opinion was violence, in her estimation. While the campus administration regretted the loss of the exercise of First Amendment rights on campus due to the canceling of the speaker (*Berkeley News, supra)*, in the end the violent protesters had their way, and the First Amendment and the student body were the losers.

The treatment Yiannopoulos received was also justified by non-student writers in prominent newspaper articles. One stated that, "Words can have a powerful effect on your nervous system. Certain types of adversity, even those involving no physical contact, can make you sick, alter your brain — even kill neurons — and shorten your life." Lisa Feldman Barrett, "When Is Speech Violence?", *The New York Times* (July 14, 2017).[16] The author, a psychology professor, reasoned that, since speech can cause stress, it can be a form of violence if it is "abusive," and not merely "offensive." She concluded by deciding "But we must also halt speech that bullies and torments. From the perspective of our brain cells, the latter is literally a form of violence." *Id*. Nowhere in the article did she discuss how to differentiate between

---

[16] https://www.nytimes.com/2017/07/14/opinion/sunday/when-is-speech-violence.html (last visited September 19, 2023)

"abusive" speech and "offensive" speech, or who should make that determination. The Berkeley Republicans welcomed Yiannopoulos' talk, so they obviously did not consider it abusive. Presumably, students' opinions fell across the spectrum. It is obvious that the "speech equals violence" trope, whatever uses it may have in therapy, cannot have any place in First Amendment law as it invalidates the very purpose of freedom of speech. *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) ("Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'"). The irony of these examples where protesters embraced the "speech is violence" trope is that they, not the speakers, were the only ones who engaged in actual violence.

Philosophers too have entered the debate. Referencing Wittgenstein, one author stated that whether speech is violence depends on how it is defined. "If we define violence as a physical act, then speech is *never* violence. If we choose to define violence as causing harm to a person, then speech is *often* violence. If we choose to define violence as intentionally causing harm, then *sometimes* speech is violence." Kevin Litman-Navarro, "Wittgenstein on Whether Speech is Violence," *JSTOR Daily* (August 30, 2017).[17] Though the writer makes a passing reference to

---

[17] https://daily.jstor.org/wittgenstein-whether-speech-violence/ (last visited September 19, 2023)

the judicial system, he does not consider how to translate this conclusion into a rule of law. Whatever the merits of his position philosophically, a rule of law based on the subjective reactions of innumerable individuals to various kinds of speech would be incoherent and unconstitutionally vague. *Grayned v. City of Rockford*, 408 U.S. 104 (1972) (upholding an anti-noise ordinance since it gave fair warning as to what was prohibited by defining distinct boundaries and so was not vague). Metaphors equating speech and violence, whatever truth they may convey in other contexts, cannot become the basis of a rule of law.

Nadine Strossen, former President of the American Civil Liberties Union, rebutted the "speech is violence" assertion by aptly observing,

> Sticks and stones directly cause harm, through their own force, but words at most can potentially contribute to harm; whether particular words actually do cause harm depends on how individual listeners perceive and respond to them, which in turn is influenced by the listeners' personalities and circumstances, including innumerable other factors that also potentially influence their psyches and behavior. . . .When there is a sufficiently tight and direct causal nexus between speech and specific serious imminent harm, including violence, free speech principles permit such *speech* to be punished.

Greg Lukianoff, "Free Speech Does Not Equal Violence: Part 1 of Answers to Bad Arguments Against Free Speech from Nadine Strossen and Greg Lukianoff", Foundation for Individual Rights and Expression (September 1, 2021) (emphasis added).[18] But even threats or speech that poses a danger of imminent harm is still speech --albeit unprotected—and not conduct.

The law cannot possibly base freedom of speech on the speculative possible reactions of individuals. Such a rule would be incoherent and unconstitutional as it would empower the heckler's veto. *Terminiello v. Chicago,* 337 U.S. 1, 4 (1949).

## CONCLUSION

While individuals and privately owned companies such as X and Twitch are free to regulate or censor speech if they wish, legislators are bound by the Constitution. In an instance of politics flowing downstream from culture, lawmakers, emboldened by the success of private censorship activities, seem to have embarked on a censorship scheme of their own in the Hateful Conduct Law. Legislators should not be allowed to import those destructive tactics into state law, as they are antithetical to the First Amendment

The District Court decision should be affirmed.

---

[18] https://www.thefire.org/news/blogs/eternally-radical-idea/free-speech-does-not-equal-violence-part-1-answers-bad-arguments (last visited September 19, 2023)

Respectfully submitted,

/s/ *Catherine W. Short*

CATHERINE W. SHORT
  *Counsel of Record*
SHEILA A. GREEN
Life Legal Defense Foundation
PO Box 1313
Ojai, CA 93024-1313
(707) 337-6880
kshort@lldf.org

Counsel for *Amici Curiae*
Life Legal Defense Foundation and Young Americans for Freedom

September 26, 2023

## RULE 32 (g) CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE

I certify that this brief complies with the type-volume limitation of Local Rule 29.1(c), the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief was prepared using a proportionally spaced typeface (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 5,493 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2019) used to prepare this brief.

/s/ Catherine W. Short