# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

---

# No. 23-356

---

EUGENE VOLOKH, LOCALS TECHNOLOGY INC., RUMBLE CANADA
INC.,
*Plaintiffs–Appellees*,

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,
*Defendant–Appellant*.

---

On Appeal from the United States District Court
for the Southern District of New York
Case No. 22-cv-10195
Honorable Andrew L. Carter, Jr., District Court Judge

---

**BRIEF OF AMICUS CURIAE THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS IN SUPPORT OF PLAINTIFFS-APPELLEES**

---

[Caption continued on next page]

Bruce D. Brown
*Counsel of Record for Amicus Curiae*
Katie Townsend
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
bruce.brown@rcfp.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iv

INTEREST OF AMICUS CURIAE.....................................................................1

SOURCE OF AUTHORITY TO FILE ................................................................2

SUMMARY OF THE ARGUMENT ....................................................................3

ARGUMENT ........................................................................................................4

   I.   The First Amendment's protection for the exercise of editorial judgment is virtually absolute. ..........................................................................................4

   II.  New York's Hateful Conduct Law chills the exercise of editorial judgment by compelling speakers to disclose or alter their editorial standards. ..............7

       A.   Compelling a speaker to disclose or alter their editorial standards burdens expression entitled to full First Amendment protection. ..........8

       B.   Requiring disclosure of a private publisher's editorial standards compels expression that is neither "factual" nor "uncontroversial."...................13

       C.   Coercing a speaker to disclose or alter editorial standards is "unduly burdensome" under the *Zauderer* standard. ..........................................15

CONCLUSION ...................................................................................................16

CERTIFICATE OF COMPLIANCE ..................................................................17

CERTIFICATE OF SERVICE............................................................................18

# TABLE OF AUTHORITIES

## Cases

*Arcara v. Cloud Books, Inc.*,
  478 U.S. 697 (1986).......................................................................................6

*Caraccioli v. Facebook, Inc.*,
  167 F. Supp. 3d 1056 (N.D. Cal. 2016),
  *aff'd*, 707 F. App'x 588 (9th Cir. 2017)..............................................13

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 557 (1980).....................................................................................11

*City Council of L.A. v. Taxpayers for Vincent*,
  466 U.S. 789 (1984).......................................................................................7

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
  412 U.S. 94 (1973).................................................................................8, 10

*Cummings v. Missouri*,
  71 U.S. (4 Wall.) 277 (1866) ........................................................................3

*Desnick v. Am. Broad. Cos., Inc.*,
  44 F.3d 1345 (7th Cir. 1995) .......................................................................12

*Discount Tobacco City & Lottery, Inc. v. United States*,
  674 F.3d 509 (6th Cir. 2012) .......................................................................13

*Ent. Software Ass'n v. Blagojevich*,
  469 F.3d 641 (7th Cir. 2006) ................................................................13, 15

*Evergreen Ass'n, Inc. v. City of New York*,
  740 F.3d 233 (2d Cir. 2014)..........................................................................14

*Hay v. N.Y. Media LLC*, No. 20-cv-6135, 2021 WL 2741653
  (S.D.N.Y. July 1, 2021),
  *aff'd*, No. 21-1727, 2022 WL 710902 (2d Cir. Mar. 10, 2022) ..........12

*Herbert v. Lando*,
  441 U.S. 153 (1979).....................................................................................3, 7

*Iancu v. Brunetti*,
  139 S. Ct. 2294 (2019) ............................................................................7

*Jian Zhang v. Baidu.com Inc.*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014) ..............................................4, 5, 9

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974)..........................................................................3, 5, 6

*Murphy v. Twitter, Inc.*,
  60 Cal. App. 5th 12 (2021) ...................................................................12

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964).................................................................................11

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
  272 F.3d 104 (2d Cir. 2001)...................................................................13

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018)............................................................................14

*NetChoice, LLC v. Att'y General*,
  34 F.4th 1196 (11th Cir. 2022) ...............................................................9

*Newspaper Guild of Greater Phila., Loc. 10 v. NLRB*,
  636 F.2d 550 (D.C. Cir. 1980) .................................................4, 10, 11

*Passaic Daily News v. NLRB*,
  736 F.2d 1543 (D.C. Cir. 1984) ..............................................................6

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
  413 U.S. 376 (1973)................................................................................12

*Prager Univ. v. Google LLC*,
  951 F.3d 991 (9th Cir. 2020) .........................................................11, 12

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988).................................................................................8

*Robinson v. Hunt County*,
  921 F.3d 440 (5th Cir. 2019) .........................................................10, 14

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ...............................................................9

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ...............................................................9

*Veilleux v. Nat'l Broad. Co.*,
   206 F.3d 92 (1st Cir. 2000) .................................................12

*Wash. Post v. McManus*,
   944 F.3d 506 (4th Cir. 2019) .......................................*passim*

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ...............................................................7

*Zauderer v. Off. of Disciplinary Counsel of Sup. Ct. of Ohio*,
   471 U.S. 626 (1985) .......................................................*passim*

**Statutes**

N.Y. Gen. Bus. Law § 394-ccc(1)–(5) ...........................................3, 4, 10

**Other Authorities**

Brief Amici Curiae of the Reporters Committee for Freedom of the Press et al.,
   *NetChoice, L.L.C. v. Attorney General, Florida*,
   34 F.4th 1196 (11th Cir. 2022) (No. 21-12355) ....................................1

Brief Amici Curiae of the Reporters Committee for Freedom of the Press et al.,
   *NetChoice, L.L.C. v. Paxton*,
   49 F.4th 439 (5th Cir. 2022) (No. 21-51178) ........................................1

Brief for the United States as Amicus Curiae,
   *NetChoice, LLC v. Paxton*, No. 22-277 (U.S. Aug. 14, 2023)............................13

*Policies and Standards*, Wash. Post,
   https://perma.cc/Y76W-5YNP (last visited Sept. 26, 2023)................................12

Press Release, Ken Paxton, Att'y Gen. of Tex., AG Paxton Issues Civil Investigative Demands to Five Leading Tech Companies Regarding

Discriminatory and Biased Policies and Practices (Jan. 13, 2021),
https://perma.cc/BZ7A-GEHA ..............................................................................10

Proposed Brief Amici Curiae of the Reporters Committee for Freedom of the
Press et al.,
*NetChoice, L.L.C. v. Paxton*,
142 S. Ct. 1715 (Mem) (2022) (No. 21A720) .......................................................1

*Standards and Ethics*, N.Y. Times,
https://perma.cc/793S-67V9 (last visited Sept. 26, 2023) ...................................11

William O. Douglas, *The Bill of Rights Is Not Enough*, *in* The Great Rights
(Edmond Cahn ed., 1963) ......................................................................................6

## INTEREST OF AMICUS CURIAE

The Reporters Committee for Freedom of the Press ("Reporters Committee" or "Amicus") is an unincorporated nonprofit association of reporters and editors that works to safeguard the rights of journalists.[1]  The Reporters Committee often appears as amicus curiae in federal courts to underline the importance of editorial independence to the freedom of the press, including in the context of new and digital media.  *See, e.g.*, Proposed Brief Amici Curiae of the Reporters Committee for Freedom of the Press et al., *NetChoice, L.L.C. v. Paxton*, 142 S. Ct. 1715 (Mem) (2022) (No. 21A720); Brief Amici Curiae of the Reporters Committee for Freedom of the Press et al., *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022) (No. 21-51178); Brief Amici Curiae of the Reporters Committee for Freedom of the Press et al., *NetChoice, L.L.C. v. Attorney General, Florida*, 34 F.4th 1196 (11th Cir. 2022) (No. 21-12355).  The Reporters Committee has a strong interest in preventing state interference in editorial judgments by private speakers, including—as in the New York statute challenged in this proceeding—through legal requirements that speakers disclose their editorial standards.

---

[1]     Per Fed. R. App. P. 29(a)(4)(E) and L.R. 29.1, Amicus declares that: (1) no party's counsel authored the brief in whole or in part; (2) no party or party's counsel contributed money intended to fund preparing or submitting the brief; and (3) no person, other than amicus, its members or its counsel, contributed money intended to fund preparing or submitting the brief.

## SOURCE OF AUTHORITY TO FILE

Counsel for Plaintiffs-Appellees and Defendant-Appellant have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

## SUMMARY OF THE ARGUMENT

The First Amendment "erects a virtually insurmountable barrier" protecting a publisher's exercise of editorial judgment. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring). And just as a state may not expressly commandeer "the function of editors," *id.* at 258 (majority opinion), "what cannot be done directly cannot be done indirectly," *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866). Laws that "subject[] the editorial process to private or official examination" in order to chill or influence the exercise of editorial discretion, *Herbert v. Lando*, 441 U.S. 153, 174 (1979), raise the very same First Amendment difficulties as statutes that attempt to directly regulate "[t]he choice of material to go into a newspaper," *Tornillo*, 418 U.S. at 258.

New York's Hateful Conduct Law, N.Y. Gen. Bus. Law § 394-ccc(1)–(5), poses just that danger. In mandating that "social media network[s]"[2] disclose how they will "respond [to] and address . . . reports of incidents of hateful conduct," *id.* § 394-ccc(3), the statute's plain intent is to discourage platforms from distributing speech New York considers hateful—as the law's title, "Social media networks;

---

[2] The statute defines "social media network" to mean "service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public." N.Y. Gen. Bus. Law § 394-ccc(1)(b). On its face, that broad definition could sweep in not just the likes of Meta or X but also any news organization that operates a website that permits users to contribute comments.

hateful conduct prohibited," underlines.  But a publisher's freedom to articulate its own editorial standards "lies at the core of publishing control," *Newspaper Guild of Greater Phila., Loc. 10 v. NLRB*, 636 F.2d 550, 560 (D.C. Cir. 1980), and however admirable New York's goals in adopting the Hateful Conduct Law, *Tornillo* bars the state from substituting its own editorial judgment for that of a private party.  To uphold that core principle on which the freedom of the press depends, Amicus respectfully urges that the district court's injunction be affirmed.

## ARGUMENT

**I.**  **The First Amendment's protection for the exercise of editorial judgment is virtually absolute.**

New York's Hateful Conduct Law compels private publishers—which may include news organizations that come within the sweep of its definition of "social media network[s]" because of the user comments that they make available to the public— to disclose how they "will respond [to] and address . . . reports of incidents of hateful conduct" as New York defines it.  N.Y. Gen. Bus. Law § 394-ccc(3).[3]  But a speaker's policies on which viewpoints to share with their audience necessarily reflect "editorial judgments about which political ideas to promote,"

---

[3]      Here, "hateful conduct" means "use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression."  N.Y. Gen. Bus. Law § 394-ccc(1)(a).

*Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 435 (S.D.N.Y. 2014), and the

Supreme Court's decision in *Tornillo* bars New York's effort to steer the exercise

of editorial discretion toward its preferred viewpoint.

In *Tornillo*, the Supreme Court unanimously affirmed that the First

Amendment forbids governmental interference in editorial decisionmaking when it

held unconstitutional Florida's "right of reply" statute, which "grant[ed] a political

candidate a right to equal space to reply to criticism and attacks on his record by a

newspaper." *Tornillo*, 418 U.S. at 243, 258. The Court made clear that state

control of the "choice of material" to include in a newspaper cannot be "exercised

consistent with First Amendment guarantees," *id.* at 258, and that that principle

applies with all the more force when an editorial decision deals with the "treatment

of public issues and public officials[,] whether fair or unfair," *id.* That bar on

"government tampering" with "news and editorial content" is necessary to ensure a

free and unfettered press. *Id.* at 259 (White, J., concurring).

The Court's decision in *Tornillo* did not turn on a rosy view of how either

the *Miami Herald* in particular, or the press in general, exercised the editorial

judgment that the Constitution protects. To the contrary, in the first half of the

Court's opinion, Chief Justice Burger summarized, with sympathy, concerns that

powerful media corporations "too often hammer[] away on one ideological or

political line using [their] monopoly position not to educate people, not to promote

5

debate, but to inculcate in [their] readers one philosophy, one attitude—and to make money." *Tornillo*, 418 U.S. at 253 (quoting William O. Douglas, *The Bill of Rights Is Not Enough*, *in* The Great Rights 124–25 (Edmond Cahn ed., 1963)). "But the balance struck by the First Amendment with respect to the press is that society must take the risk that occasionally debate on vital matters will not be comprehensive and that all viewpoints may not be expressed," *id.* at 260 (White, J., concurring), because the risks posed by the alternative approach—assigning the government the power to shape debate until its own sense of an appropriate mix of viewpoints has been satisfied—are considerably graver.

*Tornillo* states a per se rule, holding that "any such compulsion to publish that which reason tells [an editor] should not be published is unconstitutional"—period.  418 U.S. at 256; *see also, e.g.*, *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1557 (D.C. Cir. 1984) ("The Supreme Court has implied consistently that newspapers have absolute discretion to determine the contents of their newspapers.").[4]  And for good reason: The government's decision to displace an

---

[4]      Of course, the *Tornillo* rule—though absolute where it applies—does not prohibit all regulation of publishers, including social media platforms.  *See Associated Press v. United States*, 326 U.S. 1, 20 & n.18 (1945) (First Amendment does not bar enforcement against news media organization of generally applicable antitrust decree that did not compel publishers "to permit publication of anything which their 'reason' tells them should not be published").  The *Tornillo* principle is only triggered in the first place by state action that regulates editorial choices or that in practical effect singles out those "exercising the constitutionally protected freedom of the press." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 704 (1986).

editor's point of view in favor of its own is always viewpoint based. That

ideological objective is "so plainly illegitimate" as to "immediately invalidate" any

statute that aims at it. *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789,

804 (1984); *accord Wooley v. Maynard*, 430 U.S. 705, 717 (1977) ("[W]here the

State's interest is to disseminate an ideology, . . . such interest cannot outweigh an

individual's First Amendment right to avoid becoming the courier for such

message."). Like any other case of "viewpoint bias," then, a finding that the

government has deliberately usurped a private speaker's editorial role simply

"end[s] the matter." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019).

## II.    New York's Hateful Conduct Law chills the exercise of editorial judgment by compelling speakers to disclose or alter their editorial standards.

That New York's effort to influence the exercise of editorial judgment

operates indirectly—by "subject[ing] the editorial process to private or official

examination," *Herbert*, 441 U.S. at 174, rather than by directly prohibiting the

publication of content that New York considers hateful—does nothing to save it

from First Amendment scrutiny, *see Wash. Post v. McManus*, 944 F.3d 506, 518

(4th Cir. 2019) (invalidating online-advertising disclosure requirement that

threatened to chill news organizations from accepting particular ads). In arguing

otherwise, New York compares its mandate to a duty to disclose health risks or

calorie counts, regulations that compel only "factual and uncontroversial"

commercial disclosures within the meaning of the Supreme Court's decision in

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S.

626, 651 (1985). But editorial-transparency mandates burden fully protected

expression, not commercial speech, and there is nothing factual or uncontroversial

about an editor's judgments as to which viewpoints deserve to reach an audience.

A.     Compelling a speaker to disclose or alter their editorial standards
       burdens expression entitled to full First Amendment protection.

When the state compels a private party to speak, the "lodestars in deciding

what level of scrutiny to apply to a compelled statement must be the nature of the

speech taken as a whole and the effect of the compelled statement thereon." *Riley

v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). Compelling

publishers to disclose or alter their editorial standards—two ways of describing the

same intrusion on a private speaker's autonomy, because "[m]andating speech that

a speaker would not otherwise make necessarily alters the content of the speech,"

*id.* at 795—burdens fully protected expression twice over: by discouraging the

publication of speech that the mandate makes costlier or riskier to distribute, and

by interfering with a news organization's freedom to articulate its editorial

practices on its own terms. On each front, the statute threatens the freedom of the

press and "trench[es] upon an area in which the importance of First Amendment

protections is at its zenith." *McManus*, 944 F.3d at 513–14 (citation omitted).

8

Consider first the chilling effect on substantive editorial decisions. *Tornillo*'s safeguards extend to both traditional and digital media, *cf. Columbia Broad. Sys.*, *Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 144–145 (1973) (Stewart, J., concurring) (noting that arguments for "greater Government control of press freedom" in new media "would require no great ingenuity" to extend to newspapers), and there should be little question that a website or social media network's "decisions about whether, to what extent, and in what manner to disseminate third-party-created content to the public are editorial judgments protected by the First Amendment," *NetChoice, LLC v. Att'y General*, 34 F.4th 1196, 1212 (11th Cir. 2022); *see also Zhang*, 10 F. Supp. 3d at 435. There can be little doubt, too, that such protection extends to speech that others may consider hateful, because the Constitution "protect[s] even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011). But New York's Hateful Conduct Law imposes clear content-based burdens on editorial decisionmaking in that context, by making expression that the state disfavors "more expensive to host than other speech because compliance costs attach to the former and not to the latter." *McManus*, 944 F.3d at 516.

As a result, even if the statute stops short of expressly penalizing news organizations and other websites for hosting "hateful" content, the law's "inevitable effect" is to encourage editors to remove material that might meet the

9

state's definition. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011) (citation

omitted). Otherwise, any failure to remove content that a website's stated policy

arguably prohibits—a gap that will inevitably exist in the eye of the beholder,

because deciding that speech is "offensive or inappropriate" calls for "subjective

judgment," *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019)—could

prompt a costly Attorney General investigation of the publisher's editorial

practices to determine if the website has accurately disclosed its 'true' policy, *see*

N.Y. Gen. Bus. Law § 394-ccc(5).[5] This risk is hardly hypothetical. In Texas, for

instance, Attorney General Ken Paxton launched an investigation of Twitter (now

called "X") after the platform banned former President Trump, on the theory that

the ban revealed the company had falsely claimed to be fair to competing

viewpoints. Press Release, Ken Paxton, Att'y Gen. of Tex., AG Paxton Issues

Civil Investigative Demands to Five Leading Tech Companies Regarding

Discriminatory and Biased Policies and Practices (Jan. 13, 2021),

---

[5]     To say that speakers could avoid that result by declaring that they have *no* policy against hateful conduct is no answer, because a publisher has a First Amendment interest in establishing editorial standards "that determine its intrinsic excellence and its quality and public character." *Newspaper Guild of Greater Phila.*, 636 F.2d at 567 (MacKinnon, J., concurring); *cf. Columbia Broad. Sys.*, 412 U.S. at 117 (plurality opinion) (noting that a news organization's power "to advance its own political, social, and economic views" is tied up in the perceived "journalistic integrity of its editors and publishers"). Telling news outlets to "forgo some of their free speech rights" or else invite state inquiry into any standards they do announce "turns the First Amendment on its head." *McManus*, 944 F.3d at 518.

10

https://perma.cc/BZ7A-GEHA.  New York's statute lays the foundation for similar

fishing expeditions.  Licensing them, as the Hateful Conduct Law does, would

impermissibly undermine *Tornillo* by allowing states to repackage their efforts to

enforce a preferred viewpoint as an exercise in alleged consumer protection.

　　　Even if the analysis ignored that chilling effect, though, and looked narrowly

to the mandate's effect on speakers' ability to articulate their own editorial

standards, the Hateful Conduct Law would burden fully protected expression rather

than commercial speech.  'Commercial speech' describes only "expression related

solely to the economic interests of the speaker and its audience," *Cent. Hudson*

*Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980), and no

one thinks that newspapers voluntarily publish their editorial standards just to

explain the terms on which papers are sold, *see, e.g.*, *Standards and Ethics*, N.Y.

Times, https://perma.cc/793S-67V9 (last visited Sept. 26, 2023); *cf. N.Y. Times Co.*

*v. Sullivan*, 376 U.S. 254, 266 (1964) (decision to accept editorial advertisement

for pay is not commercial speech, notwithstanding existence of a profit motive).

　　　To the contrary, such disclosures serve a range of important public ends—

expressing the publisher's point of view as to what good journalism is, say, or

helping readers form their own views on the reliability of any given news item.

*See Newspaper Guild of Greater Phila.*, 636 F.2d at 560.  In much the same way,

social media networks' policies are written to express their views on what a

healthy public conversation looks like, not just to sign up the marginal user. *See Prager Univ. v. Google LLC*, 951 F.3d 991, 999–1000 (9th Cir. 2020) (rejecting, for purposes of a Lanham Act claim, the argument that "YouTube's statements concerning its content moderation policies" amount to commercial advertising).

Representations about editorial standards are, for that matter, too subjective to "propose a commercial transaction." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 385 (1973). News organizations often aspire to provide coverage that is objective, for instance, but "arguments about objectivity are endless," *Policies and Standards*, Wash. Post, https://perma.cc/Y76W-5YNP (last visited Sept. 26, 2023), and transforming every disagreement over the meaning of "fairness" into a consumer-fraud suit would impose a crushing litigation burden on the press. For much the same reason, federal courts have routinely concluded that representations about how reporting will be conducted cannot be enforced through the law of fraud or contract without running grave First Amendment risks.[6] No surprise, then, that courts have likewise found platform moderation policies too aspirational or subjective to fit under rubrics like false advertising. *See, e.g.*, *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th

---

[6]     *See, e.g.*, *Hay v. N.Y. Media LLC*, No. 20-cv-6135, 2021 WL 2741653, at *3 (S.D.N.Y. July 1, 2021), *aff'd*, No. 21-1727, 2022 WL 710902 (2d Cir. Mar. 10, 2022); *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 121–23 (1st Cir. 2000); *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1354–55 (7th Cir. 1995).

12, 41 (2021); *Prager Univ.*, 951 F.3d at 999–1000. Policies of this kind are shot

through with expressive judgment; they cannot reasonably be compared to a term-

sheet or invitation to deal. *Cf. Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056,

1064 (N.D. Cal. 2016), *aff'd*, 707 F. App'x 588 (9th Cir. 2017) (finding platform

community standards unenforceable in a breach-of-contract action). New York's

mandate that social media networks disclose standards that guide their editorial

judgment burdens expression entitled to full First Amendment protection.

> B.   Requiring disclosure of a private publisher's editorial standards
>      compels expression that is neither "factual" nor "uncontroversial."

Even if representations about editorial judgment could be shoehorned under

the heading of commercial speech—they can't—New York's statute would be

ineligible for the lenient *Zauderer* standard because a speaker's editorial standards

cannot reasonably be described as "factual and uncontroversial." 471 U.S. at 651.[7]

The first half of that test distinguishes facts from "matters of opinion," *id.*;

*see also Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 n.5 (2d Cir. 2001);

*Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 555–56 (6th

Cir. 2012); *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006),

---

[7]   As the U.S. Solicitor General recently observed, while two courts of appeals
have applied the *Zauderer* framework to platform disclosure mandates in passing,
neither court addressed the threshold question whether *Zauderer*—rather than a
more restrictive test—governs the review of such disclosures in the first place,
because the parties had barely briefed that issue. *See* Brief for the United States as
Amicus Curiae at 20, *NetChoice, LLC v. Paxton*, No. 22-277 (U.S. Aug. 14, 2023).

and it should be plain that there is no fact of the matter when deciding which news is fit to print, which speech is worth distributing to an audience, and whether particular expression is hateful, *see Robinson*, 921 F.3d at 447. Nor can New York evade that conclusion by suggesting that whether or not speakers have particular editorial standards is a "factual" question. *Zauderer*, 471 U.S. at 651. That approach would eviscerate the constraint of *Zauderer*'s requirement that disclosures be factual, licensing states to force news organizations and other speakers to disclose 'the fact' that they hold a viewpoint on any imaginable topic.

*Zauderer*'s requirement that disclosures be "uncontroversial," for its part, bars the government from "mandat[ing] discussion of controversial political topics," *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 250 (2d Cir. 2014), or requiring that a speaker "espouse the government's position on a contested public issue," *id.* at 250–51 (citation omitted); *see also id.* at 245 n.6; *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2373 (2018). But here again, New York's law forces news organizations into the political fray by requiring that they disclose an editorial perspective on the irreducibly subjective question of what to do with speech some consider "hateful." And while the Hateful Conduct Law may not directly require that publishers take a particular stance on what course to take, "it is the State's definition" of hateful conduct to which the policy must conform—on penalty of daily fines—regardless of whether

a news organization or other speaker has "an entirely different definition." *Ent. Software Ass'n*, 469 F.3d at 652.

On each front, a state mandate that a publisher disclose its editorial standards bears no reasonable resemblance to a product label or a calorie count. In this context, as much so as in *Tornillo* itself, the First Amendment applies with full force to a state's efforts to chill or influence the exercise of editorial discretion.

C. Coercing a speaker to disclose or alter editorial standards is "unduly burdensome" under the *Zauderer* standard.

Finally, even if this Court were to conclude that the *Zauderer* standard governs, New York's Hateful Conduct Law would flunk that test because the statute's chilling effect is "unduly burdensome." *Zauderer*, 471 U.S. at 651. For all the reasons given above, the statute cannot workably be enforced without "bring[ing] the state into an unhealthy entanglement with news outlets," *McManus*, 944 F.3d at 518, inviting the Attorney General into the newsroom to supervise the adequacy of a publisher's disclosures. And with "its foot now in the door," New York "has offered no rationale for where these incursions might end"—no natural stopping point or limiting principle for further state inquiry into the editorial practices that the First Amendment safeguards. *Id.* at 519. That chilling effect poses a threat to press freedom out of all proportion to any interest advanced by New York's statute. This Court should affirm the preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Reporters Committee respectfully urges the

Court to affirm the preliminary injunction.

Dated: September 26, 2023         Respectfully submitted,

        */s/ Bruce D. Brown*
        *Counsel of Record for Amicus Curiae*
        Katie Townsend
        Gabe Rottman
        Grayson Clary
        Emily Hockett
        REPORTERS COMMITTEE FOR
          FREEDOM OF THE PRESS
        1156 15th St. NW, Suite 1020
        Washington, D.C. 20005
        Telephone: (202) 795-9300
        Facsimile: (202) 795-9310

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App.

P. 29(a)(5), Local Rule 29.1(c), and Local Rule 32.1(a)(4)(A) because it contains

3,643 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word in 14-

point Times New Roman font.


Dated: September 26, 2023                  */s/ Bruce D. Brown*
                                           Bruce D. Brown
                                           *Counsel of Record for Amicus Curiae*

17

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2023, I caused the foregoing Brief of

Amicus Curiae the Reporters Committee for Freedom of the Press to be

electronically filed with the Clerk of the Court using CM/ECF, which will

automatically send notice of such filing to all counsel of record.


Dated: September 26, 2023           */s/ Bruce D. Brown*
                                          Bruce D. Brown
                                          *Counsel of Record for Amicus Curiae*