# 23-356

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

EUGENE VOLOKH, LOCALS TECHNOLOGY INC.,
and RUMBLE CANADA INC.,

*Plaintiffs-Appellees,*

v.

LETITIA JAMES, in her official capacity
as Attorney General of New York,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Southern District of New York
Hon. Andrew L. Carter, Jr.
Case No. 22-cv-10195 (ALC)

---

**Brief of Amicus Curiae Cato Institute
in Support of Plaintiffs-Appellees and Affirmance**

---

ANASTASIA P. BODEN
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 216-1414

JOSHUA R. ZUCKERMAN
BRIAN C. MCCARTY
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500

*Counsel for Amicus Curiae*

## RULE 26.1 DISCLOSURE STATEMENT

*Amicus Curiae* Cato Institute is a nongovernmental, nonprofit corporation that has no parent companies, subsidiaries, or affiliates. It does not issue shares to the public, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ..................................................i

TABLE OF CONTENTS .............................................................ii

TABLE OF AUTHORITIES................................................................ iii

INTEREST OF AMICUS .........................................................1

INTRODUCTION................................................................2

ARGUMENT ...............................................................4

    I.    The Online Hate Speech Law Regulates Speech on Matters of Public Concern .......................................................4

    II.    Statutes That Chill Speech on Matters of Public Concern Violate the First Amendment...................................7

    III.    The Online Hate Speech Law Unconstitutionally Chills Speech on Matters of Public Concern ...................................10

        A.    The Online Hate Speech Law Encourages Self-Censorship of Protected Speech...................................11

        B.    Chilling Online Speech Is Especially Harmful ..........14

        C.    The Vague Terms "Vilify" and "Humiliate" Exacerbate the Chilling Effect on Political Discourse ....................................................17

CONCLUSION ....................................................................26

CERTIFICATE OF COMPLIANCE.......................................................28

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*303 Creative LLC v. Elenis*,
    143 S. Ct. 2298 (2023)............................................................................3

*Ams. for Prosperity Found. v. Bonta*,
    141 S. Ct. 2373 (2021)......................................................................8, 10

*Ashcroft v. Am. Civil Liberties Union*,
    535 U.S. 564 (2002)..........................................................................20

*Brandenburg v. Ohio*,
    365 U.S. 444 (1969)............................................................................3

*City of San Diego v. Roe*,
    543 U.S. 77 (2004)..............................................................................6

*Colombo v. O'Connell*,
    310 F.3d 115 (2d Cir. 2002) ..............................................................7

*Connick v. Myers*,
    461 U.S. 138 (1983)............................................................................5

*Cornelio v. Connecticut*,
    32 F.4th 160 (2d Cir. 2022)..............................................................10

*Counterman v. Colorado*,
    143 S. Ct. 2106 (2023).......................................................9, 10, 15, 20

*Cox v. Louisiana*,
    379 U.S. 536 (1965)............................................................................4

*Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*,
    518 U.S. 727 (1996)..........................................................................15

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985)............................................................................5

iii

*Grosjean v. Am. Press Co*,
297 U.S. 233 (1936)............................................................................26

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*,
515 U.S. 557 (1995)..............................................................................3

*Hustler Magazine v. Falwell*,
485 U.S. 46 (1988)................................................................................3

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
138 S. Ct. 2448 (2018).........................................................................6

*Jeffries v. Harleston*,
21 F.3d 1238 (2d Cir. 1994) ................................................................6

*Laird v. Tatum*,
408 U.S. 1 (1972).................................................................................7

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
138 S. Ct. 1719 (2018).........................................................................2

*Matal v. Tam*,
582 U.S. 218 (2017).......................................................................3, 22

*McDaniel v. Paty*,
435 U.S. 618 (1978)............................................................................21

*Meyer v. Grant*,
486 U.S. 414 (1988)..............................................................................5

*Mills v. Alabama*,
384 U.S. 214 (1966)..............................................................................4

*NAACP v. Alabama*,
357 U.S. 449 (1958)....................................................................7, 8, 13

*NAACP v. Button*,
371 U.S. 415 (1963)..............................................................................3

*Nat. Socialist Party of Am. v. Village of Skokie*,
432 U.S. 43 (1977)................................................................................3

iv

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)...................................................................... 5, 9, 17

*Obergefell v. Hodges*,
  576 U.S. 644 (2015)........................................................................... 17

*Packingham v. North Carolina*,
  582 U.S. 98 (2017)....................................................................... 14, 15

*Reno v. ACLU*,
  521 U.S. 844 (1997)..................................................................... 14, 18

*Reuland v. Hynes*,
  460 F.3d 409 (2d Cir. 2006) ................................................................ 6

*Roth v. United States*,
  354 U.S. 476 (1957)............................................................................. 4

*Seemuller v. Fairfax Cnty. Sch. Bd.*,
  878 F.2d 1578 (4th Cir. 1989)............................................................. 6

*Snyder v. Phelps*,
  562 U.S. 443 (2011)........................................................................ 3, 11

*Students for Fair Admissions, Inc. v. President & Fellows
  of Harvard Coll.*,
  143 S. Ct. 2141 (2023)....................................................................... 24

*Texas v. Johnson*,
  491 U.S. 397 (1989)............................................................................. 3

*Whitney v. California*,
  274 U.S. 357 (1927)............................................................................. 4

*Zieper v. Metzinger*,
  474 F.3d 60 (2d Cir. 2007) ................................................................. 7

**STATUTES**

N.Y. Gen. Bus. Law § 394-ccc(1) ............................................. 2, 6, 11, 13

N.Y. Gen. Bus. Law § 394-ccc(1)(a)........................................................ 16

N.Y. Gen. Bus. Law § 394-ccc(2) .......................................................... 2, 16

N.Y. Gen. Bus. Law § 394-ccc(3) .......................................................... 2, 16

Sedition Act of 1798, § 2 ........................................................................ 12

Social Media Hate Speech Accountability Act,
  S.7275, 2019-2020 Leg. Sess ............................................................... 12

**OTHER AUTHORITIES**

Andrey Uspenskiy, *"Wumben, Wimpund, Woomud" An Exploration of
  Social Censure in the Internet Age*,
  18 The Morningside Review 25 (Sept. 13, 2022) ................................. 25

John Stuart Mill, *On Liberty and Other Essays*
  (John Gray ed. 2008) ............................................................................ 11

The Virginia Resolution (Dec. 24, 1798) .................................................. 5

**INTEREST OF AMICUS**

The Cato Institute is a nonpartisan public policy research foundation dedicated to advancing individual liberty and free markets. Cato is an indefatigable opponent of laws that unconstitutionally abridge the freedom of speech. Cato is an active participant in political discussions on the nation's most important socioeconomic and legal issues. To that end, Cato maintains a robust social media presence, publishes scholarly books and studies, conducts conferences, and produces the annual *Cato Supreme Court Review*. New York's Online Hate Speech Law threatens to chill political discourse on topics on which Cato regularly publishes, to the detriment of sound policymaking and public participation in the democratic process. All parties have consented to the filing of this *amicus* brief.[1]

---

[1] No party or party's counsel has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief. No person contributed money that was intended to fund preparing or submitting this brief.

1

## INTRODUCTION

"[I]t is not . . . the role of the State or its officials to prescribe what shall be offensive." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). The State of New York has nevertheless enacted a statute targeting speech that it finds offensive, including speech that can "vilify" or "humiliate" "a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." N.Y. Gen. Bus. Law § 394-ccc(1) ("Online Hate Speech Law"). Entitled "Social media networks; hateful conduct *prohibited*," the Online Hate Speech Law seeks to stifle "hateful" speech by requiring "social media networks"—broadly defined to encompass any for-profit websites that allow users to share content—to create a hate-speech policy and a mechanism for users to report "hateful" speech. *Id.* § 394-ccc(2)-(3) (emphasis added).

As the district court correctly held, New York's efforts to silence "offensive" ideas with which it disagrees facially violate the First Amendment. Indeed, the Online Hate Speech Law defies the plain meaning of the First Amendment and voluminous Supreme Court

2

precedent uniformly instructing that so-called "hate speech" is entitled to full First Amendment protection. [2] The district court correctly recognized that the Law chills the speech of social media users and facially violates the First Amendment. Indeed, the Law encourages self-censorship on the internet—the modern equivalent of the town square—

---

[2] *See, e.g.*, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2317 (2023) (First Amendment "protections belong to all, including to speakers whose motives others may find misinformed or offensive."); *Matal v. Tam*, 582 U.S. 218, 246 (2017) ("Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express the thought that we hate." (quotation marks omitted)); *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) ("[S]peech cannot be restricted simply because it is upsetting or arouses contempt."); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 574 (1995) ("[T]he point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful."); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) ("[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."); *Nat. Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43, 44 (1977) (invalidating prior restraints on a Nazi Party march); *Brandenburg v. Ohio*, 365 U.S. 444, 447, 449 (1969) (Prosecution of those espousing racial and religious hatred unconstitutionally "purports to punish mere advocacy."); *NAACP v. Button*, 371 U.S. 415, 445 (1963) ("The First Amendment is a value-free provision whose protection is not dependent on the truth, popularity, or social utility of the ideas and beliefs which are offered." (quotation marks omitted)).

by stigmatizing disfavored ideas through the use of vague and ultimately meaningless regulations on speech that "vilifies" or "humiliates."

## ARGUMENT

## I. The Online Hate Speech Law Regulates Speech on Matters of Public Concern

"Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy." *Cox v. Louisiana*, 379 U.S. 536, 552 (1965). Because the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," the Constitution "eschew[s] silence coerced by law—the argument of force in its worst form." *Whitney v. California*, 274 U.S. 357, 375–76 (1927) (Brandeis, J., concurring).

In recognition of the necessity of robust, unimpeded political discourse, the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). A "major purpose" of the First Amendment was "to protect the free discussion of governmental affairs," *Mills v. Alabama*, 384 U.S. 214, 218 (1966), and to enshrine our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and

4

wide-open," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The First Amendment protects "that right of freely examining public characters and measures, and of free communication among the people thereon, which has ever been justly deemed, the only effectual guardian of every other right." The Virginia Resolution (Dec. 24, 1798).[3]

"First Amendment protection[]" is accordingly "at its zenith" when speakers discuss "a matter of societal concern" or "the need for . . . change." *Meyer v. Grant*, 486 U.S. 414, 415, 421 (1988). "[S]peech on matters of public concern . . . is at the heart of the First Amendment's protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (quotation marks omitted). It "occupies the highest rung of the hierarchy of First Amendment values." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quotation marks omitted).

Speech addresses "a matter of public concern" when it "relat[es] to *any* matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146 (emphasis added). Speech need not be accurate, sophisticated, or civil to merit the protection accorded to speech addressing matters of public concern. On the contrary, whether listeners

---

[3] https://tinyurl.com/wrwwkce9.

5

are "offended" or view speech as "demeaning" is entirely "irrelevant to the question whether it deals with a matter of public concern." *Seemuller v. Fairfax Cnty. Sch. Bd.*, 878 F.2d 1578, 1583 (4th Cir. 1989); *see also Jeffries v. Harleston*, 21 F.3d 1238, 1242, 1245 (2d Cir. 1994) (holding that "hateful and repugnant" comments about Jews "unquestionably involved public issues"). It also makes no difference whether the speech at issue is "hyperbolic" or even "false." *Reuland v. Hynes*, 460 F.3d 409, 415 (2d Cir. 2006). All that matters is that the speech addresses "a subject of general interest and of value and concern to the public." *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004).

The Online Hate Speech Law often applies to speech on matters of public concern. It regulates certain speech addressing "race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." N.Y. Gen. Bus. Law § 394-ccc(1). There can be no serious dispute that speech on these issues can be of public concern. *See, e.g.*, *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) ("[C]ontroversial topics such as . . . sexual orientation and gender identity . . . and minority religions . . . [are] sensitive political topics, and they are undoubtedly

6

matters of profound value and concern to the public." (quotation marks omitted)).

## II. Statutes That Chill Speech on Matters of Public Concern Violate the First Amendment

The First Amendment prohibits not only direct governmental restrictions on expression but also governmental actions that deter or chill the exercise of First Amendment rights. "[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *see also Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007) ("It is well-established that First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech." (quotation marks omitted)); *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) ("[T]he First Amendment protects the right to free speech so far as to prohibit state action that merely has a chilling effect on speech.").

The Supreme Court explained why the First Amendment prohibits statutes that chill protected speech in the landmark case *NAACP v. Alabama*, 357 U.S. 449 (1958). The Court held that Alabama's efforts to

7

compel the NAACP to disclose its membership lists "exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," thereby chilling the ability of the NAACP and its members "to pursue their collective effort to foster beliefs which they admittedly have the right to advocate." *Id.* at 462–63. It made no difference that the chilling effect "follow[ed] not from state action but from private community pressures" because "it is only after the initial exertion of state power represented by the production order that private action takes hold." *Id.* at 463.

In the decades since it decided *NAACP*, the Supreme Court has repeatedly made clear that "the protections of the First Amendment are triggered not only by actual restriction" on expression. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021). "The risk of a chilling effect . . . is enough, [b]ecause First Amendment freedoms need breathing space to survive." *Id.* (quotation marks omitted). For example, even though libelous and defamatory statements are not protected by the First Amendment, states cannot restrict a false statement about a public figure unless the speaker made the statement "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether

8

it was false or not." *N.Y. Times*, 376 U.S. at 280. Absent this mens rea requirement, "would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." *Id.* at 279.

Just last term, the Supreme Court explained how "[p]rohibitions on speech have the potential to chill, or deter, speech outside their boundaries." *Counterman v. Colorado*, 143 S. Ct. 2106, 2114 (2023). "A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. Or he may simply be concerned about the expense of becoming entangled in the legal system." *Id.* at 2114–15. Whatever the would-be speaker's precise reasons, "[t]he result is 'self-censorship' of speech that could not be proscribed—a 'cautious and restrictive exercise' of First Amendment freedoms." *Id.* at 2115. To reduce the chilling effects that might lead a person "to swallow words that are in fact not true threats," the Court therefore held that states cannot restrict constitutionally unprotected threats of violence without showing that the speaker recklessly disregarded a risk that others would perceive

9

his words as threatening. *Id.* at 2116–17. In sum, the "protections of the First Amendment are triggered" by any state action that creates a "risk of a chilling effect" on protected expression. *AFP*, 141 S. Ct. at 2389.

These principles apply with full force to laws that discourage protected expression. Last year, this Court resuscitated a First Amendment challenge to a Connecticut law that requires a registered sex offender to notify the state "when he creates a new email address, instant messenger address, or other internet communication identifier." *Cornelio v. Connecticut*, 32 F.4th 160, 166, 180 (2d Cir. 2022). The Court explained that the law "burdens a registrant's 'ability and willingness to speak on the Internet'" and "plausibly deters registrants from engaging in protected online speech." *Id.* at 169. Because the law "risks chilling online speech" and was not narrowly tailored to the asserted state interests, it violated the First Amendment. *Id.* at 170.

## III. The Online Hate Speech Law Unconstitutionally Chills Speech on Matters of Public Concern

If allowed to go into effect, the Online Hate Speech Law would chill protected speech on matters of public concern. The Law requires networks to prominently display a hateful-conduct policy and a mechanism for reporting "hateful speech" to the network. It would

10

discourage users from engaging in protected expression, because users would reasonably fear that the network would publicly condemn their speech as hateful or suspend or ban them from the platform. This chilling effect would be exacerbated by the Law's vague terms "vilify" or "humiliate." These terms create a "highly malleable standard with 'an inherent subjectiveness.'" *Snyder v. Phelps*, 562 U.S. 443, 458 (2011). In today's hyperpolarized and hyperpartisan political climate, opponents of speech that mentions "race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression" often denounce the speech as vilifying or humiliating—fairly or not. N.Y. Gen. Bus. Law § 394-ccc(1). Speech on these issues lies at the forefront of political discourse, which would suffer greatly if the Law goes into effect.

## A. The Online Hate Speech Law Encourages Self-Censorship of Protected Speech

Although the Online Hate Speech Law does not directly punish the utterance of disfavored ideas, its "chief mischief" is that it imposes a "social stigma" on expressing ideas that the State does not like. John Stuart Mill, *On Liberty and Other Essays* 37 (John Gray ed. 2008). This stigma "roots out no opinions, but induces men to disguise them, or to abstain from any active effort for their diffusion." *Id.*

11

The whole point of the Law is to stigmatize protected speech. In fact, some legislators previously tried to go a step further. The Law's sponsor previously introduced the Social Media Hate Speech Accountability Act, S.7275, 2019-2020 Leg. Sess., which would have required internet service providers to remove "hate speech"—speech that "intentionally makes an insulting statement about a group of persons because of race, ethnicity, nationality, religion or beliefs, sexual orientation, gender identity or physical, mental or intellectual disability"—or face up to a $1 million fine per violation. The bill never received a floor vote, no doubt because most legislators had the good sense to realize that the First Amendment does not allow the government to fine those who do not purge the public square of protected expression that New York finds "insulting." *Compare* S.7275, *with* Sedition Act of 1798, § 2[4] (criminalizing certain "scandalous and malicious" speech). But Albany's would-be censors did not give up. Knowing that they could not directly silence disfavored speech, the Legislature instead sought to chill it.

The Online Hate Speech Law forces social media networks to promulgate policies governing so-called "hateful conduct" and create

---

[4] https://tinyurl.com/yf6pm8nw.

"mechanisms" by which users can report such conduct. This would plainly chill social media users from engaging in protected expression. After reading a network's "mechanism" for reporting "hateful conduct," which must be "clearly" and "easily accessible," or the platform's hateful-conduct policy, which must be "readily available and accessible," N.Y. Gen. Bus. Law § 394-ccc(2)–(3), many users would refrain from speech that might fall within the amorphous, protean definition of "hateful conduct." These users may fear that others will use the State-mandated mechanism to report their expression as "hateful conduct," which, in turn, could result in the network publicly condemning the speech as hateful, vilifying, or humiliating, a suspension or a ban from using the network, or the wrath of the authorities.

It is irrelevant that this "repressive effect" follows directly "from private community pressures," specifically, other users' complaints about protected speech using the State-mandated reporting mechanism or the platform's decision to suspend or ban a user. *NAACP*, 357 U.S. at 463. "The crucial factor is the interplay of governmental and private action." *Id.* In the absence of the Online Hate Speech Law, many networks, including Plaintiff-Appellees', would not adopt "hate speech" policies.

13

This would eliminate users' fears that their speech could result in suspension or removal from the network.

## B.   Chilling Online Speech Is Especially Harmful

Governmental actions that chill speech on the internet are particularly concerning because "the most important place[] . . . for the exchange of views . . . is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (citation omitted) (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)). "Social media offers 'relatively unlimited, low-cost capacity for communication of all kinds,'" and "social media users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 104–05 (quoting *Reno*, 521 U.S. at 870). Social media websites "for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107. "These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard.

14

They allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'" *Id.*

Citizens previously expressed and discussed ideas in town squares, streets, parks, and in the columns of printed newspapers and pamphlets. Now, however, many of the most important ideas and debates largely occur on social media networks (such as Facebook and X, formerly known as Twitter) and on blogs (such as the Volokh Conspiracy). "Minds are not changed in streets and parks as they once were. To an increasing degree, the more significant interchanges of ideas and shaping of public consciousness occur in mass and electronic media." *Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 802–03 (1996) (Kennedy, J., concurring in part, concurring in the judgment in part, and dissenting in part); *see also Counterman*, 143 S. Ct. at 2122 (Sotomayor, J., concurring in part and concurring in the judgment) (noting that "[o]ur society's discourse occurs more and more" on the internet and social media).

Yet New York's Online Hate Speech Law would discourage the "exercise of First Amendment rights on websites integral to the fabric of our modern society and culture." *Packingham*, 582 U.S. at 109. The law's

15

sweeping definition of "social media network" includes not only quintessential social media networks, such as Facebook or Twitter, but *any* online forums on which users can share information or ideas with other users or the public. It applies to any websites with comment sections, such as most blogs and news websites. The Law also appears to cover websites like SSRN, which is "an open access research platform used to share early-stage research, evolve ideas, measure results, and connect scholars around the world." Elsevier, *What Is SSRN?*, https://tinyurl.com/yd54549k/.

Many of these websites are far afield from what would generally be considered "social media," yet New York's Online Hate Speech Law would stifle the free exchange of ideas on all these platforms by requiring the platforms to prominently display a hateful-conduct policy and "a clear and easily accessible mechanism" for reporting "incidents of hateful conduct." N.Y. Gen. Bus. Law § 394-ccc(2)–(3). As noted above, *see supra* Part III.A, these State-mandated displays would discourage persons from communicating messages that could be perceived to "vilify, humiliate, or incite violence" against a protected class. N.Y. Gen. Bus. Law § 394-ccc(1)(a). Writers, bloggers, independent journalists, scholars, and

ordinary citizens would refrain from discussing many of the most controversial and important issues facing our democracy to avoid being reported for engaging in "hateful conduct."

That result is flatly inconsistent with our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times*, 376 U.S. at 270. New York's attempt to enlist social media networks in its campaign to discourage protected speech that it finds offensive is a clear violation of these foundational constitutional commitments.

## C. The Vague Terms "Vilify" and "Humiliate" Exacerbate the Chilling Effect on Political Discourse

"American democracy [is] at its best" when those "on both sides" of controversial issues "passionately, but respectfully, attempt[] to persuade their fellow citizens to accept their views." *Obergefell v. Hodges*, 576 U.S. 644, 714 (2015) (Scalia, J., dissenting). Unfortunately, those who advance serious and respectful arguments on the most important public-policy issues of the day are all-too-often demonized for uttering "hate speech" or for "vilifying" or "humiliating" members of a protected class.

New York cannot seriously dispute that the Online Hate Speech Law will chill potentially "vilifying" or "humiliating" speech. That's the

17

entire point of the Law. Perhaps that is why the Legislature did not bother defining "vilify" or "humiliate." The risk of a chilling effect is especially high when a law is vague, because speakers will have difficulty determining whether their speech falls on the permissible or impermissible side of the unclear line that the statute draws. *See Reno*, 521 U.S. at 871–72 ("The vagueness of . . . a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech."). Indeed, the Online Hate Speech Law's vague definition of "hateful conduct" "exacerbate[s]" self-censorship because "[i]t is not clear what the terms like 'vilify' and 'humiliate' mean." S.A.18.

Suppose an ordinary citizen is considering posting on a social media network about issues pertaining to a protected class. He has read the Law and the network's legally compelled hate-speech policies and knows that he risks punishment or censure if he says something that is "vilifying" or "humiliating." But he also doesn't know what these words mean because the Law does not bother defining them.

So he takes the logical step of looking these words up in the dictionary. He learns that "vilify" means "to say or write unpleasant

18

things about someone or something." *Vilify*, Cambridge Dictionary.[5] That doesn't really help, so he looks up "unpleasant," which means "rude and angry." *Unpleasant*, Cambridge Dictionary.[6] Then he looks up "humiliate," which means "to make someone feel ashamed or lose respect for himself or herself." *Humiliate*, Cambridge Dictionary.[7] He realizes there is no objective standard by which his speech can be assessed; even flattery might be perceived as "humiliating." *See, e.g.,* Babylon Bee, *Asian Americans Celebrate Affirmative Action Ruling With 5-Minute Study Break* (June 30, 2023).[8]

The user would probably next attempt to determine who decides whether speech is "vilifying" or "humiliating." Again, the Law has no answers. Do anonymous and unaccountable social-network moderators have the unilateral authority to decide whether speech is "vilifying" or "humiliating?" What if the moderators find the speech acceptable but just one listener is offended? Regardless, the Law has an unconstitutional chilling effect if its application depends on how the community might

---

[5] https://tinyurl.com/bdexbse5.
[6] https://tinyurl.com/4r9fau8s.
[7] https://tinyurl.com/4mcs8zxe.
[8] https://tinyurl.com/ymzsavt6.

19

react to protected speech. "An objective standard, turning only on how reasonable observers would construe a statement . . . would discourage the uninhibited, robust, and wide-open debate that the First Amendment is intended to protect." *Counterman*, 143 S. Ct. at 2116 (quotation marks omitted). It "provide[s] the most puritan of communities with a heckler's Internet veto." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 590 (2002) (Breyer, J., concurring); *see, e.g*, BBC, *1989: Ayatollah Sentences Author to Death* (Feb. 14, 1989)[9] ("[T]he author of The Satanic Verses book, which is against Islam, the Prophet and the Koran, and all those involved in its publication who are aware of its content are sentenced to death.").

The user is now very worried. He considers posting something seemingly noncontroversial—a condemnation of Russian war crimes in Ukraine. But then he realizes that the Russian embassy might report him for "vilifying" racist speech. TASS Russian News Agency, *"Nothing but racism": Putin hits out at Russophobia spreading around the world* (Sept. 30, 2022)[10] ("'Present-day global Russophobia can be nothing but a

---

[9] https://tinyurl.com/2xdr5jrz.
[10] https://tinyurl.com/544bfzb6.

manifestation of racism,' Putin said."). Indeed, the world's most evil regimes have long used allegations of racism, sexism, and other forms of bigotry as a means of silencing their critics. *See, e.g.*, Ministry of Foreign Affairs of the People's Republic of China, *Foreign Ministry Spokesperson Zhao Lijian's Regular Press Conference* (April 13, 2022) [11] ("The US government . . . instigates the 'lab leak' theory and allows racism to spawn alongside the coronavirus."). The Online Hate Speech Law gives these censors another tool in their arsenal.

The user is almost ready to give up and not speak at all, but then he realizes he has one last option—religious speech. Surely *that* must be safe—a conscientious legislature would create a religious exemption in light of the Free Exercise Clause. But the Online Hate Speech Law inflicts a First Amendment one-two punch when it is applied to religious speech that supposedly "vilifies" or "humiliates" on the basis of a protected class, like the retweeting of a Bible verse that condemns nonbelievers or promotes traditional gender roles. *Contra McDaniel v. Paty*, 435 U.S. 618, 641 (1978) (Brennan, J., concurring in the judgment)

---

[11] https://tinyurl.com/edbrt2jd.

("The State's goal of preventing sectarian bickering and strife may not be accomplished by regulating religious speech.").

The social media user decides to remain silent and refrain from sharing his political views, which is exactly what New York wants. He grumbles that his friend can make posts supporting feminism or racial equality with impunity. But his friend fares no better. A law "directed against speech found offensive to some portion of the public can be turned against minority and dissenting views to the detriment of all." *Matal v. Tam*, 582 U.S. 218, 253–54 (2017) (Kennedy, J., concurring in part and concurring in the judgment). Even speech that *condemns* hatred against protected classes is not safe from the Law's sweeping ambit.

For example, some have attempted to ban *To Kill a Mockingbird* on the ground that it causes readers "to feel humiliated or marginalized by the use of racial slurs." Katie Reilly, *A School District Has Dropped* Mockingbird *and* Huckleberry Finn *from Reading Lists Over Racial Slurs*, Time (Feb. 7, 2018). [12] A Texas legislator has compiled a list of over 800 books that "might make students feel discomfort, guilt, anguish, or any other form of psychological distress because of their race or sex." Emma

---

[12] https://tinyurl.com/2ytm6s5z/.

Sarappo, *Read the Books that Schools Want to Ban*, The Atlantic (Feb. 1, 2022).[13] The list includes Ta-Nehisi Coates's *Between the World and Me*, a "frank assessment of the effect of centuries of racial violence on contemporary Black Americans"; Margaret Atwood's acclaimed feminist novel, *The Handmaid's Tale*; and dozens of books about racism, gender identity, and abortion. *Id.* And others have objected to August Wilson's Pulitzer Prize- and Tony Award-winning play *Fences* on the grounds that it "foster[s] stereotypes about Black families," that it "destroy[s] the confidence and self-esteem of . . . the Black population," and that its use of a racial slur is a "'dagger' . . . 'cutting deeper and deeper' with each mention." Marie Fazio, *A Black Student's Mother Complained About 'Fences.' He Was Expelled.*, N.Y. Times (Dec. 15, 2020).[14]

The saga of the social media user and his friend illustrates one of the paramount dangers of the Online Hate Speech Law: it stifles political speech on *both* sides of important political debates. Suppose, for example:

- A woman who opposes affirmative action writes a short post discussing how affirmative action undermines meritocracy. A man is

---

[13] https://tinyurl.com/mr35uzv9; *full list available at* https://tinyurl.com/2ujyky3j.
[14] https://tinyurl.com/yc55rsww.

23

offended. He replies to her post by praising affirmative action, and he reports her for making "humiliating" racist speech. *See* University of California Santa Cruz, *Tool: Recognizing Microaggressions and the Messages They Send* [15] ("I believe the most qualified person should get the job" is a racist "microaggression"). The woman then reports the man's defense of affirmative action as "vilifying" on the basis of race. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2202 (2023) (Thomas, J., concurring) (describing affirmative action as "naked racism"). A hopelessly confused moderator decides to delete the entire thread, stifling an important policy debate.

- A transgender-rights group shares an opinion piece arguing that sex is not biological. Some feminists accuse the group of "humiliating" women on the basis of sex. *See* J.K. Rowling, *J.K. Rowling Writes about Her Reasons for Speaking out on Sex and Gender Issues* (June 10, 2020) [16] ("Moreover, the 'inclusive' language that calls female people 'menstruators' and 'people with vulvas' strikes many women as

---

[15] https://tinyurl.com/4xz9me3f.
[16] https://tinyurl.com/3bnzjb4y.

dehumanising and demeaning."). The transgender-rights group retorts that the feminists are "humiliat[ing]" the group on the basis of gender identity or gender expression. *See* Andrey Uspenskiy, *"Wumben, Wimpund, Woomud" An Exploration of Social Censure in the Internet Age*, 18 The Morningside Review 25, 28 (Sept. 13, 2022)[17] (accusing J.K. Rowling of "degrad[ing]" and "dehumaniz[ing]" transgender people). Following a highly publicized debate, the social media network decides not to remove the posts, but future users are afraid to discuss transgenderism, lest their posts become a media spectacle.

- A Zionist makes a pro-Israel post and is immediately accused of "vilifying" Muslims. *See* Jewish Voice for Peace, *FAQs on U.S. Islamophobia & Israel Politics*,[18] (claiming that support of Israel is the result of "Islamophobia"). A supporter of Palestinian independence makes an anti-Israel post and is immediately accused of "vilifying" Jews. *See* Anti-Defamation League, *The Boycott, Divestment and Sanctions Campaign (BDS)* (May 24, 2022)[19] (claiming that boycotts

---

[17] https://tinyurl.com/2bb3m46d.
[18] https://tinyurl.com/43z9t2as.
[19] https://tinyurl.com/yw9kc6wy.

of Israel are "antisemitic"). The weary social media network, inundated with reports, adopts a new policy that no one can discuss Middle Eastern politics.

Faced with all these potential pitfalls, a social media user may well decide that he should simply not talk about many important issues of public concern. Unless of course, he's parroting milquetoast and completely uncontroversial talking points. *Those* are safe to say—at least in theory. And that's precisely the point of the Online Hate Speech Law: to eliminate potentially offensive public discourse. It is "a deliberate and calculated device . . . to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties." *Grosjean v. Am. Press Co*, 297 U.S. 233, 250 (1936).

## CONCLUSION

This Court should affirm the decision of the district court preliminarily enjoining New York's Online Hate Speech Law.

Dated:  September 26, 2023

ANASTASIA P. BODEN
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, D.C. 20001
(202) 216-1414
aboden@cato.org

Respectfully submitted,

*/s/ Joshua R. Zuckerman*
JOSHUA R. ZUCKERMAN
BRIAN C. MCCARTY
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 955-8500
jzuckerman@gibsondunn.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Local Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,141 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point New Century Schoolbook font.

Dated: September 26, 2023          By: _/s/ Joshua R. Zuckerman_____
                                        Joshua R. Zuckerman

28