No. 23-0356

===============================================================

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

—————————————

EUGENE VOLOKH, LOCALS TECHNOLOGY INC., RUMBLE
CANADA INC.,

*Plaintiffs-Appellees,*

*v.*

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

—————————

On Appeal from the United States District Court
for the Southern District of New York

—————————

**BRIEF *AMICUS CURIAE* OF THE FOUNDATION FOR MORAL
LAW IN SUPPORT OF PLAINTIFFS-APPELLEES AND
AFFIRMANCE**

—————————————

Talmadge Butts
FOUNDATION FOR MORAL LAW
One Dexter Avenue
Montgomery, AL 36104
(334) 262-1245
talmadge@morallaw.org

September 26th, A.D. 2023          Counsel for *Amicus Curiae*

===============================================================

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 and Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure, the *Amicus* Foundation for Moral Law, Inc., certifies that it is not a subsidiary or affiliate of a publicly owned corporation.

*/s/ Talmadge Butts*

Talmadge Butts
FOUNDATION FOR MORAL LAW
One Dexter Avenue
Montgomery, AL 36104
(334) 262-1245
talmadge@morallaw.org

Counsel for *Amicus Curiae*

September 26th, A.D. 2023

C-1

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................... C-1

TABLE OF CONTENTS.................................................................... i

TABLE OF AUTHORITIES .......................................................... ii

INTEREST OF THE *AMICUS* ......................................................1

SUMMARY OF ARGUMENT ........................................................3

ARGUMENT ..............................................................................3

I.    The  New  York  Online  Hate  Speech  Law  is
      unconstitutionally void for vagueness ...................................3

      A.    The Online Hate Crimes Act is overly broad.............................4

      B.    At  the  same  time,  the  Online  Hate  Crimes  Act  is
            overly narrow ...............................................................8

II.   Compelled speech is an especially egregious violation of
      the First Amendment ........................................................ 10

III.  The Online Hate Crimes Act Discriminates Based on Both
      Content and Viewpoint.................................................... 15

CONCLUSION......................................................................... 17

CERTIFICATE OF COMPLIANCE............................................. 19

CERTIFICATE REGARDING SERVICE ................................. 20

# TABLE OF AUTHORITIES

**Cases**                                                        **Pages**

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969) ...............................................................6

*Cohen v. California,*
    403 U.S. 15 (1971) .................................................................6

*Feiner v. New York,*
    340 U.S. 315 (1951) ......................................................... 5–6

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ......................................................... 3–4

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.,*
    879 F.3d 101 (4th Cir. 2018) ................................ 12–13, 15

*Kennedy v. Bremerton School District,*
    142 S.Ct. 1612 (2022) ........................................................ 16

*Lanzetta v. New Jersey,*
    306 U.S. 451 (1939) ......................................................... 3–4

*Miami Herald Publ'g Co. v. Tornillo,*
    418 U.S. 241 (1974) .......................................................... 12

*Nat'l Inst. of Family and Life Advocates v. Becerra,*
    138 S. Ct. 1275 (2018) ...................................................... 14

*Stuart v. Camnitz,*
    114 F.3d 238 (4th Cir. 2014) ............................................ 13

*United States v. Beckles,*
    137 U.S. 886 (2017) ..............................................................4

*United States v. Harriss,*
    347 U.S. 612 (1954) ......................................................... 3–4

*United States v. Nat'l Dairy Products Corp.,*
    372 U.S. 29 (1963) ........................................................... 3–4

*U. S. v. Claypool*,
    14 Fed. 128 (D. C. Cir. 1882) .............................................................8

*Winters v. New York*,
    333 U.S. 507 (1948) ..............................................................4

*Wooley v. Maynard*,
    430 U.S. 705 (1977) .................................................... 12, 17

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) .......................................... 11–13, 17

**Statutes**

N.Y. Gen. Bus. Law § 394-CCC ...................................................................1

**Other Authorities**

*Acts* 4:12 (King James) ......................................................................7

Arthur Milikh, *"Hate Speech" and the New Tyranny over the Mind*, THE HERITAGE FOUNDATION, May 19, 2020, https://www.heritage.org/civil-society/report/hate-speech-and-the-new-tyranny-over-the-mind ................................. 9–10

*John* 14:6 (King James) .................................................................7

*Knowingly*, BLACK'S LAW DICTIONARY (2nd ed. 1910) ................................8

*Leviticus* 18:22 (King James) ...........................................................6

Lora Korpar, *Lawmaker, Pastor Charged with Hate Speech for Quoting Bible Walk Free*, NEWSWEEK, Mar. 30, 2022, https://www.newsweek.com/lawmaker-pastor-charged-hate-speech-quoting-bible-walk-free-1693385 ....................................6

*Romans* 1:27 (King James) ...............................................................6

## INTEREST OF THE *AMICUS*[1]

*Amicus curiae* Foundation for Moral Law, Inc. ("the Foundation") is a nonprofit legal defense organization located in Montgomery, Alabama, which is dedicated to the defense of constitutional liberties and to the strict interpretation of the Constitution as intended by its Framers. The Foundation has a direct interest in this case because we believe Professor Volokh has a constitutional right to use the internet to spread his ideas of constitutional interpretation, and because the Foundation also has a website (www.morallaw.org) that we use to spread our ideas.

Because the N.Y. General Business Law § 394-CCC defines "Social media network" as "service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public," the statute may apply to the Foundation's website. We are located in Alabama, but viewers in New York are able to access our website, and nothing in the Online Hate Speech Law exempts out-of-state websites. We are a nonprofit corporation, but we have a place on our website where viewers can donate to

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund its preparation or submission; and no person other than the *amicus curiae,* its members, or its counsel, contributed money that was intended to fund the preparation or submission of this brief.

1

our work, and the New York Attorney General may contend that this fits the definition of "profit-making purposes." We do not currently receive comments on our website, but we have in the past, and we might do so in the future. If we were forced to comply with the vague requirements of the Online Hate Speech Law and declare a policy that goes against what we believe, this could have a chilling effect on our decision to open our website for comments.

## SUMMARY OF ARGUMENT

When a state engages in content and viewpoint discrimination to crack down on ideas it finds offensive, it must be especially careful to respect First Amendment rights. This attempt by the Attorney General of New York to crack down on viewpoints she dislikes is like killing a fly with a sledgehammer. It also compels persons who have never engaged in hate speech of any kind to draft, adopt, implement, and enforce a policy they do not believe in.

## ARGUMENT

### I.  The New York Online Hate Speech Law is unconstitutionally void for vagueness.

The constitutional doctrine of vagueness originates in the due process clause of the Fourteenth Amendment and strikes down legislation that contains insufficient warning of what conduct is unlawful. People have a right to know with reasonable certainty what conduct is permitted and what is prohibited, so they are not forced to act at their peril. Otherwise, people will engage in acts which they mistakenly believe are legal and will refrain from acts which they mistakenly believe are illegal. Criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is forbidden. A vague statute does not give adequate notice of required conduct, does not forewarn both its reach and coverage, and may trap

3

the innocent by not providing fair warning. *See Lanzetta v. New Jersey*, 306 U.S. 451 (1939); *United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29 (1963); *United States v. Harriss*, 347 U.S. 612 (1954); *Grayned v. City of Rockford*, 408 U.S. 104 (1972).

In *Winters v. New York*, the U.S. Supreme Court stated that "there must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment." 333 U.S. 507, 515 (1948). The Court explained in *United States v. Beckles* that the void-for-vagueness doctrine applies with special rigor to criminal statutes and statutes prescribing penalties for criminal violations. 137 U.S. 886, 892 (2017). The New York Online Hate Crimes Act imposes civil penalty fines of up to $1,000.00, and each day the offense continues is a separate offense. A $1,000 penalty is a $1,000 penalty whether it is called civil or criminal, and either way it has a chilling effect on constitutionally protected speech.

## A.    The Online Hate Crimes Act is overly broad.

The vagueness begins by addressing "hateful conduct" but then defining conduct solely in terms of speech. And from that point the vagueness intensifies:

What is hateful speech? To constitute hate speech, must the speech be screamed at high intensity, using trigger words laced with profanity? Or is it

4

still hate speech if one expresses the same ideas at lower decibels, using civilized language with logic and evidence instead of profanity?

What does "vilify" mean? If a person says he finds homosexuality or transgenderism offensive, is that vilification? What if he says he has religious objections to homosexuality or transgenderism and quotes the Bible (or the Koran or the Hadith) to explain his position? Does his facial expression, or the intensity with which he speaks, make a difference in determining whether his speech is vilification?

What does "humiliate" mean? Does it turn upon the speaker's intent, or the listener's subjective reaction, or some objective standard? If a speaker presents scientific studies that demonstrate that the homosexual lifestyle is unhealthy or that many who undergo sex changes later regret their decision, and homosexuals or transgenders feel humiliated by that information (even if the information is true), does that constitute an offense? Do we look to the intent of the speaker to humiliate, the subjective reaction of the viewer, or some other standard? Do we consider that those who would feel vilified or humiliated by this language have the option to not visit the site?

And what does "incite violence" mean? Must the speaker intend to incite violence? If violence is incited, is the speaker's lack of intent a defense? If no violence actually occurred, is that an absolute defense? Do we apply the

5

"clear and present danger" test of *Feiner v. New York*, 340 U.S. 315 (1951)? Or do we apply the *Brandenburg v. Ohio*, 395 U.S. 444 (1969), test and ask whether the speech is likely to incite "imminent lawless action"? Or do we apply the "fighting words" test of *Cohen v. California*, 403 U.S. 15 (1971), and ask whether the speech is likely to incite an immediate violent reaction?

To turn the issue on its head: Does the Online Hate Crimes Act prohibit people from vilifying or humiliating white supremacists? If someone posts a cartoon on the website that makes a Ku Klux Klansman look ridiculous, can the Klansman claim he has been humiliated? Does the statute mean inciting the Klansman to violence against the person who made the statement, or does it mean inciting people to violence against the Klansman? Is referring to Donald Trump as the "orange man" (because of the color of his skin or hair) an actionable comment?

Religious speech may also run afoul of the Online Hate Crimes Act. One's opposition to homosexuality or transgenderism may be based on sincere religious conviction. What if someone posts a message on a website that simply cites Biblical (or Koran) passages that disapprove of homosexuality (i.e., *Leviticus* 18:22 and *Romans* 1:27)? Is that hate speech?[2]

---

[2] Lora Korpar, *Lawmaker, Pastor Charged with Hate Speech for Quoting Bible Walk Free*, NEWSWEEK, Mar. 30, 2022, https://www.newsweek.com/lawmaker-pastor-charged-hate-speech-quoting-bible-walk-free-1693385.

Suppose a conservative Christian posts a message that says that all religions except Christianity lead to hell because faith in Jesus Christ is the only way of salvation, citing *John* 14:6 ("I am the Way, and the Truth, and the Life; no man cometh unto the Father but by Me" (KJV)) and *Acts* 4:12 ("Neither is there salvation in any other: for there is none other name under heaven given among men, whereby we must be saved" (KJV)) and other passages, and concludes that people who do not believe in Jesus Christ are going to hell. Does this post constitute vilifying, humiliating, or inciting people to violence because of their religion, even though the poster's intent was to save people from hell by leading them to faith in Christ?

This is one of the reasons the courts disfavor vague statutes: They are subject to arbitrary and discriminatory enforcement. One who is politically liberal might judge conservative websites harshly and liberal websites with leniency. One who is "woke" might jump on anti-woke websites, while an anti-woke person might do the opposite. Justice cannot be left to the subjective whims of judges and prosecutors.

Website owners will have to carefully review each comment to determine whether somebody, somewhere, might be vilified, humiliated, or incited to violence, knowing that if they are wrong, they can be subjected to thousands of dollars in fines. And there is no way the person who operates the

7

website can prevent all New York residents from viewing the site. Anyone, anywhere in the world, is subject to penalties under this statute.

The New York Attorney General may argue that the penalties only apply to those who "knowingly" refuse to comply. But this is no protection at all. Black's Law Dictionary (2nd ed. 1910) defines "knowingly" as "[w]ith knowledge; consciously; intelligently." It further explains, "[t]he use of this word in an indictment is equivalent to an averment that the defendant knew what he was about to do, and, with such knowledge, proceeded to do the act charged. *U. S. v. Claypool*, (D. C.) 14 Fed. 128." All this requires is that the person charged knew he was not reporting alleged "hateful conduct," regardless of whether he considered the comment hateful or was aware others might consider it hateful.

**B.    At the same time, the Online Hate Crimes Act is overly narrow.**

The statute limits "hateful conduct" to certain specific targeted speech: speech on the basis of "race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity, or gender expression." Speech on other bases, while equally vilifying, humiliating, or inciting of violence, is permitted, such as:

> "I hate you because you are ugly."
> "I hate you because you are fat (or thin)."
> "I hate you because you have acne."
> "I hate you because you dress like a nerd (or goth, or jock, etc.)."

"I hate you because you are clumsy."
"I hate you because you are stupid."
"I hate you because you are rich (or poor)."

Or almost anything else.

And why are certain categories picked for special protection, while others are not? Politics and social influence are part of the reason. So-called oppressed groups want to be included in the categories of hate speech to give themselves legitimacy and also to silence their critics. For now, the United States remains the only bastion of free speech in the West where "hate speech" is not criminalized.[3] Arthur Milikh, writing for the Heritage Foundation, explains the incoherence of "hate speech" laws and their use as a political weapon:

> By ostensibly protecting general categories—race, religion, national origin, or sexuality—Western Europe's laws give the impression that all citizens are protected rather than just favored groups. In practice, however, these laws are enforced selectively: The overwhelming majority of documented cases of hate speech investigations, arrests, prosecutions, and convictions aim to protect so-called marginalized groups. One rarely finds arrests or prosecutions, for example, directed against academics, politicians, and citizens who freely malign Christianity, heterosexuality, and the legacy populations of Western European nations, though these nations' public squares are full of such speech.
>  . . .
> Some criminalization advocates not only tolerate, but encourage "hate speech" directed against the so-called oppressor group: If

---

[3] Arthur Milikh, "*Hate Speech" and the New Tyranny over the Mind*, THE HERITAGE FOUNDATION, May 19, 2020, https://www.heritage.org/civil-society/report/hate-speech-and-the-new-tyranny-over-the-mind

the liberation of oppressed groups comes to depend on disrupting or undermining the power of the oppressor, then "hate speech" toward the latter is ipso facto encouraged. Today, advocates view such speech as courageous, heroic, and necessary, both for the purpose of supposed liberation and for the deeper purpose of finding and securing an identity for the marginalized: An "angry, hateful poem by a person from a historically subjugated group" should be interpreted as "a victim's struggle for self-identity in response to racism."

. . .

[S]peech regarding facts that may call into question a group's self-respect would be viewed as "deplorable" and constitute "hate speech." For instance, speaking of the statistically documented disparities in educational preparedness of affirmative action recipients is not permissible speech. Labeling as "hate speech" factual, provable claims would extend to any number of issues that conflict with the self-respect of the marginalized.[4]

## II.  Compelled speech is an especially egregious violation of the First Amendment.

Suppose for a moment that you are a vehement opponent of President Donald Trump. You have intense dislike for him personally, you find his style of leadership abhorrent, you consider his "tweets" repulsive, you consider his policies immoral and destructive, and you fervently hope he is not reelected. And you take it for granted that your right to express your opinion about him is protected by the First Amendment.

Suppose, then, that a law is enacted that prohibits you from saying or writing anything critical of President Trump, his style, or his policies, under

---

[4] Id.

severe legal penalties for violating this law. You would feel outraged, and rightly so, because your right of freedom of expression has been violated. But you might decide to grit your teeth and remain silent rather than face the penalties.

But suppose, instead, that the law is changed, and now requires you not just to remain silent but to affirmatively say: "I love President Trump, I admire his style, I love his tweets, I hope his policies are enacted, and, above all, I fervently hope he is reelected in 2024." You would then be doubly outraged. You may think: "I might bite my tongue about President Trump, but there's no way I'm going to speak his praises. I'll go to jail instead."

The point is this: Compelled speech is an even more egregious First Amendment violation than suppressed speech. Forcing someone to say what one does not believe is worse than forcing a person to remain silent, just as forcing someone to contribute to President Trump's campaign is more outrageous than prohibiting donations to his opponent.

The Supreme Court has recognized that compelled speech is a First Amendment violation ever since *West Virginia State Board of Education v. Barnette*, in which the Court held that public schools could not force students to say the Pledge of Allegiance if they or their parents objected. 319 U.S. 624 (1943). Justice Jackson stated for the Court that "[t]o sustain the compulsory

11

flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." *Id.* at 634.[5]

In *Miami Herald Publishing Co. v. Tornillo*, the Court held unconstitutional a Florida statute requiring newspapers to publish replies of political candidates whom they had criticized, again invoking the compelled-speech doctrine. 418 U.S. 241 (1974). Likewise, in *Wooley v. Maynard*, the Court held that New Hampshire could not compel Maynard to display the state motto "Live Free or Die" on his vehicle license plate. 430 U.S. 705 (1977). Chief Justice Burger held for the majority,

> We are thus faced with the question of whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public. We hold that the State may not do so.

*Id.* at 713.

On January 5, 2018, the Fourth Circuit held that a Baltimore ordinance requiring pregnancy clinics that do not offer or refer for abortion to disclose

---

[5] Although Barnette and other plaintiffs objected to the Pledge for religious reasons, the Court stated, "[n]or does the issue as we see it turn on one's possession of particular religious views or the sincerity with which they are held. While religion supplies appellees' motive for enduring the discomforts of making the issue in this case, many citizens who do not share these religious views hold such a compulsory rite to infringe constitutional liberty of the individual." *Id.* at 634.

that fact through signs posted in their waiting rooms violated the First Amendment. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101 (4th Cir. 2018). The Fourth Circuit concluded that the Baltimore ordinance constituted compelled speech because it "compel[led] a politically and religiously motivated group to convey a message fundamentally at odds with its core beliefs and mission." *Id.* at 105. The Court noted further that an integral component of the freedom of expression is "the right not to utter political and philosophical beliefs that the state wishes to have said." *Id.* at 111 (citing *Barnette*, 319 U.S. at 642 ).

> This Court has in the past struck down attempts to compel speech from abortion providers. [*Stuart v. Camnitz*, 114 F.3d 238, 242 (4th Cir. 2014)]. And today we do the same with regard to compelling speech from abortion foes. We do so in belief that earnest advocates on all sides of this issue should not be forced by the state into a corner and required essentially to renounce and forswear what they have come as a matter of deepest conviction to believe.

*Id.* at 113. The Fourth Circuit concluded:

> Weaponizing the means of government against ideological foes risks a grave violation of our nation's dearest principles: "that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. It may be too much to hope that despite their disagreement, pro-choice and pro-life advocates can respect each other's dedication and principle. But, at least in this case, as in *Stuart*, it is not too much to ask that they lay down the arms of compelled speech and wield only the tools of persuasion. The First Amendment requires it.

13

*Id.* at 113.

On June 26, 2018, the Supreme Court decided the case of *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 1275 (2018). The California Reproductive Freedom, Accountability, Comprehensive Care, and Transparency Act (FACT Act) required crisis pregnancy centers to post notices informing their patients that California provides free or low-cost pregnancy services, including abortion and providing information as to how those services could be obtained. *Becerra*, 138 S. Ct. at 2365. NIFLA objected, because telling people how and where they can obtain abortions runs contrary to their belief that abortion is wrong. *Id.* at 2368–69. The Court sided with NIFLA, holding that the required notice was compelled speech that violated the First Amendment. *Id.* at 2376.

A website owner might object to the Online Hate Speech Law for an infinite number of reasons. He may believe certain categories of so-called hate speech prohibited by this statute, such as condemnation of the homosexual or transgender lifestyle, are justified. He may believe it is necessary to tell unbelievers they are going to hell, because God has commanded us to do so or because it is necessary to preach hellfire to save people from that fate. Alternatively, he may believe that hate speech, although wrong, is

14

constitutionally protected, and that the best way to combat hate speech is to refute it with other speech, rather than reporting it to the Attorney General.

In any event, to require website owners to craft a "hate speech" policy under threat of fines is textbook compelled speech and is unconstitutional.

## III. The Online Hate Crimes Act Discriminates Based on Both Content and Viewpoint.

The Fourth Circuit's *Greater Baltimore* decision recognized that the Baltimore ordinance's sign requirement was content- and viewpoint-based.

> The compelled speech at issue here raises particularly troubling First Amendment concerns. At bottom, the disclaimer portrays abortion as one among a menu of morally equivalent choices. While that may be the City's view, it is not the Center's. The message conveyed is antithetical to the very moral, religious, and ideological reasons the Center exists. Its avowed mission is to "provid[e] alternatives to abortion." ... Its "pro-life Christian beliefs permeate all that the Center does."

*Greater Balt.*, 879 F.3d at 110. The Fourth Circuit further stated:

> Particularly troubling in this regard is (1) that the ordinance applies solely to speakers who talk about pregnancy-related services but not to speakers on any other topic; and (2) that the ordinance compels speech from pro-life pregnancy centers, but not other pregnancy clinics that offer or refer for abortion.

*Id.* at 112. The Court drove home its point: "A speech edict aimed directly at those pregnancy clinics that do not provide or refer for abortions *is neither viewpoint nor content neutral*." *Id.* (emphasis added).

The New York Online Hate Speech Bill constitutes content discrimination. It is directed against hate speech, not against other forms of

15

speech. And it is directed against only certain categories of hate speech: race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity, and gender expression. Hate speech directed against any other category of persons—hatred against ugliness, obesity, those with criminal records, or any other category—is permitted. As we have seen, the courts frown upon content discrimination.

The New York Online Hate Speech Law also constitutes viewpoint discrimination. Speech that vilifies, humiliates, or incites violence against black people, for example, is prohibited, while speech that praises black people is permitted. Ostensibly, the same would be the case for speech regarding white people. One may lavish praise upon transgenderism, but speech that criticizes transgenderism may run afoul of the law.

As we have seen above, the law disfavors content discrimination and strongly disfavors viewpoint discrimination.

Government may have some limited flexibility to advance ideas and policies by what is called "government speech,"[6] but it may not advance those policies by prohibiting private speech, much less by compelling individuals

---

[6] In light of the Supreme Court's recent decision in *Kennedy v. Bremerton School District*, 142 S. Ct. 1612 (2022), in which Coach Kennedy's prayers at the 50-yard line after football games were held not to constitute government speech, there is no possibility that students' use of names and gender pronouns could be considered government speech.

to speak in support of the government's position. For example, the State of New Hampshire may adopt "Live Free or Die" as its motto and place that motto on license plates, but the State may not compel individuals to display that motto. *Wooley v. Maynard*, 430 U.S. 705 (1977) (holding that New Hampshire may not prohibit Maynard, a Jehovah's Witness, from covering the motto). As the Court said, "where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for the State's ideological message." *Id.* at 717.

## CONCLUSION

In *Barnette*, Justice Jackson said,

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.

319 U.S. at 641–42. But that is precisely what New York has done. By enacting this policy, New York has prescribed what shall be orthodox in matters of race, religion, sex, and other categories. Support for alternate lifestyles is orthodox, and all must say so, but the traditional view of gender is now unorthodox, and none may breathe a word of dissent. New York has violated the neutrality required of government in the marketplace of ideas.

17

The Foundation urges this Court to affirm the decision below and uphold Professor Volokh's right to free speech.

Respectfully submitted,

Talmadge Butts
FOUNDATION FOR MORAL LAW
One Dexter Avenue
Montgomery, AL 36104
(334) 262-1245
talmadge@morallaw.org

Counsel for *Amicus Curiae*

September 26th, A.D. 2023

18

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Rule 32(a)(7), Fed. R. App. P., because, excluding the parts of the document exempted by Rule 32(f), Fed. R. App. P., this document contains 4,011 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word in 14-point Times New Roman.

/s/ *Talmadge Butts*

Talmadge Butts
FOUNDATION FOR MORAL LAW
One Dexter Avenue
Montgomery, AL 36104
(334) 262-1245
talmadge@morallaw.org

Counsel for *Amicus Curiae*

September 26th, A.D. 2023

## CERTIFICATE REGARDING SERVICE

I certify that on September 26th, A.D. 2023, a true copy of this document is being filed electronically (via CM/ECF) and served by email to the following addresses:

Sarah Coco (Counsel for Appellant)
Sarah.coco@ag.ny.gov

Daniel Ortner (Counsel for Appellees)
Daniel.ortner@thefire.org

/s/ *Talmadge Butts*

Talmadge Butts
FOUNDATION FOR MORAL LAW
One Dexter Avenue
Montgomery, AL 36104
(334) 262-1245
talmadge@morallaw.org

Counsel for *Amicus Curiae*

20