# 23-356

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

EUGENE VOLOKH, LOCALS TECHNOLOGY INC., RUMBLE CANADA INC.,

*Plaintiffs-Appellees,*

—against—

LETITIA JAMES, IN HER OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF NEW YORK,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR *AMICUS CURIAE* THOMAS MORE SOCIETY
IN SUPPORT OF PLAINTIFFS-APPELLEES**

B. TYLER BROOKS
THOMAS MORE SOCIETY
309 West Washington Street, Suite 1250
Chicago, Illinois 60606
(312) 782-1680

*Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, it is hereby certified that *amicus curiae* Thomas More Society is not a public corporation, that *amicus* has no parent corporations, and that no public corporation or publicly held corporation owns ten percent or more of *amicus*.

Date: September 26, 2023          Respectfully submitted,

/s/B. Tyler Brooks
B. Tyler Brooks
THOMAS MORE SOCIETY
309 W. Washington St.
Suite 1250
Chicago, IL 60606
Telephone: (336) 707-8855
Fax: (336) 900-6535
tbrooks@thomasmoresociety.org

*Counsel for Amicus Curiae*
*Thomas More Society*

# TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE STATEMENT......................................i

TABLE OF AUTHORITIES.................................................. iv

INTEREST OF THE *AMICUS CURIAE* .................................. 1

SUMMARY OF THE ARGUMENT........................................ 1

ARGUMENT.................................................................. 3

    I.    NEW YORK'S LAW RUNS COUNTER TO OUR
          CONSTITUTIONAL TRADITION OF
          PROTECTING FREE AND ROBUST DEBATE,
          ESPECIALLY ON CONTROVERSIAL ISSUES ............. 3

        A. The First Amendment is Intended to Promote
           More, Not Less, Speech—Yet GBL § 394-ccc Does
           Just the Opposite................................................. 3

        B. Speech Does Not Lose its Constitutional
           Protection Simply Because it is "Controversial"........ 6

    II.   NEW YORK'S LAW IMPEDES THE PUBLIC'S
          RIGHT TO RECEIVE INFORMATION VITAL TO A
          SYSTEM OF SELF-GOVERNANCE IN
          VIOLATION OF THE FIRST AMENDMENT ................ 8

    III.  NEW YORK'S LAW THREATENS TO SILENCE
          EXPRESSIONS OF TRADITIONAL VALUES
          ONLINE............................................................ 10

        A. The Experience of Other Countries Shows the
           Dangers of Hate Speech Laws, Which are
           Contrary to the First Amendment ....................... 10

        B. The United States is Already Experiencing
           Censorship Online of Traditional Values................ 13

CONCLUSION.............................................................. 20

PAGE(S)

CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME
LIMIT, TYPEFACE REQUIREMENTS, TYPE-STYLE
REQUIREMENTS............................................................. 21

CERTIFICATE OF SERVICE ............................................. 22

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Bible Believers v. Wayne County*,
  805 F.3d 228 (6th Cir. 2015) ....................................... 5, 6

*Citizens United v. FEC*,
  558 U.S. 310 (2009) ................................................... 3, 8

*Cohen v. California*,
  403 U.S. 15 (1971) ..................................................... 8

*Cox v. Louisiana*,
  379 U.S. 536 (1965) .................................................... 5

*Gerber v. Herskovitz*,
  14 F.4th 500 (6th Cir. 2021) ........................................... 8

*Hammond v. DPP*,
  EWHC 69 (Admin), Crim LR 851 (2004) ........................... 12

*Ison v. Madison Local Sch. Dist. Bd. of Educ.*,
  3 F.4th 887 (6th Cir. 2021) ............................................ 7

*Lamont v. Postmaster General*,
  381 U.S. 301 (1965) .................................................... 9

*Mahanoy Area School District v. B.L.*,
  141 S. Ct. 2038 (2021) ................................................. 5

*Marshall v. Amuso*,
  571 F. Supp. 3d 412 (E.D. Pa. 2021) ................................. 7

*Martin v. Struthers*,
  319 U.S. 141 (1943) .................................................... 9

*Martin v. U.S. EPA*,
  271 F. Supp. 2d 38 (D.D.C. 2002) .................................... 9

*Matal v. Tam*,
  582 U.S. 218 (2017) .................................................... 6

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) .................................................... 6

iv

PAGE(S)

*McMahon v. City of Panama City Beach*,
   180 F. Supp. 3d 1076. (N.D. Fla. 2016) ............................. 5

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ......................................... 3

*Missouri v. Biden*,
   No. 23-30445, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) ...... 13

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964).................................................. 4

*Packingham v. North Carolina*,
   127 S. Ct. 1730 (2017) .............................................. 9

*R. v. Keegstra*,
   3 S.C.R. 697 (Can.) ................................................. 12

*Reading v. Duff et al.*,
   Case No. 1:23-cv-01469-KWM-EAP (D.N.J.) ...................... 13

*Roth v. United States*,
   354 U.S. 476 (1957).................................................. 6

*Snyder v. Phelps*,
   562 U.S. 443 (2011).................................................. 7

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011).................................................. 4

*Stanley v. Georgia*,
   394 U.S. 557 (1969).................................................. 9

*Terminiello v. Chicago*,
   337 U.S. 1 (1949).................................................... 7

*Texas v. Johnson*,
   491 U.S. 397 (1989).................................................. 7

*Watson v. Memphis*,
   373 U.S. 526 (1963).................................................. 5

*Whitney v. California*,
   274 U.S. 357 (1927).................................................. 4

PAGE(S)

## Constitutional Provisions

U.S. Const. amend. I ............................................... *passim*

## Statutes

GBL § 394-ccc ..................................................... *passim*

GBL § 394-ccc 1(b) ..................................................... 5

## Other Authorities

Criminal Code, R.S.C. 1985, ch. C46, sec. 318, 319(1), 319(2) .... 12

Michael Kent Curtis *et al.*, *Constitutional Law in Context*
    1034-36 (4th ed. 2018) .......................................... 10, 11

"High Court upholds conviction of Evangelical preacher,"
    *Church Times*, November 2, 2006, *available at*
    https://www.churchtimes.co.uk/articles/2004/30-
    january/news/uk/high-court-upholds-conviction-of-
    evangelical-preacher (last visited Sept. 26, 2023) .............. 12

Daniel Patrick Moynihan *et al.*, *Report of the Commission on
    Protecting and Reducing Government Secrecy*, S. Doc. No.
    105-2, app. A at Ch. I ("Secrecy: A Brief Account of the
    American Experience") (1997), *available at*
    https://sgp.fas.org/library/moynihan/chap1.html (last
    visited Sept. 26, 2023) .................................................. 10

"New hate speech trial ordered for anti-gay activist because
    of judge's exclusion of expert evidence," Aidan Macnab,
    *Law Times*, Aug. 24, 2023, *available at*
    https://www.lawtimesnews.com/practice-
    areas/criminal/new-hate-speech-trial-ordered-for-anti-
    gay-activist-because-of-judges-exclusion-of-expert-
    evidence/379088 (last visited Sept. 26, 2023) ..................... 12

PAGE(S)

Race Relations Act 1965, c. 73 (UK), *available at*
https://www.legislation.gov.uk/ukpga/1965/73/contents
(last visited Sept. 26, 2023) ........................................ 11

Report of the Special Committee on Hate Propaganda
(Ottawa, Queen's Printer 1966) .................................... 12

## INTEREST OF THE *AMICUS CURIAE*[1]

*Amicus Curiae* Thomas More Society is a non-profit, national public-interest law firm dedicated to restoring respect in law for life, family, and religious liberty.  The Thomas More Society provides legal services to clients free of charge and often represents individuals who cannot afford a legal defense with their own resources.  Throughout its history, the Thomas More Society has advocated for the protection of First Amendment rights, including the First Amendment rights of persons of faith when they are curtailed by the government.

## SUMMARY OF THE ARGUMENT

While "hate speech" is easy to oppose, it is nearly impossible to define.  Definitional problems aside, though, legislation against "hate speech" offers governmental censors a tool for silencing views disapproved of by those holding power.  Laws like New York's recently enacted GBL § 394-ccc reflect a belief that speech should be limited instead of robust.  Yet, our constitutional tradition has long recognized

---

[1] All parties consent to the filing of this *amicus curiae* brief.  *Amicus* certifies that no counsel for a party authored this brief in whole or in part and no person or entity, other than the *amicus*, or its counsel, has made a monetary contribution to its preparation or submission.

that so-called "controversial" speech is not only protected, but that it also often makes the most valuable contributions to political and social discourse.

GBL § 394-ccc effectively operates as a heckler's veto that permits the potentially negative reactions of others to justify censorship of a peaceful speaker. This censorship deprives the speaker of her rights and further denies intended audience members their ability to hear and consider the speaker's point of view. The experiences of nations like the United Kingdom and Canada, which have adopted "hate speech" laws, show that those individuals targeted for enforcement will not infrequently be those who simply adhere to and express traditional moral views that are unpopular with those in power. Indeed, even without the power of a law like GBL § 394-ccc, censorship of this speech is already occurring in the United States under the flimsiest of pretexts.

For the sake of the Plaintiffs' First Amendment rights, as well as for the sake of encouraging the open exchange of information in a free society, the District Court's preliminary injunction should be affirmed.

# ARGUMENT

## I. NEW YORK'S LAW RUNS COUNTER TO OUR CONSTITUTIONAL TRADITION OF PROTECTING FREE AND ROBUST DEBATE, ESPECIALLY ON CONTROVERSIAL ISSUES.

### A. The First Amendment is Intended to Promote More, Not Less, Speech—Yet GBL § 394-ccc Does Just the Opposite.

Despite the State of New York's decision to regulate and restrict speech through enactment of General Business Law § 394-ccc (the online hate speech law), "it is our law and our tradition that more speech, not less, is the governing rule." *Citizens United v. FEC*, 558 U.S. 310, 361 (2009); *see* U.S. Const. amend. I (prohibiting the government from making laws "abridging the freedom of speech"). The constitutional protection of free speech is not merely intended to encourage self-expression. "[F]ree speech is 'essential to our democratic form of government.' Without genuine freedom of speech, the search for truth is stymied, and the ideas and debates necessary for the continuous improvement of our republic cannot flourish." *Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021) (Thapar, J.) (quoting and citing *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018)).

3

Our Founders were confident in their belief "that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth[.]" *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). The Constitution accordingly seeks to "maintain a free marketplace of ideas, a marketplace that provides access to 'social, political, esthetic, moral, and other ideas and experiences.'" *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 583 (2011) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, (1969) and citing *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). "Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 n.19 (1964) (quoting John Stuart Mill, *On Liberty* (Oxford: Blackwell 1947), at 15, and citing John Milton, *Areopagitica*, in Prose Works (Yale 1959), Vol. II, at 561).

GBL § 394-ccc violates these most basic principles of the First Amendment through the imposition of a regulatory scheme on those who "operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the

public." GBL § 394-ccc 1(b). Moreover, the State's purported reasons for regulating "hate speech" are but a reincarnation of a familiar enemy of the First Amendment—the heckler's veto. "A heckler's veto generally occurs when the government suppresses speech because of poor audience reaction, especially a reaction so negative that the threat of violence becomes imminent." *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1109-10. (N.D. Fla. 2016) (citations omitted). As Justice Alito recently explained with his concurring opinion in *Mahanoy Area School District v. B.L.*, "[I]t is a 'bedrock principle' that speech may not be suppressed simply because it expresses ideas that are 'offensive or disagreeable.'" 141 S. Ct. 2038, 2055 (2021) (Alito, J., concurring) (citations omitted). Other courts have similarly recognized that "the First Amendment does not countenance a heckler's veto." *Bible Believers v. Wayne County*, 805 F.3d 228, 248 (6th Cir. 2015) (*en banc*); *see Watson v. Memphis*, 373 U.S. 526, 535 (1963) ("[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise."); *see also Cox v. Louisiana*, 379 U.S. 536, 551 (1965). "When a peaceful speaker, whose message is constitutionally protected, is confronted by a hostile crowd, the state may not silence the speaker as an expedient

alternative to containing or snuffing out the lawless behavior of the rioting individuals." *Bible Believers*, 805 F.3d at 252.

## B. Speech Does Not Lose its Constitutional Protection Simply Because it is "Controversial."

The State of New York has failed to recognize that the Constitution forbids the government from treating those who speak on controversial topics as if they were a domestic enemy. While speech that is directed to inciting imminent lawless action and that is likely to produce such a result enjoys no First Amendment protection,[2] the rule of law is not advanced by government censorship of speech that is constitutionally protected.

"[A]dvocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression[.]". *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995); *see Roth v. United States*, 354 U.S. 476, 484 (1957) ("The protection given speech . . . was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people[.]").    To that end, "[g]iving offense is a viewpoint," *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality

---

[2] *See Bible Believers*, 805 F.3d at 244 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)).

opinion), and is therefore constitutionally protected. *See, e.g., Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 895 (6th Cir. 2021) ("restrictions on abusive, personally directed, and antagonistic speech . . . violate the First Amendment"); *Marshall v. Amuso*, 571 F. Supp. 3d 412, 421-23 (E.D. Pa. 2021) (enjoining School Board public comments policy) ("[D]isfavoring ideas that offend discriminates based on viewpoint, in violation of the First Amendment.") (quoting *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019)) (internal quotation marks omitted)).

Nor does the fact that speech may stir up passions result in a forfeiture of its protected status. "The right to speak freely and to promote diversity of ideas and programs . . . may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949); *see Snyder v. Phelps*, 562 U.S. 443, 460-61 (2011) ("As a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate."); *Texas v. Johnson*, 491 U.S. 397, 408-09 (1989) ("[A] principal function of free speech under our system of government is to invite

dispute.") (internal quotation marks and citations omitted); *Cohen v. California*, 403 U.S. 15, 25 (1971) ("[O]ne man's vulgarity is another's lyric."); *see also Gerber v. Herskovitz*, 14 F.4th 500, 519-20 (6th Cir. 2021) ("[F]reedom of speech is protected against censorship or punishment, unless likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.") (internal quotation marks and citations omitted).

Speaking on controversial topics is not "hate speech." It is responsible self-governance, as it has been known in this nation since before its founding. *See, e.g., Citizens United*, 558 U.S. at 339 ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it."). Because GBL § 394-ccc violates the First Amendment by effectively censoring protected speech, the District Court's preliminary injunction below should be affirmed.

## II. NEW YORK'S LAW IMPEDES THE PUBLIC'S RIGHT TO RECEIVE INFORMATION VITAL TO A SYSTEM OF SELF-GOVERNANCE IN VIOLATION OF THE FIRST AMENDMENT.

Just as it protects the right to *speak*, the First Amendment also protects the right to *receive* information. This receipt of information is

8

vital to civic health. "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyer." *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) (citations omitted). And, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 127 S. Ct. 1730, 1735 (2017); *see Martin v. U.S. EPA*, 271 F. Supp. 2d 38, 47 (D.D.C. 2002) (quoting *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976) ("[W]here a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both.")). The Constitution therefore prevents the government from interfering with "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see, e.g., Martin v. Struthers*, 319 U.S. 141, 143 (1943).

Nevertheless, as a result of GBL § 394-ccc, the ability of Plaintiffs to speak is interfered with, and the right of untold others to receive information is likewise harmed. "Information is power, and it is no mystery to government officials that power can be increased through

controls on the flow of information." Daniel Patrick Moynihan *et al.*, *Report of the Commission on Protecting and Reducing Government Secrecy*, S. Doc. No. 105-2, app. A at Ch. I ("Secrecy: A Brief Account of the American Experience") (1997), *available at* https://sgp.fas.org/library/moynihan/chap1.html (last visited Sept. 26, 2023). Through the purported regulation of "hate speech," government censors may readily obtain control, and manipulate the flow, of information to and among citizens. GBL § 394-ccc presents exactly that danger and was thus properly enjoined as unconstitutional.

## III. NEW YORK'S LAW THREATENS TO SILENCE EXPRESSIONS OF TRADITIONAL VALUES ONLINE.

### A. The Experience of Other Countries Shows the Dangers of Hate Speech Laws, Which are Contrary to the First Amendment.

The United States has long resisted restriction of free speech under the guise of laws against "hate speech." Being aware of such abuses as "licensing of the press" and laws against "seditious libel" under British rule, our Founders created a First Amendment that would protect against the suppression of dissent. *See, e.g.,* Michael Kent Curtis *et al.*, *Constitutional Law in Context* 1034-36 (4th ed. 2018). Prior to 1688, "licensing of the press" granted the English Crown a monopoly over print

10

information via "prior restraint," or the authority to restrain publications prior to printing. *Id.* at 1035. The Crown appointed "licensers" to approve content prior to publication and criminalized any unlicensed publications. *Id.* Post-1688, "seditious libel" made it a criminal offense to criticize the Crown, Parliament, or government officials, regardless of the criticism's truth or merits.

While the First Amendment forbids these intrusions on free speech in the United States, the United Kingdom has moved toward the outlawing of a "hate speech." By means of the Race Relations Act of 1965, the U.K. Parliament prohibited "stir[ring] up hatred against any section of the public in racial hatred." *Id.* at 93, Race Relations Act 1965, c. 73 (UK), *at* https://www.legislation.gov.uk/ukpga/1965/73/contents (last visited Sept. 26, 2023). Importantly, "stir[ring] up hatred" is not limited to inciting violence, but also includes writing or publishing something "threatening, abusive, or insulting." *Id.*

The British inclination toward curtailing disfavored speech has also resulted in the expression of traditional values being deemed unworthy of protection and even subject to criminal penalties. For example, consider the notable case of Harry Hammond, an elderly preacher

11

arrested in 2003 in Bournemouth for, *inter alia*, displaying a poster saying, "Stop Immorality, Stop Homosexuality, Stop Lesbianism, Jesus is Lord." *Hammond v. DPP* [2004] EWHC 69 (Admin), [2004] Crim LR 851. Passersby threw water and dirt on him, but it was Hammond the police arrested, not his assailants. He was fined by the local court, and his conviction was upheld on appeal. *See* "High Court upholds conviction of Evangelical preacher," *Church Times*, November 2, 2006, *available at* https://www.churchtimes.co.uk/articles/2004/30-january/news/uk/high-court-upholds-conviction-of-evangelical-preacher (last visited Sept. 26, 2023).

Canada has adopted an even more aggressive anti-speech regime under the banner of curtailing "hate speech." *See* Report of the Special Committee on Hate Propaganda (Ottawa, Queen's Printer 1966), quoted with approval in *R. v. Keegstra*, [1990] 3 S.C.R. 697, 725 (Can.); Criminal Code, R.S.C. 1985, ch. C46, sec. 318, 319(1), 319(2); *see, e.g.,* "New hate speech trial ordered for anti-gay activist because of judge's exclusion of expert evidence," Aidan Macnab, *Law Times*, Aug. 24, 2023, *at* https://www.lawtimesnews.com/practice-areas/criminal/new-hate-

speech-trial-ordered-for-anti-gay-activist-because-of-judges-exclusion-of-expert-evidence/379088 (last visited Sept. 26, 2023).

The result of such laws is that statements that would fall squarely within the realm of First Amendment protections in the United States are silenced, contrary to this nation's deepest constitutional values.

## B. The United States is Already Experiencing Censorship Online of Traditional Values.

Even without laws like GBL § 394-ccc expressly creating a censorship regime, agents of federal, state, and local governments have seen fit to engage in the silencing of online speech found to be inconvenient to government narratives or favored special interests. *See, e.g., Missouri v. Biden*, No. 23-30445, 2023 WL 5821788, at *19 (5th Cir. Sept. 8, 2023).

One woman's specific case is instructive. Angela Reading, a mother and former local school board member living in New Jersey, is the victim of government censorship and the plaintiff in a pending civil rights case, *Reading v. Duff et al.*, Case No. 1:23-cv-01469-KWM-EAP (D.N.J.).[3] She drew the government's ire when she made a single Facebook post

---

[3] Mrs. Reading is represented by the Thomas More Society in her civil rights case.

questioning the propriety of discussing sexual concepts like polyamory with elementary school students. After Mrs. Reading made her November 22, 2022 Facebook post, federal, state, and local government officials launched a coordinated attack on both her and her protected speech.

A U.S. Army Major, Christopher Schilling, worked with his fellow military personnel at Joint Base McGuire-Dix-Lakehurst (MDL) to suppress Mrs. Reading's speech and label her a threat to physical safety. For example, on November 29, 2022, Schilling sent an official military email, including to local school leadership, complaining about Mrs. Reading's speech as if it were unlawful incitement to violence: "In the current political climate and recent hate crimes across the country [*sic*] it goes without saying that it takes only one person to be move [*sic*] to violent action by her post." Schilling demanded "action each of you can take to insure [*sic*] the continued safety of students until someone can put a stop to her actions."

On the same date, Major Nathaniel Lesher, head of the Joint Base's Security Forces, working with Schilling, "pushed" the idea of censoring Mrs. Reading's post to the local North Hanover Township (NJ) Police

Chief, Robert Duff. Schilling informed a group of parents and school staffers that he was "actively working with the base leadership . . . and they are working to support us in our efforts"—meaning the official censorship of Mrs. Reading's First Amendment-protected views.

The Joint Base Installation Antiterrorism Program Manager, Joseph Vazquez, referred Mrs. Reading to the New Jersey Office of Homeland Security and Preparedness as well as to the New Jersey State Police Regional Operations Intelligence Center because "[b]oth agencies['] analysts keep an eye on far right/hate groups."

Meanwhile, another Joint Base leader, Lt. Col. Megan Hall, Deputy Commander of the 87th Mission Support Group's Security Squadron, joined in the growing conspiracy to censor Mrs. Reading. Following a phone call with the Superintendent of the school district, Hall emailed local school leaders to condemn Mrs. Reading's protected speech at length, copying other military personnel. She presented the Superintendent with several posts supporting Mrs. Reading and fretted that "Ms. Angela Reading encouraged people of like mindedness to attend the monthly BOE [Board of Education] meetings and express the same view point [sic]"—as if encouraging people to attend a board meeting

(which in fact Mrs. Reading had not done) were actionable wrongdoing warranting intervention by public officials. The school superintendent forwarded Hall's implicit request for censorship of Mrs. Reading to the local police chief.

On November 30, 2022, Police Chief Robert Duff, at the behest of the aforesaid federal military officials, coerced the removal of Mrs. Reading's Facebook post. Identifying himself as the township's Chief of Police, Duff told the Facebook group administrator (a private citizen) that local police were working in cooperation with Homeland Security, which was already investigating Mrs. Reading, and Joint Base officials concerning the groundless claim that her post could provoke a school shooting, so that the administrator should take it down. The administrator was so intimidated by Duff that she removed Mrs. Reading's post while still on the phone with him.

After Chief Duff succeeded in coercing the group administrator to remove the post, he reported on his success by email to the Joint Base officials via their military email accounts, stating "the North Hanover Township Police takes this issue very seriously" and "I will continue to

see if I can get additional posts removed from other social media posts. I will keep you advised."

Once she learned of Chief Duff's actions from the Facebook group administrator, Mrs. Reading sent him an email protesting his censorship of her speech. On December 1, 2022, he telephoned Mrs. Reading to admit that he did have the Facebook post taken down and further revealed he was working with the Joint Base officials who had identified her as an "extremist."

In a social media post, Schilling depicted Mrs. Reading as a security threat to "many families" which the Joint Base leadership was taking "very seriously." The Joint Base officials continued a frenzy of communications with numerous law enforcement agencies so as to "threat-tag" Mrs. Reading's speech. On December 5, the New Jersey Office of Homeland Security and Preparedness, in response to the Joint Base's "threat-tagging" of Mrs. Reading's already-censored speech, advised that it would "loop in the Burlington County Prosecutor's Office Counter-Terrorism Coordinator for situational awareness." Joint Base leadership continued efforts to trigger a widespread law enforcement investigation and state of alarm over Mrs. Reading's protected speech by

17

"threat-tagging" it as an "incident" of potential (or even actual) criminality.

The public furor against Mrs. Reading orchestrated by government officials made untenable her elected school board position, which she resigned on December 7, 2022. Placed in the same predicament as his wife by the government's actions, Mrs. Reading's husband, too, resigned his elected position on a different school board. On December 8, 2022, upon hearing this news, Lt. Col. Hall sent an email to the Joint Base officials, stating: "Team, Thank you. Please note we appreciate everything you do for you [*sic*] kids and families here at JB MDL." The retaliation against Mrs. Reading and her family then continued, as detailed at length in her lawsuit.

The government's actions have rendered Mrs. Reading, the mother of two children, a pariah in her own community. In March 2023, she lost a job offer to work as an associate practicing education law at a respected local firm and is now virtually unemployable in her field of study.[4] She

---

[4] At the time of her Facebook post, Mrs. Reading was in her third year of study at Villanova University Law School and preparing to work in education law, as she has previously spent many years as an educator.

and her husband have had to withdraw their children from the public school system and enroll them in private school at great expense.

All of this harm befell Mrs. Reading because of the government's unlawful and unbridled response to a single social media post, no part of which was threatening violence to anyone, and which contained speech fully protected by the First Amendment. The protections of the Constitution notwithstanding, agents of the federal, state, and local government censored Mrs. Reading and radically altered her life forever.

The example of Angela Reading risks becoming common if pro-censorship laws like GBL § 394-ccc are allowed to stand. And her case shows that the prime targets of censorship, like that to be encouraged by GBL § 394-ccc, are likely to be individuals who express traditional values on issues of marriage, sexuality, or faith generally, as has been the case in other countries after the adoption of hate speech laws.

GBL § 394-ccc is not merely a threat to free speech, but it is also a threat to the lives and livelihoods of those who will be caught up in its web of censorship. The District Court therefore properly enjoined New York's law as the unconstitutional creation that it is.

19

# CONCLUSION

For the above-stated reasons, the District Court's preliminary injunction should affirmed.

Respectfully submitted,

/s/B. Tyler Brooks
B. Tyler Brooks
THOMAS MORE SOCIETY
309 W. Washington St.
Suite 1250
Chicago, IL 60606
Telephone: (336) 707-8855
Fax: (336) 900-6535
tbrooks@thomasmoresociety.org

*Counsel for Amicus Curiae*
*Thomas More Society*

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT, TYPEFACE REQUIREMENTS, TYPE-STYLE REQUIREMENTS

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) & 32(a)(7)(B) because it contains 3,727 words, excluding the parts of this brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook font.

DATED: September 26, 2023 /s/B. Tyler Brooks

B. Tyler Brooks
*Counsel for Amicus Curiae*
*Thomas More Society*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on September 26, 2023. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: September 26, 2023

/s/B. Tyler Brooks
B. Tyler Brooks
*Counsel for Amicus Curiae*
*Thomas More Society*