# No. 23-0356

**IN THE**

# United States Court of Appeals
# for the Second Circuit

EUGENE VOLOKH, LOCALS TECHNOLOGY INC.,
RUMBLE CANADA INC.,

*Plaintiffs-Appellees*,

v.

LETITIA JAMES, *in her official capacity
as Attorney General of New York*,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of New York
No. 22-CV-10195 (ALC); Hon. Andrew L. Carter, Jr.

**BRIEF OF THE NEW CIVIL LIBERTIES ALLIANCE
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

Kaitlyn D. Schiraldi
Richard Samp
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
kaitlyn.schiraldi@ncla.legal
*Counsel for Amicus Curiae*

September 26, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the New Civil Liberties Alliance ("NCLA") states that it is a nonprofit corporation organized under Section 501(c)(3) of the Internal Revenue Code. NCLA has no parent corporation and has not issued any stock owned by a publicly held company.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ........................................................ ii

TABLE OF AUTHORITIES.................................................... iii

INTEREST OF AMICUS CURIAE .....................................................1

INTRODUCTION ......................................................................2

   I.    ZAUDERER DOES NOT APPLY TO PROMOTIONS OF NEW YORK'S POLITICAL
       VALUES ...................................................................3

       A.    The Policy-Disclosure Requirement Compels Promotion of
            New York's Norms, Not Facts .............................................6

       B.    The Policy-Disclosure Requirement Compels Speech on
            Controversial Matters................................................8

  II.    INTERMEDIATE SCRUTINY IS INAPPROPRIATE...............................11

       A.    The Speech at Issue Is Not Commercial ...........................11

       B.    Even If the Speech Were Commercial, New York's Speech
            Restrictions Would Still Be Subject to Heightened Scrutiny...............14

CONCLUSION....................................................................18

CERTIFICATE OF SERVICE ................................................19

CERTIFICATE OF COMPLIANCE ..................................................20

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
    143 S. Ct. 2298 (2023) ......................................................................5

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) .................................................................. 16, 17

*Brown v. Ent. Merch. Ass'n*,
    564 U.S. 786 (2011) ........................................................................14

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) ........................................................................11

*Chaplinsky v. New Hampshire*,
    315 U.S. 568 (1942) ........................................................................11

*Evergreen Ass'n, Inc. v. City of New York*,
    740 F.3d 233 (2d Cir. 2014) ................................................ 4, 8, 10, 12

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ..........................................................................7

*Matal v. Tam*,
    582 U.S. 218 (2017) .................................................................. 2, 7, 8

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ........................................................................14

*Nat'l Inst. of Fam. and Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) ("*NIFLA*") ............................................. *passim*

*NetChoice, LLC v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ...............................................................6

*New Hope Fam. Servs., Inc. v. Poole*,
    966 F.3d 145 (2d Cir. 2020) ............................................................4, 7

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ........................................................................13

*Riley v. Nat'l Fed. of Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ..........................................................................6

*R.A.V. v. City of Saint Paul*,
    505 U.S. 377 (1992) ................................................................15

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ..............................................11, 15, 16, 17

*Telco Commc'ns, Inc. v. Carbaugh*,
    885 F.2d 1225 (4th Cir. 1989) ..........................................8, 10

*United States v. Schwimmer*,
    279 U.S. 644 (1929) ..............................................................2, 8

*United States v. Stevens*,
    559 U.S. 460 (2010) ................................................................14

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001) ..................................................................5

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ..............................................11, 12, 13

*West Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ..............................................................1, 4

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ..................................................................4

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
    471 U.S. 626 (1985) ..............................................................3, 4

**Statutes**

N.Y. GEN. BUS. LAW § 394-ccc .................................................3

**Constitutional Provisions**

U.S. CONST. amend. I ...................................................................2

## INTEREST OF *AMICUS CURIAE*[1]

The New Civil Liberties Alliance is a nonpartisan, nonprofit civil-rights organization devoted to defending constitutional freedoms from violations by the administrative state. NCLA challenges constitutional defects in state agency actions through original litigation, *amicus curiae* briefs like this one, and other means. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as the freedom of speech. Yet these selfsame civil rights are also very contemporary—and in dire need of renewed vindication—precisely because state legislators, executive branch officials, administrative agencies, and even the courts have neglected them for so long.

NCLA aims to defend civil liberties—primarily by asserting constitutional constraints on the administrative state. Although Americans still enjoy the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed to prevent. This unconstitutional state within the Constitution's United States is the focus of NCLA's concern.

NCLA is particularly concerned by New York's push to "prescribe what shall be orthodox in politics." *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642

---

[1] NCLA states that no counsel for a party authored this brief in whole or in part; and that no party or party's counsel contributed money intended to fund preparation or submission of this brief; and that no person other than NCLA, its members, or its counsel contributed money intended to fund preparation or submission of the brief. Additionally, all parties consented to the filing of this brief.

1

(1943). In a nation where the first cries for liberty and independence came from colonial pamphlets and newspapers, New York now restricts the printed word in the name of policing conduct. The notion that because a website is in the business of publishing speech that somehow reduces the courts' First Amendment scrutiny of restrictions on its speech contradicts our First Amendment traditions. What New York proposes for social media websites alone would have far-reaching consequences both beyond the State's borders and for other modes of speech.

NCLA urges this Court to affirm the holding of the district court and uphold this nation's "proudest boast … that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 582 U.S. 218, 246 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)).

## INTRODUCTION

The Framers carefully penned the First Amendment to protect against even mere *abridgement* of the freedom of speech. U.S. CONST. amend. I. Turning off the valve of free speech would rob control of the conscience. If the government controls citizens' speech—removing words or ideas that it deems ugly or vile—the very core component that makes us human has been stolen. Our brains and our tongues effectively would become property of the government.

New York's law requires that Plaintiffs have a "clear and concise policy readily available and accessible on their website … which includes how such social

2

media network will respond and address the reports of incidents of hateful conduct on their platform." N.Y. GEN. BUS. LAW § 394-ccc(3). Hateful conduct, as defined by the State, is "the use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." N.Y. GEN. BUS. LAW § 394-ccc(1)(a).

This law violates the First Amendment by compelling social media networks to endorse the State's beliefs; they must publish a "hate speech" policy in line with the State's mandate. New York's assertion that its law is no different than the "factual and uncontroversial information" authorized in *Zauderer* is untenable. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). What constitutes "hate speech" is a topic of contentious debate and can hardly be described as uncontroversial. New York also cannot proclaim the right to trample on free speech by falsely claiming that the speech is commercial in nature. Plaintiff's speech is protected under heightened First Amendment scrutiny. This Court should affirm the decision of the Southern District of New York.

## I. *ZAUDERER* DOES NOT APPLY TO PROMOTIONS OF NEW YORK'S POLITICAL VALUES

Contrary to New York's view, *Zauderer*'s exceedingly narrow allowance for compulsion of commercial speech in the lawyer-advertising context does not permit New York "'to prescribe what shall be orthodox in politics.'" *Zauderer*, 471 U.S. at

651 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). The policy-disclosure requirement as applied to Plaintiffs does not prescribe speech that is factual and uncontroversial, but instead prescribes controversial speech that runs headlong into the First Amendment.

Importantly, freedom of speech encompasses the freedom not to speak. *Wooley v. Maynard*, 430 U.S. 705, 713–715 (1977); *Barnette*, 319 U.S. at 642 (1943). Compelling commercial speech has been permitted in limited circumstances, but only where compulsion regards "purely factual and uncontroversial information about the terms under which [one's] services will be available." *Zauderer*, 471 U.S. at 650–52. The policy-disclosure requirement is not "purely factual and uncontroversial information[,]" but rather a coerced endorsement of New York's political orthodoxy. *Id*.

Across a variety of subjects, this Court and the U.S. Supreme Court have consistently stricken laws which directly or indirectly compel persons or companies to speak. *See New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145 (2d Cir. 2020) (disallowing compelled statements of adherence to New York's views regarding adoption by same-sex couples); *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233 (2d Cir. 2014) (disallowing some compelled disclosures by pregnancy service centers opposed to abortion); *Wooley*, 430 U.S. at 705 (coerced use of State motto on license plates); *Barnette*, 319 U.S. at 642 (coerced saluting of the American flag).

4

Reasons for rejecting compelled speech do not diminish simply because a party is a corporation rather than an individual. *See United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001) (commercial speech doctrine does not justify coerced funding of government advertising campaign); *see also 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2303 (2023) (anti-discrimination laws cannot force business to create website designs and statements against business' beliefs).

The problematic nature of New York's law stems from the form of compliance it demands. To establish a "clear and concise policy," Plaintiffs must publish a "definition of 'hateful conduct' … at least as inclusive as the definition set forth in the law itself." JA345. It is insufficient to say, "We will only remove speech that violates federal or state law." Instead, Plaintiffs must say, "We will remove speech that violates federal or state law, *and will remove* speech which vilifies, humiliates, or incites violence on the basis of race, color, religion, ethnicity," and so forth. Anything less than acknowledging the state orthodoxy—that these forms of speech are undeserving of constitutional protection—would fail to be "clear and concise." In forcing adherence to this orthodoxy, New York's law does not come within *Zauderer*'s narrow exception: it is neither a compelled statement of fact nor uncontroversial.

A. **The Policy-Disclosure Requirement Compels Promotion of New York's Norms, Not Facts**

First, New York's law does not simply compel a statement of fact. Plaintiffs must incorporate New York's definition of "hateful conduct" even if their policy could be stated without reference to those forms of speech. By announcing them, Plaintiffs would be singling out these forms of speech as inferior—in particular, Plaintiffs would be required to use the negatively-loaded terms "vilify" and "humiliate," suggesting that such speech is immoral or otherwise less than deserving of Plaintiffs' protection. This demand for such specific terms in essence requires Plaintiffs to "alter the content of their speech." *Nat'l Inst. of Fam. and Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*") (alteration in original) (quoting *Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)).

This demand, in other words, is normative. Accordingly, New York errs in comparing the policy-disclosure requirement to the law at issue in *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022). In *NetChoice*, Texas enacted a law requiring social media companies to "inform users about the types of content allowed on the Platform, explain how the Platform enforces its policy, and describe how users can notify the Platform of content that violates the policy." *Id.* at 446.

Unlike New York's provision, social media companies in Texas can speak as much or little about the quality and nature of "hateful conduct" as they wish. They need not use terms like "vilify" unless that is their voluntarily chosen terminology;

6

they need not refer to "hateful" speech on gender expression. All they are required to state, using whatever words they wish, are their terms of service. By contrast, Plaintiffs must adopt New York's loaded hateful-conduct terminology in the course of disclosing whether or not they will moderate the speech disfavored by New York.

This Court has addressed and rejected compelled-speech requirements ostensibly designed to serve a State's policy goals. In *New Hope*, this Court reversed the district court's dismissal of a compelled-speech claim. At issue was a regulation that required adoption agencies to acknowledge that same-sex or unmarried couples were fully capable of serving the best interests of adopted children, contrary to the plaintiff's Christian views. 966 F.3d at 171. The Court rejected claims that the required speech was really the government's own speech (not that of the adoption agency) and thus exempt from First Amendment constraints. It warned that "'[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints.'" *Id.* (quoting *Matal*, 582 U.S. at 235).

Moreover, the Supreme Court has emphasized that *Zauderer* cannot be used to "compel affirmance of a belief with which the speaker disagrees[.]" *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). To compel speech in the manner demanded by New York, however, is to affirm a (not

merely factual) social norm that "hateful conduct" is unworthy of protection, in conflict with Plaintiffs' right to refrain from speaking.

**B.    The Policy-Disclosure Requirement Compels Speech on Controversial Matters**

Second, even if the policy-disclosure requirement could qualify as a statement of fact, its subject matter consists of "anything but an 'uncontroversial' topic." *NIFLA*, 138 S. Ct. at 2372. Even before the Supreme Court's *NIFLA* decision, this Court held that *Zauderer*'s definition of "uncontroversial" was narrow, contrasting controversial disclosures with those which are "'brief, bland, and non-pejorative[.]'" *Evergreen*, 740 F.3d at 250 (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1232 (4th Cir. 1989)). New York's policy-disclosure requirement cannot plausibly be deemed "bland" or "non-pejorative."

New York's asserted "interest in preventing speech expressing ideas that offend … strikes at the heart of the First Amendment," whose "proudest boast … is that we protect the freedom to express 'the thought that we hate.'" *Matal*, 582 U.S. at 246 (quoting *Schwimmer*, 279 U.S. at 655). The rationale underlying New York's law cannot be squared with that boast. Attorney General James blamed "racist hate speech" on social media platform 4chan as the cause of the devastating Buffalo shooting. JA74. Specifically, she condemned 4chan for its "refusal to moderate … racist hate speech and radicalization." *Id.* The Attorney General believes only "changes to the law"—through abridgment of First Amendment

8

rights—will cause social media sites to "take meaningful action to prevent the proliferation of this kind of content[.]" *Id.*

When the Supreme Court addressed this issue in *NIFLA*, it reached the same conclusion as this Court in *Evergreen*. *NIFLA* involved a California law similar to the one in *Evergreen*; it required pro-life pregnancy centers "to disseminate a government-drafted notice" stating that California offers contraception and abortion services. *NIFLA*, 138 S. Ct. at 2369. Petitioner wrongly insists *NIFLA* is distinguishable because the policy at issue was of that of the State, and not the plaintiff's "own chosen policy." Br. and Special App'x for Appellant at 55, *Volokh v. James*, No. 23-356 (2d Cir. June 20, 2023), Doc. 25 ("Appellant's Br.").

New York's efforts to distinguish *NIFLA* are unavailing. *NIFLA* said that *Zauderer* was inapplicable because, among other things, California's compelled-speech requirement did not simply require the plaintiffs to disclose the terms of their services; indeed, the requirement "in no way relate[d] to the services that [the plaintiffs] provide." *NIFLA*, 138 S. Ct. at 2372. The absence of a relationship between the compelled speech and the plaintiffs' services was by itself *sufficient* for a finding that *Zauderer* was inapplicable, but *NIFLA* never suggested that it was *necessary* for such a finding. The Court deemed *Zauderer* inapplicable for the *additional* reason that the compelled speech focused on abortion—"anything but an

9

'uncontroversial' topic." *Id*. The topic of speech required by New York is likewise controversial.

Additionally, although Plaintiffs are permitted to establish their own moderation policies, they have no choice but to express the State's belief that such speech is qualitatively different—through the required use of the State's terms (*i.e.*, "vilif[ying]," "humiliat[ing]," and "hateful"). Thus, like the California law in *NIFLA*, the New York law requires Plaintiffs to express particular views unrelated to the terms of the service they offer to their readers. Moreover, because "hate speech" is not a "bland" subject, Plaintiffs are forced to wade into contentious waters by using New York's "pejorative" terms. *Evergreen*, 740 F.3d at 250 (quoting *Telco*, 885 F.2d at 1232).

Indeed, if this matter were not controversial, then it is unclear how New York's compelled speech requirement would lead to "'an informed choice regarding whether to use the platform.'" Appellant's Br. at 61 (quoting *NetChoice*, 49 F.4th at 485). The necessary implication of New York's requirement is that a less-moderated website would be unwelcoming and undeserving of minority users, while a website that restricts speech might foster a safe community. Coerced speech based on that rationale can only be characterized as "controversial" in character.

## II. INTERMEDIATE SCRUTINY IS INAPPROPRIATE

New York briefly argues that the Court should apply intermediate scrutiny to its speech restrictions, under the commercial speech doctrine. This alternative fails on several grounds. First, the limited nature of the doctrine—when combined with Plaintiffs' status as publishers—counsels in favor of strict scrutiny. Second, even if the speech at issue here could qualify as commercial speech, New York law must receive, at a minimum, "heightened scrutiny" on account of its content-based and viewpoint-based nature. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).

### A. The Speech at Issue Is Not Commercial

Full First Amendment protections are inapplicable only to "well-defined and narrowly limited classes of speech." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942). While some categories fall wholly outside First Amendment protection, commercial speech remains protected. This category is defined as speech that "[does no] more than simply propose a commercial transaction." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 760 (1976) (quotation omitted); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–63 (1980).

It is highly doubtful whether compelled corporate disclosures implicitly or expressly promoting state orthodoxy are *ever* properly subjected to relaxed First Amendment scrutiny. In *Evergreen*, this Court only assumed *arguendo* that the disclosures at issue—including New York's message that pregnant women should

11

visit *licensed* providers, including abortion providers—was commercial speech. 740 F.3d at 245 n.6. The Court ultimately concluded that it made no difference what level of review it applied to the compelled speech—strict scrutiny or the somewhat less exacting review sometimes applied to commercial speech—because New York's compelled speech requirement could survive neither level of scrutiny. *Id*. at 245. *NIFLA* likewise *assumed arguendo* that California's promotion of abortion services entailed commercial speech because it concluded that California's compelled speech violated the First Amendment even when subjected to the somewhat less exacting scrutiny sometimes applied to commercial speech. 138 S. Ct. at 2375.

As an initial matter, Plaintiffs' compelled speech is not uttered in connection with a commercial transaction. The New York law requires Plaintiffs to explain what they mean when they refer to "hateful conduct" that "vilifies" or "humiliates" certain individuals and to state whether they will remove speech satisfying those definitions. Because the Plaintiffs are required to focus on the state's orthodoxy and use the State's terminology, this compelled speech clearly accomplishes *something* "more than simply propos[ing] a commercial transaction." *Va. State Bd.*, 425 U.S. at 760 (quotation omitted).

Consider, too, the interests at play here. New York's interest (as it regards the reporting mechanism) is to "reduce[] … extremist content on social media networks[,]" and not merely to create commercial standards for advertisements.

Appellant's Br. at 62. And, unlike the typical commercial speech case, Plaintiffs' interests are not "purely economic," but include preserving a free-speech environment. *Va. State Bd.*, 425 U.S. at 762.

The speech in question cannot properly be characterized as commercial for a second reason: the nature of social media companies. Today, social media sites serve a role that was once held by traditional publishers and newspapers. Speech on innumerable topics—and on all points of the political spectrum—can be found in these modern forums. Case law has never supported the notion that newspapers and other media outlets are subject to the same scrutiny applied to vendors hawking their wares. Briefly presented with this proposition, the Supreme Court flatly rejected it in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

In *Sullivan*, Alabama officials insisted the commercial nature of an allegedly defamatory advertisement hosted by the *New York Times* precluded First Amendment protection. 376 U.S. at 265–66. However, the Court drew a line between "purely commercial advertising" and non-commercial speech produced in commercial form. *Id.* The advertisement at issue in *Sullivan* "communicated information, expressed opinion, recited grievances, [and] protested claimed abuses[.]" *Id.* at 266. It thus received full First Amendment protection.

That money exchanged hands for the advertisement's publication was "as immaterial in this connection as is the fact that newspapers and books are sold." *Id.*

13

Having distinguished publishers from merchandise mongers, the Court proceeded to apply full First Amendment protections to the newspaper's advertisement. The judiciary has declined to treat publishers and newspapers as subject to the commercial speech doctrine's level of First Amendment protection. Even when confronted with concerns over media conglomeration and newspapers' monopoly of speech in their home cities, the Supreme Court forcefully rejected reducing the news media's First Amendment protections. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 250–54 (1974).

New York provides no justification for expanding the commercial speech doctrine in this case. There is no "free-floating test for First Amendment coverage[.]" *United States v. Stevens*, 559 U.S. 460, 470 (2010). There are only a limited number of speech categories that have been "historically unprotected," and States are not free to "create new categories of unprotected speech" or to "shoehorn" new categories into old ones. *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 792–93 (2011). Because the New York law applies to speech that has historically been deemed non-commercial, strict scrutiny applies.

### B. Even If the Speech Were Commercial, New York's Speech Restrictions Would Still Be Subject to Heightened Scrutiny

Even if the New York law were a regulation of commercial speech, intermediate scrutiny would not apply. Because the law is content- and viewpoint-based, "heightened scrutiny" at a minimum is required, if not outright strict scrutiny.

14

*Sorrell*, 564 U.S. at 566. In *Sorrell*, the Supreme Court struck down a Vermont law that restricted the sale, disclosure, and use of "prescriber-identifying information" for purposes of "marketing," but not for other purposes, like education. *Id.* at 558–61. The Court found that the law was both content- and speaker-based: content-based, because it only applied to sales to those who wished to use the information for marketing; and speaker-based, because "the statute disfavor[ed] specific speakers, namely pharmaceutical manufacturers." *Id.* at 563–64. Before analyzing the statute under "heightened scrutiny," the Court indicated that "the outcome is the same" under that method or strict scrutiny—such content-based speech restrictions are a "dispositive" indicator of unconstitutionality, regardless of whether the speech is deemed commercial. *Id.* at 571.

The New York law here is similarly both content and viewpoint-based. Compliance with the law does not turn on, say, publishing a moderation policy, but *specifically* a moderation policy "at least as inclusive" as New York's—addressing at minimum all ten protected categories, from race to sexual orientation. JA345. The statute is likewise viewpoint-based because it does not cover speech which attacks those who denigrate contemporary gender identity, or are racist, sexist, or in opposition to certain religions. *R.A.V. v. City of Saint Paul*, 505 U.S. 377, 391–92 (1992) ("One could hold up a sign saying … that all 'anti-Catholic bigots' are

15

misbegotten; but not that all 'papists' are, for that would insult and provoke violence 'on the basis of religion.'").

Accordingly, "heightened scrutiny" applies at a minimum. First, consider New York's purported interest in mandating speech: "providing social media users with accurate information about networks' policies regarding users' reports of hateful conduct" and "facilitating such reports to help reduce instances of hate-fueled mass shootings and other violence." Appellant's Br. at 59. But once it is apparent discrimination is afoot, the state must counter with a showing "that the law does not seek to suppress a disfavored message." *Sorrell*, 564 U.S. at 572.

New York's interest in "facilitating" "user's reports of hateful conduct" flatly admits to what *Sorrell* prohibits. Appellant's Br. at 59. A law encouraging private actors to suppress speech is no less incompatible with the First Amendment than an outright ban. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (letter advising plaintiff his books were obscene without threatening prosecution established First Amendment claim). However significant New York's interest in stopping mass shootings, it nonetheless lacks any legitimate interest in suppressing the freedom of speech just because it deems certain viewpoints conducive to future criminal acts.

New York's other interest—to "provid[e] social media users with accurate information" about Plaintiffs' "hateful conduct" policies—does not withstand *Sorrell*'s close review. Appellant's Br. at 59. What distinguishes *Sorrell* analysis

16

from intermediate scrutiny is a focus on whether the State's interest is compatible with its statute's content- and viewpoint-based discrimination. *See* 564 U.S. at 574 (the law offers privacy "only on terms favorable to the speech the State prefers" and addresses doctor-patient relationships only with reference to some speech).

Here, New York says it wishes internet users to have "accurate information" regarding user reports of hateful conduct. Appellant's Br. at 59. Why, one must ask, does New York not care if a website refuses to disclose its moderation of politics? More importantly, why does New York not care if, instead of vilifying on the basis of gender expression, users dox, harass, or post misinformation about others who express traditional views on gender? Or they vilify those defending the Catholic Church's handling of sex abuse allegations (*i.e.*, not vilification of religion, but vilification on the basis of defending religion)? New York does not require Plaintiffs to provide "accurate information" about dissemination of such speech, even though such speech can be just as vile and harassing as speech to which the New York law is currently directed.

The answer is obvious: New York is far less interested in ensuring dissemination of accurate information about all forms of hateful speech than it is in "suppress[ing] a disfavored message." *Sorrell*, 564 U.S. at 572. Speech suppression is antithetical to First Amendment norms, regardless of whether it is suppressed directly or (as here) by indirect means. *Bantam Books*, 372 U.S. at 67.

## CONCLUSION

This Court should affirm the judgment below.

Respectfully submitted,

/s/ *Kaitlyn D. Schiraldi*
Kaitlyn D. Schiraldi
Richard Samp
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
kaitlyn.schiraldi@ncla.legal

18

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2023, I electronically filed this *amicus curiae* brief with the Clerk of this Court using the CM/ECF system, which will send notice of such filing to all counsel of record.

September 26, 2023

/s/ *Kaitlyn D. Schiraldi*
Kaitlyn D. Schiraldi
*Counsel for Amicus Curiae*
NEW CIVIL LIBERTIES ALLIANCE

19

**CERTIFICATE OF COMPLIANCE**

I certify that this *amicus curiae* brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B)(i) and 29(a)(5), as well as Local Rules 29.1(c) and 32.1(a)(4) because this brief contains 3,974 words, excluding those portions of the brief exempted by Rule 32(f). Per the local rules in this Circuit, the limit for *amicus curiae* briefs is 7,000 words.

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

September 26, 2023

/s/ *Kaitlyn D. Schiraldi*
Kaitlyn D. Schiraldi
*Counsel for Amicus Curiae*
NEW CIVIL LIBERTIES ALLIANCE

20