# 23-356

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

EUGENE VOLOKH, LOCALS TECHNOLOGY INC., RUMBLE CANADA INC.,
*Plaintiffs-Appellees*,

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,
*Defendant-Appellant*.

On Appeal from the United States District Court for the Southern
District of New York, Case No. 1:22-cv-10195

## BRIEF OF BABYLON BEE AS AMICUS CURIAE IN SUPPORT
## OF APPELLEES AND FOR AFFIRMANCE

JAMES A. CAMPBELL
JONATHAN A. SCRUGGS
BRYAN D. NEIHART
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jcampbell@adflegal.org
jscruggs@adflegal.org
bneihart@adflegal.org

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@adflegal.org

JEREMY TEDESCO
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jtedesco@adflegal.org

*Counsel for Amicus Curiae*

## DISCLOSURE STATEMENT

The Babylon Bee, LLC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Disclosure Statement ................................................................. i

Table of Authorities................................................................. iii

Identity and Interest of Amicus Curiae....................................1

Summary of Argument................................................................2

Argument....................................................................................4

I.   The Reporting Mechanism censors online speech based on its
     content and viewpoint. ........................................................4

     A.   The Reporting Mechanism chills online speech. ...................5

     B.   The Reporting Mechanism applies based on the content
          and viewpoint of the speech it chills..................................14

II.  The Disclosure Requirement compels speech by forcing
     social-media networks to adopt, publish, and endorse New
     York's definition of "hateful conduct." ...........................17

III. The Online Hate Speech Law is facially overbroad and even
     bans satire. ......................................................................20

Conclusion .................................................................................26

Certificate of Service ...............................................................27

Certificate of Compliance ........................................................28

# TABLE OF AUTHORITIES

## <u>Cases</u>

*303 Creative LLC v. Elenis,*
 143 S. Ct. 2298 (2023) ...................................................... 13, 14, 19

*Bantam Books, Inc. v. Sullivan,*
 372 U.S. 58 (1963) .......................................................................... 11

*Bery v. City of New York,*
 97 F.3d 689 (2d Cir. 1996) .............................................................. 5

*Broaderick v. Oklahoma,*
 413 U.S. 601 (1973) ........................................................................ 22

*Chaplinsky v. State of New Hampshire,*
 315 U.S. 568 (1942) .......................................................................... 6

*Craig v. Boren,*
 429 U.S. 190 (1976) ........................................................................ 13

*Entertainment Software Association v. Blagojevich,*
 469 F.3d 641 (7th Cir. 2006) ........................................................ 20

*Evergreen Association, Inc. v. City of New York,*
 740 F.3d 233 (2d Cir. 2014) .................................................... 19, 20

*Falwell v. Flynt,*
 805 F.2d 484 (4th Cir. 1986) ........................................................ 23

*Farah v. Esquire Magazine,*
 736 F.3d 528 (D.C. Cir. 2013) ...................................................... 22

*Hustler Magazine, Inc. v. Falwell,*
 485 U.S. 46 (1988) .......................................................................... 24

*Iancu v. Brunetti,*
 139 S. Ct. 2294 (2019) ............................................................. 6, 15

*Janus v. American Federation of State, County & Municipal Employees, Council 31*,
138 S. Ct. 2448 (2018) .................................................................. 16

*Kaahumanu v. Hawaii*,
682 F.3d 789 (9th Cir. 2012) ...................................................... 13

*Lamont v. Postmaster General of United States*,
381 U.S. 301 (1965) .............................................................. 11, 12

*Pacific Gas & Electric Company v. Public Utilities Commission of California*,
475 U.S. 1 (1986) ....................................................................... 19

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ....................................................................... 5

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) .................................................................... 16

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ................................................................. 4, 14

*Restaurant Law Center v. City of New York*,
360 F. Supp. 3d 192 (S.D.N.Y. 2019) ..................................... 13, 14

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
547 U.S. 47 (2006) ...................................................................... 13

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ................................................... 12

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) ...................................................... 12

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) ...................................................... 12

*United States v. Stevens*,
559 U.S. 460 (2010) ...................................................................... 5

*United States v. Williams*,
    553 U.S. 285 (2008) .................................................................. 20

*Wooley v. Maynard*,
    430 U.S. 705 (1977) .................................................................. 19

*Yorty v. Chandler*,
    13 Cal. App. 3d 467 (1970) ....................................................... 23

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of
    Ohio*,
    471 U.S. 626 (1985) .................................................................. 20

## Statutes

N.Y. Gen. Bus. Law § 394-ccc ....................................................... passim

## Other Authorities

*9 Reasons Not To Worry About The Tanking Economy*, Babylon
    Bee, Sept. 26, 2022 .................................................................... 24

Ariel Zilber, *Twitter suspends Babylon Bee for naming Rachel
    Levine 'Man of the Year'*, N.Y. Post, Mar. 21, 2022 ...................... 10

Benjamin Franklin, *Apology For Printers, 10 June 1731*, Founders
    Online, Nat'l Archives ................................................................ 22

Chelsey Cox, *Fact check: Satirical claim that the 9th Circuit Court
    of Appeals overturned Ginsburg's death*, USA Today, Sept.
    27, 2020 ....................................................................................... 8

*China slams Canada over Hong Kong, Ottawa protests*, India
    Blooms, Feb. 23, 2022 ................................................................ 24

*CNN Purchases Industrial-Sized Washing Machine To Spin News
    Before Publication*, Babylon Bee, Mar. 1, 2018 .............................. 7

Dan Evon, *Did U.S. Rep. Ocasio-Cortez Repeatedly Guess 'Free' on
    TV Show 'The Price is Right?'*, Snopes, Apr. 15, 2019 .................... 8

David Mikkelson, *Did CNN Purchase an Industrial-Sized Washing Machine to Spin News?*, Snopes, Mar. 1, 2018 ................ 8

Editorial Board, *The Stanford Guide to Acceptable Words*, Wall St. J., Dec. 19, 2022 ................................................................................. 1

Eugene Volokh, Volokh Conspiracy, *How Are Thing? Better. Better Than Tomorrow, Of Court–Worse Than Yesterday*, Reason, June 18, 2020 ............................................................................... 21

*Fast-Food Meal Costs Family $100 After They Idle In Drive-Thru For Ten Minutes*, Babylon Bee, Mar. 15, 2022 ............................ 15

G.K. Chesterson, Quotable Quote, Goodreads ....................................... 23

Gilbert Highet, *The Anatomy of Satire* (1962) .................................... 2, 22

John Vanbrugh, *The Provok'd Wife. A Comedy, Prologue*, The Project Gutenberg Ebook of Plays, vol. 1 (2016) ........................... 2

Joseph A. Wulfsohn, *Facebook apologizes for removing Babylon Bee satire mocking Sen. Hirono, says it was a 'mistake'*, Fox News, Oct. 22, 2020 ....................................................................... 9

Kassy Dillon, *When satire becomes reality: Nearly 100 Babylon Bee joke stories have come true*, Fox News, Mar. 26, 2023 .................. 24

Michelle Singletary, *7 ways a recession could be good for you financially*, Wash. Post, Sept. 29, 2022 ....................................... 24

Nikolas Lanum, *Babylon Bee skit mocks Twitter employees as sensitive, gets flagged by Twitter for 'sensitive content'*, Fox News, Apr. 28, 2022 ..................................................................... 24

*Ninth Circuit Overturns Death Of Ruth Bader Ginsburg*, Babylon Bee, Sept. 21, 2020 ................................................................... 7

*Ocasio-Cortez Appears On 'The Price Is Right,' Guesses Everything Is Free*, Babylon Bee, Apr. 12, 2019 ................................... 7

*Residents Become Chief Export Of California*, Babylon Bee, Aug. 30, 2022 ...................................................................................... 15

*Senator Hirono Demands ACB Be Weighed Against A Duck To See If She Is A Witch*, Babylon Bee, Oct. 14, 2020 ................................. 9

Suzette Hackney, *Women of the Year*, USA Today, Mar. 15, 2022 .......... 9

*The Babylon Bee's Man Of The Year Is Rachel Levine*, Babylon Bee, Mar. 15, 2022 ............................................................................. 9

*Xi Jinping Criticizes Trudeau's Heavy-Handed Approach*, Babylon Bee, Feb. 15, 2022 ....................................................................... 24

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

*The Babylon Bee* is a news satire site, similar in tone, style, and purpose to other fake news sites you may have heard of, such as *The Onion* or *CNN*. With tens of readers and nearly three jokes, our reach and cultural influence have been described as "not entirely insignificant."

Unfortunately, the world's absurdity has made our job more difficult—we have to think up fictional stories that are more outlandish than what happens in real life. Effective satire caricatures reality to make a point, but that becomes challenging when reality itself has become a caricature. Even worse, it becomes increasingly difficult for our readers to discern what's real and what's not. The *Wall Street Journal*'s editorial board sympathizes with us. "Parodists have it rough these days," the board wrote, "since so much of modern life and culture resembles the Babylon Bee."[2]

Adding to our troubles, *The Bee* is a frequent target of online censorship and attacks by humorless scolds, Big Tech, and prestigious media outlets. New York's Online Hate Speech Law increases that

---

[1] No counsel for a party authored this brief in whole or in part. No one other than *amicus curiae* and its counsel made any monetary contribution to fund the preparation or submission of this brief. All parties have consented in writing to the filing of this brief.

[2] *See* Editorial Board, *The Stanford Guide to Acceptable Words*, Wall St. J., Dec. 19, 2022, https://perma.cc/3RC7-2BXB.

censorship. As lovers of free speech and humor, *The Bee* has a substantial interest in the outcome here.

## SUMMARY OF ARGUMENT

Satire has a long and venerable history, dating back to Ancient Rome. Since its early beginnings, satire has sought to "tell[] the truth with a laugh" to criticize or ridicule ideas to bring about social improvement.[3] As one playwright put it centuries ago,

> *'Tis th' Intent and Business of the Stage,*
> *To copy out the Follies of the Age,*
> *To hold to every Man a faithful Glass,*
> *And shew him of what Species he's an A\*\*.*[4]

Sometimes people take offense at satire or misunderstand its intent. Today, that offense and misunderstanding typically happen on social media. New York's Online Hate Speech Law now encourages offended social-media users to report their exasperation to social-media networks who then must adopt a policy for removing so-called offensive speech. The law regulates speech through two provisions: the Reporting Mechanism and the Disclosure Requirement. The Reporting Mechanism silences expression, while the Disclosure Requirement compels speech.

The Reporting Mechanism requires social-media networks to create a reporting system where people can complain to the networks

---

[3] Gilbert Highet, *The Anatomy of Satire* 235 (1962).

[4] John Vanbrugh, *The Provok'd Wife. A Comedy, Prologue*, The Project Gutenberg Ebook of Plays, vol. 1 (2016), https://perma.cc/AH7Z-HE7K.

about other users' allegedly offensive speech. N.Y. Gen. Bus. Law § 394-ccc(2). But New York only requires this reporting process for speech offensive to it, which the State mislabels as "hateful conduct." *Id.* at § 394-ccc(1)(a).

The Disclosure Requirement forces social-media networks to adopt and then publish on their "website and application" a policy about how they will address "hateful conduct." *Id.* at § 394-ccc(3). But social-media networks don't define "hateful conduct." New York does. *Id.* at § 394-ccc(1)(a). This requirement then compels social-media networks to accept New York's definition of "hateful conduct" even if they disagree with it, post that definition on their own websites even if they don't want to, and explain how they respond to "hateful conduct" complaints even if they have no response.

This doesn't sit well with *The Bee*. *The Bee* regularly posts its satire on social-media networks like X, Facebook, and Instagram as a social-media user. The Reporting Mechanism threatens *The Bee*'s speech on these networks by requiring the networks to create a process for accepting and evaluating complaints about *The Bee*'s speech. *The Bee* also allows others to comment on its own website. And there, the Disclosure Requirement affects *The Bee*'s speech too. The district court's opinion should therefore be affirmed for three reasons.

*First*, the Reporting Mechanism chills speech by promoting censorship of expression by social-media users. Speakers with less

3

fortitude than *The Bee* will refrain from posting about controversial topics when they know they will be reported for it. And no matter *The Bee*'s fortitude, social-media networks can turn around and remove its content based on reports the New York law facilitates.

*Second*, the Disclosure Requirement forces social-media networks to adopt and publish New York's "hateful conduct" definition. There's a cruel irony—and probably a good joke somewhere—about forcing a renowned First Amendment law professor and the other pro-free speech Plaintiffs here to publish, promote, and adopt an anti-free speech policy.

*Finally*, the Online Hate Speech Law is facially overbroad because it regulates almost nothing but constitutionally protected speech. *The Bee*'s real concern is that the law's overbreadth makes online satire— and therefore its job—impossible. And *The Bee*'s staff do like their jobs. That's reason enough to strike the Online Hate Speech Law.

## ARGUMENT

## I.   The Reporting Mechanism censors online speech based on its content and viewpoint.

The Online Hate Speech Law's Reporting Mechanism (A) censors speech, not conduct, and (B) does so based on content and viewpoint. Such censorship requires strict-scrutiny review. *E.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015). New York conceded its law fails that standard. J.A. 313–14.

4

**A.    The Reporting Mechanism chills online speech.**

*The Bee* shares its content on social-media networks. But the Reporting Mechanism encourages other users to flag its content, which in turn motivates social-media networks to remove that content. That process chills *The Bee*'s speech and that of other social-media users.

The Reporting Mechanism requires "social media network[s]" to "provide" a "mechanism for individual users to report incidents of hateful conduct." N.Y. Gen. Bus. Law § 394-ccc(2). "Hateful conduct" means posts that "vilify, humiliate, or incite violence" against certain persons or classes of persons. *Id.* at § 394-ccc(1)(a). New York's legislature explained that the law takes aim at "hate speech." J.A. 268. That explanation tips New York's hand.

Online posts involve speech—social-media users' comments, statements, and opinions. *See Packingham v. North Carolina*, 582 U.S. 98, 104–05 (2017). That speech communicates the same "as any book, treatise, pamphlet or other writing." *Bery v. City of New York*, 97 F.3d 689, 695 (2d Cir. 1996). Through that expression, social-media users' posts "communicate some idea or concept to those who view it." *Id.* at 696. That entitles them to First Amendment protection. *Id.*

True, not all speech is protected. But that's the infrequent exception, not the general rule. *See United States v. Stevens*, 559 U.S. 460, 468–69 (2010). New York's law makes the exception the rule by

censoring speech well beyond the "historic and traditional categories" of permissible speech restrictions. *Id.* (cleaned up).

The law regulates speech that "vilif[ies]" or "humiliate[s]." N.Y. Gen. Bus. Law § 394-ccc(1)(a). But that kind of expression has always received First Amendment protection. *E.g.*, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2297, 2299–302 (2019) (protecting "immoral or scandalous" speech).

New York's "incite violence" prohibition falls short too. It lacks a temporal element necessary to ensure that it regulates *only* fighting words. *Cf. Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942) (laws may prohibit speech inciting "an immediate breach of the peace"). In short, the Reporting Mechanism authorizes and encourages users to report other users' *protected* speech to social-media networks.

These tattle-tale requirements chill reasonable people's speech by discouraging them from making comments that might arguably fit within a reportable category of speech. The marketplace for ideas and debate becomes a sea of suspicion and retaliatory reports.

*The Bee* has been subjected to similar reporting requirements. While *The Bee* continues to post content, it comes at a considerable cost.

For example, in 2019 and 2020, *The Bee* posted the following three
articles with clearly satirical headlines.[5]







*The Bee* wrote these articles to joke about media bias, political ideology,
and angst over the legal consequences of Justice Ginsburg's passing.

---

[5] *CNN Purchases Industrial-Sized Washing Machine To Spin News
Before Publication*, Babylon Bee, Mar. 1, 2018, https://perma.cc/G4EK-
F9VS; *Ocasio-Cortez Appears On 'The Price Is Right,' Guesses
Everything Is Free*, Babylon Bee, Apr. 12, 2019, https://perma.cc/3MXW-
J6Q6; and *Ninth Circuit Overturns Death Of Ruth Bader Ginsburg*,
Babylon Bee, Sept. 21, 2020, https://perma.cc/9TBH-6HUX.

But some thought the jokes were real, and fact-checked them. With the alleged purpose of preventing "misinformation," a website called Snopes and USA Today reviewed these articles for accuracy. Snopes concluded the CNN bit was satire after all, and that U.S. Congresswoman Alexandria Ocasio-Cortez didn't actually appear on the Price is Right.[6] And, after consulting 15 different sources, USA Today confirmed that courts lack the power to revive the dead.[7]

Going a step farther, Facebook demonetized *The Bee* for posting a story with this headline.[8]



---

[6] David Mikkelson, *Did CNN Purchase an Industrial-Sized Washing Machine to Spin News?*, Snopes, Mar. 1, 2018, https://www.snopes.com/fact-check/cnn-washing-machine/; Dan Evon, *Did U.S. Rep. Ocasio-Cortez Repeatedly Guess 'Free' on TV Show 'The Price is Right?'*, Snopes, Apr. 15, 2019, https://perma.cc/NM62-NXSS.

[7] Chelsey Cox, *Fact check: Satirical claim that the 9th Circuit Court of Appeals overturned Ginsburg's death*, USA Today, Sept. 27, 2020, https://perma.cc/93Y9-PZZY.

[8] *Senator Hirono Demands ACB Be Weighed Against A Duck To See If*

The headline combined allusions to the intense grilling Justice Barret faced from Hawaii's Senator and to a well-known line from the British comedic film *Monty Python and the Holy Grail*. Facebook punished *The Bee* for allegedly "inciting violence." Eventually, because of *The Bee*'s efforts, Facebook admitted its mistake, apologized, and restored *The Bee*'s article and ability to monetize.[9]

Last but not least, in 2022, USA Today named Rachel Levine, a male who identifies as a female and serves as a high-ranking official in the U.S. Department of Health and Human Services, as one of its "Women of the Year."[10] *The Bee* responded on the platform formerly known as Twitter with the following headline.[11]

---

*She Is A Witch*, Babylon Bee, Oct. 14, 2020, https://perma.cc/4UYY-7UAZ.

[9] Joseph A. Wulfsohn, *Facebook apologizes for removing Babylon Bee satire mocking Sen. Hirono, says it was a 'mistake'*, Fox News, Oct. 22, 2020, https://perma.cc/774E-QQFL.

[10] Suzette Hackney, *Women of the Year*, USA Today, Mar. 15, 2022, https://perma.cc/KYC8-34T8.

[11] *The Babylon Bee's Man Of The Year Is Rachel Levine*, Babylon Bee, Mar. 15, 2022, https://perma.cc/D9B4-3AGF.



For that, Twitter locked *The Bee*'s account under its "hateful conduct" policy unless *The Bee* acknowledged it violated the policy.[12] (*The Bee* politely declined). *The Bee*'s account was only restored after Twitter changed ownership.

These formal and informal instances of censorship would chill reasonable people from engaging in similar speech. And that's the Reporting Mechanism's intended effect. It incentivizes users to report speech they dislike, chilling other users from saying anything that might arguably fit the statutory definition of "hateful conduct" to avoid repercussions.

And the Reporting Mechanism has that effect even though New York claims that social-media networks need not respond to the complaints. *E.g.*, N.Y. Br. 8. The Reporting Mechanism infuses an aura

---

[12] Ariel Zilber, *Twitter suspends Babylon Bee for naming Rachel Levine 'Man of the Year'*, N.Y. Post, Mar. 21, 2022, https://perma.cc/L2JT-KYTU.

of censorship into the user experience and dampens debate, humor, and stupid jokes alike through the threat of removal.

The Reporting Mechanism's "informal censorship" restricts speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963). In *Bantam Books*, for example, a state Commission could not enforce the state's obscenity laws. *Id.* at 66–67. Without that authority, the Commission still sent official-looking and official-sounding letters to book distributors advising them that it was illegal to circulate certain content the Commission deemed objectionable. *Id.* at 61. And even though the Commission could not prosecute distributors, the warning letters acted as "informal sanctions" that were daunting enough to chill the distributor's speech, a result the Supreme Court held violated the distributors' freedom of speech. *Id.* at 67–72.

Two years later, the Court applied this logic again in *Lamont v. Postmaster General of United States*, 381 U.S. 301 (1965). There, the Postal Service implemented a statute that required recipients of foreign mail containing "communist political propaganda" to write a letter specifically requesting that the mail be delivered. *Id.* at 303. There, too, no official prosecution stemmed from requesting the "communist political propaganda" mail. *Id.* at 306–07. But the "affirmative obligation" to request mail condemned as "communist political propaganda" was "almost certain to have a deterrent effect" on requesting the mail. *Id.* As the Supreme Court held, that deterrence

11

restricted the recipients' First Amendment freedoms by "control[ling] the flow of ideas to the public." *Id.* at 306.

And in three recent cases, appellate courts have condemned similar policies that prohibited verbal harassment, incivility, and other forms of expression on university campuses. In those cases, university teams could receive complaints alleging policy violations. But those teams couldn't prosecute the complaints. They only had the power to refer the complaints to others for prosecution. Even so, the informal referral process objectively chilled speech because students would reasonably seek to avoid punishment by steering clear of even arguably prohibited expression. *E.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1122 (11th Cir. 2022) ("[A] government actor can objectively chill speech—through its implementation of a policy—even without formally sanctioning it."); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 333, 338 (5th Cir. 2020) (recognizing that the risk of prosecutorial referrals objectively chills speech); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (Even though the "Response Team lacks any formal disciplinary power … [it] acts by way of implicit threat of punishment and intimidation to quell speech.").

New York claims that Professor Volokh's, Rumble's, and Locals' First Amendment arguments cannot depend on how its law "regulate[s] the speech of social media *users*." N.Y. Br. 59. But that's not quite right. Vendors—like social-media networks—can vindicate the rights of their

12

customers—like social-media users. *E.g.*, *Craig v. Boren*, 429 U.S. 190, 192–97 (1976) (alcohol vendor had standing to challenge a sex-based restriction on beer sales on behalf of customers); *Kaahumanu v. Hawaii*, 682 F.3d 789, 797 (9th Cir. 2012) (wedding planner had standing to challenge permitting regulations on behalf of those seeking to marry).

In defense of the Reporting Mechanism, New York says the law merely regulates conduct, not speech. N.Y. Br. 25–32. But that cannot be squared with the fact that the Reporting Mechanism covers online expression, re-defined as "hateful conduct." N.Y. Gen. Bus. Law § 394-ccc(1)(a). As explained above and below, the First Amendment protects most of the expression this law regulates. Because speech itself triggers the Reporting Mechanism in most applications, there is no "conduct" that regulating "speech is incidental to." N.Y. Br. 30.

New York relies on *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* (*FAIR*), 547 U.S. 47 (2006), and *Restaurant Law Center v. City of New York*, 360 F. Supp. 3d 192 (S.D.N.Y. 2019). But neither case involved a law that regulated speech like New York's law does. The Solomon Amendment in *FAIR* managed campus access to military recruiters. 547 U.S. at 55, 58–59. The Supreme Court held that "the schools are not speaking when they host interviews and recruiting receptions." *Id.* at 64; *see also 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2317–318 (2023) (distinguishing *FAIR* and conduct regulations from laws that directly affect speech). And the charitable deduction law

13

in *Restaurant Law Center* set out how employers would administer employee's charitable donations. 360 F. Supp. 3d at 201. Again, the court held that the law didn't affect the employers' speech because the "mere act of sending a check" cut from an employee's earnings to that "employee's designated non-profit recipient is not speech." *Id.* at 212.

Empty rooms and the act of processing monetary transactions aren't speech. Posting ideas, opinions, and viewpoints online is. *Cf. 303 Creative LLC*, 143 S. Ct. at 2316 (rejecting arguments that law regulating a website designer's custom wedding websites only incidentally burdened her speech and only regulated her conduct). By regulating that expression, the Reporting Mechanism unconstitutionally chills speech.

## B. The Reporting Mechanism applies based on the content and viewpoint of the speech it chills.

The Online Hate Speech Law's Reporting Mechanism also regulates speech based on content and viewpoint. That makes the law "presumptively unconstitutional." *Reed*, 576 U.S. at 163. New York cannot overcome that presumption.

The Reporting Mechanism is content-based. It "applies to particular speech because of the topic discussed." *Id.* What topics? "[R]ace, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." N.Y. Gen. Bus. Law § 394-ccc(1)(a).

14

The Reporting Mechanism is also viewpoint-based. It regulates "speech based on the ideas or opinion it conveys" about certain content. *Iancu*, 139 S. Ct. at 2299. Posts that New York believes "vilify, humiliate, or incite violence against" certain groups or persons are subject to the reporting mechanism. N.Y. Gen. Bus. Law § 394-ccc(1)(a). Posts that commend or glorify certain groups or persons are not.

Consider these examples from *The Bee*'s archives.[13]



They would not be subject to the Reporting Mechanism because they touch on gas prices and California. They do not mention the prohibited content or a condemned viewpoint.

---

[13] *Fast-Food Meal Costs Family $100 After They Idle In Drive-Thru For Ten Minutes*, Babylon Bee, Mar. 15, 2022, https://perma.cc/L2ZL-48QR; *Residents Become Chief Export Of California*, Babylon Bee, Aug. 30, 2022, https://perma.cc/RRP8-DT69.

On the other hand, this headline about Rachel Levine would be reportable—and was in fact banned under Twitter's former "hateful conduct" policy—because of its content and viewpoint. *Supra* § I.A.



*The Bee*'s intent for the above article was to comment on the "controversial" subject of "gender identity." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018). Some may disagree with *The Bee*'s views and comments on that topic. The freedom to disagree about what it means to be a "woman" is a hallmark of the First Amendment. But the law cannot regulate speech based on content or viewpoint even when that expression "arouses anger, alarm or resentment." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 379, 391 (1992). Doing so removes the freedom to disagree and tilts debate on crucial topics. By subjecting comments like this to censorship, the Reporting Mechanism runs afoul of this basic principle.

16

II.   **The Disclosure Requirement compels speech by forcing social-media networks to adopt, publish, and endorse New York's definition of "hateful conduct."**

The Online Hate Speech Law's Disclosure Requirement also violates the First Amendment by compelling social-media networks to adopt, publish, and endorse New York's definition of "hateful conduct."

The Disclosure Requirement forces social-media networks to "have a clear and concise policy readily available and accessible" that explains how they will "address the reports of incidents of hateful conduct on their platform." N.Y. Gen. Bus. Law § 394-ccc(3). New York says that this requirement doesn't compel speech because many social-media networks already disclose their user content policies. N.Y. Br. 55. But that misses the point.

It's one thing for social-media networks to voluntarily draft their own policies about what to allow on their platforms and then post those policies. But it's altogether different for New York to dictate what the policy must be, define that policy based on content and viewpoint, craft that policy to turn on sensitive topics, require those networks to publish that preferred policy, and penalize non-compliance with $1,000-a-day fines. That's a compelled speech problem.

New York's Disclosure Requirement fits the latter category. New York admits as much. New York says that "[a] network must *disclose* a policy that *includes* whether and how it will respond to reports of *hateful conduct as defined by GBL § 394-ccc*." N.Y. Br. 44 (emphasis

added). In other words, the Disclosure Requirement sets a minimum threshold. Professor Volokh's, Rumble's, and Locals' policies that only request "civil" discourse, ban "racist or antisemitic content," or prohibit content with "sexual activity" fall short of this threshold. J.A. 26, 30, 34. Networks with only these policies must revise them to meet New York's standard or else risk violating the law. *See* S.A. 9–11.

Trying to distance itself from this plain reading, New York also says that the Disclosure Requirement doesn't compel speech because "[n]etworks are required to disclose only their *own* policies regarding user reports of *hateful conduct*, not any message or policy dictated by the State." N.Y. Br. 44 (emphasis added). But New York sets the standard for "hateful conduct" and therefore crafts the message. Because the State requires networks to adopt a particular policy— under the threat of $1,000-a-day fines—it *cannot* be considered the networks' *own* policy when they comply with the State's requirements and post it.

New York concedes more. It admits that the Disclosure Requirement is designed to provide users "with additional information" to "enhance[ ]" the effectiveness of the Reporting Mechanism. N.Y. Br. 33; *see also id.* at 25–27, 32. But what is that "additional information"? The social-media network's policy must include New York's definition of "hateful conduct." By acknowledging that the Disclosure Requirement forces social-media networks to publish a policy containing "additional

18

information" they otherwise would not adopt or publish, New York concedes that the Disclosure Requirement orders the networks to adopt and publish a policy that is not their own.

Indeed, the Disclosure Requirement compels speech in two distinct ways. First, the requirement "mandat[es] the manner in which the discussion of these issues"—i.e., how the networks oversee user content—"begins." *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 249 (2d Cir. 2014). Networks that want to have no policy or a policy that does not include "hateful conduct" cannot do so. Second, the requirement forces networks to carry the government's message about what speech qualifies as "hateful conduct." New York's compelled endorsement is equivalent to the unconstitutional practices of requiring a utility company to stuff third-party content into its billing envelopes or forcing drivers to display objectionable ideological messages on their license plates. *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 17 (1986); *Wooley v. Maynard*, 430 U.S. 705, 714–15 (1977).

That double compulsion is doubly unconstitutional: the First Amendment prohibits the government from "compel[ling] a person to speak [the government's] own preferred message." *303 Creative LLC*, 143 S. Ct. at 2312. Yet the Disclosure Requirement has this exact effect and purpose.

Because the Disclosure Requirement mandates that Professor Volokh, Rumble, and Locals approve and publish policies they otherwise

would not—on a sensitive and debatable topic like "hateful conduct"—cases like *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985) do not apply. *See, e.g.*, *Evergreen Ass'n, Inc.*, 740 F.3d at 245 n.6 (distinguishing *Zauderer* from laws that compel expression of "the City's preferred message" on "controversial services"); *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652–53 (7th Cir. 2006) (similar as to video game labels). New York never asks the Plaintiffs in this case or other social-media networks to disclose purely factual and uncontroversial information about their policies. New York demands that they create new policies to regulate the controversial topic of "hateful conduct" as New York defines that phrase.

That's compelled speech. That triggers strict scrutiny. And New York admits its law fails that demanding test. J.A. 313–14.

## III. The Online Hate Speech Law is facially overbroad and even bans satire.

New York's Online Hate Speech Law is also facially overbroad. Courts resolve overbreadth claims in two steps. First, they "construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008). That makes sense for "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* Second, they determine whether that construction regulates "a substantial amount of protected expressive activity." *Id.* at 297. If it does, the law is overbroad.

Step one. The Online Hate Speech Law requires social-media networks to offer users a way "to report incidents of hateful conduct" and to disclose their "hateful conduct" policy. N.Y. Gen. Bus. Law § 394-ccc(2)–(3). "Hateful conduct" means posts that "vilify, humiliate, or incite violence against" certain groups or classes of persons. *Id.* at § 394-ccc(1)(a).

Step two. As written, the law is overbroad because it *almost exclusively* applies to posts on social-media networks containing protected speech and those networks' policies for dealing with that speech. *Supra* §§ I–II. Praising Richard Dawkin's *The God Delusion* could be said to "vilify" based on "religion." Promoting practically anything Ricky Gervais says could "humiliate" based on several of the protected classes. Supporting military intervention in Ukraine to combat Russia could "incite violence" based on "national origin."

Focusing on how New York's Online Hate Speech Law applies to satire reveals its overbreadth. True, Professor Volokh, Rumble, and Locals don't themselves write satire. (Although Professor Volokh's did recite a joke from Communist-era Poland: "How are things? Better. Better than tomorrow, of course—worse than yesterday.").[14] But they

---

[14] Eugene Volokh, Volokh Conspiracy, *How Are Thing? Better. Better Than Tomorrow, Of Court–Worse Than Yesterday*, Reason, June 18, 2020, https://perma.cc/8ABW-PSU8.

may still challenge the law's overbreadth on behalf of others not before the Court. *Broaderick v. Oklahoma*, 413 U.S. 601, 611–13 (1973).

Some may think the Online Hate Speech Law draws reasonable distinctions for "hateful conduct." Ban "bad" speech, some might say, and encourage "good" speech.

But America follows a different path: freedom for speech that we like and especially for speech that we loathe. As Benjamin Franklin wrote, "if all Printers were determin'd not to print any thing till they were sure it would offend no body, there would be very little printed."[15] Nor would there be much satire. "Satire's unifying element," one court wrote, "is the use of wit to expose something foolish or vicious to criticism." *Farah v. Esquire Mag.*, 736 F.3d 528, 536 (D.C. Cir. 2013) (cleaned up). Sometimes those means "may seem cruel and mocking, attacking the core beliefs of its target." *Id.* But the end of satire is to criticize or mock for the purpose of correction and improvement.

Good satire doesn't mock to put people down and make them feel bad. It's a tool to expose foolish ideas. Such mockery, some might argue, is a moral imperative because bad ideas taken seriously have catastrophic consequences.[16]

---

[15] Benjamin Franklin, *Apology For Printers, 10 June 1731*, Founders Online, Nat'l Archives, https://perma.cc/LCF3-CTGG [Original source: The Papers of Benjamin Franklin, vol. 1, at 194-199 (Leonard W. Labaree ed., New Haven: Yale Univ. Press, 1959].

[16] Highet, *supra* note 3, at 20 ("By compelling them to look at a sight

By criticizing through humor and entertainment, satire possesses a unique ability to persuade by cutting to the heart of the matter. As the English writer G.K. Chesterton once said, "Humor can get in under the door while seriousness is still fumbling at the handle."[17] For that reason, satire has been an important part of America's democratic tradition. Political cartoons, satirical columns, stand-up comedy and the like have all contributed to the "thoroughly democratic" tradition of "hav[ing] the high-and-mighty lampooned and spoofed." *Falwell v. Flynt*, 805 F.2d 484, 487 (4th Cir. 1986) (Wilkinson, J., dissenting from denial of rehearing); *see also Yorty v. Chandler*, 13 Cal. App. 3d 467, 471 (1970) ("Ever since stone-age man began to draw on the walls of his cave, caricature has been used as a device to express opinion on matters of current interest.").

But because satire depends on criticism, some perceive it as speech that "vilif[ies], humiliate[s], or incite[s] violence." N.Y. Gen. Bus. Law § 394-ccc(1)(a). For example, *The Bee* once wrote an article about sensitive Twitter employees needing to undergo therapy due to the

---

they had missed or shunned, [the satirist] first makes them realize the truth, and then moves them to feelings of protest. … [D]irect phrases, taboo expressions, nauseating imagery, callous and crude slang—these are parts of the vocabulary of almost every satirist.").

[17] G.K. Chesterton, Quotable Quote, Goodreads, https://perma.cc/BAD4-M4AC (last visited Sept. 25, 2023).

imminent Elon Musk takeover. Without realizing the irony, Twitter flagged that joke for containing "sensitive content."[18]

*The Bee* has had other headlines flagged as "hateful conduct" by policies that the Online Hate Speech Law now mandates. *See supra* § I. But satire is almost always protected under the First Amendment. *See Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54–56 (1988). By sweeping in satire, New York's law covers a great deal of protected expression. That makes the law overbroad.

One more point about satire. Sometimes it comes true, especially these days. So often, in fact, *The Bee* has started to keep track of it. By its count, almost one hundred of *The Bee*'s satirical headlines have become actual news stories.[19] Here are two examples, with the satire on the left, and the real article on the right.[20]

---

[18] Nikolas Lanum, *Babylon Bee skit mocks Twitter employees as sensitive, gets flagged by Twitter for 'sensitive content'*, Fox News, Apr. 28, 2022, https://perma.cc/R7PP-JSWP.

[19] Kassy Dillon, *When satire becomes reality: Nearly 100 Babylon Bee joke stories have come true*, Fox News, Mar. 26, 2023, https://perma.cc/PJF9-7DEN.

[20] *Compare Xi Jinping Criticizes Trudeau's Heavy-Handed Approach*, Babylon Bee, Feb. 15, 2022, https://perma.cc/3N7P-4DQS *and 9 Reasons Not To Worry About The Tanking Economy*, Babylon Bee, Sept. 26, 2022, https://babylonbee.com/news/9-reasons-not-to-worry-about-the-tanking-economy/ *with China slams Canada over Hong Kong, Ottawa protests*, India Blooms, Feb. 23, 2022, https://perma.cc/FA4M-ZGUN *and* Michelle Singletary, *7 ways a recession could be good for you financially*, Wash. Post, Sept. 29, 2022, https://perma.cc/B76H-Y9KF.



**Xi Jinping Criticizes Trudeau's Heavy-Handed Approach**

WORLD · Feb 15, 2022 · BabylonBee.com

Click here to view this article with reduced ads. ⧉



**China slams Canada over Hong Kong, Ottawa protests**

India Blooms News Service | @indiablooms | 25 Feb 2022, 09:46 am



**9 Reasons Not To Worry About The Tanking Economy**

SPONSORED · Sep 26, 2022 · BabylonBee.com

9 Reasons Not To Worry About The Tanking Economy



Democracy Dies in Darkness

**7 ways a recession could be good for you financially**

Hey, a recession isn't all bad news. Here are seven silver linings.

Advice by Michelle Singletary
Columnist

Updated September 29, 2022 at 10:41 a.m. EDT | Published September 28, 2022 at 7:00 a.m. EDT

Other satirical headlines that came true run the gamut from jokes about former President Trump, the Grammys, Disney, Wal-Mart pants, math, political ideology, and much more. In that sense, the Online Hate Speech Law regulates *actual* news headlines that may come across as "vilif[ing], humiliat[ing], or incit[ing] violence." N.Y. Gen. Bus. Law § 394-ccc(1)(a). In sum, New York's law punishes speech whether satirical articles or factual news.

So we end where we began. Writing satire is hard enough in a day when truth is stranger than fiction. New York's overbroad and patently

unconstitutional Online Hate Speech Law makes that task well-nigh impossible.

## CONCLUSION

For the sake of protecting free discourse consistent with the spirit of America's enduring democracy, ensuring open debate in the public square that harkens back to Socrates, Aristotle, and other Important Greeks, and keeping *The Bee*'s writers from having to move back in with their parents after being censored by New York's unconstitutional speech compulsion and suppression, *The Bee* requests that this Court affirm the district court's order. New York's Online Hate Speech Law would be laughable—if its consequences weren't so serious.

Respectfully submitted,

*/s/ John J. Bursch*
John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@adflegal.org

September 26, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2023, this brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ John J. Bursch*
John J. Bursch

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Rule 29.1(c) because, excluding the portions exempted by Fed. R. App. R. 32(f), this brief contains 5,103 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


*/s/ John J. Bursch*
John J. Bursch
*Counsel for Amicus Curiae*


Dated: September 26, 2023