# 23-356

## United States Court of Appeals
## for the Second Circuit

---

EUGENE VOLOKH, LOCALS TECHNOLOGY INC., RUMBLE CANADA INC.,

*Plaintiffs-Appellees,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Southern District of New York

---

## REPLY BRIEF FOR APPELLANT

---

BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH N. VALE
 *Deputy Solicitor General*
SARAH COCO
 *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellant
28 Liberty Street
New York, New York 10005
(212) 416-6312

Dated: October 10, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................iii

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ........................................................................................ 3

POINT I

PLAINTIFFS' CHALLENGE TO THE REPORT-MECHANISM
REQUIREMENT IS UNLIKELY TO SUCCEED ............................................... 3

    A.    Plaintiffs Lack Standing to Challenge the Report-
Mechanism Requirement. ......................................................... 3

    B.    The Report-Mechanism Requirement Regulates Only
Conduct. .................................................................................. 5

    C.    The Report-Mechanism Requirement Is Severable. ................. 9

POINT II

PLAINTIFFS' CHALLENGE TO THE POLICY-DISCLOSURE
REQUIREMENT IS UNLIKELY TO SUCCEED ............................................. 11

    A.    The Policy-Disclosure Requirement Is Subject to
*Zauderer*'s Relaxed Scrutiny .................................................... 11

    B.    The Policy-Disclosure Requirement Survives *Zauderer*'s
Relaxed Scrutiny and Survives Intermediate Scrutiny in
Any Event. ............................................................................. 17

    C.    Plaintiffs' Remaining Arguments Should Be Rejected. ......... 24

        1.    GBL § 394-ccc is not impermissibly content-based or
viewpoint-discriminatory ................................................ 24

i

**Page**

     2.   GBL § 394-ccc does not infringe on networks' editorial discretion.............................................................29

POINT III

   GBL § 394-ccc Is Not Overbroad or Vague.....................................31

POINT IV

   The Remaining Preliminary Injunction Factors Favor Reversal............................................................................................36

CONCLUSION ..........................................................................................38

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*American Hosp. Ass'n v. Azar,*
  983 F.3d 528 (D.C. Cir. 2020) ................................................. 14, 20-21

*American Meat Inst. v. United States Dep't of Agric.,*
  760 F.3d 18, 26 (D.C. Cir. 2014) ..................................................... 19-20

*Association of Am. Railroads v. United States Dep't of Transp.,*
  896 F.3d 539 (D.C. Cir. 2018) ............................................................ 10

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) .............................................................................. 22

*Bolger v. Youngs Drug Prods. Corp.,*
  463 U.S. 60 (1983) .............................................................................. 24

*Brockett v. Spokane Arcades, Inc.,*
  472 U.S. 491 (1985) ............................................................................ 11

*Brown v. Entertainment Merchants Association,*
  564 U.S. 786 (2011) ............................................................................ 32

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
  447 U.S. 557 (1980) ............................................................................ 24

*Centro de la Comunidad Hispana de Locust Valley v. Town of
  Oyster Bay,*
  868 F.3d 104 (2d Cir. 2017) ............................................................... 10

*Covenant Media of S.C., LLC v. City of North Charleston,*
  493 F.3d 421 (4th Cir. 2007) ............................................................... 5

*Doninger v. Niehoff,*
  527 F.3d 41 (2d Cir. 2008) ................................................................. 36

*Entertainment Software Ass'n v. Blagojevich,*
  469 F.3d 641 (7th Cir. 2006) .............................................................. 17

iii

| Cases | Page(s) |
|---|---|

*Evergreen Association, Inc. v. City of New York*,
740 F.3d 233 (2d Cir. 2014) ............................................................. 30

*Federal Trade Comm'n v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021) ....................................................... 14

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) ............................................................................ 5

*Lewis v. Casey*,
518 U.S. 343 (1996) ............................................................................ 5

*Maryland v. King*,
567 U.S. 1301 (2012) ........................................................................ 37

*Miami Herald Publishing Co. v. Tornillo*,
418 U.S. 241 (1974) .......................................................................... 29

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010) .......................................................................... 14

*Minds Inc. v. Bonta*,
No. 23-cv-02705, 2023 WL 6194312 (C.D. Cal. Aug. 18, 2023) ...... 31-32

*Missouri v. Biden*,
No. 23-30445, 2023 WL 6425697 (5th Cir. Oct. 3, 2023) .................. 22

*Moody v. NetChoice, LLC*,
No. 22-277, 2023 WL 6319654 (U.S. Sept. 29, 2023) ......................... 8

*National Advert. Co. v. Town of Niagara*,
942 F.2d 145 (2d Cir. 1991) ............................................................. 10

*National Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001) ............................................................. 18

*National Institute of Family & Life Advocates v. Becerra*,
138 S. Ct. 2361 (2018) ...................................................................... 30

**Cases**                                                          **Page(s)**

*NetChoice, LLC v. Attorney Gen., Fla.,*
34 F.4th 1196 (11th Cir. 2022) .............................8-9, 12-13, 18, 29-30

*NetChoice, LLC v. Moody,*
No. 22-393, 2023 WL 6377782 (U.S. Oct. 2, 2023) ............................29

*NetChoice, LLC v. Paxton,*
142 S. Ct. 1715 (2022) ........................................................................37

*NetChoice, LLC v. Paxton,*
49 F.4th 439 (5th Cir. 2022) ....................................................8, 13, 18

*NetChoice, LLC v. Paxton,*
No. 22-555, 2023 WL 6319650 (U.S. Sept. 29, 2023) ..........................8

*Pacific Gas & Elec. Co. v. Public Utilities Comm'n,*
475 U.S. 1 (1986)................................................................................26

*People v. Marquan M.,*
24 N.Y.3d 1 (2014) .............................................................................10

*Picard v. Magliano,*
42 F.4th 89 (2d Cir. 2022).....................................................................3

*Recht v. Morrisey,*
32 F.4th 398 (4th Cir.) .......................................................................25

*Restaurant Law Center v. City of New York,*
360 F. Supp. 3d 192 (S.D.N.Y. 2019)...................................................6

*Riley v. National Federation of the Blind of North Carolina, Inc.,*
487 U.S. 781 (1988)............................................................................15

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
547 U.S. 47 (2006)................................................................................6

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011)........................................................................24-25

v

| Cases | Page(s) |
|---|---|

*United States v. Hansen*,
 599 U.S. 762 (2023).................................................................. 32

*Virginia v. American Booksellers Association, Inc.*,
 484 U.S. 383 (1988).................................................................. 32

*Vugo, Inc. v. City of New York*,
 931 F.3d 42 (2d Cir. 2019) ....................................................... 23

*Zauderer v. Office of Disciplinary Counsel of*
 *Supreme Court of Ohio*,
 471 U.S. 626 (1985).................................... 8, 11, 14, 17, 23

## State Statutes

Fla. Stat. Ann. § 501.2041....................................................... 9, 13

General Business Law § 394-ccc ....................................... passim

Tex. Bus. & Com. Code Ann.
 § 120.051 ................................................................................... 13
 § 120.052 ..................................................................................... 9

# PRELIMINARY STATEMENT

Enacted in the wake of a hate-fueled mass shooting that was live-streamed on social media, General Business Law (GBL) § 394-ccc requires social media networks to provide users with a mechanism for reporting hateful conduct on the network. To better inform users who wish to make use of a network's report mechanism, GBL § 394-ccc also requires networks to disclose a policy explaining how the network will respond to user reports. As the State's opening brief demonstrated, plaintiffs are not likely to succeed on the merits of their claim that these requirements infringe on their First Amendment rights. The district court's preliminary injunction should be reversed.

At the outset, the district court's failure to separately consider the statute's primary provision—the report-mechanism requirement—demands reversal. Plaintiffs lack standing to challenge this requirement because, as plaintiffs do not dispute, they each already have a mechanism for accepting user complaints. Plaintiffs' argument that they cannot be sure their existing mechanisms satisfy the statute is refuted by the plain text of the requirement and by plaintiffs' own previous statements.

Moreover, even if plaintiffs had standing, the requirement does not implicate the First Amendment because it regulates conduct, not speech.

Plaintiffs' challenge to the policy-disclosure requirement also fails. The policy-disclosure requirement mandates disclosure of factual, uncontroversial information—the network's *own* policy—which is compelled commercial speech subject to relaxed scrutiny. Plaintiffs' contrary arguments ignore well-established law defining commercial speech to include information about the terms under which a service provider's "services will be available," and recent decisions in the Fifth and Eleventh Circuits.

Finally, this Court should reject plaintiffs' sweeping alternative arguments that GBL § 394-ccc is impermissibly content-based and viewpoint discriminatory and that it infringes on networks' editorial discretion. Content-based commercial speech regulations do not trigger strict scrutiny. And GBL § 394-ccc is viewpoint neutral because it applies identically to all networks subject to GBL § 394-ccc, including plaintiffs, regardless of whether networks have a policy of removing or not removing hateful conduct. The statute also does not infringe on networks' editorial

discretion because it does not require networks to publish or remove any content.

## ARGUMENT

## POINT I

### PLAINTIFFS' CHALLENGE TO THE REPORT-MECHANISM REQUIREMENT IS UNLIKELY TO SUCCEED

### A. Plaintiffs Lack Standing to Challenge the Report-Mechanism Requirement.

Plaintiffs do not dispute that they each have made accessible a mechanism that allows users to submit reports of hateful conduct. See Br. for Appellant ("State Br.") at 11-12, 23-24. For that reason, plaintiffs are not engaged in a course of conduct "arguably proscribed" by the report-mechanism requirement. *See Picard v. Magliano*, 42 F.4th 89, 99 (2d Cir. 2022). Plaintiffs contend that they cannot be sure their existing mechanisms are sufficient because they are not exclusively for reporting hateful conduct. Br. for Pls.-Appellees ("Br.") at 25. But nothing in the report-mechanism requirement demands a mechanism for reporting exclusively hateful conduct. While a mechanism dedicated solely to accepting reports of hateful conduct meets the requirements of the statute, so too does a mechanism permitting users to complain about

hateful conduct and other issues. As plaintiff Eugene Volokh observed shortly after the statute was enacted, disclosing an email address and allowing users to "complain about whatever [they] please" satisfies GBL § 394-ccc's text. (J.A. 120.) There is also no merit to plaintiffs' argument that they have been injured by the report-mechanism requirement simply because they disagree with GBL § 394-ccc's definition of hateful conduct. The report-mechanism requirement does not force social media companies to adopt or reference the State's definition to make a report mechanism accessible to users.[1] See State Br. at 26-27.

Reading the statute as satisfied by a report-mechanism that allows reporting of both hateful conduct and other complaints does not result in surplusage. The State's reading gives effect to the words "for individual users to report incidents of hateful conduct" because the report-mechanism must permit, at minimum, reports of hateful conduct. Nothing in the text of the law requires a mechanism exclusively dedicated to reports of hateful conduct. And plaintiffs' predictions about

_____

[1] Plaintiffs' argument that the report-mechanism requirement is viewpoint discriminatory because it incorporates GBL § 394-ccc's definition of hateful conduct is also incorrect. See *infra* at 26-28.

the effectiveness of the law are wholly speculative, given that the law was enjoined before going into effect.

Plaintiffs' argument that this Court should not separately consider their standing to challenge the report-mechanism requirement (Br. at 67-68) is contrary to settled law. "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), and plaintiffs must establish that they have been injured by each provision of the law they seek to challenge, *see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-34 (1990); *Covenant Media of S.C., LLC v. City of North Charleston*, 493 F.3d 421, 429-30 (4th Cir. 2007). Plaintiffs fail to claim any reasonable threat of enforcement or any other injury stemming from the report-mechanism requirement. Accordingly, their challenge to GBL § 394-ccc's core provision is foreclosed.

## B. The Report-Mechanism Requirement Regulates Only Conduct.

Even assuming plaintiffs have standing to challenge the report-mechanism requirement, their challenge is not likely to succeed because the requirement regulates only conduct, not speech. The report-mechanism requirement requires social media networks to make

5

available a user tool for reporting incidents of hateful conduct but does not require them to speak a message about the tool or the reports. Nor does having or not having such a tool inherently express a message about the network's views.

Plaintiffs err in arguing that providing a report-mechanism requirement is inherently expressive because it requires communication of the mechanism to users. Br. at 36-37. In *Restaurant Law Center v. City of New York*, the challenged law required fast food employers to provide written notice to employees, N.Y.C. Admin. Code § 20-1302(h), of their right to direct charitable contributions pursuant to the law. *See* 360 F. Supp. 3d 192, 213 (S.D.N.Y. 2019). Likewise, the Solomon Amendment, which was challenged in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, required law schools to provide students with information about the availability of military recruiters on campus. 547 U.S. 47, 60 (2006) (discussing 10 U.S.C. § 983). These laws, like the report-mechanism requirement, nonetheless regulated conduct, rather than speech, because they primarily dictated what the regulated entity "must do," not "what they may or may not say." *Id.* at 60. Moreover, as explained in the State's opening brief (at 28-29), nothing in GBL § 394-ccc prohibits

6

social media networks from communicating any message they wish alongside the report mechanism, including a message that the report mechanism is antithetical to the network's values.

Plaintiffs plainly misread the statute in contending that the report-mechanism requirement demands a *response* to user reports. Br. at 27-28. As the State explained (see State Br. at 8-10), and as the district court properly concluded (S.A. 4, 15, 20), the report-mechanism requires a mechanism that allows a network to respond to user reports, but it does not require networks to respond in any particular way—or at all. Contrary to plaintiffs' argument, the use of the word "how" in the policy-disclosure requirement does not demand a different interpretation. Networks must disclose "how" they will respond to user reports, but they may disclose a policy of not responding.

The report-mechanism requirement, because it regulates only conduct which is not inherently expressive, is thus subject to rational basis review, which it easily survives. Indeed, plaintiffs do not dispute that the regulation survives rational basis review based on the State's interest in empowering social media users to report hateful conduct to networks easily and quickly.

7

In the alternative, as described in the State's opening brief (at 31-
32), if the Court determines that the report-mechanism requirement does
implicate speech directly, the requirement is, at most, a commercial
disclosure requirement subject to relaxed scrutiny under *Zauderer v.
Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626
(1985). The report-mechanism requirement satisfies relaxed scrutiny
because it directly advances the State's important interest in facilitating
user reports of hateful conduct and thereby alerting networks to such
conduct. And the report-mechanism requirement is not unduly burden-
some, given that it requires only the availability of an email or other
report mechanism. That conclusion is consistent with recent decisions in
the Fifth and Eleventh Circuits examining similar provisions of Florida
and Texas laws requiring the creation of user tools.[2] *See NetChoice, LLC
v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022); *NetChoice, LLC v. Attorney*

---

[2] The Supreme Court granted certiorari to review in part these
decisions, but declined to review the portions that expressed agreement
in applying *Zauderer's* relaxed scrutiny to the laws' "general disclosure
requirements," including those requiring the creation of user tools. *See
NetChoice, LLC v. Paxton*, No. 22-555, 2023 WL 6319650 (U.S. Sept. 29,
2023); *Moody v. NetChoice, LLC*, No. 22-277, 2023 WL 6319654 (U.S.
Sept. 29, 2023); *see also* Br. for the United States as Amicus Curiae at 12-
19, Nos. 22-277, 22-393 and 22-555 (filed Aug. 2023).

*Gen., Fla.*, 34 F.4th 1196, 1230 (11th Cir. 2022). Plaintiffs' attempt to distinguish the user tools in these cases based on the tools' content is unpersuasive. Br. at 45. Texas's law, much like GBL § 394-ccc, requires platforms to provide "an e-mail address or relevant complaint intake mechanism to handle user complaints." Tex. Bus. & Com. Code Ann. § 120.052(b)(3)(A); *see also* Fla. Stat. Ann. § 501.2041(2)(e)(1).

## C. The Report-Mechanism Requirement Is Severable.

Finally, as explained in the State's opening brief, the district court abused its discretion in enjoining the report-mechanism requirement based on its conclusion that plaintiffs were likely to succeed on the merits of their challenge to the policy-disclosure requirement. State Br. at 32-35. The report-mechanism requirement is severable from the policy-disclosure requirement because the Legislature made plain its preference for the report-mechanism requirement, which is the law's core function, to remain in force even if the policy-disclosure requirement is invalidated.

Plaintiffs are incorrect in arguing that the report-mechanism requirement cannot be severed because it incorporates GBL § 394-ccc's definition of hateful conduct. Br. at 26. The State's argument is that the policy-disclosure requirement, if invalidated, may be excised, not that the

9

statute's definition of hateful conduct may be excised. Plaintiffs' citation to *People v. Marquan M.*, is thus inapt because in that case the Court declined to sever an unconstitutional portion of a law where severance would have required excising substantial portions of the statutory definition of "cyberbullying." 24 N.Y.3d 1, 10 (2014). Moreover, as discussed above, the report-mechanism requirement does not require social media networks to incorporate or endorse the statute's definition of hateful conduct.

Finally, plaintiffs' argument that the question of severability is waived (Br. at 26) misapprehends this Court's role in interpreting statutes. As an initial matter, this Court was addressing a different question in *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, because there, no party asked the Court to sever the unconstitutional portions of the statute. *See* 868 F.3d 104, 118 (2d Cir. 2017). But more important, waiver is a prudential doctrine that must give way to the "general rule [that] a court should refrain from invalidating an entire statute when only portions of it are objectionable." *National Advert. Co. v. Town of Niagara*, 942 F.2d 145, 148 (2d Cir. 1991); *see Association of Am. Railroads v. United States Dep't of Transp.*, 896 F.3d

10

539, 550 (D.C. Cir. 2018) ("Parties cannot, by litigation tactics or oversight, compel the courts to strike down more of a law than the Constitution or statutory construction principles demand."). In *Brockett v. Spokane Arcades, Inc.*, for example, the Supreme Court held that the Ninth Circuit erred in failing to address whether the challenged statute was severable, 472 U.S. 491, 504-06 (1985), despite appellees' argument that severability had been waived because their opponent failed to raise the issue, *see* Br. for Appellees, *Brockett*, 472 U.S. 491 (No. 84-143), 1984 WL 565782. There is no bar to this Court considering severability.

## POINT II

### PLAINTIFFS' CHALLENGE TO THE POLICY-DISCLOSURE REQUIREMENT IS UNLIKELY TO SUCCEED

### A. The Policy-Disclosure Requirement Is Subject to *Zauderer*'s Relaxed Scrutiny.

As the State explained in its opening brief, regulations like GBL § 394-ccc's policy-disclosure requirement that require providers of commercial services to disclose "factual, uncontroversial information" about the terms under which their "services will be available" are commercial speech subject to relaxed scrutiny under *Zauderer*, 471 U.S. at 650-51. State Br. at 35-49. Such disclosure requirements comport with

11

the First Amendment if, like the policy-disclosure requirement, they reasonably relate to an appropriate governmental interest and do not unduly burden speech. *See id*. The district court erred in failing to apply *Zauderer*'s relaxed scrutiny to the policy-disclosure requirement and instead applying strict scrutiny. Plaintiffs' arguments to the contrary are unpersuasive.

First, plaintiffs fail to explain why this Court should decline to follow the consistent decisions reached by the Fifth and Eleventh Circuits, which both applied *Zauderer*'s relaxed scrutiny to uphold provisions of Texas and Florida laws requiring social media companies to disclose certain information and policies to users. *See Attorney Gen., Fla.*, 34 F.4th at 1230; *Paxton*, 49 F.4th at 485-88.[3] Plaintiffs mischaracterize the Eleventh Circuit's reasoning in applying *Zauderer* to similar disclosures, contending that it was "without discussion." Br. at 42-43. The Eleventh Circuit explained that disclosure of a platform's policies related to content moderation compel only commercial speech because social

---

[3] As noted, while the Supreme Court granted certiorari to review portions of each of these decisions, it denied review to the portions of these decisions applying *Zauderer* to uphold the laws' disclosure requirements.

media users are "engage[d] in commercial transactions with platforms by providing them with a user and data for advertising in exchange for access to a forum." *Attorney Gen., Fla.*, 34 F.4th at 1230. Nor do plaintiffs offer any response to the Fifth Circuit's reasoning that it is permissible to require "commercial enterprises" like social media platforms to disclose "information about their services" consistent with *Zauderer*. *See Paxton*, 49 F.4th at 485 (quotation marks omitted).

Plaintiffs also miss the mark in arguing that the Florida and Texas laws are distinguishable because they demand less burdensome disclosures. Br. at 45. A close examination shows that the Texas and Florida laws require far more burdensome and granular disclosures than GBL § 394-ccc's policy-disclosure requirement, on multiple issues of public debate. *See, e.g.*, Fla. Stat. Ann. § 501.2041(2)(a) (disclosure of "standards, including detailed definitions" used for "determining how to censor, deplatform, and shadow ban" users); Tex. Bus. & Com. Code Ann. § 120.051(a)(1) (disclosure of how network "curates and targets content to users").

Second, contrary to plaintiffs' contention, the policy-disclosure requirement need not "propose a commercial transaction" to qualify as

13

commercial speech. Br. at 39-44 (quotation marks omitted). As the State explained, GBL § 394-ccc's policy-disclosure requirement provides users with information about the terms under which the network's "services will be available," a well-established category of constitutionally permissible compelled commercial speech. *See Zauderer*, 471 U.S. at 651; *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249-50 (2010). For the same reason, *Zauderer*'s application is not limited to point-of-sale disclosures, as plaintiffs argue. In upholding a regulation requiring hospitals to disclose rates negotiated with insurers, the D.C. Circuit explicitly rejected the hospitals' argument—identical to plaintiffs' here—that *Zauderer* is "limited to restrictions on advertising and point-of-sale labeling." *American Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020).

In any event, a social media network's content moderation policies, in addition to providing information about the terms under which the network's "services will be available," *do* "propose a commercial transaction" to the network's users. Social media users exchange their data and attention for free access to social media networks. *See Federal Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 6 (D.D.C. 2021) (explaining

14

that "users exchange their time, attention, and personal data, rather than money, for access to" social media networks). And networks use their moderation policies to attract users to engage in this exchange. For example, NetChoice, a trade association that includes social media networks, explained that such policies are "a key point of competitive differentiation as services customize their offerings to the needs of their users." Br. of NetChoice et al. as Amici Curiae at 9 (quotation marks omitted). A network's policies thus act as an advertisement to users, proposing a transaction between users and the network from which the network profits. Because a network's policies provide information about the terms under which the network's "services will be available," and "propose a commercial transaction" to the network's users, they fit squarely within the category of commercial speech.

Third, plaintiffs fail to establish that the policy-disclosure requirement's compelled commercial speech is inextricably intertwined with networks' noncommercial speech. Br. at 40-41. Unlike the compelled disclosure of fundraiser fees in *Riley v. National Federation of the Blind of North Carolina, Inc.*, which was intertwined with the fundraiser's plea for a charitable donation, 487 U.S. 781, 796 (1988), nothing in GBL

§ 394-ccc's policy-disclosure requirement demands that networks combine their disclosure with other speech. Networks may take the opportunity to disclose their views on hateful conduct alongside their policy addressing how they will respond to reports of hateful conduct, but they need not do so. Again, plaintiff Volokh's suggested policy in response to the passage of GBL § 394-ccc is illustrative. A network policy of "you can complain about whatever you please . . . but I will respond and address the complaints entirely based on my own discretion" (J.A. 120) plainly does not require disclosure of a network's views on hateful conduct. See State Br. at 44-45.

Fourth, and relatedly, the policy-disclosure requirement does not demand disclosure of an opinion. Br. at 44-45. Plaintiffs are not required to disclose their opinion about hateful conduct, or whether particular user content meets or does not meet GBL § 394-ccc's definition of hateful conduct. Instead, networks must disclose purely factual information— "how such social media network will respond and address" reports of hateful conduct. GBL § 394-ccc(3). Plaintiffs also miss the mark with their analogy to a regulation requiring videogame stores to place "18" labels on videogames deemed sexually explicit according to a state definition. *See*

16

Br. at 44 (citing *Entertainment Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006)). The policy-disclosure requirement does not require the networks to adopt or apply GBL § 394-ccc's definition of hateful conduct. Plaintiffs need not, for example, label particular user content on their networks as hateful conduct. They need only disclose accurate information about how they will respond to user reports of hateful conduct *as identified by the user*.

**B.    The Policy-Disclosure Requirement Survives *Zauderer*'s Relaxed Scrutiny and Survives Intermediate Scrutiny in Any Event.**

As the State explained in its opening brief (at 50-58), the policy-disclosure requirement satisfies the requirements of *Zauderer* because it is reasonably related to appropriate State interests and does not unduly burden plaintiffs' speech. *See Zauderer*, 471 U.S. at 651. In particular, the policy-disclosure requirement is intended to support and enhance the core report-mechanism requirement by advancing state interests: (i) in providing social media users with accurate information about networks' policies regarding users' reports of hateful conduct and (ii) in facilitating such reports to help reduce instances of hate-fueled mass shootings and other violence. The disclosure requirement does not unduly burden

17

plaintiffs' speech because plaintiffs must simply disclose their own policy for responding to reports of hateful conduct, which may be a policy to do nothing.

Plaintiffs' arguments to the contrary are unavailing. First, the State plainly has a legitimate interest in providing social media users with accurate information about networks' policies regarding users' reports of hateful conduct, consistent with the State's recognized interest in providing consumers with information about products and services that they use. *See, e.g.*, *National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001) (disclosure "increase[d] consumer awareness of the presence of mercury in a variety of products"). The Fifth Circuit correctly recognized Texas's similar interest in "enabl[ing] users to make an informed choice regarding whether to use the Platforms." *Paxton*, 49 F.4th at 485 (quotation marks omitted); *see Attorney Gen., Fla.*, 34 F.4th at 1230 (disclosure "ensur[ed] that users . . . aren't misled about plat-forms' content-moderation policies"). Such disclosures do not simply satisfy user curiosity. Instead, they prevent users from being confused or deceived about a network's policies and allow users to select a network that aligns with their preferences, whether the user's preference is a

18

network that removes hateful conduct, or one that does not. Moreover, users have demonstrated a particular interest in information about policies concerning hate speech. According to NetChoice, "[m]ajor social media networks already have extensive hateful conduct policies and readily available content reporting systems" (Br. of NetChoice et al. at 15) and these policies are "a key point of differentiation" as networks seek to attract users (*id.* at 9). *See American Meat Inst. v. United States Dep't of Agric.*, 760 F.3d 18, 26 (D.C. Cir. 2014) (en banc) (considering consumers' interest in information to be disclosed).

The policy-disclosure requirement also serves the State's interest in reducing hate-fueled mass shootings, which the district court recognized as compelling. (S.A. 15.) By alerting users that certain networks may act on reports of hateful conduct, the policy-disclosure requirement makes it more likely that users who see hateful conduct on those networks will report it. Plaintiffs contend that the State is improperly prohibiting speech that does not immediately incite violence (Br. at 51), but the question of whether a user's speech would immediately incite violence is irrelevant because nothing in the policy-disclosure requirement prohibits or requires the removal of speech. The requirement

19

simply enhances the core report-mechanism requirement by informing users about how a network will respond to reports of hateful conduct.

Second, plaintiffs fail to establish that the connections between the State's interest and the policy-disclosure requirement are speculative. The State's interest in informing social media users about the terms under which a networks' services are available is directly advanced "through a reasonably crafted disclosure mandate." *American Meat Inst.*, 760 F.3d at 26. *See also American Hosp. Ass'n*, 983 F.3d at 540-41. Likewise, the policy-disclosure requirement is reasonably related to the State's interest in reducing hate-fueled mass shootings because disclosure of a network's policy of removing hateful conduct may encourage users to report hateful conduct linked to hate-fueled mass shootings. Conversely, disclosure of a policy of not acting on reports of hateful conduct may inform a user who is exposed to hateful conduct that further action is needed. Plaintiffs also criticize the State's reliance on statistics and information about the link between social media and hate-fueled violence cited by the Legislature during its deliberations. Br. at 53. But courts frequently consider "reference to studies and anecdotes" and even

"justifications based solely on history, consensus, and simple common sense." *American Hosp. Ass'n*, 983 F.3d at 541 (quotation marks omitted).

Third, contrary to plaintiffs' contention, the policy-disclosure requirement does not place an undue burden on their speech. Br. at 55-60. First, plaintiffs are incorrect that GBL § 394-ccc requires social media networks to remove hateful conduct. Nothing in the text of the statute supports such an interpretation. As the State has explained, the law requires two things: networks must provide users with a mechanism for reporting incidents of hateful conduct, and, to better inform users who make use of the mechanism, networks must disclose a policy explaining how the network will respond to user reports. Neither requirement demands that a network remove any user content. (*See* S.A. 20 ("The law does not even require that social media networks remove instances of 'hateful conduct' from their websites.").)

Plaintiffs argue that even if the plain text of the law does not require removal, New York officials have threatened to pursue networks who fail to remove hateful conduct. But the statements plaintiffs rely on, about "accountability" and "transparency" in the wake of a tragic mass shooting livestreamed over social media (Br. at 9-11), plainly do not

communicate a threat directed towards plaintiffs or any other network. And they fall far short of the conduct that courts found to constitute coercion in the cases plaintiffs rely on. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) (relying on "notices, phrased virtually as orders . . . invariably followed up by police visitations"); *Missouri v. Biden*, No. 23-30445, 2023 WL 6425697, at *19 (5th Cir. Oct. 3, 2023) (relying on "urgent, uncompromising demands to moderate content").

Plaintiffs further contend that they will be pressured to remove hateful conduct to avoid having to respond to user reports; but again, they ignore that the law does not require networks to respond to user reports. To the contrary, networks may decide for themselves whether and how they want to respond to reports, so long as they disclose that policy to users clearly and concisely. (*See* J.A. 172, 175; *see also* S.A. 4, 15, 20.) And plaintiffs' argument that they may alienate some users no matter what policy they disclose is irrelevant. Policy-disclosure requirements are always intended to inform consumers, who are free to act on information about the products and services they use. A disclosure requirement is not unduly burdensome simply because it requires

networks "to provide somewhat more information than they might otherwise be inclined to present." *Zauderer*, 471 U.S. at 650.

Finally, as the State argued in the alternative, the policy-disclosure requirement readily survives intermediate scrutiny as well. See State Br. at 56-57. Contrary to plaintiffs' arguments, the disclosure requirement is sufficiently tailored to the State's interests. The State's interest in informing consumers is directly advanced by the policy-disclosure requirement. And there is also a "reasonable fit," *Vugo, Inc. v. City of New York*, 931 F.3d 42, 52 (2d Cir. 2019), between the State's interest in preventing hate-fueled mass shootings and the requirement because the requirement makes it more likely that users will report hateful conduct by informing users whether networks will act on those reports. The State reasonably concluded that facilitating such reports will prevent violence, given that mass shooters have been radicalized by viewing violence on social media.

Plaintiffs propose other measures that they contend are more narrowly tailored. Br. at 54. But intermediate scrutiny does not require the State to apply the least restrictive means of regulation. *See Vugo, Inc.*, 931 F.3d at 58. Moreover, none of plaintiffs' proposed measures

23

effectuate the State's interest in providing consumers with information or target the problem identified by the Legislature, of mass shooters who have been radicalized and inspired to commit violence by viewing hateful conduct on social media.

## C.   Plaintiffs' Remaining Arguments Should Be Rejected.

### 1.   GBL § 394-ccc is not impermissibly content-based or viewpoint-discriminatory.

Plaintiffs' argument that GBL § 394-ccc is unconstitutional because it is content-based and viewpoint-discriminatory (Br. at 20-32) misreads the governing case law and the statutory scheme. As an initial matter, plaintiffs' argument that GBL § 394-ccc is impermissibly content-based ignores the well-established principle that commercial speech is entitled to "lesser protection" than other forms of constitutionally protected speech. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). Accordingly, "regulation of commercial speech based on content is less problematic" than other content-based restrictions, and is not subject to strict scrutiny. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983). In *Sorrell v. IMS Health Inc.*, for example, the Supreme Court explained that, "[i]n the ordinary case it is

24

all but dispositive to conclude that a law is content based." 564 U.S. 552, 571 (2011). But instead of applying strict scrutiny, the Court proceeded to apply *Central Hudson'*s intermediate scrutiny based on Vermont's argument that the regulation was commercial speech. *Id.*; *see Recht v. Morrisey*, 32 F.4th 398, 409 (4th Cir.) (canvassing the Supreme Court's recent decisions and rejecting the argument that strict scrutiny applies to content-based regulations on commercial speech), *cert. denied*, 143 S. Ct. 527 (2022).

That distinction is particularly important for compelled commercial disclosure requirements subject to *Zauderer'*s relaxed scrutiny which require, by definition, disclosures on a particular subject. Plaintiffs do not identify a single case applying strict scrutiny to content-based regulations addressing commercial speech regulations, much less compelled commercial disclosures subject to *Zauderer*. GBL § 394-ccc's policy-disclosure requirement, which is commercial speech, is not subject to strict scrutiny simply because it demands a disclosure on a specific issue.

Nor is the policy-disclosure requirement viewpoint discriminatory, as plaintiffs contend. As the State explained in its opening brief (at 49), the requirement does not "penalize[] the expression of particular points

of view" by social media networks. *See Pacific Gas & Elec. Co. v. Public Utilities Comm'n*, 475 U.S. 1, 9 (1986). The requirement applies to all networks, regardless of whether networks have a policy of removing hateful conduct, a policy of not removing such conduct, or a policy that falls somewhere in between.

Contrary to plaintiffs' arguments, the policy-disclosure requirement is not viewpoint discriminatory simply because it references the statute's definition of hateful conduct. *See* Br. at 22-23. Plaintiffs unjustifiably read the statute to regulate user speech and require platforms to remove user speech that meets the definition of hateful conduct. As the district court properly concluded, nothing in the statute supports such a reading. (*See* S.A. 20 ("The law does not even require that social media networks remove instances of 'hateful conduct' from their websites.").) To the contrary, the statute regulates only social media networks, not social media users, does not require networks to remove any user speech, and does not discriminate between networks expressing different viewpoints regarding whether to remove user speech that qualifies as hateful conduct.

26

Perhaps recognizing that nothing in the text of the statute supports their strained reading, plaintiffs rely instead on (i) drafts of statutes which were not enacted and (ii) statements regarding hate speech made by the Governor and the Attorney General in the wake of the Buffalo shooting.[4] *See* Br. at 7-11, 28-29, 55-58. These sources do not support plaintiffs' argument. Plaintiffs point to nothing in the draft statutes that indicates that GBL § 394-ccc should be read, contrary to its text, to hold social media networks liable for refusing to remove hateful conduct on their platforms.

In any event, the statements of the Attorney General and the Governor that plaintiffs rely on do not support the conclusion that GBL § 394-ccc should be interpreted to assert authority to impose liability on social media networks for failing to remove hateful conduct. In fact, the Attorney General's report following the Buffalo shooting explicitly disclaimed such authority. The report, published after GBL § 394-ccc was enacted, explained that because "[t]he First Amendment has no categori-

---

[4] Plaintiffs also rely on GBL § 394-ccc's title (*see* Br. at 57), but as explained in the State's opening brief (at 61), the statute's title is properly interpreted to refer to the requirement that social media networks clarify what hateful conduct *they* "prohibit," not conduct prohibited by the *State*.

27

cal exemption for hate speech[,] most of the content the shooter viewed is rankly offensive, *but its creation and distribution cannot, constitutionally, be unlawful.*" (J.A. 74 (emphasis added).) And it further concluded that, "[d]espite the integral nature of online platforms" in the Buffalo shooting, such platforms, including "even the worst offenders who enforce virtually no content moderation," cannot be held legally liable under existing law. (J.A. 112.) Far from interpreting existing law, including GBL § 394-ccc, to authorize the State to hold liable social media networks which decline to remove hateful conduct or pursue users who post hateful conduct, the Attorney General's report concluded that the State lacked that authority.

Finally, the Eleventh Circuit rejected a nearly identical argument in *NetChoice, LLC v. Attorney General of Florida*, explaining "when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a

constitutionally impermissible purpose." 34 F.4th at 1224 (citing *United States v. O'Brien*, 391 U.S. 367, 383 (1968)). The same logic applies here.[5]

## 2. GBL § 394-ccc does not infringe on networks' editorial discretion.

Plaintiffs also fail to show that the policy-disclosure requirement infringes on their editorial discretion. *See* Br. at 29-34, 41. As the State explained in its opening brief (at 47-48), to the extent social media networks have editorial discretion, the policy-disclosure requirement does not affect their discretion because it does not require networks to publish or remove any content. The policy-disclosure requirement leaves networks free to disclose any policy they wish, including a policy of never removing hateful conduct. Likewise, networks may disseminate or refrain from disseminating any content they wish.

Plaintiffs rely primarily on *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), and its progeny (Br. at 33 & n.15) but the comparison is inapt. There, the Supreme Court was considering

---

[5] The Supreme Court also denied certiorari to review this portion of the Eleventh Circuit's decision. *See NetChoice, LLC v. Moody*, No. 22-393, 2023 WL 6377782 (U.S. Oct. 2, 2023).

29

regulations that required the regulated entity to host the speech of others with whom it disagree. Here, by contrast, the policy-disclosure requirement does not require networks to host the speech of others. Nor does it require the networks to speak the State's message about hateful conduct, as did the provisions invalidated in *Evergreen Association, Inc. v. City of New York*, 740 F.3d 233 (2d Cir. 2014), and *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018). See State. Br. at 46. Plaintiffs may speak any message they wish, or no message at all, so long as they disclose their *own* policy about how they will respond to reports of hateful conduct—which may be a policy not to respond at all.

For the same reason, plaintiffs misplace their reliance on *NetChoice, LLC v. Attorney General of Florida*. The Eleventh Circuit's analysis drew a distinction between provisions of the Florida law that prohibited platforms from removing certain user content, which the court concluded infringed on platforms' editorial discretion to decide what user speech to host, and provisions requiring platforms to disclose information about their *own* policies to users, which the court upheld pursuant to *Zauderer*. *See* 34 F.4th at 1227. The policy-disclosure provision falls into the latter category and is thus subject to *Zauderer*.

30

Finally, to the extent plaintiffs contend that *any* compelled speech disclosure infringes on their editorial discretion (*see* Br. at 30-31), no court has endorsed such a sweeping argument. As the State explained in its opening brief, existing law includes many policy-disclosure requirements, including requirements that apply broadly to online services like social media networks. See at State Br. at 38-39. Under plaintiffs' theory, all such provisions would infringe on social media networks' editorial discretion and would thus be unconstitutional unless they could survive strict scrutiny.

## POINT III

## GBL § 394-CCC IS NOT OVERBROAD OR VAGUE

As the State explained in its opening brief, the district court erred in concluding that GBL § 394-ccc is overbroad because it would chill the speech of social media users. The law does not regulate the speech of social media users. Accordingly, users would not have standing to challenge the law and their interests cannot support a pre-enforcement facial overbreadth challenge. *See* State Br. at 59-60. *See Minds Inc. v. Bonta*, No. 23-cv-02705, 2023 WL 6194312, at *1, 4-5 (C.D. Cal. Aug. 18, 2023)

(rejecting argument that social media users have standing to challenge California law requiring disclosure of hate speech policy).

Plaintiffs rely on *Brown v. Entertainment Merchants Association,* 564 U.S. 786 (2011), and *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383 (1988), to argue that the Supreme Court has considered the interests of third parties in the First Amendment context. Br. at 59. But *Brown* and *Virginia* only further illustrate why it would be improper to rely on the alleged chilling of social media users' speech here. In each, the challenged regulation prohibited the sale or display of a product. *See Brown,* 564 U.S. at 789 (prohibiting sale of violent videogames to minors); *Virginia*, 484 U.S. at 387 (prohibiting display of sexual material accessible to minors). In that context, the Court reasonably considered the interests of the third-party buyer in accessing the product. Here, by contrast, GBL § 394-ccc does not prohibit the publication of hateful conduct. It is wholly speculative to contend that users' speech will be chilled by the law on the theory that some networks may disclose policies indicating that they will remove hateful conduct when that is their policy. *See Minds Inc.*, 2023 WL 6194312, at *3-4; *United States v. Hansen*, 599 U.S. 762, 770 (2023) (to justify overbreadth invalidation, potential

unconstitutional applications "must be realistic, not fanciful"). Moreover, any removal of hateful conduct would be traceable not to the law, but to the independent action of the network, unless a user could show that the network was coerced into adopting a particular policy or removing particular content. This Court should not adjudicate such a hypothetical claim.

Plaintiffs' additional arguments likewise fail. Contrary to plaintiffs' argument, GBL § 394-ccc's definition of hateful conduct does not establish that the law is overbroad. The statute's plain text makes clear that it does not require networks to prohibit or remove hateful conduct. (*See* S.A. 20.) Plaintiffs' comparisons to laws banning hate speech are unpersuasive. *See* Br. at 60-62.

Plaintiffs are likewise incorrect that the law is overbroad in its application because it applies to all for-profit social media networks that conduct business in New York. The State's interests in informing consumers and preventing hate-fueled violence apply to all networks operating in New York. As the sponsor of the bill enacting GBL § 394-ccc explained during the legislative debate, although some larger social media networks already have mechanisms in place for reporting hateful

conduct, many smaller networks may not, including new networks, which have been proliferating. (J.A. 170-172; *see also* J.A. 108.)

Finally, plaintiffs repeat the district court's error in arguing that the statute is vague because it does not give social media *users* notice of "what conduct it prohibits" and "encourages arbitrary and discriminatory enforcement." Br. at 64 (quotation marks omitted). As explained, GBL § 394-ccc does not regulate social media users at all. It does not prohibit any conduct by users or authorize enforcement actions against users. And it gives networks, the only regulated entity, clear notice of the conduct that must be made reportable by networks: conduct that users identify as hateful conduct. The district court's hypothetical (Br. at 64 (citing J.A. 353)) is thus easily answered. A "BlackLivesMatter" or "BlueLivesMatter" post could be reported as hateful conduct if a user identified it as such. But simply because a post was flagged by a user as hateful conduct does not mean that a network would be obligated to act on or respond to the report in any way. *See, e.g.*, Br. of NetChoice et al. at 16 (explaining that such posts are frequently flagged as hate speech on networks that already have a report mechanism in place, without being removed by the network).

34

Nor does the statute's reliance on imperfect user reports nullify the State's interest in making hateful conduct reportable, as plaintiffs contend. No system that relies on user reports will perfectly identify content the network will wish to moderate. The Legislature nonetheless reasonably concluded that enabling user reports may make a meaningful difference in mitigating violence. For example, Twitch shut down the live video of the Buffalo shooter's attack only after a user reported it. (J.A. 104.) And many social media networks rely heavily on user reports to identify content that violates their policies. *See* Br. of Amici Curiae Electronic Frontier Foundation et al. at 13.

# POINT IV

## THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVOR REVERSAL

Plaintiffs have not rebutted the State's showing that the remaining preliminary injunction factors, which the district court failed to consider, weigh in favor of reversal. As the State explained in its opening brief, in the First Amendment context when a plaintiff alleges an injury that is not caused by "a rule or regulation that directly limits speech," then "irreparable harm is not presumed and must still be shown." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).

Plaintiffs now contend that they are threatened with irreparable injury because the statute exerts pressure on websites to remove protected speech. Br. at 70. Again, plaintiffs read a requirement into the statute that does not exist. As the State has explained, nothing in the statute requires networks to remove any user content. Likewise, plaintiffs' argument that GBL § 394-ccc causes them irreparable harm by chilling their users' speech is incorrect because the statute does not regulate users' speech and plaintiffs cannot rely on a speculative injury to users to show irreparable harm in any event. See *supra* at 31-33.

36

Plaintiffs also fail to rebut the State's arguments that the public interest weighs heavily against a preliminary injunction here. Plaintiffs seek to enjoin a state statute intended to empower users of social media by facilitating user reports of hateful conduct and providing users with accurate information about a social media networks' policies regarding hateful conduct. (*See* J.A. 268.) Enjoining such a duly enacted statute is an irreparable injury to the State. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Moreover, enjoining a state statute is particularly inappropriate where, as here, it has not been authoritatively interpreted by the State's own courts.[6] *See NetChoice, LLC v. Paxton*, 142 S. Ct. 1715, 1718 (2022) (Alito, J., dissenting). Plaintiffs offer no response.

---

[6] If the Court concludes that there is any ambiguity in the statute, it should certify a question to the New York Court of Appeals. See State Br. at 45 n.5.

37

## CONCLUSION

This Court should reverse the district court's order granting a preliminary injunction against enforcement of GBL § 394-ccc.

Dated:  New York, New York
        October 10, 2023

                              Respectfully submitted,

                              LETITIA JAMES
                                *Attorney General*
                                *State of New York*
                              Attorney for Appellant


                          By:  */s/ Sarah Coco*
                              SARAH COCO
                              Assistant Solicitor General

BARBARA D. UNDERWOOD            28 Liberty Street
  *Solicitor General*           New York, NY 10005
JUDITH N. VALE                  (212) 416-6312
  *Deputy Solicitor General*
SARAH COCO
  *Assistant Solicitor General*
     *of Counsel*

38

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,971 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/ Oren L. Zeve_____