

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

BARBARA D. UNDERWOOD
SOLICITOR GENERAL
DIVISION OF APPEALS & OPINIONS

July 11, 2024

Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for the Second Circuit
40 Foley Square
New York, NY 10007

      Re:    *Volokh v. James*, No. 23-356

Dear Ms. Wolfe:

    I represent appellant the New York State Attorney General in the above-captioned appeal. I write in response to the Court's order directing the parties to submit supplemental letter briefs addressing the effect of the Supreme Court's decision in *Moody v. NetChoice, LLC*, No. 22-277, 2024 WL 3237685 (U.S. July 1, 2024), on this appeal. *See* Order (Feb. 23, 2024), ECF No. 141.

    For two independent reasons, the Court's decision in *NetChoice* makes plain that the district court erred here in preliminarily enjoining enforcement of General Business Law (GBL) § 394-ccc. First, *NetChoice* reaffirms that courts must separately analyze the First Amendment's potential application to each challenged statutory provision. The district court failed to conduct that analysis here when it enjoined enforcement of GBL § 394-ccc without separately addressing GBL § 394-ccc(2)'s report-mechanism requirement—even though that distinct provision operationalizes the law's core function. Second, *NetChoice* makes clear that statutory provisions requiring social media networks to disclose information to consumers are subject to the framework set out in *Zauderer v. Office of*

*Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626 (1985), rather than to strict scrutiny. The district court erred here in failing to apply *Zauderer* to GBL § 394-ccc(3)'s policy-disclosure requirement and instead applying strict scrutiny. For both reasons, this Court should reverse the district court's preliminary injunction order.

A.   The *NetChoice* Decision

*NetChoice* addressed challenges to laws enacted by Florida and Texas to regulate large social media networks. Both laws restrict the networks' ability to engage in content moderation—i.e., "to filter, prioritize, and label the varied messages, videos, and other content" that users want to post. *NetChoice*, 2024 WL 3237685, at *5. Both laws also impose certain disclosure requirements on the platforms. *See id.* at *6. Trade associations representing the networks brought separate facial challenges to each law, alleging that they violated the First Amendment. *See id.* at *7.

The Fifth and Eleventh Circuits reached different conclusions about the First Amendment's application to the content-moderation provisions. The Fifth Circuit concluded that the First Amendment did not protect the networks' content-moderation decisions and that the content-moderation provisions of Texas's law were constitutional. *See id.* at *8. By contrast, the Eleventh Circuit concluded that the First Amendment did protect the networks' content-moderation decisions because those decisions reflected the networks' editorial choices, and that the content-moderation provisions of Florida's law were unconstitutional because they did not satisfy heightened scrutiny. *Id.* at *7.

The Fifth and Eleventh Circuits largely agreed about the First Amendment's application to the disclosure provisions. Both courts applied *Zauderer*'s framework to the disclosure requirements and upheld most of those provisions because they required the networks to disclose to consumers factual, uncontroversial information about the networks' policies and practices, and were not unduly burdensome. *See NetChoice, LLC v. Paxton,* 49 F.4th 439, 485-86 (5th Cir. 2022); *NetChoice, LLC v. Attorney Gen., Fla.,* 34 F.4th 1196, 1230 (11th Cir. 2022). But the two courts reached different conclusions about disclosure provisions requiring the networks to provide users with individualized explanations of decisions

2

to remove content and ban users. The Eleventh Circuit concluded that an individualized-explanation provision in Florida's law violated the First Amendment because it required networks to explain millions of decisions a day and was thus unduly burdensome. *See NetChoice*, 2024 WL 3237685, at *7. The Fifth Circuit upheld a similar individualized-explanation provision in Texas's law. *See id.* at *8.

The Supreme Court vacated the Fifth and Eleventh Circuits' judgments and remanded the cases. The Court unanimously held that both courts had failed to properly assess the broad facial challenges to the laws because they did not determine each law's full scope and whether "the law's unconstitutional applications substantially outweigh its constitutional ones," as a facial First Amendment challenge demands. *Id.* at *8; *see id.* at *28 (Alito, J., concurring in the judgment). In particular, the Court explained, both courts had improperly focused on the application of the laws to only certain networks and only certain features of those networks (like Facebook's news feed), without considering the constitutionality of their application to other social media networks and features that the laws purported to regulate. *Id.* at *9.

While declining to decide the merits of the First Amendment questions at issue, the Supreme Court provided guidance for the circuit courts to apply on remand. The Court's analysis made plain that courts must apply a provision-by-provision First Amendment analysis because different provisions may touch on different First Amendment interests—or may not implicate the First Amendment at all. Indeed, as the Court explained, "an entity engaged in expressive activity when performing one function may not be when carrying out another." *Id.* at *11 n.4.

For example, the Court determined that the circuit courts had properly applied *Zauderer*'s framework to the laws' individualized-explanation disclosure provisions—the only disclosure provisions that the Court reviewed.[1] *See id.* at *9; *see also id.* at *43 (Alito, J., concurring in

---

[1] The Supreme Court's grant of certiorari in *NetChoice* was limited to the portions of the Fifth and Eleventh Circuits' decisions addressing the content-moderation provisions and the individualized-explanation disclosure provisions. The Court declined to review the portions of the

3

the judgment). The Court explained that in applying *Zauderer*, the analysis turns on "whether the required disclosures unduly burden expression." *Id.* at *9.

As to the content-moderation provisions, by contrast, the Court explained that the networks' "selection, ordering, and labeling of third-party posts" could be an exercise of editorial discretion protected by the First Amendment, which triggers heightened scrutiny. *Id.* at *9. Justice Alito, concurring in the judgment and writing for three justices, would have concluded that the lower courts should consider on remand whether the laws' content-moderation provisions intrude on networks' editorial discretion. *Id.* at *41-43.

### B. *NetChoice* Further Confirms That the District Court Erred Here

#### 1. The District Court Erred in Failing to Analyze § 394-ccc's Report-Mechanism Requirement.

*NetChoice* further confirms that courts must analyze each provision of a challenged law separately, because different provisions may implicate different First Amendment interests—or none at all. Here, the district court erred in failing to conduct the required provision-by-provision analysis. Instead, the court improperly enjoined enforcement of GBL § 394-ccc in its entirety based solely on its analysis of the policy-disclosure requirement, without separately analyzing the report-mechanism requirement. See State Br. at 32-35; Reply Br. at 9-11.

The Supreme Court's analysis in *NetChoice* illustrates the error in the district court's approach here. In assessing Texas's and Florida's laws, the Court distinguished between the content-moderation provisions, which prohibit social media networks from removing certain content, and the disclosure requirements, which merely require networks to provide certain information to consumers. The Court indicated that if the former implicated networks' editorial discretion, they must pass heightened First Amendment scrutiny. *NetChoice*, 2024 WL 3237685, at *15. The latter, by contrast, were subject to *Zauderer*'s relaxed scrutiny. *Id.* at *9. The

---

decisions addressing the other general disclosure requirements. See Reply Br. at 8 n.2.

Court's separate analysis of the different provisions demonstrates that it would have been error to enjoin Texas's or Florida's law in full on the grounds that the content-moderation provisions do not survive heightened scrutiny, without separately addressing whether the disclosure provisions comport with *Zauderer*'s requirements. Moreover, the Court in *NetChoice* acknowledged that some statutory provisions regulating social media networks may not trigger any First Amendment scrutiny. As the Court explained, "an entity engaged in expressive activity when performing one function may not be when carrying out another." *Id.* at *11 n.4.

Here, the district court erred in enjoining enforcement of GBL § 394-ccc in its entirety based solely on the court's analysis of the policy-disclosure requirement. The policy-disclosure requirement is intended to enhance and support GBL § 394-ccc's main requirement—that networks establish a mechanism to allow consumers to report incidents of hateful conduct. The district court improperly failed to analyze the report-mechanism requirement at all, let alone determine whether it comports with the First Amendment. See State Br. at 33-35; Reply Br. at 9-11.

As the State explained (State Br. at 22-25; Reply Br. at 3-5), a proper analysis of GBL § 394-ccc's report-mechanism requirement establishes that plaintiffs lack standing to challenge the report-mechanism requirement. As plaintiffs do not dispute, they each already have a mechanism for accepting consumer complaints, which is all the report-mechanism requirement mandates. Plaintiffs contend that they are uncertain whether these mechanisms are sufficient. But "plaintiffs cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Murthy v. Missouri*, No. 23-411, 2024 WL 3165801, at *15 (U.S. June 26, 2024) (quotation marks omitted).

In any event, because the report-mechanism requirement regulates conduct, not speech, it does not infringe on plaintiffs' First Amendment rights. As the State explained, the report-mechanism regulates what social media networks "'must *do*,'" not "'what they may or may not *say*.'" State Br. at 26 (quoting *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.,* 547 U.S. 47, 60 (2006)); Reply Br. at 5-7. *NetChoice* reaffirms that even though GBL § 394-ccc's policy-disclosure requirement regulates speech, that does not subject the entire law to First Amendment scrutiny,

5

as the district court incorrectly assumed. "[A]n entity engaged in expressive activity when performing one function may not be when carrying out another." *NetChoice*, 2024 WL 3237685, at *11 n.4.

In the alternative, *NetChoice* indicates that even if this Court determines that the report-mechanism requirement does implicate speech directly, the requirement is, at most, a commercial disclosure requirement subject to *Zauderer*'s framework. *Id.* at *9. As discussed further below, the report-mechanism requirement, like the policy-disclosure requirement, satisfies *Zauderer*'s framework because it requires disclosure of factual, uncontroversial information to consumers—specifically, it requires disclosure of the network's own mechanism allowing consumers to report hateful conduct. As the State has explained, that requirement is not unduly burdensome because it does not mandate disclosure of a complaint mechanism dedicated solely to consumer reports of hateful conduct. Networks must simply provide a mechanism that accepts reports of hateful conduct—alongside other consumer complaints, if the network wishes. See State Br. at 31-32; Reply Br. at 8-9.

### 2. The District Court Erred in Failing to Apply *Zauderer*'s Framework to the Policy-Disclosure Requirement.

*NetChoice* makes clear that the district court also erred by failing to apply *Zauderer*'s framework to GBL § 394-ccc's policy-disclosure requirement and instead applying strict scrutiny. This error independently warrants reversal.

As explained *supra* (at 3-4), in *NetChoice* the Court determined that the Fifth and Eleventh Circuits had properly applied *Zauderer*'s framework to individualized-explanation provisions. *NetChoice*, 2024 WL 3237685, at *9; *id.* at *43 (Alito, J., concurring in the judgment) ("Because these regulations provide for the disclosure of 'purely factual and uncontroversial information,' they must be reviewed under *Zauderer*'s framework . . . ."). The disclosure provisions at issue in *NetChoice* require networks to provide an individualized explanation to a user any time the network removes or alters the user's post. *See id.* at *7. Like the policy-disclosure requirement in GBL § 394-ccc, the provisions at issue in *NetChoice* thus required networks to disclose information about how they apply their content-moderation policies to consumers. For example, if a

6

network had a policy prohibiting hateful conduct (as many networks do, *see id.* at *15), the individualized-explanation provisions would require the network to disclose that the network removed user content because the network deemed it hateful under the network's policy.

As *NetChoice* confirms, the district court here erred in failing to apply *Zauderer*'s framework to GBL § 394-ccc's policy-disclosure requirement. The district court concluded that *Zauderer* is inapplicable because the disclosure of a policy about the content permitted on a network is not commercial speech. (*See* S.A. 12-14.) But *NetChoice* refutes that conclusion, affirming that provisions regulating the compelled disclosure of a network's policies provide consumers with information about the terms under which the network's "services will be available," *Zauderer*, 471 U.S. at 650-51, and are thus subject to *Zauderer*'s framework. *See NetChoice*, 2024 WL 3237685, at *9. See State Br. at 36-47; Reply Br. at 11-17.

When properly analyzed under *Zauderer*, the policy-disclosure requirement comports with the First Amendment. Like the individualized-explanation provisions in *NetChoice*, the policy-disclosure requirement mandates that social media networks provide consumers with factual, uncontroversial information about the platform's own policies and procedures—specifically, whether and how the network will respond to consumer complaints about hateful conduct. The policy-disclosure requirement advances the State's interest in transparency by requiring networks to provide this information to consumers in advance so that they can make an informed choice about whether to use the network, rather than providing it when content is removed, as the Florida and Texas laws require. And as the State has explained, GBL § 394-ccc does not require networks to adopt a particular policy regarding consumer reports of hateful conduct, or to remove or not remove any reported content. Those decisions are left entirely to the network. State Br. at 50-58; Reply Br. at 17-24.

Moreover, the policy-disclosure requirement is not unduly burdensome. Unlike the individualized-explanation provisions at issue in *NetChoice*, the policy-disclosure requirement does not require networks to explain "millions of decisions per day," *NetChoice*, 2024 WL 3237685 at *7 (quotation and alteration marks omitted). Instead, networks can comply with the policy-disclosure requirement by making available to all

7

consumers factual information about whether and how the network will act on consumer reports of hateful conduct. *Cf. id.* at *43 (Alito, J., concurring in the judgment) ("it is not clear why having to disclose the bases" of a network's decisions about allowing content on the network would unduly burden the network's expression).

Finally, to the extent plaintiffs contend that the policy-disclosure requirement is unduly burdensome because it infringes on their editorial discretion, *NetChoice* contradicts that argument. *NetChoice* concluded that networks' "selection, ordering, and labeling of third-party posts" could be an exercise of editorial discretion protected by the First Amendment, which triggers heightened scrutiny. *Id.* at *9. But the policy-disclosure requirement does not impinge on any such editorial decisions. Indeed, unlike the content-moderation provisions at issue in *NetChoice*, nothing in GBL § 394-ccc requires social media networks to change their "selection, order, and labeling" of users' posts or to otherwise publish or remove any user content.

Nor does requiring disclosure of how a network will respond to a particular category of consumer complaints infringe on networks' editorial discretion. As the State has explained, a network may comply with the policy-disclosure requirement by disclosing a policy of never responding to consumer complaints, or by disclosing a policy of responding only to certain complaints, and no others. See State Br. at 54-56. The disclosed policy simply must encompass reports of hateful conduct, such that a consumer would know whether to expect any action in response to the consumer's report of hateful conduct. The disclosure requirement does not burden plaintiffs' editorial discretion because it does not require plaintiffs to say or not say anything about hateful conduct, so long as the disclosed policy is broad enough to encompass that category of complaints. Indeed, the policy-disclosure requirement is far less burdensome than the individualized-explanation provisions at issue in *NetChoice*, which required disclosure of the bases for each of the networks' many individual content-moderation decisions.

Moreover, *NetChoice* confirms that the district court incorrectly focused solely on the policy-disclosure requirement's purported burden on plaintiffs, who argued that their networks have "'pro-free speech purposes'" (S.A. 11). *NetChoice* makes clear that a conclusion about the burden

8

on *plaintiffs* cannot support a facial challenge without a showing that GBL § 394-ccc is equally burdensome in the majority of its applications. As *NetChoice* explained, facial challenges are strongly disfavored, including in the First Amendment context, because such challenges "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." 2024 WL 3237685, at *8 (quotation marks omitted); *see id.* at *34 (Alito, J., concurring in the judgment); *cf. id.* at *19-28 (Thomas, J., concurring in the judgment). To uphold a facial challenge, courts must ascertain the challenged law's full scope and "weigh the unconstitutional as against the constitutional" applications. *Id.* at *9.

Here, plaintiffs made no attempt to show that GBL § 394-ccc is unduly burdensome in the majority of its applications, i.e., applications to networks other than plaintiffs' networks.[2] And it is implausible that plaintiffs could make that showing because many social media networks already disclose policies about hateful conduct and accept user reports of such conduct. *See id.* at *15; Br. of NetChoice et al. as Amici Curiae at 15 ("Major social media networks already have extensive hateful conduct policies and readily available content reporting systems."); *cf. id.* at *43 (Alito, J. concurring in the judgment). The policy-disclosure requirement would thus pose little burden on those networks.

            Respectfully,

            */s/ Sarah Coco*

            Sarah Coco
            Assistant Solicitor General
            (212) 416-6312

cc: Counsel of record (by ECF)

---

[2] To the extent the district court upheld plaintiffs' facial challenge based on GBL § 394-ccc's purported burden on users of social media networks, as the State has explained, that was also error. See State Br. at 59-62; Reply Br. at 31-33.