

July 11, 2024

**_Via_ ECF**
Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

    Re:    *Volokh, et. al. v. James*, No. 23-0356: Plaintiffs-Appellees' Supplemental Letter Brief regarding *NetChoice* decision

Dear Ms. Wolfe:

Plaintiffs-Appellees Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc., submit this Supplemental Letter Brief pursuant to the Court's post-argument order directing the parties to address the effect on this case of the U.S. Supreme Court's decision in *Moody v. NetChoice, LLC,* ___ U.S. ___, 2024 WL3237685 (July 1, 2024) ("*NetChoice*"), *vacating NetChoice v. Paxton*, 49 F.4th439 (5th Cir. 2022), and *NetChoice v. Moody*, 34 F.4th 1196 (11th Cir. 2022). Order, ECF No. 141, February 23, 2024.

The principles the Supreme Court articulated in *NetChoice* reinforce Plaintiffs-Appellees' arguments and the district court's reasoning in support of the preliminary injunction in this case. The *NetChoice* decision makes clear that: (1) a website engages in First Amendment-protected editorial judgment when it "compil[es] . . . speech it wants in the way it wants"; (2) state interference with those editorial processes violates the First Amendment because it alters the websites' messages; and (3) altering a websites' message to tilt the marketplace of ideas in the state's preferred direction is "very much related to the suppression of free expression" and, simply put, "not valid." 2024 WL 3237685, at *11, *12, *15.

New York's Online Hate Speech Law contravenes these principles—especially (though not solely) by commandeering websites' editorial processes with the explicitly viewpoint-based goal of "reducing" so-called "violent and extremist content." Appellant's Br. 53. *NetChoice* thus confirms that this Court should affirm the preliminary injunction against the enforcement of New York's law.

510 Walnut Street, Suite 900  Philadelphia, PA 19106
phone: 215-717-3473  Fax: 215-717-3440
thefire.org

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 2 of 14

**I.  Commandeering Websites' Editorial Judgment in a Viewpoint-Based Way to Tilt Public Debate Away from "Hate Speech" Violates the First Amendment.**

*NetChoice* reaffirms the "core teaching" of decades of the Supreme Court's compelled speech jurisprudence: "The government may not . . . alter a private speaker's own editorial choices about the mix of speech it wants to convey." 2024 WL 3237685, at *12. The First Amendment protects websites' editorial decisions when those decisions create the sites' own "distinctive expressive offering"—just like the editorial decisions of newspaper editors, cable TV providers, and parade organizers. *Id.* at *14. Therefore, courts must safeguard websites' ability to "exclude [an] unwanted message, free from government interference." *Id.* at *16 (citing *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974)).

But New York's Online Hate Speech Law, on its face, forces countless websites to create, publish, and promote the State's chosen content about "hateful" speech, as defined by the State—directly interfering with the websites' editorial choices about what messages to convey. As in *NetChoice*, the law "targets those expressive choices . . . by forcing [websites] to present and promote content" and, in Plaintiffs-Appellees' case, compelling them to present content "that they regard as objectionable." 2024 WL 3237685, at *14.

*NetChoice* also confirms the illegitimacy of speech regulations aimed at "tilting public debate in a preferred direction." *Id.* at *16 (cleaned up). New York's law, as explained in its briefing and by numerous state policymakers, is designed to do exactly that—to tilt the online marketplace of ideas away from protected speech the State regards as "hateful." This goal "is very much related to the suppression of free expression" and "is not valid" under any level of constitutional scrutiny. *Id.* at *15.

**A.  *NetChoice* held that interfering with websites' editorial choices, as New York's law does, violates the First Amendment.**

New York's Online Hate Speech law violates the free speech principles reaffirmed in *NetChoice,* which examined the constitutionality of state laws that compel social media platforms like Facebook and YouTube to publish third-party speech they otherwise would not. The Court surveyed decades of its compelled-speech precedent to reaffirm their core throughline: "An entity exercising editorial discretion in the selection and presentation of content is engaged in speech activity." *Id.* at *11 (cleaned up). Accordingly, "[w]hen the government interferes with such editorial choices . . . it alters the content of the compilation" and "in so

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 3 of 14

doing . . . overrid[es] a private party's expressive choices." *Id*. This violates the First Amendment.

As the Court explained, its "seminal case" of *Miami Herald Publishing Co. v. Tornillo* established that the state may not "substitute governmental regulation for the crucial process of editorial choice." *Id*. at *10 (cleaned up). Likewise, the Court reaffirmed the holdings of *Pacific Gas & Electric. Co. v. Public Utilities Commission of California* and *Turner Broadcasting System, Inc. v. FCC,* each of which makes clear that the state may not command entities engaged in expressive activity "to carry [speech] they would not otherwise have chosen" because doing so interfered with editorial discretion and altered their expression. *Id*. "The capstone of those precedents," *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* upheld a parade organizer's decision "to exclude a message they did not like from the communication they chose to make." *Id*. at *11 (cleaned up). The First Amendment ensured this choice "was their decision alone." *Id*.

*NetChoice* explains that a website's expressive choices of what to display as part of their "speech product[s]" enjoy protection equal to those of newspapers, newsletters, cable networks, and parades, noting that "analogies to old media, even if imperfect, can be useful," *id*. at *12, because the "basic principles of the First Amendment 'do not vary'" for online speech. *Id*. at *12 (quoting *Brown* v. *Entertainment Merchants Assn.*, 564 U. S. 786, 790 (2011)). "The choice of material, the decisions made as to content, the treatment of public issues—whether fair or unfair—all these constitute the exercise of editorial control and judgment. For a paper, and for a platform too." *Id*. at *14 (cleaned up). Importantly, whether a website's expressive content originates from the site or third parties, "the larger offering is the platform's" through which it provides a "distinctive expressive offering." *Id*. First Amendment protection thus extends also to "messages that the posts" on a website deliver. *Id*. at *15.

State laws that compel websites to display content they otherwise would not include as part of their expression, therefore, likely violate the First Amendment. *Id*. at *12 ("Texas is not likely to succeed in enforcing its law against the platforms' application of their content-moderation policies to the feeds that were the focus of the proceedings below."). The Texas and Florida statutes at issue in *NetChoice,* at least in certain applications, prohibited large social media platforms from disfavoring user posts based on viewpoint or content. To be sure, the Supreme Court remanded the cases to determine the laws' scope and whether they were facially unconstitutional. *See infra* Part II. But the Court's language makes clear that regulations of platforms' own expressive activities will be found unconstitutional based on the Court's "core teaching" regarding the First

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 4 of 14

Amendment. *Id.* at *12. In forcing websites to make public statements about their hate speech policies and pressuring them to change their editorial policies and how they implement them, the laws "alter[] the platforms' choices about the views they will, and will not, convey." *Id.* at *14. As the Court noted, it has "time and again held that type of regulation to interfere with protected speech." *Id.* By requiring websites to include in their own expression a message they do not wish to send, New York's law runs afoul of this longstanding precedent.

B.  **Each of the Online Hate Speech Law's requirements unlawfully targets online platforms' editorial decision-making.**

Like the Texas and Florida laws, New York's Online Hate Speech Law targets websites' editorial decision-making. As *NetChoice* reiterates, when platforms that produce compilations of content "decide which . . . content [to] . . . display, or how the display will be ordered and organized, they are making expressive choices." *Id.* at *15. Importantly, this principle "is as true when the content comes from third parties as when it does not." *Id.* at *11. The First Amendment thus bars New York from compelling websites to include state-mandated content in their expression if it would "alter or disrupt" those expressive choices, *id.* at *10, or to the extent they interfere with the "overall speech environment" of their "speech product[s]" when considered "as a whole." *Id.* at *15. The State cannot "advance some points of view by burdening the expression of others." *Id.* at *16 (quoting *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 20 (1986)).

Each element of the Online Hate Speech Law requires countless websites to create, display, and promote a policy and complaint mechanism, and "respond [to] and address" complaints, in order to relay the State's viewpoint-based messages about hate speech. In doing so, the law's requirements work together as part of a unified scheme to commandeer websites' First Amendment-protected editorial judgment, alter their expressive offerings, and disrupt the message of websites that object to the State's preferred viewpoint on hate speech. For this reason, the State errs when it attempts to frame the policy requirement and reporting mechanism as two wholly separate requirements that must be scrutinized separately. *See* Appellant's Reply Br. 1 (critiquing what it sees as the district court's refusal to "separately consider" each of the law's provisions); *but see* Appellees' Br. 67.

Policy Requirement

The Online Hate Speech Law commands countless websites to display "a clear and concise policy readily available and accessible on their website and

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 5 of 14

application" stating how they "will respond [to] and address" user reports of hate speech on the site.[1] N.Y. Gen. Bus. L. § 394-ccc(3). On its face, the statute requires websites, at a minimum, to create and display a public stance on the controversial and complex subject of hate speech, as defined in the statute, *see* § 394-ccc(1)(a).[2] But a speaker's choice "to exclude a message" from their speech is "their decision alone." *NetChoice*, 2024 WL 3237685, at *11 (cleaned up). New York can no more force websites to display the State's mandated policy than Texas can compel Facebook to host certain third-party speech in its News Feed.[3] Both laws

---

[1] Even assuming, as Appellant argues, that New York's law allows websites to choose whether they respond to hate speech reports—a dubious proposition, *see* Appellants' Reply Br. 14 and *infra* Section I.B. "Response Requirement"—the law certainly requires sites to say *something* about whether hate speech is a favored or disfavored part of the site's overall speech environment. Appellees' Br. 45–46. This requires platforms to express an opinion, contrary to the State's claim that its law "does not demand disclosure" of one. Appellant's Reply Br. 16. Plaintiffs-Appellees object to this demand, which violates the First Amendment's longstanding protection of a speaker's right to *choose* "what not to say." *See* Appellees' Br. 33; *NetChoice*, 2024 WL 3237685, at *18.

[2] The complexity of the State's definition and potential for ten different policies for how a website will respond to "hateful" speech about each of the ten protected classes referred to in the law makes this disclosure particularly onerous. *See* § 394-ccc(1)(a).

[3] New York has argued the Supreme Court's refusal in *NetChoice* to review *Zauderer's* applicability to Texas's general disclosure requirements connotes the Court's approval. Appellant's Reply Br. 8 & n.2, 30. Not so. "The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times." *United States v. Carver*, 260 U.S. 482, 490 (1923). Here, there are a variety of procedural reasons the Court may have chosen not to take up the issue. In particular, "the trade associations did not contest *Zauderer*'s applicability before the Eleventh Circuit[.]" 2024 WL 3237685, at *20 (Thomas J., concurring). But Plaintiffs-Appellees *do* contest *Zauderer*'s applicability here, arguing both that the policy requirement does not regulate commercial speech and that it demands much more than an uncontroversial, factual disclosure. Appellees' Br. 42–46. Regardless, unlike New York's Online Hate Speech Law, the Texas and Florida policy-disclosure requirements mandated only that the largest social media platforms publish their *already existing* content-moderation policies. Appellees' Br. 67–68. Defendants improperly try to stretch *NetChoice*'s silence

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 6 of 14

"profoundly alter[] the platforms' choices about the views they will, and will not, convey." *Id.* at \*13.

The Online Hate Speech Law, however, goes further. It requires websites to communicate several state-preferred messages. The most obvious message, as the district court concluded, is that websites must approach "hateful" speech "at least as inclusive[ly] as . . . the law itself." J.A. 345. As the State admitted at oral argument, a website using a different definition would risk being in violation of the law. Oral Argument at 2:35–2:55, *Volokh v. James*, No. 23-356 (Feb. 16, 2024 (conceding that the website policy would need to "encompass what the network will do with reports of hateful conduct . . . as defined by the statute")). Additional compelled messages include that: (1) state-defined hate speech is properly singled out for special procedures; (2) hate speech should be reported to the website's operators, or even law enforcement, because it is dangerous; and (3) because of that danger, websites must respond to complaints regarding state-defined hate speech. *See* Appellees' Br. 35. Requiring websites to send New York's preferred messages about state-defined hate speech thus commandeers editorial control of the websites' overall distinctive expression in several ways, in contravention of *NetChoice*'s express rejection of state laws that force expressive entities to "communicat[e] different values and priorities." 2024 WL 3237685, at \*16.

Paradoxically, the State acknowledges that a website's displayed policies communicate particularized messages, yet it defends its attempt to inject new or different messages into those policies. In its briefing, the State admits websites "use their moderation policies to attract users."[4] Appellant's Reply Br. 15. The Supreme Court's decision in *NetChoice* confirms the efficacy of that admission. *See* 2024 WL 3237685, at \*11 (the choice of displaying or not displaying expressive

---

about *Zauderer*. But Plaintiffs-Appellees have already shown why *Zauderer* does not apply to the Online Hate Speech Law and *NetChoice* does nothing to change that.

[4] The State argues moderation policies amount to "an advertisement to users" that propose a commercial transaction, such that the law's policy requirement should receive relaxed scrutiny as a commercial speech regulation. Appellant's Reply Br. 15. Even assuming content-moderation policies are commercial speech—something the district court correctly rejected, *see* J.A. 347–49—the State must provide a substantial state interest in restricting them but fails to offer even a legitimate one. *See infra* Section I.C; *see also* Appellees' Br. 67–68 (arguing the State has not provided evidence to show its purported interest will be served by the Online Hate Speech Law).

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 7 of 14

content in the platforms' own "distinctive compilations of expression" "results in a distinctive expressive product"). The State is thus wrong to cling to its position that it poses no First Amendment problem to force websites to change their "expressive product," *id.*, by including a policy for how they "will respond [to] and address" user reports of state-defined hate speech even if they have chosen not to have or display such a policy. N.Y. Gen. Bus. L. § 394-ccc(3). The government cannot interfere with websites' "wealth of choices about whether—and, if so, how—to convey" particular content or viewpoints that reflect the sites' distinctive expressive offerings. *Id.* at *14.

*NetChoice's* reasoning also invalidates the State's arguments that the policy requirement causes no First Amendment injury because Plaintiffs-Appellees can convey "alongside the disclosure whatever additional information or speech that they want." Appellant's Br. 54–55; *see also* Appellant's Reply Br. 6–7. But demanding websites display *more* speech to disclaim compelled content only compounds the State's interference with the websites' editorial freedom. In other words, New York suggests *a second* (at least) unwanted alteration to the website's expressive policy content on top of the compelled policy. In any event, even if "no one will wrongly attribute to them the views" of the State's required policy, the inclusion of a hate speech policy alters websites' "overall speech environment," *NetChoice*, 2024 WL 3237685, at *15, "overriding a private party's expressive choices." *NetChoice*, 2024 WL 3237685, at *11. New York's law "forces [websites] to weigh in on the debate about the contours of hate speech when they may otherwise choose not to speak." J.A. 346.[5]

---

[5] Contrary to the State's contentions, none of this means that "*any* compelled speech disclosure infringes on . . . editorial discretion." Appellant's Reply Br. 31. *NetChoice* says nothing about the kinds of user privacy-related disclosure requirements cited by the State, *see* Appellant's Br. 38–39, for obvious reasons. First, the exact categories of user information collected by websites are cold, hard facts. Displaying these facts does not send any message related to or alter the site's "distinctive expressive product." 2024 WL 3237685, at *11. But forcing a website to take a stand related to state-defined hate speech does. Second, laws protecting privacy achieve "a 'substantial state interest" not at issue here," Appellees' Br. 42 (quoting *Edenfield v. Fane*, 507 U.S. 761, 769 (1993)). Also, New York's goal is to distort the marketplace of ideas, an interest that is "not valid," under the First Amendment. *NetChoice,* 2024 WL 3237685, at *15; *see* Appellees' Br. 21–25 and *infra* Part I.C.

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 8 of 14

Reporting Mechanism

New York's reporting mechanism requirement similarly hijacks websites' editorial judgment by forcing them to create and prominently display a means for reporting "hateful" speech. *See* Appellant's Br. 38–39. The mandatory hate-speech reporting mechanism has one purpose: "for individual users to report" state-defined hate speech to the website. N.Y. Gen. Bus. L. § 394-ccc(2). Like the policy provision, it thus requires websites to implicitly send New York's preferred message about hate speech—that it is dangerous and worth reporting to authorities. It therefore similarly overrides websites' choices about "the views they will, and will not, convey," *NetChoice*, 2024 WL 3237685, at *14, and alters the "overall speech environment" each website creates. *Id*. at *15. In essence, the mechanism is the message, sitting uneasily—contradicting, really—*NetChoice*'s underscoring that the choice "to exclude a message" is a website's decision alone. *Id*. at *11.

The Online Hate Speech Law exacerbates this by mandating that websites give the mechanism prioritized placement by requiring it to be "clear and easily accessible," "clearly accessible to users," and "easily accessed from" the site. N.Y. Gen Bus. L. § 394-ccc(2). This contravenes another of *NetChoice's* central holdings that deciding to "alter, organize, *prioritize*, or disclaim" content on a website are *all* protected expressive choices. *Id.* at *5 (emphasis added). Worse, prioritizing the mechanism sends its own implicit message that reporting hate speech is important and welcome. Mandating that the mechanism have pride of placement further alters websites' "overall speech environment" and particularly interferes with the pro-free speech ethos of Plaintiffs-Appellees. *See* J.A. 347 (district court's opinion describing New York's law as putting Plaintiffs-Appellees or other pro-free speech websites "in an incongruous position").

*NetChoice* also lays to rest the State's reliance on *Rumsfeld v. Forum for Academic and Institutional Rights ("FAIR"), Inc.,* 547 U.S. 47 (2006), to argue the reporting mechanism requirement regulates only conduct. Appellant's Br. 26, 28–29. *NetChoice* clarifies that *FAIR* only allows the state to compel an entity to provide equal access to third parties when the regulated entity is not "engag[ing] in expression." 2024 WL 3237685, at *11. Requiring law schools to allow military recruiters equal access to students "did not interfere with any message" expressed by the law school. *Id.* (cleaned up). By contrast, websites are engaged in "inherently expressive," *FAIR*, 547 U.S. at 66, activity—like newspapers, newsletters, and parades—when they "alter, organize, prioritize, or disclaim" content. *Netchoice*, 2024 WL 3237685, at *5.

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 9 of 14

While the State prefers to view its law as a conduct regulation that simply requires "mak[ing] available a user tool for reporting," Appellant's Reply Br. 5–6, this is a euphemism for requiring platforms to create, display, and promote particular content that the State demands in violation of the First Amendment.

<u>Response Requirement</u>

The Online Hate Speech Law's mandate for websites to respond to user reports of hate speech also erodes their control of their speech environments by requiring "a direct response" to each complainant "informing them of how the matter is being handled." N.Y. Gen. Bus. L. § 394-ccc(2); *see also* N.Y. Gen. Bus. L. § 394-ccc(3). *See* Appellee's Br. 41–42. As explained further in Plaintiffs-Appellees' answering brief, this requirement imposes significant compliance costs on sites that allow speech defined by New York as hate speech and will now be required to spend time responding to complaints. Appellee's Br. 17. The law, therefore, incentivizes proactive banning or removal of state-defined hate speech, allowing New York to "accomplish indirectly via market manipulation what it cannot do through direct regulation—control the available channels for political discussion," Appellees' Br. 56 (citing *Washington Post v. McManus*, 944 F.3d 506, 517 (4th Cir. 2019)). Imposing these costs to influence websites' "overall speech environment" on expressive platforms like Rumble or Locals, 2024 WL 3237685, at *15–16, cannot be squared with the tenets of *NetChoice*.

**C.   *NetChoice* confirms that New York's explicit objective of tilting the marketplace of ideas is constitutionally illegitimate.**

The Supreme Court's decision in *NetChoice* repudiates New York's central goal in enacting its Online Hate Speech Law of reducing "hateful" but protected online speech. Appellees' Br. 62–64. The law's title, "Social media networks; hateful conduct prohibited," § 394-ccc, evidences the State's impermissible aim, as the district court understood. J.A. 353 (the title "strongly suggests that the law is targeted at reducing . . . hate speech online"). And the law's policy, reporting mechanism, and response requirements effectuate this aim by disincentivizing speech-permissive policies and hindering the messages and editorial choices of websites like those the Plaintiffs-Appellees operate. *See* Appellees' Br. 55–58. As the district court warned, "the state's targeting and singling out of this type of speech for special measures certainly could make social media users wary about the types of speech they feel free to engage in without facing consequences." J.A. 353.

The Supreme Court expressly rejected Texas's similar goal of "correct[ing] the mix of speech that the major social-media platforms present" by altering

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 10 of 14

private expression, holding the First Amendment forbids "licensing the government" to "change the speech of private actors . . . to achieve its own conception of speech nirvana." *NetChoice*, 2024 WL 3237685, at *15–16. Noting "there are few greater" "dangers to free expression," *id.* at *16, it held that state attempts to "rejigger the expressive realm," *id.* at *12, by burdening or promoting certain expression is simply "not valid" under the First Amendment. *Id.* at *15.

Were there any question that New York's law is cut from the same cloth, its legislative history further shows the State's intent to distort the marketplace of ideas and "tilt[] public debate" in the State's preferred direction. *Id.* at *16. In concluding that Texas's purpose in enacting its law was to impermissibly "create a better speech balance," the Supreme Court similarly looked to remarks by the bill's chief sponsor and the governor's signing statement. *NetChoice*, 2024 WL 3237685, at *15. Here, likewise, as Appellees showed in their briefing, the law's sponsors were not shy that the law's intended target was "hateful material," "hateful ideology," and the spread of "dangerous and corrosive ideas." J.A. 75, 174, 179. For instance, the President of the New York Senate emphasized that the law would "allow law enforcement to break the echo chamber where malice festers" and to "confron[t] the spread of misinformation and hateful ideology on the internet." Appellees' Br. 1–2, 9. *See* Appellees' Br. 9, 42–43, J.A. 176. Governor Hochul's signing statement similarly lauded the statute's true goal: "[W]e're now requiring social media networks to monitor and report hateful conduct on their platforms." J.A. 13; *see also id.* (including quotes from Attorney General James).

The State's briefing admits this underlying purpose in arguing the law's policy and reporting mechanisms will "make[] it more likely that users who see hateful conduct . . . will report it" and that "encouraging such user reports" will lead to "reducing violent and extremist content on social media networks that choose to remove such content." Appellant's Br. 52–53. Similarly, the State believes the policy requirement "may inform a user who is exposed to hateful conduct that further action is needed," Appellants' Reply Br. 20, "for example, by calling local or federal law enforcement." Def.'s Opp. Mot. Prelim. Inj., *Volokh v. James*, 22-cv-10195, ECF No. 21 at 25. As with Texas and Florida in *NetChoice*, New York's interest here in "tilt[ing] public debate" is "very much related to the suppression of free expression" and thus "not valid" under any level of constitutional scrutiny. *NetChoice*, 2024 WL 3237685, at *15.

Insofar as New York contends its law speaks to "providing . . . accurate information about networks' policies," Appellant's Reply Br. 18, it fails to support

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 11 of 14

the validity of that interest,[6] which is fatal insofar as a state cannot "sacrific[e] important First Amendment interests" for "speculative" gains. *Denver Area Educ. Telecomms. Consortium, Inc., v. FCC*, 518 U.S. 727, 760 (1996) (cleaned up). It is, moreover, likely unnecessary to compel the provision of such information, as websites already have every incentive to ensure their overall speech environment speaks for itself. They likewise are incentivized to provide clear content-moderation policies—which provide "a key point of differentiation" between sites, as the State recognizes. Appellant's Reply Br. 15.[7]

## II. The District Court Correctly Held that New York's Online Hate Speech Law Was Likely Invalid Both Facially and As Applied to Plaintiffs.

While in *NetChoice* the Supreme Court vacated the circuit decisions and remanded for lower courts to reconsider the facial validity of Texas's and Florida's laws, that is unnecessary here. That holding reflected that those laws include numerous provisions and possible applications to "an ever-growing number of apps, services, functionalities, and methods for communication," which the lower courts did not address. *NetChoice*, 2024 WL 3237685, at *9. The Supreme Court thus instructed them to first determine "[w]hat activities, by what actors, do the laws prohibit or otherwise regulate[.]" *Id.* at *9. After that, they can determine whether

---

[6] The State presented no evidence or legislative testimony demonstrating that anyone has been "confused or deceived" related to websites' hate speech content-moderation policies. This stands in contrast to the country-of-origin disclosure law upheld in *American Meat Institute v. U.S. Department of Agriculture ("AMI")*, 760 F.3d 18, 23 (D.C. Cir. 2014), which the State replied upon. *See* Reply Br. 19–20. In *AMI*, the D.C. Circuit cited extensive survey data, consumers' heightened health and safety interest in where their food comes from, and the significant "historical pedigree" of country-of-origin laws that the government proffered. No such evidence is present here, however.

[7] *See also* Appellees' Br. 11 (explaining that websites like those of Plaintiffs-Appellees attract users seeking a permissive speech environment by having relatively few speech policies, while others promote more aggressive moderation to attract different users seeking a different environment); Amicus Br. of NetChoice and Chamber of Progress, ECF No. 75 at 9 ("Rumble, for example, offers a competitive differentiation by promising . . . substantially less restrictive content rules than those offered by NetChoice and CHOP's members.").

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 12 of 14

"a substantial number of the law's applications are unconstitutional" compared to its plainly legitimate sweep. *Id.* at *8 (cleaned up).

Here, the Online Hate Speech Law's requirements solely infringe on covered websites' editorial judgment and, in that regard, lack a plainly legitimate sweep. And even were that not the case, the preliminary injunction is also independently justified by the fact that the law discriminates based on viewpoint and is vague. Further, a separate ground for affirmance lies in the as-applied reasoning below. In short, *NetChoice* offers a substantive path for this Court to follow without requiring the additional parsing of New York's law, which the Supreme Court held the Florida and Texas laws require.

That is so because the Online Hate Speech Law regulates *only* expressive activity—the creation, display, and promotion of website policies describing how the website "will respond and address" "hateful" content posted publicly on the site. *See* J.A. 352 (district court holding "the law is clearly aimed at regulating speech" and that it "fundamentally implicates . . . speech . . . by mandating a policy and mechanism by which users can complain about other users' protected speech"). The scope of New York's law thus requires no fact-finding because the covered activities and actors are plain on its face. The law applies only to websites and applications that display user-generated content to users. N.Y. Gen Bus. L. § 394-ccc(b). It then requires covered websites to publicly disclose how they will treat hate speech, to feature prominently a way for the public to report hate speech, and to respond to the public's reports. These requirements jointly operate—as per the State officials' principal goal in passing the law—to diminish the availability of protected expressive content the State considers "hateful." *See supra* Section I.C. They do not regulate the kinds of private communications (like email or instant messages) that the Supreme Court in *NetChoice* said necessitated remand; rather, the "principal things regulated" by New York's law are expressive in nature. *NetChoice* 2024 WL 3237685, at *9.

The district court also found the Online Hate Speech Law overbroad insofar as it chills website users' protected speech, J.A. 351–54, and *NetChoice* reinforces the futility of the State's argument that the court erred because Plaintiffs-Appellees lack third-party standing to raise their users' injuries. *See* Appellant's Br. 69; Appellant's Reply Br. 32–33. As the Supreme Court explained, online platforms, including those covered by New York's law, express *themselves* and their "*own views and priorities*" primarily by reshaping and sharing *user* content, *NetChoice*, 2024 WL 3237685, at *5 (emphasis added). "The individual messages may originate with third parties, but the larger offering is the platform's." *Id.* at *14.

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 13 of 14

There are, in any event, separate grounds for affirming the preliminary injunction here that are unaffected by the Supreme Court's holding in *NetChoice* regarding the conduct of facial challenges. First, the Online Hate Speech Law expressly targets for suppression viewpoints that New York deems hateful. *See supra* Sections I.B & I.C.; *see also* Appellees' Br. 21–25. In *Iancu v. Brunetti*, the Supreme Court made clear such viewpoint-based laws are not "salvageable by virtue of its constitutionally permissible applications." 588 U.S. 388, 398–99 (2019). Once a court finds "a law aims at the suppression of views," that "end[s] the matter." *Id.* (cleaned up). New York's law flunks that test.

Second, and separately, the Online Hate Speech Law is void for vagueness in its reliance on subjective terms like "vilify" or "humiliate," among others, which fail to define "what kind of speech or content is now the target of government regulation." J.A. 353–54. In other words, covered websites cannot know what type of speech the mandated policy, mechanism, and responses must be directed toward, so they cannot know how to comply with the law's requirements.[8] That alone is grounds to enjoin the law. *Thornhill v. State of Alabama*, 310 U.S. 88, 101 (1940) (emphasizing that a vague speech restriction was "invalid on its face").

Finally, unlike the NetChoice plaintiffs, Plaintiffs-Appellees in this case brought and prevailed on both facial and as-applied challenges. *See* J.A. 342–51 (as-applied challenge), 351–54 (facial challenge). Each Plaintiff-Appellee engages in editorial decision-making and expressive activity through the design of the overall speech environment, as well as writing their own content and allowing third-party users to upload content. *See* J.A. 10 ¶¶ 10–12, 14; J.A. 14 ¶ 23. Therefore, even if the Supreme Court's holding in *NetChoice* regarding the conduct of analyzing facial constitutional challenges had bearing here (it does not), remand would be

---

[8] The fact that the law "does not prohibit any conduct by users or authorize enforcement actions against users," Appellant's Reply Br. 41, is irrelevant to the vagueness analysis. The law is unconstitutional because it does not give covered websites a "reasonable opportunity to understand" what is required. *See Hill v Colorado*, 530 U.S. 703, 732 (2000). And, significantly, the State admitted during oral argument that using the wrong definition of "hateful" risks investigation and liability, as does inconsistently applying the policies that the Online Hate Speech Law forces them to adopt. *See supra* Section I.B. "Policy Requirement" (citing Oral Argument at 2:35–2:55); *Oral Argument* at 16:30–17:30 (conceding that a platform that did not make a conscientious effort" to apply their policy would be subject to investigations and fines under the statute for failing to disclose "accurate information").

Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
July 11, 2024
Page 14 of 14

unwarranted because this Court can affirm the grant of preliminary injunctive relief on Plaintiffs-Appellees' as-applied claims.

## Conclusion

The Supreme Court's decision in *NetChoice* vindicates the district court's conclusions and preliminary injunction. New York's Online Hate Speech Law interferes with countless websites' editorial judgment, impermissibly compelling them to alter their expressive content to communicate the State's "values and priorities" on hate speech and disrupting their overall distinctive expressive offerings. The district court also correctly held that the State's law was intended to curtail a particular category of protected speech on the internet—an interest *NetChoice* proclaims "is not valid." And because the law violates core expressive rights on its face and as applied to Plaintiffs-Appellees, the district court correctly enjoined its enforcement. This Court should, therefore, affirm the district court's preliminary injunction order.

Sincerely,

JAMES M. DIAZ
*Counsel of Record*
DANIEL M. ORTNER
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, Pennsylvania 19106
(215) 717-3473
jay.diaz@thefire.org
daniel.ortner@thefire.org

*Attorneys for Plaintiffs-Appellees Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc.*

cc: All Counsel of Record via ECF