<u>Volokh v. James</u>, No. 23-356

DENNIS JACOBS, *Circuit Judge*, dissenting:

I respectfully dissent.

To whack the moles of hate, the State of New York proposes to put regulation of internet content in the hands of the state's elected Attorney General. The district court has temporarily enjoined this "Hateful Conduct Law,"[1] and the panel today unanimously confirms that the First Amendment forbids such a measure.

However, rather than affirm the district court's preliminary injunction, the majority certifies questions to the New York Court of Appeals, asking whether the statute might be creatively read to reduce the infringement on speech. It cannot. I dissent from the certification of questions because no answer that the Court of Appeals could give to the questions posed would advance the inquiry. I would instead affirm; Judge Carter got it right.

**I.**

New York's Hateful Conduct Law governs all "service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public," and which "conduct[] business in [New York]" from anywhere in the world. N.Y. Gen. Bus. Law § 394-ccc(1)(b) and (2). While the statute refers to these businesses by the defined term "social media network," that label is grossly underinclusive; the statute apparently applies to any blog. *Id.*

The statute requires all bloggers to "have a clear and concise policy readily available and accessible on their website and application which includes how [they] will respond and address [] reports of incidents of hateful conduct on their platform." *Id.* § 394-ccc(3). The statute defines hateful conduct as "the use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." *Id.* § 394-ccc(1)(a). Bloggers must as well "provide and maintain a clear and easily

---

[1] I adopt the Majority's defined terms.

accessible mechanism for individual users to report incidents of hateful conduct," so that the platform can duly comply with its stated policy. *Id.* § 394-ccc(2). Each knowing violation of the statute subjects the blogger to "a civil penalty . . . by the attorney general not to exceed one thousand dollars" per day. *Id.* § 394-ccc(5). This is supposedly a consumer protection measure.

The Hateful Conduct Law mandates that each blog's disclosed policy be *accurate*. In the words of New York's counsel, a "consumer" must "be able to look at that policy and say, 'okay, I understand what the network is going to do if I report hateful conduct as defined by the statute.'" Oral Arg. at 2:47-2:55; *see id.* at 16:28-16:35. So, "if [a network's] policy was a lie," "that would lead to liability under the statute." *Id.* at 17:16-20. In that event, "[t]he Attorney General would be able to enforce the statute through her enforcement powers in the statute in Section 5 with civil fines and so forth," *id.* at 17:02-17:10--i.e., through daily penalties of up to one thousand dollars per violation, N.Y. Gen. Bus. Law § 394-ccc(5).[2]

## II.

I agree with the majority that "[t]he most natural reading" of this statute is that it requires blogs to "develop and publish policies that specifically address hateful conduct, as that term is defined by statute." Majority at 30. Indeed, I see no other reading. I further agree that requiring moderation policies and reporting mechanisms that speak to the state's definition of hateful conduct is unconstitutional. *See* Majority at 30, 48. In my view, the whole thing is about as constitutional as dukedoms.

New York acknowledges the attendant "'constitutional difficulties'" raised by a straightforward reading of the words in the statute; so the state's backpedaling lawyers urge this Court to construe the Hateful Conduct Law so that it does not "require a network's policy to reference the statute's definition of hateful conduct." Appellant's Br. at 45 n.5 (quoting *Skilling v. United States*, 561 U.S. 358, 406 (2010)). Accordingly, the only seriously contested question on

---

[2] The Hateful Conduct Law is part of a wider regulatory program. *See generally* New York Senate Bill S895B, codified at Article 42 (Sections 1100–1104) (New York statute, signed December 21, 2024, requiring disclosure of whether and how social media companies' terms of service address "hate speech").

2

appeal is whether the Hateful Conduct Law is amenable to some kind of a saving construction.

New York asks us to save the statute by reading it so that a regulated platform is not "required to adopt or even reference GBL § 394-ccc(1)(a)'s definition of hateful conduct in its policy" or "in making a report mechanism available." Appellant's Br. 26, 44. But before we can rely on an interpretation to save a statute, the statute must be "readily susceptible to such a construction." *United States v. Stevens*, 559 U.S. 460, 481 (2010) (citation modified). This one is not. A policy that does not "even reference" the "definition of hateful conduct" would hardly constitute the "*clear and concise* policy" on moderation that the text of the statute demands. *See* N.Y. Gen. Bus. Law § 394-ccc(3) (emphasis added). Among other objections, allowing such a counterintuitive limiting construction would "sharply diminish" the New York legislature's "incentive to draft a narrowly tailored law in the first place." *Stevens*, 559 U.S. at 481 (citation modified).

Regardless of any judicial salvage job, every lay reader would understand this statute to forbid protected speech--not least because it is *titled* "Social media networks; hateful conduct prohibited." The clear statutory wording would therefore "have a substantial chilling effect on protected conduct." *Farrell v. Burke*, 449 F.3d 470, 497 (2d Cir. 2006) (explaining that such speech restrictions are unconstitutionally vague on their face). In addition to the chill on those who read it, the words on the books empower litigious censors to invoke the statute in "hate speech" strike suits. It is no comfort that bloggers might defeat such litigation by hiring constitutional lawyers at going rates.

### III.

All agree that the statute's words are an unconstitutional speech restriction. New York's Court of Appeals has told us not to resuscitate such statutes through judicial opinion. *See People v. Dietze*, 549 N.E.2d 1166, 1169 (N.Y. 1989) (rejecting a saving construction of a speech regulation as "unacceptably vague" where "the statutory language would signify one thing but, as a matter of

3

judicial decision, would stand for something entirely different"). I would therefore affirm.[3]

---

[3] The questions asked of the New York Court of Appeals posit a statute that is radically rewritten and reconceived. Since no such statute has been presented to us, the hypothesis that it would be constitutional is dicta. *Cf. United States v. Johnson*, No. 22-1289, 2025 WL 1921533, at *1 (2d Cir. July 14, 2025) (op. of Lohier, J., joined as to this part by Robinson and Nathan, JJ.) ("[T]he question . . . remains an open one in this Circuit because the panel opinion's statements bearing on a hypothetical . . . are clearly dicta.").

    A question is not a holding; and a certification is not a disposition of the case or the issues presented. So the majority's reasoning would remain dicta whether or not the New York Court of Appeals blesses the majority's redrafting. After all, "[a] panel opinion's assertion is decidedly *not* a holding of this Court" unless it necessarily disposes of "the case before it." *Id.* at *2 (op. of Lohier). Our opinions certifying questions to the Court of Appeals make clear that we do not yet reach a "*disposition* of the case before [us]." *See, e.g., Ferreira v. City of Binghamton*, 975 F.3d 255, 291 (2d Cir. 2020) ("[T]he question certified will control our *disposition* of the case." (emphasis added)); *Beck Chevrolet Co. v. Gen. Motors LLC*, 787 F.3d 663, 682 (2d Cir. 2015) ("The *disposition* of this case could have a substantial impact . . . in New York State. . . . We accordingly certify the following two questions . . . ." (emphasis added)); *see also Adelson v. Harris*, 774 F.3d 803, 811 & n.5 (2d Cir. 2014) ("Two unresolved questions of state law may be determinative of the instant appeal and are hereby respectfully CERTIFIED . . . . Costs shall abide final *disposition* of the case." (emphasis added)).

    The hypothetical nature of such a certification is easily demonstrated. A certification can run by the New York court more than one alternative reading; and the New York court is expressly invited to reframe the certified questions (and thus the statute) as it wills. *See* Majority at 56 ("[W]e invite the Court of Appeals to reformulate or expand upon these questions as it deems appropriate.").

    If (as seems correct to me) the New York court advises that the statute will not bear the reading posited by the majority here, our certification will not bind a

## IV.

Nevertheless, the majority agrees with New York that the Hateful Conduct Law might be read to require no more than a virtual complaint box, plus a disclosed "policy of simply responding to *all* complaints" at the platforms' "'own discretion.'" Majority at 43 (quoting Appellant's Br. at 44-45); *see* J. App'x at 120. Contrary to fact, I will assume that the majority is correct.

The majority holds that New York's proposed saving construction would be constitutional, even though the natural interpretation of the statutory wording would not. So the majority enlists the New York Court of Appeals to say which interpretation is correct, with the idea that the answer would decide this appeal.

That is itself error. Before we certify questions to a state's highest court, we first ask "whether state-law principles of statutory interpretation and related precedents permit [us] to predict how the forum state's highest court would decide the point at issue." *Reyes v. City of New York*, 141 F.4th 55, 68 (2d Cir. 2025) (citation modified). We certify when "we cannot confidently predict how the [state's highest court] will interpret the relevant statute, and no controlling precedent from [that court] resolves" the case. *Loomis v. ACE Am. Ins. Co.*, 91 F.4th 565, 569 (2d Cir.) (Robinson, J., joined by Nathan, J.), *certified question answered*, 244 N.E.3d 908 (Ind. 2024).

This case is not certifiable because the majority's resolution of the constitutional issue leaves no lingering questions of statutory interpretation for the New York court. "Under the federal and New York State canons of constitutional doubt, a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, *but also grave doubts upon that score*." *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 260-61 (2d Cir. 2014)

---

future federal court to the constitutionality (or not) of some future enactment that conforms to the text of the hypothetical statute offered up for consideration by the Court of Appeals.

(emphasis added) (citation modified).  We accordingly apply a "presumption that legislatures are cognizant and respectful of constitutional limitations." *Id.* at 261.  If there were any doubt that this canon controls, it is codified in the text of the Hateful Conduct Law: "Nothing in this section shall be construed [] as an obligation imposed on a social media network that adversely affects the rights or freedoms of any persons, such as exercising the right of free speech pursuant to the first amendment to the United States Constitution."  N.Y. Gen. Bus. Law § 394-ccc(4)(a).

Since the majority concludes that there is one interpretation that is constitutional and one that is not, and since the statute must be construed to avoid even a doubt about its constitutionality, the majority necessarily should "confidently predict" (without certification) that the Court of Appeals would adopt the reading that is supposedly constitutional.  The majority's choice to certify anyway is not without cost.  An appeal from a preliminary injunction is a remedy "granted under the theory that there is an urgent need for speedy action." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  Certification will "inevitably delay[] proceedings," thwarting "prompt resolution" of this appeal. *Cruz v. Banks*, 134 F.4th 687, 697 (2d Cir.), *certified question accepted*, 259 N.E.3d 1122 (N.Y. 2025).

## V.

Even if I were willing to indulge the state's rewrite of its statute and to certify rhetorical questions, I would affirm, not certify.  The Hateful Conduct Law, when read as the state urges, is still unconstitutional.  It is immaterial which unconstitutional reading is correct.

Under the state's reading, the Hateful Conduct Law requires bloggers to commit in advance to how they will curate speech.  It threatens bloggers with punishing fines if they fail to police content in precise accordance with their stated moderation policies.  And it grants the state enforcement discretion over whether bloggers' content moderation decisions live up to those policies.  Through compliance costs and fines, the statute burdens speech--and the weight of the burden depends on the content of the speech.  The Hateful Conduct Law is thus unconstitutional as applied and on its face, even if (in the words of the majority) it "merely requires social media networks to publicly disclose their content moderation policies, whatever those policies may be, and contains no

6

requirement that those policies actually specifically address 'hateful conduct,' as defined by the statute." Majority at 30.

A.

The business end of the Hateful Conduct Law is New York's confessed plan for enforcing it: imposing "liability" of up to one thousand dollars daily, per violation, on any platform that (New York contends) disclosed a "policy [that] was a lie." Oral Arg. at 17:16-20. In other words, the statute levies fines for falling short of the blogger's announced policy--or, as the statute puts it, "liability" for "the failure to provide a mechanism for a user to report to the social media network any incidents of hateful conduct on their platform and to receive a response on such report."[4] N.Y. Gen. Bus. Law § 394-ccc(4).

The Hateful Conduct Law's constitutional deficiencies thus become manifest. It discriminates based on content by (1) deterring blogs from speaking on incendiary (or even interesting) topics; (2) forcing bloggers to commit in advance to how they will moderate future posts, thus restraining their future speech; and (3) deterring blogs from employing certain content moderation policies. Meanwhile, the law is too vague to obey, or to constrain arbitrary enforcement.

This is all elementary: the First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U.S. Const. amend. 1. A state has "no power to restrict expression because of its messages, its ideas, its subject matter, or its content." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra ("NIFLA")*, 585 U.S. 755, 766 (2018) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Laws that "target speech based on its communicative content" are therefore "presumptively unconstitutional." *Id.* (quoting *Reed*, 576 U.S. at 163).

Because "[l]awmakers may no more silence unwanted speech by burdening its utterance than by censoring its content," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011), the presumption of unconstitutionality applies when the state "imposes a financial burden on speakers because of the content of their

---

[4] The statute obligingly disclaims adding or increasing liability "for anything other than" such failure. N.Y. Gen. Bus. Law § 394-ccc(4).

speech." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991). For example, *Simon & Schuster* struck down New York's restriction on the ability of criminals to earn royalties on their memoirs because it "establishe[d] a financial disincentive to create or publish works with a particular content." 502 U.S. at 118.

Like the royalty restriction in *Simon & Schuster*, the Hateful Conduct Law disincentivizes speech based on its content. As the Supreme Court recently confirmed, a website's "presenting a curated and edited compilation of third party speech is itself protected speech." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024) (citation modified). "When the government interferes with [a website's] editorial choices," it "alters the content of the compilation." *Id.* at 731-32. The Hateful Conduct Law does that by requiring blogs, under pain of fines, to comply with their disclosed content moderation policies. Blogs' cost of compliance varies with: (1) the subjects on which they speak; (2) their moderation decisions; and (3) their moderation policies. Bloggers may accordingly "avoid or mitigate the effects of the [a]ct by altering their speech"; so the act "impose[s] a . . . burden by reason of content." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 67 (2025) (citation modified).

Subjects. The more a blog allows free-wheeling discussion of "race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression," the more complaints it will field (through the Section 394-ccc(2) report mechanism) about contributions that are said to "vilify, humiliate, or incite violence" based on these categories--i.e., statutory "hateful conduct." Since, as explained, a blog must comply with its stated policy whenever a user reports hateful conduct, more complaints means more time and cost spent on compliance with the Hateful Conduct Law's obligation to moderate in conformity with the platform's stated policy. And it means more pitfalls.

Moderation Decisions. The Hateful Conduct Law compels bloggers to speak in accordance with their previously announced policies, even when intervening events would lead them to speak otherwise. Bloggers who discover from experience that their content moderation policies are too lax face fines if they revise their policy and apply it retroactively to third-party comments that they would rather not host; the policy in place when the offending comments were posted would then be "a lie." Oral Arg. 17:16-20. Ironically, a blogger who

8

belatedly decides that a third party's "hateful conduct" might inspire a hate crime may remove that "hateful conduct" *only if* the blogger previously announced an intention to do so.

Moderation Policies.  The Hateful Conduct Law also incentivizes blogs to drain any nuance from their moderation policies.  If a blog insists on including some third-party speech and excluding other speech, it can never be sure if the Attorney General will deem the blog's disclosed moderation policy to be "a lie."  Oral Arg. 17:16-20.  Each moderation decision requires a subjective judgment with which the Attorney General is enabled to disagree, with ruinous consequences.  Accordingly, it is safer--and thus cheaper--to choose a content moderation policy that requires no subjective judgments, such as a prohibition on all third-party comments using the word "race," or "gender," or even a prohibition on third-party commenting altogether.

Even the very moderation policies that the Hateful Conduct Law appears designed to encourage--those applying the state's definition of "hateful conduct"--invite liability.  Again, speech is "hateful conduct" if it "vilif[ies], humiliate[s], or incite[s] violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression."  N.Y. Gen. Bus. Law § 394-ccc(1)(a).  And whether language "vilifies" or "humiliates" will often vary with the sensitivities of the listener.[5]

New York's (telling) advice to platforms is to simply adopt a policy of "*no formal policy at all* and appl[y] its editorial discretion on a case-by-case basis."

---

[5] Not even the law's sponsors can be sure that their speech is not "hateful conduct."  For example, one sponsor, then-Assemblywoman Patricia Fahy, posted to a social media platform about the bill: "Social media companies aren't doing enough to combat the spread of hate, racism, and white supremacy on their platforms. Authorities say the #Buffalo shooter published a document online that included the Great Replacement Theory."  Senator Patricia Fahy (@PatriciaFahy46), X (May 16, 2022, at 11:27 AM ET), https://x.com/PatriciaFahy46/status/1526222894748925952.  "White supremacy" and the "Great Replacement Theory" are terms laden with pejorative, race-based animus.

9

Majority at 33. That is a confession that the Hateful Conduct Law "impose[s] a . . . burden by reason of content": New York concedes that bloggers can "avoid or mitigate the effects of the [a]ct by altering" their curation of speech. *TikTok*, 145 S. Ct. at 67 (citation modified). Moreover, bloggers who take New York's advice are still not safe: if there *is* a logic underlying a blog's curation decisions, then a non-policy is "a lie." The Attorney General thus bears a lethal weapon: she may claim that any blogger who disclaims a hateful conduct policy secretly has one, and has failed to disclose it.

No blogger can be free of jeopardy for the further reason that the regulation (enforced by ruinous fines) is intolerably opaque. A lawful speech restriction must "provide meaningful notice of the scope of [its] prohibition" and "meaningful limits on an enforcing officer's discretion." *Farrell*, 449 F.3d at 498. New York's recast of the Hateful Conduct (as I have explained, *supra* Part II) requires bloggers to consult judicial opinions in addition to the statute's wording in order to figure out their obligations. But identifying their obligations is still not enough for confident compliance: bloggers cannot know whether they are *complying* with their obligations, or--per the Attorney General--just *lying*.

**B.**

The Hateful Conduct Law thus violates the First Amendment. The statute chills disfavored speech through multiple, mutually-reinforcing components: (1) it requires blogs to accept reports of hateful conduct; (2) those reports trigger the blog's obligation to moderate in compliance with a disclosed moderation policy; (3) and every moderation decision entails jeopardy to investigation or fines. When, as here, a state "establishes a financial disincentive to create or publish works with a particular content," the state must satisfy strict scrutiny, i.e. "must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Simon & Schuster*, 502 U.S. at 118 (citation modified). The majority and I agree that New York cannot satisfy strict scrutiny--or, for that matter, even intermediate scrutiny, which would require New York to show that its law "directly advances a substantial governmental interest and is not overly restrictive," *Safelite Group, Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014). *See* Majority at 40-41, 41 n.8.

New York insists that it need satisfy only *Zauderer* scrutiny, a standard that is less restrictive than intermediate scrutiny, and that applies only to mandatory

10

commercial disclosures of "purely factual and uncontroversial information about the terms under which services will be available." *CompassCare v. Hochul*, 125 F.4th 49, 65 (2d Cir. 2025) (citation modified) (citing *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985)). Under *Zauderer*, a state "has the burden to prove" that a commercial disclosure mandate "is neither unjustified nor unduly burdensome," albeit without the obligation to show that the statute is otherwise tailored. *NIFLA*, 585 U.S. at 776 (citing *Zauderer*, 471 U.S. at 651).

*Zauderer* is no fit for the Hateful Conduct Law. Considered as a whole, the Hateful Conduct Law looks nothing like the compelled commercial disclosures we have analyzed under *Zauderer*. For example, we applied *Zauderer* in *New York State Restaurant Ass'n v. New York City Board of Health* ("*NYSRA*"), which rejected a First Amendment challenge to a law requiring certain restaurants to disclose calorie counts on the menu. *See* 556 F.3d 114, 134 (2d Cir. 2009). That law did not (for instance) increase compliance costs or legal jeopardy depending on the restaurant's choice of menu items. True, the idea was that informed consumers would voluntarily buy fewer high-calorie dishes, *see, e.g., id.* at 134-36, so the law disproportionately harmed restaurants selling decadences. But *NYSRA* still applied *Zauderer* scrutiny because mandatory disclosure of calorie counts "further[ed], rather than hinder[ed], the First Amendment goal of the discovery of truth and contribute[d] to the efficiency of the 'marketplace of ideas.'" *Id.* at 132 (quoting *Nat'l Elec. Mfrs. Ass'n v. Sorrell* ("*NEMA*"), 272 F.3d 104, 114 (2d Cir. 2001)).

The Hateful Conduct Law is not such a commercial disclosure measure. Though it requires a blog to disclose a "hateful conduct" moderation policy, that commercial disclosure is just the hook for the state to police *non-commercial* content that the blog curates. Such "a financial disincentive to create or publish works with a particular content" *distorts* the marketplace of ideas, and must therefore satisfy strict scrutiny, not merely *Zauderer*. *See Simon & Schuster*, 502 U.S. at 118 (citation modified).

The majority sidesteps this analysis because the majority never evaluates the Hateful Conduct Law as a whole. Instead, the majority dissects the statute and assesses in isolation the constitutionality of (New York's reading of) [i] its policy disclosure requirement and [ii] its report mechanism requirement. *See*

11

Majority at 30, 48. The majority concludes that under New York's reading, the policy disclosure requirement must satisfy only *Zauderer*, *see id.* at 34, while the report mechanism requirement "does not regulate speech at all," *id.* at 49.

The majority asks the wrong questions. We do not decide whether a discrete component of a regulatory regime "could survive constitutional scrutiny if it existed separately." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993). If a component "functions, with the rest of the enactments in question, to suppress" First Amendment rights, "it must be invalidated." *Id.*

That said, even bifurcation cannot save the Hateful Conduct Law. Its policy disclosure requirement still compels speech in violation of the First Amendment--even when that provision is assessed in isolation from the report mechanism requirement or the Attorney-General's enforcement powers--because it is not a true *Zauderer* disclosure.

*Zauderer* governs only compelled disclosures of "purely factual and uncontroversial information," like the caloric content of food, *see NYSRA*, 556 F.3d at 134, or the presence of mercury in light bulbs, *see NEMA*, 272 F.3d at 107, 113-14. A mandate to disclose a content moderation policy is different in kind. A light bulb either contains mercury, or it does not, whereas virtually all "hateful conduct" moderation policies are inherently subjective. Even a straightforward policy of removing *all* statutory hateful conduct requires subjective judgments, because it is inherently contestable whether a statement "vilifies" or "humiliates" within the statutory definition. N.Y. Gen. Bus. Law *Id.* § 394-ccc(1)(a). The Attorney General is empowered to evaluate a blog's actual moderation decisions and to disagree that the blog's policy is as the blog disclosed. Thus, "the fact that *[the policies] are what they are*," Majority at 32, is itself controversial and subject to challenge. *Contra id.*

It follows that *Zauderer* does not apply. And if it does not, then--as the majority acknowledges--New York must satisfy at least intermediate scrutiny. *See* Majority at 40-41. And--as the majority agrees--New York cannot do that. *See id.*

Even if *Zauderer* governed, the Hateful Conduct Law would violate the First Amendment nevertheless. New York "has the burden to prove" that any *Zauderer* disclosure mandate "is neither unjustified nor unduly burdensome."

12

*NIFLA*, 585 U.S. at 776. Such a disclosure mandate must be "no broader than reasonably necessary," to avoid "chilling protected speech." *Id.* (citation modified). Here, New York cannot discharge even that burden.

As I have explained, *supra* Section V.A., the policy disclosure requirement is the vehicle that allows the state to disincentivize speech on certain topics. This mandatory disclosure "chill[s] protected speech," and is thus unduly burdensome. *See NIFLA*, 585 U.S. at 776. Accordingly, under any level of scrutiny that might apply, New York's strained reading of the Hateful Conduct Law is still unconstitutional.

## C.

Since the policy disclosure requirement renders New York's reading of the Hateful Conduct Law unconstitutional, I need not reach the majority's contention that the report mechanism requirement, as New York would construe it, "does not regulate speech at all." Majority at 49. But I cannot help myself: yes, it does. That provision mandates that platforms "shall provide and maintain a clear and easily accessible mechanism for individual users to report incidents of hateful conduct." N.Y. G.B.L. § 394-ccc(2). The mechanism "shall allow the social media network to provide a direct response" to the reporter. *Id.* The requirement that the mechanism "shall allow" a response means that the platform cannot send reports to a black box: they must be reviewed. Accordingly, bloggers must make themselves available for criticism.

The First Amendment protects against just this sort of regulation. In general, "individuals are not required to welcome unwanted speech into their own homes." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). Forcing bloggers to open themselves to criticism or mandatory dialogue is itself impermissible: "[i]t is uncontroversial that the First Amendment protects the right to speak anonymously." *Antonyuk v. James*, 120 F.4th 941, 1003 (2d Cir. 2024). The State has no legitimate interest in punishing bloggers who do not wish to read their hate mail.

## VI.

This case is neither the first nor last iteration of states' eroding constitutional rights through legal uncertainty. The facts here evoke those of

13

*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021).  There, Texas enacted the "Texas Heartbeat Act," also known as "S. B. 8," which created state law causes of action to sue for "statutory damages awards against those who perform or assist prohibited abortions."  *Id.* at 36.  The Texas statute predated *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); so the "prohibited abortions" were therefore constitutionally protected.  Accordingly, the statute's enforcement mechanism depended on private citizens bringing meritless lawsuits under the then-governing law.

The Court did not consider the constitutionality of S. B. 8 on its merits.  *Id.* at 38.  But several Justices observed that, even though S. B. 8 was "[u]nenforceable," the "threat of its punitive measures create[d] a chilling effect."  *Id.* at 65 (Sotomayor, J., concurring in the judgment in part and dissenting in part).  The law thus succeeded in "substantially suspend[ing]" (what was then) "a constitutional guarantee."  *Id.* at 62.

Even if, years from now, every platform subject to enforcement proceedings for inaccurate policy disclosures is vindicated on the merits, the uncertainty of that outcome under the Hateful Conduct Law will have chilled speech.  "It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion."  *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).  The uncertainty today is the point.  It is the power to suppress that every government craves.

The biggest players in the marketplace of ideas may be able to weather this chill.  But the "persons of modest means or limited mobility" who start online communities as "an unusually cheap and convenient form of communication," *City of Ladue v. Gilleo*, 512 U.S. 43, 57 (1994), are naked to their enemies.  The costs of compliance (if compliance is even possible) and insurance (if it is even available), and fines of a thousand dollars per day for any misstep, will be ruinous.

## VII.

The Hateful Conduct Law is unconstitutional under any plausible interpretation.  I would not ask the New York Court of Appeals which unconstitutional interpretation is correct.

14

Besides, I already know the answer: that court has foreclosed saving constructions like the state's here. "[C]onstruing the statute as limited to certain constitutionally proscribable speech would likely result in transforming an otherwise overbroad statute into an impermissibly vague one; the statutory language would signify one thing but, as a matter of judicial decision, would stand for something entirely different." *Dietze*, 549 N.E.2d at 1169. "Under those circumstances, persons of ordinary intelligence reading" the Hateful Conduct Law "could not know what it actually meant." *See id.*

Moreover, I doubt that the Court of Appeals will accept the certified questions' unstated premise: that the supposed saving construction is viable under *New York's* laws and constitution. At the risk of being obvious, a "guarantee of free speech" is secured by the state constitution. *Holmes v. Winter*, 3 N.E.3d 694, 698 (N.Y. 2013); *see* N.Y. Const., art. I, § 8. "The drafters" of the state guarantee "chose not to model [it] after the First Amendment, deciding instead to adopt *more expansive* language: 'Every citizen may freely speak, write and publish his or her sentiments on all subjects . . . and no law shall be passed to restrain or abridge the liberty of speech or of the press.'" *Holmes*, 3 N.E.3d at 698 (emphasis added) (quoting N.Y. Const., art. I, § 8). It cannot be that the New York Court of Appeals will construe a state statute so that it offends the state constitution; I for one would not ask.

I would affirm Judge Carter's preliminary injunction.

15