

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

BARBARA D. UNDERWOOD
SOLICITOR GENERAL
DIVISION OF APPEALS & OPINIONS

July 16, 2026

Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for
 the Second Circuit
40 Foley Square
New York, NY 10007

   Re: *Volokh v. James*, No. 23-356

Dear Ms. Wolfe:

  I represent appellant the New York State Attorney General in the above-captioned appeal. I write in response to the Court's order on June 25, 2026, ECF No. 181, directing the parties to submit supplemental letter briefs addressing the effect on this appeal of the New York Court of Appeals' decision answering this Court's certified questions concerning the scope of General Business Law (GBL) § 394-ccc. *See Volokh v. James* (*Volokh I*), 148 F.4th 71 (2d Cir. 2025) (certifying questions); *Volokh v. James* (*Volokh II*), 2026 N.Y. Slip Op. 03913, 2026 WL 1790976 (N.Y. June 23, 2026) (answering certified questions).

  As explained below, the New York Court of Appeals' decision makes plain the constitutionality of GBL § 394-ccc. In response to this Court's first two certified questions, the New York Court of Appeals ruled that social media networks can comply with the statute's requirements without explicitly referencing or addressing hateful conduct as defined by the statute. And in response to this Court's third question, the New York Court of Appeals ruled that nothing in the statute requires social

media networks to respond to user reports of hateful conduct. Under these binding interpretations from the State's highest court, GBL § 394-ccc accords with the First Amendment—as this Court's decision certifying the questions already recognized. Accordingly, this Court should reverse the district court's order granting a preliminary injunction against enforcement of the statute.

## A. Prior Proceedings

New York's Legislature passed GBL § 394-ccc in June 2022 in response to a racially motivated mass shooting in Buffalo, New York. See Br. for Appellant (Br.) at 5-10, ECF No. 25. GBL § 394-ccc imposes two requirements on for-profit social media networks doing business in New York. First, the statute's central provision requires social media networks to "provide and maintain a clear and easily accessible mechanism for individual users to report incidents of hateful conduct." GBL § 394-ccc(2). Second, to inform consumers who want to use a network's report mechanism about what to expect and to increase transparency, the statute requires social media networks to "have a clear and concise policy readily available and accessible on their website and application which includes how such social media network will respond and address the reports of incidents of hateful conduct on their platform." *Id.* § 394-ccc(3). The statute defines "hateful conduct" to mean "the use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." *Id.* § 394-ccc(1)(a).

In December 2022, before GBL § 394-ccc's effective date, plaintiffs—Eugene Volokh, operator of the legal blog The Volokh Conspiracy, and Rumble Canada Inc. and Locals Technology Inc., the operators of social media networks Rumble and Locals—sued to challenge the statute as unconstitutional under the First and Fourteenth Amendments. (J.A. 2, 10-11.) The U.S. District Court for the Southern District of New York (Carter, J.) issued a preliminary injunction prohibiting the Attorney General from enforcing GBL § 394-ccc in all its applications. (S.A. 20.) The State appealed to this Court. (J.A. 357.) See Br. for Appellant; Reply Br. for Appellant (Reply Br.), ECF No. 99.

After briefing and oral argument, this Court determined that the constitutionality of the statute turned on questions of state law that should be answered by the New York Court of Appeals. The Court held that the statute was subject to competing interpretations and that the statute's requirements would accord with the First Amendment under the interpretations presented by the State. *See Volokh I*, 148 F.4th at 90, 97, 100 & n.13. Recognizing that the state courts had not yet interpreted GBL § 394-ccc and that they are best suited to consider "the value judgments and public policy choices of New York lawmakers," this Court certified three questions of statutory interpretation to the New York Court of Appeals. *Id.* at 100. The first two certified questions asked whether, to comply with the statute's reporting mechanism and policy-disclosure requirements, a social media network must explicitly reference and address the content defined by the statute as "hateful conduct." *Id.* The third certified question asked whether GBL § 394-ccc requires a social media network to respond to user reports of hateful conduct. *Id.*

## B. The New York Court of Appeals' Decision Answering the Certified Questions

On June 23, 2026, after briefing and oral argument, the New York Court of Appeals issued a decision answering this Court's certified questions. Applying "ordinary canons of statutory construction," the court adopted the interpretations of the statute proffered by the State, which this Court had determined would render the statute consistent with the First Amendment. *See Volokh II*, 2026 N.Y. Slip Op. 03913, at *1, 2026 WL 1790976, at *1. In response to the first two certified questions, the New York Court of Appeals explained that a social media network may comply with the statute's report-mechanism and policy-disclosure requirements without explicitly referencing or addressing hateful conduct, as defined by the statute. *Id.* at *3, 2026 WL 1790976, at *4-5. In response to the third certified question, the New York Court of Appeals agreed with this Court that the statute does not require social media networks to respond to user reports of hateful conduct. *Id.* at *4, 2026 WL 1790976, at *6.

In responding to all three questions, the court wholly rejected plaintiffs' argument that the State's interpretation would render the statute meaningless. *Id.* at *5, 2026 WL 1790976, at *7. As discussed further below, the court explained that the State's interpretation was consistent with the Legislature's intent to proceed carefully and impose modest requirements to avoid violating networks' First Amendment rights. And the court explained that the statute's requirements, as interpreted by the court, would further the Legislature's goals of empowering users and making it easier to report hateful conduct. *Id.*

The court began with the report-mechanism requirement, which it recognized as the "central" requirement imposed by the statute. *Id.* at *3, 2026 WL 1790976, at *4. Agreeing with the State's interpretation, the court ruled that the statute's plain text makes clear that social media networks are not required to explicitly reference or address hateful conduct as defined by the statute to satisfy the provision. Instead, the statute requires only that social media networks offer users a tool that "enable[s] users to notify a social media network of hateful conduct posted to its platform" and "enable[s] the network to respond . . . should it choose to do so." *Id.*

In so holding, the court rejected plaintiffs' argument that the required consumer tool must be exclusively or solely for reports of hateful conduct, concluding that there was no basis for that interpretation in the statutory text. *Id.* As the court explained, the reporting mechanism must accept reports of hateful conduct. Therefore, a mechanism "described as allowing a user to report only technical problems (*e.g.,* broken links or server delays) would not satisfy the statute." *Id.*, 2026 WL 1790976, at *5. But as long as the reporting tool does not exclude user reports of hateful conduct, the requirement is satisfied by a generic tool that "can be used, without definition or limitation, to report anything a user wishes to report." *Id.*, 2026 WL 1790976, at *4. For example, the court noted, a "simple, unobscured 'report' button that provides a means for users to report any complaint" would satisfy the statute. *Id.*, 2026 WL 1790976, at *5.

As to the policy-disclosure requirement, the court similarly concluded, based on the plain text of that requirement, that it can be satisfied without explicit reference to hateful conduct as defined by the

statute—as the State had argued. *Id.* The court explained that the statute is satisfied "as long as the network's explanation is broad enough to encompass, or *include,* content falling within" the statutory definition of hateful conduct, even if the policy does not explicitly reference that content. *Id.* For example, a network could satisfy the statute by disclosing that it "will not regulate or remove any content posted on its platform" because that disclosure "necessarily inform[s] users that the network will do nothing in response to reports falling within the statutory definition of hateful conduct." *Id.* Similarly, a network could satisfy the statute by disclosing "that it will only remove content that is illegal or threatens violence against others, and not respond to any other reports." *Id.* at *4, 2026 WL 1790976, at *5.

The court explained that its interpretation of the policy-disclosure requirement was further affirmed by the statute's savings clause, *id.*, 2026 WL 1790976, at *6, which states that the statute should not be construed to impose obligations on social media networks "that adversely affects the rights or freedoms of any persons, such as exercising the right of free speech," GBL § 394-ccc(4). The court recognized that the savings clause is an "express disavowal" by the Legislature of "any intent to unconstitutionally compel speech." *Volokh II*, 2026 N.Y. Slip Op. 03913, at *4, 2026 WL 1790976, at *6.

The court also concluded that even if the plain language of the policy-disclosure requirement did not compel adoption of the court's interpretation—which it did—the court's interpretation was required by the doctrine of constitutional avoidance, because the statutory text was "fairly susceptible" to the interpretation proposed by the State and this Court had already recognized that it would render the provision constitutional. *Id.* at *4 n.5, 2026 WL 1790976, at*6 n.5 (quotation marks omitted). Accordingly, the court answered this Court's first certified question in the affirmative. *Id.* at *4, 2026 WL 1790976, at *6.

Turning to the last certified question, the court held, in agreement with this Court and the State's interpretation of the statute, that nothing in the text of the statute requires social media networks to respond to user reports of hateful conduct. Accordingly, the court answered this Court's third certified question in the negative. *Id.*

In answering the certified questions, the court squarely rejected plaintiffs' sweeping argument that the State's interpretation would render the statute meaningless. *Id.* at *4, 2026 WL 1790976, at *7. To the contrary, the court held that the State's interpretation was consistent with the Legislature's intent. *Id.* The court contrasted GBL § 394-ccc with a failed draft bill introduced in 2020 that would have required networks to remove hate speech within 24 hours of receiving a user complaint. *Id.* at *2, 2026 WL 1790976, at *1. Unlike in that failed 2020 bill, the Legislature did not intend GBL § 394-ccc "to regulate networks' moderation decisions or to compel networks to endorse the State's view that hateful conduct is socially destructive." *Id.* at *4, 2026 WL 1790976, at *7. Instead, the Legislature sought to "empower . . . social media *users*" by providing them with tools "to bring hateful conduct to networks' attention, and to identify those platforms whose policies condone such content." *Id.* As the court further explained, the Legislature could rationally have concluded that providing such tools allows users to "use, support, or associate" with networks aligned with their policy preferences and helps users decide what steps to take in encountering certain hateful conduct, like "a post or stream announcing an intent to perpetrate . . . a mass shooting." *Id.*

Moreover, the court emphasized that New York's "canons of construction do not counsel against modest interpretations, only absurdity and readings that would needlessly render a presumptively valid law unconstitutional." *Id.* GBL § 394-ccc imposes modest requirements, the court explained, for the proper purpose of avoiding potential violations of networks' First Amendment rights. *Id.* As the court concluded, "the policy choice of how to effectuate a particular aim is entrusted to the legislature," *id.*, and it was not implausible that the Legislature would select modest statutory provisions to effectuate its aims without infringing on networks' First Amendment rights.

Three judges dissented in part. The dissenting judges would have answered this Court's first two certified questions in the negative and would have ruled that the statute requires networks to adopt a policy and offer a reporting tool that explicitly references or addresses hateful conduct as defined by the statute. *Id.* at *4-5, 2026 WL 1790976, at *8-9. In response to the third certified question, the dissenting judges agreed with the majority that the statute does not require networks to respond

to user reports of hateful conduct. *Id.* at *4 n.7, 2026 WL 1790976, at *8 n.7.

### C. General Business Law § 394-ccc Is Consistent with the First Amendment.

### 1. Plaintiffs' as-applied challenges fail.

Plaintiffs' as-applied challenges to the statute fail in light of the New York Court of Appeals' interpretation of the statute. That interpretation, which is binding on this Court, *see Johnson v. Fankell*, 520 U.S. 911, 916 (1997), makes plain that the statute is consistent with the First Amendment.

*Report-mechanism requirement*. The New York Court of Appeals' decision establishes that the report-mechanism requirement regulates conduct, not speech. It is therefore subject only to rational basis review, which it easily satisfies. As this Court explained in its decision certifying questions to the New York Court of Appeals, "[i]f a social media company can comply . . . by maintaining a reporting mechanism where consumers may direct complaints—whether or not they are complaints about content meeting the State's definition of hateful conduct—and if the statute does not require social media networks to *respond* to individual complaints, then the [requirement] does not regulate speech at all." *Volokh I*, 148 F.4th at 97. That is because requiring networks to provide a consumer-facing tool like a report mechanism regulates only non-expressive conduct, not speech. *Id.* (citing *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 65-70 (2006)). See Br. at 25-32; Reply Br. at 5-9. Such requirements are subject to rational basis review and survive so long as they are reasonably related to a legitimate state interest. See Br. at 30-31.

The New York Court of Appeals' interpretation of the report-mechanism requirement hews closely to this Court's analysis of a regulation of conduct, not speech. The requirement regulates conduct because the user tool that networks must offer need not reference or address hateful conduct and need not be dedicated exclusively to reports of hateful conduct. Instead, networks are required only to offer a tool that "enable[s] users to notify a social media network of hateful conduct posted

to its platform" and "enable[s] the network to respond . . . should it choose to do so." *Volokh II*, 2026 N.Y. Slip Op. 03913, at *3, 2026 WL 1790976, at *4. The statute "does not require that the tool be provided 'solely' or 'exclusively' for users to report incidents of hateful conduct." *Id*. And the report-mechanism requirement is satisfied where a network's tool "can be used, without definition or limitation, to report anything a user wishes to report." *Id*. The New York Court of Appeals also unanimously agreed that a network is not required to respond to user reports. *Id*. at *4 & n.7, 2026 WL 1790976, at *6, *8 n.7. Accordingly, consistent with this Court's prior analysis, the report-mechanism requirement is a regulation of conduct, not speech, because it requires only that networks provide a user tool and does not require networks to say anything about the statute's definition of hateful conduct or user reports of hateful conduct. *See Volokh I*, 148 F.4th at 97.

The New York Court of Appeals' decision also makes clear that the requirement easily satisfies rational basis review. As the court explained, the provision advances the State's interest in empowering users by giving them a channel to quickly and easily express complaints to the network if they want to submit any such complaints. *Volokh II*, 2026 N.Y. Slip Op. 03913, at *4, 2026 WL 1790976, at *7. And it may help some users take appropriate action "in the potentially critical moments after finding a post or stream announcing an intent to perpetrate . . . a mass shooting." *Id*. Indeed, plaintiffs do not dispute that the regulation survives rational basis review. See Reply Br. at 7-8.

*Policy-disclosure requirement*. The New York Court of Appeals' decision similarly makes plain that the policy-disclosure requirement is consistent with the First Amendment. As this Court explained, under the State's interpretation, the statute would be satisfied by disclosure of a neutral content moderation policy that did not explicitly reference or address hateful conduct as defined by the statute, so long as the disclosure was broad enough to provide users with information about how the network would respond to user reports of hateful conduct. *Id*. at 90-91. A network could comply with that type of requirement by adopting a policy that applied to all user reports or by "describ[ing] its moderation policies using whatever categories it chose, with a catch-all provision governing anything not specifically described." *Id*. at 95.

Such a requirement would be subject to relaxed scrutiny under *Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626 (1985), because it would require only disclosure of "'purely factual and uncontroversial information about the terms under which services will be available.'" *Volokh I*, 148 F.4th at 85 (quoting *Zauderer*, 471 U.S. at 651); *see id.* at 90-91. See Br. at 36-48; Reply Br. at 11-17. As this Court explained, the mere fact that a network's policies "are what they are" is purely factual and uncontroversial information. *Volokh I*, 148 F.4th at 90 (emphasis omitted). And such a policy-disclosure requirement would satisfy *Zauderer*'s relaxed scrutiny because it would not be unduly burdensome and would be "reasonably related to the State's interest in preventing deception of consumers," by "ensur[ing] that users are fully informed about the terms of their engagement with a social media network." *Id.* at 91. See Br. at 50-58; Reply Br. at 17-24.

The policy-disclosure requirement, as interpreted by the New York Court of Appeals, is precisely the type of provision that this Court already ruled is a disclosure requirement that satisfies *Zauderer*'s relaxed scrutiny. The Court of Appeals ruled that the policy-disclosure requirement permits disclosure of a neutral content moderation policy and does not require networks to disclose a policy that specifically references or addresses hateful conduct. *Volokh II*, 2026 N.Y. Slip Op. 03913, at *3, 2026 WL 1790976, at *5. The statute is satisfied "as long as the network's explanation is broad enough to encompass, or *include,* content falling within" the statutory definition of hateful conduct, even if the policy does not explicitly reference that content. *Id.* A network can comply with the requirement by adopting a policy that applies to all reports, including reports of hateful conduct, or by describing a policy with respect to specific categories of reports that the network chooses and using a catchall term to apply to all other categories, *id.*, as this Court suggested. As this Court explained, this type of requirement is subject to *Zauderer*'s relaxed scrutiny because it requires only disclosure of factual and uncontroversial information, namely the network's *own* policy, and does not require networks to endorse or discuss the statute's definition of hateful conduct. *Volokh I*, 148 F.4th at 95.

Moreover, the New York Court of Appeals' decision makes clear that the policy-disclosure requirement survives *Zauderer*'s relaxed scrutiny because it is reasonably related to the State's goal of providing

users with information about networks' policies and facilitating reports of hateful conduct and is not unduly burdensome. This Court expressed concern that a neutral policy-disclosure requirement that did not require networks to explicitly reference or adopt the statute's definition of hateful conduct might render parts of the statutory language superfluous. *Id.* But the New York Court of Appeals explained, in adopting GBL § 394-ccc, that the Legislature sought to "empower . . . social media *users*" by providing them information about networks' policies. *Volokh II*, 2026 N.Y. Slip Op. 03913, at *4, 2026 WL 1790976, at *7. And the court emphasized that the Legislature could have rationally concluded that providing such information allows users to "use, support, or associate" with networks aligned with their policy preferences and helps users decide what steps to take in encountering certain hateful conduct, like "a post or stream announcing an intent to perpetrate . . . a mass shooting." *Id.* Moreover, the policy-disclosure requirement is not unduly burdensome. As the New York Court of Appeals explained, networks are required to disclose only their own policies and need not reference or provide their views on hateful conduct as defined by the statute. *Id.* at *3-*4, 2026 WL 1790976, at *5, *7. See Br. at 54-56; Reply Br. at 21-23.

The New York Court of Appeals also squarely rejected plaintiffs' broad argument that the State's interpretations would render the statute pointless. As the court explained, New York's "canons of construction do not counsel against modest interpretations." *Id.* at *4, 2026 WL 1790976, at *7. The court recognized that, in contrast to the failed 2020 bill referenced in the court's opinion, in enacting GBL § 394-ccc the Legislature was proceeding with moderate steps to avoid violating networks' First Amendment rights. There is nothing improper about such caution, and it does not render the statute ineffective, as the court explained. Instead, the statute "empower[s] . . . social media *users*" by providing them with tools "to bring hateful conduct to networks' attention, and to identify those platforms whose policies condone such content." *Id.* In any event, the New York Court of Appeals' interpretation is binding on this Court regardless of how moderate it renders the statute. *See Johnson*, 520 U.S. at 916.

Finally, the New York Court of Appeals rebutted the concern raised by the dissenting judge in this Court that the statute empowers the Attorney General to subject networks to enforcement proceedings if

networks fail to comply with their own policies, *see Volokh I*, 148 F.4th at 104-05 (Jacobs, J., dissenting). The court explained that the Legislature's purpose was "not to regulate networks' moderation decisions or to compel networks to endorse the State's view," but rather to empower users of the networks with information and tools to report conduct identified by the user as hateful. *Volokh II*, 2026 N.Y. Slip Op. 03913, at *4, 2026 WL 1790976, at *7. That is consistent with the plain text of the statute, which does not empower the Attorney General to bring an enforcement action based on a network's failure to adhere to its own posted policy.

## 2. Plaintiffs' facial challenges fail.

The New York Court of Appeals' decision also makes plain that plaintiffs' facial challenges to the statute fail. The district court concluded that the statute was facially invalid as overbroad and vague, on the grounds that it might chill the speech of social media *users*, even though the statute does not impose any obligations or liability on users. *See Volokh I,* 148 F.4th at 98. Even assuming plaintiffs could properly bring a challenge based on a hypothetical injury to social media users—which the State disputes and this Court did not decide—this Court correctly explained that the district court's facial analysis turned on its assumption that the statute requires a network to "incorporate the State's definition of hateful conduct into its content moderation policy disclosures and reporting mechanism." *Id.* at 99. See Br. at 58-62; Reply Br. at 31-35. As the New York Court of Appeals explained, that assumption is incorrect. The statute does not require networks to incorporate or reference hateful conduct to comply with the report-mechanism and policy-disclosure requirements. *Volokh II*, 2026 N.Y. Slip Op. 03913, at *1, 2026 WL 1790976, at *1. Accordingly, there is no basis to conclude that networks' compliance with the statutory requirements will chill the speech of their users. To the contrary, as the New York Court of Appeals concluded, the statutory requirements "*facilitate* users' speech by giving them a channel to express complaints, and compel transparency by networks." *Id.* at *4, 2026 WL 1790976, at *7.

For the foregoing reasons, the New York Court of Appeals' decision addressing this Court's certified questions establishes that GBL § 394-ccc is consistent with the First Amendment both facially and as-applied to plaintiffs.[1] This Court should therefore reverse the district court's order granting a preliminary injunction against enforcement of the statute.

Respectfully,

*/s/ Sarah Coco*

Sarah Coco
Assistant Solicitor General
(212) 416-6312

cc: Counsel of record (by ECF)

---

[1] This letter brief addresses the arguments relied upon by the district court in granting the preliminary injunction and addressed by this Court in its decision certifying questions to the New York Court of Appeals. *See Volokh I*, 148 F.4th at 89 n.7. To the extent plaintiffs seek to raise additional arguments, those arguments should be addressed by the district court in the first instance. *See id.* (citing *Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 184 (2d Cir. 2021)).