

July 16, 2026

**BY ECF**
Catherine O'Hagan Wolfe
Clerk of Court U.S. Court of Appeals
for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

> Re: ***Volokh, et. al. v. James*, No. 23-0356**
> Plaintiffs-Appellees' Supplemental Letter Brief
> in light the New York Court of Appeals decision
> No. 58, 2026 WL 1790976 (N.Y. June 23, 2026)

Dear Ms. Wolfe:

Plaintiffs-Appellees Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc., submit this Supplemental Letter Brief in response to the New York Court of Appeals ruling interpreting New York General Business Law § 394-ccc (hereinafter the "Hateful Conduct Law"). The court in *Volokh v. James*, No. 58, 2026 WL 1790976 (N.Y. June 23, 2026), answered three questions this Court had certified:

(1) whether Section 394-ccc's requirement that social media platforms publish a "clear and concise policy" describing their moderation practices (hereinafter the "Policy Disclosure Requirement") incorporates the law's definition of "hateful conduct";

(2) whether its requirement that social media platforms provide a mechanism for reporting hateful conduct (hereinafter the "Report Requirement") must specifically incorporate the state's definition of "hateful conduct"; and

(3) whether the law requires social media platforms to respond to user complaints of hateful conduct.

The state Court of Appeals concluded that neither the Policy Disclosure Requirement nor the Report Requirement require social media platforms to incorporate the State's "hateful conduct" definition, and that the law does not require social media platforms to respond to complaints regarding hateful conduct. *James*, 2026 WL 1790976, at *4–6.

**INTRODUCTION**

The New York Court of Appeals' response to this Court's certified questions settles how to interpret the Hateful Conduct Law as a matter of New York law but does not resolve the ultimate issue of the statute's constitutionality. That inquiry remains for this Court, which, for the reasons set forth herein, should hold Plaintiff-Appellees are likely succeed on the merits and affirm the district court's preliminary injunction.

The one point on which all agree is that, as written, the Hateful Conduct Law is an "unconstitutional speech restriction." *Volokh v. James*, 148 F.4th 71, 102 (2d Cir. 2025) (Jacobs, J., dissenting). But the question now is whether the law as reinterpreted by the New York Court of Appeals is likely unconstitutional. This Court's majority observed that a "determination of the *constitutionality* of the hypothetical interpretation of Section 394-ccc proffered by the State is necessary to our disposition of this appeal." *Id.* at 100. And while it suggested the only issue yet undecided is the "true meaning of the statute," *id.*, the ultimate questions do not answer themselves and are not preordained by this Court's initial opinion.

The majority's suggestion that the state court's authoritative interpretation of the law "may be 'determinative' of this appeal," *id.*, is based on three assumptions: (1) that the applicable First Amendment standard for social media moderation policies is the test for compelled commercial speech disclosures in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985); (2) that the Hateful Conduct Law would survive review under *Zauderer*; and (3) that the Hateful Conduct Law, as reinterpreted, creates no additional First Amendment problems. Each of those assumptions requires close examination before this Court may resolve the ultimate question for this appeal of whether Plaintiff-Appellees are likely to succeed in their constitutional challenge. And, as explained below, these assumptions are unwarranted.

I.  *Zauderer* **Does Not Provide the Correct Framework for Evaluating the Hateful Conduct Law's Constitutionality.**

This Court's certification order rested on the understanding that Section 394-ccc is likely unconstitutional as compelled speech unless it is classifiable as commercial speech within the *Zauderer* framework. *James,* 148 F.4th at 83–88. This is because "freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all'" *Janus v. Am. Fed'n of State, Cty. & Mun. Emps. Council*, 585, U.S. 878, 892 (2018) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)), and

because "[f]or corporations as for individuals, the choice to speak includes within it the choice of what not to say." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986). *See Nat'l Inst. of Fam. & Life Advocs.* (*NIFLA*) *v. Becerra*, 585 U.S. 755, 766 (2018).

The majority noted that commercial speech receives "a less exacting standard of judicial scrutiny" and, specifically, that "regulations requiring commercial disclosure of 'purely factual and uncontroversial information about the terms under which . . . services will be available' may survive constitutional scrutiny if they are 'reasonably related to the State's interest in preventing the deception of customers,' and are not 'unjustified or unduly burdensome.'" *James*, 148 F.4th at 85 (quoting *Zauderer*, 471 U.S. at 651). And it concluded the Hateful Conduct Law would likely survive First Amendment review if the law could be interpreted using the *Zauderer* framework. *Id.* at 89-90. However, *Zauderer* is a poor fit to assess the compelled disclosure of editorial and moderation policies, and the Court's hypothetical discussion of applying *Zauderer* to the Hateful Conduct Law is necessarily incomplete as a result.

As Judge Jacobs observed, "no such [reinterpreted] statute has been presented to us, and the hypothesis that it would be constitutional is dicta." *Id.* at 103 n.3 (Jacobs, J., dissenting). Although the majority countered that the only "hypothetical" factor is "the true meaning of the statute," *id.* at 20 n.13, that presupposes *Zauderer* as the appropriate test, and that when actually applied (not just in the abstract), *Zauderer* would allow Section 394-ccc to survive. However, this Court's earlier opinion did not go through the steps of applying *Zauderer's* requirements to the Hateful Conduct Law as reinterpreted and justified. The New York Court of Appeals' views as to the law's scope merely "lay[s] the groundwork for the careful analysis of the First Amendment issues in this case." *Expressions Hair Design v. Schneiderman*, 877 F.3d 99, 107 (2d Cir. 2017) ("the answer we receive [from the Court of Appeals] will determine the proper framework for our constitutional analysis").

## A.  Applying *Zauderer* in this Case is a Stretch.

Interpreting the Hateful Conduct Law as a routine commercial disclosure is far afield from *Zauderer*'s original purpose, where the intrusion on First-Amendment-protected speech was justified solely by "the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. In recent years, however, *Zauderer* has undergone a bit of "mission creep," with some circuit courts (including this one) holding that compelled commercial disclosures may constitutionally serve more general government interests than just preventing potential deception. *See, e.g.*,

*CompassCare v. Hochul*, 125 F.4th 49, 64–65 (2d Cir. 2025) (disclosures about terms of employment in employee handbook); *Schneiderman*, 877 F.3d at 103 (price disclosures); *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health* (*NYSRA*), 556 F.3d 114, 131–32 (2d Cir. 2009) (disclosure of calorie count on restaurant menus); *Nat'l Elec. Mfrs. Ass'n v. Sorrell* (*NEMA*), 272 F.3d 104, 107 (2d Cir. 2001) (disclosure of mercury content in light bulbs).[1] But as the majority here recognized, "there are limits to *Zauderer's* applicability." *James*, 148 F.4th at 87 (citing *Evergreen Ass'n, Inc. v. City of New York*, 470 F.3d 233, 238 (2d Cir. 2014), and observing the state could not compel disclosures relating to abortion and pregnancy services); *see also Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 263–64 (2d Cir. 2014) (rejecting application of *Zauderer* to commercial disclosure law).

The majority here acknowledged "the universe of potentially cognizable state interests under the *Zauderer* framework has not been fully defined" and that the Supreme Court "'has never clearly specified a governing framework that determines when *Zauderer's* less exacting standard should apply instead of *Central Hudson's* intermediate scrutiny.'" *James*, 148 F.4th at 86 n.6 (quoting *Schneiderman*, 877 F.3d at 103). Importantly, some consumer interests are insufficient to support disclosure requirements even under *Zauderer. See, e.g., Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996) ("[C]onsumer curiosity alone is not a strong enough state interest to sustain the compulsion of even an accurate, factual statement . . . in a commercial context."). And, at the same time, "some aspects of the *Zauderer* analysis are arguably more stringent than traditional rational basis review." *James*, 148 F.4th at 86 n.6. *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 33–34 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in the judgment) ("*Zauderer* fit requirements are far more stringent than mere rational basis review.").

Notwithstanding this uncertainty–about what state interests might suffice, what level of fit between means and ends might be required, or what burdens might be excessive–the majority opted to apply "*Zauderer* scrutiny" (hypothetically, at least) on the assumption that it is "more relaxed than ordinary intermediate or strict scrutiny." *James*, 148 F.4th at 86 n.6. Given these open questions, which include what type of showing "*Zauderer* scrutiny" requires, it seems premature for this Court reach a firm conclusion that *Zauderer* is the proper standard to assess the constitutionality

---

[1] *See also, e.g., Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc); *NAM v. SEC*, 800 F.3d 518 (D.C. Cir. 2015); *American Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 755-56 (9th Cir. 2019) (en banc); *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 843-44 (9th Cir. 2019).

of Section 394-ccc's disclosure requirements, much less what the outcome should be when the test is applied. At a minimum, using *Zauderer* to assess he compelled disclosure of social media moderation policies pushes the boundaries of that test's application under the First Amendment.

## B. Social Media Moderation Policies Are Not Commercial Speech.

Although the contours and requirements of *Zauderer* remain unfixed, there is one point about which the Supreme Court has been quite clear—*Zauderer* applies only to compelled *commercial* speech. *See NIFLA*, 585 U.S. at 768–69 (citing *Hurley v. Irish-Am. Gay. Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995)); *303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023). Even in *Zauderer*, the Court emphasized that the lawyer's statements "would have been 'fully protected' if they were made in a context other than advertising." *NIFLA*, 585 U.S. at 771 (quoting *Zauderer*, 471 U.S. at 637 n.7). The fact that the speech related to his business was irrelevant. The same conclusion applies here.

*Zauderer* is inapplicable to social media moderation standards and the policies they implement, because they do not involve "commercial speech," which does no more than "propose a commercial transaction." *Bd. of Trs. of State Univ. of N.Y. v. Fox* (*SUNY*), 492 U.S. 469, 473 (1989) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). Rather, the disclosure mandate of Section 394-ccc relates to social media platforms' *editorial* policies. *Moody v. NetChoice, LLC*, 603 U.S. 707, 711 (2024) (Social media platforms' "choices about which messages are appropriate give the feed a particular expressive quality and 'constitute the exercise' of protected 'editorial control.'") (quoting *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)).[2] *See Hurley*, 515 U.S. at 570 ("[T]he presentation of an edited compilation of speech generated by other persons . . . fall[s] squarely within the core of First Amendment scrutiny."). "The mere fact that [a social media platform's] beliefs are memorialized in the company's content moderation

---

[2] In *Moody*, one issue the Court addressed was the constitutionality of "explanation" requirements, that the Fifth and Eleventh Circuits had evaluated under *Zauderer* and reached opposite conclusions. The Court acknowledged the application of *Zauderer* in the decisions below, 603 U.S. at 725, but in remanding the cases for further review, the Court instructed that further evaluation of these disclosure provisions should be guided by the Court's conclusion that social media platforms "are engaged in expression when they make content-moderation choices in their main feeds." *Id.* at 727 n.3.

policy does not, by itself, convert expression about those beliefs into commercial speech." *X Corp. v. Bonta*, 116 F. 4th 888, 902 (9th Cir. 2024).

It makes no difference whether the Hateful Conduct Law requires social media platforms to change their moderation practices (and no one has suggested it does). Forcing platforms to simply *disclose* their policies is a First Amendment problem and cannot be characterized as the regulation of advertising. Even where the policy requires only disclosure of an existing policy and does not require the platform to explain or opine on what the policy means, "that fact . . . is immaterial or at least non-dispositive as to the *nature* of the speech being conveyed, which is fundamentally non-commercial." *Id.* at 901 n.9. The government "cannot get its way just by asserting an interest in improving, or better balancing, the marketplace of ideas," *Moody*, 603 U.S. at 732, in this case by claiming an interest in helping users understand their options.

While platforms may have "economic motivation" for hosting speech, that alone does not render their expressive activities "commercial." *See Va. State Bd. of Pharmacy*, 425 U.S. at 761–62. Mere economic motivation, or reference to an economic product or service, does not convert noncommercial speech into commercial speech. *Riley*, 487 U.S. at 796; *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983) ("[E]conomic motivation . . . would clearly be insufficient by itself to turn the materials into commercial speech."); *cf. N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) ("That the Times was paid for publishing the ad[] is as immaterial . . . as is the fact that newspapers and books are sold.").

The State now tries to describe the Hateful Conduct Law as a "transparency measure" to assist users in deciding which services to use. *James*, 2026 WL 1790976, at *7. But in addition to the fact that this purported purpose of the law was adopted solely as a pretextual litigating position, *see infra* Section II.A.2., it cannot convert this into a commercial speech issue. The Supreme Court rejected precisely that argument in *Riley*, where the state claimed the more relaxed standard for commercial speech should apply to professional charitable fundraisers. 487 U.S. at 795–96. The Court acknowledged the amount of the donation the charity receives "might be relevant to the listener" and "could encourage or discourage the listener from making a political donation," but still applied stricter scrutiny because "a law compelling its disclosure would clearly and substantially burden the protected speech." *Id.* at 798. The same applies to disclosure of social media moderation policies. The test "for whether speech is commercial or non-commercial cannot turn on whether the speech is 'directed to potential consumers and may presumably play a role in the decision of whether to use the platform'. . . ." *X Corp.*, 116 F.4th at 902 n.10. "Even a pure

'transparency' measure, if it compels non-commercial speech, is subject to strict scrutiny." *Id*. at 902 (citing *Riley*, 487 U.S. at 796–97).

Even if *Zauderer* were to apply to certain kinds of disclosures by social media platforms, the Supreme Court has stressed that such disclosures "violate the First Amendment if they unduly burden expression," *Moody*, 603 U.S. at 725, and that "consideration of that issue" of undue burden must be "inform[ed]" by the reality that platforms "are engaged in expression when they make content-moderation choices in their main feeds." *Id*. at 727 n.3. For reasons given below, the New York law does impose an "undue burden": the burden is potentially substantial, for reasons given in Part III, and it is unjustified (and therefore undue) by the government's actual interests, for reasons given in Part II.

### C. Other Applications of *Zauderer* are Inapt.

Other cases from this circuit that have applied *Zauderer* to uphold various types of disclosure requirements do not apply here. The majority suggested that if platforms could satisfy Section 394-ccc's policy disclosure requirement without requiring any reference to the State's definition of "hateful conduct," it "would be more closely analogous to the calorie-content disclosure requirement in *NYSRA* or the mercury disclosure requirement in *NEMA* than the abortion-services disclosure requirement at issue in *NIFLA* and *Evergreen*." *James*, 148 F.4th at 90. As the majority put it, "[s]ocial media networks like Plaintiffs may not *want* to discuss content moderation policies at all," but in its view, that is no different from the "chain restaurants in NYSRA [who] didn't want to talk about the calorie content of their meals." *Id*. at 91. But this misses the point. The compelled speech problem here transcends the notion of an entity's mere preference not to disclose a "true fact" about its non-expressive goods or services. In this case—unlike in *NYSRA*—the "true fact" at issue, and decision whether or not to disclose things about it, is itself service consisting of constitutionally protected speech.

The Supreme Court in *Moody* explained that the First Amendment protects a social media platform's choice of whether to have a moderation policy in the first place, as well as its decision about how robust to make it. *Moody*, 603 U.S. at 732 ("[N]one of that changes just because a compiler includes most items and excludes just a few. . . It 'is enough' for a compiler to exclude the handful of messages it most 'disfavor[s].'" (quoting *Hurley*, 515 U.S. at 574)). The same goes for the platform's decision to publicize its moderation policies—or not. And the added First Amendment dimension protecting the thing to be disclosed fundamentally distinguishes this case from others like *NYSRA*. This Court said so itself in *NYSRA*, 556 F.3d at 134, when

it explained how disclosure of calorie counts on a restaurant menu or mercury content in light bulbs is not comparable to requiring "opinion-based" ratings of video games. 556 F.3d at 134 (quoting *Ent. Software Ass'n v. Blagojevich*, 469 U.S. 641, 652 (7th Cir. 2006)). Compelling disclosure of whether and how social media platforms handle subjective judgments regarding controversial speech has more in common with video game ratings on expressive products, which cannot be compelled under *Zauderer*, than it does with calorie counts on a menu or mercury content in light bulbs. *See Blagojevich*, 469 F.3d at 651–54 (7th Cir. 2006).

Compelling disclosure of moderation policies that reflect a platform's "choices . . . about which messages are appropriate" as a function of its editorial judgment, *Moody*, 603 U.S. at 738, is fundamentally different. For that reason, the Supreme Court has long rejected efforts to equate food and drug labeling to speech regulation, observing "there is no specific constitutional inhibition against making the distributors of food the strictest censors of their merchandise, but the constitutional guarantees of the freedom of speech and of the press stand in the way of imposing a similar requirement on the bookseller." *Smith v. California*, 361 U.S. 147, 152–53 (1958) (cleaned up). Efforts to compare disclosure requirements for non-speech-based products are inapposite.

## II. Even as Reformulated the Hateful Conduct Law Fails First Amendment Scrutiny.

The New York Court of Appeals narrowly (4-3) accepted the State's reading of the Hateful Conduct Law, holding the Policy Disclosure Requirement does not compel reference or adherence to the law's definition of "hateful conduct," and that platforms can satisfy the Reporting Requirement with a "simple, unobscured 'report' button that provides a means for users to report any complaint, whatever its nature." *James*, 2026 WL 1790976, at *5–6. The Court of Appeals also held the law does not require social media platforms to "adopt any particular policy on responding to such reports." *Id.* at *6.

Without a doubt, as reinterpreted, Section 394-ccc is less restrictive than a natural reading of its plain language would suggest. But even as narrowed, the law imposes restrictions on social media platforms' speech by requiring them to formulate and disseminate a policy (however minimal) on how they handle complaints about "hateful conduct." And they must provide a mechanism for receiving complaints from users even if the platform need not respond. This necessarily triggers First Amendment scrutiny, both because the law compels speech social media platforms may prefer not to utter, *Riley*, 487 U.S. at 795, and because it requires the platforms

to host unwanted speech. *See, e.g.*, *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). This Court has already determined that the Hateful Conduct Law could not survive either strict or intermediate scrutiny. *See James*, 148 U.S. at 96–98. And, for reasons set forth below, as reinterpreted it cannot survive any level of First Amendment scrutiny, including the test set forth in *Zauderer*.

### A. The Hateful Conduct Law Does Not Serve a Substantial Government Interest.

Just as the Hateful Conduct Law was substantially rewritten through the certification process, the rationale the State advanced to justify it evolved in the telling. In the end, the law emerged not as a way to combat hate speech online as the legislature intended, but as a consumer "transparency" law. The Court of Appeals followed the State's lead in reimagining Section 394-ccc and its purported purpose to fit within the *Zauderer* box, but the shift in the law's rationale only undermines its validity.

#### 1. The State Must Articulate and Support a Non-speculative Interest.

Regardless of the level of scrutiny that may apply, it is the government's burden to justify any restriction on speech. To survive intermediate scrutiny, for example, the State must demonstrate its speech restriction (or compulsion) directly advances a "substantial government interest" and is not "overly restrictive." *Safelite Grp., Inc.*, 764 F.3d at 261. The government's burden to justify any restriction on speech begins by identifying a substantial government interest that will be served in a direct and material way. *Amestoy*, 92 F.3d at 72–73. This burden "is not slight." *Ibanez v. Fla. Dep't of Bus. & Prof. Reg. Bd. of Accountancy*, 512 U.S. 136, 143 (1994). The asserted interest cannot be "mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993). And courts routinely strike down speech restrictions supported only by speculation. *See, e.g.*, *Riley*, 487 U.S. at 797–98 (speculation that public might find disclosures relevant and persuasive); *Ibanez*, 512 U.S. at 143 (speculation that public might be mislead absent compelled disclosure); *Amestoy*, 92 F.3d at 73 n.1 ("Although the dissent suggests several interests that if adopted by the state of Vermont may have been substantial, . . . Vermont adopted no such rationales for its statute.").

The analysis is largely the same even under *Zauderer*. "[T]he Supreme Court has not stated that something less than a 'substantial' governmental interest would justify either a restriction on commercial speech or a compelled commercial disclosure." *Am. Meat Inst.*, 760 F.3d at 31 (Kavanaugh, J., concurring). Accordingly, Judge (now-Justice) Kavanaugh explained, the government's obligation to demonstrate a reasonable fit between means and ends under *Zauderer* is "far more stringent than mere rational basis review." *Id.* at 33–34. This Court noted Justice Kavanaugh's observation as it acknowledged "some aspects of the *Zauderer* analysis are arguably more stringent than traditional rational basis review." *James*, 148 F.4th at 86 n.6.

## 2. The Revised Rationale for the Hateful Conduct Law

The Hateful Conduct Law's overriding purpose was to reduce hate speech and hopefully reduce violence as a result. (J.A. 16, 18–19, 169, 171–79, 280–81, 285–86, 290–94, 306, 311.) Legislative history shows the law reflected the legislature's belief that social media platforms were not doing enough to monitor, flag, and respond to content that purportedly vilified or humiliated certain groups or that could lead to violence. (J.A. 177, 179) However, as this Court observed, "the connection between the Policy Disclosure Requirement and facilitating reports that might prevent future horrific acts like the Buffalo shooting is tenuous at best." *James*, 148 F.4th at 94. Accordingly, the State had to search for a different rationale.

The New York Court of Appeals on certification did not mention a governmental purpose of reducing hate speech or potential violence in its interpretation of the Hateful Conduct Law. Instead, it described the law's purpose as providing platform users "with the mechanisms and information they need to bring hateful conduct to networks' attention and to identify those platforms whose policies condone such content." *James*, 2026 WL 1790976, at *7. It stated the legislature "could rationally have concluded that such mechanisms and information may be important to consumers in this age of increasingly toxic online discourse and real-world violence." *Id.* As a consequence, the law "compel[s] transparency by networks," thus "enabling users to make informed decisions when choosing among platforms based on their reporting mechanisms and procedures." *Id.*[3]

---

[3] The Court of Appeals also noted that a user's "understanding of a social media network's policy with respect to hateful conduct can also help them decide what actions to take in the potentially critical moments after finding a post or stream announcing an intent to perpetrate, say, a mass shooting." *Id.* However, the

This transparency rationale appears nowhere in the legislative history. *See Amestoy*, 92 F.3d at 73 n.1 (rejecting disclosure requirement based on rationales that might have been considered by the legislature but weren't). The law's sponsor explained that the proposed legislation was concerned about the "4.75 billion posts . . . made every day on social media" and advocated requiring networks to "monitor and provid[e] individuals a vehicle for recording hateful and violent intended conduct." (J.A. 169) She clarified that "[w]hat we are trying to go after here . . . with billions of posts every day, we are really trying to target this on inciting violence. . . . [T]he hateful conduct moving toward that inciting of violence." (J.A. 175) The sponsor described the bill as cutting edge legislation ""in an effort to be proactive" in response to "racist violence . . . increasingly targeting minority groups such as immigrants, ethnic minorities, LGBTQ" and others. (J.A. 178–79) The legislation contemplated the Attorney General would be charged with "mak[ing] sure that companies are complying," (J.A. 175), who in turn has stated "[w]e can no longer rely entirely on the industry to regulate itself through voluntary commitments." (J.A. 76) The first mention of a legislative purpose of transparency measure came up at oral argument as a litigation position as part of the State's defense of the law. (J.A. 308, 327–28, 329–30)

### 3. The State's Substitute Legislative Purpose Cannot Support the Hateful Conduct Law

The Supreme Court recently reaffirmed the rule that "Government justifications for interfering with First Amendment rights must not be hypothesized or invented *post hoc* in response to litigation." *Nat'l Republican Senatorial Comm. v. FEC*, No. 24-621, 2026 WL 1868932, (cleaned up) (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022)). The Court has made clear in various contexts that "[g]overnment justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Kennedy*, 597 U.S. at 543 n.8 (cleaned up); *see also United States v. Eichman*, 496 U.S. 310, 316 n.6 (1990) (rejecting substitute rationale and noting law at issue was not "designed to advance this asserted interest."); *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 867–73 (2005) (rejecting argument that law served a secular legislative purpose where it was "presented only as a litigating position"); *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification [for a government measure subject to

legislative history is devoid of any examples of social media platforms that lack information on how users may reach them, including the Buffalo shooting that gave rise to the legislation. (J.A. 103–04).

intermediate scrutiny] must be genuine, not hypothesized or invented *post hoc* in response to litigation."). This Court similarly has held "[t]he government's asserted interests must be genuine and not merely post-hoc rationalizations." *Cornelio v. Connecticut*, 32 F.4th 160, 173 n.5 (2d Cir. 2022) (cleaned up).

As noted, the Hateful Conduct Law is not a regulation of commercial speech. *See supra* Section I.B. However, even in the context of commercial speech regulations, the government is not permitted "to supplant the precise interests put forward by the State with other suppositions." *Edenfield*, 507 U.S. at 766–68. As this Court observed in striking down commercial disclosure requirements in *Safelite Group, Inc.*, 764 F.3d at 265, "we are skeptical that the government's asserted consumer protection interests are genuine and not merely post-hoc rationalizations." Even if the legislature had articulated "transparency" as the purpose of the Hateful Conduct Law, it would be inadequate to support the restrictions on platforms' First Amendment rights. *See supra* at 6. But where, as here, the rationale was presented as a *post hoc* litigation strategy, it cannot serve as a basis for upholding the Hateful Conduct Law.

To further complicate this justification for the stripped-down version of the law, there can be no demonstration of any fit between means and ends, which under *Zauderer* is "more stringent than mere rational basis review." *See Am. Meat Inst.*, 760 F.3d at 33–34 (Kavanaugh, J., concurring in the judgment). The New York Court of Appeals' conclusion that a platform's unadorned statement that it will review complaints case-by-case in its own discretion is sufficient to permit a user to "readily infer . . . what it will do in response to a report of content that vilifies, humiliates, or incites violence against a protected class," *James*, 2026 WL 1790976, at *6. is dubious at best. As Judge Garcia observed in dissent, "[i]t also seems odd, to say the least, that a statute designed to protect the public and inform the consumer . . . could be satisfied when a user can 'infer,' from a statement such as 'we consider all complaints at our discretion' . . . how a network will respond to reports of 'hateful conduct.'" *Id.* at *9 (Garcia, J., dissenting). By that standard, the hypothetical user might just as "readily infer" what the platform would do with such a report if it had no policy at all. This absence of fit between means and ends should inform this Court's assessment of the law's constitutionality.

### B. The Savings Clause Does Not Ameliorate the Burden on Speech.

The New York Court of Appeals placed great weight on the Hateful Conduct Law's savings clause to support its conclusion that the legislature disavowed "any intent to unconstitutionally compel speech." *Id.* at *6. However, this ignores that the

speech the law compels—even as narrowed on certification—still imposes an unconstitutional burden on social media platforms. *See supra* at 6. The Court of Appeals mainly reasoned that the law as enacted is "significantly more limited in scope than [other] 2020 proposed legislation" that the legislature did not adopt. *James*, 2026 WL 1790976, at *2, *7.

This, however, is misdirection. The main utility of the Savings Clause is that it clarifies that the Hateful Conduct Law should not be interpreted to permit direct regulation of social media moderation policies, as the 2020 legislation would have permitted. But Plaintiff-Appellees' challenge is focused on what Section 394-ccc requires, not on what the 2020 legislation would have required if enacted.

Accordingly, Section 394-ccc's savings clause cannot save it from constitutional review. The law's plain language makes this clear. Section 394-ccc(4)(a) states that the Hateful Conduct Law shall not be construed "as an obligation imposed on a social media network that adversely affects the rights or freedoms of any persons," including "the right of free speech pursuant to the first amendment to the United States Constitution." N.Y. Gen. Bus. Law § 394-ccc(4)(a). But as courts have affirmed time and again, such a savings clause that does no more than declare the law to be consistent with the First Amendment does not foreclose judicial review of the law's actual terms. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 477-481 (2010) (rejecting exceptions clause); *College*; *Coll. Republicans at S.F. State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1020–21 (N.D. Cal. 2007) (invalidating student conduct code despite "savings clause" that "prohibits disciplinary action against students based on behavior protected by the First Amendment"). The Constitution does not permit the government to deal itself a "get out of jail free" card.

The next part of the savings clause is more responsive to the 2020 legislation than to the current law. Section 394-ccc(4)(b) states that the law shall not be construed "to add to or increase liability of a social media network for anything other than the failure to provide a mechanism for a user to report to the social media network any incidents of hateful conduct on their platform and to receive a response on such [a] report." N.Y Gen. Bus. Law § 394-ccc(4)(b). This provision would be more meaningful to the constitutional analysis if the current law endeavored to do what the 2020 legislation proposed—to give the state regulatory power over moderation policies. But that is not what is at issue here. Plaintiff-Appellees are challenging the Hateful Conduct Law because it compels them to adopt and disclose a hateful conduct policy and to have mechanism for receiving complaints. *See James*, 148 F.4th at 109 (Jacobs, J. dissenting) ("The State has no legitimate interest in punishing bloggers who do not wish to read their hate mail."). The savings clause is not an answer to this

problem. In fact, read as an affirmative command, Section 394-ccc(4)(b) states that the Hateful Conduct Law *shall be construed* to impose liability on social media networks for "the failure to provide a mechanism for a user to report to the social media network any incidents of hateful conduct on their platform and to receive a response on such [a] report." N.Y Gen. Bus. Law § 394-ccc(4)(b).

To say the Hateful Conduct could have been worse if the legislature had adopted the 2020 legislation is not a constitutional defense.

## III. The Hateful Conduct Law's Enforcement Provisions Enable Informal Oversight of Social Media Moderation Policies.

### A. The Court of Appeals' Reinterpretation of the Law Leaves Significant Constitutional Questions.

Radically revising a statute in an effort to salvage it necessarily creates a situation where "the statutory language would signify one thing[,] but, as a matter of judicial decision, would stand for something entirely different." *New York v. Dietze*, 75 N.Y.2d 47, 53 (1989). In this case, the New York Court of Appeals' reinterpretation of the 400-word Hateful Conduct Act results in a mandate that can be expressed in about thirty words: The Hateful Conduct Law requires social media platforms to have a virtual complaint box for reports of "hateful conduct," plus a disclosed policy of responding to all complaints at the platforms' own discretion. *See James*, 148 F.4th at 103 (Jacobs, J., dissenting). This raises questions of what the effect will be of the surplus language and powers.

One bit of surplusage is the State's definition of "hateful conduct," which means "the use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." N.Y. Gen. Bus. Law § 394-ccc(1)(a). Any policy and report mechanism must be sufficiently capacious to accommodate the three broad content categories (vilification, humiliation, or incitement) and the ten protected classes (race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression). Although these categories and classes are not to be used as a basis for direct regulation of private moderation policies, the definition constitutes the State's authoritative definition of the "hateful conduct" it hopes to reduce.

The Court of Appeals decision leaves untouched the enforcement powers set forth in Section 394-ccc(5). This section empowers the Attorney General to assess civil

penalties for knowing noncompliance and to conduct investigations of social media platforms. Specifically, the Attorney General is authorized "to take proof and make a determination of the relevant facts and to issue subpoenas." *Id.* § 394-ccc(5). But if, as the Court of Appeals has decided, platforms are in full compliance with the Hateful Conduct Law so long as they publish a broad and generic policy and maintain a working email address as a virtual complaint box, it begs the question of what the investigatory power is for and why it requires subpoena power. These questions spawned by the law's reinterpretation have constitutional implications.

**B. The Revised Statute Establishes a Framework for Informal Speech Regulation.**

Under the Court of Appeals' reinterpretation of the Hateful Conduct Law the statute does not directly empower the State to regulate social media platforms' moderation practices. But the First Amendment is not concerned only with direct regulation. The government is also barred from doing indirectly what it cannot do directly. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–69 (1963). Our Constitution prohibits "'subtle … interference' with protected liberties no less than it does 'heavy-handed frontal attack[s].'" *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1130 (2026) (quoting *Bates v. Little Rock*, 361 U.S. 516, 523 (1960)). And in this case, the Hateful Conduct Law as reinterpreted replicates the scheme of informal censorship the Supreme Court invalidated in *Bantam Books*.

In that case, Rhode Island established a "Commission to Encourage Morality in Youth" to exert government pressure on booksellers in order to restrict access to titles considered harmful to minors while at the same time avoiding First Amendment scrutiny. *Bantam Books, Inc.*, 372 U.S. at 59–60. The Commission lacked any direct regulatory authority but could advise booksellers whether their wares "contain[ed] obscene, indecent or impure language, or manifestly tend[ed] to the corruption of the youth." *Id.* at 59. Booksellers were entirely free to ignore the "advice," but the Commission could recommend prosecution under state obscenity laws. And local police would pay follow-up visits to bookstores to see if they were selling any of the books on the Commission's list. *Id.* at 61–63. The Court acknowledged no books had been "seized or banned by the State, and that no one has been prosecuted for their possession or sale," but nevertheless held Rhode Island's scheme was "a form of effective state regulation superimposed upon the State's criminal regulation of obscenity and making such regulation largely unnecessary." *Id.* at 67, 69. The Court observed "[w]e are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the

circulation of publications to warrant injunctive relief." *Id*. at 67. It therefore enjoined the Rhode Island law that had been designed to evade First Amendment limits by authorizing only informal pressure.

New York's Hateful Conduct Law as now reconfigured follows the same design. It specifies the types of "hateful" speech the State would like to regulate if only the First Amendment would permit it. The Attorney General, who is charged with enforcing the law, has made clear "[w]e can no longer rely entirely on the industry to regulate itself through voluntary commitments." (J.A. 76) And she has called for the disclosure of information from social media platforms, "including the amount and type of content, their policies regarding this type of content, user reports and complaints about the content, actions the platform has taken, and any delay in the takedown." (J.A. 117) This is precisely the kind of informal scheme the Court in *Bantam Books* concluded "plainly serves as an instrument of regulation independent of the laws." 372 U.S. at 69 (cleaned up).

## C.   Informal Oversight Mechanisms Will Chill Moderation Policies.

Judge Jacobs described as "[t]he business end of the Hateful Conduct Law . . . New York's confessed plan for enforcing it." *James*, 148 F.4th at 104 (Jacobs, J., dissenting). The prospect of fines for noncompliance and intrusive investigations will affect social media platforms' ability to freely adopt and enforce their own moderation policies. This will chill the development of moderation policies in response to changing events. Those "who discover from experience that their content moderation policies are too lax face fines if they revise their policy and apply it retroactively to third-party comments that they would rather not host." *Id*. at 106.

And even if such actions do not result in a fine, the prospect of burdensome subpoenas from the Attorney General will encourage platform operators to tread carefully. *See First Choice Women's Resource Centers,* 146 S. Ct. at 1125-26 ("[e]ven if a subpoena targeting First Amendment activity is never enforced in court, [it] will give its targets a very good reason to clam up"). "An objectively reasonable recipient of a demand like that would be induced … to trim its protected [activity] knowing it now stands in the government's crosshairs." *Id*. at 1127 (citing *Bantam Books*, 372 U.S. at 68). It will be "safer—and thus cheaper—to choose a content moderation policy that requires no subjective judgments, such as a prohibition on all third-party comments using the word 'race,' or 'gender,' or even a prohibition on third-party commenting altogether." *James*, 148 F.4th at 106 (Jacobs, J., dissenting).  In this way, "the Hateful Conduct Law disincentivizes speech based on its content." *Id*.

Accordingly, even as narrowed by the New York Court of Appeals construction, the Hateful Conduct Law imposes an unacceptable burden on protected speech.

## CONCLUSION

For the foregoing reasons, this Court should find that New York's Hateful Conduct law is a regulation of non-commercial speech and is not subject to First Amendment review under *Zauderer*. Applying the proper test, this Court should hold that Plaintiff-Appellees are likely to succeed in their constitutional challenge, and it should affirm the award of preliminary injunctive relief barring enforcement of the law.

Respectfully Submitted,

/s/ Robert Corn-Revere
  Robert Corn-Revere
    (D.C. Bar No. 375415)
  FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
    700 Pennsylvania Ave. SE, Ste. 340
    Washington, DC 20003
    (215) 717-3473
    bob.corn-revere@fire.org

  BARRY N. COVERT
    (New York Bar No. 27118)
  LIPSITZ GREEN SCIME CAMBRIA LLP
    42 Delaware Ave., Suite 120
    Buffalo, NY 14202
    Tel: (716) 849-1333 x 365
    bcovert@lglaw.com

*Attorneys for Plaintiff-Appellees*

cc: All Counsel of Record (By ECF)